# EXHIBIT A

HIDDEN HILLS 2001, LP

A WASHINGTON LIMITED PARTNERSHIP

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP

DATED EFFECTIVE AS OF JANUARY 1, 2002

A:\Hidden Hills\LP.7

EXHIBIT A

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090001

# TABLE OF CONTENTS

Page

Preliminary Statement ........................................................................... 1
ARTICLE I .............................................................................................. 1
Defined Terms ....................................................................................... 1
ARTICLE II ............................................................................................ 18
Continuation; Name; Purpose and Term ............................................... 18
    Section 2.1     Continuation.................................................................. 18
    Section 2.2     Name and Office; Agent for Service............................. 19
    Section 2.3     Purpose......................................................................... 19
    Section 2.4     Authorized Acts ........................................................... 19
    Section 2.5     Term and Dissolution ................................................... 20
ARTICLE III ........................................................................................... 21
Financing and Disposition of Property.................................................. 21
ARTICLE IV ........................................................................................... 22
Partners; Capital .................................................................................... 22
    Section 4.1     General Partners ........................................................... 22
    Section 4.2     Limited Partners .......................................................... 22
    Section 4.3     Partnership Capital and Capital Accounts................... 23
    Section 4.4     Liability of Limited Partners ....................................... 24
    Section 4.5     Certain Rights of Investor Limited Partner ................. 24
ARTICLE V ............................................................................................ 27
Capital Contributions of Investor Limited Partner................................ 27
    Section 5.1     Installments of Capital Contributions .......................... 27
    Section 5.2     Adjustments to Capital Contributions .......................... 29
ARTICLE VI ........................................................................................... 31
Distributions of Cash; Allocations of Profits, Losses and Tax Credits ............ 31
    Section 6.1     Profits and Losses and Tax Credits ............................. 31
    Section 6.2     Application and Distributions Prior to Dissolution....... 32
    Section 6.3     Liquidation ................................................................... 34
    Section 6.4     Special Distribution Provisions ................................... 35
    Section 6.5     Special Allocation Provisions ...................................... 36
    Section 6.6     Order of Application ..................................................... 39
ARTICLE VII .......................................................................................... 40
Rights, Powers and Duties of the General Partners ............................... 40
    Section 7.1     Restrictions on Authority ............................................. 40
    Section 7.2     Independent Activities .................................................. 41
    Section 7.3     Business Management and Control; Designation of
                     Managing General Partner ............................................ 42
    Section 7.4     Duties and Obligations of the General Partners............ 42
    Section 7.5     Representations and Warranties; Certain Indemnities .... 46
    Section 7.6     Indemnification ............................................................ 49
    Section 7.7     Liability of General Partners to Limited Partners ........ 50
    Section 7.8     Reserves........................................................................ 50

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090002

Section 7.9          Obligation To Provide for Project Expenses .................................. 52
Section 7.10        Certain Payments to the General Partners and Affiliates................. 52
Section 7.11        Joint and Several Obligations ..................................................... 53
Section 7.12        Grant of Security Interest ........................................................... 53
Section 7.13        Tax Matters Partner.................................................................... 54
ARTICLE VIII ................................................................................................. 55
Withdrawal of a General Partner; New General Partners ............................................ 55
Section 8.1          Voluntary Withdrawal ................................................................. 56
Section 8.2          Right To Continue ...................................................................... 56
Section 8.3          Successor General Partner ........................................................... 56
Section 8.4          Interest of Predecessor General Partner ....................................... 57
Section 8.5          Designation of New General Partners ........................................... 58
Section 8.6          Amendment of Certificate; Approval of Certain Events................. 59
Section 8.7          Admission of a General Partner .................................................. 59
ARTICLE IX ...................................................................................................... 59
Transfer of Limited Partner Interests; Additional Limited Partners............................. 59
Section 9.1          Right To Assign .......................................................................... 59
Section 9.2          Restrictions ................................................................................ 59
Section 9.3          Substitute Limited Partners ......................................................... 60
Section 9.4          Assignees ................................................................................... 60
Section 9.5          Additional Limited Partners ........................................................ 61
ARTICLE X ........................................................................................................ 62
Loans ................................................................................................................. 62
ARTICLE XI ....................................................................................................... 62
Management Agent ............................................................................................... 62
ARTICLE XII ...................................................................................................... 63
Books and Reporting, Accounting, Tax Elections, Etc. ............................................. 64
Section 12.1        Books, Records and Reporting..................................................... 64
Section 12.2        Bank Accounts ........................................................................... 68
Section 12.3        Elections .................................................................................... 68
Section 12.4        Special Adjustments.................................................................... 68
Section 12.5        Fiscal Year ................................................................................. 68
ARTICLE XIII ..................................................................................................... 69
General Provisions ............................................................................................... 69
Section 13.1        Notices ....................................................................................... 69
Section 13.2        Word Meanings .......................................................................... 69
Section 13.3        Binding Provisions ..................................................................... 69
Section 13.4        Applicable Law .......................................................................... 69
Section 13.5        Counterparts............................................................................... 69
Section 13.6        Paragraph Titles ......................................................................... 70
Section 13.7        Separability of Provisions; Rights and Remedies........................... 70
Section 13.8        Effective Date of Admission ........................................................ 71
Section 13.9        Amendment Procedure ................................................................ 71
Section 13.10      Delivery of Certificate................................................................. 72
Section 13.11      Requirements of the Lender ........................................................ 74

CB__ PARTNERSHIP AGREEMENT; 1-1-02_105090003

Section 13.12    Requirements for Bonds......................................................... 76
Section 13.13    Special Power of Attorney..................................................... 71

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090004

## HIDDEN HILLS 2001, LP

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP OF HIDDEN HILLS 2001, LP dated effective as of January 1, 2002 among HIDDEN HILLS MANAGEMENT, LLC, as Managing General Partner; PROTECH 2002-A, LLC, ("PROTECH"), as Special Limited Partner; Catherine M. Tamaro and Hidden Hills Management, LLC, as Original (and Withdrawing) Limited Partners; and AMTAX HOLDINGS 114, LLC (referred to as "AMTAX"), as Investor Limited Partner.

### Preliminary Statement

The Partnership was organized as a partnership in the laws of the State of Washington pursuant to a Certificate and Agreement of Limited Partnership dated as of August 8, 2001 (the "Limited Partnership Agreement") filed with the Secretary of State of Washington (the "Filing Office") on August 14, 2001. The Limited Partnership Agreement and amendments thereto, as previously amended, are herein collectively called the "Original Partnership Agreement."

The purposes of this amendment to, and restatement of, the Original Partnership Agreement are (i) to enable the Partnership to admit Protech as Special Limited Partner and AMTAX as the Investor Limited Partner, (ii) to provide for the withdrawal of the Original Limited Partner as Limited Partner and (iii) to set out more fully the rights, obligations and duties of the Partners.

Now, therefore, it is agreed and certified, and the Original Partnership Agreement is hereby amended and restated in its entirety, as follows:

### ARTICLE I

### Defined Terms

The defined terms used in this Agreement shall have the meanings specified below:

"Accountants" means any firm of certified public accountants as may be engaged by the Managing General Partner with the Consent of the Investor Limited Partner.

"Act" means the National Housing Act, as amended from time to time.

"Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of a Partnership Fiscal Year, after giving effect to the following adjustments:

      (i)     Such Capital Account shall be increased by the amount of any Deficit Restoration Obligation of such Partner.

      (ii)    Such Capital Account shall be decreased by the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Allocation Regulations.

A:\Hidden Hills\LP.7

The foregoing definition of Adjusted Capital Account Deficit and the application of such term in the manner provided in Article IV hereof is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Allocation Regulations and shall be interpreted consistently therewith.

"Admission Date" means the date on which AMTAX is admitted to the Partnership as the Investor Limited Partner pursuant to Section 13.8.

"Affiliate" or "Affiliated Person" means, when used with reference to a specified Person: (i) any Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with the specified Person; (ii) any Person that is an officer of, partner in, or trustee of, or serves in a similar capacity with respect to the specified Person or of which the specified Person is an officer, partner, or trustee, or with respect to which the specified Person serves in a similar capacity; (iii) any Person that, directly or indirectly, is the beneficial owner of, or controls, 10% or more of any class of equity securities of, or otherwise has a substantial beneficial interest (10% or more) in, the specified Person, or of which the specified Person is directly or indirectly the owner of 10% or more of any class of equity securities, or in which the specified Person has a substantial beneficial interest (10% or more); and (iv) any relative or spouse of the specified Person.  Affiliate or Affiliated Person of the Partnership or a General Partner does not include a Person who is a partner in a partnership or joint venture with the Partnership (or any other Affiliated Person) if that Person is not otherwise an Affiliate or Affiliated Person of the Partnership or General Partner.

"Agency" means, as applicable, the Authority and/or any other government agency having jurisdiction over the particular matter to which reference is being made.

"Agreement" means this Amended and Restated Agreement of Limited Partnership, as amended from time to time.

"Allocation Regulations" means the Treasury Regulations issued under Sections 704(b) and 752 of the Code, as the same may be modified or amended from time to time.  In the event that the Allocation Regulations are revised or amended subsequent to the date of this Agreement, references herein to sections or paragraphs of the Allocation Regulations shall be deemed to be references to the applicable sections or paragraphs of the Allocation Regulations as then in effect.

"AMTAX" means AMTAX HOLDINGS 114, LLC, an Ohio limited liability company and its successors.

"Asset Management Fee" means the annual cumulative fee in an amount equal to .30% of the Investor Limited Partner's Capital Contribution (as adjusted annually by the C.P.I.), beginning with the funding of the First Installment and which will be pro-rated in the first year from the date of the First Installment, payable by the Partnership to the Manager of the

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090006

Investor Limited Partner, or an affiliate thereof, for its services in monitoring Partnership activities. Such fee shall be payable from Cash Flow as set forth in Section 6.2, provided, however, that if there is insufficient Cash Flow in any year, the Managing General Partner shall make a Subordinate Loan to the Partnership (notwithstanding any limitations set forth in Section 7.9) to enable the Partnership to pay the fee currently. Should the Managing General Partner fail to make Subordinate Loans to pay such fee, any amounts not payable currently due to insufficient Cash Flow shall be payable from subsequent years' Cash Flow and Capital Proceeds as set forth in Section 6.2.

An "Assignment" shall mean any assignment, transfer or sale, and the words "assign," "assignee" and "assignor" shall have correlative meanings, except in each case where the sense of this Agreement requires a different construction.

"Auditors" means a firm of independent certified accountants as may be engaged by the Managing General Partner, for the purpose of reviewing, preparing, certifying various reports as required by this Agreement or by applicable government agencies.

"Authority" means the Pierce County Housing Authority ("PCHA").

"Bonds or Bond Documents" means the Housing Revenue Bonds, 2002 (The Hidden Hills Apartments Project) Series 2002 bonds issued to the Partnership by the Authority in the amount of up to $8,100,000 with a 32-year term, 30-year amortization and a fixed interest rate not to exceed 6.6% per annum. The bonds will be non-recourse to the Partners.

"Breakeven" means the date upon which the income from the normal operation of the Apartment Complex received on a cash basis for a period of three (3) consecutive calendar months after completion of construction, equals or exceeds all accrued operational costs of the Apartment Complex, including but not limited to taxes, assessments, reserve fund deposits and debt service payments (but excluding the Asset Management Fee and the Partnership Management Fee), for such period of three (3) consecutive calendar months, with each month viewed individually against accrued operational costs on an annualized budget basis as reasonably approved by the Investor Limited Partner. The determination that Breakeven has occurred shall be subject to confirmation by the Investor Limited Partner pursuant to a physical inspection of the Property; provided, however, that in the event that the Investor Limited Partner does not make such physical inspection of the Property within fifteen (15) business days after having received an accountants' determination letter, then the Investor Limited Partner will be deemed to have waived the physical inspection requirement and Breakeven shall be deemed to have occurred.

"Buildings" means the building or buildings located on the Land which, in the aggregate, are to contain upon completion of construction 216 dwelling units.

"Capital Account" means, with respect to any Partner, the Capital Account maintained by the Partnership with respect to such Partner in accordance with the provisions of Section 4.3B.

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090007

"Capital Contribution" means the total amount of cash and the Gross Asset Value of any property contributed or agreed to be contributed to the Partnership by each Partner as shown in the Schedule (minus any liabilities secured by such contributed property that the Partnership assumes or takes subject to). Any reference in this Agreement to the Capital Contribution of a then Partner shall include a Capital Contribution previously made by any prior Partner in respect to the Partnership interest of such then Partner.

"Capital Proceeds" means the gross proceeds resulting from any Capital Transaction less the expenses of the Partnership incident to such Capital Transaction, before any application or distribution of such proceeds pursuant to this Agreement.

"Capital Transaction" means any transaction the proceeds of which are not includable in determining Cash Flow, including without limitation the sale, refinancing or other disposition of all or substantially all of the assets of the Partnership, but excluding loans to the Partnership (other than a refinancing of any Mortgage Loan) and contributions of capital to the Partnership by the Partners.

"Carryover Allocation" means an allocation of Federal Housing Tax Credits made in accordance with Section 42(h)(1)(E) of the Code.

"Cash Flow" means, with respect to any Fiscal Year or applicable period, (a) all cash receipts of the Partnership from operations, including other income from late fees, forfeited security deposits, vending, cable, garage or parking income, washer-dryer rentals, and all other income of any kind, subsidy payments or rental interruption insurance recoveries received by the Partnership during such period, plus (b) any interest or like earnings of the Partnership and any amounts which the General Partner releases upon approval of Investor Limited Partner from any Partnership reserve as being no longer necessary to hold as part of such reserve, less (i) cash funds used to pay Project Expenses of the Partnership during the period, including any fees and expenses paid to the Manager of the Investor Limited Partner or the General Partner (other than the Asset Management Fee and the Partnership Management Fee), (ii) all cash payments during such period to discharge Partnership indebtedness (other than Subordinated Loans), and (iii) any amounts added to Partnership reserves (other than the Operating Reserves) during such period.

"Certificate" means the certificate of limited partnership of the Partnership as amended from time to time in accordance with the terms hereof.

"Change of Control" means, in any one or series of transactions: (i) in the case of a corporation, a sale, transfer, assignment or other disposition of fifty percent (50%) or more of the voting stock of the corporation or a change in the majority of directors of the board of directors of the corporation; (ii) in the case of a partnership, a sale, transfer, assignment or other disposition of a general partner's interest in the partnership or, in addition, in the case of a corporate general partner, a sale, transfer, assignment or other disposition as set out in (i) herein; (iii) in the case of a limited liability company, a sale, transfer, assignment or other

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090008

disposition of the managing member's interest in the limited liability company, or, in addition, in the case of a corporate managing member, a sale, transfer, assignment or other disposition as set out in (i) herein, or, in the case of more than one managing member (or if all members share management or non-member managers), any change in the majority of members; or (iv) in the case of any other entity, a change substantially in effect as set forth in (i) through (iii) herein, to the extent applicable. The Managing General Partner shall have the right to assign up to an aggregate 49% of his interest in the General Partner in any one or series of transactions. The Investor Limited Partner shall be indemnified and held harmless from any and all liabilities, costs and expense arising from such transfers which shall be made in accordance with the applicable securities and other laws.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the Treasury Regulations promulgated thereunder at the time of reference thereto.

"Commission" means the Washington State Housing Finance Commission.

"Commitments" means and includes, collectively, the Mortgage Loan Commitments, and any documents and other instruments delivered to or required by the Lender or the Agency by or from the Partnership in connection with any of such Commitments, the Mortgage Loan[s] or the Project, as amended from time to time.

"Completion Date" means the later of: (i) the date on which AMTAX shall have received copies of all requisite certificates or permits permitting occupancy of 100% of the apartment units in the Project as issued by each governmental agency having jurisdiction; provided, however, that if such certificates or permits are of a temporary nature, the "Completion Date" shall not be deemed to have occurred unless that work remaining to be done is of a nature which would not impair the permanent occupancy of any of such apartment units; or (ii) the date as of which the Managing General Partner certifies that the work to be performed by the Builder under the Construction Contract is substantially complete. Any representation by the Managing General Partner under this Agreement that the Completion Date has occurred shall be subject to confirmation by the Investor Limited Partner pursuant to a physical inspection of the Property; provided, however, that in the event that the Investor Limited Partner does not make such physical inspection of the Property within 15 business days after having received any such Managing General Partners' representation, then the Investor Limited Partner will be deemed to have waived the physical inspection requirement.

"Consent of the Investor Limited Partner(s)" means the prior written consent or approval of the Investor Limited Partner, or, if at any time there is more than one Investor Limited Partner, the prior written consent or approval of at least 51% in interest of the Investor Limited Partners.

"Construction Contract" means the construction contract between the Partnership and the Builder providing for the construction of the Improvements in accordance with the Commitments, as amended from time to time.

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090009

"Construction Lender" means the maker of the Construction Loan together with its successors and assigns in such capacity.

"Construction Loan" means the letter of credit from the Construction Lender to the Partnership.

"Construction Loan Agreement" means the loan agreement between the Partnership and the Construction Lender providing for the disbursement of the proceeds of the Construction Loan.

"Consumer Price Index or C.P.I." means the Consumer Price Index for All Urban Consumers, All Cities, for All Items (base 1982-84 = 100) published by the United States Bureau of Labor Statistics.  In the event such index is not in existence when any determination relying on such index under this Agreement is to be made, the most comparable governmental index published in lieu thereof shall be substituted therefor.

"Cost Certification" means the date upon which the Investor Limited Partner has received a certification by the Managing General Partner of the construction and development costs of the Apartment Complex and the Eligible Basis of the Apartment Complex for purposes of Tax Credits, together with a report thereon issued by the Auditors in a form and substance as approved by Investor Limited Partner.

"Credit Agency" means the Authority.

"Credit Deficiency" shall mean for each calendar year the difference between the Projected Credit (or adjusted Projected Credit if a Credit Shortfall that occurred previously has already been taken into account and an adjustment to the Projected Credit has been made) and the amount of the Tax Credit actually available to the Investor Limited Partner for the calendar year. Tax Credits actually available for any such year shall not offset or reduce the Credit Deficiency for any prior or subsequent year.

"Credit Period" means the period of ten (10) years beginning with the taxable year in which the Project is placed in service or, if an election has been made pursuant to Section 42(f)(1) of the Code to defer the commencement of the Credit Period, and the Consent of the Investor Limited Partner obtained, the succeeding taxable year.

"Credit Recovery Loan" has the meaning set forth in Section 5.2C.

"Credit Shortfall" shall mean the difference, as of the Completion Date and based upon the Cost Certification, between the Maximum Annual Credit and the amount of annual Tax Credits for which the Property will be eligible, as evidenced by the applicable documentation, including Forms 8609.

"Debt Coverage Date" means the first day following a period of three (3) consecutive calendar months commencing on or after Final Closing during each of which, as determined by

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090010

an accountant, the Project has produced income (as computed under the definition of Breakeven) after payment of all cash requirements other than debt service on the Permanent Mortgage Loan and satisfaction of all reserve requirements (in each case as described under the definition of Breakeven) at least equal to 1.10 times the amount of the monthly debt service, including mortgage insurance premiums, if any, on the Permanent Mortgage Loan.

"Deficit Restoration Obligation" means, for each Partner, the sum of (i) any amounts which such Partner is obligated to restore to the Partnership in accordance with the provisions of Sections 1.704-1(b)(2)(ii)(c), 1.704-1(b)(2)(ii)(h) or any other applicable provisions of the Allocation Regulations, (ii) such Partner's Share of Partnership Minimum Gain if any, and (iii) such Partner's Share of Partner Nonrecourse Debt Minimum Gain, if any.

"Depreciation" means, for the Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis.

"Designated Prime Rate" means the annual rate of interest which is at all times equal to the lesser of (i) the Base Rate plus 1%, with calculations of interest to be made on a daily basis and on the basis of a 360-day year and (ii) the maximum rate permitted by law; the term "Base Rate" in this sentence means the rate of interest published from time to time by The Wall Street Journal as the prime rate.

"Developer" means Hidden Hills Management, LLC acting in its capacity as developer of the Project and not in its capacity as a General Partner.

"Development Agreement" means the Development Agreement of even date herewith between the Partnership and the Developer.

"Development Advances" has the meaning set forth in the Development Agreement.

"Development Fee" has the meaning set forth in the Development Agreement.

"Entity" means any general partnership, limited partnership, corporation, limited liability company, joint venture, trust, business trust, cooperative or association.

"Event of Bankruptcy" means, as to a specified Person:

      (i)    the entry of a decree or order for relief by a court having jurisdiction in the premises in respect of such Person in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or appointing a receiver, liquidator,

assignee, custodian, trustee, sequestrator (or similar official) of such Person or for any substantial part of his property, or ordering the winding-up or liquidation of his affairs and the continuance of any such decree or order unstayed and in effect for a period of ninety (90) consecutive days; or

(ii)     the commencement by such Person of a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy, insolvency or other similar law, or the consent by him to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or similar official) of such Person or for any substantial part of his property, or the making by him of any assignment for the benefit of creditors, or the failure of such Person generally to pay his debts as such debts become due, or the taking of action by such Person in furtherance of any of the foregoing.

"Facility" shall have the meaning given to it in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601 et seq., as amended, and shall also include any meaning given to analogous property under other Hazardous Waste Laws.

"Federal Housing Tax Credit" means the low-income housing tax credit authorized by Section 42 of the Code.

"FHA" means the Federal Housing Administration of HUD or any successor entity and any authorized representatives or agents thereof, including the Secretary of HUD, the Federal Housing Commissioner and their representatives and agents.

"Filing Office" has the meaning given it in the Preliminary Statement of this Agreement.

"Final Closing" means the date upon which all of the following events have occurred: (i) Permanent Mortgage Commencement, (ii) the Project's being free of any mechanics' or other liens (except for the Mortgage[s] and liens either bonded against in such a manner as to preclude the holder thereof from having any recourse to the Project or the Partnership for payment of any debt secured thereby or affirmatively insured against (in such manner as precludes recourse to the Partnership for any loss incurred by the insurer) by the Title Policy or by another policy of title insurance issued to the Partnership by a reputable title insurance company in an amount satisfactory to Special Tax Counsel [or by an endorsement of either such title policy], (iii) the disbursement of proceeds under the Permanent Mortgage Loan[s] has been made in the full amount permitted by the Authority and, (iv) all amounts due in connection with the construction of the Project have been paid or provided for.

"Fund" means Paramount Financial Group, Inc. or an Affiliate on behalf of the Investor Limited Partner.

"General Partner" or "General Partners" means any Person or Persons designated as a

General Partner in the Schedule or any Person who becomes a General Partner as provided herein, in such Person's capacity as a General Partner of the Partnership. If at any time the Partnership shall have a sole General Partner, the term "General Partners" shall be construed as singular.

"General Partner Loan" or "GP Loan" means the loan from the General Partner to the Partnership made no later than at the Admission Date, in the principal amount of $675,000 with a fifteen (15) year term and fifteen (15) year amortization period. The General Partner Loan shall be junior to, subject to and subordinate to, all other debt and accounts payable of the Partnership owed to non-Affiliates of the General Partner.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

>    (i)    The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the contributing Partner and the Partnership;

>    (ii)    The Gross Asset Values of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partner, as of the following times: (a) the acquisition of an additional interest in the Partnership by any new or existing Partner in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Partnership to a Partner of more than a de minimis amount of Partnership property as consideration for an interest in the Partnership; and (c) the liquidation of the Partnership within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Allocation Regulations; provided, however, that the adjustments pursuant to clauses (a) and (b) above shall be made only if the General Partner reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership;

>    (iii)    The Gross Asset Value of any Partnership asset distributed to any Partner shall be the gross fair market value of such asset on the date of distribution; and

>    (iv)    The Gross Asset Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Allocation Regulations and Section 3.04 hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (iv) to the extent the General Partner determines that an adjustment pursuant to clause (ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Section (i), (ii) or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090013

Depreciation taken into account with respect to such asset for purposes of computing Profits or Losses.

"Gross Revenues" means total income, revenue (including gross rental income of the Project prior to any reduction or payments for fees, costs and reimbursements to Management Agent), profit, and gain, proceeds from a sale or refinancing of the Property (all as adjusted by refunds and amounts held in escrow, but not by amounts held or placed in reserves) from all sources, including interest, royalties and dividends, whether taxable, nontaxable or exempt from taxation.

"Hazardous Material" shall have the collective meanings given to the terms "hazardous material," "hazardous substances," "hazardous wastes," "toxic substances" and analogous terms in the Hazardous Waste Laws.  In addition, the term "Hazardous Material" shall also include oil and any other substance known to be hazardous.

"Hazardous Waste Laws" means and includes the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980; the Resource Conservation and Recovery Act; the Toxic Substances Control Act and any other federal, state or local statutes, ordinances, regulations or by-laws dealing with Hazardous Material, as the same may be amended from time to time and including any regulations promulgated thereunder.

"HUD" means the Department of Housing and Urban Development of the United States of America and its successors.

"Immediate Family" means, with respect to any Person, his spouse, parents, parents-in-law, descendants, nephews, nieces, brothers, sisters, brothers-in-law, sisters-in-law, children (by adoption or otherwise), children-in-law, grandchildren and grandchildren-in-law.

"Improvements" means the Buildings and any related facilities to be constructed and/or rehabilitated in accordance with the Commitments.

"Incentive Supervisory Fee" shall have the meaning set forth in Section 7.10D herein.

"Initial Closing" means the date upon which the later of the Construction Loan and General Partner Loan were closed and the first disbursement of proceeds of such loans were made to the Partnership.

"Initial 90% Occupancy Date" means the first date upon which not less than 90% of the apartment units in the Project have been leased to, and are occupied by, Qualified Tenants under executed Lender approved leases, if any such approval is applicable.

"Initial 95% Occupancy Date" means the first date upon which not less than 95% of the apartment units in the Project have been leased to, and are occupied by, Qualified Tenants under executed Lender approved leases, if any such approval is applicable.

A:\Hidden Hills\LP.7

10

"Initial 100% Occupancy Date" means the first date upon which not less than 100% of the apartment units in the Project have been leased to, and are occupied by, Qualified Tenants under executed Lender approved leases, if any such approval is applicable.

"Installment" means the First, Second, Third or Fourth Installment [or any subsequent Installment], as the context may require, of Capital Contributions of the Investor Limited Partner as described in Section 5.1A.

"Interest" means all the interest of a Partner in Cash Flow and other distributions, capital, Profits or Losses, Tax Credits, and otherwise in the Partnership, including all allocations and distributions and all rights under this Agreement, and also shall include such interests and rights of such Partner in any successor partnership formed pursuant to this Agreement.

"Invested Amount" means (i) as to AMTAX, an amount equal to the Capital Contributions of AMTAX paid pursuant to Section 5.1 hereof divided by .87 and reduced by any distributions of Cash Flow from operations and/or Capital Proceeds and other returns of capital and (ii) as to any other Partner, an amount equal to its Capital Contribution actually paid, reduced by distributions of Cash Flow from operations and/or Capital Proceeds and other returns of capital.

"Investment Agreement" means the Investment Agreement dated November 21, 2001 as amended, among an affiliate of AMTAX, the Partnership, the General Partner and others providing, among other things, for the investment of AMTAX in the Partnership.

"Investment Closing" means the date of delivery of this Agreement.

"Investment Company or Investment Companies" means AMTAX.

"Investment Limited Partner" means AMTAX and any successor thereto.

"Investor Limited Partner(s)" means, initially, AMTAX and shall include any other Persons admitted as Investor Limited Partners and their successors in such capacity.

"Investment Partnership" means AMTAX.

"Land" means the parcels of land on which the Improvements known as Hidden Hills Apartments, are located in University Place, Washington.

"Lender" means the Construction Lender or the Permanent Lender.

"Limited Partner" or "Limited Partners" mean any or all of those Persons designated as Limited Partners in the Schedule, any Person admitted as a Limited Partner pursuant to Section 9.5, or any Person who becomes a Substitute Limited Partner as provided herein, in each such Person's capacity as a Limited Partner of the Partnership.

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090015

"Low Income Unit" means any of the 216 dwelling units in the Project which are to be held for occupancy by the Partnership in such manner as to qualify such units as qualified low-income housing units under Section 42(i)(3) of the Code.

"Management Agent" means Pacificap Management, Inc., or any successor thereto as the management agent for the Project.

"Management Agreement" means the management contract or agreement by and between the Partnership and the Management Agent which has received all Requisite Approvals.

"Management Fee" means the amount payable from time to time by the Partnership to the Management Agent for management services in accordance with the Management Agreement which shall be subject to any Requisite Approvals.

"Managing General Partner" means any Managing General Partner designated as provided in Section 7.3B.

"Maximum Annual Credit" shall mean $425,784 per year for the total Credit Period.

"Minimum Set-Aside Test" means the set aside test selected by the Partnership pursuant to Section 42(g) of the Code whereby at least 40% of the units in the Apartment Complex must be occupied by individuals with incomes equal to 60% or less of area median income, as adjusted for family size.

"Mortgage" means any mortgage indebtedness of the Partnership evidenced by any Note and secured by any mortgage on the Property from the Partnership to any Lender; and, where the context admits, "Mortgage" shall mean and include any of the mortgages securing said indebtedness and any other documents pertaining to said indebtedness which were required by the Lender as a condition to making such Mortgage Loan.   In case any Mortgage is replaced by any subsequent mortgage or mortgages, such term shall refer to any such subsequent mortgage or mortgages.   The term "mortgage" means any mortgage, mortgage deed, deed of trust, deed to secure debt or any similar security instrument, and "foreclose" and words of like import include the exercise of a power of sale under a mortgage or comparable remedies.

"Mortgage Loan" means a loan made pursuant to a Mortgage Loan Commitment and secured by a Mortgage.

"Mortgage Loan Commitments" means and includes the commitment of (i) Key Bank National Association to provide the Construction Loan in an amount not to exceed $8,100,000 for twenty four (24) months at an interest rate of up to 6.6%, (ii) the Permanent Lender to issue the Bonds in an amount not to exceed $8,100,000 with a 32 year term, 30 year amortization and a fixed interest rate of up to 6.6% per annum, and (iii) the General Partner

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090016

Loan.

"Note" means and includes any Note from the Partnership to a Lender evidencing a Mortgage Loan, and shall also mean and include any note supplemental to said original note issued to a Lender or any note issued to a Lender in substitution for any such original note.

"Operating Reserve" has the meaning given in Section 7.8C.

"Original Partnership Agreement" has the meaning specified in the Preliminary Statement.

"Partner" means any General Partner or Limited Partner.

"Partner Nonrecourse Debt" has the meaning set forth in Section 1.704-2(b)(4) of the Allocation Regulations.

"Partner Nonrecourse Debt Minimum Gain" has the meaning set forth in Sections 1.704-2(i)(2) and (3) of the Allocation Regulations.

"Partner Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(i)(1) of the Allocation Regulations.

"Partnership" means the limited partnership governed by this Agreement as said limited partnership may from time to time be constituted.

"Partnership Agreement" means this Amended and Restated Agreement of Limited Partnership wherein the Investor Limited Partner is admitted to the Partnership as a limited partner.

"Partnership Counsel" means Robert J. Sullivan, P.C., or such other counsel as the General Partner may designate from time to time as counsel for the Partnership.

"Partnership Management Fee" has the meaning set forth in Section 7.10C.

"Partnership Minimum Gain" has the meaning set forth in Section 1.704-2(d) of the Allocation Regulations.

"Payment Certificate" has the meaning given it in Section 5.1B(i).

"Permanent Lender" means the maker of the Permanent Mortgage Loan, together with its successors and assigns in such capacity.

"Permanent Mortgage Commencement" means the first date on which the full amount of principal of the Permanent Mortgage Loan has been released to the Partnership.

A:\Hidden Hills\LP.7

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090017

"Permanent Mortgage Loan" means the loan provided to the Partnership from the Pierce County Housing Authority ("PCHA") in the form of tax-exempt bonds in an amount not to exceed $8,100,000 with a 32-year term, 30-year amortization and a fixed interest rate of 6.6% per annum. The loan will be non-recourse to the Partners.

"Person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person where the context so admits.

"Profits or Losses" means, for each Fiscal Year or other period, an amount equal to the Partnership's taxable income or loss for such Fiscal Year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(i)     Any items described in Sections 705(a)(1)(B) and 705(a)(1)(C) of the Code which are not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss.

(ii)    Any expenditures of the Partnership described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Allocation Regulations, and not otherwise taken into account in computing Profits or Losses, shall be subtracted from such taxable income or loss.

(iii)   Gain or loss resulting from any disposition of Partnership Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

(iv)    In the event of a distribution of Partnership assets to a Partner (whether in connection with a liquidation or otherwise), or in the event the Gross Asset Value of any Partnership asset is adjusted upon the acquisition of an additional interest in the Partnership, unrealized income, gain, loss and deduction inherent in such distributed or adjusted assets (not previously reflected in Capital Accounts) shall be allocated pursuant to Section 6.1 hereof as if there had been a taxable disposition of such distributed or adjusted assets at fair market value.

(v)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of "Depreciation" set forth herein.

(vi)    Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 6.5 hereof shall be taken into account in computing Profits or Losses only if the Accountants determine that such items should

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090018

be so reflected.

"Profits or Losses from a Capital Transaction" means the Profits or Losses, if any, recognized by the Partnership as a result of a Capital Transaction, as determined for federal income tax purposes by the Accountants, but without regard to any adjustments to basis pursuant to Section 734 and 743 of the Code.

"Project" or "Property" means the Land and the Improvements.

"Project Documents" means and includes the Construction Contract, the Mortgages, the Regulatory Agreement, the Commitments, the Management Agreement and all other documents relating to the Project which are required by, or have been executed in connection with, any of the foregoing documents.

"Project Expenses" means (i) up to and including the Completion Date, those expenses, properly accruable through such date which may be properly charged as operating expenses of the Project under standard accounting procedures and which are allocable, in accordance with generally accepted accounting principles, to apartment units for which all requisite approvals for occupancy have been obtained; such operating expenses may include real estate taxes and debt service with respect to the Mortgage Loan (to the extent such operating expenses are not funded out of Capital Contributions or Mortgage Loan Proceeds), but shall not include any costs required to be capitalized in accordance with generally accepted accounting principles; and (ii) after the Completion Date, all the costs and expenses of any type incurred incidental to the ownership and operation of the Project, including, without limitation, taxes, capital improvements reasonably deemed necessary by the General Partners and not funded out of any reserves for such, and the cost of operations, debt service, maintenance and repairs, and the funding of any reserves required to be maintained by the Lender and the Agency, but shall not include (i) repayments of  Subordinated Loans or (ii) distributions to Partners pursuant to Article VI.

"Projected Credit" means Federal Housing Tax Credits on a year-by-year basis in the amount of $283,572 for 2002 and $425,358 per year for each of the years 2003 through 2011, and $141,786 for the year 2012, which the Managing General Partner has projected to be the total amount of the Tax Credits which will be allocated to the Investor Limited Partner by the Partnership, constituting ninety-nine point ninety percent (99.90%) of the total Tax Credits in the aggregate amount of $4,257,838 which are projected to be available to the Partnership.

"Purchase Agreement" means the Purchase Agreement of even date herewith pursuant to which the Purchaser has agreed, among other things, to purchase the Interest of the Investor Limited Partner under specified circumstances.

"Purchaser" means Hidden Hills Management, LLC, a Washington limited liability company, as purchaser under the Purchase Agreement.

"Qualified Tenant" means a tenant (i) with income not exceeding the percentage of area

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090019

gross median income set forth in Section 42(g)(1)(A) or (B) of the Code (whichever is applicable) who leases an apartment unit in the Project under a lease having an original term of not less than twelve months at a rent not in excess of that specified in Section 42(g)(2) of the Code, and (ii) complying with any other requirements imposed by the Project Documents.

"Recapture Amount" means the "credit recapture amount" as defined in Section 42(j)(2) of the Code.

"Recapture Event" means an event which results in the "recapture" of Federal Housing Tax Credits pursuant to Section 42(j) of the Code.

"Regulations" means the rules and regulations of any Agency which are applicable to the Project or the Partnership.

"Regulatory Agreement" means the Regulatory Agreement, if any, entered or to be entered into between the Partnership and the Permanent Lender and between the Partnership and the Agency.

"Regulatory Allocations" means the allocations set forth in Sections 6.5A through 6.5G hereof.

"Related Agreements" means the Development Agreement, the Purchase Agreement, the Investment Agreement and each other agreement (other than this Agreement) constituting an exhibit thereto or executed in connection therewith.

"Related Person" has the meaning set forth in Section 1.752-4(b) of the Allocation Regulations.

"Requisite Approvals" means any required approvals of the Lender or any Agency to an action proposed to be taken by the Partnership.

"Rent Restriction Test" means the test pursuant to Section 42 of the Code whereby the gross rent charged to tenants of the low-income units in the Apartment Complex may not exceed thirty percent (30%) of the qualifying income levels.

"Schedule" means the schedule of partners annexed hereto as Schedule A as amended from time to time and as so amended at the time of reference thereto.

"Section 8 Commitment" means the commitment of the Authority to the Partnership to provide housing assistance payments pursuant to an Agreement to Enter into Housing Assistance Payments Contract, as amended from time to time.

"Service" means the Internal Revenue Service.

"Share of Partner Nonrecourse Debt Minimum Gain" means, for each Partner, an

amount equal to such Partner's "share of partner nonrecourse debt minimum gain," determined in accordance with the provisions of Section 1.704-2(i)(5) of the Allocation Regulations.

"Share of Partnership Minimum Gain" means, for each Partner, an amount equal to such Partner's "share of partnership minimum gain," determined in accordance with the provisions of Section 1.704-2(g) of the Allocation Regulations.

"Special Investment Company Tax Counsel" means Bronson & Migliaccio, LLP or other counsel acceptable to the Investor Limited Partner.

"State" means the State of Washington.

"Subordinated Loan" means a loan by a General Partner pursuant to Section 7.9.

"Substitute Limited Partner" means any Person who is admitted to the Partnership as a Limited Partner under the provisions of Section 9.3.

"Surplus Cash" means any unrestricted cash remaining on hand after (1) the payment of (a) all sums due or currently required to be paid under the terms of any Mortgage or Note; (b) all amounts required to be deposited in the reserve fund for replacement; and (c) all obligations of the Partnership other than the Mortgage Loan unless funds for payment are set aside; and (2) the segregation and recording of (a) an amount equal to the aggregate of all special funds to be maintained by the Partnership under the Project Documents or this Agreement, including full funding of all mortgage insurance premium, real estate tax, insurance, and other escrows; (b) all tenant security deposits or prepaid rents held; and (c) all accounts and accrued items payable. Notwithstanding the foregoing, Surplus Cash as of a given date shall also include rental assistance payments properly accrued but not received through such date but received thereafter.

"Tax Credit" means the Federal Housing Tax Credit and, as applicable, the Historic Tax Credit and/or the State Housing Tax Credit.

"Tax Credit Reservation" means the receipt by the Partnership of a credit allocation from the Credit Agency or a reservation or conditional commitment therefor in the annual amount of at least $425,784.

"Tax Matters Partner" means the Partner designated as the Tax Matters Partner of the Partnership by the General Partner pursuant to the provisions of Section 7.13.

"Terminating Capital Transaction" means a Capital Transaction resulting in or involving the termination and winding up of the business of the Partnership or any other event resulting in the "liquidation" of the Partnership within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Allocation Regulations.

"Terminating Event." The death or permanent disability of, or an adjudication of

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090021

insanity or incompetence as to, an individual General Partner (unless the Consent of the Investor Limited Partner to a substitute General Partner is received, and such substitute General Partner is admitted to the Partnership by the first to occur of (i) the sixtieth day following such event or (ii) such earlier date as is necessary to prevent a dissolution of the Partnership under the Act), an Event of Bankruptcy as to or dissolution of a General Partner, the Transfer of its Partnership Interest by a General Partner, removal of a General Partner, or the voluntary or involuntary withdrawal of a General Partner from the Partnership.  For purposes of the foregoing, an individual General Partner shall be deemed to be permanently disabled if he or she becomes disabled during the term of this Agreement through any illness, injury, accident or condition of either a physical or psychological nature and, as a result, is unable to perform substantially all of his or her duties and responsibilities hereunder for 120 days during any period of 365 consecutive calendar days.  Involuntary withdrawal shall occur whenever a General Partner may no longer continue as a General Partner by law or pursuant to any terms of this Agreement.  In the case of a General Partner which is an Entity, a Transfer of a majority of the voting stock (or other beneficial interest) of the General Partner to a Person who is not an Affiliate of the General Partner shall be deemed to be a Transfer by the General Partner of its Partnership Interest.

"TIF" means Tax Increment Financing or any other real estate tax abatement.

"Title Policy" means the owner's policy of title insurance issued to the Partnership as endorsed to increase the amount thereof to an amount equal to the appraised value of the Project, but in no event less than the sum of the Permanent Mortgage Loan and the Capital Contribution of the Partners, and to update such policy to a date not earlier than 10 days prior to the date of the Investment Closing.

"Uniform Act" means the Limited Partnership Act as in effect under the laws of the State, as amended from time to time.

"Vessel" shall have the meaning given to it in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601 et seq., as amended, and shall also include any meaning given to analogous property under other Hazardous Waste Laws.

## ARTICLE II

### Continuation; Name; Purpose and Term

Section 2.1      Continuation

The parties hereto hereby agree to continue the limited partnership known as HIDDEN HILLS 2001, LP, formed pursuant to the provisions of the Uniform Act.

Section 2.2      Name and Office; Agent for Service

A:\Hidden Hills\LP.7                                      18

A.     The Partnership shall continue to be conducted under the name and style set forth in Section 2.1.  The principal office of the Partnership shall be at 7201 92nd Avenue, SE, Mercer Island, WA 98040-5812.  The General Partners may at any time change the location of such principal office and shall give due notice of any such change to the Limited Partners.

B.     The name and address of the agent for service of process required to be maintained under the Uniform Act shall be:

> Steven Arterberry
> P.O. Box 1083
> Mercer Island, WA 98040-5812

### Section 2.3     Purpose

The purpose of the Partnership is to acquire, rehabilitate, develop, repair, improve, maintain, operate, lease, dispose of and otherwise deal with the Project in accordance with any applicable Regulations and the provisions of this Agreement.  The Partnership shall not engage in any other business or activity.

### Section 2.4     Authorized Acts

In furtherance of its purposes, but subject to all other provisions of this Agreement including, but not limited to, Article VII, the Partnership is hereby authorized:

(i)     To acquire by purchase, lease or otherwise any real or personal property which may be necessary, convenient or incidental to the accomplishment of the purposes of the Partnership.

(ii)    To acquire, construct, operate, maintain, finance and improve, and to own, sell, convey, assign, mortgage or lease any real estate and any personal property necessary, convenient or incidental to the accomplishment of the purposes of the Partnership.

(iii)   To borrow money and issue evidences of indebtedness in furtherance of any or all of the purposes of the Partnership and to secure the same by mortgage, pledge or other lien on the Property or any other assets of the Partnership, to the extent permitted by the Mortgage Loan Commitments.

(iv)    To prepay in whole or in part, refinance, recast, increase, modify or extend any Mortgage and in connection therewith to execute any extensions, renewals, or modifications of such Mortgage.

(v)     To employ any Person, including any Affiliate, to perform services for, or to sell goods to, the Partnership (including without limitation management services) and to pay for such goods and services; provided that (except with respect to any

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090023

contract specifically authorized by this Agreement) the terms of any such transaction with an Affiliate shall not be less favorable to the Partnership than would be arrived at by unaffiliated parties dealing at arms' length.

(vi)     To execute any and all notes, mortgages and security agreements in order to secure loans from the Lender and any and all other documents, including but not limited to the Project Documents, required by the Lender or any Agency in connection with each Mortgage and Mortgage Loan and the acquisition, construction, rehabilitation, repair, development, improvement, maintenance and operation of the Property, or otherwise required by the Lender or any Agency in connection with the Property.

(vii)    To execute contracts with any Agency.

(viii)   To execute leases of some or all of the apartment units of the Project.

(ix)     To modify or amend the terms of any agreement or contract which the General Partners are authorized to enter into on behalf of the Partnership; provided, however, that such terms as amended shall not (a) materially adversely affect the Partnership or the Limited Partners or (b) be in contravention of any of the terms or conditions of this Agreement.

(x)      To enter into any kind of activity and to perform and carry out contracts of any kind necessary to, or in connection with, or incidental to, the accomplishment of the purposes of the Partnership, so long as said activities and contracts may be lawfully carried on or performed by a partnership under the laws of the State.

(xi)     To execute the Related Agreements and any notices, documents or instruments permitted or required to be executed or delivered in connection therewith or pursuant thereto.

Section 2.5     Term and Dissolution

A.     The Partnership shall continue in full force and effect until December 31, 2052, except that the Partnership shall be dissolved prior to such date upon the happening of any of the following events:

(i)      The sale or other disposition of all or substantially all the assets of the Partnership;

(ii)     A Terminating Event with respect to a General Partner unless the business of the Partnership is continued pursuant to Article VIII;

(iii)    The election to dissolve the Partnership made in writing by the General Partners with the Consent of the Investor Limited Partner and any Requisite Approvals

or by the Investor Limited Partner pursuant to Section 4.5; or

       (iv)    The entry of a final decree of dissolution of the Partnership by a court of competent jurisdiction.

B.    Upon dissolution of the Partnership (unless the business of the Partnership is continued pursuant to Article VIII), the General Partners (or for purposes of this paragraph their trustee, receiver, successor or legal representative) shall cause the cancellation of the Certificate and liquidate the Partnership assets and apply and distribute the proceeds thereof in accordance with Section 6.3.   Notwithstanding the foregoing, in the event such liquidating General Partners shall determine that an immediate sale of part or all of the Partnership's assets would cause undue loss to the Partners, the liquidating General Partners may, in order to avoid such loss, defer liquidation of, and withhold from distribution for a reasonable time, any assets of the Partnership except those necessary to satisfy the Partnership debts and obligations (other than Subordinated Loans [and the Working Capital Loan]).

## ARTICLE III

### Financing and Disposition of Property

A.    The Partnership is authorized to obtain the Mortgage Loans and the General Partner Loan to finance the acquisition, development and rehabilitation of the Property and (to the extent permitted by the Lender) to meet the initial expenses of operating the Project and to secure the same by the Mortgage.   Each Mortgage shall provide that no Partner or Related Person shall bear the economic risk of loss for all or any part of such Mortgage Loans except to the extent that the General Partner or its Affiliates may have liability for the Construction Loan, the General Partner Loan or customary exceptions to nonrecourse acts of the General Partner.

The General Partners are specifically authorized, for and on behalf of the Partnership, to execute the Project Documents and any permitted amendments thereto and, subject to the limitations set forth herein, such other documents as they deem necessary or appropriate in connection with the acquisition, development, operation and financing of the Property.

B.    Each General Partner shall be bound by the terms of the Project Documents. Any incoming General Partner shall as a condition of receiving any interest in the Property agree to be bound by the Project Documents to the same extent and on the same terms as the other General Partners.   Upon any dissolution of the Partnership or any transfer of the Property while any Mortgage is held by any Lender, no title or right to the possession and control of the Property and no right to collect the rents therefrom shall pass to any Person who is not, or does not become, bound in a manner satisfactory to the Lender and the Agency to the Project Documents and the provisions of this Agreement.   The Project Documents shall be binding upon and shall govern the rights and obligations of the Partners, their heirs, executors, administrators, successors and assigns as long as the corresponding Mortgage Loans shall be

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090025

outstanding.

C.      The Partnership may increase the amount of the Mortgage Loans or refinance any Mortgage, including any required transfer or conveyance of Partnership assets for security or mortgage purposes, and may sell, lease, exchange or otherwise transfer or convey all or substantially all the assets of the Partnership; provided, however, that the terms of any such increase, refinancing, sale, exchange or other transfer or conveyance effected after the Admission Date must receive the Consent of the Investor Limited Partner before such transaction shall be binding on the Partnership.   Notwithstanding the foregoing, no such Consent shall be required for the leasing of apartments to tenants in the normal course of operations; provided, however, unless such Consent is obtained the Partnership shall lease the Project in such a manner as to qualify as a "qualified low-income housing project" under Section 42(g)(1) of the Code, and shall lease all of the Low Income Units in the Project to Qualified Tenants.

D.      Upon the sale of the Property by the Partnership, no Person may pay to any Person real estate commissions in excess of the lesser of that which is reasonable, customary, and competitive with those paid in similar transactions in the same geographic area.

## ARTICLE IV

### Partners; Capital

Section 4.1      General Partners

The General Partner of the Partnership is Hidden Hills Management, LLC and its address and Capital Contribution are set forth in Schedule A.

Section 4.2      Limited Partners

A.      AMTAX HOLDINGS 114, LLC, ("AMTAX") is hereby admitted as the Investor Limited Partner.  Its address and Capital Contribution are set forth in the Schedule. The payment of its Capital Contribution is governed by Section 5.1.

B.      PROTECH 2002-A, LLC, ("PROTECH") is hereby admitted as Special Limited Partner.  Its address and Capital Contribution are set forth in the Schedule.

C.      The Original Limited Partners are Catherine M. Tamaro and Hidden Hills Management, LLC.   By their execution of this Agreement, the Original Limited Partners withdraw as Limited Partners and acknowledge and agree that the Original Limited Partners, as such, shall have no further rights or obligations with respect to the Partnership as of the Admission Date as Limited Partners.

Section 4.3      Partnership Capital and Capital Accounts

A:\Hidden Hills\LP.7                                          22

A.     The capital of the Partnership shall be the aggregate amount of the cash and the Gross Asset Value of property contributed by the General Partners and by the Limited Partners as set forth in Schedule A.  Except as specifically set forth herein, no Partner shall have any right to make voluntary Capital Contributions to the Partnership.  No interest shall be paid by the Partnership on any Capital Contribution to the Partnership.  Schedule A shall be amended from time to time to reflect the withdrawal or admission of Partners, any changes in the Partnership Interests held by a Partner arising from the transfer of a Partnership Interest to or by such Partner and any change in the amounts to be contributed or agreed to be contributed by any Partner.

B.     An individual Capital Account shall be established and maintained for each Partner, including any additional or substituted Partner who shall hereafter receive an interest in the Partnership.  The Capital Account of each Partner shall be maintained in accordance with the following provisions:

(i)     To each Partner's Capital Account there shall be credited such Partner's Capital Contributions, such Partner's distributive share of Profits, and any items in the nature of income or gain that are specially allocated pursuant to Section 6.5 hereof, and the amount of any Partnership liabilities that are assumed by such Partner or that are secured by any Partnership Property distributed to such Partner;

(ii)     To each Partner's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Partnership Property distributed to such Partner pursuant to any provision of this Agreement, such Partner's distributive share of Losses, and any items in the nature of expenses or losses that are specially allocated pursuant to Section 6.5 hereof, and the amount of any liabilities of such Partner that are assumed by the Partnership or that are secured by any property contributed by such Partner to the Partnership.

In the event that the Gross Asset Values of Partnership assets are adjusted pursuant to this Agreement, the Capital Accounts of all Partners shall be adjusted simultaneously to reflect the aggregate net adjustment as if the Partnership recognized gain or loss equal to the amount of such aggregate net adjustment.

C.     The original Capital Account established for any substituted Partner shall be in the same amount as, and shall replace, the adjusted Capital Account of the Partner which such substituted Partner succeeds, and, for the purposes of the Agreement, such substituted Partner shall be deemed to have made the Capital Contribution, to the extent actually paid in, of the Partner which such substituted Partner succeeds.  The term "substituted Partner," as used in this paragraph, shall mean a Person who shall become entitled to receive a share of the Profits or Losses, Tax Credits and distributions of the Partnership by reason of such Person succeeding to the Partnership Interest of a Partner by assignment of all or any part of a Partnership Interest.  To the extent a substituted Partner receives less than 100% of the Partnership Interest of a Partner, its Capital Account and Capital Contribution shall be in proportion to the Partnership Interest it receives, and the Capital Account and Capital

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090027

Contribution of the Partner who retains a partial interest in the Partnership shall continue, and not be replaced, in proportion to the Partnership Interest it retains.

D.      The foregoing provisions and the other provisions of this Agreement relating to the maintenance of the Capital Accounts are intended to comply with the Allocation Regulations and shall be interpreted and applied in a manner consistent with such Allocation Regulations.  In the event the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with the Allocation Regulations, the Managing General Partner may make such modification, subject to the provisions of Section 6.3D.  The Managing General Partner shall adjust the amounts debited or credited to Capital Accounts with respect to (i) any property contributed to the Partnership or distributed to the Partners, and (ii) any liabilities that are secured by such contributed or distributed property that are assumed by the Partnership or the Partners, in the event the Managing General Partner shall determine such adjustments are necessary or appropriate pursuant to Section 1.704-1(b)(2)(iv) of the Allocation Regulations.  Subject to the provisions of Section 6.3D, the Managing General Partner also shall make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with the Allocation Regulations.

E.      The Partnership shall not redeem or repurchase any Partnership Interest, and no Partner shall have the right to withdraw, or receive any return of, its Capital Contribution, except as specifically provided herein.  The General Partners shall have no personal liability for the repayment of the Capital Contribution of any Limited Partner.  Nothing in this Section 4.3 shall alter the limitation on liability of a General Partner or its Affiliates pursuant to Section 7.7.

Section 4.4      Liability of Limited Partners

No Limited Partner shall be liable for any debts, liabilities, contracts, or obligations of the Partnership.  A Limited Partner shall be liable only to make payments of its Capital Contribution as and when due hereunder.  After its Capital Contribution shall be fully paid, no Limited Partner shall, except as otherwise required by the Uniform Act, be required to make any further capital contributions or payments or lend any funds to the Partnership.

Section 4.5      Certain Rights of Investor Limited Partner

A.      Subject to the provisions hereinafter set forth in this Section 4.5, and to the Regulations, in addition to the other rights provided for in this Agreement, the Investor Limited Partner shall have the right:

(i)      to amend this Agreement, subject to the provisions of Section 13.9; provided that such amendment (a) shall not in any manner allow the Limited Partners to take any action which would constitute their taking part in the control of the Partnership's business within the meaning of the Uniform Act, and (b) shall not, without the consent of any General Partner affected, except in the case of a removal

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090028

pursuant to Section 4.5A(iv), alter the rights, powers, obligations or duties of the affected General Partner or its interest in the Profits and Losses of the Partnership, Tax Credits or distributions or alter any of the provisions of Section 4.5B;

(ii)    with the consent of the General Partner, to dissolve the Partnership;

(iii)    with the consent of the General Partner, to approve or disapprove the sale of all or substantially all of the assets of the Partnership; and

(iv)    to remove any or all of the General Partners and elect one or more new General Partners in the event of any misconduct or failure to exercise reasonable care with respect to any material matter in the discharge of its duties and obligations as General Partner, and such misconduct or failure to exercise reasonable care can reasonably be expected to cause economic detriment to the Partnership or the Project, or upon the occurrence of any of the following:

(1)    the General Partner shall have violated any material provisions of the Investment Agreement, Construction Loan Agreement and/or the Loan Agreement and/or the Extended Use Agreement, or any material provisions of any other Project Document or other document required in connection with the Construction Loan or the Mortgage Loan, or any provisions of the Lender and/or Agency regulations applicable to the Apartment Complex; or an event sufficient for a Purchase Obligation to arise under the Purchase Agreement shall have occurred (other than Lender or Agency disapproval) and such violation has not been cured within thirty (30) days, or if such violation is not susceptible to cure within such thirty (30) day period, the General Partner is diligently making all reasonable efforts to cure the same and the same is cured within ninety (90) days; or

(2)    the General Partners, or any of them, shall have violated any rights, powers, duties, representations or warranties as set forth in Article VII herein or shall have violated any material provision of this Agreement, and such misconduct or failure to exercise reasonable care can reasonably be expected to cause economic detriment to the Partnership or the Project or defaulted on a guarantee herein or the timely payment of a Penalty Payment or violated any material provision of applicable law; or

(3)    the General Partners, or any of them, shall have caused the Construction Loan or the Permanent Mortgage Loan to go into default and such default has not been cured within thirty (30) days or if such default has not been cured within such thirty (30) day period, the General Partner is diligently making all reasonable efforts to cure the same, provided the Loan is not in foreclosure; or

(4)    the General Partners, or any of them, shall have conducted their

A:\Hidden Hills\LP.7                                   25

own affairs or the affairs of the Partnership in such manner as would cause the termination of the Partnership for federal income tax purposes; or cause the Partnership to be treated for federal income tax purposes as an association, taxable as a corporation or shall have effected a Change of Control without the consent of the Investment General Partner; or

(5)      failure to maintain a Debt Coverage Ratio of at least 1.00 for any consecutive six (6) month period (exclusive of Deferred Developer Fees) and the General Partner has not pursued remedies or undertaken corrective action which is necessary or appropriate in the sole and absolute discretion of the Investor Limited Partner to correct or cure such failure; or

(6)      failure to furnish reports as required in Section 12.1; or

(7)      any penalty assessed against the Partnership or a General Partner for the benefit of the Limited Partners, or any amount otherwise due the Limited Partners from a Managing General Partner or the Partnership, is not paid within thirty (30) days or any operating deficits are not funded and paid by the Managing General Partner within the earlier or thirty (30) days when due or when necessary for the continuation of the Project without delay; or

(8)      after the first nine (9) months, the occupancy of the Project  for any three (3) consecutive months or the average occupancy for any year falls below 85% (unless debt service and Asset Management Fees are paid when required) unless such reduced occupancy is solely due to fire damage or similar casualty (repaired within a reasonable time) or other such catastrophes totally beyond the control of the Managing General Partner; or

(9)      the total number of Federal Housing Tax Credit qualified units of the Project falls below ninety percent (90%) without the consent of the Investor Limited Partner.

B.      The Interest of any General Partner removed pursuant to this Section 4.5 shall be valued and sold pursuant to Section 8.4.

C.      Upon written request to the Managing General Partner by the Investor Limited Partner, the Managing General Partner shall call a meeting of the Limited Partners for any matters for which the Limited Partners may vote, as set forth herein.  Upon receipt of a written request either in person or by certified mail stating the purpose(s) of the meeting, the Managing General Partner shall provide all Limited Partners within ten days after receipt of said request, written notice (either in person or by certified mail) of a meeting and the purpose of such meeting to be held on a date not less than 15 nor more than 60 days after receipt of said request, at a time and place convenient to the Investor Limited Partner.

D.      In the event a Managing General Partner is removed pursuant to this Section

4.5, substantial cost and expense will be incurred by the Partnership in effecting the removal, arranging for a suitable replacement and completing the orderly transfer of records and management. It is understood and agreed by, between and among the parties that in view of the reasons for removal as set forth in subparagraph (A)(iv) therein, the removed Managing General Partner, and not the Partnership nor the Investor Limited Partner, should be charged with these costs and expenses. The parties agree that liquidated damages for these costs and expenses (only and not in lieu of other amounts owed by such Managing General Partner nor other losses incurred due to such Managing General Partner) in the amount of $25,000 shall be paid by such removed Managing General Partner to the Partnership upon such removal and that the Partnership shall be entitled to immediately collect, offset or otherwise initiate any actions authorized under the law to recover such liquidated damages from such removed Managing General Partner or its assets and receivables.

ARTICLE V

Capital Contributions of Investor Limited Partner

Section 5.1    Installments of Capital Contributions

A.    The Investor Limited Partner shall contribute as its Capital Contribution the sum of $3,360,328 payable and in the following installments:

(1)    $1,600,000 upon the latest to occur of (i) Tax Credit Reservation, receipt of 42 (M)(1)(D) and 42 (M)(2)(D) determination or equivalent documentation, (ii) Initial Closing, (iii) receipt of a commitment acceptable to the Investor Limited Partner for the Permanent Mortgage Loan, (iv) December 31, 2001, or (v) the Admission Date (the "First Installment"); The proceeds of this First Installment shall be placed into a construction escrow account held by the construction lender or by a title company approved by the Investor Limited Partner and disbursed prior to any advance on the Construction Loan, pursuant to standard AIA Document G702 for draw request. In addition to the draw requests, invoices, lien waivers and certification by an inspecting architect approved by the Investor Limited Partner shall also be submitted.

(2)    $1,200,000 upon the latest to occur of (i) the Completion Date, (ii) Cost Certification, (iii) January 1, 2003, or (iv) satisfaction of all of the conditions to the payment of the First Installment (the "Second Installment"). The proceeds of the Second Installment shall also be placed in the escrow account and disbursed in accordance with the procedures for the First Installment.

(3)    $291,734 upon the latest to occur of: (i) the Initial 90%  Occupancy Date, (ii) Break-even has occurred, (iii) Final Closing has occurred, (iv) receipt of Forms 8609 for all Buildings, (v) an attestation by Partnership's Accountant providing a detailed analysis of the depreciable assets including personal property, land improvements, and the building, (vi) April 1, 2003, or (vii) all third-party notes are paid, or (viii) satisfaction of all of the conditions to the payment of the First and Second Installments (the "Third Installment").

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090031

(4)    $268,594 upon the latest to occur of (i) three (3) consecutive months of an average of 1.20 debt coverage, (ii) Initial 95% Occupancy Date and 100% of the units are Tax Credit qualified, (iii) July 1, 2003, or (iv) satisfaction of all of the conditions of the payment of the First, Second and Third Installments (the "Fourth Installment").

B.    If necessary, the Investor Limited Partner, or an Affiliate, agrees to provide a loan (the "Bridge Loan") to the Partnership in an amount equal to the Second Installment, subject to credit underwriting, and receipt of a market study and seismic report, both acceptable to the Investor Limited Partner.  The terms of this Bridge Loan will include but not be limited to a, 30-day LIBOR plus 450 basis points adjusted monthly, calculated on a 360 day year.  The fees associated with this Bridge Loan include, but are not limited to the following: (i) originations – 100 basis points, (ii) exit – 100 basis points and (iii) actual recording costs. The Bridge Loan will be fully secured by the  General Partner, such security to be reasonably acceptable to the Investor Limited Partner, in accordance with the standards of banks or commercial lenders for similar loans, subject to the rights and priorities of the Permanent Mortgage Loan.  The Bridge Loan will be repaid from the proceeds of the Second Installment when escrowed.

C.    The obligation of the Investor Limited Partner to make each Installment (except as otherwise provided) is subject to each of the following conditions:

(i)    The Managing General Partner shall have executed and delivered to the Investor Limited Partners a certificate (the "Payment Certificate"), in the form attached hereto as Exhibit 1, dated the date such Installment is to be paid to the Partnership and attaching the Title Policy endorsement referred to therein.

(ii)    In the case of the First Installment, all Requisite Approvals to the admission of AMTAX as Investor Limited Partner pursuant to this Agreement shall have been obtained.

(iii)    Each of the representations and warranties set forth in Section 7.5 shall in all material respects be true and correct.

(iv)    No event shall have occurred which would permit AMTAX to give an Election Notice under the Purchase Agreement.

(v)    No event shall have occurred which suspends or terminates the obligations of the Investor Limited Partner to pay Installments under the provisions of this Agreement which has not been cured as therein provided.

(vi)    Notwithstanding the foregoing, if an Installment has not become due because of a failure to satisfy any condition to the payment thereof, but such condition can be satisfied by the payment of money, then in the discretion of the Investor Limited Partner such Installment may be collected notwithstanding the failure to satisfy such

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090032

condition, provided that when such Installment is paid (1) the amount required to satisfy such condition is disbursed directly to the requisite parties for the purpose of satisfying such condition, and (2) any acceleration of maturity of indebtedness and any other default and any action or proceeding which was the basis of the failure to satisfy such condition or which resulted from such failure has been effectively waived and, in the case of any such action or proceeding, terminated with prejudice.

Section 5.2   Adjustments to Capital Contributions

The Capital Contribution of the Investor Limited Partner shall be subject to reduction in the manner provided in this Section 5.2.

A.   If, as of the Completion Date and based upon the Cost Certification, it is determined that the amount of Tax Credits for which the Project will be eligible (as evidenced by applicable documentation including Forms 8609) is less than the Maximum Annual Credit, such difference being hereinafter referred to as a "Credit Shortfall", then there shall be a reduction in the Investor Limited Partner's Capital Contribution in an amount equal to the product of (i) the Credit Shortfall and (ii) 7.90 (referred to as the "Credit Shortfall Adjustment").   Such reduction shall be applied by decreasing the amount of the next Installment due, and, if necessary, further Installments (reducing the earlier ones first) by the amount of the Credit Shortfall Adjustment.   If all Installments of Capital Contribution have been paid at the time of a Credit Shortfall, or the aggregate amount of Installments remaining at the time of the Credit Shortfall is less than the amount of the Credit Shortfall Adjustment, then the Credit Shortfall Adjustment, or any balance of the Credit Shortfall Adjustment over the amount of the remaining Installments, as the case may be, shall be immediately distributed, in cash, to the Investor Limited Partner.

In the event that the amount of Tax Credit for which the Project will be eligible is more than the Maximum Annual Credit, then the Investor Limited Partner's Capital Contribution shall be increased based upon the same ratio of additional tax credits to additional losses. Such additional amount shall be payable in installments in the same proportion as set forth in Section 5.1A herein.

B.   In the event there is Credit Deficiency or any Recapture Event, within sixty (60) months after the Completion Date, then the Investor Limited Partner shall be entitled to a penalty payment from the Managing General Partner (the "Penalty Payment").   For these purposes, any event which causes a Credit Deficiency during the first sixty (60) months that also results in or creates a Credit Deficiency that extends into the last sixty (60) months, will be penalized and adjustments made as if the Credit Deficiency had occurred entirely during the first sixty (60) months.   The Penalty Payment will be in a total amount equal to the sum of: (i) the product of (a) the total of the Credit Deficiency for each of the years of Projected Credit and (b) .86 and (ii) the Recapture Amount and any additional interest and/or penalty that may be assessed by the Service for any year as a result of the Recapture Event. The Penalty Payment shall be paid from an additional capital contribution made by the Managing General Partner to the Partnership within thirty (30) days of written notice from the Investor Limited

Partner.  The Managing General Partner shall pledge its Partnership Interest to secure such payment of its additional capital contribution.  In the event the Managing General Partner fails to fund any Penalty Payment when due, the Investor Limited Partner may, at its sole discretion, pursue one or more remedies including any of the following remedies: (i) attach or otherwise seize any amount otherwise distributable to the Managing General Partner from Cash Flow of the Partnership; (ii) recover the funds from the Managing General Partner; (iii) assert its rights under the Uniform Commercial Code or other applicable law either against the Managing General Partner's Partnership Interest or other assets of the Managing General Partner; and (iv) remove the Managing General Partner pursuant to Section 4.5.  However, after the initial two (2) years from the Admission Date, in the event a Credit Deficiency under this Section 5.2 B is due solely through a change in the law, and no fault of the General Partner, such Penalty Payment shall be payable from Cash Flow, Capital Proceeds or as a Credit Recovery Loan as set forth in Section 5.2C.

C.    If an event which causes a Credit Deficiency or a Recapture Event initially occurs at any time after the fifth anniversary of completion of construction, except as set forth in subparagraph B above, then the Investor Limited Partner shall be deemed to have made a loan (a "Credit Recovery Loan") to the Partnership in an amount equal to the sum of (i) the product of (a) the Credit Deficiency and (b) .86, and (ii) the Recapture Amount and any additional interest and/or penalty that may be assessed by the Service for any year as a result of the Recapture Event.  Credit Recovery Loans shall bear simple interest at 9% per annum and shall be repaid only as provided in Section 6.2B.  The Managing General Partner and the Developer shall pledge and collaterally assign their interest and all their Partnership distributions, all amounts due to them for Subordinated Loan repayments, and all fees due to them to secure payment of such Credit Recovery Loans.

D.    Attached as Schedule B is a schedule of Specified Tax Benefits that were calculated based upon projections provided by the Managing General Partner and which constitute a substantial portion of the Investor Limited Partner's expected return.  If, prior to funding the First Installment and once again prior to funding the Third Installment, the Investor Limited Partner determines that the Specified Tax Benefits are not achievable due to inaccuracies contained within or modifications to the underlying assumptions contained within the projections provided by the Managing General Partner, the parties to this Agreement agree to amend the Investor Limited Partner's Capital Contribution to provide the Investor Limited Partner with a return that is consistent with the return contemplated by the Specified Tax Benefits.

E.    After Admission of the Investor Limited Partner, the General Partners shall be entitled to a return of capital in an amount equal to their respective capital contributions made prior to Admission, subject to the General Partners maintaining an aggregate Capital Contribution of no more than .09% of the Capital Contributions of all Partners.  This return of capital will be funded from the proceeds of the Investor Limited Partner's Capital Contribution.

ARTICLE VI

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090034

<u>Distributions of Cash; Allocations of Profits, Losses and Tax Credits</u>

Section 6.1   <u>Profits and Losses and Tax Credits</u>

A.      After giving effect to the special allocation provisions of Section 6.5, Operating Profits or Losses and Tax Credits for any Partnership Fiscal Year shall be allocated .09% to the General Partner, .01% to Protech and 99.90% to the Investor Limited Partner.

B.      After giving effect to the special allocation provisions of Section 6.5, Profits or Losses from a Capital Transaction in any Partnership Fiscal Year shall be allocated to and among the Partners as follows:

<u>As to Profits</u>:

        <u>First</u>, an amount of Profits equal to the aggregate negative balances (if any) in the Capital Accounts of all Partners having negative balance Capital Accounts shall be allocated to such Partners in proportion to their negative Capital Account balances until all such Capital Accounts have zero balances; and

        <u>Second</u>, an amount of Profits shall be allocated to each of the Partners until the positive balance in the Capital Account of each Partner equals the amount of cash which would be distributed to such Partner if such Profits were cash available to be distributed in accordance with the provisions of Clauses <u>Eighth</u> through <u>Eleventh</u> of Section 6.2B(ii).

<u>As to Losses</u>:
        <u>First</u>, an amount of Losses equal to the aggregate positive balances (if any) in the Capital Accounts of all Partners having positive balance Capital Accounts shall be allocated to such Partners in proportion to their positive Capital Account balances until all such Capital Accounts have zero balances; <u>provided</u>, <u>however</u>, that if the amount of Losses so to be allocated is less than the sum of the positive balances in the Capital Accounts of those Partners having positive balances in their Capital Accounts, then such Losses shall be allocated to the Partners in such proportions and in such amounts so that the Capital Account balances of each Partner shall equal, as nearly as possible, the amount such Partner would receive if an amount equal to the excess of (i) the sum of all Partners' balances in their Capital Accounts computed prior to the allocation of Losses under this clause <u>First</u> over (ii) the aggregate amount of Losses to be allocated to the Partners pursuant to this clause <u>First</u> were distributed to the Partners in accordance with the provisions of Clauses <u>Eighth</u> through <u>Eleventh</u> of Section 6.2B(ii); and

        <u>Second</u>, the balance, if any, of such Losses shall be allocated .09% to

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090035

the General Partner, .01% to Protech and 99.90% to the Investor Limited Partner.

Section 6.2     Application and Distributions Prior to Dissolution

A.      Application and Distribution of Cash Flow

(i)     The Managing General Partner shall determine, as of the end of each calendar quarter, the amount of Cash Flow that is available as of the end of such period to be applied as provided in Section 6.2A(ii).  Cash Flow that is so determined as available for distribution as of the end of any period shall be deemed Cash Flow for such period even if distributed after such period.

(ii)     Subject to the provisions of Section 5.2 with respect to any Credit Deficiency or Recapture Amount or other amounts due the Investor Limited Partners including Penalty Payments and repayment of Credit Recovery Loans, the amount of Cash Flow shall be distributed as follows:

First, to the maintenance of Operating Reserves as set forth in Section 7.8B herein;

Second, to the payment of any current and accrued Asset Management Fee;

Third, to the payment of any deferred portion of the Developer Fee in an annual amount that still enables the property to operate at a 1.00 debt coverage ratio (exclusive of payment of any Asset Management Fees and Partnership Management Fees).  All payments to be applied to principal and then interest as funds are available;

Fourth, to the repayment of the General Partner Loan and then the balance if any, to the repayment of any Subordinated Loans of the Managing General Partner;

Fifth, to the payment of the Partnership Management Fee;

Sixth, to the payment of a priority distribution to the Investor Limited Partner equal to 10% of the balance;

Seventh, to the payment of the Incentive Supervisory Fee to the Managing General Partner in the amounts as set forth in Section 7.10D herein; and

Eighth, any remainder, 99.90% to the Investor Limited Partner, .01% to PROTECH and .09% to the Managing General Partner.

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090036

    (iii)    Cash Flow shall be applied as provided in Section 6.2A(ii) within 30 days of the end of each calendar quarter. Notwithstanding that applications are made quarterly, the amount of each item on an annual basis must be paid prior to payment of any subsequent items.

B.    <u>Distributions of Proceeds from a Sale or Refinancing</u>

    (i)    The Managing General Partner shall determine, within 45 days after the Partnership's receipt thereof, the amount of Capital Proceeds available to be applied as provided in Section 6.2B(ii).

    (ii)    Subject to the provisions of Section 5.2 with respect to any Credit Deficiency or Recapture Amount or other amounts due the Investor Limited Partners, including Penalty Payments and further subject to the provisions of Section 6.3 below, any Capital Proceeds shall be distributed to and among the Partners in the following amounts and order of priority:

    <u>First</u>, to the payment of all debts and liabilities of the Partnership excluding those owed to Partners, and to the establishment of any required reserves;

    <u>Second</u>, to the payment of the Asset Management Fee of such year and for previous year as to which the Asset Management Fee has not been paid in full;

    <u>Third</u>, to the repayment of any Credit Recovery Loans and any interest thereon, of the Investor Limited Partner;

    <u>Fourth</u>, in the event of a sale, to the Investor Limited Partner, a priority distribution (the "Exit Tax Distribution") equal to the after-tax value of which is sufficient to pay any taxes on gain attributable to the Investor Limited Partner's negative capital account and pay any taxes thereon, if any;

    <u>Fifth</u>, to the repayment of any outstanding deferred portions of the Developer Fee;

    <u>Sixth</u>, to the repayment of the General Partner Loan and then the balance, if any, to the repayment of any Subordinated Loans of the Managing General Partner;

    <u>Seventh</u>, to the payment of the Partnership Management Fee of such year and for previous year as to which the Partnership Management Fee has not been paid in full;

    <u>Eighth</u>, except in the case of a refinancing, to each Partner an amount

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090037

equal to the positive balance in its capital account, as adjusted;

Ninth, to the payment of a priority distribution to the Investor Limited Partner equal to 10% of the balance;

Tenth, to the payment of the Incentive Supervisory Fee to the Managing General Partner in the amounts as set forth in Section 7.10 D herein; and

Eleventh, the balance of such proceeds, if any, shall be distributed .09% to the Managing General Partner; .01% to Protech and 99.90% to the Investor Limited Partner.

Section 6.3    Liquidation

A.    Upon the liquidation and dissolution of the Partnership, unless the business of the Partnership is continued pursuant to the provisions of Sections 8.2 or 8.3 hereof, the General Partners shall liquidate the assets of the Partnership and cause the business of the Partnership to be wound up in accordance with the Uniform Act and cause the Certificate to be cancelled in accordance with the provisions of Section 2.5B.

B.    Subject to the provisions of Section 6.3C below, any Capital Proceeds from a Terminating Capital Transaction remaining after payment of, or adequate provision for, the debts and obligations of the Partnership shall be distributed to those Partners with positive Capital Account balances (after taking into account all Capital Account adjustments for the Partnership taxable year) in proportion to said Capital Account balances.

C.    Except as hereinafter specifically provided, if following the "liquidation" of a Partner's interest in the Partnership (as defined in Section 1.704-1(b)(2)(ii)(g) of the Allocation Regulations) or the dissolution of the Partnership and the distribution or liquidation of its assets in accordance with the foregoing provisions of this Section 6.3, the Partner whose interest is being liquidated (or, in the case of the liquidation and dissolution of the Partnership, any Partner) has a negative balance in its Capital Account after adjusting such Capital Account to reflect the allocations and distributions required under Sections 6.1 and 6.2 above (including, without limitation, the allocation to such Partner of his or its Share of Partnership Minimum Gain and/or Share of Partner Nonrecourse Debt Minimum Gain), the amount of such negative balance shall be contributed by such Partner to the Partnership on the first to occur of (i) the date which is ten (10) days after the delivery to such Partner of a certificate of the Accountants, prepared in good faith and at the expense of the Partnership, setting forth the calculation of such Partner's negative Capital Account balance, or (ii) the later of (A) the last day of the taxable year of the Partnership in which such liquidation occurs, or (B) 90 days after the date of the liquidation.  Any such amount shall be distributed to those Partners having positive Capital Account balances in proportion to, and to the extent necessary to eliminate such positive balances, or in such other manner as may be required under Section 1.704-1(b)(2)(ii)(b)(3) of the Allocation Regulations.  Except to the extent of his or its Share of Partnership Minimum Gain or Partner Nonrecourse Debt Minimum Gain, if any, no Limited

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090038

Partner shall have a Deficit Restoration Obligation nor shall any Limited Partner otherwise be required to restore any deficit balance in his or its Capital Account at any time.

D.    The parties intend that, as a result of the application of the allocation and distribution provisions contained in this Article VI, any Capital Proceeds from a Terminating Capital Transaction will be distributed in the same manner as Capital Proceeds are distributed under the provisions of Section 6.2B. If the Partnership is advised at any time by the Accountants or counsel that an actual distribution of Capital Proceeds at the end of any Fiscal Year in accordance with the provisions of Section 6.3B would not result in each Partner receiving the amount that it would have received if Section 6.2B rather than Section 6.3B applied to such distribution, the General Partner shall so notify the Limited Partners and, with the Consent of the Investor Limited Partner, are authorized and empowered to amend the provisions of this Article VI relating to the allocation of Profits or Losses (other than the Regulatory Allocations) for such Fiscal Year (and for subsequent Fiscal Years if necessary) to cure such defect consistent with the principles set forth in the first sentence of this Section 6.3D.

Section 6.4    Special Distribution Provisions

A.    Notwithstanding anything to the contrary contained herein, in no event shall the General Partners receive as an aggregate distribution under Sections 6.2 or 6.3 hereof less than .09% of the aggregate amounts distributed to all the Partners under Sections 6.2 or 6.3 hereof. In order to carry the immediately preceding sentence into effect, in the event that any distribution to the General Partners would, but for the provisions of this paragraph, fail to equal or exceed .09% of the aggregate amount distributable to all the Partners, then the amounts otherwise distributable to all the Partners under Sections 6.2 or 6.3 hereof shall be reduced and reallocated to the General Partners in order to assure the General Partners of their .09% share.

B.    Except as otherwise specifically provided in this Section 6.4, if the funds available for any distribution to the Partners are insufficient to distribute to any class of Partners the maximum amount which otherwise would be distributable to such class under the applicable provision(s) of this Article VI, the amount available for distribution shall be distributed pro rata to the members of such class in proportion to their respective paid-in Capital Contributions.

Section 6.5    Special Allocation Provisions

Notwithstanding anything to the contrary contained herein:

A.    Nonrecourse Deductions shall be allocated 99.90% to the Investor Limited Partner, .01% to Protech and .09% to the General Partner.

B.    Partner Nonrecourse Deductions shall be allocated to and among the Partners in the manner provided in the Allocation Regulations.

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090039

C.     Subject to the provisions of Section 6.5T, if there is a net decrease in Partnership Minimum Gain for a Partnership Fiscal Year, the Partners shall be allocated items of Partnership income and gain in accordance with the provisions of Section 1.704-2(f) of the Allocation Regulations.

D.     Subject to the provisions of Section 6.5T, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain for a Partnership Fiscal Year, then any Partner with a Share of such Partner Nonrecourse Debt Minimum Gain shall be allocated items of Partnership income and gain in accordance with the provisions of Section 1.704-2(i)(4) of the Allocation Regulations.

E.     Subject to the provisions of Sections 6.5A through 6.5D above, in the event that any Partner unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Allocation Regulations, items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Allocation Regulations, the Adjusted Capital Account Deficit of such Partner as quickly as possible.  This Section 6.5E is intended to constitute a "qualified income offset" provision within the meaning of the Allocation Regulations and shall be interpreted consistently therewith.

F.     Subject to the provisions of Sections 6.5A through 6.5E above, in no event shall any Partner be allocated Losses which would cause it to have an Adjusted Capital Account Deficit as of the end of any Partnership Fiscal Year.  Any Losses which are not allocated to a Partner by reason of the application of the provisions of this Section 6.5F shall be allocated to the other Partners.

G.     Subject to the provisions of Sections 6.5A through 6.5F above, in the event that any Partner has an Adjusted Capital Account Deficit at the end of any Partnership Fiscal Year, items of Partnership income and gain shall be specially allocated to each such Partner in the amount of such Adjusted Capital Account Deficit as quickly as possible.

H.     Without limiting the generality of Section 6.5B above, (i) if the Partnership incurs recourse obligations to fund the payment of deductible items which are not anticipated to be paid in the ordinary course of business or (ii) if the Partnership incurs losses from extraordinary events which are not recovered from insurance or otherwise and which are not anticipated to be paid in the ordinary course of business (the obligations and losses under clauses (i) and (ii) being referred to herein collectively as "Excess Expenses") in respect of any Fiscal Year, then the calculation and allocation of Losses shall be adjusted as follows:  first, an amount of deductions equal to such Excess Expenses for the Fiscal Year in question shall be allocated to the General Partner; and second, the balance of such deductions and all gross income shall be allocated as provided in Section 6.1A.  For purposes of this Section 6.5H, extraordinary events include casualty losses, losses resulting from liability to third parties for tortious injury, losses resulting from a breach of a legal duty by the Partnership or by the General Partner, and deductions resulting from other liabilities which are not incurred in the

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090040

ordinary course of business. Nothing in this Section 6.5H shall prevent the Partnership from recovering an extraordinary loss from a General Partner who is liable therefor by law or under this Agreement. If any Excess Expenses shall be repaid from Cash Flow generated in respect of any Fiscal Year, then the allocation of Profits and Losses under Section 6.1A for such Fiscal Year shall be adjusted as follows: first, the General Partner shall be allocated an amount of the gross income of the Partnership equal to the amount of the Excess Expenses repaid in such Fiscal Year; and second, the balance of such gross income and all deductions shall be allocated as provided in Section 6.1A.

I.    In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial Gross Asset Value. In the event that the Gross Asset Value of any Partnership Property is adjusted pursuant to the terms of this Agreement, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 6.5I are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

J.    Syndication expenses, if any, for any Fiscal Year or other period shall be specially allocated to the Investor Limited Partner.

K.    For purposes of determining the Profits, Losses, Tax Credits or any other items allocable to any period, Profits, Losses, Tax Credits and any such other items shall be determined on a daily, monthly, or other basis, as determined by the General Partners using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

L.    To the extent that interest on loans (or other advances which are deemed to be loans) made by any General Partner to the Partnership is determined to be deductible by the Partnership in excess of the amount of interest actually paid by the Partnership, such additional interest deduction(s) shall be allocated solely to such General Partner.

M.    If the Service successfully disallows the deduction of all or any part of any fee paid by the Partnership to a General Partner or its Affiliates by recharacterizing such fee as a distribution to such General Partner, there shall be, to the extent permitted by the Code, a special allocation of gross income to such General Partner for the Fiscal Year with respect to which such disallowed deduction was claimed by the Partnership in the amount of such disallowed deduction.

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090041

N.   Except as otherwise specifically provided in this Article VI, all Profits, Losses and Tax Credits allocated to each class of Partners shall be shared by the respective Partners in such class in the ratio which the Capital Contribution by each Partner in such class bears to the aggregate paid-in Capital Contributions of all Partners in such class.

O.   Notwithstanding anything to the contrary contained herein, the General Partner (or, if there is more than one General Partner, all of the General Partners as a group) shall be allocated not less than .09% of each material item of Partnership income, gain, loss, deduction and credit ("Partnership Items") at all times during the existence of the Partnership, provided, however, that temporary nonconformance with the provisions of this Section 6.5O shall be permitted to the extent permitted by the Code and the Regulations thereunder.  Subject to the foregoing, in the event that there is no allocation of a material Partnership Item to the General Partner(s) hereunder or if the amount of any material Partnership Item allocable to the General Partner(s) hereunder shall not equal .09% of the aggregate amount allocable to all the Partners without giving effect to this provision, then the amount of such Partnership Item(s) otherwise allocable to the Limited Partners hereunder shall be correspondingly reduced in order to assure the General Partner(s) of its or their .09% share.  Any such reduction shall be applied to reduce the shares of all classes of Limited Partners in proportion to their respective percentage interests.

P.   For purposes of determining each Partner's proportionate share of the excess Nonrecourse Liabilities of the Partnership pursuant to Section 1.752-3(a)(3) of the Allocation Regulations, the Investor Limited Partners shall be deemed to have a 99.90% interest in Profits and the General Partners shall be deemed to have a .09% interest in Profits.

Q.   Any recapture of any Tax Credit shall be allocated to and among the Partners in the same manner in which the Partners share the expenditures giving rise to such Tax Credit.

R.   In the event the adjusted tax basis of any investment credit property that has been placed in service by the Partnership is increased pursuant to Section 50(c) of the Code, such increase shall be allocated among the Partners (as an item in the nature of income or gain) in the same proportions as the investment tax credit that is recaptured with respect to such property is shared among the Partners.  Any reduction in the adjusted tax basis (or cost) of Partnership investment credit property pursuant to Section 50(c) of the Code shall be allocated among the Partners (as an item in the nature of expenses or losses) in the same proportions as the basis (or cost) of such property is allocated pursuant to Treasury Regulation Section 1.46-3(f)(2)(i).

S.   The basis (or cost) of any Partnership investment credit property shall be allocated among the Partners in accordance with Treasury Regulation Section 1.46-3(f)(2)(i).  All Tax Credits shall be allocated among the Partners in accordance with applicable law.  In the event Partnership investment credit property is disposed of during any taxable year, Profits for such taxable year (and, to the extent such Profits are insufficient, Profits for subsequent taxable years) in an amount equal to the excess, if any, of (i) the reduction in the adjusted tax basis (or cost) of such property pursuant to Section 50(c) of the Code, over (ii) any increase in

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090042

the adjusted tax basis of such property, shall be allocated among the Partners in proportion to their respective shares of such excess determined pursuant to Section 6.5R hereof.  In the event that more than one item of such property is disposed of by the Partnership, the foregoing sentence shall apply to such items in the order in which they are disposed of by the Partnership, so that Profits equal to the entire amount of such excess with respect to the first such property disposed of shall be allocated prior to any allocations with respect to the second such property disposed of, etc.

T.    If for any Fiscal Year the application of the minimum gain chargeback provisions of Section 6.5C or Section 6.5D would cause a distortion in the economic arrangement among the Partners and it is not expected that the Partnership will have sufficient other income to correct that distortion, the General Partners may request a waiver from the Commissioner of the IRS of the application in whole or in part of Section 6.5C or Section 6.5D in accordance with Section 1.704-2(f)(4) of the Allocation Regulations.  Furthermore, if additional exceptions to the minimum gain chargeback requirements of the Allocation Regulations have been provided through revenue rulings or other Service pronouncements, the General Partners are authorized to cause the Partnership to take advantage of such exceptions if to do so would be in the best interest of a majority in interest of the Partners.

U.    All interest income of the Partnership shall be allocated  to the Managing General Partner and Cash Flow available after payment of the Asset Management Fee, in an amount sufficient to pay the associated tax liability, shall be distributed to the Managing General Partner.

Section 6.6    Order of Application

The provisions of this Article VI shall be applied in the order required by the applicable provisions of the Allocation Regulations or if no such order is specified, in the manner determined by the Accountants.

ARTICLE VII

Rights, Powers and Duties of the General Partners

Section 7.1    Restrictions on Authority

A.    Notwithstanding any other provisions of this Agreement, the General Partner shall have no authority to perform any act in respect of the Partnership or the Project in violation of (i) any applicable law or regulation, or (ii) any agreement between the Partnership and any Lender or Agency.

B.    The General Partner shall not have any authority to do any of the following acts without the Consent of the Investor Limited Partner and any Requisite Approvals:

(i)    to incur indebtedness for money borrowed on the general credit of the

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090043

Partnership, except as specifically permitted by Article III or Article X, or

      (ii)    following completion of rehabilitation of the Improvements, to construct any new capital improvements, or to replace any existing capital improvements if construction or replacement would substantially alter the use of the Property, or

      (iii)    to acquire any real property in addition to the Property (other than easements or similar rights necessary or convenient for the operation of the Project), or

      (iv)    to bear, or cause or permit any Related Person to bear, the economic risk of loss with respect to all or any portion of any Note or Mortgage or the indebtedness secured thereby, except as provided in Article IIIA, or

      (v)    to cause the Partnership to make any loan or advance to any Person (for purposes of this clause 7.1B(v), accounts receivable in the ordinary course of business from Persons other than the General Partners or their Affiliates shall not be deemed to be advances or loans), or

      (vi)    to lease any Low Income Unit in the Project to other than Qualified Tenants or otherwise operate the Project in such a manner or take any action which could cause any Low Income Unit in the Project to fail to be treated as a qualified low-income housing unit under Section 42(i)(3) of the Code or which would cause the recapture by the Partnership of any Federal Housing Tax Credit under Section 42 of the Code, or

      (vii)    to amend any Project Document, or to permit any party thereunder to waive any provision thereof, to the extent that the effect of such amendment or waiver would be to eliminate, diminish or defer any obligation or undertaking of the Partnership, the General Partners or their Affiliates which accrues, directly or indirectly, to the benefit of, or provides additional security or protection to, the Investor Limited Partner (notwithstanding that the Investor Limited Partner is neither a party to nor express beneficiary of such provision or was not a Partner when such provision became effective), or

      (viii)    to increase or refinance any Mortgage or to sell or convey the Property, except as provided in Article IIIC, and except that the General Partners may cause the Partnership to grant easements and similar rights affecting the Land to obtain utility services for the Project or for other purposes necessary or convenient for the operation of the Project, or

      (ix)    to cause the Partnership to commence a proceeding seeking any decree, relief, order or appointment in respect to the Partnership under the federal bankruptcy laws, as now or hereafter constituted, or under any other federal or state bankruptcy, insolvency or similar law, or the appointment of a receiver, liquidator, assignee,

custodian, trustee, sequestrator (or similar official) for the Partnership or for any substantial part of the Partnership's business or property, or to cause the Partnership to consent to any such decree, relief, order or appointment initiated by any Person other than the Partnership, or

(x)     to pledge or assign any of the Capital Contribution of the Investor Limited Partner or the proceeds thereof, or

(xi)     to amend any of the Related Agreements.

(xii)     to approve any changes to the plans and specifications for the Project which would result, either individually or in the aggregate, in an overall development cost increase in excess of $50,000.00 (provided, however, that any Consent of the Investor Limited Partners required under this clause (xii) shall not be unreasonably withheld.)

C.     The General Partner shall not (a) cause the Partnership to utilize Cash Flow to acquire interests in other limited partnerships or (b) cause the Partnership to invest or reinvest the proceeds of any sale or refinancing of the Project.

Section 7.2     Independent Activities

Any Partner may engage independently or with others in other business ventures of every nature and description including, without limitation, the ownership, operation, management, and development of real estate, regardless of whether such real estate directly competes with the Project, and neither the Partnership nor any Partner shall have any rights by reason of this Agreement in and to such independent ventures or the income or profits derived therefrom.

Section 7.3     Business Management and Control; Designation of Managing General Partner

A.     The General Partner shall have the exclusive right to manage the business of the Partnership.  No Limited Partner (except one who may also be a General Partner and then only in its capacity as General Partner) shall (i) have any authority or right to act for or bind the Partnership, or (ii) except as required by law, participate in or have any control over the Partnership business.  The Limited Partners hereby consent to the exercise by the General Partners of the powers conferred on them by this Agreement.

B.     The powers and duties of the General Partner hereunder may be exercised in the first instance by one or more Managing General Partners who, subject to the terms and provisions of this Agreement, shall manage the business and affairs of the Partnership.  Each Managing General Partner is hereby authorized to execute and deliver in the name and on behalf of the Partnership all such documents and papers (including any required by any Lender or Agency) as such Managing General Partner deems necessary or desirable in carrying out

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090045

such duties hereunder. Hidden Hills Management, LLC is hereby designated as the initial Managing General Partner; if such Person shall become unable to serve in such capacity or shall cease to be a General Partner, or if there is a Change of Control of the Managing General Partner, the Special Limited Partner shall become the substituted Managing General Partner in its place and stead, subject to the consent of the Investor Limited Partner. If for any reason no designation is in effect, the powers of the Managing General Partner shall be exercised by the majority consent of the remaining General Partners. A designation of a successor as Managing General Partner or the designation of an additional Managing General Partner pursuant to Article VIII shall supersede any designation or other exercise of rights pursuant to this Section 7.3B. Any action required or permitted to be taken by a corporate General Partner (or corporate general partner of a General Partner which is a partnership) hereunder may be taken by such of its proper officers or agents as it shall validly designate for such purpose.

Section 7.4    Duties and Obligations of the General Partners

A.    The General Partners shall use their best efforts to carry out the purposes, business and objectives of the Partnership referred to in Section 2.3, and shall devote to Partnership business such time and effort as may be necessary to (i) supervise the activities of the Management Agent, (ii) make inspections of the Project to determine if the Project is being properly maintained and that necessary repairs are being made thereto, (iii) prepare or cause to be prepared all reports of operations which are to be furnished to the Partners or which are required by any Lender or Agency, (iv) elect to defer the commencement of the Credit Period for all or any portion of the Federal Housing Tax Credit allowable to the Partners under Section 42(g) of the Code, to the extent that any such deferral may be in the best economic interest of the Investor Limited Partner or shall otherwise be requested by the Investor Limited Partners, (however, such deferral shall not serve to reduce any Credit Deficiency) (v) cause the Project to be insured against fire and other risks covered by such insurance in the maximum amount required by any Lender and/or the Agency or, following termination of the Regulatory Agreement, good management practices, in any event in an amount equal to the full replacement value of the Improvements, (vi) obtain and keep in force during the term of the Partnership adequate business or rental interruption and workmen's compensation insurance satisfactory to each Lender and Agency, (vii) obtain and keep in force during the term of the Partnership public liability insurance for the benefit of the Partnership and its Partners in amounts from time to time reasonably acceptable to the Agency and the Lenders, (viii) enforce all contracts entered into for the benefit of the Partnership, (ix) rehabilitate and operate the Property in compliance with all applicable Hazardous Waste Laws, and (x) do all other things which may be reasonably necessary to manage the affairs and business of the Partnership. Further, in the event of any casualty and provided that the insurance proceeds shall be made available therefor, the General Partners shall repair any damage to the Project which was caused by such event, so as to restore the Project (as nearly as possible) to the condition and status thereof immediately prior to such occurrence. All of the insurance policies required by this Section 7.4A shall (a) be written by insurance companies rated A or better by Best's, (b) include AMTAX as a named insured, and (c) include a provision requiring the insurance company to notify AMTAX in writing 30 days prior to the cancellation of any such policy. In addition, the General Partners shall promptly provide AMTAX or its representatives with

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090046

copies of such insurance policies upon request from time to time. The General Partners shall review regularly all of the Partnership and Project insurance coverage to insure that it is adequate. In particular, the General Partners shall review at least annually the insurance coverage required by Section 7.4A(v) to insure that it is in an amount at least equal to the then current full replacement value of the Improvements.

B.     Subject to the terms of the Project Documents and to the requirements of Section 42 of the Code, the Managing General Partner shall use reasonable efforts consistent with sound management practice to cause the Project to maximize income produced by the Project, including, if necessary, seeking any necessary approvals of, and implementing, appropriate adjustments in the rent schedule of the Property.

C.     The Managing General Partner shall hold for occupancy such percentage of the apartments in the Project in such a manner as to qualify the entire Project as a "qualified low income housing project" under Section 42(g) of the Code as interpreted from time to time in regulations and rulings promulgated thereunder. The General Partners shall not take any action which would cause the termination or discontinuance of the qualification of the Project as a "qualified low income housing project" under Section 42(g) of the Code or which would cause the recapture of any Federal Housing Tax Credit without the Consent of the Investor Limited Partner.

D.     The Managing General Partner shall prepare and submit to the Secretary of the Treasury (or any other Agency designated for such purpose), on a timely basis, any and all annual reports, information returns and other certifications and information and shall take any and all other action required (i) to insure that the Partnership (and its Partners) will continue to qualify for the Federal Housing Tax Credit for all Low Income Units in the Project and (ii) unless the Consent of the Investor Limited Partner is received to act otherwise in a particular instance, to avoid recapture of such credit for failure to comply with the requirements of Section 42 of the Code.

E.     The General Partners agree that, except as provided in or contemplated by the Commitments (including the exceptions to nonrecourse provisions of the Loan Documents), neither they nor any Related Person will at any time bear the economic risk of loss for payment of any Mortgage Loan. The General Partners agree that they will not cause any Limited Partner at any time to bear the economic risk of loss for payment or performance under any Note or Mortgage; provided, however, that the Limited Partners shall be liable for the performance of their obligations set forth in this Agreement. Each Limited Partner agrees not to take any action which would cause it to bear the economic risk of loss for payment of any Mortgage Loan.

F.     The General Partner shall have fiduciary responsibility for the safekeeping and use of all funds and assets of the Partnership, whether or not in their immediate possession or control. The General Partner shall not employ, or permit another to employ, such funds or assets in any manner except for the exclusive benefit of the Partnership. In addition, the Managing General Partner will insure that adequate insurance coverage is maintained at all

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090047

times including liability insurance of not less than $3,000,000.00 per occurrence, fire, theft, hazard and liability insurance for replacement costs and all such policies to have the Investor Limited Partner named as an additional Insured. The Investor Limited Partner may require earthquake insurance pending review of a seismic report with a PML rating based upon a 10% probability of exceedance during a 50-year time interval. If required, the policy shall cover at least 22% of the replacement cost of the Apartment Complex and shall have a maximum deductible equal to five percent (5%) of the policy. The General Partner guarantees to keep an earthquake insurance policy acceptable to the Investor Limited Partner in place during the entire Compliance Period as defined in the Code, failure to do so shall be grounds for removal.

      G.    No General Partner shall contract away the fiduciary duty owed at common law to the Limited Partners.

      H.    The General Partner shall (i) not store (except in compliance with applicable Hazardous Waste Laws) or dispose of any Hazardous Material at the Project, or at or on any other Facility or Vessel owned, occupied, or operated either by any General Partner, any Affiliate of a General Partner, or any Person for whose conduct any General Partner or Affiliate of a General Partner is or was responsible; (ii) neither directly nor indirectly transport or arrange for the transport of any Hazardous Material (except in compliance with applicable Hazardous Waste Laws); (iii) provide the Limited Partners with written notice (x) upon any General Partner's obtaining knowledge of any potential or known release, or threat of release, of any Hazardous Material at or from the Project or any other Facility or Vessel owned, occupied, or operated by any General Partner, any Affiliate of a General Partner or any Person for whose conduct any General Partner or Affiliate of a General Partner is or was responsible or whose liability may result in a lien on the Project; (y) upon any General Partner's receipt of any notice to such effect from any Federal, state, or other governmental authority; and (z) upon any General Partner's obtaining knowledge of any incurrence of any expense or loss by any such governmental authority in connection with the assessment, containment, or removal of any Hazardous Material for which expense or loss any General Partner may be liable or for which expense or loss a lien may be imposed on the Project.

      I.    If requested to do so by the Investor Limited Partners at any time after the completion of the fourteenth year of the compliance period (as defined in Section 42(i)(1) of the Code), the General Partner shall submit a written request to the Credit Agency to find a Person to acquire the Partnership's interest in the low-income portion of the Project and/or take such other action permitted or required by the Code as the Investor Limited Partner may reasonably request to effect a sale of the Project or to terminate the extended use commitment of Section 42(h)(6)(B) of the Code.

      J.    Subject to compliance with Section 42 of the Code and the rules of the agency, upon completion of the Compliance Period, the Managing General Partner shall have the option (the "Option") to purchase the interest of the Investor Limited Partner in the real estate, fixtures and personal property of the Partnership (the "Interest") for a period of twenty-four (24) months. The Managing General Partner may exercise the Option upon written notice to the Investor Limited Partner at any time after the end of the Compliance Period (the "Option

Period"). In the event the Managing General Partner exercises the Option, it must pay to the Investor Limited Partner the Option Price (as defined herein) in cash. The Option Price shall equal the greater of (i) the fair market value of the Interest, without offset for any lack of control or inability to control management of the Investor Limited Partner, (Fair Market Value shall be determined by two independent MAI appraisers: one selected by the Managing General Partner and one by the Investor Limited Partner. If such appraisers are unable to agree on the value, they shall jointly appoint a third independent MAI appraiser whose determination shall be final and binding), or (ii) an amount determined by the Partnership Accountants, which is sufficient to pay (a) all outstanding indebtedness secured by the Apartment Complex and (b) distribute to the Investment Company cash proceeds sufficient to enable the Investment Company to pay, on an after tax basis, any taxes projected to be imposed on the Investment Company as a result of the sale pursuant to the Option. However, in no event shall the Option Price be at an amount less than the Exit Tax Distribution.

K.     Subject to the Option in Section 7.4J above, the Limited Partner shall have the option to force a sale of its interest in the real estate, fixtures and personal property comprising the Apartment Complex (the "Limited Partnership Option") for a period of twenty-four (24) months following the close of the Compliance Period as determined by the Code. Such sale shall be executed at Fair Market Value, as determined under Section 7.4J. In the event that the Investor Limited Partner exercises the Limited Partnership Option, the Managing General Partner shall have a "Right of First Refusal" to purchase the Partnership Interest.

Section 7.5    <u>Representations and Warranties; Certain Indemnities</u>

A.     The Managing General Partner hereby represents and warrants to the Investor Limited Partners that the following are true as of the date hereof and will be true on the due date for each Installment:

(i)     The Partnership is a duly organized limited partnership validly existing under the laws of the State and has complied with all recording requirements with each proper governmental authority necessary to establish the limited liability of the Limited Partners as provided herein.

(ii)     No litigation or proceeding against the Partnership, any General Partner, the Builder or the Developer, nor any other litigation or proceeding directly affecting the Project, is pending before any court, administrative agency or other governmental authority which would, if adversely determined, have a material adverse effect on the Partnership, any General Partner, the Builder, the Developer or their respective businesses or operations, except for such matters as to which the likelihood of such a determination adverse to the Partnership is, in the opinion of Partnership Counsel or other counsel acceptable to the Investor Limited Partner, remote.

(iii)     (a)     No default by any General Partner, any Affiliate thereof having any relationship with the Project, or the Partnership, in any material respect has occurred or is continuing (nor has there occurred any continuing event which, with the

giving of notice or the passage of time or both, would constitute such a default in any material respect) under any of the Project Documents.

(b)     The Project Documents are in full force and effect (except to the extent fully performed in accordance with their respective terms).

(c)     All operating and replacement reserves are fully funded to the extent required by the Project Documents and this Agreement.

(d)     No failure or refusal of the Lender to make any advance required under the Construction Loan Agreement has occurred and is continuing.

(iv)     No Partner or Related Person bears the economic risk of loss with respect to the indebtedness evidenced by any Note and secured by any Mortgage, except as permitted by Article IIIA.

(v)     All building, zoning and other applicable certificates, permits and licenses necessary to permit the construction, rehabilitation, repair, use, occupancy and operation of the Project have been obtained (other than prior to completion of the rehabilitation of the Project or a specified portion thereof, such as will be issued only after the completion of the rehabilitation of the Project or such specified portion thereof) and neither the Partnership nor the General Partners has received any notice or has any knowledge of any violation with respect to the Project of any law, rule, regulation, order or decree of any governmental authority having jurisdiction which would have a material adverse effect on the Project or the construction, rehabilitation, use or occupancy thereof, except for violations which have been cured and notices or citations which have been withdrawn or set aside by the issuing agency or by an order of a court of competent jurisdiction.

(vi)     The Partnership owns the fee simple interest in the Property and has good and marketable title thereto, free and clear of any liens, charges or encumbrances other than the Mortgage, matters set forth in the Title Policy delivered at Investment Closing, encumbrances the Partnership is permitted to create under Sections 2.4 and 7.1, and mechanics' or other liens which have been bonded or insured against in such a manner as to preclude the holder of such lien or such surety or insurer from having any recourse to the Property or the Partnership for payment of any debt secured thereby. None of the liens, charges, encumbrances or exceptions set forth in the Title Policy delivered at Investment Closing has or will have a material adverse effect upon the construction or operation of the Project.

(vii)     The execution and delivery of all instruments and the performance of all acts heretofore or hereafter made or taken or to be made or taken, pertaining to the Partnership or the Property by any General Partner or Affiliate thereof which is a corporation have been or will be duly authorized by all necessary corporate or other action, and the consummation of any such transactions with or on behalf of the

Partnership will not constitute a breach or violation of, or a default under, the charter or by-laws of any such corporation or any agreement by which any such corporation or any of its properties is bound, nor constitute a violation of any law, administrative regulation or court decree.   Each such corporation is duly organized and validly existing under the law of the state of its incorporation.

(viii)   No General Partner is in default in any material respect in the observance or performance of any provision of this Agreement to be observed or performed by such General Partner.

(ix)   The Related Agreements are in full force and effect and no default by any party thereto (other than AMTAX or its Affiliates) has occurred or is continuing thereunder (nor has there occurred any event which, with the giving of notice or the passage of time, or both, would constitute such a default in any economically material respect thereunder).

(x)   No Event of Bankruptcy has occurred and is continuing with respect to the Partnership, any General Partner, its Affiliates, the Developer, its Affiliates or the Purchaser.

(xi)   The entire Project will qualify, or on and after the Completion Date qualifies, as a "qualified low-income housing project" under Section 42(g) of the Code and all Low Income Units in the Project qualify as "low income" apartment units under Section 42 of the Code.   100% of all Units in the Project will qualify as Low-Income Units as defined under Section 42 of the Code.

(xii)   The Managing General Partner is not insolvent as defined in the Uniform Fraudulent Transfer Act or such other fraudulent conveyance law as may be applicable under the laws of the State;

(xiii)   All tax returns, financial statements, Schedules K-1 and reports due under Article XII have been properly filed and/or transmitted, as applicable.

(xiv)   No General Partner, Affiliate of a General Partner or Person for whose conduct any General Partner is or was responsible has ever:   (i) owned, occupied, or operated a Facility or Vessel on which any Hazardous Material was or is stored, transported, or disposed of (except if such storage, transport or disposition was or is at all times in compliance with applicable Hazardous Waste Laws); (ii) directly or indirectly transported, or arranged for transport, of any Hazardous Material (except if such transport was or is at all times in compliance with applicable Hazardous Waste Laws); (iii) caused or was legally responsible for any release of any Hazardous Material; (iv) received notification from any Federal, state or other governmental authority of (x) any potential, known, or threat of release of any Hazardous Material from the Project or any other Facility or Vessel owned, occupied, or operated by any General Partner, Affiliate of a General Partner, or Person for whose conduct any

General Partner or Affiliate of a General Partner is or was responsible or whose liability may result in a lien on the Project; or (y) the incurrence of any expense or loss by any such governmental authority or by any other Person in connection with the assessment, containment, or removal of any release or threat of release of any Hazardous Material from the Project or any such Facility or Vessel.

(xv)    To the best of the Managing General Partner's knowledge, no Hazardous Material was ever or is now stored on, transported or disposed of on the Land (except to the extent any such storage, transport or disposition was at all times in compliance with all Hazardous Waste Laws).

(xvi)    Other than the initial year and last year of the Credit Period as allowed by the Code, the amount of the maximum annual Federal Housing Tax Credit to the Partnership shall be at least $425,784.

(xvii)   At least 50% or more of the aggregate basis of the land and building is financed with tax-exempt bond proceeds, and the entire Project is eligible for credits without receiving an LIHC allocation.

(xviii)  The Bonds have been or will be properly issued for the benefit of the Project in accordance with Section 142 (d) of the Code and the Project is or will be financed in accordance with Section 42 (h)(4) of the Code.   The Partnership will comply with the requirements of the Bond Documents, including owning and operating the Project as a "qualified residential rental project" within the meaning of Section 142 (d) of the Code for the required period.

B.    The Managing General Partner agrees to promptly indemnify, defend and hold harmless the Partnership and the Limited Partners from and against any and all claims, losses, damages and liabilities (as well as from and against any and all attorneys' fees and other costs and expenses incurred in connection therewith) which the Partnership and the Limited Partners may incur by reason of any liabilities to which either the Partnership or the Project is subject at the Admission Date; provided, however, that the foregoing indemnification shall not apply to any Mortgage, necessary contractual obligations normally incurred pursuant to the Commitments in connection with the operation of the Property, or to acts for which the General Partners are entitled to indemnification under Section 7.6.

C.    The Managing General Partner agrees promptly to indemnify, defend, and hold harmless the Partnership and the Limited Partners from and against any claim, loss, damage or liability (as well as from and against any and all attorneys' fees and other costs and expenses incurred in connection therewith) on account of the presence or escape of any Hazardous Material at or from the Property (or at any other location).   Any claim, loss, damage or liability described in the immediately preceding sentence may be defended, compromised, settled, or pursued by the Limited Partners with counsel of the Limited Partners' selection, but at the expense of General Partners.   Notwithstanding anything else set forth in this Agreement, this indemnification shall survive the withdrawal of any General Partner and/or the termination

of this Agreement.

D.     The General Partner acknowledges familiarity with recently issued technical advice memoranda 200043015, 200043016, 200043017, 200044004, and 200044005 and has discussed the substance of the memoranda rulings with its tax advisor and represents and warrants that the Project meets the requirements of Section 42(h)(1)(E) taking into consideration those rulings.

Section 7.6     Indemnification

Each General Partner (including any Retired General Partner) shall be indemnified by the Partnership against any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by him or it in connection with the Partnership from parties other than the Partnership or the Investor Limited Partner, provided that the same were not the result of negligence or misconduct on the part of the General Partner or any of its "Designated Affiliates" (as such term is defined in Section 7.7B.) and were the result of a course of conduct which the General Partners, in good faith, determined was in the best interest of the Partnership.  Any indemnity under this Section 7.6 shall be provided out of and to the extent of Partnership assets only, and no Limited Partner shall have any personal liability on account thereof; provided, however, that no indemnification shall be provided for any losses, liabilities or expenses arising from or out of any alleged violation of federal or state securities laws unless (1) there has been a successful adjudication on the merits of each count involving alleged securities law violations as to the particular indemnitee and the court approves indemnification of litigation costs; (2) such claims have been dismissed with prejudice on the merits by a court of competent jurisdiction as to the particular indemnitee and the court approves indemnification of litigation costs; or (3) a court of competent jurisdiction approves a settlement of the claims against a particular indemnitee and finds that indemnification of the settlement and related costs should be made.  In any claim for indemnification in connection with a settlement which was so approved, the party seeking indemnification shall place before the court the position of the Securities and Exchange Commission and the relevant state Securities Commission and any state securities administrator whose rules or published policies require such disclosure with respect to the issue of indemnification for securities law violations.

The Partnership shall not incur that cost of that portion of any insurance which insures any party against any liability as to which such party is herein prohibited from being indemnified.

Section 7.7     Liability of General Partners to Limited Partners

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090053

A.     No General Partner or Designated Affiliate (as defined in Section 7.7B) shall be liable, responsible or accountable for damages or otherwise to the Partnership or to any Limited Partner for any loss suffered by the Partnership which arises out of any action or inaction of such General Partner or Designated Affiliate if that General Partner or Designated Affiliate, in good faith, determined that such course of conduct was in the best interests of the Partnership and such course of conduct did not constitute negligence or misconduct on the part of that General Partner or Designated Affiliate.

B.     As used in Sections 7.6 and 7.7, a "Designated Affiliate" is any Person performing services on behalf of the Partnership who: (1) directly or indirectly controls, is controlled by, or is under common control with any General Partner, (2) owns or controls 10% or more of the outstanding voting securities of any General Partner, (3) is an officer, director, partner or trustee of any General Partner, or (4) if any General Partner is an officer, director, partner or trustee, of any company for which the General Partner acts in any such capacity.

Section 7.8     Reserves

A.     The Managing General Partner shall establish all reserves required by any of the Project Documents and maintain them in accordance with the terms thereof.

B.     Additionally, the Managing General Partner shall establish a reserve account for capital replacements (the "Replacement Reserve Fund"), which account shall be funded by an initial deposit of $70,000 at the time of the Third Installment and annual deposits per apartment (the "Annual Deposits"), in equal monthly installments beginning at the time of the Third Installment as  set forth in section 5.1A, in the Project (or such lesser amount as shall be approved in writing by the Investor Limited Partner from time to time). The Annual Deposits shall be an amount equal to $250 per apartment for years one (1) through five (5) of the Compliance Period, $300 per apartment for years six (6) through ten (10) of the Compliance Period, and $350 per apartment thereafter. Withdrawals from such reserve shall be utilized solely to fund capital repairs and improvements deemed necessary by the Managing General Partner and, except in the case of withdrawals of $10,000 or less for emergencies only, may be made only with the Consent of the Investor Limited Partner, such consent not to be unreasonably withheld.  All withdrawals must be disclosed in writing to the Investor Limited Partner within thirty (30) days thereof.

C.     Additionally, the Managing General Partner shall establish an Operating Reserve (at a date no later than that of the Third Installment as set forth in section 5.1A) in the amount of $153,000, to provide for operating deficits which shall be funded by the Managing General Partner.  In the event this initial amount is funded by the Managing General Partner and not from available Partnership funds, it is to be treated as a "Subordinated Loan", except that any maximum annual repayment amount may not exceed one fourth (1/4) of the initial amount funded with the Subordinated Loan and repayment will not begin until after tax returns and audits for one full year of operations are completed.   The initial amount must be maintained annually, with the minimum balance to be funded by operations Cash Flow or additional "Subordinated Loans" if necessary.  All disbursements from this account must be

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090054

authorized by the Investor Limited Partner. If the Permanent Lender requires additional operating and/or debt service reserves, this required operating reserve amount may be used to fund all or part of lenders requirements only upon the Investor Limited Partner's approval. If the Property maintains a 1.20 debt coverage ratio after stabilization, this Operating Reserve may be reduced by $76,500 annually commencing on the first anniversary of the Third Installment. These released funds may be utilized first to pay any deferred Developer Fee, if any remains, or released into Cash Flow and distributed in accordance with Section 6.2A herein.

D.     The Partnership is entering into an Environmental Escrow Agreement with -Fannie Mae (the "Environmental Escrow") providing for a $1,047,234 deposit into escrow for environmental cleanup activities for the Tacoma Smelter Plume Site area of the Project (the "Remedial Work"). The Partnership agrees not to amend, modify, or revoke the Environmental Escrow, or any environmental insurance policy it enters into, and not to request or accept any waiver of its provisions without the prior written Consent of the Investor Limited Partner. Further, in the event any of the funds of the Environmental Escrow are not used for Remedial Work, but are released to the Partnership, such released funds shall be utilized: First, to pay any Deferred Developer Fee; Second, to pay any balance of the General Partner Loan and then any Subordinate Loans; and, Third, the balance, if any, to be distributed 90% to the Managing General Partner and 10% to the Investor Limited Partner.

Section 7.9     Obligation To Provide for Project Expenses

The Managing General Partner agrees that if the Partnership requires funds, beyond those available in the Operating Reserves account,  to (i) discharge Project Expenses (other than to make payments to Partners, payments of any outstanding Subordinated Loans or other obligations herein provided to be payable solely out of Cash Flow or distributions of Capital Proceeds) or comply with Tax Credit Rules or regulations during or in respect of the period commencing on the Admission Date, or (ii) pay the Asset Management Fee, or (iii) assure maintenance by the Partnership of Surplus Cash of at least $1.00 at all times during such period, or, (iv) (without using funds available in the Operating Reserves account either directly or indirectly, or any other funds otherwise available for payment or prepayment of the Mortgage Loans or distributions of Cash Flow, or to fund reserves), fully fund the $1,047,000 Environmental Escrow no later than at the time of the Permanent Mortgage Commencement, then, in such events, the Managing General Partner shall furnish to the Partnership the funds required (items (i) through (iv) are collectively referred to as the "Expense Obligations"). Amounts so furnished for Expense Obligations shall constitute Subordinated Loans.  Any such Subordinated Loans shall be non-interest bearing and shall be repayable only as provided in Article VI.  The cumulative amount of all Subordinated Loans, other than any amount for item (iv), the Environmental Escrow,  shall not be required to exceed $600,000 (the "Capped Subordinated Loans").  The obligation to provide for such Capped Subordinated Loans shall be reduced by $150,000 annually commencing on the first anniversary of the Third Installment.

Section 7.10   Certain Payments to the General Partners and Affiliates

A:\Hidden Hills\LP.7                                      51

A.      For its services in connection with the development of the Property and the supervision to completion of the construction of the Improvements and as reimbursement for Development Advances, the Developer shall be entitled to receive the amounts set forth in the Development Agreement.

B.      All of the Partnership's expenses shall be billed directly to, and paid by, the Partnership to the extent practicable.  Subject to the terms of this Agreement, reimbursements to a General Partner or any of its Affiliates by the Partnership shall be allowed subject to the following conditions:

  (i)      such goods or services must be necessary for the prudent formation, development, organization or operation of the Partnership;

  (ii)      reimbursement for goods or services provided by Persons who are not affiliated with a General Partner shall not exceed the cost to a General Partner or its Affiliates of obtaining such goods or services; and

  (iii)      reimbursement for goods and services obtained directly from a General Partner or its Affiliates shall not exceed the amount the Partnership would be required to pay independent parties for comparable goods and services in the same geographic location.

C.      The Partnership shall pay to the Managing General Partner a non-cumulative Partnership Management Fee (as adjusted by the C.P.I.)in the annual amount equal to the Asset Management Fee, beginning with payment of the First Installment, such fee to be prorated in the first year from the date of the First Installment.  The Partnership Management Fee shall be payable solely from Cash Flow as provided in Section 6.2A or as the case may be, 6.2B.

D.      The Partnership shall pay to the Managing General Partner a non-cumulative Incentive Supervisory Fee from either "Distributions of Cash Flow" or from "Distributions from a Sale or Refinancing", as the case may be, in each year the Partnership has income in excess of losses (without taking into account the effects of accelerated depreciation, Tax Credits or any deduction allowable under Section 179 of the Code) in an amount equal to 33% of the Gross Revenues of the Project (as determined by the Accountants) from "Distributions of Cash Flow and in an amount equal to 33% of the Gross Revenues of the Project (as determined by the Accountants) from "Sale or Refinancing".  The Incentive Supervisory Fee shall be payable solely from Cash Flow as provided in Section 6.2A, or as the case may be, 6.2B.

E.      Neither the General Partner nor any of its Affiliates shall be entitled to any other compensation, fees or profits from the Partnership in connection with the acquisition, construction, development or rent-up of the Land or Improvements or for the administration of the Partnership's business or otherwise, except for (i) payments provided for or referred to in Sections 2.4(v) or 7.10, (ii) payments of the Management Fee referred to in Article XI,

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090056

(iii) fees and distributions under Article VI and (iv) such other fees and distributions as may be permitted to be paid by the Lenders or the Agency out of the proceeds of any Mortgage Loan.

Section 7.11   Joint and Several Obligations

All obligations of the General Partners hereunder are joint and several obligations of the General Partners, except as herein expressly provided to the contrary.

Section 7.12   Grant of Security Interest

In order to secure the performance by the General Partner and the Developer of their obligations to the Investor Limited Partner under this Agreement and all other agreements or instruments delivered concurrently herewith, the General Partner and the Developer hereby assign to the Investor Limited Partner all amounts otherwise payable to the General Partner and the Developer under this Agreement and the Development Agreement (as fees, distributions or otherwise), which assignment shall be deemed a grant of a security interest. The General Partner and the Developer hereby represent and warrant to the Investor Limited Partner that the security interest granted hereunder is and shall remain a perfected first security interest in the collateral herein described.   At the request of the Investor Limited Partner, the General Partner and the Developer shall execute such documents and take such other actions as may be necessary or appropriate in the discretion of the Investor Limited Partner to further evidence and perfect the security interest granted hereby.

Notwithstanding any of the foregoing, unless and until there occurs an Event of Default hereunder, the Investor Limited Partner agrees to forebear exercising its right to Developer Fees payable to Developer or the Managing General Partner, and the Developer or the Managing General Partner shall have the right to receive all Developer Fees and retain and enjoy the same not otherwise needed to complete the development of the project.

Section 7.13   Tax Matters Partner

A.     The Tax Matters Partner ("TMP") for the Partnership shall be the General Partner if there is a single General Partner or, if there is a Managing General Partner, the Managing General Partner serving in such capacity from time to time.

B.     The TMP shall have the right to resign as the TMP by giving thirty (30) days written notice to each Partner, provided there is another General Partner willing to serve in such capacity.  Upon the resignation, death, legal incompetency or Bankruptcy of the Person serving as the TMP, any successor to the interest of the TMP pursuant to the applicable provisions of this Section 7.9 shall be designated as the successor TMP, but such designee shall not become the TMP until the designation of such Person has been approved by the Consent of the Investor Limited Partner, which consent shall not be unreasonably withheld or delayed.

C.     The TMP shall employ experienced tax counsel to represent the Partnership in

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090057

connection with any audit or investigation of the Partnership by the Service, and in connection with all subsequent administrative and judicial proceedings arising out of such audit. The fees and expenses of such counsel shall be a Partnership expense and shall be paid by the Partnership. Such counsel shall be responsible for representing the Partnership; it shall be the responsibility of the General Partners and of the Investor Limited Partner, at their expense, to employ tax counsel to represent their respective separate interests.

D.      The TMP shall keep the Partners informed of all administrative and judicial proceedings, as required by Section 6623(g) of the Code, and shall furnish to each Partner who so requests in writing, a copy of each notice or other communication received by the TMP from the Service (except such notices or communications as are sent directly to such requesting Partner by the Service). All third party costs and expenses incurred by the TMP in serving as the TMP shall be Partnership expenses and shall be paid by the Partnership.

E.      The TMP shall not have the authority, unless such action has been approved by the Consent of the Investor Limited Partner, to do all or any of the following:

   (i)      to enter into a settlement agreement with the IRS which purports to bind partners other than the TMP,

   (ii)     to file a petition as contemplated in Section 6226(a) or 6228 of the Code,

   (iii)    to intervene in any action as contemplated in Section 6226(b) of the Code,

   (iv)     to file any request contemplated in Section 6227(b) of the Code, or

   (v)      to enter into an agreement extending the period of limitations as contemplated in Section 6229(b)(1)(B) of the Code.

F.      The relationship of the TMP to the Investor Limited Partner is that of a fiduciary, and the TMP has a fiduciary obligation to perform its duties in such manner as will serve the best interests of the Partnership and the Investor Limited Partner.

G.      The Partnership shall indemnify the TMP (including the officers and directors of a corporate TMP) from and against judgments, fines, amounts paid in settlement, and expenses (including attorneys' fees) reasonably incurred by them in any civil, criminal or investigative proceeding in which they are involved or threatened to be involved by reason of being the TMP, provided that the TMP acted in good faith, within what is reasonably believed to be the scope of its authority and for a purpose which it reasonably believed to be in the best interests of the Partnership or the Partners. The TMP shall not be indemnified under this provision against any liability to the Partnership or its Partners to any greater extent than the indemnification allowed by Section 7.6 of this Agreement. The indemnification provided hereunder shall not be deemed to be exclusive of any other rights to which those indemnified

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090058

may be entitled under any applicable statute, agreement, vote of the Partners, or otherwise.

## ARTICLE VIII

### Withdrawal of a General Partner; New General Partners

Section 8.1    Voluntary Withdrawal

A.    No General Partner shall have the right to withdraw or retire voluntarily from the Partnership or sell, assign or encumber his or its Interest without the Consent of the Investor Limited Partner and, if required, any Requisite Approvals.

B.    Notwithstanding the foregoing, a General Partner may at any time propose to the Investor Limited Partner a Person to serve as his or its successor, or if at such time there be more than one General Partner, to serve as a successor to one or more of the General Partners desiring to withdraw. If the Consent of the Investor Limited Partner is obtained, and all Requisite Approvals are obtained to such withdrawal and the admission of such successor, all Partners hereby agree that this Agreement and the Certificate shall be appropriately amended to effect such withdrawal and admission.

Section 8.2    Right To Continue

In the event of the occurrence of a Terminating Event with respect to any General Partner, the remaining General Partners, if any, and any successor General Partner, shall have the right to elect to continue the business of the Partnership employing its assets and name, all as contemplated by the laws of the State.  Within ten (10) days after the occurrence of such Terminating Event, the remaining General Partners, if any, shall notify the Investor Limited Partner thereof and of their decision whether or not to continue the business of the Partnership.

Section 8.3    Successor General Partner

A.    Upon the occurrence of any Terminating Event referred to in Section 8.2, the remaining General Partners may (but are not required to) designate a Person to become a successor General Partner to the General Partner as to whom such event shall have occurred. Any Person so designated, subject to the Consent of the Investor Limited Partner (and, if required by the Act or any other applicable law, the consent of any other Partner so required), shall become a successor General Partner upon its written agreement to be bound by the Project Documents and by the provisions of this Agreement.

B.    If any Terminating Event referred to in Section 8.2 shall occur at a time when there is no remaining General Partner and no successor becomes a successor General Partner pursuant to the preceding provisions of this Section 8.3 or if the remaining General Partners do not elect to continue the business of the Partnership (in which case such Partners shall also be considered "Retired General Partners" for purposes of this Article VIII), then the Investor Limited Partner shall have the right to designate a Person to become a successor General

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090059

Partner upon his or its written agreement to be bound by the Project Documents and by the provisions of this Agreement.

C.     If the Investor Limited Partner elects to reconstitute the Partnership pursuant to this Section 8.3 and admit a successor General Partner pursuant to this Section 8.3, the relationship of the parties in the reconstituted Partnership shall be governed by this Agreement.

Section 8.4     Interest of Predecessor General Partner

A.     Except as provided in Section 8.3, no assignee or transferee of all or any part of the Partnership Interest of a General Partner shall have any automatic right to become a General Partner.  Upon the designation of a successor General Partner (if any) pursuant to Section 8.3, such Partner shall have the option to acquire the predecessor General Partner's Partnership Interest by paying to such General Partner or its representatives the fair market value of such Partnership Interest (provided that if the predecessor General Partner is in violation of any of the covenants or undertakings contained in this Agreement, or has violated any representation or warranty contained herein, the designated successor General Partner may pay such amount into escrow until such violation has been corrected).  Any dispute as to such fair market value or as to the final disposition of such amount shall be settled by Arbitration, in accordance with the rules for commercial arbitration of the American Arbitration Association to be held in King County, Washington.  Each party shall choose an arbitrator and the two arbitrators shall choose a third independent arbitrator.  All arbitrators shall be experienced in the valuation of low-income tax credit projects.  The decision of the majority of the arbitrators shall be final and the parties consent to entry of judgement upon such decision.

B.     If no successor General Partner is designated or if the designated successor General Partner of the predecessor General Partner does not desire to purchase the Partnership Interest of the predecessor General Partner, such Partnership Interest of the predecessor General Partner shall be deemed to be that of a Special Class Limited Partner and the holder thereof shall be entitled only to such rights as the assignee of a Limited Partnership Interest may have as such under the provisions of Section 9.4 hereof, the Uniform Act and other applicable laws of the State.

C.     Upon the occurrence of a Terminating Event as to any General Partner, such General Partner (the "Retired General Partner") shall be deemed to have automatically transferred to the remaining General Partners, in proportion to their respective General Partnership interests, or, if there shall be no remaining General Partners, then to the Partnership for the benefit of the remaining Partners, all or such portion of the General Partnership Interest of such Retired General Partner which, when aggregated with the existing General Partnership Interests of all such remaining General Partners, if any, will be sufficient to assure such remaining General Partners and any successor General Partner a .09% interest in all Profits, Losses, Tax Credits and distributions of the Partnership under Article VI hereof. No documentation shall be necessary to effectuate such transfer, which shall be automatic. That portion of the General Partnership Interest of the Retired General Partner which shall not have been transferred pursuant to this Section 8.4C shall be retained by such Retired General

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090060

Partner (or pass to legal representatives of a deceased General Partner) who or which shall have the status of a Special Limited Partner, with no right to receive share of the Profits, Losses, Tax Credits, and distributions of the Partnership to which the Retired General Partner as such, would have been entitled had such Terminating Event not occurred, and such Retired General Partner (or his legal representatives in the case of a deceased General Partner) shall not be considered to be a Limited Partner for the purpose of sharing the benefits allocated to the Limited Partners under Article VI hereof and shall not participate in the votes or consents of the Limited Partners hereunder.  No consideration shall be paid to such Retired General Partner by the remaining General Partners or the Partnership in the event of a Transfer pursuant to this Section 8.4C.

D.      For the purposes of Article VI hereof, the effective date of the transfer pursuant to the provisions of Section 8.4C of the General Partnership Interest of a Retired General Partner shall be deemed to be the date on which such Terminating Event occurs.

E.      Anything herein contained to the contrary notwithstanding, any General Partner who withdraws voluntarily in violation of Section 8.1 or is removed shall remain liable for all of its obligations under this Agreement, for its obligations under the Related Agreements and the Project Documents, for all its other obligations and liabilities hereunder incurred or accrued prior to the date of its withdrawal and for any loss or damage which the Partnership or any of its Partners may incur as a result of such withdrawal, except for any loss or damage attributable to the activities of the remaining and/or successor General Partners subsequent to such withdrawal or removal.

F.      The estate (which term, for purposes of this Section 8.4F, shall include the heirs, distributees, estate, executors, administrators, guardian, committee, trustee or other personal representative) of a General Partner who is a natural person as to whom a Terminating Event has occurred shall be and remain liable for all his liabilities and obligations hereunder, except as provided in this Section 8.4F.  In the event of the death, insanity or incompetency of a General Partner who is a natural person, his estate shall remain liable for all his obligations and liabilities hereunder incurred or accrued prior to the date of such event, and for any damages arising out of any breach of this Agreement by him, but his estate shall not have any obligation or liability on account of the business of the Partnership or the activities of the other General Partners after his death, insanity or incompetency unless it elects to become a General Partner pursuant to Section 8.3A.

Section 8.5    Designation of New General Partners

A.      A General Partner may, with the written consent of all Partners, at any time designate one or more new General Partners with such General Partnership Interest(s) as the General Partner may specify.

B.      Any new General Partner shall, as a condition of receiving any interest in Partnership Property, agree to comply with the terms of the Project Documents and by the

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090061

provisions of this Agreement to the same extent and on the same terms as any other General Partner.

Section 8.6    Amendment of Certificate; Approval of Certain Events

A.    Upon the admission of a new General Partner, pursuant to the preceding provisions of this Article VIII, the Schedule shall be amended to reflect such admission and an amendment to the Certificate, also reflecting such admission, shall be filed in the manner and to the extent required by the Uniform Act.

B.    Each Partner hereby consents to and authorizes any admission or substitution of a General Partner or any other transaction, including, without limitation, the continuation of the Partnership business, which has been authorized by the requisite percentage of Partners under the provisions of this Agreement, subject to the provisions of Section 8.7, and hereby ratifies and confirms each amendment of this Agreement and/or the Certificate necessary or appropriate to give effect to any such transaction.

Section 8.7    Admission of a General Partner

Notwithstanding any other provisions of this Agreement, no Person shall be admitted as an additional or successor General Partner without the written approval of all Partners and, unless prior to consummation of such transaction, the Limited Partners shall have received an opinion of Special Counsel to the effect that the consummation of such transaction will not cause (i) the Partnership to be treated as an "association" for federal income tax purposes, or (ii) the Limited Partners to be deemed to be taking part in the control of the business of the Partnership within the meaning of the Uniform Act.

ARTICLE IX

Transfer of Limited Partner Interests; Additional Limited Partners

Section 9.1    Right To Assign

The Investor Limited Partner may not make a voluntary assignment of the whole or any portion of its Partnership Interest without the written consent of the Managing General Partner, which shall not be unreasonably withheld.  Consent to assignments of the Investor Limited Partnership Interest shall be withheld to the extent necessary to preserve the Partnership's tax status and attributes and to comply with securities laws or to reasonably determine that the proposed assignee has sufficient assets to satisfy the Investor Limited Partner's Capital Contribution obligations, or such obligations are guaranteed by the assigning Investor Limited Partner.  Notwithstanding the foregoing, in no event shall any assignee of a Limited Partner have any right to become a Substitute Limited Partner without compliance with all applicable provisions of this Article IX.

Section 9.2    Restrictions

CB__ PARTNERSHIP AGREEMENT; 1-1-02_105090062

A.     No sale or exchange of the Interest of any Person as a Limited Partner shall be made if such sale or exchange would violate the Regulations, except a sale pursuant to the Purchase Agreement.

B.     In no event shall all or any part of a Limited Partner's Interest be assigned or transferred to a minor or to an incompetent.

C.     The General Partner may require as a condition of any assignment of any Interest that the assignor assume all costs incurred by the Partnership in connection therewith.

D.     Any assignment in contravention of any of the provisions of Section 9.1 or this Section 9.2 shall be void and ineffectual and shall not bind, or be recognized by, the Partnership.

Section 9.3     Substitute Limited Partners

A.     No Limited Partner shall have the right to substitute an assignee as a Limited Partner in his place.  The General Partner, however, may in its exclusive discretion permit any such assignee to become a Substitute Limited Partner and any such permission by the General Partner shall be binding and conclusive without the consent or approval of any other Person, except, if required, any Requisite Approvals.  Any Substitute Limited Partner shall, as a condition of receiving any interest in the Partnership assets, agree to be bound (to the same extent as his assignor was bound) by the Project Documents and by the provisions of this Agreement.

B.     Upon the admission of a Substitute Limited Partner, the Schedule shall be amended to reflect the name and address of such Substitute Limited Partner and to eliminate the name and address of his assignor and, if necessary, an amendment to the Certificate reflecting such admission shall be filed in accordance with the Uniform Act at least once each calendar quarter during which a Substitute Limited Partner is admitted, in order to effect the substitution thereof.  Each Substitute Limited Partner shall execute such instrument or instruments as shall be required by the General Partner to signify its agreement to be bound by all the provisions of this Agreement.

Section 9.4     Assignees

A.     In the event of the death or incapacity or dissolution of any Limited Partners, his or its legal representatives shall have such rights as are afforded them by the Uniform Act. The death or dissolution of a Limited Partner shall not dissolve the Partnership.

B.     An assignee of a Limited Partner who does not become a Substitute Limited Partner in accordance with Section 9.3 shall, if such assignment is in compliance with the terms of this Agreement, have the right to receive the same share of profits, losses and

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090063

distributions of the Partnership to which the assigning Limited Partner would have been entitled if no such assignment had been made by such Limited Partner.

C.     Any Limited Partner who shall assign all its Interest shall cease to be a Limited Partner of the Partnership, and shall no longer have any rights or privileges or obligations of a Limited Partner except that, unless and until the assignee of such Limited Partner is admitted to the Partnership as a Substitute Limited Partner in accordance with Section 9.3, said assigning Limited Partner shall retain the statutory rights and be subject to the statutory obligations of an assignor limited partner under the Uniform Act as well as the obligation to make the Capital Contributions attributable to the Interest in question, if any portion thereof remains unpaid.

D.     In the event of any assignment of a Limited Partner's Interest as a Limited Partner, there shall be filed with the Partnership a duly executed and acknowledged counterpart of the instrument making such assignment; such instrument must evidence the written acceptance of the assignee to all the terms and provisions of this Agreement; and if such an instrument is not so filed, the Partnership need not recognize any such assignment for any purpose.

E.     In the case of any assignment of a Limited Partner's Interest as a Limited Partner, where the assignee does not become a Substitute Limited Partner, the Partnership shall recognize the assignment not later than the last day of the calendar month following receipt of notice of assignment and required documentation.

F.     An assignee of a Limited Partner's Interest as a Limited Partner who does not become a Substitute Limited Partner as provided in Section 9.3 and who desires to make a further assignment of his Interest shall be subject to the provisions of this Article IX to the same extent and in the same manner as any Limited Partner desiring to make an assignment of its Interest.

Section 9.5     Additional Limited Partners

A.     The Managing General Partner may admit additional Limited Partners only with the Consent of the Investor Limited Partner.

B.     Any incoming Limited Partner shall, by his or its execution of this Agreement and as a condition to receiving any interest in the Partnership property, agree to be bound by the Project Documents to the same extent and in the same terms as the other Limited Partners.

C.     Upon the admission of any additional Limited Partners, an amendment to this Agreement and, if necessary or appropriate, the Certificate reflecting such admission shall be filed with each appropriate governmental authority.   Such amendment shall amend the Schedule to reflect the names, addresses and Capital Contributions of such additional Limited Partners, and shall set forth the agreement of such additional Limited Partners to be bound by all the provisions of this Agreement.

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090064

ARTICLE X

Loans

A.     All Partnership borrowings shall be subject to the restrictions of Section 7.1, this Article, the Project Documents and the Regulations.   To the extent borrowings are permitted, they may be made from any source, including Partners and Affiliates.   The Partnership may issue instruments evidencing Subordinated Loans pursuant to Section 7.9.

B.     If any Partner shall lend any monies to the Partnership, such loan shall be unsecured and the amount of any such loan shall not be an increase of its Capital Contribution. Until such time as the General Partner and the Developer shall have performed fully their obligations to furnish funds pursuant to Section 7.9 hereof and pursuant to the Development Agreement, any loan from a General Partner or an Affiliate of a General Partner shall be an obligation of the Partnership to the Partner or Affiliate only if it constitutes a borrowing permitted by Section 7.9 or pursuant to the Development Agreement and shall be repayable as therein provided.   Subject to the preceding sentence, any loans to the Partnership by a General Partner or an Affiliate of a General Partner may be made on such terms and conditions as may be agreed on by the Partnership, consistent with good business practices.

ARTICLE XI

Management Agent

A.     Subject to the consent of the Investor Limited Partner, the Managing General Partner shall have responsibility for obtaining a Management Agent acceptable to each Lender and Agency to manage the Project in accordance with the requirements of each Lender and Agency.   The Managing General Partner shall cause the Partnership to enter into the Management Agreement with the Management Agent, which may be an Affiliate of a General Partner.   Subject to the Regulations, the Management Agent shall be entitled to receive a reasonable and competitive Management Fee (determined by reference to arm's-length property management arrangements for comparable properties in force in the general locality of the Project) not to exceed the lesser of 4% of net rental income or the maximum amount permitted by each Agency or Lender.   If at any time after the Completion Date:

(i)     the Project shall be subject to a substantial building code violation or violations which shall not have been cured within 90 days after notice from the applicable governmental agency or department or unless such violation(s) is (are) being validly contested by the General Partner by proceedings which operate to prevent any fines or criminal penalties from being levied against the Partnership or unless in the case of any such violation not susceptible of cure within such 90-day period, the Managing General Partner is diligently making reasonable efforts to cure the same,

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090065

(ii)    operating revenues of the Project in respect of any period of 24 consecutive calendar months after the Completion Date shall be insufficient to permit the Partnership to pay when due on a current basis all Partnership obligations in respect of such 24-month period,

(iii)    the representation and warranty set forth in Section 7.5A(xi) cannot be accurately made or a Recapture Event shall have occurred,

(iv)    the Management Agent or its agents or employees have demonstrated incompetence or malfeasance in the management of the Project,

(v)    the Management Agent shall fail to provide the required information to the General Partner in a timely manner to permit the Managing General Partner to make all reports required by Article XII when due,

(vi)    an Event of Bankruptcy shall occur with respect to the Management Agent,

(vii)    the Management Agent shall take any action or omit to take any action which violates in any material respect the terms of the Project Documents or any local, state or federal law applicable to the Project, or

(viii)    the Management Agent is an Affiliate of a General Partner and the General Partner is removed as such under the terms of this Agreement,

then, in any such event, the Managing General Partner shall forthwith give to the Investor Limited Partner notice of such event, and thereafter the Partnership shall, subject to any Requisite Approvals, forthwith terminate its management agreement with the Management Agent, unless the Consent of the Investor Limited Partner is obtained to the retention of the Management Agent as the manager of the Property. If such approval is not so obtained, the Managing General Partner shall immediately proceed to select a qualified Person (which, in the event the terminated Management Agent was an Affiliate of the General Partners, shall be unaffiliated with any General Partner) as the new Management Agent for the Property, which selection shall be subject to any Requisite Approvals including approval of the Investment Limited Partner; and, after such selection, no Management Fee shall be payable to any Person which is an Affiliate of a General Partner unless the management contract with any such Person shall provide for the right of the Partnership to terminate the same upon the occurrence of the circumstance described in this Article XI.

## ARTICLE XII

### Books and Reporting, Accounting, Tax Elections, Etc.

Section 12.1    Books, Records and Reporting

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090066

A.      The Managing General Partner shall keep or cause to be kept:

(i) A complete and accurate set of books and supporting documentation of transactions with respect to the conduct of the Partnership's business. The books of the Partnership shall be kept on the accrual basis. The books and records of the Partnership (including all records required to be maintained under the Uniform Act) shall at all times be maintained at the principal office of the Partnership. Each of the Partners and their duly authorized representatives shall have the right to examine the books of the Partnership and all other records and information concerning the operation of the Property at reasonable times.

(ii) Prior to Final Closing, and within five (5) days of submission to the Construction Lender, the Managing General Partner shall cause to be distributed to the Limited Partner copies of the monthly draws of the Construction Loan, with attached documentation, including construction status report signed by the Inspecting Architect, along with copies of all change orders prior to each such draw, copy of the Certificate of Occupancy, copy of the Architect's Certificate of Compliance and a copy of an Insurance Binder listing the Limited Partner as an additional party to be notified as to any changes to the policy. Within fifteen (15) days of the closing thereto, the Managing General Partner shall also provide to the Investor Limited Partner copies of all documents for the Permanent Mortgage Loan.

B.      The Managing General Partner shall cause to be prepared and distributed to all persons who were Partners at any time during a fiscal year of the Partnership, all reports and forms listed below shall be in reasonable formats agreed to by the Partners prior to the admission date:

(i)     Within thirty (30) days of the Completion Date, a Credit Basis Worksheet for each building of the Apartment Complex, in a form as specified by the Investor Limited Partner.

(ii)    By March 15 of each calendar year, and with respect to the previous fiscal year of the Partnership, an audited financial statement which includes: (A) a balance sheet as of the end of such fiscal year and statements of income, Partners' equity, and changes in financial position and a Cash Flow statement, for the year then ended, all of which, shall be prepared in accordance with generally accepted accounting principles and accompanied by an auditor's report containing an opinion of the Accountants, and (B) a report of the activities of the Partnership during the period covered by the report. Such report shall set forth distributions to Limited Partners for the period covered thereby and shall separately identify distributions from: (1) Cash Flow from operations during the periods, (2) Cash flow from operations during a prior period which had been held as reserves, (3) proceeds from disposition of the Apartment Complex or any other investments of the Partnership, (4) lease payments on net leases with builders and sellers, (5) costs reimbursed to any General Partner and its Affiliates verified by an accountant's review of time records and the specific nature of the work,

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090067

(6) reserves, (7) borrowed monies, loans and additional contributions and (8) transactions outside of the ordinary course of business with a description thereof.

(iii)     By March 1 of each calendar year, and with respect to the previous fiscal year of the Partnership, (A) all information necessary for the preparation of the Limited Partners' federal income tax returns, (B) a qualifying occupancy summary in a format acceptable to the Investor Limited Partner.

(iv)     Within fifteen (15) days of the end of each month for the first year and each quarter thereafter, Low Income Housing Credit Monitoring Form, Rent Rolls, Statement of Income and Expenses, Operating Statement and Occupancy/Rental Report, all in the form specified or approved by the Investor Limited Partner. Copies of the bank statements for all Reserve and Escrow accounts are also to be provided at these times.

(v)     Within thirty (30) days after the end of each quarter of each fiscal year of the Partnership, a report containing:

        (A)     a balance sheet, which may be unaudited;

        (B)     a statement of income for the quarter then ended, which may be unaudited;

        (C)     a statement of cash flows, which may be unaudited;

        (D)     the certification by the General Partners that the Apartment Complex and all tenants thereof are in compliance with all requirements and regulations applicable to Federal Housing Tax Credits; and

        (E)     other pertinent information regarding the Partnership and its activities during the quarter covered by the report.

(vi)     Immediately upon being informed thereof, written notice of any IRS, Tax Credit Agency, or local municipality audits, investigations, official inquiries, or notices relating to, or arising from, alleged non-compliance or alleged violations of law, regulations, rules or codes.

(vii)     As soon as practicable, copies of all correspondence between the Managing General Partner, and/or Management Company and either the Agency or the IRS.

C.     Within sixty (60) days after the end of each fiscal year of the Partnership the Managing General Partner shall provide to the Investor Limited Partner:

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090068

(i)     A certification by the Managing General Partner that (A) all Construction Loan and/or Mortgage Loan payments and taxes and insurance payments with respect to the Apartment Complex are current as of the date thereof, or if there is any default, a description thereof, and (B) there is no building, health or fire code violation or similar violation of a governmental law, ordinance or regulation against the Apartment Complex or, if there is any violation, a description thereof;

(ii)    the information specified in Section 12.1D;

(iii)   a descriptive statement of all transactions during the fiscal year between the Partnership and each General Partner and/or any Affiliate, including the nature of the transaction and the payments involved; and

(iv)    a copy of the annual report to be filed with the United States Treasury concerning the status of the Apartment Complex as low-income housing and, if required, a certificate to the Credit Agency concerning the same.

D.     Upon the reasonable written request of the Investor Limited Partner for further information with respect to any matter covered in items B or C above, the Managing General Partner shall furnish such reasonable information within 30 days of receipt of such request. The Managing General Partner, on behalf of the Partnership, shall send to the Investor Limited Partner, copies of complete first year tenant files within thirty (30) days of each tenant's initial occupancy date and on each anniversary date, 20% of all tenant files as randomly identified by the Investor Limited Partner. Upon request, the Managing General Partner shall provide the Investor Limited Partner with current photographs and/or slides of the Apartment Complex and other reports as may be required by federal or state agencies or by the Investor Limited Partner.

E.     The Managing General Partner, on behalf of the Partnership, shall send to the Investor Limited Partner, on or before July 31 in each year, a report which shall state:

(i)     the then occupancy level of the Apartment Complex;

(ii)    if there are any operating deficits or anticipated operating deficits, the manner in which such deficits will be funded; and

(iii)   such other matters as shall be material to the operation of the Partnership, including, without limitation, any building, health governmental law, ordinance or regulation by the Apartment Complex of which the General Partners, or any of them, is (are) aware.

F.     Prior to October 15 of each year, the Managing General Partner, on behalf of the Partnership, shall send to the Investor Limited Partner a current (nine month) balance sheet, an estimate of the Investor Limited Partner's share of the Tax Credits by each building of the Property, estimate of total Tax Credits, and estimates of Profits and Losses for tax

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090069

purposes of the fiscal year in a form as specified by the Investor Limited Partner.   Such estimate shall be prepared by the Managing General Partner and the Accountants.

      G.     Within 15 days after the end of any calendar quarter during which:

         (i)    there is a material default by the Partnership under the Project Documents or in payment of any mortgage, taxes, interest or other obligation on secured or unsecured debt,

         (ii)    any reserve has been reduced or terminated by application of funds therein for purposes materially different from those for which such reserves was established,

         (iii)    the General Partners, or any of them, has (have) received any notice of a material fact which may substantially affect further distributions, or

         (iv)    any Partner has pledged or collateralized his or its Interest in the Partnership,

the Managing General Partner shall send the Investor Limited Partner a detailed report of such event.

      H.     After the Admission Date, the Managing General Partner, on behalf of the Partnership, shall send to the Investor Limited Partner a copy of all applicable periodic reports covering the status of project operations from the previous period, as may be required by any Lender and/or Agency, as applicable.

      I.     Failure to provide the K-1 or the audit required under Section 12.1 within the time requirements set forth therein will result in the assessment of a $100 per day penalty due and payable to the Investor Limited Partner, until the tax information and/or reports are received.  These penalties (the "Report Penalties") will be waived if the required information is received within three (3) business days of receipt of a written or faxed notice of demand from the Investor Limited Partner (including a notice sent by facsimile).  Regardless of whether the Report Penalties are paid, should the above applicable reporting requirements not be met, the Investor Limited Partner may require the removal of the Accountants and the right to approve a replacement.

      J.     Special Report.   Unless otherwise fully reported to the Limited Partners pursuant to this Section 12.1, a special report must be issued within 60 days after the end of each quarter for real property acquisitions.  The report shall contain a description of properties acquired, the present or proposed use of such properties, lease terms, financing terms, title insurance and bonding information.

      K.     Every Limited Partner shall at all times have access to the records of the Partnership and may inspect and copy any of them.  A list of the names and addresses of all of

the Limited Partners shall be maintained as part of the books and records of the Partnership and shall be mailed to any Limited Partner upon request. A reasonable charge for copy work may be charged by the Partnership.

Section 12.2    Bank Accounts

The bank accounts of the Partnership shall be maintained in such banking institutions as the General Partner shall determine with the approval of each Lender and Agency, and withdrawals shall be made only in the regular course of Partnership business on such signature or signatures as the General Partner shall determine. All deposits (including security deposits and other funds required to be escrowed by any Lender or Agency) and other funds not needed in the operation of the business shall be deposited, to the extent permitted by applicable requirements of the Lender and the Agency, in interest-bearing accounts or invested in short-term United States Government obligations maturing within one year.

Section 12.3    Elections

Subject to the provisions of Section 12.4, all elections required or permitted to be made by the Partnership under the Code shall be made by the Managing General Partner in such manner as it considers to be most advantageous to the Limited Partners. Notwithstanding the foregoing, however, unless the Consent of the Investor Limited Partner is obtained permitting a different cost recovery schedule, the Partnership shall depreciate its personal and real property utilizing the alternative depreciation system of Section 168(g)(2) of the Code.

Section 12.4    Special Adjustments

In the event of a transfer of all or any part of the interest of any Partner or in the event an election pursuant to Section 754 of the Code (or corresponding provisions of succeeding law) is made by the Investor Limited Partner, the Partnership shall elect, if requested by the transferee or by the Investor Limited Partner (as the case may be), pursuant to Section 754 of the Code (or corresponding provisions of succeeding law) to adjust the basis of Partnership assets. Notwithstanding anything to the contrary contained in Article X, any adjustments made pursuant to said Section 754 shall affect only the successor in interest to the transferring Partner. Each Partner will furnish the Partnership with all information necessary to give effect to such election.

Section 12.5    Fiscal Year

The Fiscal Year of the Partnership shall be the calendar year unless some other year is required by the Code.

## ARTICLE XIII

### General Provisions

A:\Hidden Hills\LP.7

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090071

Section 13.1   Notices

Except as otherwise specifically provided herein, all notices, demands or other communications hereunder shall be in writing and shall be deemed to have been given when the same are (i) deposited in the United States mail and sent by certified or registered mail, postage prepaid, (ii) deposited with Federal Express or similar overnight delivery service, (iii) transmitted by telecopier or other facsimile transmission, answerback requested, or (iv) delivered personally, in each case, to the parties at the addresses set forth below or at such other addresses as such parties may designate by notice to the Partnership:

      (a)    If to the Partnership, at the principal office of the Partnership set forth in Section 2.2.

      (b)    If to a Partner, at his or its address set forth in the Schedule.

Section 13.2   Word Meanings

The words such as "herein", "hereinafter", "hereof", and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.  The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires. Any references to "Sections" or "Articles" are to Sections or Articles of this Agreement, unless reference is expressly made to a different document.

Section 13.3   Binding Provisions

The covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the heirs, legal representatives, successors and assignees of the respective parties hereto, except in each case as expressly provided to the contrary in this Agreement.

Section 13.4   Applicable Law

This Agreement shall be construed and enforced in accordance with the internal laws of the State.

Section 13.5   Counterparts

This Agreement may be executed in several counterparts and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the original or the same counterpart.

Section 13.6   Paragraph Titles

Paragraph titles and any table of contents herein are for descriptive purposes only, and shall not control or alter the meaning of this Agreement as set forth in the text.

Section 13.7   <u>Separability of Provisions; Rights and Remedies</u>

A.      Each provision of this Agreement shall be considered separable and (i) if for any reason any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid, or (ii) if for any reason any provision or provisions herein would cause the Limited Partners to be bound by the obligations of the Partnership under the laws of the State as the same may now or hereafter exist, such provision or provisions shall be deemed void and of no effect.

B.      Each of the parties hereto irrevocably waives during the term of the Partnership (including any periods during which the business of the Partnership is continued under Article VIII) any right (i) that such party may have to maintain any action for partition with respect to the property of the Partnership, and (ii) any right to commence an action seeking dissolution of the Partnership (unless the Consent of the Investor Limited Partner has been obtained).

C.      The rights and remedies of any of the parties hereunder shall not be mutually exclusive, and the exercise of one or more of the provisions hereof shall not preclude the exercise of any other provisions hereof. Each of the parties confirms that damages at law may be an inadequate remedy for breach or threat of breach of any provisions hereof.   The respective rights and obligations hereunder shall be enforceable by specific performance, injunction, or other equitable remedy, but nothing herein contained is intended to limit or affect any rights at law or by statute or otherwise of any party aggrieved as against the other parties for a breach or threat of breach of any provision hereof, it being the intention by this paragraph to make clear that under this Agreement the respective rights and obligations of the Partners shall be enforceable in equity as well as at law or otherwise.

D.      Each Partner irrevocably:

(i)      agrees that any suit, action or other legal proceeding arising out of this Agreement, any of the Related Agreements or any of the transactions contemplated hereby or thereby shall be brought in the courts of record of Pierce County of the State of Washington or the courts of the United States located in the Western District of Washington;

(ii)     consents to the jurisdiction of each such court in any such suit, action or proceeding; and

(iii)    waives any objection which he or it may have to the laying of venue of any such suit, action or proceeding in any of such courts.

Section 13.8   <u>Effective Date of Admission</u>

Any Partner admitted to the Partnership during any calendar month shall be deemed to have been admitted as of the first day of such calendar month for all purposes of this Agreement including the allocation of Profits, Losses and Tax Credits under Article VI; provided, however, that if regulations are issued by the Service or an amendment to the Code is adopted which would require, in the opinion of the Accountants, that a Partner be deemed admitted on a date other than as of the first day of such month, then the General Partner shall select a permitted admission date which is most favorable to the Partner.

Section 13.9    Amendment Procedure

This Agreement may be amended by the General Partner with the Consent of the Investor Limited Partner or in the manner provided in Section 4.5, subject to the following:

      (i)    The term of the Partnership shall not be extended beyond December 31, 2052 without the written approval of all Partners.

      (ii)    This Section 13.9 shall not be amended without the written approval of all Partners.

      (iii)    This Agreement shall not be modified or amended in such a manner as to increase the amount of Capital Contributions or reduce the interest of any Limited Partner in Profits, Losses, Tax Credits, Cash Flow or Capital Proceeds of the Partnership or otherwise increase the liability of any Limited Partner without the written approval of each Limited Partner affected thereby.

      (iv)    Without the written approval of all Partners, no amendment hereof may reduce the percentage in interest of Partners required hereunder for the taking or omission of any action or for the consent to any action proposed to be taken or omitted.

      (v)    Notwithstanding any agreement to the contrary contained in this Agreement, no amendment will be made to this Agreement which will affect the rights of any Lender or Agency under the terms of any Project Document without the prior written approval of such Lender or Agency.

      (vi)    Article VI may be amended by the General Partner only with the prior written consent of the Investor Limited Partner.

Section 13.10 Delivery of Certificate

Promptly upon the filing of the Certificate and each amendment thereto in the Filing Office, the Managing General Partner shall deliver or mail a copy thereof to each Limited Partner.

Section 13.11 Requirements of the Lender and the Agency

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090074

A.      For as long as any Mortgage from the Partnership held by the Lender shall be outstanding:

(i)      each of the provisions of this Agreement shall be subject to, and the General Partner covenants to act in accordance with the Regulations and the Commitments, but in no event shall any Partner be personally liable for the performance of this covenant;

(ii)      the Regulations and the Commitments shall be binding upon and shall govern the rights and obligations of the Partners, their heirs, executors, administrators, successors and assigns, but only to the extent expressly provided therein;

(iii)      any Partner hereafter shall, as a condition of receiving an interest in the Partnership property, agree to be bound by the Commitments and other documents required in connection with the Mortgage Loan to the same extent and on the same terms as the other parties;

(iv)      upon any dissolution of the Partnership or any transfer of the Property, no title to or right to the possession and control of the Property, and no right to collect the rent therefrom shall pass to any Person who is not or does not become bound by the Commitments (including, without limitation, the Regulatory Agreement) in a manner satisfactory to the Lender;

(v)      no amendment of this Agreement which would affect the rights of the Lenders under any of the documents referred to in this Section 13.11 shall be made without the prior written consent of the Lender;

(vi)      any other provisions of this Agreement to the contrary notwithstanding, if any provisions of this Agreement shall be in conflict with any provisions of the Commitments (including, without limitation, the Regulatory Agreement), the provisions of the Commitments shall control;

(vii)      no distributions (as that term is defined in the Regulatory Agreement) shall be made except as permitted by the terms of the Regulatory Agreement;

(viii)      any other provisions of this Agreement to be the contrary notwithstanding, fees for services payable to the Developer pursuant to the Development Agreement shall be payable only out of Capital Contributions or Surplus Cash;

(ix)      the Partnership shall not be voluntarily dissolved without the prior written consent of the Lender; and

(x)      the provisions of this Section 13.11 shall not be deleted, amended or modified without the prior written consent of the Lender.

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090075

B.    In the event the Partnership elects to (a) pay off any loan that has been insured or coinsured and (b) refinance the Property with the proceeds of a new loan from a lender to be insured or coinsured, this provision shall remain operative unless modified at the request of said secretary or such lender.

Section 13.12 Requirements for Bonds

A.    Not withstanding any other provision of this Agreement to the contrary, so long as any Bonds shall be outstanding, the Partnership shall not, and the General Partner shall have no authority in respect of the Partnership or the Project to, perform any act or permit any act to be taken on its behalf which:

(i)    Is contrary to or would result in a breach or violation of or a default under any requirement, covenant or other obligation of the Partnership set forth in any Bond document; or

(ii)    Would adversely affect the exemption from taxation under the Code of the interest paid on the Bonds.

B.    Not withstanding any other provision in the Agreement to the contrary, for so long as any Bonds shall be outstanding:

(i)    Each of the provisions of this Agreement shall be subject to, and the General Partners covenant to act in accordance with the Bond Documents, but in no event shall any Partner be personally liable for the performance of this covenant.

(ii)    No amendment of this Agreement which would affect the rights of any party to any Bond Document (other than the Partnership) shall be made without the prior written consent of such party and without prior compliance with the conditions for amending such Bond Document;

(iii)    If any provision of this Agreement shall be in conflict with any provision of any Bond Document, such conflicting provision of this Agreement shall be suspended and the provisions of the Bond Document shall control;

(iv)    No part of the Project will be sold or otherwise disposed of or leased, and no change in the use of the Project shall be made, except in accordance with the terms and conditions of the Bond Documents;

(v)    The Partnership shall not change or permit any change in its identity or ownership (except for admitting additional limited partners pursuant to the terms of this agreement), undertake any other obligations, directly or indirectly, or take or permit any other actions which would impair or prevent performance of its obligations, except as permitted thereby, without obtaining the requisite approvals under the Bond

A:\Hidden Hills\LP.7                              72

Documents;

(vi)     To the extent reasonably possible, the Partners shall take all actions necessary to amend this Agreement to comply with any amendments to the Code or the Treasury Regulations effective retroactive to the date of such changes that are applicable to the exemption of federal taxation under the Code of the interest paid on the Bonds; and

(vii)    The provision of this Section 13.12 shall not be deleted, amended or modified without the prior written consent of the parties to the Bond Documents.

Section 13.13 Special Power of Attorney

The Managing General Partner hereby constitutes and appoints the Manager of the Investor Limited Partner as its true and lawful attorney-in-fact, with full power and authority to act in its name, place and stead, to make, execute, sign, certify, acknowledge, deliver, file and record on its behalf, any certificate, document, or instrument necessary or helpful, to effect the admission of the Special Limited Partner as a General Partner and as Managing General Partner, if authorized in accordance with Section 7.3 herein.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

CB__PARTNERSHIP AGREEMENT; 1-1-02_105090077

# HIDDEN HILLS 2001, LP

## PARTNERSHIP AGREEMENT SIGNATURE PAGE

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**MANAGING GENERAL PARTNER:**
HIDDEN HILLS MANAGEMENT, LLC

By: _____
Catherine M. Tamaro,
Managing Member

-and-

By: _____
Chad I. Rennaker,
Managing Member

**SPECIAL LIMITED PARTNER:**
PROTECH 2002-A, LLC

By: _____
Its: President

**INVESTOR LIMITED PARTNER:**
AMTAX HOLDINGS 114, LLC

By:   PARAMOUNT PROPERTIES, INC.

By: _____
Its: President

**ORIGINAL (AND WITHDRAWING LIMITED PARTNERS):**

_____
Catherine M. Tamaro

-and-

HIDDEN HILLS MANAGEMENT, LLC
By: _____
Catherine M. Tamaro,
Managing Member

-and-

By: _____
Chad I. Rennaker,
Managing Member

A:\Hidden Hills\LP.71

# HIDDEN HILLS 2001, LP

<u>SCHEDULE A</u>

| Name and Business Address` | Original Initial Capital Contributions | Percentage Interests |
|---|---|---|
| <u>MANAGING GENERAL PARTNER:</u> HIDDEN HILLS MANAGEMENT, LLC 7201 92ND Avenue, SE Mercer Island, WA 98040-5812 | $    3,028[1] | .09% |
| <u>SPECIAL LIMITED PARTNER:</u> PROTECH 2002-A, LLC 3825 Columbus Road, S.W. Granville, OH  43023 | $        336 | .01% |
| <u>INVESTOR LIMITED PARTNER:</u> AMTAX HOLDINGS 114, LLC 3825 Columbus Road, S.W. Granville, OH  43023 | $3,360,328[2] | 99.90% |
| TOTAL | $ 3,363,692 | 100% |

---

[1]   In the event any deferred portion of the Developer Fee is still outstanding prior to the end of thirteen (13) years of the Placed in Service Date of the first building of the Apartment Complex, the Managing General Partner shall make an additional Capital Contribution to the Partnership in an amount equal to such outstanding amount, prior to the end of such thirteenth (13) year.  Such additional Capital Contribution shall be used solely to pay the outstanding deferred Developer Fee.  Such Capital Contribution shall be returned to the Managing General Partner out of Distributions of Cash Flow or proceeds from a Sale or Refinancing in the same priority, but prior to, the repayment of Subordinated Loans of the Managing General Partner.

[2]   $1,600,000 has been paid in as of the date of the Investment Closing; An additional $1,760,328 is to be paid in pursuant to Article V, subject to adjustment and conditions to payment as provided herein.

A:\Hidden Hills\LP.7

## SCHEDULE B
## SCHEDULE OF PROJECTED LOSSES TO INVESTMENT PARTNER

|  | YEAR | (Tax Loss) |
|---|---|---|
| 1 | 2002 | ($105,771) |
| 2 | 2003 | ($170,486) |
| 3 | 2004 | ($203,221) |
| 4 | 2005 | ($197,620) |
| 5 | 2006 | ($200,642) |
| 6 | 2007 | ($159,251) |
| 7 | 2008 | ($176,834) |
| 8 | 2009 | ($193,658) |
| 9 | 2010 | ($148,316) |
| 10 | 2011 | ($151,074) |
| 11 | 2012 | ($290,051) |
| 12 | 2013 | ($228,559) |
| 13 | 2014 | ($222,414) |
| 14 | 2015 | ($237,071) |
| 15 | 2016 | ($117,327) |
| 16 | 2017 Sale Year | ($558,033) |

A:\Hidden Hills\LP.7

## HIDDEN HILLS 2001, LP

### INSTALLMENT PAYMENT CERTIFICATE

The undersigned, constituting the managing general partner (the "Managing General Partner") of HIDDEN HILLS 2001, LP, a Washington limited partnership (the "Partnership"), does hereby Certify to AMTAX HOLDINGS 114 LLC an Ohio limited liability company ("AMTAX"), pursuant to Section 5.1B(i) of the Amended and Restated Agreement of Limited Partnership of the Partnership, dated as of January 1, 2002 (the "Partnership Agreement"),

1.      All preconditions, representations, warranties and agreements set forth in the Partnership Agreement and applicable to the First Installment have been satisfied.

2.      As set forth in Section 5.1A of the Partnership Agreement, the amount of the [First] Installment is $1,600,000.

3.      All of the events listed in Section 5.1A (1) have occurred.

4.      Each of the representations and warranties set forth the Partnership Agreement, including those set forth in Section 7.5, is in all material respects true and correct.

5.      No event has occurred which would permit AMTAX to give an Election Notice under the Purchase Agreement.

6.      No event has occurred which suspends or terminates the obligations of the Investor Limited Partner to pay Installments under the Partnership Agreement which has not been cured as therein provided.

7.      In the case of the First Installment, attached hereto is a true copy of the Title Policy, including all endorsements thereto (the most recent of which is dated within 10 days of the date hereof), evidencing the accuracy of the representation contained in Section 7.5A (vi) of the Partnership Agreement.

Capitalized terms not defined herein shall have the meanings given to them in the Partnership Agreement.

By: _Catherine Tamaw_

Member of Hidden Hills Management, LLC, the general partner of Hidden Hills 2001, LP

STATE OF WASHINGTON          )
                                                      ) ss.
County of _King_                            )

On this _30_ day of _Jan_, 2002, before me personally came _Catherine Tamara_ to me known to be the person described in and who executed the foregoing instrument, and he duly acknowledged to me that he executed the same.

_Terri C. Sanders_
Notary Public in & for the State
Terri C. Sanders                      of WA.
My appointment expires Nov. 29, 2002