# EXHIBIT B



**VIA EMAIL AND**
**FIRST-CLASS MAIL**

November 30, 2017

Catherine M. Tamaro
Hidden Hills Management, LLC
3236 78th Avenue SE, Suite 202
Mercer Island, WA 98040
E-Mail:ctamaro@mindspring.com

Re:   *Hidden Hills 2001, LP (the "Partnership")*

Dear Hidden Hills Management, LLC:

AMTAX Holdings 114, LLC ("AMTAX") is the Investor Limited Partner of the Partnership. Hidden Hills Management, LLC ("HHM") is the Partnership's Managing General Partner. The respective rights and obligations of the Partners are governed by the Partnership's Amended and Restated Agreement of Limited Partnership (the "Partnership Agreement"). Capitalized terms not otherwise defined herein shall have the meaning given to such terms in the Partnership Agreement and, unless otherwise specified, all section references refer to sections of the Partnership Agreement.

By this letter, AMTAX provides notice that it is removing HHM as Managing General Partner of the Partnership and appointing an affiliate, Saugatuck, LLC, a Delaware limited liability company, as the new Managing General Partner because of HHM's violations of material provisions of the Partnership Agreement.

Pursuant to Section 4.5(A)(iv)(2), AMTAX has the right to remove HHM as the Partnership's Managing General Partner if HHM violates a material provision of the Partnership Agreement and the violation can reasonably be expected to cause economic detriment to the Partnership or the Project. As detailed in the November 3, 2017 letter from counsel for AMTAX (attached hereto as Exhibit A), HHM has violated Section 7.4.J of the Partnership Agreement by: (a) improperly influencing what is supposed to be an independent appraisal process in an effort to depress the appraised value of the Project and thereby reduce the value of the Partnership and, by extension, the value of AMTAX's interests; and (b) secretly selecting a third appraiser while falsely representing to AMTAX that it remained interested in AMTAX's proposal to market the Project for sale (which HHM's counsel conceded would "tell us" the fair market value of the Project).

Hidden Hills Management, LLC
November 30, 2017
Page 2

HHM, moreover, has since compounded its breach by filing a complaint in the Superior Court of the State of Washington for Pierce County on November 14, 2017 that improperly seeks to force AMTAX to sell its interest in the Partnership at an artificially low price that is based in part on the appraisal that HHM improperly commissioned and manipulated.

HHM took each of these actions for its own pecuniary benefit, and thus has also breached its fiduciary duties to AMTAX and the Partnership in violation of Sections 7.4.F and 7.4.G. The transparency of HHM's self-serving efforts to manipulate what is supposed to be an independent appraisal process is confirmed not only by HHM's misrepresentations about its secret commissioning of a third appraiser, but also by its failure to a disclose a broker's opinion of value that HHM had previously commissioned, which provided an opinion of value that is significantly higher than any of the three appraisals of the Project.

HHM's actions were intended specifically to depress the value of the Partnership's primary asset (i.e., the Project), and thus can reasonably be expected to cause economic detriment to both the Partnership and the Project. HHM's actions also threaten to harm the Partnership by forcing it to participate in a voluntary remediation program that, by the estimation of HHM's own retained environmental expert, would impose costs on the Partnership well in excess of one million dollars. HHM has not made any commitment to actually go through with the environment remediation it claims is necessary, which suggests that it is simply using the environmental issues as a pretext to reduce its purchase price. By communicating with state environmental agencies, however, HHM is threatening to expose the Partnership to regulatory oversight and costs that can reasonably be expected to cause economic detriment to the Partnership. In addition, HHM has commissioned a Technical Memorandum from Environmental Partners Inc. that includes a remediation estimate of $3,760,450. Although remediation is not required by law, this Technical Memorandum will now have to be disclosed to any potential buyer of the Project, resulting in material economic detriment to the Partnership.

HHM's removal as Managing General Partner of the Partnership shall be effective upon the delivery of this notice to HHM. HHM may demonstrate its willingness to cooperate in its removal by confirming such cooperation in writing and by voluntarily dismissing the complaint referenced above. Please be advised that AMTAX reserves the right to seek a restraining order, declaratory relief, or any other appropriate remedy—including the collection of liquidated damages pursuant to Section 4.5.D—to enforce its removal rights under the Partnership Agreement.

This Notice of Removal is not, and shall not be deemed to be, a waiver, election, or estoppel as to any claim, objection, defense, or remedy of AMTAX under the Partnership Agreement and related transaction documents or applicable law. All such rights, claims, objections, defenses, and remedies are expressly reserved.

Hidden Hills Management, LLC
November 30, 2017
Page 3

Very truly yours,

AMTAX Holdings 114, LLC, an Ohio limited liability company

By: Tax Credit Holdings III, LLC, its Manager
By: Alden Pacific Holdings, LLC, its Managing Member

By: _____
    Alison Wadle, Executive Vice President & Secretary


cc (via email only):  Chris Blake
                      Joseph P. McCarthy, Esq.
                      Eric S. Pettit, Esq.

Enclosure



ERIC S. PETTIT
epettit@bsfllp.com

**VIA EMAIL AND
FIRST-CLASS MAIL**

November 3, 2017

Joseph P. McCarthy, Esq.
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, Washington 98191
joseph.mccarthy@stoel.com

Re:   *Hidden Hills 2001, LP (the "Partnership")*

Dear Mr. McCarthy:

As you know, my firm represents AMTAX Holdings 114, LLC in its capacity as the Investor Limited Partner of the Partnership. All capitalized terms in this letter not otherwise defined herein shall have the meanings attributed to them in the Partnership's Amended and Restated Agreement of Limited Partnership (the "Partnership Agreement").

I write in response to your emails of October 23, 2017, which attach an appraisal report for the Property (the "Colliers report"), as well a "Technical Memorandum" by Environmental Partners, Inc. that is referred to and relied on in the Colliers report. Unfortunately, these materials confirm that your client is continuing to wield the improper influence on the appraisal process that my client and I have repeatedly warned against. We therefore reject the use of the Colliers report in determining the fair market value of the Property.

Given where things stand, I think it is important to document the events that preceded your most recent emails. On March 14, 2017, Catherine Tamaro sent a letter that purported to exercise the Managing General Partner's option under Section 7.4.J of the Partnership Agreement to purchase my client's interests in the real estate, fixtures, and personal property of the Partnership. Section 7.4.J of the Partnership Agreement sets forth a process for determining the fair market value of those interests. That process first requires the Investor Limited Partner and the Managing General Partner each to obtain an appraisal from an independent MAI appraiser.

**BSF**

Catherine M. Tamaro
November 3, 2017
Page 2

While Ms. Tamaro acknowledged in her March 14, 2017 letter that it would be improper for either party to "instruct its appraiser as to a desired valuation," she immediately violated that very principle by dictating that "[t]he cost of remediating the property's environmental liability fully must be included in the valuation." Through its agent, Chris Blake, the Investor Limited Partner affirmatively objected to any attempt by the Managing General Partner to impose conditions on the appraisal in an effort to reduce what it would have to pay to buy out the Investor Limited Partner. The Investor Limited Partner nonetheless complied with its obligation to obtain an appraisal of the Property, which was performed by Cushman & Wakefield and assessed the value of the Property at $19,700,000.

Mr. Blake sent the Cushman & Wakefield appraisal report to Ms Tamaro via email on May 11, 2017. In his email, Mr. Blake stated that "[b]ased on your prior concerns I want to specifically emphasize that the appraiser, who is familiar with the Tacoma Smelter Plume, was deliberately alerted to the property's soil contamination and provided with all environmental and soil clean up documents in our possession."

On June 19, 2017, Ms. Tamaro sent a letter to Mr. Blake enclosing an appraisal report obtained by the Managing General Partner from CBRE. That report, which valued the Property at $14,050,000, reduced its fair value determination to account for environmental remediation costs based on the appraiser's claim that "it is likely that a potential buyer would require the site to be cleaned prior to sale." Ms. Tamaro admitted in the cover letter enclosing the appraisal report that she was "attempting to obtain a new loan on this property, in order to have sufficient funds to purchase the LP's interest," and that potential lenders had informed her "that they will require the owner of Hidden Hills Apartments to implement a remediation plan under the State of Washington's Voluntary Cleanup Program as a condition of obtaining a new loan." Ms. Tamaro's letter also accused Cushman & Wakefield of failing to consider soil contamination issues, thereby resulting in a "flawed appraisal that does not represent the property's fair market value."

Mr. Blake responded to Ms. Tamaro's letter by email on June 28, 2017. In his email, Mr. Blake disputed Ms. Tamaro's baseless accusation that Cushman & Wakefield's appraisal was "flawed," and pointed out that soil contamination and its impact on property valuation are addressed on pages 80 and 92 of Cushman & Wakefield's appraisal report. Mr. Blake also noted in his email that he had recently discovered that the Managing General Partner had engaged Tim Flint at CBRE to provide a broker's opinion of value ("BOV") for the Property, and that Mr. Flint had arrived at a property value that, at its midpoint, is $7,250,000 million (52%) higher than the $14,050,000 value reflected in the CBRE appraisal. Mr. Blake observed that the BOV commissioned by the Managing General Partner corroborated the statement in Cushman & Wakefield's appraisal report that "[d]iscussions with brokers active in the Pierce County market indicate that sales of multifamily properties in the subject's general vicinity are



Catherine M. Tamaro
November 3, 2017
Page 3

not being adversely impacted by the Tacoma Smelter Plume." Mr. Blake questioned why Ms. Tamaro had elected to hide the CBRE BOV from both the Investor Limited Partner and its *own* appraiser, who was also affiliated with CBRE. Finally, Mr. Blake suggested that, given their fundamental disagreement on what impact, if any, environmental issues have on the fair market value of the Property, the parties should consider marketing the Property for sale through CBRE.

Ms. Tamaro sent a letter in response to Mr. Blake's email on July 17, 2017. Ms. Tamaro stated that the Managing General Partner was not interested in selling the Property, and notified Mr. Blake that the Managing General Partner had retained Environmental Partners, Inc. to "obtain[] cost figures from an excavation contractor in order to complete a remediation plan with accurate pricing." Ms. Tamaro stated further that Environmental Partners had previously estimated that the "cost to obtain a No Further Action Letter from the Washington Department of Ecology ("DOE") would be $1.5-$2.5 million."

Mr. Blake responded to Ms. Tamaro's July 17, 2017 letter by email on July 18, 2017. Mr. Blake reiterated in his email that listing the Property for sale with CBRE was in everyone's best interests, but went on to state that if the Managing General Partner instead wanted to continue with the appraisal process set forth in Section 7.4.J of the Partnership Agreement, then "a third appraiser needs to be selected immediately as it is apparent that our appraisers do not agree on value." Mr. Blake stated further that "prior to engaging the final appraiser I think it is necessary for us to have a conversation about what information will be shared with the third appraiser and rules for communicating with that appraiser," and specifically requested that the Managing General Partner respond promptly to the issues identified in his email.

Despite his request for a prompt response, Mr. Blake did not receive any reply to his email. Accordingly, at the Investor Limited Partner's request I sent a letter on August 2, 2017 addressing Ms. Tamaro's July 17, 2017 letter. My August 2, 2017 letter informed Ms. Tamaro that the Managing General Partner's attempt to interfere with the appraisal process by insisting that environmental remediation costs be calculated and deducted from any fair market value determination was improper and constituted a breach of the Managing General Partner's fiduciary duties. I stated further that the Managing General Partner's insistence that fair market value take into account the full cost of remediation was particularly inappropriate given that the Partnership is currently under no legal or regulatory obligation to perform any remediation work, and that the ability of the Managing General Partner to obtain financing in connection with its purchase of the Investor Limited Partner's interest was not a relevant or proper factor to consider when determining the fair *market* value of the Property. My letter noted that the Managing General Partner's improper efforts to influence the appraisal process to its own advantage were confirmed by its decision to hide the CBRE BOV discussed in Mr. Blake's June 28, 2017 email from the Investor Limited Partner and the appraisers. I concluded my letter



Catherine M. Tamaro
November 3, 2017
Page 4

with a demand that the Managing General Partner either agree to determine fair market value by marketing and selling the Property, or to work in good faith with the Investor Limited Partner to select a third appraiser to determine fair market value as provided in Section 7.4.J of the Partnership Agreement. My letter confirmed that if the Managing General Partner was willing to pursue the former option, the Investor Limited Partner would agree to give the Managing General Partner a right of first refusal to purchase the Property at the price determined by this bidding process.

You sent a response to my August 2, 2017 letter on August 11, 2017. After discussing the perceived relevance of environmental remediation costs to fair market value and repeating Ms. Tamaro's claim that the Cushman & Wakefield appraisal failed adequately to consider that information, you stated that "Ms. Tamaro is giving serious consideration to your request that the partnership market the property," and invited me to contact you if the Investor Limited Partner remained interested in marketing the property for sale. Significantly, you conceded in your letter that "disclosure and marketing will tell us" the fair market value of the Property.

I was traveling out of the country when you sent me your August 11, 2017 letter, and as a result I was unable to respond until August 29, 2017. You and I were able to speak by phone on August 30, 2017, and I confirmed in that conversation that the Investor Limited Partner remained interested in marketing the Property through CBRE. You responded that, although you were not yet in a position to commit, you thought that your client would be willing to market the Property. You emphasized when we spoke that it was important that any disagreements about the proper allocation of sales proceeds be identified up front, and I confirmed that the Investor Limited Partner was willing to be transparent about its position regarding how sales proceeds would be allocated.

On September 18, 2017, I sent you an email attaching the sales proceed allocation analysis that you requested, and also spoke to you by phone. During our conversation I specifically asked you whether the Managing General Partner remained interested in marketing the property, and in response you gave no indication that the Managing General Partner was no longer interested in marketing the property and instead wanted to return to the appraisal process. Accordingly I was very surprised and concerned when you called me on September 22, 2017 to tell me that Ms. Tamaro had taken steps to select a third appraiser without informing me or my client. Although you claimed when we spoke that she had done this without your knowledge, you subsequently forwarded email correspondence confirming that you were aware of Ms. Tamaro's desire to return to the appraisal process as early as September 6, 2017. The email correspondence you forwarded also reflected that Ms. Tamaro had obtained the names of two different appraisers to conduct the third appraisal, and had chosen between those two appraisers without first informing or consulting with the Investor Limited Partner.



Catherine M. Tamaro
November 3, 2017
Page 5

As I stated in an email I sent you on September 27, 2017, I cannot fathom why you would have waited more than two weeks to inform me of Ms. Tamaro's secret and improper efforts to restart the appraisal process unilaterally, let alone why you would have hid that information from me in response to a direct question. Accordingly I informed you in my September 27, 2017 email that, for these reasons, among others, the Investor Limited Partner reserved its right to object to any appraisal performed by either of the two appraisers identified in the email you forwarded.

You did not respond to my email, even to address my concern that you were "facilitating Ms. Tamaro's efforts to obtain a third party appraisal behind the backs of my clients in order to exert improper influence on the appraisal process." Accordingly I followed up with another email on October 12, 2017, in which I noted that I had not received any response to my previous email and asked for an update regarding the status of the third appraisal. You responded the next day. In your response, you summarily denied that Ms. Tamaro was improperly influencing the appraisal process or that you were facilitating such an effort, but did not address with any specificity the concerns raised in my September 27, 2017 email. You stated in your email that Ms. Tamaro expected to receive an appraisal from Colliers (whom she had unilaterally selected to conduct the third appraisal) on October 23, 2017.

Given your failure to address the serious concerns I raised regarding Ms. Tamaro's improper efforts to influence the appraisal process, on October 16, 2017 I sent you a follow up email asking that you forward to me any emails or other written correspondence and to summarize any verbal communications that you, Ms. Tamaro, or the Managing General Partner's designated appraiser have had with the Colliers appraiser. I explained in my email that, in light of your representation that neither you nor Ms. Tamaro have attempted to improperly influence the appraisal process, this request should be neither controversial nor burdensome to accommodate.

Unfortunately, you ignored my request for this information. Instead, as noted above, on October 23, 2017, you emailed me a copy of the Colliers report along with a "Technical Memorandum" referred to and relied on in the Colliers report. The Technical Memorandum includes a cost estimate of nearly $3.8 million to perform environmental remediation of the Property (which is far higher than the original estimate of $1.5-$2.5 million), and the Colliers report deducted that entire amount—including "a 50 percent contingency of $1,220,150" based solely on "unknown or changed conditions"—from fair market value. The appraiser claimed that this deduction was appropriate because, according to the appraiser, "[l]enders would only provide a loan for the subject if either the contamination was remediated by the owner before funding of a loan, or a plan is provided to remediate the site within the first year or two of the loan, or the owner would set up an escrow account and deposit money equivalent to the estimated remediation costs to cover the potential remediation of the contamination."



Catherine M. Tamaro
November 3, 2017
Page 6

The Investor General Partner hereby formally objects to the use of the Colliers report in determining the fair market value of the Property for purposes of Section 7.4.J of the Partnership Agreement. The Investor Limited Partner's objection is based on the Managing General Partner's improper efforts to influence the appraisal process for its own pecuniary benefit as described above, including but not limited to its unilateral selection of the Colliers appraiser without informing the Investor Limited Partner, as well as its subsequent failure to provide relevant communications with the Colliers appraiser. The Managing General Partner's conduct is not legitimate, but instead is intended only to artificially suppress fair market value in order to reduce the price the Managing General Partner will need to pay to divest the Investor Limited Partner of its interests in the Partnership. Indeed, the Managing General Partner has not made any commitment to actually go through with the environmental remediation reflected in the Technical Memorandum following its purchase of the Investor Limited Partner's interest, and a review of the website for the State of Washington's Department of Ecology confirms that the Managing General Partner has not even placed the Property on the lengthy waiting list for the Voluntary Cleanup Program under which the proposed remediation would supposedly be undertaken.

In an effort to resolve this dispute as efficiently as possible, the Investor Limited Partner is willing to accept any of three possible options:

The first option is for the Managing General Partner to agree to allow the Investor Limited Partner to work with CBRE to market and sell the Property. As you acknowledged in your August 11, 2017 letter, marketing the Property for sale will, by definition, provide us with the most accurate determination of fair market value.

The second option is for the Managing General Partner to purchase the Investor Limited Partner's interests based on the Property's midpoint value as determined by CBRE in the BOV that you commissioned and subsequently hid from the Investor Limited Partner (i.e., $21,300,000).

The third option is for your client to cooperate voluntarily with its removal as the Managing General Partner of the Partnership.

To the extent that the Managing General Partner refuses to accept any of the three options above, the Investor Limited Partner will have no choice but to exercise its right under Section 4.5.A(iv) of the Partnership Agreement to remove your client as the Partnership's Managing General Partner involuntarily based on its multiple and material breaches of its contractual and fiduciary duties as described above. Please advise as to how your client wishes to proceed no later than next Wednesday, November 8, 2017.



Catherine M. Tamaro
November 3, 2017
Page 7

Nothing in this letter is intended to waive any of my clients' rights or remedies, all of which are expressly reserved.

Very truly yours,

ERIC S. PETTIT

cc: Chris Blake (via email only)
Alison Wadle, Esq. (via email only)