1               IN THE UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON
2                        AT TACOMA

3    _____

     HIDDEN HILLS MANAGEMENT,      )
4    LLC, and 334th PLACE 2001     )
     LLC,                          )
5                                  )
                  Plaintiffs,      ) No. 3:17-cv-06048-RBL
6       vs.                        )
     AMTAX HOLDINGS 114, LLC,      )
7    and AMTAX HOLDINGS 169,       )
     LLC,                          )
8                                  )
                  Defendants.      )
9                                  )
     AMTAX HOLDINGS 114, LLC,      )
10   AMTAX HOLDINGS 169, LLC,      )
     and PARKWAY APARTMENTS,       )
11   LP,                           )
                                   )
12      Counter-Plaintiffs,        )
        vs.                        )
13                                 )
     HIDDEN HILLS MANAGEMENT,      )
14   LLC, and 334th PLACE          )
     2001, LLC,                    )
15                                 )
        Counter-Defendants.        )
16   _____

17        30(b)(6) DEPOSITION UPON ORAL EXAMINATION OF
                    AMTAX HOLDINGS 169, LLC
18                        CHRIS BLAKE
                   Friday, October 26, 2018
19   _____

20                         taken at
                600 University Street, Suite 3600
21                   Seattle, Washington

22   _____

                DIANE RUGH, RMR, CRR, CCR #2399
23              NELSON COURT REPORTERS, INC.
                6513 132nd Avenue NE, #184
24              Kirkland, Washington 98033
                      (206) 920-2184
25              info@nelsonreporters.com

Chris Blake 30(b)(6)                      30(b)(6)
October 26, 2018

```
1        Q.   And which of the topics are you here to testify
2    about today?
3               MS. JOHNSON:  While Mr. Blake is reviewing
4    this, I do just want to note for the record that we did
5    serve objections and agreed to produce him on all the topics
6    subject to those objections.
7               THE WITNESS:  I believe the topics in Exhibit
8    A.
9        Q.   (BY MR. PRITCHARD)  Okay.
10              And do you understand if I refer to "AMTAX" during
11   this deposition, I will refer to AMTAX 169?
12       A.   Yes.
13       Q.   Do you know why you were chosen as AMTAX
14   representative for these topics?
15              MS. JOHNSON:  Objection to the extent it calls
16   for attorney-client privileged information and work product.
17              But you may answer.
18              THE WITNESS:  I was one of the primary contacts
19   at Alden Torch in negotiations for Parkway and Hidden Hills
20   for the sale and refinance of those properties.
21       Q.   (BY MR. PRITCHARD)  Where are you employed?
22       A.   Alden Torch Financial.
23       Q.   What's your title there?
24       A.   Director, Capital Transactions.
25       Q.   What generally are the duties associated with that?
```

Chris Blake 30(b)(6)                    30(b)(6)
October 26, 2018

```
 1    don't think there's any reason to be checking in more
 2    frequently than that.
 3        Q.    (BY MR. PRITCHARD)  So one of the responsibilities
 4    of an asset manager would be to do an annual audit review?
 5              MS. JOHNSON:  Objection.  Calls for
 6    speculation.
 7              THE WITNESS:  I believe so, yes.
 8        Q.   (BY MR. PRITCHARD)  Did that occur in connection
 9    with Parkway?
10              MS. JOHNSON:  Same objections.
11              THE WITNESS:  I don't know specifically, but I
12    think so.
13        Q.   (BY MR. PRITCHARD)  You don't know if anyone at
14    AMTAX reviewed the annual audit statements?
15              MS. JOHNSON:  Objection.  Mischaracterizes his
16    testimony.
17              THE WITNESS:  As a part of an annual audit
18    review, I believe that's an asset management function, so I
19    assume that's what Gary did each year.  And then as a part
20    of the capital transaction review, we'd obviously go in and
21    take a look at the audited financials because that goes into
22    our models and our projections.
23        Q.   (BY MR. PRITCHARD)  How many other low-income tax
24    credit properties do you work with?
25        A.   Me specifically?
```

Chris Blake 30(b)(6)                          30(b)(6)
October 26, 2018

1    Q.   (BY MR. PRITCHARD)   So what typically happens after
2    a property stops delivering tax credits to a limited
3    partner?
4              MS. JOHNSON:   Objection.  Vague.
5              THE WITNESS:   Nothing's required at that time,
6    so it would just continue to operate until you get to the
7    end of compliance.  In some cases the partners decide that
8    they no longer want to own the property and they can sell it
9    at that point, or in the case of Parkway, I think a general
10   partner can make an offer to purchase the limited partner's
11   interest.
12   Q.   (BY MR. PRITCHARD)   Did that happen here?
13             MS. JOHNSON:   Objection.  Vague, calls for
14   speculation, calls for a legal conclusion.
15             THE WITNESS:   We didn't sell the LP interest.
16   We negotiated for a while and that ultimately broke down.
17   Q.   (BY MR. PRITCHARD)   But the general partner made an
18   offer to purchase the limited partner's interest in Parkway;
19   right?
20             MS. JOHNSON:   Objection.  Calls for a legal
21   conclusion.
22             THE WITNESS:   Yes.
23   Q.   (BY MR. PRITCHARD)   So there's nothing stopping a
24   buyout of the limited partner's interest before the
25   compliance period ends; is that right?

```
 1                   THE WITNESS:  It would be within the
 2   Partnership Agreement.  If there's an outstanding default
 3   that has not been cured, then I don't think the general
 4   partner could validly exercise its option until this
 5   happened.
 6       Q.   (BY MR. PRITCHARD)  What's the basis for that?
 7       A.   I guess common sense.  I think that you wouldn't
 8   want to sell your interest in a partnership if there were
 9   major defaults outstanding and you were entitled to
10   additional proceeds that aren't contemplated under the
11   appraisal process.
12       Q.   When you say "you," who are you referring to?
13                   MR. PRITCHARD:  Could you read back the last
14   answer, please?
15                   (Court reporter read back as requested.)
16                   THE WITNESS:  The limited partner.
17       Q.   (BY MR. PRITCHARD)  Can you point to any language
18   in Section J here that supports what you just said in your
19   prior testimony?
20                   MS. JOHNSON:  Objection.  Calls for a legal
21   conclusion, document speaks for itself.
22                   THE WITNESS:  Well, it says, "Subject to
23   compliance in Section 42 of the Code and the rules of the
24   agency."
25                   So a major default might be that the property
```

1          And I would instruct you not to answer to the

2     extent it calls for attorney-client privileged information.

3               THE WITNESS:  Not necessarily.

4     Q.   (BY MR. PRITCHARD)  So were you not monitoring the

5     process in connection with the buy-out under Section 7.4.J

6     as it progressed in 2018?

7               MS. JOHNSON:  Objection.  Mischaracterizes his

8     testimony, may call for attorney-client privileged

9     information.

10              THE WITNESS:  I don't think I would be involved

11    until our counsel was satisfied that all defaults had been

12    cured.  So no.

13    Q.   (BY MR. PRITCHARD)  Do you know if it's accurate

14    that all of the information that is referenced in this

15    letter was in fact provided to AMTAX?

16              MS. JOHNSON:  Objection.  Calls for

17    speculation, lacks foundation.

18              THE WITNESS:  I didn't verify myself.  I have

19    no reason to believe that these items were not provided.

20    But I confirmed that each one was received.

21    Q.   (BY MR. PRITCHARD)  At the time of this letter had

22    AMTAX selected an appraiser?

23              MS. JOHNSON:  Objection.  Calls for

24    attorney-client privileged information and/or attorney work

25    product.

Chris Blake 30(b)(6)                    30(b)(6)
October 26, 2018

1           And to the extent it would require you to
2    divulge that information, I would instruct you not to
3    answer.
4           MR. PRITCHARD:   It's asking for a fact.   It has
5    nothing to do with attorney-client privilege or work
6    product.
7       Q.   (BY MR. PRITCHARD)   You can answer the question.
8           MS. JOHNSON:   I will decide whether he's
9    instructed not to answer; whether he follows my instruction.
10          Again, to the extent you believe it requires
11   you to divulge that information, I'd instruct you not to
12   answer.   Otherwise you can.
13          THE WITNESS:   I don't know.
14      Q.   (BY MR. PRITCHARD)   Do you know when AMTAX selected
15   an appraiser?
16          MS. JOHNSON:   Same objections.
17          THE WITNESS:   I don't.
18      Q.   (BY MR. PRITCHARD)   If we could just turn quickly
19   back to Exhibit 1.   Topic 1 says, "All reasons for AMTAX
20   169's failure to provide an appraisal as required by Section
21   7.4.J of the Parkway Limited Partnership Agreement."
22          You're the designated representative to answer
23   questions related to this topic; right?
24      A.   That's right, but most of those discussions again
25   were with counsel, and it's my understanding that they are

1   subject to attorney-client privilege.

2       Q.   So you're not going to answer questions related to

3   this topic on the basis that it's protected by

4   attorney-client privilege?

5               MS. JOHNSON:  Objection.  Argumentative,

6   mischaracterizes his testimony.

7               THE WITNESS:  As I said, I can answer anything

8   that's not subject to that privilege, but what you're asking

9   for I believe is protected.

10      Q.   (BY MR. PRITCHARD)  But you don't know when AMTAX

11  selected an appraiser?

12      A.   I don't.

13      Q.   But you are the representative to answer these

14  questions related to this; right?

15      A.   That's right.

16      Q.   Is it your position that the timing of selecting an

17  appraiser is protected by the attorney-client privilege?

18              MS. JOHNSON:  Objection.  Calls for a legal

19  conclusion, argumentative, beyond the scope of the topic.

20              THE WITNESS:  No, I'm saying I don't know when

21  the appraiser was engaged.  But the appraiser was engaged by

22  counsel so, you know, I was not directly involved.

23      Q.   (BY MR. PRITCHARD)  So the appraiser wasn't engaged

24  by AMTAX?

25              MS. JOHNSON:  Objection.  Calls for

1            MS. JOHNSON:  Objection.  Calls for

2    speculation.

3            THE WITNESS:  Because it also involves a

4    Partnership Agreement required -- or mandated an appraisal

5    process with the same general partner.

6       Q.   (BY MR. PRITCHARD)  What does the Hidden Hills

7    dispute have to do with whether 334th Place can exercise its

8    option under Section 7.4.J of the Parkway LPA?

9       A.   We believe the Hidden Hills appraisal process was

10   manipulated and that the general partner acted in bad faith

11   in order to suppress the limited partner's purchase price on

12   that.  And accordingly, we would expect them to also

13   manipulate the Parkway appraisal process.

14      Q.   So you don't view 334th Place and Hidden Hills

15   Management as separate entities?

16            MS. JOHNSON:  Objection.  Mischaracterizes his

17   testimony.

18            THE WITNESS:  I'm saying Catherine Tamaro is

19   the general partner in both partnerships.

20      Q.   (BY MR. PRITCHARD)  Did AMTAX view its duty to

21   provide an appraisal under Section 7.4.J under the Parkway

22   LPA as somehow related to the Hidden Hills dispute?

23            MS. JOHNSON:  Objection.  Calls for

24   speculation.

25            THE WITNESS:  I don't know.  I think that would

Chris Blake 30(b)(6)                    30(b)(6)
October 26, 2018

1   be a legal consideration.

2       Q.   (BY MR. PRITCHARD)   Just asking for your

3   understanding.   Is that how you viewed it?

4               MS. JOHNSON:   Objection to the extent it calls

5   for a legal conclusion or attorney-client privileged

6   information.

7               Otherwise you can answer.

8               THE WITNESS:   They're separate Partnership

9   Agreements and would have separate appraisal processes.

10  But I do view their -- I view it as having a connection

11  because there is the same general partner, and again would

12  be concerned that they would manipulate the process in a

13  similar manner.

14      Q.   (BY MR. PRITCHARD)   Is there any allegation that

15  334th Place manipulated the process in connection with 7.4.J

16  in the Parkway Partnership?

17      A.   I don't believe so.

18      Q.   This letter also states that, "AMTAX is in the

19  process of evaluating questionable activity by 334th Place

20  in its capacity as a General Partner of the Partnership."

21      A.   That's right.

22      Q.   What does that mean?

23      A.   When we have properties or partnerships that are

24  involved in litigation, we review all of the other

25  properties that we're partnered in to see if there's any

Chris Blake 30(b)(6)                    30(b)(6)
October 26, 2018

1   similar activity that would also constitute a default.

2       Q.    You say you do this for all properties in

3   connection with a potential buy-out; is that your testimony?

4       A.    No.   I'm saying that when we're in active

5   litigation with a specific general partner, we review all of

6   our other partnerships to look for questionable activity.

7       Q.    You weren't in active litigation with 334th Place

8   at the time of this letter, were you?

9            MS. JOHNSON:   Objection.   Calls for

10  speculation.

11           THE WITNESS:   No, but it's the same person that

12  is the general partner, so.

13      Q.    (BY MR. PRITCHARD)   When did AMTAX first start

14  investigating questionable activity?

15      A.    I mean, this goes back to when I started at Hunt at

16  the time.   So there's always been kind of ongoing questions

17  about unauthorized fees and other payments to the general

18  partner.

19           But I think as it relates to this letter, it would

20  have been sometime in Q1 2018 that we did kind of a deeper

21  dive into the financials for the properties that we are

22  partners with Catherine in.

23      Q.    So you said you did a deeper dive.   So that was --

24  was that undertaken by you?

25      A.    No.

1          MS. JOHNSON:  Objection to the extent it calls

2   for attorney-client privileged information and attorney work

3   product.

4          Otherwise you can answer.

5          THE WITNESS:  So we have some accountants that

6   do kind of forensic accounting and will go back and review

7   the audited financials, compare those to all of the legal

8   and Regulatory Agreements to make sure that everything is

9   done by the letter of the agreements.  And they would have

10  performed that.

11      Q.   (BY MR. PRITCHARD)  Who are these people?

12      A.   I believe it would have been John Thomas and Caley

13  Diaz, I believe is her last name.

14      Q.   What are their roles at AMTAX?

15      A.   They're the forensic accountants that I've just

16  described.

17      Q.   Within Alden Torch?

18      A.   They are Alden Torch employees.

19      Q.   Were you in communication with them during this

20  deeper dive?

21          MS. JOHNSON:  Same objections.

22          THE WITNESS:  When their analysis was complete,

23  yes.

24      Q.   (BY MR. PRITCHARD)  Did you correspond with them in

25  connection with their results?

Chris Blake 30(b)(6)                     30(b)(6)
October 26, 2018

1          MS. JOHNSON:  I'm going to object to the extent
2   this calls for attorney-client privileged information or
3   attorney work product and instruct you not to answer to the
4   extent it does.
5          THE WITNESS:  I met with them to review their
6   conclusions, yes.
7     Q.   (BY MR. PRITCHARD)  What did you talk about?
8          MS. JOHNSON:  Same objections.
9          THE WITNESS:  Basically all the questionable
10  activity that we've identified as a part of this lawsuit.
11  So the calculation of fee amounts.
12          MS. JOHNSON:  Let's take a quick break.
13    Q.   (BY MR. PRITCHARD)  Were you finished answering the
14  question?
15          MS. JOHNSON:  Sorry.  As soon as he's finished.
16          THE WITNESS:  Yes.
17          (Short break.)
18    Q.   (BY MR. PRITCHARD)  So I just want to be clear from
19  the outset, I'm not asking for anything that's
20  attorney-client privileged, so keep that in mind as I'm
21  asking these questions.
22    A.   Sure.
23    Q.   But so you said, I think, that you asked John
24  Thomas and Caley Diaz to do a deep dive in the first quarter
25  of 2018 into the financial issues in the Parkway

Chris Blake 30(b)(6)                              30(b)(6)
October 26, 2018

1   Partnership; is that right?

2                    MS. JOHNSON:  And I'm going to just to keep

3   asserting the attorney-client privilege objection

4   instruction and say "same objection" to speed this along.

5                    THE WITNESS:  I would just clarify that I think

6   I testified that I have no oversight.  I believe that

7   project was requested and kind of overseen by counsel.  I

8   reviewed the numbers to always have a second set of eyes and

9   just discussed everything because there will be implications

10  on a capital transaction.  But to be clear, I didn't run

11  that effort.

12       Q.   (BY MR. PRITCHARD)  So you never had any

13  conversations about this with John Thomas and Caley Diaz

14  outside of the presence of counsel?

15       A.   Not to my recollection, no.  I think counsel was

16  always present.

17       Q.   So you never had any communications with them

18  whatsoever outside of the presence of counsel?

19                    MS. JOHNSON:  Objection.  Mischaracterizes his

20  testimony.  Do you mean communications about these issues?

21                    MR. PRITCHARD:  About these issues, yes.

22                    THE WITNESS:  Right.  Counsel was always

23  present in those communications.

24       Q.   (BY MR. PRITCHARD)  So there are no emails, then,

25  that counsel was not copied on between either of these two

Chris Blake 30(b)(6)                    30(b)(6)
October 26, 2018

```
 1    Alden Torch employees or you and these two employees?
 2                 MS. JOHNSON:  Objection.  Calls for
 3    speculation.  Same objections.
 4                 THE WITNESS:  I don't believe so for that
 5    specific analysis.
 6        Q.   (BY MR. PRITCHARD)  Counsel was copied on
 7    everything?
 8                 MS. JOHNSON:  Same objections.
 9                 THE WITNESS:  If there were emails, yes.  And
10    my recollection was we would just meet with counsel, and it
11    was kind of a high level looking at audited financials and
12    the actual relevant agreements.  But yes.  So I'm not sure
13    that there were many emails, if any.
14        Q.   (BY MR. PRITCHARD)  How many times did you meet on
15    this issue?
16        A.   Two or three times.
17        Q.   What did these two accountants ultimately prepare?
18                 MS. JOHNSON:  Objection to the extent it calls
19    for attorney-client privileged information and work product.
20                 I would instruct you not to answer.
21                 THE WITNESS:  Basically the list of
22    unauthorized payments or payments that we dispute.
23        Q.   (BY MR. PRITCHARD)  Is that it?
24                 MS. JOHNSON:  Same objections.
25                 THE WITNESS:  Yes.
```

Chris Blake 30(b)(6)                    30(b)(6)
October 26, 2018

```
1        Q.    (BY MR. PRITCHARD)  Was it a report?

2              MS. JOHNSON:  Same objections.

3              And I'd instruct you not to answer to the

4    extent it calls for attorney work product or attorney-client

5    privileged information.

6              THE WITNESS:  Counsel determined what we

7    produce, and anything that would have been --

8        Q.    (BY MR. PRITCHARD)  Right.  And I'm asking what

9    these two people prepared.  They're not lawyers; right?

10       A.    No.  They're accountants.

11       Q.    What did they prepare?

12             MS. JOHNSON:  Same objections.

13             THE WITNESS:  Basically a compilation of all

14   prior year fees and payments that we do not believe the

15   general partner was entitled to pay themselves, or accrue.

16       Q.    (BY MR. PRITCHARD)  Did AMTAX produce that in this

17   case?

18             MS. JOHNSON:  Objection.  Calls for

19   speculation, calls for attorney-client privileged

20   information and attorney work product.

21             Chris, I'm instructing you not to answer.

22             THE WITNESS:  I will follow counsel's

23   instructions.

24             MR. PRITCHARD:  You're instructing him not to

25   answer whether AMTAX produced this report?
```

Chris Blake 30(b)(6)                    30(b)(6)
October 26, 2018

```
 1              MS. JOHNSON:  I'm instructing him not to answer
 2   as to any attorney-client privileged information or attorney
 3   work product documents that were prepared at the instruction
 4   of counsel.
 5      Q.   (BY MR. PRITCHARD)  How far back did these
 6   accountants look?
 7              MS. JOHNSON:  Same objections.
 8              THE WITNESS:  As far as I know, to partnership
 9   origination.  So it would have been 2002, or if an audit
10   wasn't produced in 2002, then 2003.
11      Q.   (BY MR. PRITCHARD)  What did they look at?
12              MS. JOHNSON:  Same objections.
13              THE WITNESS:  Payments to the general partner
14   and affiliates.
15      Q.   (BY MR. PRITCHARD)  What did they review?
16              MS. JOHNSON:  Objection.  Calls for
17   speculation, calls for attorney-client privileged
18   information and attorney work product.
19              You may answer if it doesn't.
20              THE WITNESS:  Audited financial statements.
21      Q.   (BY MR. PRITCHARD)  Is that it?
22              MS. JOHNSON:  Same objections.
23              THE WITNESS:  I've already testified that they
24   reviewed those in conjunction with relevant agreements of
25   the Partnership Agreements and any of their amendments that
```

1   would be pertinent.

2       Q.   (BY MR. PRITCHARD)   If there's any non-privileged

3   documents that these two accountants prepared in connection

4   with this deeper dive, would AMTAX produce them to us in

5   this litigation?

6               MS. JOHNSON:   Objection to the extent they're

7   responsive and relevant.

8               But otherwise you may respond.

9               THE WITNESS:   Yes.  I don't think that would be

10  a problem.

11              MR. PRITCHARD:   Is there a claim it's not

12  relevant?

13              MS. JOHNSON:   There's no claim.  I'm saying

14  that it's counsel's call whether something is produced or

15  not, and I just want to make sure it's clear on the record

16  that that's the case.

17      Q.   (BY MR. PRITCHARD)   Do you know when the Hidden

18  Hills lawsuit was filed?

19      A.   I don't know the exact date.

20      Q.   Does November 2017 sound right to you?

21      A.   Yes, roughly.

22      Q.   And this deeper dive occurred in the first quarter

23  of 2018, you said; right?

24      A.   It may have started in late 2017.  I don't know for

25  sure.  But again, I didn't instruct those accountants to

Chris Blake 30(b)(6)                    30(b)(6)
October 26, 2018

1    start that process, that was directed by counsel.  So I'm
2    not sure when that whole process started.
3        Q.    And the extent this list of, I guess you said
4    unauthorized -- the results of these accountants'
5    investigation, the list of unauthorized fees or payments, to
6    the extent that involves purely factual information, what
7    did it consist of?
8              MS. JOHNSON:  Objection.
9              I'm going to instruct you not to answer on the
10   basis of attorney-client privilege and attorney work
11   product.
12             MR. PRITCHARD:  I'm asking for the facts that
13   these people produced in connection with their
14   investigation.
15             MS. JOHNSON:  I'm going to assert the same
16   objections and instruct you not to answer.
17       Q.    (BY MR. PRITCHARD)  And again, just to be clear,
18   you said there were no emails between these two accountants
19   and anyone else at AMTAX that were not copied with an
20   attorney?
21             MS. JOHNSON:  Objection.  Mischaracterizes his
22   testimony.  Same objections as before.
23             THE WITNESS:  Not to my knowledge.
24             (Exhibit 6 was marked.)
25       Q.    (BY MR. PRITCHARD)  Have you seen this letter

Chris Blake 30(b)(6)                     30(b)(6)
October 26, 2018

```
 1      A.    That's right, yes.

 2      Q.    Do you know when 334th Place first sought to bring

 3   the Parkway dispute into this case in federal court?

 4      A.    I don't know.  I wouldn't have been a part of that

 5   discussion.

 6      Q.    Is it on May 18, 2018?

 7               MS. JOHNSON:  Objection.  Asked and answered.

 8               THE WITNESS:  I think that would have been

 9   handled by counsel.  I don't know the exact date.

10               (Exhibit 8 was marked.)

11      Q.    (BY MR. PRITCHARD)  This is a letter from AMTAX

12   that was sent on May 8, 2018.  And we'll get to the

13   substance of it later, but is it fair to say that this

14   letter and the allegations in it form the basis for the

15   counterclaims that AMTAX asserted in this case?

16               MS. JOHNSON:  Objection.  Calls for

17   speculation, calls for a legal conclusion, document speaks

18   for itself.

19               THE WITNESS:  Generally, yes.

20      Q.    (BY MR. PRITCHARD)  Is this letter representative

21   of the results of the deeper dive that the two accountants

22   did in the first quarter of 2018?

23               MS. JOHNSON:  Objection.  Calls for

24   attorney-client privileged information and attorney work

25   product.
```

1   a legal conclusion.
2               THE WITNESS:  Yes, I think the items described
3   in the letter are the uncured defaults that I've mentioned.
4       Q.   (BY MR. PRITCHARD)  Right.  And so that's the
5   reason why AMTAX has refused to participate in the process
6   called for in Section 7.4.J; correct?
7               MS. JOHNSON:  Same objections.
8               THE WITNESS:  That's right.  I mean, not
9   refused, but to resolve these items before that process
10  continues.
11      Q.   (BY MR. PRITCHARD)  Actually, if you could just go
12  back to Exhibit 5 quickly.  There's one other question I
13  had.
14              It says here in the last paragraph, "AMTAX will
15  address your request to move forward with the appraisal
16  process set forth in Section 7.4.J of the Partnership
17  Agreement once it has completed its review of the issues
18  identified above."
19              Why is that referred to as a "request"?
20              MS. JOHNSON:  Objection.  Calls for
21  speculation, lacks foundation.
22              THE WITNESS:  I'm not sure.  I didn't write the
23  letter.
24      Q.   (BY MR. PRITCHARD)  Do you know if the author of
25  this letter viewed it as a request and not a contractual

```
 1              MS. JOHNSON:  Objection.  Document speaks for
 2    itself.
 3              THE WITNESS:  Sorry, was there a question?
 4        Q.   (BY MR. PRITCHARD)  Yeah.
 5         Do you see where it says that?
 6        A.   Yes.
 7        Q.   What's the basis for that statement?
 8              MS. JOHNSON:  Objection to the extent it calls
 9    for a legal conclusion and attorney-client privileged
10    information.
11              Otherwise you may answer.
12              THE WITNESS:  I think it's fairly
13    self-explanatory.  We don't want to proceed with an
14    appraisal process that ultimately results in us selling our
15    interest in a property because that's our last chance to get
16    the amounts that are owed to us.  So it makes sense to cure
17    out all outstanding defaults prior to proceeding with the
18    process.
19        Q.   (BY MR. PRITCHARD)  And this letter goes on to
20    state that 334th Place must "immediately cancel and
21    relinquish all accounts payable by the Partnership to the
22    General Partner (currently estimated to total in excess of
23    $2.7 million).  Is that right?
24        A.   That's what it says.
25        Q.   What's the basis for that?
```

1          MS. JOHNSON:  Objection.  Calls for

2   speculation.

3          And to the extent it calls for attorney-client

4   privileged information, I'd instruct you not to answer, but

5   otherwise you may.

6          THE WITNESS:  I believe that our counsel

7   determined that would be the amount that it would take to

8   cure these defaults and breaches based on their discussions

9   with our forensic accounting group.

10      Q.   (BY MR. PRITCHARD)  So this letter is essentially,

11  is it fair to say, demanding that unless 334th Place gives

12  up more than 2.7 million of what its owed, then AMTAX won't

13  move forward with the appraisal process under Section 7.4.J?

14         MS. JOHNSON:  Objection.  Mischaracterizes

15  testimony, misstates the document, document speaks for

16  itself.

17         THE WITNESS:  Again, it says "currently

18  estimated," and I don't think it was that specific.  But

19  basically, yes, it was saying these items need to be cured

20  before we proceed.

21      Q.   (BY MR. PRITCHARD)  Do you know how much AMTAX

22  claimed for damages in its counterclaims?

23      A.   I don't remember the number.

24      Q.   Will you believe me if I represented to you that it

25  was 1.5 million?

 1  |  A.   Right.  So until the items that are mentioned in
 2  | that letter, if there's any other additional claims that
 3  | aren't mentioned in that letter are resolved, AMTAX doesn't
 4  | plan to proceed with the appraisal process.

 5  |  Q.   Is it still AMTAX's position that that would
 6  | require giving up 2.7 million in accounts payable?

 7  |          MS. JOHNSON:  Objection.  Mischaracterizes his
 8  | testimony, misstates the documents, may call for a legal
 9  | conclusion or attorney-client privileged information.

10  |          Otherwise you may answer.

11  |          THE WITNESS:  Possibly.  As time passes and if
12  | there are continued mismanagement of partnership funds and
13  | payments to affiliates that aren't authorized, that number
14  | can grow over time.  Or if certain items are cured, it may
15  | go down.  But I don't think we're locked into that specific
16  | number, because it's fluid.

17  |  Q.   (BY MR. PRITCHARD)  Okay.  I'm going to shift gears
18  | a little bit.

19  |       What can you tell me about what Parkway's audit
20  | requirements are generally?

21  |          MS. JOHNSON:  Objection.  Calls for a
22  | narrative, may call for a legal conclusion.

23  |          THE WITNESS:  I believe that's detailed in the
24  | Partnership Agreement, but generally the general partners
25  | are required to provide audited financial statements each

1   year that are -- I believe they're subject to our approval.

2       Q.    (BY MR. PRITCHARD)   They're subject to AMTAX's

3   approval?

4       A.    Our review, yeah.

5       Q.    Review or approval?   Or both?

6       A.    Both.

7       Q.    And is it the LPA that requires that the audits

8   occur?

9             MS. JOHNSON:   Objection.   Calls for

10  speculation.

11            THE WITNESS:   I believe so.   And some of that

12  might be included in the Management Agreement as well.

13      Q.    (BY MR. PRITCHARD)   Do you know if HUD requires

14  annual audits of the Parkway Partnership?

15      A.    I believe so.

16      Q.    Any other agencies that would require it in the

17  context of this property?

18      A.    I think all tax credit partnerships are required to

19  obtain an annual audit.

20      Q.    So how does it work?   Once the audit is finished,

21  is it distributed to these agencies normally?

22      A.    I'm not sure if the state reviews a copy, but HUD

23  would review a copy, I believe.

24      Q.    And AMTAX would as well?

25      A.    That's right.   So we would get a draft, we'd review

1   it and provide comments, and the general partner would work

2   with the CPA to finalize it and sign off on it.

3       Q.   So AMTAX would review before the audit is

4   finalized; is that right?

5       A.   In some cases, not all cases.  So I think there

6   would be a high-level review, and then if there were any red

7   flags that came up as a part of that process, they might

8   look into it deeper.  If nothing jumped out at the asset

9   manager or accountant, they might just instruct the GP to go

10  ahead and finalize.

11          We do have thousands of partnerships, so.

12      Q.   Is there a formal process in place for how Alden

13  Torch would handle review of annual audits?

14      A.   There is.  It's an asset management function so I'm

15  not familiar with all the technical or a detailed picture of

16  how that process works, but there is a process in place.

17      Q.   Okay.

18          So in this case it would be more in Gary Newbold's

19  wheelhouse?

20      A.   It was the annual audit review at the time he was

21  the asset manager, yes.  And obviously when capital

22  transactions is involved we would look at the audits, and

23  sometimes we'd flag things that weren't caught in the audit

24  reviews and kind of elevate those and try to get answers to

25  those questions, which I think is what happened in a couple

Chris Blake 30(b)(6)                    30(b)(6)
October 26, 2018

 1  instances in Parkway.

 2      Q.   And is that before or after the audits are filed

 3  that you would get involved?

 4      A.   It depends on the time of year that we start

 5  looking at a property.  So if I started looking at a

 6  property and only the draft was available, then it would

 7  have been finalized yet.  But if I started looking at a

 8  property later in the year, obviously the audit has been

 9  finalized and filed already.

10      Q.   Okay.

11           And so that's one of Gary Newbold's functions as

12  the asset manager, to review the annual audit draft either

13  in draft form or after it's finalized?

14      A.   I believe so, yes.

15      Q.   So he would have done that every year that he was

16  the asset manager; right?

17           MS. JOHNSON:  Objection.  Calls for

18  speculation, lacks foundation.

19           THE WITNESS:  I believe so.

20      Q.   (BY MR. PRITCHARD)  And there's been an audit every

21  year for Parkway since 2002; right?

22      A.   I think so.  There should have been, yeah.

23      Q.   And the partnership -- those audit statements were

24  filed and reviewed by AMTAX every year?

25           MS. JOHNSON:  Objection.  Calls for

Chris Blake 30(b)(6)                    30(b)(6)
October 26, 2018

1   speculation.

2              THE WITNESS:  You know, I can only speak about

3   what's happened since I've worked at Hunt and Alden Torch,

4   so I'm not sure what the process was at Paramount and

5   Catmark.  I assume it was similar if not identical.  I just

6   wasn't there.  I can't guarantee that.

7       Q.   (BY MR. PRITCHARD)  So why were the two accountants

8   that Alden Torch directed to investigate mismanagement asked

9   to look back to 2002?

10             MS. JOHNSON:  Objection to the extent it calls

11  for attorney-client privileged information and attorney work

12  product.

13             Otherwise you can answer.

14             THE WITNESS:  Because that's when the

15  partnership was formed.

16      Q.   (BY MR. PRITCHARD)  If AMTAX found something

17  inaccurate in an audit when it reviewed it, how would it

18  handle that situation?

19             MS. JOHNSON:  Objection.  Incomplete

20  hypothetical, calls for a legal conclusion.

21             THE WITNESS:  Depends on the inaccuracy.  But I

22  believe the asset manager would notify the general partner

23  and the general partner would need to notify the auditor and

24  obtain a corrected audit.

25      Q.   (BY MR. PRITCHARD)  Do you know if that has

Chris Blake 30(b)(6)                    30(b)(6)
October 26, 2018

```
 1   occurred since you've been at either Hunt Companies or Alden
 2   Torch?
 3       A.   For Parkway?
 4       Q.   Yeah.
 5       A.   I don't know.
 6       Q.   Has it occurred with other partnerships that you've
 7   been involved with?
 8       A.   I know that we have gotten revised audits and
 9   financial statements.
10       Q.   But you don't know if that happened with Parkway?
11       A.   I don't know.
12       Q.   Since you've been at Alden Torch, did AMTAX review
13   each audit as it came in each year?
14       A.   Each audit for Parkway?
15       Q.   For Parkway, yes.
16       A.   As far as I know, someone at Alden Torch would have
17   review those.  But again, I don't know what level of detail,
18   but yes.
19       Q.   Same is true for Hunt Companies before Alden Torch?
20       A.   Yes, as far as I know.
21       Q.   And if AMTAX saw issues in the audit, would it
22   contact 334th Place to address that?
23            MS. JOHNSON:  Objection.  Incomplete
24   hypothetical, calls for speculation.
25            THE WITNESS:  Most likely, yes.
```

```
 1              THE WITNESS:  Yes, these are a portion of the
 2   items that were listed in the letter.
 3        Q.   (BY MR. PRITCHARD)  Is Caley Diaz your subordinate?
 4        A.   She doesn't report to me.
 5        Q.   So why did you ask her to do this?
 6              MS. JOHNSON:  Objection to the extent it calls
 7   for attorney-client privileged information and attorney work
 8   product.
 9              I'd instruct you not to answer.
10              THE WITNESS:  Because as I mentioned, all of
11   our deals in litigation -- or I should say when we're
12   involved in litigation with a general partner we will look
13   at all of the other properties, and apparently she hadn't
14   done this one.  But that is our standard process.
15        Q.   (BY MR. PRITCHARD)  And this is you -- this is the
16   deep dive that you were testifying to; right?  This is you
17   requesting that she do the deep dive; is that right?
18              MS. JOHNSON:  Objection.  Mischaracterizes his
19   testimony.
20              And again, I will instruct you not to answer to
21   the extent it calls for attorney-client privileged
22   information or attorney work product.
23              THE WITNESS:  Yeah, I asked her to look into
24   it, the numbers.
25        Q.   (BY MR. PRITCHARD)  Did you ask any accountants at
```

1  accurate.

2      Q.   (BY MR. PRITCHARD)  So part of the due diligence

3  that you did, it looks like it's an email from Gary Newbold

4  to ask someone else at Hunt Company to make this audit a

5  priority to review?  That's what he says here; right?

6              MS. JOHNSON:  Objection.  Compound.

7              THE WITNESS:  Yes.

8      Q.   (BY MR. PRITCHARD)  So review of the audit is a

9  significant part of the due diligence that you would do in

10  connection with a buy-out; right?

11             MS. JOHNSON:  Objection.  Mischaracterizes his

12  testimony, calls for speculation.

13             THE WITNESS:  Yes, I believe so.

14     Q.   (BY MR. PRITCHARD)  So this would have been a

15  review of the audit for 2013; is that right?

16     A.   Yes.

17     Q.   Is this the same John Thomas, is this one of the

18  forensic accountants from 2018?

19     A.   Yes, it is.  But again, that group didn't exist at

20  the time.  I think he was more of just like a staff

21  accountant at the time.

22     Q.   But he was in a similar role at that time as he is

23  now?

24     A.   Well, he's no longer at the company.  In I guess

25  the end of 2017 and early 2018, he was a part of that

1  were still reviewing it.

2      Q.   And this is the same audit that -- if we could turn

3  back to Exhibit 22.  This is the same audit that you said,

4  "I think we are on the same page with respect to the audit

5  and can move forward with discussion of selling the LP

6  interest."  It's the same one; right?

7      A.   Yes.

8      Q.   So that also includes the deferred developer fee

9  issues that you were raising in March of 2014, doesn't it?

10             MS. JOHNSON:  Objection.  Argumentative,

11  mischaracterizes testimony.

12             THE WITNESS:  Again, I've mentioned that there

13  are multiple items of disagreement on the developer fee.

14  She believed she addressed one of them by adjusting the

15  accrued interest in 2013.  But as we sit here today, we've

16  done, obviously, more review and determined that that was a

17  year too late.

18             So the more we dig into this the more we

19  uncover and the more unauthorized activity we've uncovered.

20      Q.   (BY MR. PRITCHARD)  Let's go to the 2013 audit.

21  It's Exhibit 16, Page 10, Note 7.

22             Are you contending that there is anything in this

23  development fee note that was not -- let me rephrase it.

24      A.   I think I have the wrong document.  Can you repeat?

25      Q.   Exhibit 16, the 2013 audit.

1    MS. JOHNSON:  Same objection.

2    THE WITNESS:  No.  I think the audit accurately

3  reflects what happened, but what happened wasn't in

4  accordance with the Partnership Agreement.

5    But, you know, if the general partner made an

6  equity contribution in 2013, that's reflected accurately.

7  And that statement would be accurate based on what actually

8  happened, not what we think should have happened based on

9  running the partnership based on the requirements of the

10  Partnership Agreement.

11  Q.    (BY MR. PRITCHARD)  So the counterclaims and the

12  May 8th letter also state that 334th Place "Paid Project

13  Management Fees that collectively exceeded the 4 percent Net

14  Rental Income cap set forth in the LPA by more than

15  $100,000."

16    Is that right?

17  A.    Yes.

18  Q.    Can you point me specifically to where you're

19  getting the $100,000 figure?

20  A.    That's not my calculation.

21  Q.    Whose calculation is it?

22    MS. JOHNSON:   Objection.

23    To the extent it calls for attorney-client

24  privileged information or attorney work product, I would

25  instruct you not to answer.

Chris Blake 30(b)(6)                    30(b)(6)
October 26, 2018

1              THE WITNESS:  I won't answer, based on

2    counsel's recommendation.

3        Q.   (BY MR. PRITCHARD)  You're not going to answer who

4    came up with this number?

5              MS. JOHNSON:  Same objections and instruction.

6              THE WITNESS:  I don't know.  I assume it came

7    from our counsel's conversations with the forensic

8    accounting group.  But I didn't come up with that number and

9    wasn't -- I didn't come up with the number.  I don't know.

10       Q.   (BY MR. PRITCHARD)  But it was based on a number

11   calculated by one of the members of the forensic accounting

12   group; is that right?

13             MS. JOHNSON:  Objection.  Misstates his

14   testimony, calls for speculation.

15             Same objections and instruction.

16             THE WITNESS:  I'm saying that's possible, but

17   it's not difficult math.  So counsel may have just looked at

18   the management fee paid in a given audit, calculated the net

19   rental income, and if it exceeds 4 percent then you add that

20   and do that for each year.

21             So it doesn't necessarily take a forensic

22   accountant to do that; it may have been counsel.

23       Q.   (BY MR. PRITCHARD)  You verified that the

24   counterclaims were true and accurate, didn't you?

25       A.   Yes.

Chris Blake 30(b)(6)                    30(b)(6)
October 26, 2018

1      Q.   And are you aware that AMTAX has a responsibility

2   to demonstrate the actual, specific itemized damages that

3   it's claiming in the counterclaims?

4      A.   I assume so.

5      Q.   Are you able to do that as a 30(b)(6) witness here

6   today?

7      A.   I mean, I don't know how I would be able to

8   calculate every single fee here that's been paid out of

9   order as we sit here today.

10          I thought my responsibility was to educate myself

11   on these, and I looked at various audits, and if a

12   management fee exceeds 4 percent it exceeds 4 percent.  And

13   I have no reason to believe that whoever prepared this

14   number was not able to calculate that accurately.

15      Q.   Can you turn to Exhibit 1, Topic 14, please.

16          MS. JOHNSON:  To the extent you're going to

17   refer to a topic in the deposition notice, I'll just

18   reiterate that he's been produced subject to the objections

19   that were asserted, including objections based on privilege

20   and legal conclusions and expert testimony.

21      Q.   (BY MR. PRITCHARD)  Can you read No. 14, please?

22      A.   "Every element of the claimed damages of

23   $1.5 million in AMTAX 169's counterclaims, and for each

24   element or component the amount of damages sought and an

25   explanation of the basis for the claim damages."

Chris Blake 30(b)(6)                    30(b)(6)
October 26, 2018

1      Q.    You're the designated representative to testify to

2   this topic, aren't you?

3      A.    Yes.

4      Q.    So who does know the answer to the question of how

5   that number was arrived at?

6            MS. JOHNSON:  Objection.  Argumentative, asked

7   and answered.

8      Q.    (BY MR. PRITCHARD)  It's not you, right?  You just

9   testified it's not you.

10           MS. JOHNSON:  Objection.  Mischaracterizes his

11  testimony, harassing.

12           THE WITNESS:  Yes, I didn't calculate that

13  number, but I was involved in discussions with counsel

14  during that deep dive process and have no reason to believe

15  that that number is not accurate.

16     Q.    (BY MR. PRITCHARD)  So who is the representative of

17  AMTAX that can answer the question and substantiate the

18  damages in this case?

19           MS. JOHNSON:  Objection, again.  Harassing.

20  This topic was objected to.  Mr. Blake can testify as to the

21  information he knows that's not privileged.  Mr. Blake is

22  the designated representative on this topic subject to our

23  objections.

24           THE WITNESS:  As I testified, I believe that

25  discussion was protected by attorney-client privilege.

Chris Blake 30(b)(6)                           30(b)(6)
October 26, 2018

```
 1        Q.    (BY MR. PRITCHARD)  So you're saying the amount of
 2    AMTAX's damages in the counterclaims is protected by
 3    attorney-client privilege?
 4                MS. JOHNSON:  Objection.  Mischaracterizes his
 5    testimony, asked and answered, harassing.
 6                THE WITNESS:  I'm saying that the discussions
 7    where those amounts were determined is privileged.
 8                MS. JOHNSON:  Let's take a quick break.
 9                (Short break.)
10        Q.    (BY MR. PRITCHARD)  Are you ready to itemize the
11    damages for over $100,000 in this case that AMTAX claimed?
12        A.    They're described in the May 8th letter.
13        Q.    Can you point that out, please?  Where?
14        A.    In the bullet points.  So conceptually, I've walked
15    you through why we disagree with all of these items, and
16    that was used to arrive at the amount of damages.
17        Q.    But you can't give me a specific itemization of the
18    more than $100,000 in alleged unauthorized project
19    management fees; is that right?
20                MS. JOHNSON:  Objection.  Mischaracterizes his
21    testimony.
22                THE WITNESS:  No.  Again, those amounts were I
23    guess determined in discussions with counsel, and I'm
24    instructed not to discuss anything that would be subject to
25    attorney-client privilege.
```

Chris Blake 30(b)(6)                    30(b)(6)
October 26, 2018

```
 1      Q.    So if you back out just the fees that are Advances
 2   from GP and Trieste Holdings, that's $2 million; right?
 3      A.    It is.
 4      Q.    That's more than the 1.5 million in damages that
 5   AMTAX is claiming in this litigation; right?
 6      A.    Obviously 2 million exceeds 1.5, so.
 7      Q.    So you approved of $2 million in fees in 2014?
 8           MS. JOHNSON:  Objection.
 9      Q.   (BY MR. PRITCHARD)  That's what this waterfall
10   says; right?
11           MS. JOHNSON:  Objection.  Mischaracterizes his
12   testimony, mischaracterizes the document, calls for a legal
13   conclusion.
14           THE WITNESS:  Potentially, yeah.  I mean, we
15   may not have dug in as deep as we should have, and maybe she
16   would have gotten away with paying herself fees that were
17   not authorized.  But I don't know what these numbers are
18   comprised of, so.
19      Q.   (BY MR. PRITCHARD)  Well, you do know that it's
20   advances to the general partner and it's fees claimed by
21   Trieste Holdings which is an affiliate of the general
22   partner; right?
23           MS. JOHNSON:  Same objection.  Document speaks
24   for itself, calls for speculation.
25           THE WITNESS:  It's amounts owed to those two
```