1                                      THE HONORABLE RONALD B. LEIGHTON

2

3

4

5

6

7                            UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF WASHINGTON
8                                  AT TACOMA

9   HIDDEN HILLS MANAGEMENT, LLC,       No. 3:17-cv-06048-RBL
   and 334TH PLACE 2001, LLC,
10                             HIDDEN HILLS MANAGEMENT, LLC's
               Plaintiffs,          CROSS MOTION FOR SUMMARY
11                            JUDGMENT AND OPPOSITION TO
      v.                        DEFENDANT'S MOTION FOR
12                            SUMMARY JUDGMENT
   AMTAX HOLDINGS 114, LLC, and
13   AMTAX HOLDINGS 169, LLC,        NOTE ON MOTION CALENDAR:

14               Defendants.        AMTAX's MOTION: February 15, 2019

15                           HHM'S CROSS MOTION: March 8, 2019

16

17   AMTAX HOLDINGS 114, LLC, AMTAX
   HOLDINGS 169, LLC, and PARKWAY
   APARTMENTS, LP
18
               Counter-Plaintiffs,
19
      v.
20
   HIDDEN HILLS MANAGEMENT, LLC,
21   and 334TH PLACE 2001, LLC,

22               Counter-Defendants.

23

24

25

26

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
(3:17-cv-06048-RBL)

STOEL RIVES LLP
ATTORNEYS
600 University St., Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

## I.  INTRODUCTION AND SUMMARY

The Limited Partnership Agreement ("**LPA**") of Hidden Hills 2001, LP ("**Hidden Hills**" or the "**Partnership**") dates back to January 1, 2002.  Hidden Hills Management LLC ("**HHM**" or the "**GP**") has been part of the Partnership from the beginning.  Its managing member, Catherine Tamaro, was involved in the Partnership's formation, the acquisition of the Hidden Hills property from the previous owner and the negotiations with the lenders and regulatory agencies.

The negotiation began in 1999.  It took three years to complete because the soils at Hidden Hills were found to have high levels of arsenic and lead.  The Department of Ecology ("**Ecology**") listed Hidden Hills as a highly contaminated site.   Potential lenders declined to finance the deal unless the contamination was remediated.  The Partnership finally secured financing from ARCS mortgage, a Fannie Mae lender.   The financing was conditioned on the Partnership placing $1.25 million in escrow for environmental cleanup, based on the 1999 and 2000 soil characterization reports by Environmental Partners, Inc. ("**EPI**").

The GP contributed cash to the Partnership in connection with the purchase and deferred the payment of fees it was otherwise owed in order to fund the escrow.  If the cleanup was required and the escrow funds were insufficient, the GP was required to pay the difference.  If the LP exited the partnership in a buyout, the GP remained responsible for any future cleanup, whether voluntary or required by Ecology or a lender.  To date Ecology has not required a cleanup.  The escrow has grown to $1.5 million.

AMTAX Holdings 114, LLC's ("**AMTAX 114**" or the "**LP**") current manager, Alden Torch, knows little about the Partnership's history.  It came to the Partnership in late 2011, when it acquired other unrelated AMTAX LP interests governed by similar agreements.  In its motion for summary judgment, AMTAX seeks to defeat the GP's option to buy out its interest under § 7.4.J of the LPA.  It faults the GP for sharing historic and updated information about contamination and cleanup with the appraisers retained to determine the buyout price under

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 1

1  § 7.4.J, and insists that the risk of future cleanup and the related difficulty of financing (or

2  refinancing) the property is not "real."  AMTAX insists that the property should instead be put

3  on the market under § 7.4.K of the LPA, and purported to remove the GP to achieve that goal.

4      But the LPA does not give that choice to the LP.  After managing the property diligently

5  for 16 years and delivering to the LP the maximum tax credits and write-offs that the low income

6  housing tax credit ("**LIHTC**") partnership is designed to provide, the GP has earned to right to

7  buy AMTAX out under § 7.4.J, at the price determined by the third appraisal, if, as here, the first

8  two appraisals disagree on value.  Here, the first two appraisals were over $5 million apart.  The

9  third appraisal was prepared by experienced appraisers at Colliers International ("**Colliers**").

10  There is no dispute that they considered all available information, including some brokers' view

11  that contamination has little effect on value, and valued the property at $13.5 million.  The

12  Colliers appraiser testified that his appraisal reflected his independent judgment and was in no

13  way influenced by Ms. Tamaro.  As a matter of law that is all § 7.4.J requires.

14      To be sure, the GP and the LP have very different and equally strong views on whether

15  the existing contamination and related scarcity of financing are relevant to the value of Hidden

16  Hills.  But the Court does not need to resolve this disagreement.  That is the point of agreeing in

17  advance to a third, and binding, appraisal.  AMTAX's accusations against Ms. Tamaro do not

18  override the agreed-upon contractual mechanism for setting the buyout price.  AMTAX does not

19  challenge Colliers appraiser's credentials or offer any competent evidence to contradict his

20  testimony that the appraisal was the result of his independent professional judgment.  The GP is

21  entitled to a judgment as a matter of law that requires AMTAX to honor the terms of the LPA.

22      **II.      FACTS AND PROCEDURAL BACKGROUND**

23      **A.  The Partnership Purchases the Property in 2002**

24      The property is located in University Place.  It was built in 1984 and has 216 units.  Dkt.

25  # 64 (cited herein as "Pettit Decl." Ex. 33 (Colliers appraisal)).  It was in the plume of the

26  ASARCO smelter.  *Id.* at 30 (HHM-2622).  But the issue is not merely that the property was in

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 2

1    the smelter plume.  In 1998, Tacoma Water selected the property as one of its test sites, and the

2    soil tested for high levels of lead and arsenic.  *Id.*, Ex. 30 (cited herein as "Tamaro TRO Decl." ¶

3    6, Ex. C).  After more testing in 1999, Ecology listed the property on its "Confirmed and

4    Suspected Contaminated Sites List."  *Id.* ¶ 7; Ex. 33 (Colliers appraisal at 30).  It is undisputed

5    that this property is publicly listed as a contaminated property.  Pritchard Decl. Ex. T (Answer to

6    RFA 10).

7            HHM negotiated and facilitated the purchase of the Hidden Hills property on behalf of

8    the Partnership, which was formed to place the property in the LIHTC program.  Tamaro TRO

9    Decl. ¶ 6; Tamaro Decl. ¶ 1. The contamination made the negotiations difficult.  Sullivan Decl. ¶

10   4; Hallgrimson Decl. ¶ 2.   The first two lenders contacted by HHM wanted the arsenic and lead

11   remediated before it would close the loan.  Sullivan Decl. ¶ 9.  Another lender did not require a

12   cleanup but instead mandated the funding of an escrow account, in the amount of approximately

13   $1.25 million, in the event that the cleanup was required (the "**Environmental Escrow**").  *Id.*  In

14   May 1999, the draft purchase and sale agreement with the seller reflected a purchase price of

15   $9.8 million.  Pritchard Decl., Ex. A at HHM-008312.  When the transaction finally closed on

16   January 30, 2002, the final purchase price was $8,900,000, reflecting a significant

17   contamination-related discount.  *Id.* Ex. B (excise tax affidavit); Tamaro TRO Decl. ¶ 10;

18   Sullivan Decl. ¶ 5.

19           **B.  The Project Documents**

20           The main project document, ***the LPA***, allowed the LP to receive LIHTC credits in return

21   for its investment of $ 3.57 million.[1]  Pettit Decl., Ex. 1 (cited herein as "LPA").  The tax credits

22   are the primary purpose of these investments.  Over the fifteen year compliance period, AMTAX

23   _____

24           [1] Section 42 of the Internal Revenue Code permits investors who commit capital to
     affordable housing projects to earn tax credits. The tax credits are fully earned and retained
25   during the fifteen-year compliance period.   Tamaro Decl. ¶ 1; Dkt. # 37 (AMTAX
     Counterclaims ¶¶ 24-27).

26

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 3

**STOEL RIVES** LLP
ATTORNEYS
600 University St., Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*

1    114 received $4.55 million in federal tax credits, $3.57 million in federal tax write-offs, and

2    $188,000 in management fees.  Tamaro Decl. ¶ 3.  HHM contributed $700,962 to the Partnership

3    at closing, but in order to ensure that AMTAX 114 received its full 99.9% share of the tax

4    credits, HHM's contribution was accounted for as a "General Partner Loan" under the LPA.  *See*

5    Tamaro Decl. ¶ 2; LPA at 9.  HHM also deferred receipt of fees it was owed in order to fund the

6    Environmental Escrow.  Tamaro Decl. ¶ 2.  HHM has managed the Partnership since January

7    2002.  *Id.* ¶ 3.

8           Section 7.4.J of the LPA gives HHM an option to purchase the LP's interest during the

9    two years after the end of the compliance period.  LPA § 7.4.J.[2]  The price of the interest is based

10   on the fair market value of the property held by the Partnership.  *Id.*  Fair market value, for the

11   purposes of the buyout option, "shall be determined by two independent MAI [Member of the

12   Appraisal Institute] appraisers: one selected by the Managing General Partner and one by the

13   Investor Limited Partner.  If such appraisers are unable to agree on the value, they shall jointly

14   appoint a third independent MAI appraiser whose determination shall be final and binding."  *Id.*

15   There are no other provisions in the LPA addressing the requirements for the appraisal process.

16          The project documents also included the ***Environmental Escrow Agreement***.  Pettit

17   Decl. Ex. 3.  This agreement (a condition of the Fannie Mae financing) required the Partnership

18   to fund an interest-bearing escrow account to use for remediation costs in the event a clean-up

19   was required.  At the insistence of Paramount Financial Group, Inc. ("**Paramount**"), AMTAX

20   114's original manager, HHM funded the Environmental Escrow by, among other things,

21   deferring the payment of fees that were otherwise be owed to the GP.  Sullivan Decl. ¶ 5;

22   Tamaro Decl. ¶ 2.  In connection with a buyout of the LP's interest, the funds in the

23

24

_____

25          [2] Section 7.4.K provides a forced sale right to the LP, which is expressly subject to the
     buyout option in Section 7.4.J.

26

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 4

STOEL RIVES LLP
ATTORNEYS
600 University St., Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

1    Environmental Escrow will be divided up between the partners.  *See* LPA §§6.2(B) and 7.8(D);

2    Pritchard Decl. Ex. C (Tamaro Dep. at 446).

3         HHM and AMTAX 114 also entered into a separate ***Environmental Indemnity & ADA***

4    ***Compliance Agreement*** ("**Indemnity**").  *See* Pettit Decl. Ex. 2.  Except for Paragraph 2, the

5    Indemnity was a standard form agreement that AMTAX 114 drafted and used for each of the

6    partnerships in which an AMTAX entity invested.  *See, e.g.*, Pritchard Decl. Ex. D ((blacklined

7    Indemnity Agreement adding Paragraph 2)); Ex. E (AMTAX cover letter indicating the

8    Indemnity is a standard form); Ex. F (Parkway indemnity).   Paragraph 2 memorialized the

9    environmental contamination of the Property with lead and arsenic. Paragraph 4 stated the

10   standard terms of the indemnity.   Paragraph 8 contained an integration clause.

11        Those familiar with the parties' intent when it was signed stated that the Indemnity "had

12   nothing to do with any diminution of the property value, as that issue was addressed at the time

13   of acquisition by the seller's reduction of the price paid by the Partnership."  Sullivan Decl. ¶ 7.

14   AMTAX 114's original internal financial projections also show that it had no expectation that

15   the Partnership property would have any residual value that would be distributed to the LP at the

16   end of the compliance period.  Gibson Decl. ¶ 5, Exs. A & B.  Thus, the Indemnity was not

17   intended to address the terms of any buyout after the compliance period.  *Id*. ¶¶ 4-7.

18        AMTAX 114's current manager is not familiar with this history.  In 2001, the LP was

19   managed by Paramount, which signed both the LPA and the Indemnity on behalf of AMTAX

20   114.  In the mid-2000s, Paramount was absorbed by Capmark, another LIHTC housing asset

21   management firm.  Pritchard Decl. Ex. G (HH Blake Dep. at 10); Ex. H (Parkway Blake Dep. at

22   10).  Hunt Companies purchased Capmark in bankruptcy in 2011, and ultimately became Alden

23   Torch in 2015.  *Id.* Ex. H (Parkway Blake Dep. at 10-11, 13 ("It was effectively a name

24   change.").  AMTAX 114's representative is Chris Blake, the Director of Capital Transactions at

25   Alden Torch.  He testified that Alden Torch inherited those agreements when it took over the

26

**STOEL RIVES LLP**
ATTORNEYS
600 University St., Suite 3600, Seattle, WA 98101
*Telephone* 206.624.0900

1    asset management function for AMTAX 114 in late 2011, almost ten years after the agreements

2    had been executed.  *See id.* Ex. G (HH Blake Dep. at 76).

3      **C.  Before the End of the Compliance Period HHM Contacts Lenders, CBRE, and EPI Regarding Hidden Hills**

4          Catherine Tamaro first reached out to Todd Henderson at CBRE in the fall of 2015 to

5    appraise the Hidden Hills property (among others) for a property tax appeal and to gauge a

6    potential early buyout of the LP's interest.  Pritchard Decl. Ex. I.  She generally discussed the

7    environmental issues with CBRE at that time, explained the history of the site, and sent a packet

8    of related documents and correspondence.  *Id.* Ex. C (Tamaro Dep. at 357).  CBRE issued that

9    appraisal on February 3, 2016, valuing the property at $13,800,000.  Dkt. # 63 (cited herein as

10   "Blake Decl." Ex. 6.[3]  HHM shared this appraisal with the LP in July 2016, over six months

11   before HHM exercised the option.   Blake Decl. ¶ 4, Ex. 7.

12         In the fall of 2016, HHM began contacting lenders about financing for the buyout.  Blake

13   Decl., Ex. 5; Pritchard Decl. Ex. C (Tamaro Dep. at 443).  Ms. Tamaro learned that lenders

14   taking a security interest in the property would—as in 2001—likely require a cleanup.  *See, e.g.*,

15   Pritchard Decl. Ex. C (Tamaro Dep. at 343-44, 379); Ex. K (Wells Fargo letter declining loan).

16   Potential lenders also wanted updated information relating to the contamination.  *See, e.g.*, *id.*

17   Ex. C (Tamaro Dep. at 368 ("I would have needed that information to approach a lender."), 459

18   (discussions with lender regarding updated Phase I)).  As a result, Ms. Tamaro contacted EPI, the

19   consulting firm that analyzed the soil on the property on behalf of the seller in 1999 and 2001, to

20   update its historic environmental assessments and remediation cost estimates that were first

21   completed in 2001.  *Id.* Ex. L (Carp Dep. at 33 (discussing EPI's solicitation of remediation bids

22   in 2001)).  EPI provided its updated Planning-Level Remediation Cost Estimate on January 3,

23

24   _____

25           [3] At the time of this appraisal no updated information about the costs of remediation was available. CBRE made the "extraordinary assumption" that the funds in the Environmental Escrow were sufficient.  Pritchard Decl. Ex. J (Henderson Dep. at 60).

26

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 6

STOEL RIVES LLP
ATTORNEYS
600 University St., Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

1   2017 and estimated the cleanup cost to range between $1.5-2.5 million.  Pettit Decl. Ex. 11.  The

2   EPI representative testified that Ms. Tamaro never directed or communicated any expectation of

3   what EPI's estimate should be.  Pritchard Decl. Ex. L (Carp Dep. at 112) ("I didn't have an

4   understanding that she was hoping to have a higher cost estimate."); *see also* Ex. C (Tamaro

5   Dep. at 374-75).

6        In January 2017, HHM obtained another appraisal of the Hidden Hills property from

7   CBRE for a tax appeal and shared with CBRE the updated Phase I and the Planning-Level

8   Remediation Cost Estimate prepared by EPI.  *Id.* Ex. C (Tamaro Dep. at 394-95).  CBRE's

9   appraisal, dated January 30, 2017, valued the property at $13 million.  Pettit Decl. Ex. 12.  HHM

10  had no reason to show the tax appraisal to AMTAX 114 and did not do so.  Pritchard Decl. Ex. C

11  (Tamaro Dep. at 389).

12      **D.  AMTAX 114 Attempts to Force a Sale of the Property Before HHM**
13              **Exercises the Option**

14       On January 3, 2017, three days after Hidden Hills' compliance period ended, AMTAX

15  114 sent HHM a letter titled a "Required Sale Notice" under the LPA.  Pritchard Decl. Ex. M.

16  In the letter, AMTAX 114 demanded that HHM "promptly use its best efforts to obtain a buyer

17  for Hidden Hills . . . on the most favorable terms available."  *Id.*  HHM responded that there was

18  no such requirement in the LPA and that any right the LP may have regarding its exit was

19  expressly subject to the GP's buyout option under Section 7.4.J.  *Id.* Ex. N. HHM further stated

20  that it planned to exercise that option and advised the LP that it "has no right to prevent, or

21  interfere with, the general partner's exercise of its option."  *Id.*

22       HHM exercised the option by letter dated March 14, 2017, and proposed some "ground

23  rules" for proceeding with the appraisal process.  Blake Decl. Ex. 13.[4]   The parties discussed the

24  process during March and April of 2017.  On May 4, 2017, AMTAX 114 cut the discussions

25      [4] By March 14, 2017, AMTAX 114 had already started to reach out to brokers regarding
26  selling the property.  *See, e.g.*, Pritchard Decl. Ex. O.

**STOEL RIVES** LLP
ATTORNEYS
600 University St., Suite 3600, Seattle, WA 98101
*Telephone* 206.624.0900

1   short, refusing to negotiate any procedure to implement Section 7.4.J and stating that the "only

2   requirement" placed on the LP was to "select an MAI appraiser to determine the fair market

3   value of its interests" effectively leaving the GP to complete the process called for under Section

4   7.4.J without further involvement from the LP.  Pritchard Decl. Ex. P.[5]

5          **E.  The Three Appraisers: CBRE, C&W, and Colliers**

6                  **1.  CBRE**

7          Upon receiving AMTAX's May 4, 2017 letter, HHM selected Todd Henderson, a MAI

8   appraiser at CBRE, to appraise the property for the buyout option.  As it had done previously,

9   HHM sent to CBRE all relevant and material information regarding the property, including EPI's

10  initial Planning-Level Remediation Cost Estimate.  Tamaro TRO Decl. ¶¶ 5,15.  Ms. Tamaro

11  told Mr. Henderson that she planned to ask a broker at CBRE, Tim Flint, for a broker's opinion

12  of the property's value (BOV) to "have some idea of how the brokers will view the

13  environmental issue."  Pritchard Decl. Ex. Q.  Mr. Henderson talked to Mr. Flint and recalled

14  him saying, "I could only tell you what the value would be with clean.  I don't have any idea

15  how the market would handle the environmental contamination."  *Id.* Ex. J (Henderson Dep. at

16  69).  Mr. Henderson also spoke to other brokers and lenders regarding the contamination,

17  considered the materials provided by Ms. Tamaro, and then conducted an independent appraisal

18  of the Property.  *Id.* at 38-39, 169.  The report, dated June 7, 2017, valued the property at

19  $14,050,000, higher than the two prior CBRE appraisals. *See* Blake Decl. Ex. 19.

20

21  ───────────────

22          [5] Despite withdrawing from the appraisal process, the LP continued to push the GP to
    agree to sell the property during the summer of 2017.  *See* Mot. at 9-10.  In August 2017,

23  AMTAX 114's outside counsel made a number of accusations and demands, including that the
    GP agree to market the property for sale.  Pettit Decl. Ex. 25.  By that point, the parties

24  communicated only through counsel.  Pritchard Decl. Ex. C (Tamaro Dep. at 471).  Although
    AMTAX speculates that HHM was "feigning interest in marketing" (Mot. at 10), Ms. Tamaro

25  testified that she seriously considered Alden Torch's demand to market the property in August
    2017.  Ex. C (Tamaro Dep. at 489).

26

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 8

STOEL RIVES LLP
ATTORNEYS
600 University St., Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

1    Mr. Henderson testified that CBRE's appraisers are "independent and don't want to be

2    influenced in any way, shape or form by what someone thinks the property is worth." Pritchard

3    Decl. Ex. J (Henderson Dep. at 85); *see also* 169 ("our conclusions are reached independently of

4    other appraisals, other broker's opinions."). HHM provided Mr. Henderson no direction as to

5    valuation or suggested any desired value. *See id.* Ex. C (Tamaro Dep. at 392) ("Todd does not

6    give me a lower number, he gives me his market value."); Ex. J (Henderson Dep. at 174) ("If

7    you're implying did Catherine tell me the value to value the property, that absolutely was not

8    true … and had she done that I would have declined the assignment").

9                        **2.  Cushman & Wakefield**

10   AMTAX 114 selected Andy Noble of Cushman & Wakefield ("**C&W**") to do the

11   appraisal on April 3, 2017.  Pritchard Decl. Ex. R.  Mr. Noble testified that AMTAX 114 did not

12   disclose the fact that the Property was contaminated with arsenic and lead until after he had

13   completed his draft on May 5, 2017, more than a month after he was retained.  *Id.* Ex. S (Noble

14   Dep. at 24).[6]  AMTAX 114 also never provided to C&W the remediation cost estimate from EPI,

15   although HHM had previously made it available to AMTAX 114.  *Id.* Ex. S (Noble Dep. at 58);

16   Ex. G (HH Blake Dep. at 62).  Mr. Noble testified that the omitted information was "material."

17   *Id.* Ex. S (Noble Dep. at 153).  He further testified that he would have considered the cost of

18   remediation had it been provided to him, at the very least as a capital expense for deferred

19   maintenance.  *See id.* at 113.  In its report, C&W stated that "the cost of the remediation is not

20

21   _____

22       [6] AMTAX 114 provided C&W with selected materials related to the contamination,
     including the Phase I site assessment dated November 28, 2001, and information about the
23   Environmental Escrow, ***on May 9, 2017, four days after Mr. Noble's draft appraisal had been
     completed.***  Pritchard Decl. Ex. R at 2.  The next day, after giving this voluminous (but still
24   incomplete) information less than a day's consideration, C&W provided AMTAX 114 with draft
     language concluding that the contamination had no impact on the property's fair market value.
25   Id. Ex. S (Noble Dep. at 128).   After AMTAX 114 approved it, Mr. Noble included it in his final
     report verbatim.  *Id.* at 130; Ex. G (HH Blake Dep. at 61).
26

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 9

STOEL RIVES LLP
ATTORNEYS
600 University St., Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

1    currently determinable" and valued the property at $19,700,000, $5,650,000 higher than the

2    CBRE appraisal.  Blake Decl. Ex. 15 (C&W Appraisal at 80).

3    **3. Colliers**

4    Because the CBRE and C&W appraisals were far apart, on September 6, 2017, Mr.

5    Henderson and Mr. Noble nominated a third MAI appraiser.  Their joint selection included two

6    names, John Campbell at Colliers and Jeremy Streufert of Kidder Matthews.  *See* Pettit Decl. Ex.

7    48. Mr. Campbell was recommended by Mr. Noble, who had a high level of confidence in his

8    ability and his integrity.  *See* Pritchard Decl. Ex. S (Noble Dep. at 14, 190). Catherine Tamaro

9    had no prior relationship with either and retained Mr. Campbell because his name was first on

10   the list. Tamaro TRO Decl. ¶ 17.  Mr. Noble forwarded the email with their third appraisal

11   nominations to Alden Torch the next day.  Pettit Decl. Ex. 48.[7]

12   Colliers' appraisal was prepared for the Partnership. Pettit Decl. Ex. 38; Pritchard Decl.

13   Ex. U (Hutsell Dep. at 28) ("And so do you recall who your client was?  A. Hidden Hills").  As

14   the managing member of the Partnership's GP, Ms. Tamaro was Colliers' point of contact.  Pettit

15   Decl. Ex. 38.  Pursuant to its standard practice, Colliers sought third-party environmental reports

16   relating to the Partnership. Pritchard Decl. Ex. U (Hutsell Dep. at 36).  Ms. Tamaro provided

17   Colliers with all of the material information in her possession, including the updated EPI

18   remediation cost estimate completed on August 8, 2017 and the updated Phase I.  Tamaro TRO

19   Decl. ¶¶ 18-19.

20

21   [7] AMTAX 114's counsel stated that ___he___ did not learn about the third appraisal until
     September 22, 2017, when HHM's counsel forwarded to him Todd Henderson's September 6,

22   2017 email. Pettit Decl. ¶ 22, Ex. 31.  Mr. Noble had in fact sent ___AMTAX___ the same email on
     September 7, 2017.  *Id.* at Ex. 48.  By September 22, 2017, AMTAX, Alden Torch, ___and___ its

23   outside counsel knew that Colliers had been engaged to provide a third appraisal.  Yet no one
     from AMTAX contacted Colliers before it issued its report more than a month later.  Pritchard

24   Decl. Ex. G (HH Blake Dep. at 72).  AMTAX only reached out to Colliers after this litigation
     was filed in November 2017. *See, e.g.*, Pettit Decl. Ex. 43.  Ms. Tamaro never instructed

25   Colliers not to talk to AMTAX prior to the litigation.  Pritchard Decl. Ex. C (Tamaro Dep. at
     500).

26

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 10

**STOEL RIVES** LLP
ATTORNEYS
600 University St., Suite 3600, Seattle, WA 98101
*Telephone* 206.624.0900

1    Mr. Hutsell previously stated in a declaration that "[a]t no time during the process did I

2    feel that Ms. Tamaro attempted to influence me or my conclusions regarding the fair market

3    value of the property."  Dkt # 2-1 at 29 (Hutsell Decl. ¶ 11); *see also* Pritchard Decl. Ex. C

4    (Tamaro Dep. at 504) ("I didn't give him instructions on how to write his appraisal.").  Mr.

5    Hutsell testified that the Colliers report "represented the independent appraisal of value based on

6    . . . all the information that was collected and reviewed by both him and John Campbell."  *Id.* Ex.

7    U (Hutsell Dep. at 162).

8    In addition to documents regarding the environmental contamination and the

9    Environmental Escrow, Colliers also considered information it collected independently from

10   lenders, brokers, and developers.  *Id.* at 163.  The BOV that Tim Flint prepared was one such

11   data point, as was the opinion of Armand Tiberio, another CBRE broker who believed financing

12   would be available on this property.  *Id.* Ex. V; Ex. W.[8]  Colliers gave all of this information the

13   due weight it deserved in its independent professional judgment, and issued its report on October

14   23, 2017, valuing the property at $13,500,000.  Pettit Decl. Ex. 33; Dkt. # 2-1 at 29 (Hutsell

15   Decl. ¶ 3); Ex. U (Hutsell Dep. at 83); *id.* at 23 ("we felt confident in what we were able to

16   determine and provide an estimate of value based on the information provided.").

17   **F.  AMTAX Refuses to Recognize the Third Appraisal and Purports to Remove
     HHM as the General Partner, Resulting in this Litigation**

18

19   On November 3, 2017, AMTAX 114's counsel wrote to HHM refusing to recognize its

20   buyout option. Pettit Decl. Ex. 47 at HHM-003181.  It threatened to remove HHM as the GP

21   unless HHM agreed to either (1) abandon its option under § 7.4.J and sell the property using a

22   broker chosen by AMTAX or (2) agree that for purposes of § 7.4.J the value of the property was

23   $21,300,000, ***$1.6 million above AMTAX's own appraiser's value***.  *Id.* at HHM-003186.  On

24   November 14, 2017, HHM filed suit in state court seeking a declaration that the final and binding

25   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [8] Mr. Tiberio spent approximately 15 minutes on the Hidden Hills BOV.  Pritchard Decl.

26   Ex. X (Flint Dep. at 56).

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 11

**STOEL RIVES** LLP
ATTORNEYS
600 University St., Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*

1   Colliers appraisal must be honored under the LPA.  Dkt. # 1-1.  AMTAX 114 responded by a

2   letter dated November 30, 2017 that purported to remove HHM as the GP.  Pettit Decl. Ex. 47.

3        In December 2017, AMTAX 114 removed the case to this Court and brought four

4   counterclaims against HHM, including breach of contract, breach of fiduciary duty, a declaratory

5   judgment regarding the option price, and for removal of HHM as GP.  Dkt. # 16.  All of

6   AMTAX 114's counterclaims were predicated on the contention that AMTAX 114's buyout

7   interest should have been higher because the costs of remediating the known contamination on

8   the property should not have been taken into account by the appraisers.   Months later, AMTAX

9   114 amended its counterclaims to assert a new claim for a declaratory judgment for

10  indemnification.  Dkt. # 24.  Prior to this amendment, AMTAX had never provided any

11  indication that it had any right to indemnification in the context of the buyout option, despite a

12  flurry of letters and negotiations between AMTAX and HHM over a nearly a year.

13                **III.        AUTHORITY AND ARGUMENT**

14       AMTAX 114 asks the Court to rewrite the LPA by denying HHM its explicit buyout

15  option under Section 7.4.J and instead force a sale of the property under Section 7.4.K.  *See* LPA

16  § 7.4.K ("Subject to the Option in Section 7.4.J above . . .").  This extraordinary remedy—that is

17  contrary to the LPA's terms—is based on a barrage of accusations against Ms. Tamaro. But the

18  facts underlying AMTAX's accusations are either speculative (e.g., Ms. Tamaro improperly

19  "influenced" the appraisers) or disputed (e.g., whether the effect of contamination on the market

20  price is "real").  Even if these accusations were material to the interpretation of the LPA—and

21  they are not—these disputes would present triable issues that preclude summary

22  judgment. *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013); Fed. R. Civ. P. 56.

23       But AMTAX's accusations and speculation are not relevant to the exercise of the GP's

24  buyout right.  The LPA contemplated the potential for a disagreement over value, just like the

25  one here, by implementing the third appraisal mechanism.  Section 7.4.J is unambiguous and the

26  facts relevant to it are not in dispute.  The option has been validly exercised, the independent

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 12

**STOEL RIVES** LLP
ATTORNEYS
600 University St., Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*

1   appraisal process is complete, and the third appraisal is, by definition, "final and binding."  And

2   by its own plain terms, the Indemnity has not been triggered.  HHM has delivered all the LIHTC

3   benefits to which AMTAX 114 was entitled under the LPA over a fifteen year period.  HHM is

4   now entitled to the benefit of its bargain under the LPA: a declaration that the buyout must

5   proceed and the third appraisal's valuation controls.

### A. HHM is Entitled to Declaratory Judgment that the Colliers Appraisal is "Final and Binding"

8   Under LPA § 7.4.J, the buyout option does not require AMTAX's consent.  The third

9   appraisal is final and binding.  AMTAX does not like § 7.4.J or the third appraisal and seeks to

10   frustrate the buyout option and the binding appraisal by an end run--removing the GP.   It relies

11   on Washington case law holding that the terms of an option contract are strictly construed.  Mot.

12   at 16.  That may be true, as far as it goes, but reading a contract's terms strictly does not permit

13   the Court to add terms that are not there.  *See Hardy v. Hartford Ins. Co.*, 236 F.3d 287, 291 (5th

14   Cir. 2001) ("rule[s] of strict construction do[] not authorize a perversion of language, or the

15   exercise of inventive powers").

16   For example, although insurance contracts are strictly construed against the insurer, "a

17   strict application should not trump the plain, clear language of an exclusion . . . [i]n Washington

18   the expectations of the insured cannot override the plain language of the contract."  *Kut Suen Lui*

19   *v. Essex Ins. Co.*, 185 Wn. 2d 703, 712, 375 P.3d 596 (2016).  The same rationale applies to

20   option contracts.  *See, e.g.*, 17A C.J.S. Contracts § 430 ("As is true for contracts more generally,

21   if the language is clear, there is no room for the application of rules of construction; however, if

22   the language is ambiguous, an option is to be strictly construed.") (citing, among other cases,

23   *Pardee v. Jolly*, 163 Wn. 2d 558, 182 P.3d 967 (2008)).

24   AMTAX 114 concedes that § 7.4.J is unambiguous, and does not dispute that all

25   conditions precedent to exercising the option have been met.  Mot. at 17.  As a result, this Court

26   should apply the plain terms of the agreement.  The LPA provides, in relevant part, that the

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 13

STOEL RIVES LLP
ATTORNEYS
600 University St., Suite 3600, Seattle, WA 98101
*Telephone* 206.624.0900

1    option price is determined by the fair market value of the property held by the Partnership, which

2    "shall be determined by two independent MAI appraisers: one selected by [HHM] and one by

3    [AMTAX 114]. If such appraisers are unable to agree on the value, they shall jointly appoint a

4    third independent MAI appraiser whose determination shall be final and binding." *See* Pettit

5    Decl., Ex. 1 (LPA § 7.4.J).  AMTAX contends this language was not followed in two ways: (1)

6    CBRE and C&W did not "attempt to agree on a value" before appointing the third appraiser and

7    (2) CBRE and C&W did not "jointly appoint" the third appraiser.  Mot. at 17-18.  Neither

8    contention provides any basis to negate HHM's option and disregard the "final and binding"

9    appraisal.

10       ***First***, there is no requirement in Section 7.4.J that the first two appraisers "attempt" to

11   agree on value, the provision states only that if they are "unable to agree on the value" they move

12   on to the third appraiser.  The CBRE valuation of Hidden Hills was $14,050,000 and the C&W

13   valuation was $19,700,000.  *Compare* Blake Decl. Ex. 15 *with* Ex. 19.  The two appraisals were

14   $5,650,000 apart, a disagreement that speaks for itself.  As AMTAX's own representative

15   recognized it 2015, a buyout price gap of several million dollars is a "non-starter."  Blake Decl.

16   Ex. 5.[9]  If more is required, contrary to assertions in AMTAX's motion, Andy Noble and Todd

17   Henderson did in fact speak and concluded "that the values were not the same, and there needed

18   to be a third appraiser hired."  Pritchard Decl. Ex. S (Noble Dep. at 221).

19       ***Second***, AMTAX argues that because Henderson and Noble jointly appointed two firms,

20   Colliers and Kidder Matthews, as opposed to a single one, Section 7.4.J was not followed.  Mot.

21   at 18.  AMTAX fails to explain why this matters and neglects to mention that John Campbell of

22   Colliers was suggested by Andy Noble, ***AMTAX's own appraiser.***  *See* Pritchard Decl. Ex. S

23   (Noble Dep. at 14, 190).   Henderson testified that "we agreed on the telephone call that . . . we

24

25       [9] Incidentally, AMTAX did nothing to encourage C&W to "attempt" to agree on a value
26   with CBRE.  Pritchard Decl. Ex. G (HH Blake Dep at 72).

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 14

**STOEL RIVES** LLP
ATTORNEYS
600 University St., Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*

1    would appoint John Campbell" because—like Noble—Henderson believed Campbell to be a fine

2    choice.  *Id.* Ex. J (Henderson Dep. at 156).  And it is undisputed that Catherine Tamaro had no

3    prior relationship with either and retained Campbell because he was first on the list.  Tamaro

4    TRO Decl. ¶ 17.  There was nothing secret about the selection process.  Andy Noble forwarded

5    the email jointly nominating John Campbell to his contact at AMTAX 114 the next day.  *See*

6    Pettit Decl., Ex. 48.  AMTAX 114's representative testified that AMTAX never contacted

7    Colliers during the two months before the appraisal was issued.  Pritchard Decl. Ex. G (HH

8    Blake Dep. at 72).   AMTAX cannot wait to see whether it likes the appraisal before attacking

9    the process, much less when the appraiser it now dislikes was nominated by Mr. Noble.

10         AMTAX argues in the alternative that its accusations against Ms. Tamaro (which HHM

11   disputes) mean that her actions violated "the clear purpose of Section 7.4.J."  Mot. at 18.  It cites

12   to no contractual language in support of this argument.  *Id.*   AMTAX 114 appears to suggest that

13   the appraisers were not "independent."   If so, the record is to the contrary.  When asked if

14   Catherine Tamaro tried to influence CBRE's conclusions, Mr. Henderson testified:

15         No.  I believe Catherine was giving me factual data. If you're implying did
16         Catherine tell me the value to value the property, that absolutely was not true and
         would not have happened, and had she done that I would have declined the
17         assignment.

18   Pritchard Decl. Ex. J (Henderson Dep. at 174).  Cory Hutsell unequivocally testified that the

19   Colliers appraisal was not based on any preconceived idea or approach and that the report

20   represented his independent judgment.  *Id.* Ex. U (Hutsell Dep. 162-163).  He submitted a

21   declaration earlier in this case confirming the same.  Dkt # 2-1 at 29 (Hutsell Decl. ¶ 11).

22         AMTAX offers no competent evidence to cast doubt on the sworn testimony of Mr.

23   Henderson and Mr. Hutsell and resorts to insinuations about their credibility.  *See* Mot. at 13

24   (listing bullet points that consist entirely of speculation).  This is not enough to defeat (much less

25   prevail on) a summary judgment motion.  *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir.

26   2008) (the "argument in opposition to summary judgment boils down to an allegation that … the

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 15

STOEL RIVES LLP
ATTORNEYS
600 University St., Suite 3600, Seattle, WA 98101
*Telephone* 206.624.0900

1    stated reasons for the school's actions are phony. . . . The [nonmoving party] correctly note[s]

2    that evaluations of witness credibility are inappropriate at the summary judgment stage. . . .

3    However, when challenges to witness' credibility are *all* that a plaintiff relies on, and he has

4    shown no independent facts-no proof- to support his claims, summary judgment in favor of the

5    defendant is proper." ) (internal citations omitted).  *See also Trentadue v. Redmon*, 619 F.3d 648,

6    652 (7th Cir. 2010) (a party opposing summary judgment must carry the burden to "show more

7    than some metaphysical doubt as to the material facts . . . and neither speculation nor generic

8    challenges to a witness's credibility are sufficient to satisfy this burden.").

9          The CBRE and Colliers appraisers testified their appraisals represented their independent

10   professional judgment.  Although Mr. Noble admitted that AMTAX failed to provide him with

11   material information, HHM accepts for the purposes of this motion that C&W too was

12   independent.  Under § 7.4.J, the Colliers appraisal controls as a matter of law.

13            **B.  AMTAX 114 Is Not Entitled to Any Indemnification**

14         As a last resort, AMTAX argues that if it must proceed with the buyout under § 7.4.J, the

15   GP must indemnify it for any diminution of its interest's value related to the contamination.

16   AMTAX misreads the Indemnity, which has an entirely different purpose.

17         The Indemnity states that in consideration for AMTAX 114 acquiring a limited

18   partnership interest in the Partnership,  the GP agrees to hold AMTAX 114 harmless "from

19   environmental liabilities" to the extent set forth in the agreement.  Paragraph 2, which is unique

20   to the Hidden Hills Partnership, describes the soil contamination, defined as "Environmental

21   Condition."  It states that

22        • the soils on the Property contain elevated levels of arsenic and  lead as
             detailed in EPI's Draft Soil Characterization Report,  above 20 g per kg,

23        • Ecology was conducting a study to determine a cleanup level but was not
24           at the time requiring properties to comply with the 20 mg per kg level;

25

26

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 16

**STOEL RIVES** LLP
ATTORNEYS
600 University St., Suite 3600, Seattle, WA 98101
*Telephone* 206.624.0900

1
- "as such time as Ecology determines a cleanup level for arsenic in soils,"
the GP would "take such actions as are necessary to comply with such
cleanup level."

2

3   Aside from Paragraph 2, the Indemnity is a standard form, drafted and used by AMTAX in many

4   partnerships.  *See* Pritchard Decl. Exs. D, E.

5       In Paragraph 3, the GP warrants that, except for the Environmental Condition described

6   in Paragraph 2, there are "no investigations, inquiries, orders, hearings, actions or other

7   proceedings by … any governmental agency … pending or … threatened in connection with any

8   Hazardous Substance Activity in violation of any applicable  Environmental laws."

9       Paragraph 4 is the "indemnity" section of the agreement.  It contains form language

10  found in many AMTAX partnerships and provides in full:

11      The Indemnitor [HHM] agrees to indemnify, hold harmless and defend the
Company [AMTAX 114] from and against any and all claims, costs, litigation,
12      proceedings, investigations, loss, damage, liability, fine, penalty, assessment or
expense, and/or loss, or deferment or delay of distributions from Hidden Hills to
13      the Company (collectively referred to as "Environmental Liability") arising from,
or as a result of, or relating to, any Hazardous Substance, Hazardous Substance
14      Activity or violation of Environmental Laws or ADA Laws, on the, or adversely
affecting the, Property.  Defense of the Company by Indemnitor shall be provided
15      by competent counsel of Indemnitor's choice, and the Company shall reasonably
cooperate in such defense.
16

17  Pettit Decl. Ex. 2 (Indemnity ¶ 4).  "Distributions" is undefined.

18      "Indemnity agreements are essentially agreements for contractual contribution, whereby

19  one tortfeasor, against whom damages in favor of an injured party have been assessed, may look

20  to another for reimbursement." *Stocker v. Shell Oil Co.*, 105 Wn. 2d 546, 549, 716 P.2d 306

21  (1986). The indemnity provided for in Paragraph 4 is no different.  By its terms, it is triggered by

22  some ***third-party action*** —"claims, costs, litigation, proceedings, investigations, loss, damage,

23  liability, fine, penalty, assessment or expense and/or loss, or deferment or delay of distributions"

24  —under environmental or ADA laws, related to contamination "on the … or … affecting the

25  property."  *See also* Preamble (the purpose of the agreement is to "indemnify and hold harmless

26

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 17

1    [Amtax 114] *from environmental liabilities*.") (emphasis added).

2         The indemnity places on the GP alone the risk of potential third-party action resulting

3    from the contamination and associated costs.   If, for example, Ecology mandated a cleanup of

4    arsenic-contaminated soils or a tenant brought suit for personal injury to a child caused by lead

5    exposure, the defense and associated costs (e.g., mandatory clean-up or settlement of the

6    personal injury claim) would be borne by the GP alone.   And, if the Partnership's funds were tied

7    up in the interim and AMTAX 114 did not receive regular distributions (or received reduced

8    distributions), AMTAX 114 would be required to be made whole by the GP.

9         No such triggering event has materialized.   As of the date the GP exercised its buyout

10   option under § 7.4.J—or to date—no environmental claims have been brought, no related costs

11   incurred, and no related distributions to AMTAX 114 lost, deferred or delayed.   And of course

12   the GP alone remains responsible for any future claims.   In other words, while being the LP,

13   AMTAX 114 has been protected from the risk of environmental actions and related costs and has

14   no exposure to that risk after its LP interest is bought out by the GP.

15        But AMTAX wants more.   It stretches the reference to "loss, or deferment or delay of

16   distributions" in Paragraph 4 to argue that the GP must indemnify it against the diminution of

17   Hidden Hills property's *value* related to the lead and arsenic contamination after the buyout.

18   AMTAX's reading of "loss, or deferment or delay of distributions" makes it into an independent

19   guarantee of property value, which is nowhere mentioned in Paragraph 4 or anywhere else in the

20   Indemnity.   If the original parties intended for the GP to guarantee the LP a certain "value," they

21   would have done so explicitly, most logically in Paragraph 2, which was drafted specifically to

22   address the environmental situation unique to Hidden Hills.   They would have also specified

23   which of the many possible "values" (e.g., tax value, appraised value, fair market value) they had

24   in mind.   But the parties did not do so *because the risk of an enforcement action or a personal*

25   *injury claim has nothing to do with the property's value*.   Under the Indemnity's unambiguous

26   terms value is irrelevant.   The Court should refuse AMTAX's request to rewrite the Indemnity

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 18

1   by inserting a term the parties never intended to include.  *See* Sullivan Decl., Gibson Decl.

2         AMTAX's reading is also contrary to familiar rules of contract interpretation.  "Words in

3   a series should be interpreted in relation to one another."  *Ali v. Fed. Bureau of Prisons*, 552 U.S.

4   214, 229 (2008).  *See also United States v. Williams,* 553 U.S. 285, 294 (2008) ("a word is given

5   more precise content by the neighboring words with which it is associated").  Courts therefore

6   "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying

7   words." *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015).  *See also California State*

8   *Legislative Bd., United Transp. Union v. Dep't of Transp.*, 400 F.3d 760, 763 (9th Cir. 2005);

9   *Ball v. Stokely Foods*, 37 Wn. 2d 79, 87, 221 P.2d 832 (1950) ("Washington courts apply these

10  rules when interpreting contracts."); *Lombardo v. Pierson*, 121 Wn. 2d 577, 583, 852 P.2d 308

11  (1993) (applying *ejusdem generis* to contract interpretation).

12        Because the phrase "loss, deferment or delay of distributions" follows a long list of  third-

13  party actions—"claims, costs, litigation, proceedings, investigations, loss, damage, liability, fine,

14  penalty, assessment or expense *and/or loss, deferment or delay of distributions*"—it must be

15  interpreted consistently with the preceding examples, not in isolation.  Namely, if the Partnership

16  is short of money as a result of enforcement action by Ecology or a personal injury claim arising

17  out of contamination, the LP's distributions cannot be reduced.  But there is no Indemnity

18  ***without some third-party action***, otherwise the long list of such actions at the beginning of the

19  phrase would be meaningless.  AMTAX's reading fails as a matter of law.

20        AMTAX is not really complaining about distributions, it is complaining that the

21  appraised value of Hidden Hills is lower than it hoped.  But disagreements about value are

22  resolved through the appraisal process contained in the LPA.  Nothing in the Indemnity promised

23  the LP any particular value of its interest.  Instead it required the GP to hold AMTAX "harmless"

24  from third-party claims and expenses related to contamination.  AMTAX has received the full

25  benefit of the Indemnity.  Nothing happened.  The Partnership purchased the Property in 2002

26  for $8,900,000, at a discount reflecting the known environmental contamination.  AMTAX 114

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 19

1    benefited from the reduced price when investing in the Partnership.  The Property is now being

2    valued at $13,500,000.  AMTAX 114's 99.9 percent interest has increased proportionately, no

3    loss by any measure.

4            AMTAX hedged against a risk that did not materialize.  Any future risk of remediating

5    the contamination is borne by the GP alone.  The indemnity claim therefore fails as a matter of

6    law.  *Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc.*, 168 Wn. App. 86, 100,

7    285 P.3d 70 (2012) ("In order to prove an indemnity claim, a plaintiff must demonstrate that

8    there exists a contract containing an indemnity provision that binds the defendant to reimburse

9    the plaintiff for the amount claimed.").

10           **C.  AMTAX 114 Is Not Entitled to Removal**

11           AMTAX 114 seeks the GP's removal so that it can strip it of its option rights under

12   §7.4.J and sell the Hidden Hills Property under §7.4.K.  The sale was AMTAX's "preferred

13   outcome" since the time the compliance period ended.  Pritchard Decl. Ex. G (HH Blake Dep. at

14   14-15).  AMTAX first tried to get what it wanted by pressuring HHM to give up the option rights

15   under §7.4.J.  It  threatened removal unless the GP agreed to let the LP market the property and

16   give up its option, or agree to the property a value of $21,300,000, $1.6 million higher than

17   C&W's appraisal.[10]  *See* Pettit Decl. Ex. 47 at HHM-003186.  When the GP rejected these

18   demands, AMTAX attempted to frustrate the option entirely by removing the GP.  Its tactics fail

19   as a matter of law.

20           *First*, as in Parkway, there is no dispute here that all conditions precedent to exercise of

21   the option have been met.  As a result, Washington law holding that the option must be protected

22   from interference by its grantor applies with equal force here, where AMTAX seeks to eliminate

23   the option entirely through the GP's removal.  *See, e.g.*, *Thompson v. Thompson*, 1 Wn. App.

24   _____

25        [10]  This extortionate demand was similar to AMTAX's tactic in Parkway, where it
     insisted that the GP give up $2.7 million in accounts payable as a condition of AMTAX's
26   approval of the buyout option.

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 20

100065087.6 0009368-00002

STOEL RIVES LLP
ATTORNEYS
600 University St., Suite 3600, Seattle, WA 98101
*Telephone* 206.624.0900

1   196, 200, 460 P.2d 679 (1969); *Barnett v. Buchan Baking Co.*, 45 Wn. App. 152, 160, 724 P.2d

2   1077 (1986); *McFerran v. Heroux*, 44 Wn. 2d 631, 638, 269 P.2d 815 (1954)).  Indeed, AMTAX

3   114 admitted that its purported removal resulted in negating the option.  *See* Pritchard Decl. Ex.

4   G (HH Blake Dep. at 25) ("If the general partner is removed … would it be able to complete the

5   buyout process?  A. No.").  Under these authorities protecting options under Washington law,

6   AMTAX cannot defeat the option by purporting to remove the GP more than six months after the

7   option had been exercised.  Just as in Parkway, if AMTAX 114 actually had any viable damages

8   claims, it could bring those separately against HHM without blocking the option.

9         ***Second***, AMTAX misunderstands the nature of the GP's fiduciary duties and how they

10   apply in the context of negotiating a right unique to the GP.  There is no basis for any contention

11   that HHM was acting "on behalf of a party having an interest adverse to the limited partnership."

12   *See* Mot. at 23.  Instead, the issue is whether it is a breach of duty to act in furtherance of one's

13   interest in exercising the GP's right to buy out an LP.  Under Washington law, it is not, because

14   "a partner does not violate a duty or obligation under this chapter or under the partnership

15   agreement merely because partner's conduct furthers the partner's own interest."  RCW

16   25.05.165(5).  *See also J & J Celcom v. AT&T Wireless Servs. Inc.*, 162 Wn.2d 102, 113, 169

17   P.3d 823 (2007) ("Under RUPA, partners need not obtain the consent of their copartners as a

18   precondition for pursuing their own self-interest.").[11]

19         In *RSD AAP, LLC v. Alyeska Ocean, Inc.*, the Washington Court of Appeals found no

20   breach of fiduciary duty when one partner, "on its own behalf as an individual partner," sought to

21   purchase another partner's interest in the partnership.  190 Wn.App. 305, 358 P.3d 483 (2015).

22   _____

23         [11] Courts in Delaware have articulated a similar common law principle of fiduciary
     duties; "the duty to put the 'best interest of the corporation and its shareholders' above 'any

24   interest ... not shared by the stockholders generally' does not mean that the controller has
     to subrogate his own interests so that the minority stockholders can get the deal that they want."

25   *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1040–41 (Del. Ch. 2012).  This is exactly what
     AMTAX 114 is asking for the Court to do.

26

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 21

1    Citing RCW 25.05.165(5), the court held that the partner "did not violate the duty of loyalty or

2    any other obligation imposed because it sought an opportunity for itself as a partner in the

3    enterprise." *Id.* at 322.  Courts in other states applying identical statutory language have reached

4    similar conclusions.  *See, e.g.*, *Welch v. Via Christi Health Partners, Inc.*, 133 P.3d 122, 142

5    (2006) ("a partner may legitimately pursue self-interest instead of solely the interest of the

6    partnership and the other partners as must a trust trustee" and that the limited partner's

7    allegations "must be considered in this light"); *Holloway v. Evers*, No. M2006-01644-COA-R3-

8    CV, 2007 WL 4322128 (Tenn. Ct. App. Dec. 6, 2007) (applying same principle to buyout of a

9    partner's interest by other partners).

10        Under RCW 25.05.165(5), it could not have been a breach of duty for the GP to share

11    with the appraisers information about the environmental contamination issues on the property,

12    even if the disclosures did have the effect of reducing the price to buy out the LP.  There is no

13    question that the contamination is real and of public record, and was admitted by Mr. Noble to be

14    material information.  *See* Pritchard Decl. Ex. T (AMTAX admitting the property is on

15    Ecology's Contaminated Site List); Ex. S (Noble Dep. at 152-53).  AMTAX 114 also does not

16    (and cannot) contend that HHM provided false information to any appraiser or concealed

17    anything from an appraiser (as AMTAX did).  Instead, the crux of AMTAX's argument is that

18    HHM should ***not*** have disclosed facts related to the known contamination of the property and the

19    potential costs of remediation.  But there is ***no duty to conceal*** known material facts from an

20    appraiser, as a matter of law.

21        The opposite is true.  There is a statutory duty to disclose to a potential buyer that the

22    property site is contaminated.  *See* RCW 64.06.013.  A buyer may not waive the right to receive

23    disclosure of environmental contamination.  RCW 64.06.010(7), and a seller that fails to disclose

24    known environmental contaminants faces liability for rescission or fraud.  *See, e.g.*, *Jackowski v.*

25    *Borchelt*, 174 Wn.2d 720, 737, 278 P.3d 1100 (2012).   HHM did not breach any duty by

26    following Washington law and providing the required disclosures to CBRE and Colliers.

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 22

**STOEL RIVES** LLP
ATTORNEYS
600 University St., Suite 3600, Seattle, WA 98101
*Telephone* 206.624.0900

1    The Colliers appraiser considered the contamination and cost of remediation to be

2   material facts affecting the fair market value of the property.  Dkt # 2-1 at 29 (Hutsell Decl. ¶ 9).

3   *See also* Pritchard Decl. Ex. U (Hutsell Dep. at 102) ("basically a lender would expect some

4   deduction for remediation of soil from the value as if clean in order to, you know, that would

5   determine the as-is value.").  He also considered the input from CBRE brokers that the

6   contamination would not impact the availability of financing, as well as the input from actual

7   lenders indicating that it would.  *Compare* Ex. U (Hutsell Dep. at 74-75) *with id.* at 80 ("during

8   the appraisal process we discovered that, in talking with lenders, that it would have to be

9   cleaned").  Colliers' appraisers also received Tim Flint's BOV, and gave it whatever due weight

10  they felt it deserved.  Pritchard Decl. Ex. V; Pettit Decl. Ex. 21.[12]  In Colliers' view, the potential

11  lack of financing reduces the pool of potential buyers, which in turn, would reduce the fair

12  market value of the property.  Dkt # 2-1 at 29 (Hutsell Decl. ¶¶ 9-10).  Colliers reached that

13  decision independently after consideration of all of the material information disclosed by HHM.

14  *Id.* ¶ 11; Pritchard Decl. Ex. U (Hutsell Dep. at 162).  There was no breach of fiduciary duty.

15    *Third*, AMTAX misunderstands the removal provision in the LPA.  Section 4.5A(iv)(2)

16  provides for removal only when a GP "violate[s] any rights, powers, duties, representations or

17  warranties as set forth in Article VII herein or shall have violated any material provision of this

18  Agreement, ***and such misconduct or failure to exercise reasonable care can reasonably be***

19  ***expected to cause economic detriment to the Partnership or the Project.***"  LPA § 4.5A(iv)(2)

20  (emphasis added).  As an initial matter, AMTAX has not proved any violation of Article VII or

21  material breach of the LPA for the reasons set forth above.  But even if it had, AMTAX's claim

22

23    [12] Under the LPA, the BOV is irrelevant.  Brokers are not MAI appraisers.  Mr. Flint's
    BOV includes a disclaimer that it "is not an appraisal and has not been performed in accordance
24  with the Uniform Standards of Processional Appraisal Practice."  Pettit Decl. Ex. 21 at 2.  A
    disclaimer is required if a broker provides an opinion of value in litigation.  *See* RCW
25  18.140.020(6).  But even if it was relevant, Catherine Tamaro told Colliers about the BOV, and
    the appraisers "weren't interested in it."  Pritchard Decl. Ex. C (Tamaro Dep. at 498).

26

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 23

1   for removal would still fail because there no evidence that any actions taken by HHM could

2   "reasonably be expected to cause economic detriment to the Partnership or the Project."

3   AMTAX claims only that *it* will be harmed by the disclosure of the contamination to the

4   appraisers.  It is ***not*** seeking any damages on behalf of the Partnership.  Pritchard Decl. Ex. T

5   (interrogatory answer stating AMTAX 114 is "not seeking damages on behalf of the Partnership

6   in connection with its counterclaims in this action.").  As a result, AMTAX 114 has not and

7   cannot prove any reasonable expectation of economic detriment ***to the Partnership*** in connection

8   with an action taken by HHM to buy out the LP's interest.  Removal is therefore unavailable.

9   **IV.**     **CONCLUSION**

10       For the foregoing reasons, HHM requests that the Court enter the attached order

11   providing the following relief: (1) denying AMTAX 114's motion for summary judgment, (2)

12   granting HHM's cross-motion for summary judgment, (3) entering judgment in favor of HHM's

13   claim for declaratory relief and specific performance, and (4) dismissing each of AMTAX 114's

14   Hidden Hills-related counterclaims (Counts One through Five in AMTAX's answer and

15   counterclaims).

16

17   DATED:  February 11, 2019

18

19

20

21

22

23

24

25

26

*/s/ Rita V. Latsinova*
David R. Goodnight, WSBA No. 20286
Rita V. Latsinova, WSBA No. 24447
J. Scott Pritchard, WSBA No. 50761
600 University Street, Suite 3600
Seattle, WA  98101
Phone:  (206) 624-0900
Facsimile:  (206) 386-7500
Email:  david.goodnight@stoel.com
Email:  rita.latsinova@stoel.com
Email:  scott.pritchard@stoel.com

Attorneys for Plaintiff Hidden Hills
Management LLC and 334th Place 2001, LLC

**STOEL RIVES** LLP
ATTORNEYS
600 University St., Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*

100065087.6 0009368-00002

**<u>CERTIFICATE OF SERVICE</u>**

1

2        I hereby certify that on the 11th day of February, 2019, I electronically filed the

3  foregoing with the Clerk of the Court using the CM/ECF system which will send notification of

4  such filing to the following participants:

5  - **David J. Burman**
     dburman@perkinscoie.com,docketsea@perkinscoie.com

6  - **Christopher G Caldwell**

7    ccaldwell@bsfllp.com,BSF_LAD_Records@BSFLLP.com

8  - **David R Goodnight**
     DRGOODNIGHT@STOEL.COM,SEA_PS@stoel.com,docketclerk@stoel.com,jamie.do

9    mbek@stoel.com

10 - **Margarita V. Latsinova**
     rvlatsinova@stoel.com,sea_ps@stoel.com,docketclerk@stoel.com,

11   debbie.dern@stoel.com

12 - **Steven Douglas Merriman**
     smerriman@perkinscoie.com,docketsea@perkinscoie.com,JTanzy@perkinscoie.com

13 - **Eric S Pettit**
     epettit@bsfllp.com

14
15 - **J. Scott Pritchard**
     scott.pritchard@stoel.com,sea_ps@stoel.com,docketclerk@stoel.com,eileen.mccarty@st

16   oel.com

17 - **Arwen Johnson**
     ajohnson@bsfllp.com

18 - **Grayce S. Zelphin**
     gzelphin@bsfllp.com

19

20        Dated February 11, 2019.

21                                                *s/ Debbie Dern*

22                                                Debbie Dern
                                                 Legal Practice Assistant

23                                                Stoel Rives LLP
                                                 debbie.dern@stoel.com

24

25

26

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
 (3:17-cv-06048-RBL) - 25

**STOEL RIVES LLP**
ATTORNEYS
600 University St., Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*