# Exhibit A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SENIOR HOUSING ASSISTANCE GROUP,
Plaintiff/Counter-Defendant,

v.

AMTAX HOLDINGS 260, LLC, et al.
Defendants/Counter-Plaintiffs.

AMTAX HOLDINGS 260, LLC, et al.,
Third-Party Plaintiffs,

v.

SENIOR HOUSING ASSISTANCE
CORPORATION, et al. Third-Party
Defendants.

Case No. C17-1115RSM

ORDER RE: MOTIONS FOR SUMMARY
JUDGMENT

This matter comes before the Court on three Motions for Summary Judgment filed by
the parties.  Dkts. ##85, #89 and #92.  At its base, this is a contract dispute between Plaintiff
Senior Housing Assistance Group ("SHAG"), a Washington nonprofit providing affordable
housing for seniors, and its for-profit investor partners (the "AMTAX" defendant entities)
involved in seven Low-Income Housing Tax Credit ("LIHTC") apartment projects in the Puget
Sound region.  The parties dispute how the partnership agreements ("Partnership Agreements")
permit or do not permit SHAG to take ownership of the apartment projects now that all the tax

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 1

credits have been obtained.  Plaintiff SHAG seeks a declaratory judgment stating it has the right to exercise what are called special rights of first refusal ("Special ROFR's") without prior written consent from AMTAX and "without a bona fide third-party offer to buy the project or an intention to accept such an offer." Dkt. #85 at 3.  Defendants/Counter-Plaintiffs AMTAX request the Court declare as a matter of law: "(1) SHAG's ROFR has not been triggered with respect to any of the Projects; (2) SHAG cannot unilaterally exercise its ROFR in the absence of a bona fide third-party offer that the Partnership is willing to accept with the consent of the Limited Partners; (3) SHAG cannot exercise its ROFR while the [Global Indemnity Agreement] remains in effect; and (4) Counter-Defendants may be removed as General Partners of the Partnerships pursuant to Sections 4.5A(iv)(1) and (2) of the Partnership Agreements." Dkt. #89 at 31.  Counter-Defendants Lynnwood Retirement Living, LLC, Steel Lake Enterprises, LLC, Woodlands Associates, LLC, and Lakewood Meadows Enterprises, LLC (collectively the "LLC General Partners") move for dismissal of AMTAX's causes of action to remove the LLC General Partners from their positions as the Managing General Partners of the seven Project Partnerships. Dkt. #92.  For the reasons stated below, the Court denies SHAG's Motion, denies AMTAX's Motion, and grants the LLC General Partners' Motion.

## I.      BACKGROUND

### A. The LIHTC Program

The Low-Income Housing Tax Credit ("LIHTC") Program, 26 U.S.C. § 42, is a federal tax credit program designed to promote the development of affordable rental housing for low-income households.  *See e.g., Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P.*, 479 Mass. 741, 743 (2018).  This program encourages private investment in such housing by

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 2

providing tax credits to owners of qualifying LIHTC projects over a fifteen-year "Compliance Period." At the end of that period, after all the tax credits have been claimed, "most investor limited partners will seek to leave the project, usually—but not always—by selling their interest to the nonprofit general partner." *Id*. at 744. The statute permits such sales to nonprofits, whether acting as the general partner or in some other capacity, by expressly allowing nonprofit organizations a statutory "right of 1st refusal" to buy the projects at a statutorily prescribed minimum price. 26 U.S.C. § 42(i)(7)(A). The statute does not define "right of 1st refusal." However, a "right of first refusal" is defined in Black's Law Dictionary as "[a] potential buyer's contractual right to meet the terms of a third party's higher offer." Right of First Refusal, Black's Law Dictionary (10th Ed. 2014). The statutory "minimum purchase price" is essentially the sum of the remaining debt secured by the property and all taxes attributable to the sale. *See* 26 U.S.C. § 42(i)(7)(B). This is typically below fair market value and is commonly described as "debt plus exit taxes." *Homeowner's Rehab*, 479 Mass. at 745. The purpose of this below-market purchase right is to encourage LIHTC properties to end up in the hands of nonprofits that would keep the units affordable. *Id*. at 754-55.

**B.  History of SHAG and SHAC**

The Plaintiff, SHAG, is a Puget Sound-based nonprofit 501(c)(3) corporation with the mission of fostering low-income housing, particularly for seniors. Dkt. #88 ("Woolford Decl."), ¶¶ 4-5. For nearly 30 years SHAG has been involved in the construction and operation of dozens of low-income housing developments in the Puget Sound region. *Id*. at ¶ 6. Third-party Defendant Senior Housing Assistance Corporation ("SHAC") is SHAG's wholly-owned for-profit subsidiary. *Id*. ¶ 8.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 3

SHAG is involved in all seven of the LIHTC projects at issue, and SHAC is involved in five. SHAG is each project's lessee and operator. *Id.* ¶ 14. Pursuant to Section 7.4L of applicable Partnership Agreements for each project, SHAG also holds a Special ROFR enabling it to, in theory, acquire the properties at the aforementioned below-market rate. *Id.* at ¶ 16. Because of SHAG's role as a nonprofit lessee and operator, each project enjoys a continuing real estate tax exemption from the State of Washington. *Id.* at ¶ 15. In addition to being the *lessee*, SHAG is also the *general partner* in the Auburn Court partnership. *Id.* at ¶ 12. SHAC is the general partner in the Boardwalk and WoodRose partnerships and is a member in the LLC that is a general partner for Lakewood, Alderwood, and Woodlands. *Id.* Thus, SHAG or its wholly-owned subsidiary play multiple roles in the partnerships for almost all of the properties at issue.

### C. AMTAX

What SHAG brings to the partnerships in terms of access to the LIHTC tax credits, the AMTAX entities bring in investment capital. In exchange for its investment, AMTAX holds approximately a 99 percent interest in each project partnership to ensure it receives a commensurate percentage of the tax benefits generated by each project. Dkt #93 ("Park Decl."), ¶ 16. The other partners divide up the remaining one percent. *Id.* AMTAX does not, however, receive 99 percent of the projects' other economic benefits, *e.g.*, cash flows from operations or capital proceeds from a sale or refinancing, which go largely to other project participants. *Id.*

### D. The LLC General Partners

As previously mentioned, SHAG or SHAC serve as the general partners or members of the general partner for six of the seven project partnerships. Woodland Decl. at ¶ 12. Additional general partners in four of the project partnerships are limited liability companies

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 4

1   (the "LLC general partners"). *Id.* Those limited liability companies are third-party Defendants

2   in this action, along with SHAC.

3       The largest percentage owner of the LLC general partners for Lakewood, Alderwood,

4   and Woodlands is Pacific Northern Construction Company ("PNCC"). Park Decl. at ¶¶ 4, 13.

5   Bryan M. Park is PNCC's controlling shareholder and president. *Id.* Mr. Park also has a

6

7   financial interest in Meridian's LLC general partner, and acts on that LLC general partner's

8   behalf. *Id.* at ¶¶ 4, 13. Mr. Park, PNCC, and PNCC's affiliates are longtime for-profit

9   developer partners of SHAG. *Id.* at ¶ 3. Entities in which PNCC has some interest were the

10

11  developers of each of the seven LIHTC projects at issue, either directly or by contracting to

12  perform development work on another party's behalf. *Id.* at ¶ 5. AMTAX presents evidence

13  indicating that Mr. Park has substantial involvement in SHAG's board meetings and provides

14  financial and legal advice to SHAG. *See* Dkt. #89 at 12–13. Mr. Park is a CPA and tax

15  attorney. Park Decl. at ¶ 7.

16

17  **E. The LIHTC Project Agreements**

18      The seven LIHTC projects at issue are owned by limited partnerships. They are referred

19  to by the parties as Woodlands, Alderwood Court, Meridian Court, Auburn Court, Boardwalk,

20  WoodRose, and Lakewood Meadows. Park Decl. at ¶ 12. Each project dedicates 100 percent

21

22  of its units to low- and moderate-income elderly and disabled people. Woolford Decl. at ¶ 10.

23      The seven Limited Partnership Agreements have only slight differences. Each has two

24  stated purposes: (1) to develop, operate, and "otherwise deal with" the projects; and (2) to enter

25  into operating use lease agreements with SHAG to ensure favorable treatment under federal and

26  state tax laws. *Id.* at Exs. E-F § 2.3. The "General Partners" have "the exclusive right to

27  manage the business of the Partnership." *Id.* at Exs. E-F § 7.3A. The "Investor Limited

28

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 5

Partners" do not have management rights and have only those rights outlined in Section 4.5 and elsewhere in the agreement. *Id.* at Exs. E-F §§ 4.5 and 7.3A.

The favorable tax treatment lasts for fifteen years—the Compliance Period. At the end of this, the Partnership Agreements provide three ways in which the individual project participants—including SHAG—can influence a purchase or sale of the property. They are outlined in Sections 7.4J, K, and L of the Partnership Agreements and are the heart of this dispute. *See id.* at Exs. G-M. Each right is exercisable for only two years after the close of the Compliance Period.

Section 7.4J provides an "option" held by the Managing General Partner of each partnership. This General Partner could be an LLC with a connection to SHAG or even SHAG itself depending on which property is being examined. The Managing General Partner has two years after the close of the compliance period to exercise its right to buy the project at the greater of fair market value or debt plus exit taxes. *Id.* at § 7.4J.

Under Section 7.4K of each agreement, the Investor Limited Partner has the right to "force a sale" of the apartment complex, at fair market value, for two years after the close of the compliance period. *Id.* at § 7.4K. This right is expressly "[s]ubject to the option" in Section 7.4J. *Id.* In the Woodlands and Alderwood agreements, the partnership agreements reiterate that point by also giving the General Partner (the option holder) a "Right of First Refusal" to purchase the project in the event the Investor Limited Partner forces a sale under Section 7.4K. *Id.* at Ex. E § 7.4K. In the other five agreements, Section 7.4K confirms that any forced sale will also be subordinate to SHAG's right to exercise its Special ROFR "in accordance with the provisions of Section 7.4L." *See id.* at Ex. F § 7.4K.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 6

Section 7.4L gives SHAG as the lessee the right, for two years after the close of the compliance period, to purchase the Project at the statutory minimum price:

> Notwithstanding Paragraphs 7.4J and 7.4K above, for a period of twenty-four (24) months following the close of the Compliance Period as determined by the Code, if (i) the Senior Housing Assistance Group (the "Purchaser") is then the Lessee and operator of the Apartment Complex pursuant to the Operating Use Lease, (ii) the Senior Housing Assistance Corporation is then a qualified corporation with respect to the Purchaser (as defined under Section 42(h)(5)(D)(ii) of the code) and is a member of a General Partner, and (iii) the Purchaser is then a qualified nonprofit organization as defined under Section 42(h)(5)(C) of the Code, then the Purchaser shall have a "Right of First Refusal" (the "Special ROFR") to purchase the Project at a purchase price (the "Purchase Price") equal to the sum of (1) the minimum purchase price as determined under Section 42(i)(7)(B) of the Code (the "Statutory Minimum Purchase Price") and (2) the amount of each of the items set forth in Section 6.2B(ii), Paragraphs First through Seventh thereof, to the extent that the amounts of such items are not already reflected in the Statutory Minimum Purchase Price in order to avoid any duplication.

Id. Ex. F § 7.4L. Again, this statutory minimum price is likely to be below the market rate for these properties.

There is no explicit provision in Sections 7.4J, K, and L making the rights in those sections contingent on any other party's consent. And the exercise of SHAG's Special ROFR right, like the General Partner's option, expressly is not subject to prior approval by the Investor Limited Partner as stated earlier in the document:

> the Investor Limited Partners shall have the right . . . with consent of all remaining Partners, to approve or disapprove the sale of all or substantially all of the assets of the Partnership (other than a sale pursuant to the Option described in Section 7.4J or the Special ROFR described in Section 7.4L).

Id. at Ex. F § 4.5A(iii) (emphasis added).

**F. The Negotiations for these Agreements**

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 7

The Partnership Agreements were negotiated by Bryan Park on behalf of the developer and LLC general partner entities, and by a company called Paramount Financial Group, Inc. on behalf of AMTAX. Park Decl. at ¶¶ 9, 15, 17. Records of the communications back and forth indicate that Mr. Park required a Special ROFR for SHAG's benefit. SHAG cites to, *inter alia*, an October 20, 2001 letter during negotiations indicating the parties' intent that the below-market Special ROFR be unilaterally exercisable by SHAG in order to give SHAG a meaningful opportunity to purchase similar to the opportunities enjoyed by the other project participants. Park Decl. at ¶ 20, Ex. B.

### G. Events after the Agreements were Signed

Throughout the 15-year compliance period, AMTAX received the tax credits and cash flow it expected. Dkt. #87 ("Rubenzahl Decl."), ¶¶ 4 - 5; Park Decl. at ¶ 40. All together, those amounts totaled more than $34 million, $33 million of which came from tax benefits. *Id.* The 15-year compliance periods have now passed for all the projects and all the tax credits have been claimed. Park Decl. ¶ 40.

The parties now find themselves in the two-year window for exercising the special rights to influence the sale of the properties. SHAG has attempted to exercise its Special ROFRs in four projects and plans to exercise the same in the other three projects. Woolford Decl. at ¶¶ 27-49, Exs. O-DD. In each case in which SHAG has already exercised, the partnerships had also ostensibly received third party offers to purchase the properties. *Id.* Those offers were transmitted to AMTAX before or on the same day the Special ROFRs were exercised. *Id.* And for the Meridian project, the general partner had also exercised its option to purchase the project before SHAG exercised its Special ROFR. *Id.* at ¶ 36, Exs. Q-R; Park Decl. at ¶ 42, Ex. I.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 8

AMTAX has attempted to deny SHAG's rights to purchase any of these projects under its Special ROFRs, necessitating this lawsuit.

## II.      DISCUSSION

### A. Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Material facts are those which might affect the outcome of the suit under governing law. *Anderson*, 477 U.S. at 248. In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)).

On a motion for summary judgment, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004). The Court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994). However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"In construing a written contract, the basic principles require that (1) the intent of the parties controls; (2) the court ascertains the intent from reading the contract as a whole; and (3) a court will not read an ambiguity into a contract that is otherwise clear and unambiguous." *Mayer v. Pierce County Med. Bureau*, 80 Wn. App. 416, 420, 909 P.2d 1323 (1995).

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 9

Washington follows the objective manifestation theory of contracts. Under this approach, the Court "attempts to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). The Court should "generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Id.* at 504 (citing *Universal/Land Constr. Co. v. City of Spokane*, 49 Wn. App. 634, 637, 745 P.2d 53 (1987)). Contract interpretation is typically an issue of law. "If a contract is unambiguous, summary judgment is proper even if the parties dispute the legal effect of a certain provision." *Mayer*, 80 Wn. App. at 420.

**B. Section 7.4L's "Right of First Refusal"**

The parties' first and main disagreement is over the meaning of Section 7.4L's use of the term "right of first refusal." SHAG argues that Section 7.4L sets forth an exclusive list of all the conditions necessary for SHAG to exercise its ROFR: "(1) SHAG must exercise within 24 months of the close of the compliance period; (2) SHAG must be 'then the Lessee and operator of the Apartment Complex pursuant to the Operating Use Lease;' (3) SHAC (if involved in that project) must be SHAG's wholly-owned subsidiary and either general partner or a member of the LLC general partner; and (4) SHAG must be 'then a qualified nonprofit organization.'" Dkt. #85 at 16 (citing Woolford Decl. at ¶¶ 17-25, Exs. E-M). SHAG argues that, even though the words "right of first refusal" are contained in this section, this is not a common law right of first refusal, but really permits SHAG to have an option to buy at the statutory minimum price. *Id.* SHAG cites only to *Kelly v. Ammex Tax & Duty Free Shops W., Inc.*, 162 Wn. App. 825, 830-32 (2011) for the proposition that "[e]ven where the words 'right of first refusal' are

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 10

1   explicitly used, courts look to the substance of the right conveyed to determine whether the right

2   is a common law right of first refusal or something else entirely." *Id.* at 16–17.

3       *Kelly, supra,* explains the difference between a right of first refusal and a right of first

4   offer, or option:

6       A preemptive right to purchase real estate can take the form of
        either a "right of first refusal" or a "right of first offer." *Bill Signs*
7       *Trucking,* 157 Cal. App. 4th at 1522-23. Obviously, in either, the
        landowner has decided to sell the property. But the way in which
8       the landowner goes about selling the property is dictated by the
        form that preemptive right takes.

10      The right of first refusal requires the landowner to first get an offer
        to purchase from a third party, that the seller is willing to accept.
11      *Id.* at 1523. The seller must then offer the property to the grantee
        of the right of first refusal, who then has the option to match the
12      offer or refuse to match the offer and decline to purchase the
        property. *Id.* A right of first refusal does not become an option to
13      purchase until the owner of the property voluntarily decides to sell
14      the property and receives a bona fide offer to purchase from a third
        party. *Bennett Veneer Factors, Inc. v. Brewer,* 73 Wn.2d 849, 856,
15      441 P.2d 128 (1968).

17      The right of first offer, on the other hand, does not require the
        landowner to go out and get an offer before offering it to the
18      grantee. *Bill Signs Trucking,* 157 Cal. App. 4th at 1523. Instead,
        the landowner first offers the property to the holder of the right of
19      first offer. *Id.* And then, if that grantee does not accept the offer,
        the landowner is free to sell the property to third parties. The
20      landowner must, of course, sell or offer to sell to third parties at the
        same price and on the same terms and conditions at which the
21      property was offered to the grantee of the right of first offer. *Id.* at
22      1522-23.

23  *Kelly,* 162 Wn. App. 830-31.

25      The Court notes that the facts in *Kelly* are distinct from those here. In that case, the

26  contract at issue referred both to a "right of first refusal" and "right of first offer" alternatively.

27  *Kelly,* 162 Wn. App. at 830. The court in *Kelly* found that the substance of the right more

28  closely resembled a right of first offer. Here, Section 7.4L only refers to a right of first refusal.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 11

1    On the very same page, Section 7.4J provides the General Partner an "option." It is hard to

2    imagine how the parties to these contracts could have inadvertently intended 7.4L to provide the

3    equivalent of an option right.

4        SHAG argues that requiring a third-party offer—inherent in the definition of a right of

5    first refusal—would serve no purpose at all under the unique terms of these Agreements:

6

7            Given the Special ROFR's short exercise window, it would be
             exceedingly difficult, if not impossible, to exercise the Special
8            ROFR if its exercise also required a third-party offer and
             AMTAX's consent to sell. In fact, AMTAX would have every
9            incentive not to give its consent during the Special ROFR's two-
             year lifespan if it meant the difference between a below-market
10           sale to SHAG and a sale at fair market value to someone else a
             short time later. Under those circumstances, the Special ROFR
11           would have no practical value to SHAG, and the Court should not
             interpret it in a way that renders it superfluous or meaningless.
12

13   Dkt #85 at 18. SHAG argues that the Court cannot interpret Section 7.4L in a manner that

14   renders it superfluous or meaningless, or in a way that would thwart the objective of the

15
     contract. *Id.* (citing *Ibrahim v. AIU Ins. Co.*, 177 Wash. App. 504, 515 (2013); *Hearst*, 154
16
     Wn.2d at 502 (courts consider the "objective of the contract")). SHAG also maintains that the
17
     Special ROFR's are not common law rights of first refusal "because the parties explicitly made
18
     it exercisable without AMTAX's involvement" in Section 4.5A(iii), which gives AMTAX the
19
20   right to consent to any sale except sales pursuant to the general partner option and SHAG's

21   Special ROFR. *Id.* at 19. SHAG points to the parties' negotiation history. *Id.* at 20.

22
         AMTAX responds that this Special ROFR serves a purpose as a defensive right,
23
     intended to protect SHAG from the property being sold out from under it without its consent,
24
25   but that it is not an offensive right to obtain the property at below-market rates. *See* Dkt. #89 at

26   22. AMTAX argues that, for the Auburn Court Project, SHAG has a ROFR as a lessee and a

27   right to an option as a General Partner, thus "[r]eading the ROFR in the manner advanced by

28

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 12

1  SHAG accordingly would lead to an absurd result that, as a practical matter, would render
2  SHAG's option in Section 7.4J superfluous." *Id.* at 23.
3          The Court finds as an initial matter that the term right of first refusal is not ambiguous or
4  open to interpretation. This term is precisely defined in both standard and legal dictionaries and
5  has a specific clear meaning in a contract concerning real estate. However, this is not the end of
6  the Court's analysis. If the entirety of each agreement clearly demonstrates an intent *contrary*
7  to the ordinary meaning of a right of first refusal, then the Court can interpret this provision in
8  accord with the rest of the agreement. *See Hearst*, 154 Wn.2d at 504. Both SHAG and
9  AMTAX point to provisions of the agreements that are rendered superfluous by the other's
10  interpretation of the ROFR. The Court finds that certain language in the Agreements
11  demonstrates an intent for the ROFRs to be exercisable as essentially an option, but that other
12  language demonstrates an intent to provide a right clearly different from an option. Given all of
13  the above, the Court cannot find that the Agreements *clearly* demonstrate an intent contrary to
14  the ordinary meaning of a right of first refusal. As stated by AMTAX, this does not render
15  Section 7.4L superfluous or meaningless; it simply provides a right that is apparently *unlikely* to
16  be used. This portion of SHAG's Motion is denied.
17
18  **C. Whether the Partnerships Have Received Bona Fide Third Party Offers**
19          Now that the Court has established that Section 7.4L's ROFR requires SHAG to meet
20  the ordinary definition of a right of first refusal (in addition to its other requirements), the next
21  question is whether SHAG has permissibly exercised this right for any of the Projects under the
22  facts of this case. AMTAX argues this right is unavailable because the Partnerships have not
23  received any bona fide third party offers. AMTAX presents evidence that the offers received
24  were sham offers orchestrated by Mr. Park and SHAG, and that many were not even offers but
25
26
27
28

merely letters of intent. *See* Dkt. #89 at 28–29. SHAG responds by arguing that these sham offers were indeed solicited by SHAG or Mr. Park, but were justifiable as a "belt and suspenders" approach given the anticipation that AMTAX "was likely to resist SHAG's Special ROFR." Dkt. #99 at 10.

The Court finds that this specific issue is mired in questions of fact and will hear from the witnesses involved in these offers before ruling on this issue. If the Court as fact-finder determines that the third party offers were sham offers or otherwise did not meet the requirements for a right of first refusal under Washington law, then SHAG's Special ROFR will not have been triggered.

The Court notes that AMTAX also argues it has not consented to any of these third party offers. The Court finds that nowhere in the Partnership Agreements is such consent explicitly required, and the definition of a right of first refusal only requires a third party offer to be made, not that the third party offer is acceptable to the seller. Even if such were required under common law, Section 4.5A(iii) specifically states that AMTAX's consent is not required for SHAG to exercise its Special ROFR, and such consent would impermissibly render this provision meaningless. *See Ibrahim, supra.*

**D. Congressional Intent**

AMTAX argues that Congress considered and affirmatively declined to permit a right for a below-market option as opposed to a right of first refusal. *See* Dkt. #89 at 25. This argument is moot given that the Court has found that the Section 7.4L provides SHAG a right of first refusal and not an option.

**E. The Global Indemnity Agreement**

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 14

1    AMTAX argues that SHAG does not meet the requirement as a qualified nonprofit
2    organization because it has entered into a Global Indemnity Agreement ("GIA") with a for-
3    profit entity controlled by Mr. Park. *See* Dkt. #89 at 29–30.
4        In 2001, SHAG and SHAC entered into a "Global Indemnity Agreement" ("GIA") with
5    PNCC and a number of its affiliates, including Counter-Defendant Steel Lake Enterprises.
6    Pettit Decl., Ex. U. The GIA provides, in relevant part:
7
8        > In exchange for executing and delivering this Agreement and
9        > continuing to provide financial support, guarantees and
         > indemnifications to or for the benefit of the Project Partnerships
10       > and the General Partners with respect to the Facilities . . . , and for
11       > agreeing to pay any tax liability of the tax credit investor limited
         > partners and all transaction costs associated with the exercise of a
12       > ROFR, it is understood and agreed by the parties that the
         > **ownership of the Facilities after the exercise of the ROFR will**
13       > **be arranged such that the Developers and/or Co-General**
         > **Partners affiliated with PNCC will maintain the same direct or**
14       > **indirect economic ownership percentage in each of the**
         > **Facilities as they enjoyed immediately before the expiration of**
15       > **the 15-year tax credit compliance period and the exercise of the**
16       > **ROFR** and SHAG and/or SHAC would succeed to the direct or
         > indirect economic ownership percentage of the tax credit investor
17       > limited partners at the same time of the exit of such tax credit
18       > investor limited partners from the Project Partnerships.

19   *Id.* (emphasis added). Mr. Park has stated in deposition that, under the GIA, LIHTC properties
20   for which SHAG exercised its ROFR would be jointly owned by SHAG and a PNCC affiliate,
21   in other words by a nonprofit and a for-profit. Pettit Decl., Ex. B ("Park Dep. I Tr.") at 200:10–
22   21.
23
24       The Court is not charged with addressing the desirability of the GIA from a public
25   policy standpoint or comparing the effects of the GIA with the intent of Congress. At the time
26   the Special ROFRs were exercised, SHAG was a nonprofit. Under the GIA, it is not until *after*
27   the right is exercised that ownership of the properties is arranged as detailed in the GIA. In any
28

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 15

1   event, AMTAX has failed to demonstrate that this agreement destroys SHAG's nonprofit status.

2   The GIA therefore does not prevent SHAG from triggering its Special ROFRs.

3       **F. Fiduciary Duty**

4           AMTAX argues that SHAG and the other General Partners' actions above have violated

5   their fiduciary duty to AMTAX and the Court should remove them from the partnership. *See*

6   Dkt. #89 at 30–31. A plaintiff alleging breach of fiduciary duty "must prove (1) existence of a

7   duty owed, (2) breach of that duty, (3) resulting injury, and (4) that the claimed breach

8   proximately caused the injury." *Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP*,

9   110 Wn. App. 412, 433–34, 40 P.3d 1206 (2002). The Court finds AMTAX has been unable to

10  demonstrate breach or injury at this time, as AMTAX is arguing only that SHAG has *attempted*

11  to use its ROFR to purchase these properties at a below-market rate, not that the properties have

12  actually been sold. Furthermore, and more importantly, AMTAX has been unable to

13  demonstrate actual injury, only pointing to its need to litigate these issues as an injury—this is

14  insufficient. *See* Dkt. #89 at 31. This portion of AMTAX's Motion is denied.

15      **G. The LLC General Partners' Motion for Summary Judgment**

16          Finally, the Court will address the LLC General Partners' Motion for Summary

17  Judgment, Dkt. #92. To the extent that the LLC General Partners move to dismiss AMTAX's

18  causes of action for breach of fiduciary duty, the Court finds that AMTAX has been unable to

19  demonstrate a substantial injury, a necessary element of its claim. AMTAX as the nonmoving

20  party has this burden. *See Celotex*, 477 U.S. at 323. These claims are properly dismissed.

21          As for AMTAX's declaratory judgment causes of action to remove the partners for

22  failures in reporting pursuant to Section 4.5A(iv) of the Agreements, the Court again finds that

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 16

1  AMTAX has been unable to demonstrate actual damages.   Section 4.5A of the Agreements

2  states:

3            Subject to the provisions hereinafter set forth in this Section 4.5,
4            and to the Regulations, in addition to the other rights provided for
             in this Agreement, the Investor Limited Partners shall have the
5            right:

6            * * *

7
             (iv) to remove any or all of the General Partners and elect one or
8            more new General Partners in the event of any material misconduct
             or failure to exercise any reasonable care with respect to any
9            material matter in the discharge of its stated duties and written
             obligations as a General Partner, the effect of which could have a
10           material adverse affect on the Partners or the Partnership, unless
             cured within a reasonable time, but in no event more than sixty
11           (60) days, or upon the occurrence of any of the following:
12
             * * *
13
             (6) repeated failure to furnish reports as required in Section 12.1;
14           or
15
             (7) any penalty assessed against the Partnership or a General
16           Partner for the benefit of the Limited Partners, or any amount
             otherwise due the Limited Partners from a General Partner or the
17           Partnership, is not paid within thirty (30) days . . . .
18
19  Park Decl., Ex. L.

20      AMTAX's counterclaims allege that the General Partners should be removed because

21  they were late in submitting to AMTAX's managing agent, Alden Torch Financial, certain

22  annual financial reports (audit reports and tax returns) during 2016 and 2017, for which Alden

23  Torch sent notices of default to the General Partners.   Dkt. #26, ¶ 76; Park Decl. at 66.

24  Although Section 12.1 of the Project Partnership Agreements provides that the reports for a

25  given year are due in February or March of the following year, the project's accountants and

26  auditors were unable to complete their reports until several months after the contract deadlines

27

28

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 17

1   in 2016 and 2017 for the 2015 and 2016 calendar years. Park Decl. at ¶ 67. However, the

2   allegedly late reports due in 2016 and 2017 were provided to Alden Torch at approximately the

3   same times as had been the case in prior years. *Id.*

4        The LLC General Partners argue that AMTAX has suffered no damage because the

5   reports at issue were delivered at times consistent with the course of dealing of the parties and

6   that "the removal remedy sought by AMTAX would be an impermissible penalty wildly out of

7   proportion to the nature and scope of the alleged breach." Dkt. #92 at 6. The LLC General

8   Partners rely on the deposition testimony of AMTAX's 30(b)(6) witness, who testified only to

9   hypothetical tax implications of the delay in receiving the reports. *Id.* at 10 – 11 (citing Dkt.

10   #94 ("Walters Decl."), Ex. A at 143-145, Ex. B). The LLC General Partners also argue that the

11   remedy sought by AMTAX—the removal of all the General Partners—would be an

12   impermissible penalty. *Id.* at 13 (citing, *inter alia*, *Wallace Real Estate Inv., Inc. v. Groves*, 124

13   Wn.2d 881, 886, 881 P.2d 1010, 1013-1014 (1994)). Finally, the LLC General Partners

14   contend that "[t]he fact that AMTAX has not sought to recover the contract remedy of

15   liquidated damages, and has only sought removal of the General Partners, only provides further

16   support for the conclusion that AMTAX is using its 'late report' theory as a pretext to seek a

17   multi-million-dollar windfall." *Id.* at 15.

18        AMTAX argues that it need not assert actual damages because it is not asserting a

19   breach of contract claim, but merely to enforce the terms of the contract. Dkt. #96 at 17.

20   AMTAX does not dispute that actual damages are required for a breach of contract claim.

21        On Reply, the LLC General Partners argue that AMTAX's pleading clearly alleges that

22   the General Partners failed to act "as required in Section 12.1 of the applicable partnership

23   agreements." Dkt. #111 at 7 (citing Dkt. #26 at 28). The LLC General Partners state:

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 18

1      Given AMTAX's own characterization of its "late reports" claim,
2 the nature of its claim can only be that of a claim for breach of
  contract. Basing its claim on a "failure to satisfy" contractual
3 obligations, and on a "failure to comply" with a contract, is just a
  different way to say that AMTAX is asserting a claim for breach of
4 contract. By referring to its breach of contract claim by choosing
  not to use the word "breach," AMTAX has engaged in a
5 transparent semantic exercise in an attempt to avoid the legal
  requirement to prove the basic elements of its breach of contract
6 claim.

7 *Id.*

8

9      The Court agrees with the analysis of the LLC General Partners.  The Court cannot

10 declare that a term of the Agreements is applicable in this case without finding that the LLC

11 General Partners breached the contract, and AMTAX has failed to meet its burden to

12 demonstrate actual damages, a required element of such a claim.  *See Celotex*, 477 U.S. at 323.

13 These causes of action are properly dismissed.

14

15 **H. Amici Briefing**

16      The Court acknowledges and appreciates the amici briefing filed by The National

17 Housing Law Project and LeadingAge, and the responsive briefing filed by AMTAX.  *See* Dkts.

18 #109-2 and #116.  However, nothing contained in that briefing changes the Court's conclusions

19 above.

20

21                   **III.    CONCLUSION**

22      Having reviewed the relevant briefing, attached declarations, and the remainder of the

23 record, the Court hereby finds and ORDERS:

24     1)  Plaintiff SHAG's Motion for Summary Judgment, Dkt. #85, is DENIED.

25

26     2)  Defendant/Counterclaimant AMTAX's Motion for Summary Judgment, Dkt. #89, is

27        DENIED.

28

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 19

3) Counter-Defendants LLC General Partners' Motion for Summary Judgment is GRANTED. AMTAX's declaratory judgment for removal and breach of fiduciary duty counterclaims are DISMISSED.


DATED this 19 day of February 2019.


RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 20