UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

HIDDEN HILLS MANAGEMENT,
LLC, and 334th PLACE 2001, LLC

     Plaintiffs,

 v.

AMTAX HOLDINGS 114, LLC, et al.,

     Defendants.

CASE NO. C17-6048 RBL

ORDER ON MOTIONS FOR
SUMMARY JUDGMENT

THIS MATTER is before the Court on the following dispositive motions: Plaintiff 334th Place 2001's Motion for Summary Judgment [Dkt. #52]; Defendant Amtax Holdings' Motion for Summary Judgment [Dkt. # 62] and Plaintiff Hidden Hills Management's (HHM's) Cross Motion for Summary Judgment [Dkt. # 71].

The fact-intensive case involves two related limited partnerships which own two low income housing projects: Hidden Hills (an apartment complex in University Place, purchased in 2002) and Parkway (an apartment complex in Federal Way, purchased in 2003). HHM is the general partner of the Hidden Hills Limited Partnership. 334th Place is the general partner of the Parkway Apartments Limited Partnership. Catherine Tamaro owns and manages both general partners, and manages both apartment complexes.

Defendant AMTAX[1] is the limited partner in each partnership. Alden Torch LLC[2] owns and manages AMTAX. AMTAX invested in the partnerships to harvest the Low-Income Housing Tax Credits (LIHTIC) associated with operating such projects. The two LPAs are functionally identical. Each grants to the general partner an option to purchase the limited partner's interest subject project at the end of the IRS "compliance[3] period":

> Subject to compliance with Section 42 of the Code and the rules of the agency, upon completion of the Compliance Period, the Managing General Partner **shall** have the option (the "Option") to purchase the interest of the Investor Limited Partner in the real estate, fixtures and personal property of the Partnership (the "Interest") for a period of twenty-four (24) months. ***The Managing General Partner may exercise the Option upon written notice to the Investor Limited Partner at any time after the end of the Compliance Period (the "Option Period").*** In the event the Managing General Partner exercises the Option, it must pay to the Investor Limited Partner the Option Price (as defined herein) in cash.

[Paragraph 7.4.J (Parkway agreement), Pritchard Decl. Dkt. # 53, Ex. A at 11(emphasis added)].

Under the LPAs, Tamaro operated each complex for the full compliance period, and AMTAX passively benefitted from the tax credits and other tax benefits. Tamaro provided annual audited financial statements to her limited partner. The general partners' efforts to force a purchase of the limited partners' interests (at a favorable, low price), and the limited partners' resistance to selling (and alternative effort to sell at a higher price) is the genesis of these parallel disputes.

---

[1] "Amtax Holdings 114 LLC" is the Hidden Hills limited partner, and "Amtax Holdings 169 LLC" is the Parkway limited partner. This Order will refer to the Limited Partners as the singular "AMTAX."

[2] Alden Torch purchased AMTAX in 2011.

[3] The LIHTC program is not indefinite, and the tax credits are "exhausted" after the [IRS] Compliance Period, which is 15 years. The general partner's two-year unilateral purchase option coincides with the expiration of the limited partner's tax credit benefit of ownership.

# I. BACKGROUND.

HHM's option to purchase Hidden Hills from AMTAX matured in January 2017, a year before 334th's option to purchase Parkway matured. As those dates approached, the parties began discussing a voluntary sale of each project to the general partner. The Parkway negotiations began earlier, in 2013, but ended (relatively amicably) without an agreement. The partners cooperated on a successful re-finance of Parkway in 2015.

The partners' informal negotiations for the voluntary sale of AMTAX's interest in Hidden Hills began in 2015. Hidden Hills was and is a more complicated project. It is in the Tacoma Smelter Plume,[4] and its topsoil was confirmed to be contaminated with "elevated" levels of arsenic and lead[5] from the Tacoma Asarco Smelter as early as 1998.

This topsoil contamination at the heart of the Hidden Hills dispute is not new news to the partners or anyone else. HHM had engaged Environmental Partners (EPI) to perform Phase I Environmental Site Assessment on Hidden Hills in connection with the general partnership's initial purchase of Hidden Hills in 1999-2000, and EPI estimated then that the cost to clean up the contamination would be about $1 million. Because of the contamination, the partnership had difficulty obtaining financing for its purchase. Its lender ultimately required it to place $1.05

---

[4] The plume is expansive, reaching south to Thurston County, West to Mason County, and North to the Snohomish County line. The parties have surely realized that Parkway is about as far from the smelter site as Hidden Hills is, and it too is "within the plume." *See* EPI's January 3, 2017 Technical Memorandum, Pettit Dec. Ex. 64-2 at Ex. 10 attachment A.

[5] This fact does not appear to be disputed, but the actual level of contamination is not highlighted, if it is in the extensive record. EPI's cost estimate is based on its "assumption" that the levels are between 0.9 and 230 parts per million. *Id*. at 5.

Whatever the level is, HHM concedes Ecology has never undertaken (and is unlikely to ever undertake) any enforcement action requiring any remediation of Hidden Hills. HHM's concern is that *lenders* would balk at loaning money secured by a contaminated property, and might require "No Further Action" letter from Ecology as a condition of doing so.

million into an interest-bearing environmental escrow account, under an agreement with the "credit enhancer," Fannie Mae. [Environmental Escrow Agreement, Pettit Decl. Dkt. # 64-1, Ex. 3 at p. 4]. The parties agreed to use these funds to remediate the property once Ecology determined the required[6] clean-up level. The partnership purchased Hidden Hills for $8.9 million in 2002. HHM claims that price was discounted due to the environmental contamination.

HHM also agreed to broadly indemnify its limited partner for the presence of hazardous substances on the property:

4. <u>Indemnity</u>. The Indemnitor agrees to indemnify, hold harmless and defend the Company from and against any and all claims, costs, litigation, proceedings, investigations, loss, damage, liability, fine, penalty, assessment or expense, and/or loss, or deferment or delay of distributions from Hidden Hills to the Company (collectively referred to as "Environmental Liability") arising from, or as a result of, or relating to, any Hazardous Substance, Hazardous Substance Activity or violation of Environmental Laws or ADA Laws, on the, or adversely affecting the, Property. Defense of the Company by Indemnitor shall be provided by competent counsel of Indemnitor's choice, and the Company shall reasonably cooperate in such defense.

[Environmental Indemnity & ADA Compliance Agreement, Pettit Decl. Dkt. # 64-1, Ex. 2 at p. 3].

HHM's attorney during the partnership's initial purchase of Hidden Hills, Robert Sullivan, testifies that this provision "had nothing to do with any diminution of the property value, as that issue was addressed at the time of acquisition by the seller's reduction of the price

---

[6] Ecology does not require any such cleanup. It does have a *Voluntary* Cleanup Program (VCP), and successful participation in that program might entitle a property owner to a No Further Action Letter. [*See* EPI's January 3, 2017 Technical Memorandum, Pettit Dec. Ex. 64-2 at Ex. 10 attachment A]. EPI has not opined that Ecology will require the work it describes as a condition of an NFA under the VCP.

paid by the partnership. The Indemnity Agreement applies if Ecology requires Amtax to clean-up the property[.]" [Sullivan[7] Dec. Dkt. # 72].

But Sullivan also concedes that the indemnity's purpose was to shift the risk and cost of any future environmental remediation from the limited to the general partner:

> [T]he intent of the Indemnity Agreement was to allocate the financial risk for environmental issues between the general and limited partners. Of specific concern was whether Ecology would require a cleanup, and that the cost of the cleanup might exceed the amount of escrowed funds[.] By requiring the general partner to "indemnify hold harmless and defend" the limited partner against Environmental Liabilities, the Indemnity Agreement shifted this financial risk to the general partner for future clean-up.

*Id.*

In late 2015, HHM engaged CBRE to appraise Hidden Hills, apparently in preparation for exercising its option. CBRE's February 3, 2016 appraisal acknowledged the contamination but did not it alter its valuation of the project based on it, because it made the "extraordinary assumption" that the Environmental Escrow Account (then about $1.5 million) would cover the cost of any required remediation. [Feb. 3, 2016 CBRE Appraisal, Blake Decl. Dkt. # 63-1, Ex. 6 at p. vii]. CBRE's 2016 appraisal valued Hidden Hills at $13,800,000.

AMTAX claims it did not know HHM had commissioned the 2016 CBRE appraisal, or that it had been completed, until Tamaro sent it a copy in July 2016, five months before the end of the compliance period. [Blake Decl. Dkt. # 63]. Prior to exercising her option (but after receiving and sharing the first CBRE appraisal), Tamaro also engaged EPI to perform an updated Phase I ESA on Hidden Hills. It did so on November 3, 2016 [November 3, 2016 EPI Phase I ESA, Pettit Decl. Dkt. # 64-1, Ex. 8]. EPI's report reflected that it was done in connection with "a re-finance" of the property, acknowledged that the site was "in the plume," and recited that it

---

[7] AMTAX's Motion to Strike Sullivan's declaration is DENIED for purposes of this Motion.

had "elevated" levels of lead and arsenic. It did not quantify those levels and it did not claim that a cleanup was or would be required.

Around the same time, Tamaro asked CBRE (Todd Henderson) to appraise the property a second time.

The compliance period ended, and HHM's option matured, on January 1, 2017. Two days later, EPI sent HHM a "Technical Memorandum" as a follow-on to its November 3 Phase I ESA. EPI estimated the cost of a cleanup of the Hidden Hills lead and arsenic contamination at $1.5 - $2.5 million—assuming that remediation was required or desired. [January 3, 2017 EPI Technical Memorandum, Pettit Decl. Dkt. # 64-2, Ex. 10]. HHM provided this document to CBRE for consideration in its second appraisal.

The same day, AMTAX exercised its own contractual right (subject to the general partner's purchase option) to force the partners to sell Hidden Hills on the open market. [Hidden Hills Partnership Agreement section 7.4.K, Pettit Decl. Dkt. # 64-1, Ex. 1 at 46]. HHM declined, pointing to its option. AMTAX participated in the ensuing appraisal process, but continued to push for such a sale even as the partnership devolved into litigation. It argues that Tamaro falsely claimed to be interested in such a sale.

CBRE's second, January 30, 2017 appraisal valued the property at $13.0 million. Its value included a reduction of $2.5 million (the high end of the EPI cost estimate), and it did not offset that hypothetical cost by the $1.5 million escrow account balance, because it "understood" that the account "was not transferrable in the event of a sale." [CBRE January 30, 2017 Appraisal, Pettit Decl. Dkt. # 64-1, Ex. 12 at p. 1-2]. AMTAX claims the Escrow Agreement expressly contemplates a sale.

HHM formally exercised its option in March 2017. Consistent with the partnership agreement's provisions for determining the Hidden Hills option price, each party chose an appraiser.

AMTAX selected Andy Noble of Cushman and Wakefield. C&W's April 2017 appraisal of Hidden Hills acknowledged that the property was in the plume, and that it had reviewed EPI's initial Phase I ESA (2001), but it concluded[8] that "the sales of multifamily properties in the subject's general vicinity are not being adversely impacted by the Tacoma Smelter Plume." Its valuation therefore did not include any deduction for potential environmental remediation costs. C&W appraised the Hidden Hills project at $19.7 million. [April 27, 2017 C&W Appraisal, Blake Decl. Dkt. # 63-1, Ex. 15].

HHM nominated CBRE's Todd Henderson, who was obviously familiar with the property. Tamaro again provided Henderson EPI's recent Phase I ESA, and its Technical Memorandum. CBRE's June 7, 2017 appraisal valued the property at $14.05 million. [June 7, 2017 CBRE Appraisal, Blake Decl. Dkt. # 63-1, Ex. 19]. Like its January appraisal, CBRE's appraisal reduced the bottom line value by the assumed cost of the hypothetically-required remediation of the property.

In May, Tamaro had also asked a different CBRE Broker, Tim Flint, to provide a "Broker's Opinion of Value (BOV)," in connection with her contemplated *sale* (as opposed to, and presumably after, her forced purchase) of Hidden Hills. [*See* Pettit Decl. Dkt. # 64-2 at Ex. 18]. *One day* after CBRE provided HHM its $14.05 million appraisal of Hidden Hills, CBRE provided HHM a BOV opining that Hidden Hills was worth $20.8 - 21.8 million [CBRE's June

---

[8] HHM argues that Noble later conceded that the potential for environmental remediation was "material," though it is not clear he was aware of the nature of the contamination, the Environmental Indemnity Agreement, or the Environmental Escrow Account.

8, 2017 BOV, Pettit Decl. Dkt. # 65 at Ex. 21]. The BOV did not address any environmental contamination or remediation.

On June 19, Tamaro sent AMTAX CBRE's June 7 appraisal, but not CBRE's June 8 BOV, CBRE's January 30, 2017 appraisal, or EPI's January 3, 2017 Technical Memorandum. She explained she was attempting to obtain a new loan for her purchase, and that her "lender will require the owner to implement a remediation plan under Ecology's Voluntary Cleanup Program as a condition of obtaining a new loan." [Blake Dec. Dkt. # 63 at Ex. 20]. Tamaro also claimed that the C&W appraisal was flawed because it did not factor in the cost of the remediation she claimed her lender would require.

The partnership agreement provided that if the two appraisers could not agree on the value, they together would nominate a third appraiser to perform a third, independent, final and binding appraisal:

> Fair Market Value shall be determined by two independent MAI appraisers: one selected by the Managing General Partner and on by the Investor Limited Partner. *If* such appraiser are unable to agree on the value, *they shall jointly appoint a third independent* MAI appraiser whose determination shall be *final and binding*[.]

[Hidden Hills Partnership Agreement, Pettit Decl. Dkt. # 64-1, Ex. 1 at para. 7.4.J (emphasis added)].

The first two appraisers did not agree[9] on a value, and they jointly nominated *two* potential third appraisers, John Campbell of Colliers, and Jeremy Streufert of Kidder Mathews. For reasons that remain unclear, these names were provided to HHM, but not to AMTAX. *Tamaro* then selected Colliers/Campbell ("first on the list") to be the third appraiser.

---

[9] AMTAX argues the LPA required them to try, and that they did not.

1   AMTAX claims Colliers was not aware that its role was to be the third, independent,

2   final appraiser. It is undisputed that Tamaro was Colliers' "point person" on the appraisal—

3   Colliers referred to her as "the client"—and she alone had contact with Colliers. HHM claims

4   AMTAX was free to similarly contact Colliers but did not do so.

5   In the summer of 2017, Tamaro again contacted EPI, this time to provide a "more

6   detailed remediation cost estimate" for Hidden Hills. EPI's August 8, 2017 Technical

7   Memorandum estimated the cost to remediate Hidden Hills at roughly $3.75 million, which was

8   apparently calculated by adding a $1.2 million (50%) "contingency" for "unknown or changed

9   conditions" on top of the high end of its prior estimate of $1.5 - 2.5 million.  [EPI's August 8,

10  2017 Technical Memorandum, Pettit Decl. Dkt. # 64-4, Ex. 35, at p. 6]. As with EPI's prior

11  estimates, this new estimate implicitly assumed that the remediation was required, or desired.

12  Tamaro provided this Technical Memorandum to Colliers, but not to AMTAX.

13  AMTAX claims it did not know Colliers/Campbell had been selected, or that Tamaro

14  "secretly" appointed the "independent" third appraiser. It claims Tamaro's conduct violated the

15  LPA, which required the two appointed appraisers (not HHM) to select the third, and that she

16  improperly interfered with the appraisal process, particularly by providing EPI's August

17  Technical Memorandum. AMTAX claims and demonstrates that Tamaro instructed Colliers' to

18  discount its appraisal by the EPI remediation cost estimate and Colliers did so.[10]

19  In any event, Colliers' October 2017 appraisal valued Hidden Hills at $13,500,000.

20  [October 23, 2017 Colliers appraisal, Pettit Decl. Dkt. # 64-1, Ex. 33]. Colliers' valuation

21

22  [10] AMTAX catalogues a litany of Tamaro/HHM - Colliers contacts that are fundamentally at
    odds with the notion of an "independent" appraisal. *See* Pettit Dec. Dkt. # 64-5, *see* AMTAX's

23  MSJ Dkt. # 62 at 13-14. After "ordering" the discount, Tamaro reviewed and commented on a
    *draft* Colliers appraisal that was still $3 million higher than version she asks the Court to declare

24  "independent, final, and binding" as a matter of law.

included a straight deduction for EPI's latest estimate of the cost of a hypothetical remediation of the topsoil contamination:

> The owner provided an estimate to remediate the contamination at $3,760,450 which includes $1,220,150 in contingency. As a result, these costs are deducted from the indicated value.

[October 23, 2017 Colliers appraisal, Pettit Decl. Dkt. # 64-1, Ex. 33, at p. 92].

AMTAX refused to proceed with the sale.[11] In November 2017, it disputed the validity of Collier's appraisal, threatened to remove HHM as the General Partner under the partnership agreement, and demanded that HHM agree to either sell the property on the market, or buy Hidden Hills based on the midpoint of the BOV CBRE provided Tamaro ($21.3 million).

Two weeks later, HHM sued in state court, seeking to enforce its option and force a purchase based on the third, independent, final and binding Colliers appraisal. AMTAX purported to remove HHM as the general partner under the LPA. It did remove the state court case here [Dkt. # 1], and asserted counterclaims for breach of contract, breach of fiduciary duty, declaratory judgment as to the option price, and confirming or effectuating its removal of HHM as the general partner. [Dkt. # 24]. It later added an indemnification counterclaim under the Environmental Indemnity Agreement. [Dkt. # 37].

AMTAX claims that Tamaro and HHM violated the LPA by secretly and improperly appointing Colliers, and by improperly interfering with the appraisal process. It also claims it has since discovered that HHM violated its fiduciary duties and breached the LPA in various ways, going back ten years. It claims HHM charged the partnership excess fees, paid them to family

---

[11] The appraisal process sets the Fair Market Value, but the Option Price the General ultimately pays is the result of a variety of additional calculations, reflecting the mortgage and other debits and credits. The parties refer to these calculations as the "distribution waterfall," which is detailed in the LPA. The parties also dispute how that waterfall applies to calculate the Option Price. HHM seeks a judgment requiring it to pay AMTAX about $1 million.

members, and failed to maximize rental rates, all as part of a long-term scheme to enrich herself at the partnership's expense, and to purchase Hidden Hills (and Parkway) at a discount. [Dkt. # 37].

By the time 334th's option to purchase AMTAX's interest in Parkway matured in January 2018, the Tamaro/AMTAX relationship had plainly deteriorated beyond repair. 334th promptly purported to exercise that option. AMTAX responded in March that it was evaluating the "questionable activity" it had uncovered during the Hidden Hills dispute, regarding Tamaro's management and operation of both general partnerships. It demanded that 334th cure its defaults as a condition of moving forward on the option. 334th responded by sending AMTAX the CBRE appraisal it had commissioned on Parkway, and sought to proceed with the appraisal process as part of the buyout.

On May 8, AMTAX wrote 334th a letter accusing it of financial mismanagement and other breaches of the LPA, claiming it had the right to remove 334th as the general partner, and that as a result 334th did not have the right to exercise its option. [Pritchard Decl. Dkt. # 53-14, Ex. N)]. The same day, 334th sought leave to amend its existing (HHM) complaint to include the Parkway dispute. [Dkt. # 25] The request was granted [Dkt. # 32], and both disputes are now in this case. 334th seeks a declaratory judgment on its unconditional right to exercise its option to purchase Parkway. [Dkt. # 33].

AMTAX counterclaimed, claiming as it had on Hidden Hills that the general partner had mismanaged the project, incurred excessive fees, and breached the Parkway LPA and its fiduciary duties. It seeks a declaration that 334th cannot exercise its option, seeks to remove 334th as the general partner, and damages. [Dkt. # 37].

# II. DISCUSSION

**A. The pending Motions.**

After a year of thorough discovery, the parties filed the three pending summary judgment motions.

AMTAX seeks summary judgment in the Hidden Hills dispute, on three points: (1) the Colliers' appraisal is not "independent, final and binding;" (2) any remediation costs are HHM's responsibility under the Environmental Indemnity Agreement, and the potential cost of a cleanup should not be deducted from Hidden Hills' value; (3) AMTAX effectively removed HHM as the general partner under the LPA for breaching her duties to it and the partnership. [Dkt. # 62].

HHM also seeks summary judgment in the Hidden Hills dispute, on (1) its right to exercise its option to purchase at the Colliers' appraised value, (2) the inapplicability of the Environmental Indemnity Agreement, (3) AMTAX's claim that it effectively removed HHM as the Hidden Hills general partner, and (4) AMTAX's counterclaims. [Dkt. # 71]

334th seeks summary judgment [Dkt. # 52] on two issues that it claims would resolve at least the Parkway portion of this case: First, it asks the Court to determine as a matter of law that it is entitled to and did exercise its unconditional option to purchase Parkway, and that AMTAX's "retaliatory" effort to remove it as general partner was not effective to terminate that right.

Second, it claims that AMTAX's counterclaims for excessive fees, mismanagement and breaches of the partnership agreement and 334th's fiduciary duties are all based on the audited financial statements that 334th timely provided over the years. It argues that all the claims are time-barred, that AMTAX is estopped from asserting them, and that some of them (the failure to maximize rents) are barred by the Business Judgment Rule. It seeks summary dismissal of all Parkway counterclaims.

The excellent briefing and voluminous record demonstrate that this is an intensely factual dispute. As a result, many of the issues will require a trial. But on two issues, the facts are not reasonably disputed, and their effect can be determined as a matter of law.

**B. Summary Judgment Standard.**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323-24. There is no requirement that the moving party negate elements of the non-movant's case. *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). Once the moving party has met its burden, the non-movant must then produce concrete evidence, without merely relying on allegations in the pleadings, that there remain genuine factual issues. *Anderson*, 477 U.S. 242, 248 (1986).

## C. Hidden Hills.

### 1. The Colliers' appraisal was not independent, and it is not final or binding.

AMTAX asks the court to determine as a matter of law that the Colliers' appraisal was not conducted in accordance with the partnership agreement's requirements. It correctly argues that such contracts must be "strictly construed," and that the Colliers' appraisal does not meet the partnership agreement's strict requirements in at least two ways, as a matter of law.

AMTAX claims that the first two appraisers were contractually required to appoint a (single) third, independent appraiser to conduct a final, binding one, *if* they "could not agree" on a value. It also claims HHM and Tamaro improperly interfered with the independent appraisal process and that the Colliers appraisal is not the final binding appraisal to be used for the option price—even disregarding the fact that it failed to account for the Environmental Indemnity Agreement and the Environmental Escrow Account. AMTAX accurately claims that HHM instead took a "second bite at the apple" in appointing and manipulating its own appraiser, instead of the independent process the contract plainly required.

HHM also seeks summary judgment on this issue. It argues that the appraisal process was followed as a matter of law. It claims that first two appraisers "could not agree" (as demonstrated by the difference in their valuations) and claims that even AMTAX's own appraiser, Noble (of C&W), thought Campbell was "a fine choice." It claims there was "nothing secret" about the selection process, and relies on the Colliers appraisers' (Campbell and Hutsell's) testimony that they were "not influenced" by HHM. It claims the Colliers appraisal controls as a matter of law and asks the Court to order a sale based on that value.

It is true that first two appraisers did not agree, but it is not at all clear that they tried to reconcile their differences.[12] More importantly, they did not "jointly appoint" an independent third appraiser; they gave Tamaro two names, and she picked one. That's not the same thing, as a matter of law.

Tamaro's claim that she did not know Campbell or Colliers is not an answer to the claim that she picked the appraiser. Tamaro's various excuses and explanations for why she fed the appraiser secret information, or why she solicited an even higher EPI estimate and instructed the appraiser to use it as straight value reduction, or failed to inform Colliers what its role really was, are not enough to avoid the clear legal conclusion that the appraisal was far from "independent." AMTAX has amply demonstrated that the process was tainted beyond salvation, as a matter of law. [*See* Generally, Pettit Dec. Dkt. # 64-5; AMTAX's MSJ Dkt. # 62 at p. 12 n. 5 - p. 14.].

AMTAX's motion for Summary Judgment on this single issue is GRANTED and HHM's parallel Motion on it is DENIED. Colliers was not jointly appointed by the first two appraisers, its appraisal was not independent, final or binding, and it is not the valuation for determining the option price as a matter of law.

**2.  HHM broadly agreed to Indemnify AMTAX for "environmental liability."**

HHM argues that the Environmental Indemnity Agreement was intended to apply if and only if a third party made a claim against the partnership as the result any environmental contamination, including the anticipated claim that Ecology would require the owners to

---

[12] The LPA pointedly made the first two appraisers' "settlement" effort (and the failure of that effort) a precondition to going through the process again with a third, independent appraisal. The CBRE - C&W gap was about double the high end of EPI's then-estimated remediation cost, which CBRE deducted and C&W did not. It is plausible—it might even be likely—that two reasonable appraisers could meet somewhere in the middle, and avoid the third, far more contentious appraisal process.

1    remediate the arsenic and lead on Hidden Hills. It claims it was not intended to compensate

2    AMTAX for any diminution in value based on the presence of the contamination.

3        AMTAX argues the Environmental Indemnity should be interpreted as any other

4    contract, to give effect to the parties' intentions. It claims that an indemnity contract should

5    "receive a reasonable construction so as to carry out, rather than defeat, the purpose for which it

6    was executed." *See McDowell v, Austin Corp.*, 105 Wn.2d 48, 53-54 (1985) (citations omitted).

7        The goal of contract interpretation is to "ascertain the intention of the parties." *Berg v.*

8    *Hudesman*, 115 Wash.2d 657, 663 (1990) (quoting Corbin, *The Interpretation of Words and the*

9    *Parol Evidence Rule*, 50 Cornell L. Quar. 161, 162 (1965), 4. S. Williston, Contracts 601, at 306

10   (3d ed. 1961)).  In Washington, courts determine the parties' intent by examining the contract's

11   objective manifestations.  *Hearst Communications, Inc. v. Seattle Times Co.*, 154 Wash.2d 493,

12   503 (2005).  Words should be given their ordinary, usual and popular meaning "unless the

13   entirety of the agreement clearly demonstrates a contrary intent." *Hearst Communications, Inc.*,

14   154 Wash.2d at 504.  Subjective intent is generally irrelevant if the intent can be determined

15   from the actual words used. *Hearst Communications, Inc.*, 154 Wash.2d at 504.

16       In determining the objective intent, courts may refer to extrinsic evidence for the

17   "meaning of specific words and terms used." *Hearst Communications, Inc.*, 154 Wash.2d at 503

18   (quoting *Hollis v. Garwall, Inc.*, 137 Wash.2d 683, 695-96 (1999)).  Extrinsic evidence may be

19   relied on even in the absence of ambiguity. *See Berg v. Hudesman*, 115 Wash.2d 657, 669

20   (1990). Extrinsic evidence may include: "(1) the subject matter and objective of the contract, (2)

21   all the circumstances surrounding the making of a contract, (3) the subsequent acts and conduct

22   of the parties, and (4) the reasonableness of respective interpretations urged by the parties."

23   *Hearst Communications, Inc.*, 154 Wash.2d at 502 (citing *Berg v. Hudesman*, 115 Wash.2d 657,

24

667 (1990)). Extrinsic evidence may not be used to "show an intention independent of the instrument" or to "vary, contradict, or modify the written word." *Id.*

HHM's argument on the operation and application of the Environmental Indemnity is not persuasive. First, the Environmental Indemnity Agreement does not say what HHM now claims it means; it was unambiguously, intentionally broad. It contained no limitation to actual claims by third parties.

More importantly, HHM has consistently conceded that if Ecology required a cleanup, the Environmental Indemnity Agreement would require HHM to pay for it. Sullivan also concedes that his client intended to shoulder the risk of any environmental remediation. HHM claims that because Ecology has *not* required a cleanup, the Environmental Indemnity Agreement does not apply, and it can instead place the entire hypothetical cost of that very same cleanup on AMTAX.

AMTAX's argument is persuasive: if HHM is permitted to ignore the Environmental Indemnity, to effectively charge some hypothetical cost to AMTAX, and to keep the Environmental Escrow fund, it will own Hidden Hills without performing any remediation. At the same time, AMTAX "will be stuck paying for a cleanup that never happens on a property it no longer owns." *See* Dkt. # 62 at 25.

HHM's reading of the Environmental Indemnity Agreement is unfair and unwarranted. It is contrary to the parties' admitted intent, and to the words they used. It makes no sense to argue that the Environmental Indemnity Agreement is not triggered because Ecology has not "required" a cleanup, but to nevertheless claim that HHM's option purchase price should be

discounted by the ever-increasing estimated cost[13] of a cleanup everyone knows will never occur, because it might be "required" by HHM's lender.

HHM is in fact claiming that a third party "requires" a cleanup: it claims that the lenders it has approached to fund its purchase option will require a cleanup as a condition of funding HHM's purchase.

HHM has also suggested that a potential buyer might require a cleanup, but that isn't what any of the appraisals say, and it certainly isn't what CBRE'S $20.8-21.8 million BOV says. There is evidence in the record of one potential buyer, HHM, and while it wants the potential cost of remediation to be high (to drive down Hidden Hills value and its purchase price), there is no evidence that it intends to actually remediate the property, or that it could or would hire EPI to implement the "Cleanup Action Plan" described in its Technical Memoranda. If it *did* clean up Hidden Hills, before or after it purchased, it would have to pay for it. It makes no sense to inflate that cost as much as possible, and charge it to the reluctant, indemnified seller. The parties did not agree that that was how it worked, as a matter of law.

There is no question of fact on this claim. AMTAX's Motion for Summary Judgment on its claim that the Environmental Indemnity Agreement requires HHM to bear the risk of any

---

[13] EPI's August 8 Technical Memorandum provides no explanation for its "estimated" costs, and does not suggest that anyone will require any such efforts. It acknowledges that the first step in approaching a contamination problem is to perform a "Remedial Investigation," and the second is to perform a "Feasibility Study" (RI/FS). The purpose of the latter is to "develop and evaluate cleanup action alternatives prior to implementation and (then) select the model remedy most appropriate for the subject property."

Once Ecology signs off on that, "*then* the Cleanup Action Plan *will be* developed." [See EPI August 8, 2017 Technical Memorandum, Pettit Dec. Ex. 64-4 at 7 (emphasis added)]. EPI's cost estimate—for a Cleanup Action Plan it has not developed, based on an RI/FS it has not performed, based on cleanup "requirements" Ecology has not imposed—is pure speculation. The costs EPI developed for HHM's appraisal process do not reflect any real or required cleanup, and they have nothing to do with the Fair Market Value of Hidden Hills.

environmental contamination claim or loss is GRANTED. Any future, third, independent, final and binding appraisal will be conducted without reference to the contamination, and without reference to EPI's various estimates.

HHM's Motion for Summary Judgment on this issue is DENIED.

### 3. **AMTAX'S right to remove HHM as general partner presents a question of fact**.

AMTAX argues that HHM and Tamaro's "Colliers" conduct—demonstrably, even brazenly contrary to the letter and spirit of the contract's appraisal process—violated the agreement, and HHM's fiduciary duties to the partnership. It argues it therefore had the right to remove HHM as general partner under the LPA, seeks a ruling that it effectively did so, and that the effect is to preclude HHM's option as a matter of law.

The LPA gives the limited partner the right to remove the General if it violates its fiduciary duties to the partnership:

> (2) the General Partners, or any of them, shall have violated any rights, powers, duties, representations or warranties as set forth in Article VII herein or shall have violated any material provision of this Agreement, and such misconduct or failure to exercise reasonable care can reasonably be expected to cause economic detriment to the Partnership or the Project or defaulted on a guarantee herein or the timely payment of a Penalty Payment or violated any material provision of applicable law; or

[Hidden Hills LPA § 4.5, Pettit Dec. Dkt. # 64-1 at 25]. "Article VII" describes the General Partners' fiduciary obligations to the partnership. *Id.*

HHM argues that it effectively exercised its option to purchase Hidden Hills, because the LPA imposed only two conditions on that right, and they were met. At the time HHM exercised its option, AMTAX had not claimed it was in default, had not claimed it breached its fiduciary duties, and had not sought to remove HHM. It claims AMTAX went along with the appraisal

process, until it did not like the result. HHM argues AMTAX's subsequent removal effort was ineffective, as a matter of law.

HHM argues that once it exercised the option, it was entitled to treat AMTAX as an arms-length adversary with respect to the purchase price. It correctly claims that under Washington law, "a partner does not violate a duty or obligation under this chapter or under the partnership agreement merely because the partner's conduct furthers the partner's own interest." *See* RCW 25.05.165(5); *J&J Telecom v. AT&T Wireless Servs. Inc.,* 169 P.3d 823 (2007) (other citations omitted). This principle and these authorities do not foreclose the possibility, though, that something more could be a violation of such duties.

HHM's position is difficult to square with HHM's claim that its role as general partner entitled Tamaro to be Colliers contact person, on the *partnership's* behalf. A reasonable fact-finder could find that HHM was not acting on the partnership's behalf, and that its efforts had the intended effect of "causing economic detriment to the Partnership or the Project"—Tamaro was driving the value of the partnership's only asset, Hidden Hills, for her own benefit. HHM's argument that Washington law requires a *seller* to disclose environmental contamination to a buyer (or face a rescission or fraud claim) is not persuasive support for its claim that as a *buyer* it was required to solicit, inflate, and disclose EPI's cost estimates to an independent appraiser. *See* RCW 654.06.101(7).

The Hidden Hills Limited Partnership did not wind-up or dissolve, and the duties the Hidden Hills LPA imposed did not end, when HHM exercised its unilateral option. Instead, that initiated a process under the LPA, ultimately leading to a valuation, the distribution waterfall, and the payment of cash for AMTAX's interest. If and to the extent HHM is arguing that it had

no further obligations to the partnership or to AMTAX, or that its exercise prevented the limited from removing it regardless of its conduct, it is wrong as a matter of law.

Th Court's determination (above) that HHM improperly interfered with the appraisal process necessarily leads to the conclusion that HHM's Motion (for a declaration that the appraisal process is complete) must be DENIED. Its summary judgment motion on AMTAX's Hidden Hills counterclaims must also be DENIED.

But that does not mean that AMTAX's own Motion for Summary Judgment on its counterclaims must be granted, or that its removal was warranted or effective to preclude the option as a matter of law. The corrective for the tainted appraisal may be as simple as re-doing the appraisal process. Or perhaps it damaged the partnership in a way that will require HHM to compensate AMTAX. AMTAX's counterclaims, and its purported removal of HHM as general partner, present complicated and hotly-contested factual disputes requiring a trial.

AMTAX's Motion for Summary Judgment on the efficacy of its removal notice, and for a judgment in its favor on its Hidden Hills counterclaims is DENIED. HHM's Motion for Summary Judgment on its claim that the removal is ineffective as a matter of law, and for dismissal of the Hidden Hills counterclaims, is similarly DENIED.

**D. Parkway.**

**1. 334th effectively initiated the appraisal process, but that does not preclude its removal under the partnership agreement.**

The Parkway dispute is less complicated than the Hidden Hills dispute, but they overlap. 334th's motion seeks a declaration as a matter of law that it effectively exercised its option, and that AMTAX's subsequent effort to remove it is therefore not effective.

As it did above, the Court views these as separate questions. One is whether 334th was required to "not be in default" as a pre-condition of even attempting to exercise its unilateral

option. The second is whether that unconditional exercise precludes AMTAX from later removing 334th during the appraisal process, for later-discovered or later-committed breaches (before the buy-out is complete and the partnership is wound up).

334th also seeks summary judgment on AMTAX's Parkway counterclaims, arguing that they are time barred, that AMTAX is estopped from asserting them (because it timely received and was silent about the audited financial statements) and they are barred by the Business Judgment Rule.

AMTAX argues that the Court should imply a "no default" precondition on to the option, where it would be fundamentally unfair to permit the optionee to drive down the partnership's value and then buy it at a discount, while removing the limited partner's primary recourse— removal of the general for just that sort of breach.

As to the first issue, 334th correctly claims that the option's plain language does not place any pre-conditions[14] on its right to exercise its option. 334th relies largely on *Lakeside Mngmt., Inc. v Care Realty LLC*, 2009 WL 903818 (D. N.H. 2009)). *Lakeside* held that a tenant was entitled to exercise its option to renew despite the non- or late payment of rent, because the lessor had accepted its payments for years and was estopped from invoking those failures to prevent the option. 334th argues that, unlike the agreement there, its option was not conditioned on the absence of default.

AMTAX argues that the Court should imply the optionee's freedom from default as an additional condition on the valid exercise of the option. It argues that, whatever *Lakeside* held on its facts, under Washington law a tenant who has "chronically failed" to pay rent is not entitled to

---

[14] The option is expressly conditioned only on the property's compliance with IRS rules and the end of the compliance period. There is no dispute that these conditions were met.

exercise an option to renew the lease, because it would be "fundamentally unfair" to require the lessor to honor the exercise where the tenant was in default. *Citing Hindquarter Corp. v. Property Development Corp.*, 95 Wn.2d 809, 631 P.2d 923 (1981).

The *Hindquarter* lessor was aware its tenant was in default, and had so claimed, by the time the tenant sought to renew. AMTAX had claimed that *HHM's* conduct violated the Hidden Hills LPA, and now claims it has since discovered that 334th similarly worked to drive down the value of Parkway in an effort to purchase it on the cheap. But AMTAX did not claim 334th was in default or seek to remove 334th for failure to cure those defaults, until after the option was exercised.

334th's Motion for Summary Judgment is GRANTED to the limited extent that AMTAX's claimed "defaults" do not preclude it from exercising the option and initiating the appraisal process.

But 334th's motion for a declaration that its option exercise precluded AMTAX as a matter of law from later removing it under the LPA (based on breaches 334th committed after its notice, or which AMTAX discovered before the buyout was complete), is DENIED. The validity and efficacy of the removal will be resolved at trial.

**2. AMTAX's counterclaims and 334th's affirmative defenses present questions of fact.**

334th seeks summary judgment on AMTAX's Parkway counterclaims, arguing all are barred by the six-year limitations period applicable to written contracts, and the three-year limitations period (subject to the discovery rule) for tort claims. It also argues that AMTAX is estopped from raising these claims, because it long ago received and accepted audited financial statements which it only later scrutinized to discover allegedly unauthorized fees. It claims that some of its decisions (the alleged failure to maximize rents, specifically) by the Business Judgment Rule.

Even if they are limited by time, some of AMTAX's counterclaims are timely (and evidence of earlier misconduct may be admissible, even if it is not actionable). 334th's defenses to the counterclaims (like the counterclaims themselves) depend on the resolution of disputed facts. 334th's Motion for Summary Judgment on AMTAX's counterclaims is DENIED.

IT IS SO ORDERED.

Dated this 2nd day of May, 2019.

Ronald B. Leighton
United States District Judge