THE HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| HIDDEN HILLS MANAGEMENT, LLC, and 334TH PLACE 2001, LLC, | No. 3:17-cv-06048-RBL |
| Plaintiffs, | PLAINTIFFS' TRIAL BRIEF |
| v. | |
| AMTAX HOLDINGS 114, LLC, and AMTAX HOLDINGS 169, LLC, | |
| Defendants. | |
| AMTAX HOLDINGS 114, LLC, AMTAX HOLDINGS 169, LLC, and PARKWAY APARTMENTS, LP, | |
| Counter-Plaintiffs, | |
| v. | |
| HIDDEN HILLS MANAGEMENT, LLC, and 334TH PLACE 2001, LLC, | |
| Counter-Defendants. | |

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1                                      **I.INTRODUCTION**

2    **A.    Hidden Hills**

3          The Hidden Hills 2001, LP ("**Hidden Hills**") Limited Partnership Agreement ("**LPA**")

4    gives the general partner ("**GP**"), Hidden Hills Management, LLC ("**HHM**") the Option to buy

5    out the limited partner's ("**LP**"), AMTAX Holdings 114, LLC ("**AMTAX 114**"), "interest" in

6    the partnership after the 15-year Compliance Period.  The buyout option belongs solely to the

7    general partner ("**GP**"), HHM, after it delivered to the LP all the tax benefits offered by the low

8    income housing tax credit ("**LIHTC**") program during the Compliance Period.  It is undisputed

9    that HHM provided AMTAX notice that it was exercising its right under § 7.4.J of the LPA to

10   initiate a process to determine the Option Price.  This price was to be set by an appraisal process.

11          The Hidden Hills dispute arose, in large part, because HHM and AMTAX disagreed on

12   whether the appraisal should include the cost of cleaning up lead and arsenic contamination at

13   the property.  In its summary judgment Order, the Court determined that the appraisal process

14   was tainted by HHM and concluded that the appraisals of the LP's interest in the partnership

15   must not include a discount for environmental contamination clean-up costs.  The appraisal by

16   Cushman & Wakefield ("**C&W**") solicited by AMTAX 114 did not reduce the value of the

17   property for any environmental contamination costs.

18          Following receipt of the summary judgment Order, HHM notified AMTAX that it

19   accepted the C&W appraisal number of $19,700,000. *See* Tab A.  It then provided its calculation

20   of the price of purchasing AMTAX's interest in the partnership based on that appraised value.

21   This is known as the "waterfall" calculation under § 6.2(B) of the LPA.  On May 14, 2019,

22   HHM's counsel sent its waterfall calculation to AMTAX, which identified how HHM reached an

23   Option Price of $4,968,129.  *See* Tab B. In response, AMTAX counsel indicated that while

24   AMTAX might not now accept its own C&W appraisal as the starting point for any waterfall

25   calculation and still insisted on removal of the GP, it provided its own waterfall calculation of

26   the Option Price under § 7.4.J of $7,607,419.  *See* Tab C.  After careful review, counsel for

PLAINTIFFS' TRIAL BRIEF- 1
(Case No. 17-cv-06048-RBL)

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*

1   HHM notified AMTAX 114's counsel that it agreed with several adjustments on the waterfall

2   calculation, which is explained in the correspondence, and increased the waterfall calculation for

3   the Option Price to $5,613,907.  *See* Tab D.  HHM stated that it was prepared to finalize the

4   option exercise by paying that amount in cash, pursuant to § 7.4.J of the LPA.  *Id.*

5           At this point, therefore, the delta between HHM and AMTAX 114's waterfall

6   calculations for the Option Price is $1,993,512, due to a difference in opinion on the appropriate

7   controlling date.  Under § 7.4.J, HHM requests that the Court declare (a) that HHM has a right to

8   exercise its buy-out option, and (b) set the final Option Price per the LPA.[1]  If the Option Price

9   as set is one that can be satisfied by the GP, then the GP will pay the Option Price in cash, and

10  AMTAX will be made whole.  If the Option Price as set by this Court is one that cannot be

11  satisfied by the GP in cash, then the LP has a right, under § 7.4.K, to force a sale of its interest in

12  the partnership in the market.  In that event, the GP has a right of first refusal under § 7.4.K.

13  This ensures that the LP will be made whole by a market value purchase of its interest.

14          HHM believes, however, that AMTAX seeks not merely to be fairly compensated for its

15  interest, but rather, to have the GP removed so as to take ownership of the property.  Such a

16  result would have the effect of depriving the GP of the right to exercise the option, which was

17  agreed to given the required 15 years of hard work and funds it invested in managing the

18  property during the Compliance Period.  The LP reaped the tax benefits the GP delivered without

19  fail to the LP for 15 years.  At no time during this 15-year period did the LP claim that the GP

20  breached a fiduciary duty or engaged in conduct that required removal.  These allegations were

21  made only after the GP provided notice of its right to exercise the buy-out option.

22          HHM has managed the property for 15 years, dealing with such issues as renting units,

23  collecting rents, responding to the tenants, and maintaining and improving the buildings and

24  grounds.  AMTAX 114 was the beneficiary of investment returns and the tax credits earned

25  _____

[1] The GP recognizes that the Court may conclude that a new third appraisal is necessary.  The GP simply

26  wants to proceed to a point where the Option Price under the LPA has been set and the option can be exercised.

PLAINTIFFS' TRIAL BRIEF- 2
(Case No. 17-cv-06048-RBL)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1   during that Compliance Period, totaling $8.1 million.  HHM has earned the right at the end of the

2   15-year period to exercise its option, which it did.   The issue now is the Option Price and

3   waterfall calculation.

4        Importantly, in the Hidden Hills matter there are no allegations of mismanagement or

5   misconduct outside of the appraisal process that is the subject of this Court's summary judgment

6   ruling.  AMTAX 114 is not bringing derivative claims.  It has dropped its counterclaims for

7   damages.   Under these circumstances, AMTAX should not be allowed to seek HHM's removal

8   in an effort to block the exercise of the option.  The issue for trial should be the calculation of the

9   Option Price in light of HHM's acceptance of the C&W appraisal proffered by AMTAX 114.

10  **B.**    **Parkway**

11        The Court has already ruled that 334th Place 2001, LLC ("**334th Place**") the GP of

12   Parkway Apartments LP ("**Parkway**"), has a right under the Parkway LPA to exercise its buy-

13   out option.  As the Court stated, AMTAX Holdings 169, LLC's ("**AMTAX 169**" and with

14   AMTAX 114, "**AMTAX**") claimed defaults do not preclude 334th Place from exercising the

15   option and initiating the appraisal process.  MSJ Order at 23.  AMTAX 169 has a contractual

16   duty, and a duty of good faith and fair dealing, to provide an appraisal so the parties can

17   determine the fair market value ("**FMV**") of the property and the price of its interest in the

18   partnership.  It has no right to refuse to engage in the buyout and appraisal process.

19        Yet to date, AMTAX 169 has refused to participate in the contractually required process.

20   This refusal frustrates the parties' agreement – to allow the GP at the end of the 15-year

21   Compliance Period to exercise the option.  Ms. Tamaro will confirm what is evident from the

22   LPA: this right was fundamental to the agreement.  At the end of the Compliance Period, the GP

23   has a clear right to exercise its buy-out option, and the LP has a clear contractual obligation to

24   provide an appraisal so that the FMV of its interest can be determined.  Until that contractual

25   process is honored, the parties cannot even determine the value of AMTAX's interest.

26

PLAINTIFFS' TRIAL BRIEF- 3
(Case No. 17-cv-06048-RBL)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1    During the 15-year Compliance Period, the GP worked extremely hard, year in and year

2    out, to maintain the Parkway property, rent it, and to make capital improvements, and invested

3    its own resources in the property.  The GP's work assured that LP's investment was repaid with

4    significant returns.  The GP's work included:

- Managing the property to ensure regulatory compliance and delivery of tax credits and other tax benefits to the LP;
- Leasing the properties;
- Dealing with evictions;
- Replacing rotting decks;
- Replacing single-pane windows with double-pane windows;
- Replacing the siding, which was installed in the 1970s;
- Setting rents;
- Maintaining HUD compliance;
- Ensuring continuing compliance with the property tax exemption requirements;
- Dealing with bed bug infestations; and
- Maintaining the tax-exempt status of the municipal bonds.

Ms. Tamaro will describe this work and other work she performed for 15 years.  The LP

was aware of this work and discussed much of it during the Compliance Period.  At no time did

the LP make any claims for breach of fiduciary duty, nor did it seek the GP's removal.  The

issues about which it now complains in an effort to remove the GP and block the exercise of the

option right were the subject of annual audits that it accepted, without exception — every year.

Only after the GP exercised its right to buy out the LP after the 15-year Compliance Period, and

after reaping the economic benefits of its investment and tax credits, did it raise the specter of the

GP's removal, while refusing to participate in the option buy-out process.

334th Place was in the trenches for many years keeping the partnership viable with daily

management decisions and the infusion of millions of its own funds in the form of loans and

deferred fees owed to the GP.  Now, after the tax credits have been delivered and the option has

been exercised, AMTAX 169 contends that it should not have to provide its appraisal to set the

buy-out option price.  Instead, it now demands, for the first time, the removal of the GP based on

PLAINTIFFS' TRIAL BRIEF- 4
(Case No. 17-cv-06048-RBL)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1  work done throughout the Compliance Period.  No such demand was ever made by AMTAX for

2  15 years, while the GP delivered to AMTAX the economic benefits of its investment.

3      AMTAX's position is fundamentally unfair.  It thwarts the purpose of the buy-out option

4  and deprives the GP of the hard work it invested in the partnership.  AMTAX has enjoyed the

5  benefits of GP's work for 15 years.  The evidence will show that the vast majority of the issues

6  AMTAX raises are not "new news," and are barred by the statutes of limitations, estoppel, the

7  business judgment rule, or a combination of those rules.  If AMTAX can show any damage from

8  any of its counterclaims, it can be made whole through an award.  But it should not be permitted,

9  after enjoying 15 years of benefits, to refuse to participate in the option buy-out process.  Yet

10  that is exactly what AMTAX is doing.  The GP's clear contractual right to exercise the buy-out

11  option should be honored.

12                        **II.FACTS TO BE PROVEN AT TRIAL**

13      Hidden Hills owns the Hidden Hills apartment complex located in University Place.

14  Parkway owns the Parkway apartment complex located in Federal Way.  HHM and 334th Place

15  are the GPs of Hidden Hills and Parkway.   Catherine Tamaro is the principal of each GP and has

16  managed the partnerships for 17 years.  Ms. Tamaro first purchased a low-income housing

17  property in 1996, the Westside Estates Apartments, a 448-unit property located on N. Pearl

18  Street in Tacoma.  She currently owns and manages nine complexes totaling over 1,300

19  affordable housing units in south King County and Pierce County.  Three of her properties are

20  owned in partnership with the Tacoma Housing Authority and receive direct subsidy from the

21  U.S. Department of Housing and Urban Development ("**HUD**").  Another of her housing

22  projects involved the renovation of a vacant building in the Stadium District into an elderly and

23  disabled project, financed in part by loans from the City of Tacoma.  Ms. Tamaro has served as

24  the GP with LP investors in 15 properties since she first purchased a low-income housing

25  property in 1996.  This litigation is the first time an LP has ever sought removal or accused her

26  of breaching any duty to the partnership or LP.

PLAINTIFFS' TRIAL BRIEF- 5
(Case No. 17-cv-06048-RBL)

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*

1     Defendants AMTAX 114 and AMTAX 169 are the LPs of Hidden Hills and Parkway.

2  AMTAX is currently managed by Alden Torch Financial LLC ("**Alden Torch**"), a syndicator of

3  federal low-income housing tax credits for investors in AMTAX funds.  The firm is based in

4  Denver, and it is the largest affordable housing asset management firm in the industry.  Alden

5  Torch purchased an interest in the LPs of Parkway and Hidden Hills in the secondary market in

6  2011.  Alden Torch was not involved in the original structuring or financing of these projects.

7  The original investor invested in these partnerships in 2002 to harvest the LIHTC provided by

8  the federal government to encourage private investment in low income housing programs.  As

9  LIHTC properties, they are regulated by federal and state agencies, including HUD, the IRS, and

10  the Washington State Housing Finance Commission ("**WSHFC**").

11     Each partnership has a 15-year Compliance Period, which is when the tax credits are

12  earned and retained.  A central responsibility of the GPs under the LPAs is to ensure that the

13  underlying properties remained in compliance with the federal tax code so that AMTAX could

14  continue to reap the tax benefits during the Compliance Period.  There is no dispute that the GPs

15  delivered all the tax credits to which the LPs were entitled.  In Hidden Hills, over the 15-year

16  Compliance Period, AMTAX 114 received over $8.1 million in federal tax credits and write-offs,

17  in exchange for an upfront investment of $3.6 million.  In Parkway, AMTAX 169 contributed

18  $2.8 million in equity and received over $7.2 million in federal tax credits and write-offs over the

19  15-year Compliance Period.  For Hidden Hills, the Compliance Period ended on December 31,

20  2016.  For Parkway, the Compliance Period ended on December 31, 2017.

21     For a two-year period after the Compliance Period ends, the GPs have a right to purchase

22  the LPs' interest in the partnerships pursuant to § 7.4.J.  The LPs have no such reciprocal right.

23  The provision in each LPA states: "Subject to compliance with Section 42 of the Code and the

24  rules of the agency, upon completion of the Compliance Period, the Managing General Partner

25  shall have the option (the "Option") to purchase the interest of the Investor Limited partner . . ."

26  The Option Price is calculated pursuant to an appraisal process used to determine the underlying

PLAINTIFFS' TRIAL BRIEF- 6
(Case No. 17-cv-06048-RBL)

101974651.3 0009368-00002

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1    properties' FMV: "Fair Market Value shall be determined by two independent MAI appraisers:

2    one selected by the Managing General Partner and one by the Investor Limited Partner.  If such

3    appraisers are unable to agree on the value, they shall jointly appoint a third independent MAI

4    appraiser whose determination shall be final and binding." [2]

5    **A.    Hidden Hills**

6          The Hidden Hills property is located in University Place.  It was built in 1984 and has

7    216 units.  It was in the plume of the ASARCO smelter.  In 1998, Tacoma Water selected the

8    property as one of its test sites, and the soil tested for high levels of arsenic and lead.  Shortly

9    thereafter, the Washington Department of Ecology listed the property on its "Confirmed and

10   Suspected Contaminated Sites List," where it remains to date.   HHM exercised its option on

11   March 14, 2017, and selected CBRE as its appraiser to determine FMV.  After taking into

12   account the estimated costs of remediating the environmental contamination, CBRE valued the

13   property at $14,050,000.  AMTAX 114 selected C&W as its appraiser.  C&W did not discount

14   the value of the property based on the environmental contamination on the property site.  It

15   valued the property at $19,700,000.  A third appraisal was issued by Colliers International

16   Valuation & Advisory Services ("**Colliers**").  After taking into account the estimated costs of

17   remediating the environmental contamination, Colliers valued the property at $13,500,000.

18         HHM brought suit in state court in November 2017 seeking a declaration that the Colliers

19   appraisal was "final and binding" under the LPA and that AMTAX must proceed with a buyout

20   based on the FMV from the appraisal report.  AMTAX removed the case to this Court and

21   counterclaimed, seeking, among other things, a declaration that HHM was validly removed from

22   the partnership and the third appraisal is not "final and binding" under the LPA.  The parties

23   briefed cross motions for summary judgment.  On May 2, 2019, this Court granted in part

24   AMTAX 114's motion, ruling the Colliers appraisal was not final and binding, "[a]ny future,

25

26         [2] The Option Price is set by applying a distribution waterfall under § 6.2(B) of the LPAs.

PLAINTIFFS' TRIAL BRIEF- 7
(Case No. 17-cv-06048-RBL)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1  third, independent, final and binding appraisal will be conducted without reference  to the

2  contamination, and without reference to EPI's various estimates," and that "[t]he corrective for

3  the tainted appraisal maybe as simple as re-doing the appraisal process." Order at 15, 18-19, 21.

4       After review and consideration of the Court's Order, HHM sent a letter to AMTAX 114

5  dated May 7, 2019, accepting in writing the C&W appraisal as the basis for calculating the FMV

6  of AMTAX 114's interest.  Tab A.  HHM's proposed Option Price after calculating the

7  distribution waterfall based on the C&W appraisal was $4,968,506.  The parties have since

8  corresponded regarding the appropriate calculations for the waterfall.  Tabs B-D.  HHM has

9  adjusted its calculations, arriving at an Option Price of $5,613,907.  AMTAX 114's calculated

10  Option Price is currently $7,607,419, with a difference of $1,993,512.

11      Although AMTAX 114 is participating in the conversation regarding the Option Price

12  calculations, it maintainins that it will proceed to trial on the issue of whether HHM should be

13  removed.  AMTAX 114 has never asserted derivative claims and has recently dropped its

14  remaining damage claims for breach of contract and breach of fiduciary duty as a result of this

15  Court's summary judgment order and HHM's acceptance of the C&W appraisal.

16  **B.    Parkway**

17      **1)    Parkway's Background and Management**

18      The Parkway Apartments are in Federal Way.  Built in 1975, it is a 208-unit multifamily

19  community consisting of 19 two-story buildings, one community building, and one

20  maintenance/laundry building.  In 2002, the property was acquired by Parkway and after

21  renovation was placed in the LIHTC program, which requires that most units be rented to

22  individuals and families below a certain income level.  Ms. Tamaro participated in the

23  acquisition and conversion of Parkway to the LIHTC program and has served as the principal of

24  334th Place, Parkway's GP, since the partnership's inception.

25      Under § 7.3 of LPA, the GP has sole responsibility and the "exclusive right" to manage

26  Parkway's business.  The GP's primary duties include maintaining the partnership's regulatory

PLAINTIFFS' TRIAL BRIEF- 8
(Case No. 17-cv-06048-RBL)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1  compliance and delivering LIHTC credits to the LP.  There is no dispute that 334th Place has

2  maintained compliance and delivered full tax credits to AMTAX 169 during the 15-year

3  Compliance Period.  AMTAX 169's present complaints involve matters within the discretion of

4  a managing partner, including:

5
- The way in which the GP dealt with bed bugs;
- The setting of rents;
6
- The GP's decision to replace rotting decks;
- The GP's decision to replace certain windows; and
7
- The GP's efforts to comply with HUD and other agency requirements.

8      The GP must exercise its "best efforts" in carrying out its duties. § 7.4(A).  Under §

9  7.7(A), the GPs are insulated from any liability for any loss suffered by the partnership that

10  "arises out of any action or inaction of such General Partner . . . if that General Partner . . . in

11  good faith, determined that such course of conduct was in the best interests of the Partnership

12  and such course of conduct did not constitute negligence or misconduct . . . ."  Under the LPA,

13  the LP's oversight role is limited to specified consent rights, as well as the review and

14  acceptance of the annual audited financial statements that the partnership must provide to

15  AMTAX and HUD.  334th Place caused the partnership's audited financial statements to be

16  submitted to the regulator and to AMTAX 169 every year during the Compliance Period.

17      **2)      HUD Encourages 334th Place to Refinance the Partnership's Loan**

18      Parkway is financed by a HUD-insured loan, which was entered into in 2002 and

19  refinanced in 2015.  Under § 13.11 of the LPA, the HUD project documents are senior to the

20  LPA.  There are also federal regulations governing the condition of properties financed through

21  HUD insured loans, known as the Uniform Physical Condition Standards.  These collectively

22  require and ensure that HUD-insured properties are kept in "good repair."  24 C.F.R. § 5.703.

23  HUD ensures compliance through its Real Estate Inspection Center (REAC), which inspects

24  projects every one, two, or three years depending on how well they score.  HUD also requires a

25  capital needs assessment to be submitted every 10 years.  An independent assessment of

26  Parkway required by HUD was prepared in May 2014; the report estimated that the property

PLAINTIFFS' TRIAL BRIEF- 9
(Case No. 17-cv-06048-RBL)

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*

1    would require over $2 million in needed repairs in the next 10 years, including asphalt

2    resurfacing ($135,000), exterior siding replacement ($256,000), windows replacement

3    ($129,000), sliding doors replacement ($104,000), and roof replacement ($300,000).

4         In 2014, to free up cash for these repairs, HUD encouraged Parkway to refinance its loan

5    at a lower rate.  The HUD Project Manager emailed AMTAX representatives to encourage them

6    to agree to the refinancing, stating: "though the property has been plagued by certain financial

7    performance issues, I believe Catherine [Tamaro] has made drastic improvements to its physical

8    condition and management."  AMTAX ultimately agreed, and the refinance was closed on

9    February 25, 2015.  As a condition of the new loan, guaranteed by HUD, the partnership set

10   aside $516,000 in reserves for the repairs, and had to deposit $104,000 annually towards repairs.

11        To keep the partnership solvent and continue delivering tax credits to the LP throughout

12   the years, 334th Place loaned over $1.3 million to Parkway and deferred payment on almost $1.1

13   million of reimbursable payroll expenditures and management fees that have been carried on the

14   books as accounts payable owed to the GP, totalling $2.4 million.  These advances and deferred

15   fees benefitted Parkway – and AMTAX.  In seeking approval for the refinance, AMTAX 169

16   acknowledged: "The GP has not been able to raise rents to improve cash flow and has been

17   funding the deficits by deferring payroll from the affiliated management company."  The

18   advances by 334th Place and deferred management fees owed to its affiliates were also disclosed

19   in the partnership's audited financial statements.

20        **3)     AMTAX Scrutinizes the Audited Financial Statements in Connection with a
             Potential Voluntary Buyout of Its Interests in 2014, and Concludes the**
21        **Voluntary Buyout Could Proceed**

22        AMTAX 169's asset manager, Gary Newbold, was Alden Torch's primary point of

23   contact for 334th Place and Ms. Tamaro.  He served in that role from 2013 until he left Alden

24   Torch in 2016.  Mr. Newbold's role was to monitor AMTAX's investment and the work done by

25   the GP.  He received, reviewed, and accepted Parkway's annual audited financial statements

26

PLAINTIFFS' TRIAL BRIEF- 10
(Case No. 17-cv-06048-RBL)

1   every year, as well as additional financial reports, such as monthly rent rolls, and financial

2   statements, and yearly budgets.  He personally visited the Parkway property and was well aware

3   of its condition and the ongoing repairs.  He was also provided with a copy of HUD's capital

4   needs assessment outlining the needed repairs.  Whenever Mr. Newbold questioned a particular

5   fee or expense, Ms. Tamaro provided a full explanation to his satisfaction.  Since he left Alden

6   Torch, the new asset manager has never raised any issues of mismanagement or unauthorized

7   fees.  Until this litigation, AMTAX never challenged or questioned the accuracy of Parkway's

8   audited financial statements.

9          In December 2013, Ms. Tamaro proposed buying out the LP's interest.  The proposal

10  prompted AMTAX to scrutinize the Parkway audited financial statements, the setting of rents,

11  fees, and expenses, and the work being done on the property.  Mr. Newbold and Chris Blake,

12  Alden Torch's Director of Capital Transactions and AMTAX's 30(b)(6) representative,

13  conducted the due diligence and negotiated a potential buyout with Ms. Tamaro.  In the spring

14  2014, Mr. Newbold and Mr. Blake instructed John Thomas, an Alden Torch accountant, to give

15  "priority" to reviewing the partnership's 2013 audited financial statements.  After that review,

16  and after asking Ms. Tamaro a series of pointed questions regarding the same fees that are at

17  issue in this case, the repairs, and the setting of rental rates (all of which Ms. Tamaro answered),

18  Mr. Blake informed her that AMTAX 169 was "on the same page with respect to the [2013]

19  audit" and authorized proceeding with the buyout.  The 2014 voluntary buyout ultimately fell

20  through because the partners could not come to terms on price; however, they agreed to restart

21  negotiations when the GP's option matured in January 2018.  The voluntary buy-out price and

22  the Option Price under the LPA are calculated based on the same LPA waterfall formula.

23      **4)     In Response to the Hidden Hills Litigation, AMTAX 169 Scrutinizes the
              Same Audited Financial Statements Again and Concludes the Mandatory**
24      **Buyout Cannot Proceed**

25

26

PLAINTIFFS' TRIAL BRIEF- 11
(Case No. 17-cv-06048-RBL)

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*

In December 2017, in response to the Hidden Hills litigation, Mr. Blake put into practice Alden Torch's policy of scrutinizing any other entities that share common principals with HHM. He instructed two Alden Torch forensic accountants to do a "deep dive" into Parkway's audited financial statements dating back to 2002, nine years before Alden Torch had any involvement in Parkway. He pointed out as "problematic" similar audit notes as to which he was "on the same page" when negotiating the voluntary buyout in 2014.

The "deep dive" task was assigned to two forensic accountants, including John Thomas. This time, the accountants were not "on the same page" with the audits and instead generated a list of "unauthorized" fees and expenses – based on their review of the same audited financial statements. This list of allegedly "unauthorized" fees and expenses totaling approximately $1.5 million now forms the primary basis for AMTAX's counterclaims in Parkway.

**5)      AMTAX 169 Refuses to Proceed with the Parkway Buy-Out Option Process**

The GP's buy-out option matured on January 1, 2018. 334th Place exercised its option two days later. Alden Torch did not respond until March 6, 2018.  It stated it was in the "process of evaluating questionable activity by 334th Place" and that it would address the "request" to move forward with the appraisal process once it completed the review.  334th Place responded the next day, providing the appraisal and stating that it was ready to provide any additional financial information AMTAX may request.  AMTAX 169 again went silent for months.

On May 8, 2018, 334th Place sought to supplement the complaint seeking declaratory relief requiring AMTAX 169 to participate in good faith in the Parkway buyout.  In response, AMTAX 169 accused 334th Place of mismanagement and contended that unspecified fees owed to 334th Place were "unauthorized."  The letter stated AMTAX 169 would not move forward with the buy-out process unless 334th Place gave up $2.7 million in accounts payable to it.[3]  This

---

[3] The $2.7 million represented funds that 334th Place, through Ms. Tamaro, had advanced to Parkway over the 15-year Compliance Period.  These advances kept Parkway operating and ensured that AMTAX 169 continued to receive the tax credits, and were reflected in the  annual audited financial statements as   amounts due and owing to the GP.

PLAINTIFFS' TRIAL BRIEF- 12
(Case No. 17-cv-06048-RBL)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1  Court granted HHM's motion to amend the complaint by adding the Parkway dispute.  AMTAX

2  169 counterclaimed in July 2018 for damages and removal.  AMTAX 169 also sent 334th Place

3  a second letter, purporting to remove it as the GP pursuant to § 4.5(A)(iv)(2) of the LPA.

4      The counterclaims assert six causes of action: (1) breach of contract, (2) breach of

5  fiduciary duty, (3) a declaratory judgment that 334th Place should be removed as the GP, (4)

6  conversion, (5) unjust enrichment, and (6) a declaratory judgment that 334th Place has no buy-

7  out option pursuant to § 7.4.J.  All of these claims are different labels for the same theories of

8  liability: AMTAX 114 challenges 334th Place's managerial decisions with respect to (1) the

9  setting of rents; (2) certain fees and expenses accrued in connection with the management of the

10  partnerships and the properties; and (3) "unnecessary" repair work throughout the years.

11      **6)      The Rents**

12      AMTAX 169 contends it and/or Parkway was damaged because 334th Place did not

13  sufficiently raise rents at the Parkway apartments over the years.  334th Place demonstrated at

14  trial, through rent rolls that were submitted to AMTAX every month, that the rents were in fact

15  raised consistently every year from 2012, and are currently at allowable levels under LIHTC and

16  tax-exempt bond, and the low income property tax exemption regulations.

17      Parkway's rents, which are derived from the King County Median Income published

18  annually by HUD, increased as follows:

|  | King County HUD Median Income | Parkway Rent 1BR Unit | Parkway Rent 2BR Unit |
|---|---|---|---|
| January 1, 2012 | $86,800 | $615 | $745 |
| December 31, 2017 | $96,000 | $800 | $950 |
| Percent Increase 2012 through 2017 | 10.6% | 30.1% | 27.5% |

23  Ms. Tamaro balanced a number of factors in setting rents based on her understanding of the

24  property's location, its low income tenants, its multiple regulatory agreements, and the rents

25  Parkway could reasonably command.

26

PLAINTIFFS' TRIAL BRIEF- 13
(Case No. 17-cv-06048-RBL)

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*

1    **7)    The Fees**

2    AMTAX challenges the following categories of fees and expenses, all of which are

3    related to the management of the partnership.  They include: (1) nonprofit managing GP fees,

4    which were first incurred in 2007; (2) developer fees and interest, which were incurred in 2009;

5    (3) project management fees, which were first incurred in 2004; (4) repair supervision fees,

6    which were first incurred in 2010; (5) construction costs, which were incurred in 2003; (6) tenant

7    file review fees, which were first incurred in 2010; (7) bookkeeping fees, which were first

8    incurred in 2011; (8) a rent subsidy for staff housing, which was first incurred in 2013; (9) legal,

9    extermination, and engineering survey fees to an affiliate, which were first incurred in 2014; (10)

10   "miscellaneous fees," which were first incurred in 2003; and (11) asset management fees to

11   AMTAX that it alleges were "underpaid" beginning in 2002.

12   <u>Managing GP Fee</u>.  On her own initiative, Ms. Tamaro recruited Hearthstone Housing

13   Foundation to become a co-GP in the partnership and gave up one-half of her GP interest

14   voluntarily.  Hearthstone's duties include filing an application annually with the Washington

15   Department of Revenue ("**DOR**") for a low-income housing property tax exemption.  Because

16   the partnership's cash flow was insufficient to pay Hearthstone's fee, 334th Place advanced

17   funds annually to cover it.  Coco Vasquez, Executive Director, told Ms. Tamaro that Hearthstone

18   would not stay in the partnership if it did not receive its fee timely.   Hearthstone's fees through

19   2017 totaled $98,479, while the value of the property tax exemption was $1.67 million.  This

20   financial benefit flowed to the partnership and to AMTAX 169.  These fees, paid to Hearthstone

21   through advances made by 334th Place, were disclosed in the partnership's audited financial

22   statements and HUD financial filings each year they were incurred.

23   <u>Developer Fees and Interest.</u>  The parties do not dispute that the deferred developer fees

24   ("**DDF**") were earned by and owed to the GP pursuant to a "Development Agreement" dated

25   June 1, 2002.  Instead, AMTAX 169 contends that the partnership applied its 2009 capital

26

PLAINTIFFS' TRIAL BRIEF- 14
(Case No. 17-cv-06048-RBL)

1   contribution to invoices in the wrong order, so that a portion of 334th Place's developer fee was

2   paid when other invoices had higher priority.[4]  334th Place does not dispute this fact.  Had the

3   error been noticed in 2009, 334th Place could have made a simple accounting adjustment.

4   Plaintiffs' expert, Lorraine Barrick, will testify that this error made no net economic difference to

5   the partnership, and in fact may have resulted in a net benefit since the interest accrued on this

6   fee was underbilled.  These fees were disclosed in the partnership's audited financial statements

7   and HUD financial filings each year they were incurred.

8       Project Management Fees.  Ms. Tamaro also handles the management of the apartment

9   complex (as opposed to the partnership) through an affiliated entity, Trieste Holdings, LLC.  The

10  LPA provides that the Management Agent, Trieste Holdings, is entitled to a fee of 4% of net

11  rental income, known as a Project Management Fee.  334th Place acknowledges that there were

12  certain overcharges (as well as some undercharges) between 2002 and 2017 with respect to the

13  Project Management Fee.  In 2012, Property Management Fees were erroneously accrued at

14  10%.  The evidence at trial demonstrated, however, that AMTAX 169 identified this issue at the

15  time, and it was corrected by 334th Place in the 2013 audited financial statements.  In total,

16  approximately $59,814 in Project Management Fees were overcharged between 2002 and 2017.

17  These fees were disclosed in the partnership's audited financial statements and HUD financial

18  filings each year they were incurred.  AMTAX 169 has never taken any steps to remove Trieste

19  as the managing agent under the LPA.

20      Repair Supervision Fees.  Trieste Holdings utilized its general contractor license and its

21  journeyman carpenters to supervise, plan, and perform capital repairs at Parkway Apartments.

22  Trieste Holdings was responsible for obtaining the required building permits, and the work

23  undertaken went beyond carpentry, including form work, framing, and exterior finish.  Trieste

24  _____

25      [4] AMTAX 169 also makes two arguments pertaining to interest on the DDF: (1) accrued interest on the
    DDF should have been contributed as capital and (2) interest should have stopped accruing in 2012, not 2013.  The
26  GP's expert will address these issues during trial.

PLAINTIFFS' TRIAL BRIEF- 15
(Case No. 17-cv-06048-RBL)

1   Holdings' carpenters rebuilt 104 second-story balconies, many of which had dry rot; they re-

2   roofed and insulated five buildings (out of 22); they replaced the single-pane windows and doors

3   in 190 units, thereby making the units more energy-efficient and less prone to mold and dry rot;

4   and they are in the process of replacing building siding, much of which is either dry-rotted or has

5   allowed water intrusion.  AMTAX contends that planning for and supervising of this work and

6   taking out building permits under its contractor license should have been included in the 4%

7   Property Management Fee.  But if Trieste did not do this work, the partnership would have had

8   to hire an outside general contractor, which certainly would have charged a repair supervision

9   fee plus a percentage of materials. Trieste is licensed and bonded and its repair supervision fees

10  were fair and reasonable.  These fees were disclosed in the partnership's audited financial

11  statements and HUD financial filings each year they were incurred.

12       _Extermination Services._  North Pearl Street, LP, an affiliate of 334th Place and the owner

13  of Westside Estates Apartments in Tacoma, began exterminating bed bugs with heat instead of

14  insecticides.   HUD encourages heat treatment for infested units if possible.  North Pearl Street

15  charges $1,200 to treat an infested unit at Parkway, which is competitive with the few

16  commercial exterminators that offer this service.  A total of six units were treated by this method.

17  AMTAX contends the fees to treat bed bugs were "unreasonably high" but has no evidence to

18  support this claim.  These fees were disclosed in the partnership's audited financial statements

19  and HUD financial filings each year they were incurred.

20       _Construction Costs_.  In May 2002 the partnership executed a contract for construction

21  services with an affiliate of 334th Place; the contract was then re-executed on June 12, 2002.

22  AMTAX 169 did not enter the partnership until 10 days later.  A portion of the construction

23  contract was unpaid at the end of renovation; this unpaid portion was accrued as a partnership

24  liability in the 2003 audited financial statement and was referenced in the notes of every annual

25  audit of Parkway until 2014, when it was paid.  AMTAX 169 now objects to an obligation that

26  was disclosed in 12 consecutive audited financial statements and HUD financial filings.

PLAINTIFFS' TRIAL BRIEF- 16
(Case No. 17-cv-06048-RBL)

1      Tenant File Review Fee.  The LPA states that 334th Place must ensure compliance with

2      Internal Revenue Code §§ 42 and 142.  The LPA does not address 334th Place's role in

3      maintaining compliance with RCW 84.36.560/WAC 458-16-550, to maintain the Washington

4      real property tax exemption.  334th Place charged the partnership a monthly fee of $3.00/unit to

5      partially reimburse Trieste Holdings for the salary of the highly trained employee who managed

6      all this compliance.  Trieste Holdings' compliance supervisor reviewed all the paperwork of the

7      on-site employees, she attended regular compliance training, and she prepared and filed all the

8      reporting required by the IRS, HUD, WSHFC, and the DOR.  Many affordable housing

9      partnerships employ outside consultants to perform program compliance or double-check the

10     GP's work.  These fees were disclosed in the partnership's audited financial statements and HUD

11     financial filings each year they were incurred.

12         Bookkeeping Fees.  "Bookkeeping fees" is defined in HUD Handbook 4381.5.  Trieste

13     Holdings has never charged for payroll processing, because it was never done in-house.  In 2011-

14     2013, Trieste Holdings used the services of ADP Payroll; ADP charged all payroll processing

15     fees to a central account in the name of Trieste Holdings, which then submitted bi-weekly

16     invoices to the partnership for reimbursement, in accordance with the terms of the Property

17     Management Agreement.  In 2014 Trieste Holdings switched to Paychex, which deducted

18     payroll processing fees directly from Parkway's operating account.  No monies except the direct

19     reimbursements in 2011-2013 have ever been paid to Trieste Holdings as "bookkeeping fees."

20     The reimbursements were disclosed in the partnership's audited financial statements and HUD

21     financial filings each year they were incurred.

22         Rent Subsidy.  To have staff available after hours and in emergencies, Parkway discounts

23     the rent of its personnel who live on-site.  An independent contractor with a large family serving

24     as a member of Parkway's staff moved to a small dwelling next door to Parkway.  That dwelling

25     is owned by an affiliate of 334th Place.  Parkway subsidized her rent in the new dwelling by the

26     same amount as it had subsidized her apartment rent.  Her move resulted in no net benefit or loss

PLAINTIFFS' TRIAL BRIEF- 17
(Case No. 17-cv-06048-RBL)

1   to the partnership:  although Parkway paid a rent subsidy to an affiliated landlord, the subsidy

2   was recouped because her vacated unit could now be rented at the full, non-discounted rent.  This

3   independent contractor is bilingual, and her translation services are important in communicating

4   with Parkway's non-English-speaking residents.  These rent payments were disclosed in the

5   partnership's audited financial statements and HUD financial filings each year they were

6   incurred.

7        Work by Steven Arterberry.  Since 2014, Ms. Tamaro's husband, Steven Arterberry, has

8   done occasional work for the partnership and the property.  He is licensed in Washington as an

9   attorney and a professional engineer and provided certain services to the partnership within his

10  expertise for reasonable market rates.  These fees were disclosed in the partnership's audited

11  financial statements and HUD financial filings each year they were incurred.

12       Miscellaneous Expenses.  In 2003, a $17,000 charitable contribution was paid to Tacoma

13  Area Coalition for Individuals with Disabilities ("**TACID**").  The partnership made a

14  commitment to pay TACID in its January 10, 2002 application to the WSHFC for tax exempt

15  bonds.  AMTAX 169 deducted this charitable contribution from its taxes in 2003.  It now claims

16  that this charitable contribution should not have been paid, and therefore must be repaid to the

17  partnership and AMTAX 169.  AMTAX has also claimed damages associated with a $17,562

18  "payment" in 2005 and a $16,411 "payment" in 2016, but provided no evidence supporting or

19  explaining these claimed damages.

20       Asset Management Fees.  Alden Torch receives its own fee from Parkway for its role in

21  managing the LP's passive investment.  334th Place always timely paid the invoices that Alden

22  Torch sent for these fees.  Alden Torch now takes the position that the invoices it created and

23  sent were not high enough, and as a result, 334th Place should be liable for damages for paying

24  the invoices that Alden Torch sent.  These fees were disclosed in the partnership's audited

25  financial statements and HUD financial filings each year they were incurred.  According to HUD

26  financial filings, AMTAX 169 appears to have corrected its own billing errors in 2005.

PLAINTIFFS' TRIAL BRIEF- 18
(Case No. 17-cv-06048-RBL)

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1

    **8)**      **Property Repairs**

2        In 2002 Parkway spent over $1.6 million on renovations, but not all building components

3    were addressed at the time.  Ten years later, the property was facing a further need for capital

4    expenditures.  In 2014, Parkway replaced all its remaining single-pane windows and sliders with

5    double-pane glass and received a $120,000 energy conservation rebate from Puget Sound

6    Energy. In that same year, Parkway replaced five failed roofs and its obsolete trash compactor to

7    comply with Federal Way's surface water management regulations.  In 2015-2016, Parkway

8    replaced all 104 sets of second-story wooden balcony railings, many of which exhibited signs of

9    dry rot, with safer and more weather-resistant aluminum railings.  In 2016, Parkway resurfaced

10    all its asphalt and rebuilt its hazardous broken sidewalks.  In 2017, Parkway began replacing its

11    dry-rotted T-111 building siding with a pre-painted, weather-resistant product, a project that is

12    about halfway to completion.  AMTAX 169 now claims that all of these repairs were

13    "unnecessary" and have "damaged" the partnership.  Excluding the trash compactor, all of these

14    repairs and replacements were identified in HUD's 2014 capital needs assessment as needing

15    repair or replacement in the next decade.  HUD adjusted the property's reserve deposit so that

16    renovation funds would be available, and Parkway's refinance of its HUD loan resulted in

17    interest savings of over $20,000 per month.  The monthly reserve deposits and interest savings

18    provided the primary sources of funds for the renovation work.

19    **9)**      **2018 Audited Financial Statements**

20        Laura Lindal is a sole proprietor CPA who has served as the independent auditor for

21    Parkway and Hidden Hills since 2016.  She will testify as to the partnerships' auditing process

22    and opinion that the audited financial statements fairly and accurately present the financial

23    picture of the partnerships in all respects.  Ms. Lindal and all the partnerships' auditors before

24    her timely delivered the audited financial statements to the LP every year since the partnerships'

25    inceptions in 2002.  For the first time in 2019, there has been a delay in finalizing the audits.

26

PLAINTIFFS' TRIAL BRIEF- 19
(Case No. 17-cv-06048-RBL)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1    In February 2019, AMTAX's expert testified that he believed the Parkway audits were

2    "materially misstated," a very serious allegation against the auditor.  The standards for an auditor

3    require that the audit is planned and performed to "obtain reasonable assurance about whether

4    the financial statements are free of material misstatement."  Upon learning of AMTAX's

5    position, Ms. Lindal notified the counsel provided by her insurer.  She was unable to issue her

6    independent auditor's opinions and on the advice of counsel, she withdrew as the auditor for

7    each partnership.  The GPs have provided AMTAX with the draft 2018 financial statements and

8    final 2018 HUD financial filing that Ms. Lindal completed before she withdrew and have since

9    attempted to retain a new accounting firm to start all over again with the 2018 audits.  AMTAX

10   seeks to have the GPs removed for a failure to timely provide an independent auditor's opinions.

11                                  **III. ARGUMENT**

12   **A.    Hidden Hills**

13           During trial, AMTAX 114 did not pursue its First and Second Counterclaims for Relief:

14   Breach of Contract and Breach of Fiduciary Duty.  AMTAX 114 has also not asserted any

15   derivative claims for damages on behalf of the Hidden Hills partnership.  As a result, AMTAX

16   114's First and Second Counterclaims should be dismissed with prejudice.

17           As this Court has recognized, HHM has a right under § 7.4.J of the Hidden Hills LPA to

18   buy out AMTAX 114's interest in the partnership by exercising its option.  There is no dispute

19   that all conditions precedent for the exercise of the option have been met, and the option has

20   been validly exercised as a matter of law.  Section 7.4.J sets forth an appraisal process that is

21   used to determine the "Option Price" at which HHM can exercise its buy-out option.  On May 2,

22   2019, the Court ruled that under § 7.4.J, the appraisal process used to set the Option Price was

23   "tainted . . . as a matter of law."  Order at 15.  The Court further stated that "[t]he corrective for

24   the tainted appraisal may be as simple as re-doing the appraisal process."  Order at 21.

25           To correct the appraisal process and comply with the Court's order, on May 7, 2019,

26   HHM accepted the C&W appraisal report solicited by AMTAX 114 as the basis for calculating

PLAINTIFFS' TRIAL BRIEF- 20
(Case No. 17-cv-06048-RBL)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1   the FMV of AMTAX 114's interest. Tab A. Accepting C&W's appraisal, which did not discount

2   the property's value based on the environmental contamination costs, should cure the "taint"

3   identified by the Court in its Order on the parties' cross motions for summary judgment. HHM's

4   Option Price after calculating the distribution waterfall based on the C&W appraisal was

5   $4,968,506.  The parties have since corresponded regarding the appropriate calculations for the

6   waterfall.  Tabs B-D.   During that correspondence, HHM adjusted its calculations, arriving at an

7   Option Price of $5,613,907.  AMTAX 114's calculated Option Price is currently $7,607,419.

8          The remaining disagreement in price relates to an issue of timing: whether the FMV

9   should be as of the date of the option exercise or today.  Under § 7.4.J, the option is exercised as

10   of the date the GP notifies the LP of its exercise.  Here, that was on March 14, 2017. Case law

11   holds that when exercising an option to purchase, where the price is determined through an

12   appraisal process as it is here, the FMV of the option price should be valued as of the date of the

13   option exercise.  *See, e.g.*, *Nichols v. Glickman*, 156 F. Supp.2d 1173, 1179 (D. Or. 2001)

14   (affirming the hearing officer's holding "that the proper valuation date for the property was May

15   14, 1998, the date on which plaintiffs gave formal written notice of their intent to exercise the

16   option"); *Pridgen v. Wagoner*, No. 57921-5-I, 2007 WL 1181008, at *3 (Wash. Ct. App. Apr.

17   23, 2007) (unpublished) ("[I]t would not be reasonable to interpret the option agreement in this

18   case to allow the sales price of the property to be determined using its market value 10 months

19   after Pridgen exercised the option."); *LaMore Rest. Grp., LLC v. Akers*, 748 N.W.2d 756, 766

20   (S.D. 2008) ("We find there was a sufficient basis for the trial court to interpret the contract as

21   requiring the first and third appraisers to use April 27, 2005, effectively the date the option was

22   exercised, as their date of valuation.").[5]

23   _____

24         [5] These cases apply to the date of valuation for appraisals, but the same rationale applies to the date of the
    waterfall calculations, which is a similar valuation exercise.  For example, RCW 82.45.010 defines a sale for the
25   purposes of Washington code governing excise taxes, and states that for making determinations under this chapter,
    "the date upon which the option is exercised is the date of the transfer or acquisition of the controlling interest."
26   RCW 82.45.010(2)(b).  The same should be true for the date of the waterfall calculations.

PLAINTIFFS' TRIAL BRIEF- 21
(Case No. 17-cv-06048-RBL)

1        Where HHM has accepted AMTAX 114's own appraisal and there are few issues

2    remaining to reach a fair Option Price under § 7.4.J, removal would be fundamentally unfair.

3    AMTAX 114 lacks any derivative claims on behalf of the partnership, and it is not pursuing

4    damages claims.  Given HHM's acceptance of the C&W appraisal, it cannot establish any

5    reasonable expectation of an "economic detriment to the partnership or the Project" that would

6    provide grounds for HHM's removal.  *See Senior Hous. Assist. Grp. v. AMTAX*, 2019 WL

7    687837, at *10 (W.D. Wash. Feb. 19, 2019) (finding in similar case interpreting similar LPA that

8    removal requires actual proof of damages).  HHM's right to purchase AMTAX 114's interest in

9    the partnership should be honored and AMTAX 114's removal counterclaim denied. [6]

10   **B.    Parkway**

11        **1)    The Option Was Validly Exercised, AMTAX Must Proceed with the
           Appraisal Process to Complete the Buyout, and 334th Place Should Not Be
12         Removed**

13        Under well settled principles of Washington law, "the optioner may not withdraw the

14   option or make its exercise more difficult during the agreed term of the option."  *Barnett v.*

15   *Buchan Baking Co.*, 45 Wn. App. 152, 160 (1986).  For its value to be preserved, the option must

16   be protected from interference.  Thus, "[d]uring the agreed term of [the] option, [the optionee]

17   has a right that the option giver shall not repudiate or make performance impossible or more

18   difficult . . . .." *McFerran v. Heroux*, 44 Wn. 2d 631, 638 (1954).

19        334th Place has a right to buy out AMTAX 169's interest in the partnership through the

20   exercise of its option.  All conditions precedent for the exercise of the option have been met, and

21   the option has been validly exercised as a matter of law.  As this Court previously ruled,

22   "AMTAX's claimed 'defaults' do not preclude [334th Place] from exercising the option and

23   initiating the appraisal process."  MSJ Order at 23.  AMTAX 169 will fail to demonstrate at trial

24

25   _____

          [6] AMTAX also seeks removal under § 12.1 of the LPA for failure to provide audited financial statements

26   for Hidden Hills.  That issue is addressed in the context of removal in Parkway, as set forth below.

PLAINTIFFS' TRIAL BRIEF- 22
(Case No. 17-cv-06048-RBL)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1    that removal would be warranted "based on breaches 334th Place committed after its notice, or

2    which AMTAX discovered before the buyout was complete." *Id.*   Prior to the exercise of the

3    option and the Hidden Hills litigation, AMTAX 169 had never sought removal or accused the GP

4    of a breach of duty.  The reasons offered by AMTAX 169 for removal were based on conduct by

5    334th Place that AMTAX 169 had known about and accepted for many years.

6            Even without an exercised option, the standard for removal is high.  *See, e.g.*, *Bickler v.*

7    *Parkview Vill. Assocs.*, 596 N.W.2d 501 (Wis. Ct. App. 1999) (removal improper despite use of

8    partnership funds to purchase a personal boat, in part because partners did not seek removal for

9    over 12 years); *Garber v. Stevens*, No. 601917/05, 2012 WL 2091186 (N.Y. Sup. Ct. 2012)

10   (finding removal proper under extreme circumstances, including failure to pay taxes); *Drucker v.*

11   *Mige Assocs. II*, 639 N.Y.S.2d 365, 367 (1996) ("[T]he court ordered removal of a partner...[is a]

12   rarely invoked remed[y.]").

13           Removal here would be inequitable, as it would provide AMTAX 169 with a windfall in

14   obtaining the property notwithstanding 334th Place's valid option to buy out the LP's interest.

15   There are no allegations that 334th Place diverted partnership funds for personal use.  To the

16   contrary, 334th Place infused millions of its own funds to keep the partnership afloat and

17   delivering tax credits to the LP during the Compliance Period.  At this point, 334th Place's

18   purchase of AMTAX's interest in accordance with the LPA, plus any damages it could prove at

19   trial, would be sufficient for AMTAX to be made whole upon its exit from the partnership.

20   Removal is not a just remedy.

21           With respect to AMTAX 169's claimed basis for removal under § 12.1 for a failure to

22   provide an independent auditor's opinion of the 2018 financial statements, imposing the drastic

23   remedy of removal would also be inappropriate.  The evidence at trial will establish that 334th

24   Place delivered timely audited financial statements and otherwise complied with all reporting

25   requirements to the LP for 17 years.  The withdrawal of Parkway's auditor, Ms. Lindal, in 2019

26   was the result of this litigation and statements made by AMTAX 169 challenging the

PLAINTIFFS' TRIAL BRIEF- 23
(Case No. 17-cv-06048-RBL)

1    partnership's audits in this case.  It would similarly be unjust to remove 334th Place for a failure

2    to provide an independent auditor's opinion of the 2018 financial statements when it was

3    AMTAX 169's actions that made it impossible to complete the audit process.

4           Based on the totality of the circumstances, the evidence at trial will demonstrate that

5    AMTAX 169's decision to seek removal in these circumstances was an effort to make

6    performance of the option impossible, contrary to the LPA and Washington law.  AMTAX 169

7    had a contractual obligation under the LPA to provide an appraisal for the purposes of

8    proceeding with the appraisal process called for under § 7.4.J.  It has failed to honor that

9    obligation.  334th Place is entitled to a declaration that AMTAX must either provide an appraisal

10    that values the property as of the date of the option exercise or utilize the Novogradac appraisal

11    dated May 10, 2018 for the purposes of § 7.4.J so that 334th Place can proceed with its

12    enforceable right to determine the Option Price and exercise the buyout option under the LPA.

13
14
          **2)**   **The Vast Majority of AMTAX's Counterclaims and Alleged Damages Are Barred by the Statute of Limitations**

15           AMTAX 169's challenges to 334th Place's setting of rents, fees, expenses, and repair

16    work form the basis for all its damage counterclaims, including breach of contract, breach of

17    fiduciary duty, conversion, and unjust enrichment.  AMTAX 169 has not specifically identified

18    which theories of liability are based in tort or in breach of contract.

19           To the extent AMTAX 169's claims sound in alleged breaches of the LPA, they are

20    governed by a six-year statute of limitations.  *See* RCW 4.16.040 (six-year limitation for the

21    commencement of actions "upon a contract in writing, or liability express or implied arising out

22    of a written agreement").  In Washington, a contract action accrues on breach and the discovery

23    rule does not apply except in limited circumstances not present here.  *1000 Va. Ltd. P'ship v.*

24    *Vertecs Corp.,* 158 Wn.2d 566, 576 (2006).  Nor does Washington law recognize the concept of

25    a "continuing breach," *i.e.*, a "'breach of contract that endures for a considerable time or

26    is repeated at short intervals'" as a basis to extend the applicable limitations period.  *Schreiner*

PLAINTIFFS' TRIAL BRIEF- 24
(Case No. 17-cv-06048-RBL)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1   *Farms, Inc. v. Am. Tower, Inc.*, 173 Wn. App. 154, 161 (2013) (citation omitted). Thus, for the

2   purposes of AMTAX 169's claimed breaches of the LPA, the claim accrues on the date that any

3   breach began: "subsequent damages [are] not severable from it." *Id.*

4         Tort claims have a three-year statute of limitations. RCW 4.16.080; *Hudson v. Condon*,

5   101 Wn. App. 866, 873 (2000). Where a claim for breach of contract is not grounded on a

6   breach of a specific term under the LPA, it is treated as a claim arising under a breach of

7   fiduciary duty theory and the three-year statute of limitations period applies. *Hudson*, 101 Wn.

8   App. at 873. Thus, to the extent any of AMTAX 169's damages claims sound in tort, *e.g.*, the

9   breach of fiduciary duty claim, the conversion claim, or the unjust enrichment claim, the

10   applicable statute of limitations is three years.[7]

11         Under these principles, the only categories of fees that could serve as a basis for a

12   potentially viable damages claim are those in which fees were first incurred either after July 2,

13   2012 (for LPA breaches) or after July 2, 2015 (for tort claims). The discovery rule does not

14   apply to the tort claims because, as set forth below, AMTAX 169 knew of the factual basis for

15   the claims it brought by 2013, if not earlier. *See Clare v. Saberhagen Holdings, Inc.*, 129 Wn.

16   App. 599, 603 (2005). All of AMTAX 169's tort claims, which are all predicated on alleged

17   misconduct occuring prior to July 2, 2015, are therefore barred. With respect to AMTAX 169's

18   breach of contract claims, $1,634,456 of AMTAX 169's alleged damages are barred.

19         **3)  AMTAX 169's Counterclaims Are Barred by Estoppel**

20         Under Washington law, "'a party should be held to a representation made or position

21   assumed where inequitable consequences would otherwise result to another party who has

22   justifiably and in good faith relied thereon.'" *Kramarevcky v. Dep't of Soc. & Health Servs.*, 122

23   ───────────────
24   [7] The unjust enrichment claim should be dismissed for the independent reason that the LPA governs the
     relationship between the parties. "A party to a valid express contract is bound by the provisions of that contract and
     may not disregard the same and bring an action on an implied contract relating to the same matter, in contravention
25   of the express contract." *Chandler v. Wash. Toll Bridge Auth.*, 17 Wn.2d 591, 604 (1943); *see also MacDonald v.
     Hayner*, 43 Wn. App. 81, 86 (1986) ("The courts will not allow a claim for unjust enrichment in contravention of a
26   provision in a valid express contract.")

PLAINTIFFS' TRIAL BRIEF- 25
(Case No. 17-cv-06048-RBL)

101974651.3 0009368-00002

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1    Wn.2d 738, 743 (1993) (*quoting Wilson v. Westinghouse Elec. Corp.*, 85 Wn.2d 78, 81 (1975)).

2    Equitable estoppel has three elements:  (1) an admission, statement, or act inconsistent with a

3    later-asserted claim; (2) action by another person in reliance upon that admission, statement, or

4    act; and (3) injury to the relying person from allowing the first party to contradict or repudiate

5    the earlier admission, statement, or act. *Bd. of Regents of the Univ. of Wash. v. City of Seattle*,

6    108 Wn.2d 545, 551 (1987).  "'[E]stoppel may arise . . . from silence or inaction as well as from

7    words or actions.'"  *Id*. at 553-54 (citation omitted).

8         All of the counterclaims in this case with respect to fees were based on Alden Torch's

9    accountants' 2018 review of Parkway's annual audited financial statements dating back to 2002.

10   All of the fees at issue were disclosed in those audits, and AMTAX 169 previously received,

11   reviewed, and accepted the audits every year.  Thus, every year for 16 years AMTAX 169 made

12   an admission or statement or performed an act that is inconsistent with the litigation-driven

13   position it adopted in 2018.

14        334th Place will also demonstrate that AMTAX representatives accepted many of the

15   specific fees at issue, the capital repairs that Parkway required, and the rental rates set by the GP.

16   For example, AMTAX 169 reported to its investor member in 2014 that 334th Place was not in

17   default and was instead advancing money to Parkway well over its obligation to fund some

18   operating deficits.   Earlier that year, Mr. Newbold and Mr. Blake made Parkway's audit review

19   a "priority" in connection with the potential voluntary buyout of the LPs' interest and found

20   nothing that should impede moving forward with a sale of the LP's interest.  Now, Mr. Blake and

21   AMTAX 169 claim that the very same categories of fees and the issues addressed in 2014 are

22   "major defaults" that should prevent a buyout of the LP's interest in 2018.

23        The last two elements necessary to find an estoppel are also present.  334th Place relied

24   upon AMTAX 169's acceptances of the audited financial statements and the fees disclosed

25   therein, and has continued to advance significant sums to Parkway throughout the years,

26   deferring payment on almost all the fees AMTAX 169 now challenges.  334th Place did so to

PLAINTIFFS' TRIAL BRIEF- 26
(Case No. 17-cv-06048-RBL)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1   maintain Parkway's financial stability and regulatory compliance – and AMTAX's entitlement to

2   tax credits – with the expectation that those advances and fees would ultimately be paid.  In

3   2018, however, AMTAX 169 held up the contractually mandated buy-out process unless 334th

4   Place would agree to cancel $2.7 million in accounts payable, effectively attempting to erase all

5   the advances and fees that had accrued and were owed to 334th Place over the past 17 years,

6   according to the financial statements AMTAX itself repeatedly accepted.   334th Place would be

7   significantly injured if AMTAX 169 is now permitted to repudiate its earlier acceptances.

8   Estoppel applies to bar all of AMTAX 169's counterclaims.

9         **4)   AMTAX 169's Counterclaims Are Barred by the Business Judgment Rule**

10       The LPA states that "the General Partner shall have the exclusive right to manage the

11   business of the Partnership.  No Limited Partner . . . shall (i) have any authority or right to act for

12   or bind the Partnership, or (ii) except as required by law, participate in or have any control over

13   the Partnership business."  LPA § 7.3.  Under § 7.4(A), 334th Place is required to use its "best

14   efforts" in carrying out its duties under the LPA.

15       Collectively, these provisions are an expression of the business judgment rule.  "The

16   'business judgment rule' in Washington immunizes" a party for "management decisions, which

17   were undertaken within the power and authority of management . . . and which were made in

18   good faith." *Para-Medical Leasing, Inc. v. Hangen*, 48 Wn. App. 389, 393 (1987) (citation

19   omitted); *see also Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 234 (3d Cir. 2001)

20   ("Precedent treats 'best efforts' as a form of good faith and sound business judgment.").  Thus,

21   Washington courts will not second guess or interfere with managerial decisions, including the

22   payment of management fees or other fringe benefits, unless the accuser can prove the decisions

23   were made in bad faith or were the product of fraud. *Nursing Home Bldg. Corp. v. DeHart*, 13

24   Wn. App. 489, 500 (1975).  That is, mere negligence is not enough to disturb what is otherwise a

25   valid business judgment. *See Duffy v. Piazza Constr., Inc.*, 62 Wn. App. 19, 22 (1991) ("'[W]e

26   hold as a matter of law that negligence in the management of the affairs of a partnership or joint

PLAINTIFFS' TRIAL BRIEF- 27
(Case No. 17-cv-06048-RBL)

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*

1    venture does not create any right of action against that partner by other members of the

2    partnership.'" (citation omitted)).

3         AMTAX 169 will fail to demonstrate at trial any of the fees at issue were incurred in bad

4    faith.  The evidence will show that the claims regarding "unauthorized fees" were developed by

5    scrutinizing audits in which all those fees were fully disclosed by the GP.  There is no evidence

6    that 334th Place ever acted with intent to conceal anything or enrich itself at the expense of the

7    partnership.  *See J & J Celcom v. AT & T Wireless Servs. Inc.*, 162 Wn.2d 102, 113 (2007) (no

8    breach of fiduciary duty in connection with affiliate transactions when partner acts in good faith

9    on full disclosure of material information).  To the contrary, 334th Place has advanced millions

10   to the partnership and deferred payment on fees owed to it to keep Parkway viable, with

11   AMTAX's full knowledge and to its benefit.  As a result, the business judgment rule applies.

12        With respect to the non-fee-related theories of liability, it was the GP's duty to keep the

13   property in good repair.  Parkway's HUD-insured loan came with duties to the federal

14   government that preceded any duty of 334th Place to maximize AMTAX 169's return.  As

15   HUD's approved management agent, Ms. Tamaro was required to ensure compliance with

16   HUD's mission to provide quality affordable housing to low income tenants.  In fact, both 334th

17   Place and AMTAX have duties to HUD that stem from the LPA, as the HUD project documents

18   are senior to the LPA (§ 13.11(C)(i)).  The evidence at trial will demonstrate that the repair work

19   on the property was done in good faith and was in the best interests of the partnership.  As a

20   result, 334th Place is insulated under the business judgment rule from any liability or damages in

21   connection with the work that it did to improve the condition of the property.  The same rationale

22   applies with respect to the setting of rental rates.

23        **5)      AMTAX 169's Counterclaims Also Fail for Failure to Establish Damages or
24                 Breach of Contract or Duty**

25        With respect to AMTAX's challenges to work done by affiliates, LPA § 2.4(v) expressly

26   permits affiliates to provide services to the partnership.  LPA § 7.10(E) affirms that affiliates

PLAINTIFFS' TRIAL BRIEF- 28
(Case No. 17-cv-06048-RBL)

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*

1   may be paid for providing services to the partnership.  The only condition placed on paying for

2   the services of affiliates is that the transaction "shall not be less favorable to the Partnership than

3   would be arrived at by unaffiliated parties dealing at arms' length." LPA § 2.4(v).   The

4   evidence at trial will show that the work completed by 334th Place's affiliates was both

5   necessary and reasonable, and consistent with market rates.  With respect to Trieste, AMTAX

6   169 never took any steps to remove it as the Management Agent under the LPA.  As a result,

7   there was no breach of the LPA for any affiliate work.

8        The same is true with respect to the Hearthstone Housing Foundation fees and the rent

9   credit given to a member of Parkway's staff.  Nothing in the LPA prohibited paying Hearthstone

10   through advances to the partnership, and the ongoing payments were necessary to retain a

11   valuable tax exemption that benefited the partnership well over the fees paid.  Similarly,

12   providing a rent credit to a long-time independent contractor did not violate any provision of the

13   LPA. It also had no economic impact on the partnership, because the Parkway apartment that

14   was vacated was subsequently rented out by another tenant, without a housing subsidy.  The

15   remaining fees and expenses challenged by AMTAX 114 were likewise either permitted under

16   the LPA, caused no damage to the partnership or AMTAX, or were otherwise a permissible

17   discretionary charge for necessary work in managing the partnership.  AMTAX 169's

18   counterclaims therefore fail as a matter of law.

19   **IV.   CONCLUSION**

20        The GPs will demonstrate at trial that their contractual rights to buy out the LPs' interests

21   should be honored and that there are no grounds for removal.  Judgment should be entered in

22   favor of HHM and 334th Place in accordance with the proposed findings of fact and conclusions

23   of law submitted herewith.

24

25

26

PLAINTIFFS' TRIAL BRIEF- 29
(Case No. 17-cv-06048-RBL)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1       DATED:  May 22, 2019

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*/s/ David R. Goodight*
David R. Goodnight, WSBA No. 20286
Rita V. Latsinova, WSBA No. 24447
J. Scott Pritchard, WSBA No. 50761
600 University Street, Suite 3600
Seattle, WA  98101
Phone:  (206) 624-0900
Facsimile:  (206) 386-7500
Email:  david.goodnight@stoel.com
Email:  rita.latsinova@stoel.com
Email:  scott.pritchard@stoel.com

Attorneys for Plaintiff Hidden Hills
Management, LLC and 334th Place 2001, LLC

PLAINTIFFS' TRIAL BRIEF- 30
(Case No. 17-cv-06048-RBL)

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on the 22nd day of May 2019, I electronically filed the foregoing

3

with the Clerk of the Court using the CM/ECF system which will send notification of such filing

4

to the following participants:

5

- **David J. Burman**
  dburman@perkinscoie.com,docketsea@perkinscoie.com

6

- **Christopher G Caldwell**
  ccaldwell@bsfllp.com,BSF_LAD_Records@BSFLLP.com

7

8

- **David R Goodnight**
  DRGOODNIGHT@STOEL.COM,SEA_PS@stoel.com,docketclerk@stoel.com,jamie.do

9

mbek@stoel.com

10

- **Margarita V. Latsinova**
  rvlatsinova@stoel.com,sea_ps@stoel.com,docketclerk@stoel.com,sherry.toves@stoel.co

11

m

12

- **Steven Douglas Merriman**
  smerriman@perkinscoie.com,docketsea@perkinscoie.com,JTanzy@perkinscoie.com

13

- **Eric S Pettit**
  epettit@bsfllp.com

14

15

- **J. Scott Pritchard**
  scott.pritchard@stoel.com,sea_ps@stoel.com,docketclerk@stoel.com,eileen.mccarty@st

16

oel.com

17

Dated May 22, 2019.

18

19

20

*s/ Eileen McCarty*
Eileen McCarty
Practice Assistant
Stoel Rives LLP
eileen.mccarty@stoel.com

21

22

23

24

25

26

PLAINTIFFS' TRIAL BRIEF - 31
(Case No. 14-cv-6024-RBL)

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

May 7, 2020


Mr. Chris Blake
Alden Torch Financial
1225 17th Street, Suite 1400
Denver, Colorado  80202

Via electronic mail and certified US Mail # 7018 0680 0001 2917 8695

Dear Mr. Blake:

Pursuant to Section 7.4.J of the Limited Partnership Agreement ("LPA"), Hidden Hills Management, LLC ("HHM") accepts the Cushman & Wakefield ("C&W") appraisal of $19,700,000 solicited by AMTAX Holdings 114, LLC ("AMTAX 114"), as the basis for calculating the fair market value of the Interests of AMTAX 114 and Protech 2002-A, LLC ("Protech") in Hidden Hills 2001, LP ("Hidden Hills").  Pursuant to Sections 6.2B(ii) and 7.8D of the LPA, HHM's payment to AMTAX 114 and Protech will be $4,968,506.

C&W's appraisal does not deduct any value associated with environmental contamination and therefore complies with the Court's directive that any binding appraisal "will be conducted … without reference to EPI's various estimates."

It also gives AMTAX 114 the full value of its Interest based on its own appraisal. AMTAX 114's claimed damages pertain to an alleged diminution of its Interest as a result of the reduced property value reflected in the Colliers International Valuation and Advisory Services appraisal report.  HHM's acceptance of C&W's appraisal to calculate AMTAX 114's Interest under Section 7.4.J cures any of AMTAX 114's alleged damages. HHM is not aware that AMTAX 114 asserted or developed any alternative damage theory or evidence, and AMTAX has not brought any derivative claims on behalf of Hidden Hills.

This letter is not intended to be a settlement proposal and it is fully admissible at trial.

Very truly yours,
HIDDEN HILLS MANAGEMENT, LLC

Catherine M. Tamaro

---

| From: | Goodnight, David R. |
|---|---|
| To: | Eric Pettit; Jessica Rodriguez |
| Cc: | Craig Bessenger; Pritchard, J. Scott; Arwen Johnson; Latsinova, Rita V.; Grayce Zelphin; Merriman, Steven D. (Perkins Coie) |
| Subject: | RE: Hidden Hills/Parkway - AMTAX Pretrial Statement |
| Date: | Tuesday, May 14, 2019 2:28:40 PM |
| Attachments: | LP Payout HH 2019.05.06.pdf |
| | 2017.12.18 DRG ltr to David Burman re Hidden Hills.pdf |

Eric:

Thank you for your email.

I have attached the waterfall calculations used to reach the option price set forth in HHM's May 7th letter.

I believe we had resolved any disputes regarding the calculations (other than the fair market value of the property) through a series of letters in the fall of 2017.

If your client disputes any of these calculations, please let us know.

That correspondence is attached for your review, and we are available to discuss.

Regards,

David R. Goodnight
Stoel Rives LLP
drgoodnight@stoel.com
600 University Street, Suite 3600
Seattle, WA 98101
(206) 386-7586 (work)
(206) 999-1054 (cell)
(206) 386-7500 (fax)
Bio | vCard

**From:** Eric Pettit [mailto:epettit@bsfllp.com]
**Sent:** Tuesday, May 14, 2019 11:09 AM
**To:** Goodnight, David R.; Pritchard, J. Scott; Jessica Rodriguez; Latsinova, Rita V.
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

David – My client's response to Ms. Tamaro's May 7 letter is attached.  I believe it responds to most of the issues identified in your email.  As for whether AMTAX will accept Ms. Tamaro's calculation of the option price, I note that neither you nor Ms. Tamaro has provided any such calculation, but instead have only identified what you believe the option price should be based on a $19.7 million valuation of the property.  As reflected in the letter, we do not think that option price is correct, even assuming the $19.7 million valuation.  Please provide Ms. Tamaro's calculation so that we can confirm whether a dispute exists on this issue.

Thanks,

Eric

**Eric S. Pettit**
Partner

**BOIES SCHILLER FLEXNER** LLP

725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) +1 (213) 629-9040
(f) +1 (213) 629-9022
epettit@bsfllp.com
www.bsfllp.com

**From:** Goodnight, David R. [mailto:david.goodnight@stoel.com]
**Sent:** Monday, May 13, 2019 4:26 PM
**To:** Eric Pettit; Pritchard, J. Scott; Jessica Rodriguez; Latsinova, Rita V.
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie); Goodnight, David R.
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Eric,

Ms. Tamaro has now accepted the appraisal fmv by AMTAX appraiser, Mr. Noble.

Will AMTAX accept Mr. Tamaro's calculation of the buy-out, or option, price (see attached).

If AMTAX feels the calculation is wrong, please let us know your client's thinking and provide your calculation.

In light of Ms. Tamaro's acceptance of AMTAX appraisal price, does AMTAX still intend to seek Ms. Tamaro's removal.

We are happy to discuss if you would like to call.

Thanks,

David R. Goodnight
Stoel Rives LLP
drgoodnight@stoel.com
600 University Street, Suite 3600
Seattle, WA 98101
(206) 386-7586 (work)
(206) 999-1054 (cell)
(206) 386-7500 (fax)

Bio | vCard

---

**From:** Eric Pettit [mailto:epettit@bsfllp.com]
**Sent:** Monday, May 13, 2019 2:35 PM
**To:** Goodnight, David R.; Pritchard, J. Scott; Jessica Rodriguez; Latsinova, Rita V.
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

No, that is not correct.  We have provided these designations to be used in support of our counterclaims in the event that any of these witnesses are unable to appear at trial.

**Eric S. Pettit**
Partner

BOIES SCHILLER FLEXNER LLP

725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) +1 (213) 629-9040
(f) +1 (213) 629-9022
epettit@bsfllp.com
www.bsfllp.com

---

**From:** Goodnight, David R. [mailto:david.goodnight@stoel.com]
**Sent:** Monday, May 13, 2019 2:27 PM
**To:** Eric Pettit; Pritchard, J. Scott; Jessica Rodriguez; Latsinova, Rita V.
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Eric,

I gather you are not planning to call any of these witnesses live.

Is that right.

David R. Goodnight
Stoel Rives LLP
drgoodnight@stoel.com
600 University Street, Suite 3600
Seattle, WA 98101
(206) 386-7586 (work)
(206) 999-1054 (cell)
(206) 386-7500 (fax)
Bio | vCard

---

**From:** Eric Pettit [mailto:epettit@bsfllp.com]
**Sent:** Monday, May 13, 2019 1:49 PM
**To:** Pritchard, J. Scott; Jessica Rodriguez; Latsinova, Rita V.; Goodnight, David R.
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Following up on my email below, highlighted deposition transcripts reflecting the designations below are attached for your reference.

Best,

Eric

**Eric S. Pettit**
Partner

**BOIES SCHILLER FLEXNER** LLP

725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) +1 (213) 629-9040
(f) +1 (213) 629-9022
epettit@bsfllp.com
www.bsfllp.com

**From:** Eric Pettit
**Sent:** Friday, May 10, 2019 8:02 PM
**To:** 'Pritchard, J. Scott'; Jessica Rodriguez; 'Latsinova, Rita V.'; 'Goodnight, David R.'
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; 'Merriman, Steven D. (Perkins Coie)'
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Scott:  Here are our deposition designations.  Have a nice weekend.

**Todd Henderson**
9:25-10:10
42:9-16
48:2-50:15
59:3-62:5
68:2-22
88:25-89:25
96:24-97:2
102:9-18
129:11-130:2
130:13-131:14
133:20-134:11
152:11-154:2
169:12-15
172:9-173:16

**Cory Hutsell**
6:3-11
7:23-11:13
12:7-13:13

28:11-30:6
30:12-35:2
37:16-25
41:8-42:11
52:17-54:10
67:1-5
69:13-21
70:22-71:25
73:2-75:10
80:8-18
97:16-101:16
106:21-108:15
109:20-22
112:23-113:15
114:23-118:7
139:19-141:11
144:14-145:4
147:5-22
150:18-151:17
152:23-153:25

**Brett Carp**
6:20-7:9
11:14-12:23
50:9-51:11
51:24-52:10
57:2-59:20
95:25-96:6
137:7-138:17
154:11-155:20

**Eric S. Pettit**
Partner

BOIES SCHILLER FLEXNER LLP

725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) +1 (213) 629-9040
(f) +1 (213) 629-9022
epettit@bsfllp.com
www.bsfllp.com

**From:** Eric Pettit
**Sent:** Friday, May 10, 2019 2:14 PM
**To:** 'Pritchard, J. Scott'; Jessica Rodriguez; Latsinova, Rita V.; Goodnight, David R.
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Scott – That schedule makes sense to me, and I am generally available on Wednesday except for a meeting from noon to one.

Best,

Eric

**Eric S. Pettit**
Partner

**BOIES SCHILLER FLEXNER** LLP
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) +1 (213) 629-9040
(f) +1 (213) 629-9022
epettit@bsfllp.com
www.bsfllp.com

**From:** Pritchard, J. Scott [mailto:scott.pritchard@stoel.com]
**Sent:** Friday, May 10, 2019 1:56 PM
**To:** Jessica Rodriguez; Latsinova, Rita V.; Goodnight, David R.
**Cc:** Eric Pettit; Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Eric,

We propose the following schedule to govern further proceedings on the pretrial order:

- We will send you our markup of your pretrial statement at the end of the day on Monday May 13th.

- We hold the LCR 16(k) attorney conference on Wednesday May 15th.

- We file the agreed-upon proposed pretrial order on Friday May 17, 2019.

Please let us know your availability for the call on Wednesday.

Thanks,

Scott

Scott Pritchard | STOEL RIVES LLP
scott.pritchard@stoel.com | (206) 386-7585

**From:** Jessica Rodriguez [mailto:jrodriguez@bsfllp.com]
**Sent:** Thursday, May 09, 2019 6:45 PM

**To:** Pritchard, J. Scott; Latsinova, Rita V.; Goodnight, David R.
**Cc:** Eric Pettit; Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** FW: Hidden Hills/Parkway - AMTAX Pretrial Statement

Counsel,

I'm resending AMTAX's pretrial statement and trial exhibit list. I inadvertently spelled Mr. Pritchard's email address wrong.

I apologize for any confusion.

**Jessica Rodriguez**
P a r a l e g a l

BOIES SCHILLER FLEXNER LLP
725 S. Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) (213) 629-9040
jrodriguez@bsfllp.com
www.bsfllp.com

---

**From:** Jessica Rodriguez
**Sent:** Thursday, May 9, 2019 6:38 PM
**To:** 'scottpritchard@stoel.com' <scottpritchard@stoel.com>; 'rita.latsinova@stoel.com' <rita.latsinova@stoel.com>; 'david.goodnight@stoel.com' <david.goodnight@stoel.com>
**Cc:** Eric Pettit <EPettit@BSFLLP.com>; Craig Bessenger <CBessenger@BSFLLP.com>; Grayce Zelphin <gzelphin@BSFLLP.com>; 'Merriman, Steven D. (Perkins Coie)' <SMerriman@perkinscoie.com>
**Subject:** Hidden Hills/Parkway - AMTAX Pretrial Statement

Counsel,

AMTAX's pretrial statement and trial exhibit list are attached.  Deposition designations will be provided tomorrow.

Best,

**Jessica Rodriguez**
P a r a l e g a l

BOIES SCHILLER FLEXNER LLP
725 S. Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) (213) 629-9040
jrodriguez@bsfllp.com
www.bsfllp.com

---

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from

disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1 08201831BSF]

|     | A | B | C | D | E |
|-----|---|---|---|---|---|
| 1   | | | **Hidden Hills** | | |
| 2   | | | | | 3/31/17 |
| 3   | | **§7.8D Release of Environmental Escrow** | | | |
| 4   | | | Environmental Escrow | | 1,558,553 |
| 5   | | | Balance of Administrative General Partner Loan | | -700,962 |
| 6   | | | Interest on Administrative General Partner Loan | | -252,242 |
| 7   | | | 10% of Remaining Environmental Escrow to ILP | | -60,535 |
| 8   | | | 90% of Remaining Environmental Escrow to AGP | | -544,814 |
| 9   | | | **Remaining Environmental Escrow** | | 0 |
| 10  | | | | | |
| 11  | | **Gross Revenues (Limited Partnership Agreement, p. 10)** | | | |
| 12  | | | Hidden Hills Apartments | | 19,700,000 |
| 13  | | | Operating Account | | 10,882 |
| 14  | | | Tax & Insurance Escrows | | 56,571 |
| 15  | | | **Gross Revenues** | | 19,767,452 |
| 16  | | | | | |
| 17  | | **Profits (Limited Partnership Agreement, p. 14)** | | | |
| 18  | | | Gross Revenues (Line 15) | | 19,767,452 |
| 19  | | | Replacement Reserve | | 143,691 |
| 20  | | | Brokerage Fee (2% x Line 12) | | -394,000 |
| 21  | | | WA & Pierce County Excise Tax (1.78% x Line 12) | | -350,660 |
| 22  | | | Partnership Legal, Title, Bond Payoff, Escrow, Audit, Valuation, Tax Return | | -75,000 |
| 23  | | | **Capital Proceeds** | | 19,091,484 |
| 24  | | | | | |
| 25  | | **§6.2B Distribution of Capital Proceeds** | | | |
| 26  | | | Capital Proceeds (Line 23) | | 19,091,484 |
| 27  | | | PNC Mortgage Principal Balance | | -6,299,167 |
| 28  | | | PNC Mortgage Interest Payable plus 20 days' notice of redemption | | -57,498 |
| 29  | | | PNC/Fannie Mae Mortgage Payoff Fee | | -62,992 |
| 30  | | | Accounts Payable | | -65,746 |
| 31  | | | Property Taxes Payable | | -4,788 |
| 32  | | | Administrative General Partner Deferred Developer Fee/Capital Contribution | | -1,166,673 |
| 33  | | | Administrative General Partner Capital Account | | 0 |
| 34  | | | Investor Limited Partner Capital Account (10% Priority Distribution) | | -1,143,462 |
| 35  | | | Administrative GP Incentive Supervisory Fee (33% of Gross Revenues) | | -6,523,259 |
| 36  | | | 99.90% of Balance of Such Proceeds to AGP Capital Account | | -3,764,132 |
| 37  | | | 0.09% of Balance of Such Proceeds to AGP Capital Account | | -3,391 |
| 38  | | | 0.01% of Balance of Such Proceeds to SLP Capital Account | | -377 |
| 39  | | | **Distribution of Capital Proceeds** | | 0 |
| 40  | | | | | |
| 41  | | **Summary:  Total to Investor Limited Partner** | | | |
| 42  | | | §7.8D 10% of Remaining Environmental Escrow to ILP (Line 7) | | 60,535 |
| 43  | | | §6.2B(ii) 10% Priority Distribution to ILP Capital Account (Line 34) | | 1,143,462 |
| 44  | | | §6.2B(ii) 99.90% of Balance of Such Proceeds to ILP Capital Account (Line 3 | | 3,764,132 |
| 45  | | | **Total to Investor Limited Partner** | | **$4,968,129** |
| 46  | | | | | |
| 47  | | **Summary:  Total to Special Limited Partner** | | | |
| 48  | | | §6.2B(ii) 0.01% of Balance of Such Proceeds to SLP Capital Account (Line 3 | | 377 |
| 49  | | | **Total to Special Limited Partner** | | **$377** |



600 University Street, Suite 3600
Seattle, WA  98101
T. 206.624.0900
F. 206.386.7500
www.stoel.com

DAVID R. GOODNIGHT
D. 206.386.7586
david.goodnight@stoel.com

December 18, 2017

**VIA EMAIL ONLY**

David Burman
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101

**Re:   Hidden Hills**

Dear Mr. Burman:

We represent Hidden Hills Management, LLC.

Attached as Exhibit A is Catherine Tamaro's letter of November 14, 2017 and the attached spreadsheet, which calculated the distribution of profits and losses from a sale of the limited partner's interest in Hidden Hills 2001, LP, based on the value established by the October 23, 2017 appraisal report by Colliers International Valuation & Advisory Services.  The November 14, 2017 letter provided for an allocation of profits of $531,748 to Amtax Holding 114 LLC and $0 to Protech 2002-A LLC, as shown in the spreadsheet.

Attached as Exhibit B is a revised spreadsheet showing a total due to the limited partners of $1,051,856.  The difference between Exhibit B and Exhibit A concerns Line 33 in the spreadsheet and whether or not the General Partner Capital Account should be subtracted.  It has been confirmed that this capital account should not be subtracted, which results in a total due of $1,051,812 to Amtax Holdings 114, LLC and $44 to Protech 2002-A, LLC.

Please use this revised spreadsheet and total due.  To my knowledge, except for the valuation (line 12), our clients were in agreement on all other calculations in the spreadsheet. The Administrative General Partner is prepared to tender these funds immediately.

Regards,

David R. Goodnight

**EXHIBIT A**

November 14, 2017


Mr. Chris Blake
Alden Torch Financial
1225 17th Street, Suite 1400
Denver, Colorado  80202

Dear Chris:

I have received from Mr. Eric Pettit a copy of my spreadsheet calculating the distribution of profits and losses from a sale of the limited partner's interest in Hidden Hills 2001, LP that includes your comments.  We are in mutual agreement with all of the calculations except the Administrative General Partner's Capital Account, to which you have proposed a correction.  I do not agree with your correction.  Under Section 6.2B of the Limited Partnership Agreement, all positive capital accounts are to be allocated Capital Proceeds in an amount equal to the positive capital balance in the account.

The appraisal report by Colliers International Valuation & Advisory Services dated October 23, 2017 established the value of Hidden Hills Apartments as $13,500,000.  Inclusion of that figure into my spreadsheet results in an allocation of profits of $531,748 to Amtax Holding 114, LLC and $0 to Protech 2002-A, LLC.  A copy of my spreadsheet is enclosed.  The Administrative General Partner is prepared to tender funds immediately.


Very truly yours,
Hidden Hills Management, LLC

*Catherine Tamaro*

Catherine M. Tamaro


enclosure

| A | B | C | D | E |
|---|---|---|---|---|
| 1 | | **Hidden Hills** | | |
| 2 | | | | 3/31/17 |
| 3 | | **§7.8D Release of Environmental Escrow** | | |
| 4 | | Environmental Escrow | | 1,558,553 |
| 5 | | Balance of Administrative General Partner Loan | | -700,962 |
| 6 | | Interest on Administrative General Partner Loan | | -252,242 |
| 7 | | 10% of Remaining Environmental Escrow to ILP | | -60,535 |
| 8 | | 90% of Remaining Environmental Escrow to AGP | | -544,814 |
| 9 | | **Remaining Environmental Escrow** | | 0 |
| 10 | | | | |
| 11 | | **Gross Revenues (Limited Partnership Agreement, p. 10)** | | |
| 12 | | Hidden Hills Apartments | | 13,500,000 |
| 13 | | Operating Account | | 10,882 |
| 14 | | Tax & Insurance Escrows | | 56,571 |
| 15 | | **Gross Revenues** | | 13,567,452 |
| 16 | | | | |
| 17 | | **Profits (Limited Partnership Agreement, p. 14)** | | |
| 18 | | Gross Revenues (Line 15) | | 13,567,452 |
| 19 | | Replacement Reserve | | 143,691 |
| 20 | | Brokerage Fee (2% x Line 12) | | -270,000 |
| 21 | | WA & Pierce County Excise Tax (1.78% x Line 12) | | -240,300 |
| 22 | | Partnership Legal, Title, Bond Payoff, Escrow, Audit, Valuation, Tax Return | | -75,000 |
| 23 | | **Capital Proceeds** | | 13,125,844 |
| 24 | | | | |

| | | C | D | E |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | Hidden Hills | | 3/31/17 |
| 25 | | §6.2B Distribution of Capital Proceeds | | |
| 26 | | Capital Proceeds (Line 23) | | 13,125,844 |
| 27 | | PNC Mortgage Principal Balance | | -6,299,167 |
| 28 | | PNC Mortgage Interest Payable plus 20 days' notice of redemption | | -57,498 |
| 29 | | PNC/Fannie Mae Mortgage Payoff Fee | | -62,992 |
| 30 | | Accounts Payable | | -65,746 |
| 31 | | Property Taxes Payable | | -4,788 |
| 32 | | Administrative General Partner Deferred Developer Fee/Capital Contribution | | -1,166,673 |
| 33 | | Administrative General Partner Capital Account | | -756,852 |
| 34 | | Investor Limited Partner Capital Account (10% Priority Distribution) | | -471,213 |
| 35 | | Administrative General Partner Incentive Supervisory Fee | | -4,240,916 |
| 36 | | 99.90% of Balance of Such Proceeds to ILP Capital Account | | 0 |
| 37 | | 0.09% of Balance of Such Proceeds to AGP Capital Account | | 0 |
| 38 | | 0.01% of Balance of Such Proceeds to SLP Capital Account | | 0 |
| 39 | | **Distribution of Capital Proceeds** | | 0 |
| 40 | | | | |
| 41 | | **Summary:  Total to Investor Limited Partner** | | |
| 42 | | §7.8D 10% of Remaining Environmental Escrow to ILP (Line 7) | | 60,535 |
| 43 | | §6.2B(ii) 10% Priority Distribution to ILP Capital Account (Line 34) | | 471,213 |
| 44 | | §6.2B(ii) 99.90% of Balance of Such Proceeds to ILP Capital Account (Line 36) | | 0 |
| 45 | | **Total to Investor Limited Partner** | | **$531,748** |
| 46 | | | | |
| 47 | | **Summary:  Total to Special Limited Partner** | | |
| 48 | | §6.2B(ii) 0.01% of Balance of Such Proceeds to SLP Capital Account (Line 38) | | 0 |
| 49 | | **Total to Special Limited Partner** | | **$0** |

# EXHIBIT B

| A | B | C | D | E |
|---|---|---|---|---|
| 1 | | Hidden Hills | | 3/31/17 |
| 2 | | | | |
| 3 | | §7.8D Release of Environmental Escrow | | |
| 4 | | Environmental Escrow | | 1,558,553 |
| 5 | | Balance of Administrative General Partner Loan | | -700,962 |
| 6 | | Interest on Administrative General Partner Loan | | -252,242 |
| 7 | | 10% of Remaining Environmental Escrow to ILP | | -60,535 |
| 8 | | 90% of Remaining Environmental Escrow to AGP | | -544,814 |
| 9 | | Remaining Environmental Escrow | | 0 |
| 10 | | | | |
| 11 | | Gross Revenues (Limited Partnership Agreement, p. 10) | | |
| 12 | | Hidden Hills Apartments | | 13,500,000 |
| 13 | | Operating Account | | 10,882 |
| 14 | | Tax & Insurance Escrows | | 56,571 |
| 15 | | Gross Revenues | | 13,567,452 |
| 16 | | | | |
| 17 | | Profits (Limited Partnership Agreement, p. 14) | | |
| 18 | | Gross Revenues (Line 15) | | 13,567,452 |
| 19 | | Replacement Reserve | | 143,691 |
| 20 | | Brokerage Fee (2% x Line 12) | | -270,000 |
| 21 | | WA & Pierce County Excise Tax (1.78% x Line 12) | | -240,300 |
| 22 | | Partnership Legal, Title, Bond Payoff, Escrow, Audit, Valuation, Tax Return | | -75,000 |
| 23 | | Capital Proceeds | | 13,125,844 |
| 24 | | | | |

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | Hidden Hills | | 3/31/17 |
| 25 | | | **§6.2B Distribution of Capital Proceeds** | | |
| 26 | | | Capital Proceeds (Line 23) | | 13,125,844 |
| 27 | | | PNC Mortgage Principal Balance | | -6,299,167 |
| 28 | | | PNC Mortgage Interest Payable plus 20 days' notice of redemption | | -57,498 |
| 29 | | | PNC/Fannie Mae Mortgage Payoff Fee | | -62,992 |
| 30 | | | Accounts Payable | | -65,746 |
| 31 | | | Property Taxes Payable | | -4,788 |
| 32 | | | Administrative General Partner Deferred Developer Fee/Capital Contribution | | -1,166,673 |
| 33 | | | Administrative General Partner Capital Account | | 0 |
| 34 | | | Investor Limited Partner Capital Account (10% Priority Distribution) | | -546,898 |
| 35 | | | Administrative General Partner Incentive Supervisory Fee | | -4,477,259 |
| 36 | | | 99.90% of Balance of Such Proceeds to ILP Capital Account | | -444,379 |
| 37 | | | 0.09% of Balance of Such Proceeds to AGP Capital Account | | -400 |
| 38 | | | 0.01% of Balance of Such Proceeds to SLP Capital Account | | -44 |
| 39 | | | **Distribution of Capital Proceeds** | | 0 |
| 40 | | | | | |
| 41 | | | **Summary:  Total to Investor Limited Partner** | | |
| 42 | | | $7.8D 10% of Remaining Environmental Escrow to ILP (Line 7) | | 60,535 |
| 43 | | | $6.2B(ii) 10% Priority Distribution to ILP Capital Account (Line 34) | | 546,898 |
| 44 | | | $6.2B(ii) 99.90% of Balance of Such Proceeds to ILP Capital Account (Line 36) | | 444,379 |
| 45 | | | **Total to Investor Limited Partner** | | **$1,051,812** |
| 46 | | | | | |
| 47 | | | **Summary:  Total to Special Limited Partner** | | |
| 48 | | | $6.2B(ii) 0.01% of Balance of Such Proceeds to SLP Capital Account (Line 38) | | 44 |
| 49 | | | **Total to Special Limited Partner** | | **$44** |

| From: | Eric Pettit |
|---|---|
| To: | Goodnight, David R.; Jessica Rodriguez |
| Cc: | Craig Bessenger; Pritchard, J. Scott; Arwen Johnson; Latsinova, Rita V.; Grayce Zelphin; Merriman, Steven D. (Perkins Coie) |
| Subject: | RE: Hidden Hills/Parkway - AMTAX Pretrial Statement |
| Date: | Friday, May 17, 2019 5:01:17 PM |
| Attachments: | Sale & Environmental Escrow Waterfalls v2.pdf |

David:

Thanks for sending HHM's waterfall calculations.  Although we maintain that a waterfall analysis is unnecessary because HHM has been removed as the general partner of the Hidden Hills partnership, and further dispute that HHM has the unilateral right to cut any appraisal process short by simply "accepting" the Cushman & Wakefield value determination more than two years after it was presented, we agree that it is helpful in advance of trial to identify any disputes in the parties' respective waterfall calculations in the event that it ever becomes relevant in the future.  To that end, I am attaching an analysis my client prepared that compares the parties' competing waterfall calculations.

There are three main drivers for the approximately $2.6 million difference between the GP and the LP calculations.  First, the GP assumes selling costs that are approximately $300,000 higher than the LP's cost calculation, which is based on an assumption of three percent of gross sales price.  We believe that three percent is a generous assumption, even without taking into account the fact that many typical transaction costs would not be incurred and transfer taxes would not be triggered given the nature of the contemplated transaction (i.e., the sale of the LP's interests to the GP as opposed to the sale of the Project to a third party).

The second main driver for the different amounts is timing.  Catherine's calculation is based on financial numbers that are two years old, which we do not believe is appropriate.  Instead, the proper approach would be to run the waterfall at the time that the option price is actually being determined.  This is particularly true given that HHM did not "accept" the Cushman appraisal until May 2019, and the two year delay was caused by an appraisal process that the Court has found was "tainted beyond salvation" because of the GP's conduct.

The final principal driver of the difference between the GP and LP buyout calculations is the treatment of the DDF.  After reviewing the GP's waterfall and the draft 2018 audit that we just recently received, it has come to our attention that the GP has been paying off interest and principal on the GP loan out of order.  As a result, since 2016, $921,736 of distributable cash flow has been improperly used to pay down principal and interest on the GP loan, despite the fact that the cash flow waterfall in Section 6.2A of the LPA prioritizes repayment of the DDF before any GP loans, even after the DDF is paid off with a GP capital contribution (the footnote to Schedule A of the LPA indicates that the capital contribution made by the GP to pay off the DDF is to be repaid in the same priority in the waterfall).  Thus, cash flow that was incorrectly applied to the GP loan should have instead reduced the amount of the unpaid DDF capital contribution made by the GP in 2015.  Indeed, if cash flow had been distributed in the correct priority, the DDF capital contribution balance would be $244,937 at December 31, 2018, and would be paid in full by the end of this year.

By intentionally skipping payment of the DDF capital contribution in the cash flow waterfall, and instead using that cash flow to pay down the GP loan, the GP's approach allows a greater amount of the Environmental Escrow funds to flow through to the bottom of the escrow waterfall (which the GP has argued does not have a tier requiring the repayment of the DDF capital contribution).  The reason this approach has a significant impact on the LP buyout price is that the Environmental Escrow has a much more favorable residual split for the GP (90%) than the sale waterfall (.1%)

Please let us know if you have any questions about the above or attached.

Best,

Eric


**Eric S. Pettit**
Partner

**BOIES SCHILLER FLEXNER** LLP
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) +1 (213) 629-9040
(f) +1 (213) 629-9022
epettit@bsfllp.com
www.bsfllp.com

---

**From:** Goodnight, David R. [mailto:david.goodnight@stoel.com]
**Sent:** Tuesday, May 14, 2019 2:29 PM
**To:** Eric Pettit; Jessica Rodriguez
**Cc:** Craig Bessenger; Pritchard, J. Scott; Arwen Johnson; Latsinova, Rita V.; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Eric:

Thank you for your email.

I have attached the waterfall calculations used to reach the option price set forth in HHM's May 7th letter.

I believe we had resolved any disputes regarding the calculations (other than the fair market value of the property) through a series of letters in the fall of 2017.

If your client disputes any of these calculations, please let us know.

That correspondence is attached for your review, and we are available to discuss.

Regards,

David R. Goodnight

Stoel Rives LLP

drgoodnight@stoel.com

600 University Street, Suite 3600

Seattle, WA 98101

(206) 386-7586 (work)

(206) 999-1054 (cell)

(206) 386-7500 (fax)

Bio | vCard

**From:** Eric Pettit [mailto:epettit@bsfllp.com]
**Sent:** Tuesday, May 14, 2019 11:09 AM
**To:** Goodnight, David R.; Pritchard, J. Scott; Jessica Rodriguez; Latsinova, Rita V.
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

David – My client's response to Ms. Tamaro's May 7 letter is attached.  I believe it responds to most of the issues identified in your email.  As for whether AMTAX will accept Ms. Tamaro's calculation of the option price, I note that neither you nor Ms. Tamaro has provided any such calculation, but instead have only identified what you believe the option price should be based on a $19.7 million valuation of the property.  As reflected in the letter, we do not think that option price is correct, even assuming the $19.7 million valuation.  Please provide Ms. Tamaro's calculation so that we can confirm whether a dispute exists on this issue.

Thanks,

Eric

**Eric S. Pettit**
Partner

**BOIES SCHILLER FLEXNER LLP**

725 South Figueroa Street, 31st Floor

Los Angeles, CA 90017

(t) +1 (213) 629-9040

(f) +1 (213) 629-9022

epettit@bsfllp.com

www.bsfllp.com

**From:** Goodnight, David R. [mailto:david.goodnight@stoel.com]
**Sent:** Monday, May 13, 2019 4:26 PM
**To:** Eric Pettit; Pritchard, J. Scott; Jessica Rodriguez; Latsinova, Rita V.
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie); Goodnight, David R.
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Eric,

Ms. Tamaro has now accepted the appraisal fmv by AMTAX appraiser, Mr. Noble.

Will AMTAX accept Mr. Tamaro's calculation of the buy-out, or option, price (see attached).

If AMTAX feels the calculation is wrong, please let us know your client's thinking and provide your calculation.

In light of Ms. Tamaro's acceptance of AMTAX appraisal price, does AMTAX still intend to seek Ms. Tamaro's removal.

We are happy to discuss if you would like to call.

Thanks,

David R. Goodnight
Stoel Rives LLP
drgoodnight@stoel.com
600 University Street, Suite 3600
Seattle, WA 98101
(206) 386-7586 (work)
(206) 999-1054 (cell)
(206) 386-7500 (fax)
Bio | vCard

---

**From:** Eric Pettit [mailto:epettit@bsfllp.com]
**Sent:** Monday, May 13, 2019 2:35 PM
**To:** Goodnight, David R.; Pritchard, J. Scott; Jessica Rodriguez; Latsinova, Rita V.
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

No, that is not correct.  We have provided these designations to be used in support of our counterclaims in the event that any of these witnesses are unable to appear at trial.

**Eric S. Pettit**
Partner

**BOIES SCHILLER FLEXNER LLP**
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) +1 (213) 629-9040
(f) +1 (213) 629-9022
epettit@bsfllp.com
www.bsfllp.com

---

**From:** Goodnight, David R. [mailto:david.goodnight@stoel.com]
**Sent:** Monday, May 13, 2019 2:27 PM
**To:** Eric Pettit; Pritchard, J. Scott; Jessica Rodriguez; Latsinova, Rita V.

**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Eric,

I gather you are not planning to call any of these witnesses live.

Is that right.

David R. Goodnight
Stoel Rives LLP
drgoodnight@stoel.com
600 University Street, Suite 3600
Seattle, WA 98101
(206) 386-7586 (work)
(206) 999-1054 (cell)
(206) 386-7500 (fax)
Bio | vCard

---

**From:** Eric Pettit [mailto:epettit@bsfllp.com]
**Sent:** Monday, May 13, 2019 1:49 PM
**To:** Pritchard, J. Scott; Jessica Rodriguez; Latsinova, Rita V.; Goodnight, David R.
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Following up on my email below, highlighted deposition transcripts reflecting the designations below
are attached for your reference.

Best,

Eric

**Eric S. Pettit**
Partner

**BOIES SCHILLER FLEXNER LLP**

725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) +1 (213) 629-9040
(f) +1 (213) 629-9022
epettit@bsfllp.com
www.bsfllp.com

---

**From:** Eric Pettit
**Sent:** Friday, May 10, 2019 8:02 PM
**To:** 'Pritchard, J. Scott'; Jessica Rodriguez; 'Latsinova, Rita V.'; 'Goodnight, David R.'
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; 'Merriman, Steven D. (Perkins Coie)'
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Scott:  Here are our deposition designations.  Have a nice weekend.

**Todd Henderson**
9:25-10:10
42:9-16
48:2-50:15
59:3-62:5
68:2-22
88:25-89:25
96:24-97:2
102:9-18
129:11-130:2
130:13-131:14
133:20-134:11
152:11-154:2
169:12-15
172:9-173:16

**Cory Hutsell**
6:3-11
7:23-11:13
12:7-13:13
28:11-30:6
30:12-35:2
37:16-25
41:8-42:11
52:17-54:10
67:1-5
69:13-21
70:22-71:25
73:2-75:10
80:8-18
97:16-101:16
106:21-108:15
109:20-22
112:23-113:15
114:23-118:7
139:19-141:11
144:14-145:4
147:5-22
150:18-151:17
152:23-153:25

**Brett Carp**

6:20-7:9
11:14-12:23
50:9-51:11
51:24-52:10
57:2-59:20
95:25-96:6
137:7-138:17
154:11-155:20

**Eric S. Pettit**
Partner

**BOIES SCHILLER FLEXNER** LLP

725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) +1 (213) 629-9040
(f) +1 (213) 629-9022
epettit@bsfllp.com
www.bsfllp.com

---

**From:** Eric Pettit
**Sent:** Friday, May 10, 2019 2:14 PM
**To:** 'Pritchard, J. Scott'; Jessica Rodriguez; Latsinova, Rita V.; Goodnight, David R.
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Scott – That schedule makes sense to me, and I am generally available on Wednesday except for a meeting from noon to one.

Best,

Eric

**Eric S. Pettit**
Partner

**BOIES SCHILLER FLEXNER** LLP

725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) +1 (213) 629-9040
(f) +1 (213) 629-9022
epettit@bsfllp.com
www.bsfllp.com

---

**From:** Pritchard, J. Scott [mailto:scott.pritchard@stoel.com]
**Sent:** Friday, May 10, 2019 1:56 PM
**To:** Jessica Rodriguez; Latsinova, Rita V.; Goodnight, David R.
**Cc:** Eric Pettit; Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Eric,

We propose the following schedule to govern further proceedings on the pretrial order:

- We will send you our markup of your pretrial statement at the end of the day on Monday May 13th.

- We hold the LCR 16(k) attorney conference on Wednesday May 15th.

- We file the agreed-upon proposed pretrial order on Friday May 17, 2019.

Please let us know your availability for the call on Wednesday.

Thanks,

Scott

Scott Pritchard | STOEL RIVES LLP
scott.pritchard@stoel.com | (206) 386-7585

---

**From:** Jessica Rodriguez [mailto:jrodriguez@bsfllp.com]
**Sent:** Thursday, May 09, 2019 6:45 PM
**To:** Pritchard, J. Scott; Latsinova, Rita V.; Goodnight, David R.
**Cc:** Eric Pettit; Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** FW: Hidden Hills/Parkway - AMTAX Pretrial Statement

Counsel,

I'm resending AMTAX's pretrial statement and trial exhibit list. I inadvertently spelled Mr. Pritchard's email address wrong.

I apologize for any confusion.

**Jessica Rodriguez**
Paralegal

BOIES SCHILLER FLEXNER LLP
725 S. Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) (213) 629-9040
jrodriguez@bsfllp.com
www.bsfllp.com

---

**From:** Jessica Rodriguez
**Sent:** Thursday, May 9, 2019 6:38 PM
**To:** 'scottpritchard@stoel.com' <scottpritchard@stoel.com>; 'rita.latsinova@stoel.com' <rita.latsinova@stoel.com>; 'david.goodnight@stoel.com' <david.goodnight@stoel.com>

**Cc:** Eric Pettit <EPettit@BSFLLP.com>; Craig Bessenger <CBessenger@BSFLLP.com>; Grayce Zelphin <gzelphin@BSFLLP.com>; 'Merriman, Steven D. (Perkins Coie)' <SMerriman@perkinscoie.com>
**Subject:** Hidden Hills/Parkway - AMTAX Pretrial Statement

Counsel,

AMTAX's pretrial statement and trial exhibit list are attached.  Deposition designations will be provided tomorrow.

Best,

**Jessica Rodriguez**
Paralegal

BOIES SCHILLER FLEXNER LLP
725 S. Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) (213) 629-9040
jrodriguez@bsfllp.com
www.bsfllp.com

---

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1 08201831BSF]

## Hidden Hills (10509)

### SALE PROCEEDS ANALYSIS

| Year of Sale (December 31st) | 2019 | | Trieste | | Variance |
|---|---|---|---|---|---|
| Gross Property Value ($91,204 per Unit) | 19,700,000 | | 19,700,000 | | |
| Less: Selling Costs (3.00% of Gross) | 591,000 | | 882,582  4.5% | | (291,582) |
| **Net Sale Proceeds** | **19,109,000**  Env Escrow | | **18,817,418**  Env Escrow | | |
| Release of Reserves and Net Cash | 695,266 | 1,568,833 | 140,610 | 1,558,553 | 564,936 |
| **Cash Available for Hard Debt Repayment** | **19,804,266** | **1,568,833** | **18,958,028** | **1,558,553** | 10,280 |
| Loans | | | | | |
| Pierce County Bonds | - | - | 6,356,665 | - | (651,363) |
| Less: Total Hard Debt | 5,705,302 | | 6,356,665 | - | |
| Estimated LTV at Sale | 29% | | 0% | | |
| **Proceeds After Hard Debt Repayment** | **14,098,964** | **1,568,833** | **12,601,363** | **1,558,553** | |
| AMF  AMTAX Holdings 114, LLC | - | - | - | - | 0 |
| DDF–contributed amount  General Partner | - | - | 1,166,673 | - | (1,166,673) |
| GP Loans  General Partner | 1,412,405 | | 953,204 | | 459,201 |
| PMF  General Partner | - | | - | | 0 |
| ILP Pos Cap  AMTAX Holdings 114, LLC | - | - | - | - | 0 |
| GP Pos Cap  General Partner | - | | - | | 0 |
| ILP Priority Dist  AMTAX Holdings 114, LLC | 1,409,896 | | 1,143,462 | | (22,259) |
| ISF- 33% of Gross Income  General Partner | 6,501,000 | | 6,523,259 | | |
| LESS: Sale Waterfall  General Partner | 7,910,896 | 1,412,405 | 8,833,394 | 953,204 | |
| **Cash Flow Before Residual Splits** | **6,188,068** | **156,428** | **3,767,969** | **605,349** | |

| | | 2019 | | | Trieste | | | Variance |
|---|---|---|---|---|---|---|---|---|
| CF Split: AMTAX Holdings 114, LLC | 99.90% | 6,181,880 | 15,643 | 10.00% | 3,764,201 | 60,535 | 10.00% | 2,372,787 |
| CF Split: ProTech 2002 - A, LLC | 0.01% | 619 | - | 0.00% | 377 | - | 0.00% | 242 |
| CF Split: General Partner | 0.09% | 5,569 | 140,786 | 90.00% | 3,391 | 544,814 | 90.00% | (401,850) |

| | 2019 | | | Trieste | | | Variance |
|---|---|---|---|---|---|---|---|
| Total Returns: AMTAX Holdings 114, LLC | 7,591,776 | 15,643 | 7,607,419 | 4,907,663 | 60,535 | 4,968,198 | 2,639,221 |
| Total Returns: ProTech 2002 - A, LLC | 619 | - | 619 | 377 | - | 377 | 242 |
| Total Returns: General Partner | 6,506,569 | 1,553,190 | 8,059,759 | 7,693,323 | 1,498,018 | 9,191,341 | (1,131,582) |

TAB C, PAGE 059 OF 70


ALDEN TORCH FINANCIAL

| | |
|---|---|
| **From:** | Goodnight, David R. |
| **To:** | Eric Pettit |
| **Cc:** | Craig Bessenger; Pritchard, J. Scott; Arwen Johnson; Jessica Rodriguez; Latsinova, Rita V.; Grayce Zelphin; Merriman, Steven D. (Perkins Coie); Catherine Tamaro |
| **Subject:** | RE: Hidden Hills/Parkway - AMTAX Pretrial Statement |
| **Date:** | Tuesday, May 21, 2019 9:34:59 AM |
| **Attachments:** | LP Payout HH 2019.05.20.pdf |

Eric,

Thank you for providing the waterfall calculation of the buyout price for the Limited Partner's ("LP's") interest in the Hidden Hills Apartments.

You state that there are three main drivers of the  difference between the GP and LP's respective waterfall calculations:  (1)  the estimate of the transaction costs, (2)  the timing, and (3) the priority of paying off the DDF and the GP loan.

For the sake of resolving the remaining dispute over the waterfall calculation, we accept your estimate of transactions costs (3%),  and accept the priority of repaying the DDF and GP loan.

Attached is a revised spreadsheet that models these entries accordingly.

The  calculation date is 3/14/17,  the date the option was exercised, which we believe controls here.

The calculation results in $5,614.345.00 as the amount due to AMTAX 114 and Protech 2002-A for their interests in the partnership.

Hidden Hills Management is prepared to finalize the option exercise by paying this amount in cash.

Regards,

David R. Goodnight
Stoel Rives LLP
drgoodnight@stoel.com
600 University Street, Suite 3600
Seattle, WA 98101
(206) 386-7586 (work)
(206) 999-1054 (cell)
(206) 386-7500 (fax)
Bio | vCard

**From:** Eric Pettit [mailto:epettit@bsfllp.com]
**Sent:** Friday, May 17, 2019 5:01 PM
**To:** Goodnight, David R.; Jessica Rodriguez
**Cc:** Craig Bessenger; Pritchard, J. Scott; Arwen Johnson; Latsinova, Rita V.; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

David:

Thanks for sending HHM's waterfall calculations.  Although we maintain that a waterfall analysis is unnecessary because HHM has been removed as the general partner of the Hidden Hills partnership, and further dispute that HHM has the unilateral right to cut any appraisal process short by simply "accepting" the Cushman & Wakefield value determination more than two years after it was presented, we agree that it is helpful in advance of trial to identify any disputes in the parties' respective waterfall calculations in the event that it ever becomes relevant in the future.  To that end, I am attaching an analysis my client prepared that compares the parties' competing waterfall calculations.

There are three main drivers for the approximately $2.6 million difference between the GP and the LP calculations.  First, the GP assumes selling costs that are approximately $300,000 higher than the LP's cost calculation, which is based on an assumption of three percent of gross sales price.  We believe that three percent is a generous assumption, even without taking into account the fact that many typical transaction costs would not be incurred and transfer taxes would not be triggered given the nature of the contemplated transaction (i.e., the sale of the LP's interests to the GP as opposed to the sale of the Project to a third party).

The second main driver for the different amounts is timing.  Catherine's calculation is based on financial numbers that are two years old, which we do not believe is appropriate.  Instead, the proper approach would be to run the waterfall at the time that the option price is actually being determined.  This is particularly true given that HHM did not "accept" the Cushman appraisal until May 2019, and the two year delay was caused by an appraisal process that the Court has found was "tainted beyond salvation" because of the GP's conduct.

The final principal driver of the difference between the GP and LP buyout calculations is the treatment of the DDF.  After reviewing the GP's waterfall and the draft 2018 audit that we just recently received, it has come to our attention that the GP has been paying off interest and principal on the GP loan out of order.  As a result, since 2016, $921,736 of distributable cash flow has been improperly used to pay down principal and interest on the GP loan, despite the fact that the cash flow waterfall in Section 6.2A of the LPA prioritizes repayment of the DDF before any GP loans, even after the DDF is paid off with a GP capital contribution (the footnote to Schedule A of the LPA indicates that the capital contribution made by the GP to pay off the DDF is to be repaid in the same priority in the waterfall).  Thus, cash flow that was incorrectly applied to the GP loan should have instead reduced the amount of the unpaid DDF capital contribution made by the GP in 2015.  Indeed, if cash flow had been distributed in the correct priority, the DDF capital contribution balance would be $244,937 at December 31, 2018, and would be paid in full by the end of this year.

By intentionally skipping payment of the DDF capital contribution in the cash flow waterfall, and instead using that cash flow to pay down the GP loan, the GP's approach allows a greater amount of the Environmental Escrow funds to flow through to the bottom of the escrow waterfall (which the GP has argued does not have a tier requiring the repayment of the DDF capital contribution).  The reason this approach has a significant impact on the LP buyout price is that the Environmental

Escrow has a much more favorable residual split for the GP (90%) than the sale waterfall (.1%)

Please let us know if you have any questions about the above or attached.

Best,

Eric


**Eric S. Pettit**
Partner

**BOIES SCHILLER FLEXNER** LLP

725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) +1 (213) 629-9040
(f) +1 (213) 629-9022
epettit@bsfllp.com
www.bsfllp.com

---

**From:** Goodnight, David R. [mailto:david.goodnight@stoel.com]
**Sent:** Tuesday, May 14, 2019 2:29 PM
**To:** Eric Pettit; Jessica Rodriguez
**Cc:** Craig Bessenger; Pritchard, J. Scott; Arwen Johnson; Latsinova, Rita V.; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Eric:

Thank you for your email.

I have attached the waterfall calculations used to reach the option price set forth in HHM's May 7th letter.

I believe we had resolved any disputes regarding the calculations (other than the fair market value of the property) through a series of letters in the fall of 2017.

If your client disputes any of these calculations, please let us know.

That correspondence is attached for your review, and we are available to discuss.

Regards,

David R. Goodnight
Stoel Rives LLP
drgoodnight@stoel.com
600 University Street, Suite 3600

Seattle, WA 98101

(206) 386-7586 (work)

(206) 999-1054 (cell)

(206) 386-7500 (fax)

Bio | vCard

---

**From:** Eric Pettit [mailto:epettit@bsfllp.com]
**Sent:** Tuesday, May 14, 2019 11:09 AM
**To:** Goodnight, David R.; Pritchard, J. Scott; Jessica Rodriguez; Latsinova, Rita V.
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

David – My client's response to Ms. Tamaro's May 7 letter is attached.  I believe it responds to most of the issues identified in your email.  As for whether AMTAX will accept Ms. Tamaro's calculation of the option price, I note that neither you nor Ms. Tamaro has provided any such calculation, but instead have only identified what you believe the option price should be based on a $19.7 million valuation of the property.  As reflected in the letter, we do not think that option price is correct, even assuming the $19.7 million valuation.  Please provide Ms. Tamaro's calculation so that we can confirm whether a dispute exists on this issue.

Thanks,

Eric

**Eric S. Pettit**
Partner

**BOIES SCHILLER FLEXNER LLP**

725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) +1 (213) 629-9040
(f) +1 (213) 629-9022
epettit@bsfllp.com
www.bsfllp.com

---

**From:** Goodnight, David R. [mailto:david.goodnight@stoel.com]
**Sent:** Monday, May 13, 2019 4:26 PM
**To:** Eric Pettit; Pritchard, J. Scott; Jessica Rodriguez; Latsinova, Rita V.
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie); Goodnight, David R.
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Eric,

Ms. Tamaro has now accepted the appraisal fmv by AMTAX appraiser, Mr. Noble.

Will AMTAX accept Mr. Tamaro's calculation of the buy-out, or option, price (see attached).

If AMTAX feels the calculation is wrong, please let us know your client's thinking and provide your calculation.

In light of Ms. Tamaro's acceptance of AMTAX appraisal price, does AMTAX still intend to seek Ms. Tamaro's removal.

We are happy to discuss if you would like to call.

Thanks,

David R. Goodnight
Stoel Rives LLP
drgoodnight@stoel.com
600 University Street, Suite 3600
Seattle, WA 98101
(206) 386-7586 (work)
(206) 999-1054 (cell)
(206) 386-7500 (fax)
Bio | vCard

**From:** Eric Pettit [mailto:epettit@bsfllp.com]
**Sent:** Monday, May 13, 2019 2:35 PM
**To:** Goodnight, David R.; Pritchard, J. Scott; Jessica Rodriguez; Latsinova, Rita V.
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

No, that is not correct.  We have provided these designations to be used in support of our counterclaims in the event that any of these witnesses are unable to appear at trial.

**Eric S. Pettit**
Partner

BOIES SCHILLER FLEXNER LLP
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) +1 (213) 629-9040
(f) +1 (213) 629-9022
epettit@bsfllp.com
www.bsfllp.com

**From:** Goodnight, David R. [mailto:david.goodnight@stoel.com]
**Sent:** Monday, May 13, 2019 2:27 PM
**To:** Eric Pettit; Pritchard, J. Scott; Jessica Rodriguez; Latsinova, Rita V.
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Eric,

I gather you are not planning to call any of these witnesses live.

Is that right.

David R. Goodnight
Stoel Rives LLP
drgoodnight@stoel.com
600 University Street, Suite 3600
Seattle, WA 98101
(206) 386-7586 (work)
(206) 999-1054 (cell)
(206) 386-7500 (fax)
Bio | vCard

**From:** Eric Pettit [mailto:epettit@bsfllp.com]
**Sent:** Monday, May 13, 2019 1:49 PM
**To:** Pritchard, J. Scott; Jessica Rodriguez; Latsinova, Rita V.; Goodnight, David R.
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Following up on my email below, highlighted deposition transcripts reflecting the designations below are attached for your reference.

Best,

Eric

**Eric S. Pettit**
Partner

**BOIES SCHILLER FLEXNER** LLP

725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) +1 (213) 629-9040
(f) +1 (213) 629-9022
epettit@bsfllp.com
www.bsfllp.com

**From:** Eric Pettit
**Sent:** Friday, May 10, 2019 8:02 PM
**To:** 'Pritchard, J. Scott'; Jessica Rodriguez; 'Latsinova, Rita V.'; 'Goodnight, David R.'
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; 'Merriman, Steven D. (Perkins Coie)'
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Scott:  Here are our deposition designations.  Have a nice weekend.

**Todd Henderson**
9:25-10:10

42:9-16
48:2-50:15
59:3-62:5
68:2-22
88:25-89:25
96:24-97:2
102:9-18
129:11-130:2
130:13-131:14
133:20-134:11
152:11-154:2
169:12-15
172:9-173:16

**Cory Hutsell**
6:3-11
7:23-11:13
12:7-13:13
28:11-30:6
30:12-35:2
37:16-25
41:8-42:11
52:17-54:10
67:1-5
69:13-21
70:22-71:25
73:2-75:10
80:8-18
97:16-101:16
106:21-108:15
109:20-22
112:23-113:15
114:23-118:7
139:19-141:11
144:14-145:4
147:5-22
150:18-151:17
152:23-153:25

**Brett Carp**
6:20-7:9
11:14-12:23
50:9-51:11
51:24-52:10
57:2-59:20

95:25-96:6
137:7-138:17
154:11-155:20

**Eric S. Pettit**
Partner

**BOIES SCHILLER FLEXNER** LLP
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) +1 (213) 629-9040
(f) +1 (213) 629-9022
epettit@bsfllp.com
www.bsfllp.com

---

**From:** Eric Pettit
**Sent:** Friday, May 10, 2019 2:14 PM
**To:** 'Pritchard, J. Scott'; Jessica Rodriguez; Latsinova, Rita V.; Goodnight, David R.
**Cc:** Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Scott – That schedule makes sense to me, and I am generally available on Wednesday except for a meeting from noon to one.

Best,

Eric

**Eric S. Pettit**
Partner

**BOIES SCHILLER FLEXNER** LLP
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) +1 (213) 629-9040
(f) +1 (213) 629-9022
epettit@bsfllp.com
www.bsfllp.com

---

**From:** Pritchard, J. Scott [mailto:scott.pritchard@stoel.com]
**Sent:** Friday, May 10, 2019 1:56 PM
**To:** Jessica Rodriguez; Latsinova, Rita V.; Goodnight, David R.
**Cc:** Eric Pettit; Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** RE: Hidden Hills/Parkway - AMTAX Pretrial Statement

Eric,

We propose the following schedule to govern further proceedings on the pretrial order:

- We will send you our markup of your pretrial statement at the end of the day on Monday May 13th.

- We hold the LCR 16(k) attorney conference on Wednesday May 15th.

- We file the agreed-upon proposed pretrial order on Friday May 17, 2019.

Please let us know your availability for the call on Wednesday.

Thanks,

Scott

Scott Pritchard | STOEL RIVES LLP
scott.pritchard@stoel.com | (206) 386-7585

---

**From:** Jessica Rodriguez [mailto:jrodriguez@bsfllp.com]
**Sent:** Thursday, May 09, 2019 6:45 PM
**To:** Pritchard, J. Scott; Latsinova, Rita V.; Goodnight, David R.
**Cc:** Eric Pettit; Craig Bessenger; Arwen Johnson; Grayce Zelphin; Merriman, Steven D. (Perkins Coie)
**Subject:** FW: Hidden Hills/Parkway - AMTAX Pretrial Statement

Counsel,

I'm resending AMTAX's pretrial statement and trial exhibit list. I inadvertently spelled Mr. Pritchard's email address wrong.

I apologize for any confusion.

**Jessica Rodriguez**
P a r a l e g a l

BOIES SCHILLER FLEXNER LLP
725 S. Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) (213) 629-9040
jrodriguez@bsfllp.com
www.bsfllp.com

---

**From:** Jessica Rodriguez
**Sent:** Thursday, May 9, 2019 6:38 PM
**To:** 'scottpritchard@stoel.com' <scottpritchard@stoel.com>; 'rita.latsinova@stoel.com' <rita.latsinova@stoel.com>; 'david.goodnight@stoel.com' <david.goodnight@stoel.com>
**Cc:** Eric Pettit <EPettit@BSFLLP.com>; Craig Bessenger <CBessenger@BSFLLP.com>; Grayce Zelphin <gzelphin@BSFLLP.com>; 'Merriman, Steven D. (Perkins Coie)' <SMerriman@perkinscoie.com>
**Subject:** Hidden Hills/Parkway - AMTAX Pretrial Statement

Counsel,

AMTAX's pretrial statement and trial exhibit list are attached.  Deposition designations will be provided tomorrow.

Best,

**Jessica Rodriguez**
Paralegal

BOIES SCHILLER FLEXNER LLP
725 S. Figueroa Street, 31st Floor
Los Angeles, CA 90017
(t) (213) 629-9040
jrodriguez@bsfllp.com
www.bsfllp.com

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1 08201831BSF]

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | | | **Hidden Hills** | | |
| 2 | | | | | **3/14/17** |
| 3 | | **§7.8D Release of Environmental Escrow** | | | |
| 4 | | | Environmental Escrow | | 1,558,553 |
| 5 | | | Balance of Administrative General Partner Loan | | -700,962 |
| 6 | | | Interest on Administrative General Partner Loan | | -617,842 |
| 7 | | | 10% of Remaining Environmental Escrow to ILP | | -23,975 |
| 8 | | | 90% of Remaining Environmental Escrow to AGP | | <u>-215,774</u> |
| 9 | | | **Remaining Environmental Escrow** | | 0 |
| 10 | | | | | |
| 11 | | **Gross Revenues (Limited Partnership Agreement, p. 10)** | | | |
| 12 | | | Hidden Hills Apartments | | 19,700,000 |
| 13 | | | Operating Account | | 10,882 |
| 14 | | | Tax & Insurance Escrows | | <u>56,571</u> |
| 15 | | | **Gross Revenues** | | 19,767,452 |
| 16 | | | | | |
| 17 | | **Profits (Limited Partnership Agreement, p. 14)** | | | |
| 18 | | | Gross Revenues (Line 15) | | 19,767,452 |
| 19 | | | Replacement Reserve | | 143,691 |
| 20 | | | Selling Costs (3.0% of Appraisal Price) | | <u>-591,000</u> |
| 21 | | | **Capital Proceeds** | | 19,320,144 |
| 22 | | | | | |
| 23 | | **§6.2B Distribution of Capital Proceeds** | | | |
| 24 | | | Capital Proceeds (Line 21) | | 19,320,144 |
| 25 | | | PNC Mortgage Principal Balance | | -6,299,167 |
| 26 | | | PNC Mortgage Accrued Interest (partnership debt because payable in arrears) | | -32,502 |
| 27 | | | Accounts Payable | | -66,801 |
| 28 | | | Administrative General Partner Deferred Developer Fee/Capital Contribution | | -804,101 |
| 29 | | | Investor Limited Partner Capital Account (10% Priority Distribution) | | -1,211,757 |
| 30 | | | Administrative GP Incentive Supervisory Fee (33% of Gross Revenues) | | -6,523,259 |
| 31 | | | 99.90% of Balance of Such Proceeds to ILP Capital Account | | -4,378,174 |
| 32 | | | 0.09% of Balance of Such Proceeds to AGP Capital Account | | -3,944 |
| 33 | | | 0.01% of Balance of Such Proceeds to SLP Capital Account | | <u>-438</u> |
| 34 | | | **Distribution of Capital Proceeds** | | 0 |
| 35 | | | | | |
| 36 | | **Summary:  Total to Investor Limited Partner** | | | |
| 37 | | | §7.8D 10% of Remaining Environmental Escrow to ILP (Line 7) | | 23,975 |
| 38 | | | §6.2B(ii) 10% Priority Distribution to ILP Capital Account (Line 29) | | 1,211,757 |
| 39 | | | §6.2B(ii) 99.90% of Balance of Such Proceeds to ILP Capital Account (Line 31) | | <u>4,378,174</u> |
| 40 | | | **Total to Investor Limited Partner** | | **$5,613,907** |
| 41 | | | | | |
| 42 | | **Summary:  Total to Special Limited Partner** | | | |
| 43 | | | §6.2B(ii) 0.01% of Balance of Such Proceeds to SLP Capital Account (Line 33) | | <u>438</u> |
| 44 | | | **Total to Special Limited Partner** | | **$438** |
| 45 | | | | | |
| 46 | | **Total Payment to ILP and SLP** | | | **$5,614,345** |