```
 1                UNITED STATES DISTRICT COURT

 2          WESTERN DISTRICT OF WASHINGTON AT TACOMA

 3   _____

 4                               )
     HIDDEN HILLS MANAGEMENT,     )
 5   LLC, and 334th PLACE 2001,   )
     LLC,                         )
 6                               )
     Plaintiffs,                  )
 7                               )
     v.                          ) 3:17-cv-06048-RBL
 8                               )
     AMTAX HOLDINGS 114, LLC, and ) TACOMA, WASHINGTON
 9   AMTAX HOLDINGS 169, LLC,     )
                                  ) June 3, 2019
10   Defendants.                  )
                                  ) 9:00 a.m.
11   _____ )
                                  ) Bench Trial
12   AMTAX HOLDINGS 114, LLC,     )
     AMTAX HOLDINGS 169, and      )
13   Parkway APARTMENTS, LP,      )
                                  )
14                               )
     Counter-Plaintiffs,          )
15                               )
     v.                          )
16                               )
     HIDDEN HILLS MANAGEMENT,     )
17   LLC, and 334th PLACE 2001,   )
     LLC,                         )
18                               )
     Counter-Defendants.          )
19   _____

20              VERBATIM REPORT OF PROCEEDINGS
21         BEFORE THE HONORABLE RONALD B. LEIGHTON
               UNITED STATES DISTRICT JUDGE
22   _____

23

24   Proceedings stenographically reported and transcript
            produced with computer-aided technology
25
```

1

2
                              APPEARANCES
3

4   FOR THE PLAINTIFF:            DAVID R. GOODNIGHT
                                  MARGARITA V. LATSINOVA
5                                 J. SCOTT PRITCHARD
                                  Stoel Rives
6                                 600 University Street
                                  Suite 3600
7                                 Seattle, Washington

8

9

10  FOR THE DEFENDANT:            CRAIG H. BESSENGER
                                   ERIC S. PETTIT
11                                GRAYCE S. ZELPHIN
                                  Boies Schiller & Flexner
12                                725 South Figueroa Street
                                  31st Floor
13                                Los Angeles, California

14

15

16

17

18

19

20

21

22

23

24

25

3

1

2                          EXAMINATION INDEX

3

4    EXAMINATION OF:                                        PAGE

5      CATHERINE TAMARO     DIRECT EXAMINATION                70
                            BY MS. LATSINOVA
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        EXHIBIT INDEX

 2
    EXHIBITS ADMITTED                                PAGE
 3
     Exhibits 2, 3, 4, 7, 9, 10, 11, 12, 13, 14, 15,   6
 4   17, 18, 21, 22, 25, 26, 27, 28, 29, 31, 32, 33,
     35, 36, 38, 39, 40, 42, 43, 44, 45, 46, 47, 48,
 5   49, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61,
     62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 37,
 6   74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85,
     86, 87, 88, 89, 90, 91, 92, 94, 95, 96, 97, 98,
 7   99, 100, 101, 102, 103, 104, 105, 106, 107, 109,
     110, 111, 112, 113, 114, 115, 117, 118, 119, 120,
 8   121, 122, 123, 124, 125, 126, 127, 128, 129, 130,
     131, 132, 133, 134, 135, 136, 137, 138, 139, 140,
 9   141, 142, 143, 144, 145, 167, 167, 148, 149, 150,
     151, 152, 153, 154, 155, 167, 157, 158, 159, 160,
10   161, 162 and 163

11   Exhibits A-1, A-3 - A-23, A-25, A-27 - A-32,       6
     A-35 - A-59, A-61 - A-67, A-70 - A-101, A-103 -
12   A-277, A-279, A-280, A-283, A-285 - A-293

13   Exhibit 23                                        133

14   Exhibit 50                                        137

15

16

17

18

19

20

21

22

23

24

25
```

1                                    MORNING SESSION

2                                    JUNE 3, 2019

3           THE CLERK:  This is the matter of Hidden Hills

4    Management versus AMTAX Holdings, Cause No. 13-06048-RBL.

5        Counsel, please make an appearance.

6           MR. GOODNIGHT:  Good morning, David Goodnight.

7           THE COURT:  Good morning.

8           MS. LATSINOVA:  Rita Latsinova.

9           THE COURT:  Good morning.

10          MR. PRITCHARD:  Scott Pritchard.

11          THE COURT:  That's it.  Okay.

12          MR. PETTIT:  Eric Pettit from Bois Schiller, I will

13   let my co-counsel represent themselves.  Our client

14   representative is Christopher Blake.

15          MR. BESSENGER:  Craig Bessenger.

16          MS. ZELPHIN:  Good morning, Grayce Zelphin.

17          THE COURT:  This is before the Court for a bench

18   trial.  Before we start, are there any preliminary issues or

19   matters you be want to take up with the Court?

20          MR. GOODNIGHT:  Just a couple.  We have four exhibits

21   for our side that have not been provided to the Court.  I

22   have copies of those.  Can I hand them up?

23          THE COURT:  Sure.  Absolutely.

24          MR. GOODNIGHT:  Thank you.

25       The other is that we have a list of exhibits that we would

1   like to offer into evidence at this time in our case, that

2   are not objected to on any ground, if I may read them.

3           THE COURT:  Doesn't matter whether they objected or

4   not, it is going to come in.  Sure.

5           MR. GOODNIGHT:  Shall I read them into the record?

6           THE COURT:  I may.

7           MR. GOODNIGHT:  No. 2, 3, 4, 7, 9, 10, 11, 12, 13,

8   14, 15, 17, 18, 21, 22, 25, 26, 27, 28, 29, 31, 32, 33, 35,

9   36, 38, 39, 40, 42, 43, 44, 45, 46, 47, 48, 49, 51, 52, 53,

10  54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68,

11  69, 70, 71, 72, 37, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83,

12  84, 85, 86, 87, 88, 89, 90, 91, 92, 94, 95, 96, 97, 98, 99,

13  100, 101, 102, 103, 104, 105, 106, 107, 109, 110, 111, 112,

14  113, 114, 115, 117, 118, 119, 120, 121, 122, 123, 124, 125,

15  126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137,

16  138, 139, 140, 141, 142, 143, 144, 145, 167, 167, 148, 149,

17  150, 151, 152, 153, 154, 155, 167, 157, 158, 159, 160, 161,

18  162 and 163.

19          THE COURT:  Great.  Thank you.

20      Any other preliminary matters?

21          MR. PETTIT:  I have a list, I can give you -- where

22  there are uninterrupted ranges, I can give you the range, if

23  that is not objectionable to Mr. Goodnight.

24          MR. GOODNIGHT:  No, not at all.

25          MR. PETTIT:  Let me get this done with, and then I

1   will raise the one issue.

2      We have, ours have an A prefix, A-1, A-3 through A-23,

3   A-25, A-27 through A-32, A-35 through A-59, A-61 through

4   A-67, A-70 through A-101.  A-103 through A-277, A-279, A-280,

5   A-283, A-285 through A-293.

6            THE COURT:  Okay.  Thank you.

7            MR. PETTIT:  Your Honor, the one other issue I want

8   to raise before we get started, we had issued a trial

9   subpoena and a request for documents to an individual named

10  Laura Lindal.  Ms. Lindal was the auditor for the two

11  partnerships that are at issue.

12           THE COURT:  I read the proposed pretrial order.

13           MR. PETTIT:  Okay.  So we had issued that subpoena

14  for her to show up.  We sent her a notice of acknowledgement

15  saying, sign this and return this to us, you don't have to

16  show up on the first day.  We will give you notice.  The way

17  you normally do.

18           THE COURT:  Right.

19           MR. PETTIT:  We spoke to her original counsel, and I

20  think that is who -- we sent the subpoena to the original

21  counsel.  That counsel withdrew.  There was a new counsel

22  appointed for Ms. Lindal.  We were able to speak with that

23  counsel, but we had requested that she provide the documents.

24  We had requested that she sign the acknowledgements.  We

25  wanted some confirmation about Ms. Lindal's status.  She

1    didn't give us any of that information.

2        Late last week, I was speaking with Mr. Goodnight,

3    preparing for this trial, and he indicated he had spoken with

4    Ms. Lindal's counsel, and that they were planning on calling

5    her as a witness in their case in chief.  I don't have a

6    problem, necessarily, that she's not here today.  It is of

7    concern to me that our subpoena was ignored and that we also

8    had requested documents that are of recent vintage, documents

9    that hadn't been produced in discovery, and we haven't

10   received those.

11       THE COURT:  Mr. Goodnight, what is your knowledge on

12   this matter?

13       MR. GOODNIGHT:  We had talked to Mary Haddad, who is

14   the new lawyer that has been involved for about a week.  I

15   have no knowledge --

16       THE COURT:  I want to know whether you are planning

17   on calling her, putting her on.

18       MR. GOODNIGHT:  Yes.  Yes, we are.

19       THE COURT:  On your own time, cooperate together so

20   that you can -- so we don't have to have any unpleasantries

21   over Ms. Lindal's attendance.

22       MR. GOODNIGHT:  Absolutely.

23       THE COURT:  Anything else?  Ready for opening

24   statement?

25       MR. GOODNIGHT:  Yes, Your Honor.

1          THE COURT:  All right.  Mr. Goodnight.

2          MR. GOODNIGHT:  Thank you.  I wanted to introduce

3    Catherine Tamaro.  And her husband is in the back seat,

4    Mr. Arterberry.  Thank you, Your Honor.

5          I represent the general partners of both partnerships.

6    And Ms. Tamaro is the principal of each general partner, HHM

7    and Hidden Hills and 334th Place, but I am going to refer to

8    them just as GP or general partner:  I don't think it makes

9    any difference.

10         Ms. Tamaro will be our first witness.  She has been the

11   general partner and manager of both partnerships from the

12   beginning, for over 17 years.

13         Each of the partnerships owns a low-income housing tax

14   credit apartment complex.  Both serve low-income tenants.

15   Ms. Tamaro put both deals together in 2001 and 2002, and then

16   has done many, many things over the years, as can you

17   imagine.  I will mention a few:

18         She identified the properties.  She negotiated their

19   purchases.  She applied for and received tax-exempt bond

20   finances and low-income tax credits.  She negotiated the

21   partnership agreements, and supervised the renovations of

22   both properties and their entry into the low-income housing

23   tax credit program, known as LITHC.

24         Ms. Tamaro lives in Washington, and has worked for

25   low-income housing for 20 years, and she wants to continue to

1    own and operate both of these properties.  Now, she manages

2    affordable housing units in Pierce County, South King County,

3    and three of her properties are owned in partnership with the

4    Tacoma Housing Authority.

5        She has renovated apartments on North I Street in the

6    historic Stadium District, with financial assistance from the

7    City of Tacoma.  She has worked with the Tacoma Housing

8    Authority, Pierce County Housing Authority, and King County

9    Housing Authority.  They have all assisted her in financing

10   affordable housing projects.  This is what she does.  This is

11   what she's been doing for over 20 years.

12       Parkway and Hidden Hills are for low-income residents.  As

13   I mentioned, the rents are restricted to levels calculated

14   from HUD median income of the county in which the project is

15   located.  And you will hear testimony about the rent levels.

16       The Parkway property, Your Honor, which is now on the

17   screen, is in Federal Way.  And if you look at the photo in

18   the bottom left, you will see the decks and you will see the

19   siding here.  When we talk in the record about the

20   replacement of the decks that were rotting and the siding

21   that was aged out, that's what we are talking about.  This on

22   the right side are the old decks and the old siding of

23   Parkway.

24       This property required very substantial capital

25   improvements over the years, and you will hear about that,

1  including windows, which are also shown here, sliding doors,

2  and so forth.

3      Now, the Hidden Hills complex is in University Place,

4  Washington.  And it is pictured here.  Each of these two

5  partnerships, Your Honor, are governed by very similar,

6  almost identical partnership agreement?  AMTAX is the limited

7  partner, and they really are passive investors managed by

8  Alden Torch, a syndicator of federal low-income housing tax

9  credit for investors in what are called the AMTAX funds.

10     Alden Torch is an asset management firm in Denver, and

11 bundles low-income tax credit properties into these

12 investment funds.  And the funds then reap the benefits of

13 tax credits and losses during what is known as the compliance

14 period.  And those are provided by the federal government.

15         THE COURT:  The 17-year period.

16         MR. GOODNIGHT:  Seventeen, exactly, Your Honor.  The

17 compliance period is technically 15 years, but it has been 17

18 years.

19     When Ms. Tamaro acquired the properties, Alden Torch was

20 not involved.  It bought the original LP interest in 2011.

21 There is a timeline here that will show you the relevant, key

22 dates.  So the point is that Alden Torch had no involvement

23 at the beginning of these properties in the structuring or

24 the financing of projects, or any work done between 2001 and

25 2011.  It came in here.

1    AMTAX is really now challenging managerial decisions made

2    by the GP, like dealing with leaking roofs, siding,

3    replacement of decks, even the extermination of bedbugs,

4    paving parking lots, et cetera.

5        It is ironic that you will see, I believe you will see,

6    Your Honor, that there are no complaints that the general

7    partner has done too little to take care of the property.

8    She has done too much.  It is too expensive.  This slide

9    shows the timeline going back to 2001.

10       Now, Ms. Tamaro also has partnered with Alden Torch on two

11   affordable housing projects in Nevada.  I would note, Alden

12   Torch has never made any claim for breach of fiduciary duty

13   or removal.  In fact, Your Honor, Ms. Tamaro, in the 20-some

14   years she has been involved in affordable housing and

15   low-income tax credit properties, has never been the subject

16   for breach of fiduciary duty or removal in any case.

17       What this case is really about, and the reason the removal

18   claims have arisen after the exercise of the option, has

19   everything to do with the housing market in Tacoma and the

20   appreciation of these properties.

21       Under the partnership agreement, the GP has a right to buy

22   out the limited partnership interest after the 15-year

23   compliance period.  That right is characterized as an onion

24   that's held only by the general partner.  The limited

25   partner, by contrast, is getting the tax credits and losses

1    every year throughout the 15 years.  But the general partner

2    is not.  The general partner waits 'til year 15, and then can

3    exercise the option to buy out the LP.  That's when she has

4    the benefit of all this work.

5         This 15-year period is called the compliance period.

6    During that time, all of -- you will see evidence and

7    admissions -- that all of the tax credits and losses were

8    paid out to Alden Torch.

9         So the time for the GP to exercise the buyout option for

10   Hidden Hills and Parkway arrived in 2017 and '18.  Fifteen

11   years has gone by.  There's no dispute that the option was

12   timely exercised.  It is not a "Snow White" option.  It

13   doesn't require no defaults.  It doesn't require a perfect

14   GP.  It is tied to the time.  Fifteen year compliance period

15   ends, option can be exercised.

16        I want to turn briefly to the tax credits and losses that

17   were earned during the 15-year period.  A central

18   responsibility of Ms. Tamaro was to deliver those tax credits

19   and losses.  That is a big deal.  It requires enormous

20   amounts of attention and work.  Typically in these LITHC

21   properties, as Your Honor likely knows, the investor is not

22   looking for cash flow.  They are looking for the losses and

23   the credits.  And they got those.

24        Those benefits are at the heart of the partnership

25   agreement like this.  And there's no dispute that the GP kept

1   the partnership compliant, during the entire 15 years, so

2   that all of those tax credits and losses were earned.

3        Hidden Hills and Parkway are regulated by federal and

4   state agencies, including HUD, the IRS, the Washington State

5   Housing Finance Commission and the Washington Department of

6   Revenue.  It is a lot of regulatory work.

7        Ms. Tamaro dealt with all of that to ensure compliance,

8   for 15 years.  The partnership obtained audit and financial

9   statements every year.  The GP prepares the draft financial

10  statements and works with the auditor.  And those statements

11  were done year-in and year-out Ms. Tamaro will explain that

12  work.  Now, the limited partner had a right to accept the

13  audits, which in my experience is normal, and always did so.

14       Ms. Tamaro has managed both of the partnerships since

15  2002, and she supervises employees that work there.  She

16  manages repairs.  She maintains the property.  She sets the

17  rents, and we will tell you how she does that.  And most

18  importantly on Parkway, she ensures compliance with HUD

19  requirements.  It is a HUD loan.  And you will hear evidence

20  that is very significant.

21       She will explain to you and give you a sense, I think, of

22  the work that she's done over these years.  And I have a

23  screen here that just, in a checklist format, lays out all of

24  this kind of work.

25       The benefit of all of this to AMTAX over 15 years was $8.1

1   million dollars in federal tax credits and write offs in

2   exchange for an upfront investment of $3.6 million.  It

3   worked.  And Parkway, $7.2 million in tax credits and losses

4   over 15 years.  A total of $15.3 million reaped, just as

5   expected, because of compliance during the 15-year period.

6   So the 15-year period passes, the buyout option arrives,

7   based on the end of the compliance period, and Ms. Tamaro,

8   undisputed, says:  I am giving notice of my option to buy the

9   properties.

10      It is a unilateral right.  There's no question about that.

11  What is she buying out?  She's buying out -- not the

12  property -- she's buying out the interest of the limited

13  partner, after the compliance period.

14      Now we have here a slide that simply quotes from the

15  relevant section, what she is buying out is the interest in

16  the real estate owned by the limited partner.  So there's no

17  dispute that that's what she's exercising the option to buy

18  out.  There's no dispute that she has the right.  There's no

19  dispute it was timely exercised.

20      What is she seeking in this case?  She's seeking in both

21  properties, Your Honor, the same thing.  Once the exercise of

22  the option is triggered, there is a process to set the option

23  price.  Once the option price is set -- through two steps --

24  first is, what is the appraisal value?  And then the

25  waterfall calculation under the partnership agreement,

1   Section 6.2.  Once that's set, she either can or she cannot

2   pay cash to the limited partner for the interest in the

3   property.  This next slide shows -- Exhibit 2 -- shows the

4   requirement that she pay cash.

5       Now, in Hidden Hills -- I want to now break this down,

6   Your Honor, and talk about Hidden Hills and the issues there,

7   and Parkway -- in Hidden Hills, the primary issue and the

8   problem was the buyout price.  Your Honor ruled that the

9   third appraisal that was obtained was tainted.  It should not

10  have considered the environmental issues.  The contamination

11  was not to be included in the final and binding appraisal.

12  So it was, in fact, not final and binding to set the option

13  price.

14      Your Honor suggested that to cure those defects in setting

15  the fair market value, it may be as simple as redoing the

16  appraisal process.  And there is a quote here from your

17  order.

18      I'll tell you straight up, Your Honor, that our primary

19  objective, Ms. Tamaro's primary objective, is to cure the

20  taint in Hidden Hills to be able to exercise the option and

21  pay the option price, if she is able.  We think there are two

22  ways of doing this.  The first is to simply accept the AMTAX

23  appraisal as it was provided.  And we did that.  We provided

24  notice.  We accept the appraisal number from AMTAX.

25      The second, which is also viable but would require more

1   time, I think, is to solicit a new final and binding third

2   appraisal that comports with this Court's order.  And she is

3   also, Ms. Tamaro is also willing to do that.  But she wants

4   the opportunity to know what the option price is and to pay

5   it in cash.  That's what we want.

6       On May 7th, the general partner gave notice to AMTAX that

7   it had accepted the appraisal, without qualification.  And we

8   said:  This is not a settlement communication, we are

9   accepting your appraisal.  $19.7 million.  We then calculate

10  what is called the waterfall, and the option price number to

11  be 4.968 million.  And I list that here on the screen.  We

12  explained that calculation.  We sent it to counsel, and we

13  said:  That is what we think the option price should be.  It

14  is at Tab B of our trial brief.

15      AMTAX counsel then provided its own waterfall, also based

16  on their appraisal, while saying clearly to us:  It is too

17  late for Ms. Tamaro to accept our appraisal.  But for the

18  sake of running the numbers, if we do, this is what we come

19  up with.  Pretty big delta.  It is not too surprising that

20  there could be differences in the way the waterfall is

21  calculated under Section 6.2.  We will get into that

22  evidence, but it is a little bit complicated.

23      I then notified counsel for AMTAX that the general partner

24  agreed with several adjustments that were being made to the

25  waterfall.  That is explained in Tab D to our trial brief

1    correspondence.  And that increased the waterfall to 5.614

2    million.

3        Ms. Tamaro will explain why she agreed to those

4    adjustments in her original waterfall, which have to do with

5    the priority payments under Section 6.2 that you will see are

6    listed in the partnership agreement.

7        So at this point in Hidden Hills, the delta between the

8    general partner and AMTAX is the difference between the high

9    and the low, which is 1.993 million.  That is the delta, on

10   the question of what is the option price.

11       Once the option price issue is resolved, Ms. Tamaro, under

12   Section 7, is to pay cash, if she is able to finalize the

13   option.  In that event, let's say Your Honor resolves issues

14   about the option price, which is perfectly fine with us, in

15   that event, if she pays cash, then by definition -- the way I

16   am thinking about it, unless they quarrel with their own

17   appraisal or the date of the appraisal -- by definition they

18   will have received fair value for their interest in the

19   partnership.

20       If the option price is one that cannot be paid in cash,

21   she can't do it, which is possible, then AMTAX we think has a

22   right, under the very next section of the partnership

23   agreement, to say, okay, we are going to market this interest

24   for sale in the market.  And you have, general partner, a

25   right of first refusal.  Then the market sets the price.

1    Right?  So the agreement is structured with the appraisal

2    process and the waterfall, and then the market sets the

3    price, and she either can or can't exercise the right of

4    first refusal.

5        The point is that either way, the limited partner should

6    be made whole.  And the option right should be allowed to be

7    exercised, in our view.

8        The second way to resolve the dispute under the option

9    price is to appoint a final and binding third appraiser.  And

10   as I said, Ms. Tamaro is willing to do that, if that is

11   deemed necessary by the Court.

12       Now, I want to switch gears, Your Honor, and talk for a

13   moment about the removal request in Hidden Hills, not in

14   Parkway, but just in Hidden Hills.

15       First of all, in Hidden Hills, there is no claim for

16   damages by AMTAX.  AMTAX has dropped its direct damage claim.

17   And we highlight that in the pretrial order.  AMTAX has never

18   asserted a derivative claim in Hidden Hills -- putting

19   Parkway aside, in Hidden Hills, never asserted a derivative

20   claim.  And we cite to the response to Interrogatory No. 4.

21       So, in Hidden Hills, there is no allegation that the GP

22   mismanaged the partnership or incurred any improper fees

23   during 15 years.  There's no damage claim.  There's no

24   derivative claim.  The allegations of misconduct are in

25   connection with the appraisal process only.  That is why we

1    are saying, we want -- we understand you want to talk about

2    that, AMTAX, but we want to put us in a position to cure

3    that, so that both parties' rights can be fully exercised.

4        AMTAX is essentially, I think, taking the position it is

5    too late.  You can't cure.  We want you out.  Which is really

6    about AMTAX wanting, not its interest in the property, but it

7    wants the property.  It wants the property because of the

8    Tacoma housing market.

9        That is not the right, under the partnership agreement,

10   unless you find a basis for removal.  The right is to be paid

11   for your interest.  Removal, under Section 4.5, requires a

12   showing of economic detriment to the partnership, or to the

13   project.  This is our Exhibit 2, under the partnership

14   agreement, Section 4.5.

15       It seems to me, Your Honor, that neither the partnership

16   nor the project will be harmed by accepting AMTAX's own

17   appraisal and setting a fair option price.  AMTAX has no

18   damage claim.  It has no derivative claim.  There is no

19   economic detriment that warrants removal, so long as we can

20   get to a fair option price, which is the whole point of

21   Section 7.  That's the bargain, that is the bargain between

22   both sides.  She gets to buy the property out at that price.

23   She has that right under the agreement.

24       Let me turn to the Parkway issues, which are quite

25   different.  The same basic issue is, will the option be

1   recognized and will she have the opportunity to exercise it

2   at a fair option price?  But the issues are quite different.

3        Parkway's compliance period ended one year later than

4   Hidden Hills, on December 31, '17, and at that point the

5   litigation in Hidden Hills was underway.  The parties were

6   already at odds on one of the two properties.

7        The compliance period ends.  GP exercises her option right

8   on January 3, 2018, notifies AMTAX -- this is Exhibit 128.

9   AMTAX does not respond.  The GP writes again on February 15th

10  to AMTAX, explaining that the appraisal has been completed,

11  the audit has been completed.  The financial information has

12  been delivered, Exhibit 131.  Again, February, AMTAX does not

13  respond.

14       AMTAX does respond in March, but it refuses to provide the

15  required appraisal.  It said it was evaluating activity by

16  the GP and that it would address the request, in quotes, the

17  request to move forward with the appraisal process once it

18  completed this evaluation.  This is now two to three months

19  after the option has been exercised.  This is in Exhibit 132

20  and on the screen.  Evaluating questionable activity.  Will

21  address the request later.  No appraisal.

22       Well, you will see in the partnership agreement that the

23  option is not a request.  It is a right.  It is a right that

24  materializes after 15 years.  The GP responded the following

25  day, provided the appraisal, stated:  I am willing to make

1    any financial information you need available.  This is

2    Exhibit 133.  AMTAX, again, refuses to provide an appraisal

3    in April.  It is now four months later.  No appraisal.

4        It becomes clear to us that AMTAX is not going to allow

5    the general partner to go through the process of setting the

6    option price.  It is not going to cooperate in the appraisal

7    process.  We write and we say, look it, if you don't

8    cooperate we are going to amend the Complaint and add Parkway

9    to this case.  They resist that.  We file a motion, which

10   Your Honor grants.  Now Parkway is in the case.

11       During all this time, after 17 years of managing this

12   property, AMTAX is telling us that it needs months to figure

13   out whether it has a claim against Ms. Tamaro?  Four months,

14   no appraisal.  Five months, no appraisal.  After 17 years.

15   What it is doing is it is hiring an expert witness from a

16   firm called Novogradac and trying to concoct, frankly, a

17   claim for removal so that it doesn't have to go through with

18   the buyout option.  That's exactly what happened here.

19       Section 7.4J required AMTAX to provide an appraisal.  And

20   refusal to do so is a breach of its obligation.  And I think

21   Your Honor recognized that in the Court's summary judgment

22   order, granting in part our motion, to the extent that AMTAX

23   has claimed defaults.  This is the Snow White point.  This is

24   not a Snow White option.  Claimed defaults do not justify a

25   refusal to participate in the process.  Otherwise, you could

 1    never get to the buyout option price.

 2         AMTAX went a step further.  They actually said to

 3    Ms. Tamaro:  Unless you withdraw your claims under Section

 4    6.2 for repayment of monies you invested of the partnership

 5    of $2.7 million, we won't provide an appraisal.  You must

 6    withdraw your claims.

 7         She had loaned money to the Parkway Partnership, which is

 8    permitted and required under Section 7.9 of the partnership

 9    agreement.  If the partnership doesn't have cash flow to pay

10    repairs, to do the work, to pay payroll, the general partner

11    has a duty to invest funds.  And she invested, you will see,

12    well over $1.2 million of her own money, as required and

13    permitted.  And AMTAX was saying:  Unless you give that up,

14    we won't part.

15         She had an absolutely clear contractual right to invest

16    that money and to expect that it would be repaid when the

17    option was exercised.  That is right in the agreement under

18    Section 6.2.  And I will reference 5th and 6th.  Sixth:  The

19    repayment of any subordinated loans of the managing general

20    partner is part of the waterfall.  This had been listed in

21    financial statements for many, many, many years, year-in and

22    year-out.  There was no question about it.  But AMTAX was

23    refusing to participate, unless she gave up these funds.

24         In other words, unless you give up the 2.7 million, we

25    won't allow the option to be exercised.

1    Ms. Tamaro worked for over 15 years on these properties,

2  keeping them in good condition.  Not barely habitable

3  condition, good condition, as required by HUD.  And she

4  managed the following types of repairs.  You will hear about

5  siding.  The siding was aged out.  You will hear about deck

6  replacement.  The decks were literally rotting.  You're going

7  to hear about paving.  You will hear about leaking roofs.

8    And, Your Honor, of course all of these repairs are now

9  baked into the value of the property.  If it is appraised

10  today, all of this is value in the property.  That is part of

11  the payment of the option price.  But they would not

12  participate in the option.

13    The loans are specifically authorized by the partnership

14  agreement, and they were required to complete such things as

15  payroll.

16    She had a clear contractual right to be repaid for those

17  loans, and the demand is totally improper.

18    Every year, Parkway's audited financial statements had a

19  going concern note that you will hear about.  Ms. Tamaro will

20  explain it to you, to the effect that the partnerships were

21  being kept alive through Ms. Tamaro's investment for things

22  like payroll and expenses.  You will see the going concern

23  note in Exhibit 126.

24    So while AMTAX refused to provide an appraisal in Parkway,

25  we later learned that it had commissioned one, but refused to

give it to us.  It commissioned it as a litigation tool, but
not as an appraisal.  And this is Exhibit 136.

This same firm that employs AMTAX expert,
Mr. Krabbenschmidt, who you will hear from, also provided
this litigation appraisal for counsel.  That appraisal was
completed in May of 2018, five months after the exercise, but
not provided until later, until we demanded it.

Our second witness will be an Alden Torch employee, who is
here today, Mr. Blake.  In December of 2017, after the Hidden
Hills litigation was underway, he commenced and directed a
team to scrutinize the financial statements that Alden Torch
and AMTAX had been receiving for 17 years, to try to find
some basis for removal.

It is now clear that in response to the buyout option,
AMTAX decided -- this is in Exhibit 125 -- had decided let's
go for removal.  Not participate.

You will see that the claims AMTAX developed involved
matters squarely within the discretion of general partner,
things like repairs to the property.  Even something as
simple as replacing a trash compactor or dealing with
bedbugs.  That, they say, is a basis for removal.

Much of this work was done before AMTAX even invested.  It
was all -- I think it will be true to say, I think the
evidence will show, that all of this work was disclosed in
financial statements and audits.

1     AMTAX and its experts are now claiming that the GP should

2 have done as little as possible to keep the property -- and

3 this is what Mr. Krabbenschmidt said -- barely habitable,

4 while increasing the rents more aggressively on the

5 low-income tenants.  So don't replace the decks.  Don't

6 replace the siding.

7     But this property, you will see, Your Honor, is financed

8 by HUD.  There is a HUD note.  The note doesn't say "barely

9 habitable."  It says the GP and LP are liable if the property

10 is not kept in good condition.  Rotting decks are not in good

11 condition.  Leaking roofs are not in good condition.  You

12 will see documentary evidence that Ms. Tamaro -- and she will

13 explain this to you -- that she raised the rents

14 appropriately, numerous times.  And she did so wisely, and in

15 compliance with all applicable standards.

16     The problem that AMTAX has is that the same fees it now

17 alleges are improper, it approved throughout the entire

18 compliance period.  Fifteen years.  So it's all of a sudden

19 their basis for removal.  For instance, you will see

20 Mr. Blake concluded, then, that he was on the same page in

21 2014, on the same page as the GP with respect to the audits.

22 There was a proposed buyout at that time.  And they looked at

23 financials, they looked at audits and said:  We are on the

24 same page.

25     Now they say the very same fees are multiple material

1   breaches that justify removal.  Four years later.

2       This slide compares what AMTAX was saying in 2014 to what

3   it is saying today.  AMTAX knew about the fees it now says

4   were unauthorized because they were disclosed not only in

5   financials, not only in audits, they were discussed in

6   emails, they were discussed in meetings, and you're going to

7   see evidence of that, back and forth.  Need to replace the

8   decks.  Need to replace the sliding doors, there is mold.

9   That's the evidence you will see.

10      The evidence will show that all of AMTAX claims are

11  attacks legally on the managerial discretion of the general

12  partner.

13      Ms. Tamaro has discretion under specific provisions of the

14  partnership agreement.  And this is true, as I am sure the

15  Court has seen in many types of partnerships, whether it is a

16  winery or a housing project.  It is particularly true in a

17  low-income housing project.  The passive investor doesn't

18  come in and manage the rents.  They get information about

19  that.  That is the GP's job.  Evictions, repairs, et cetera.

20      Section 7.3A addresses this and says that the GP has the

21  exclusive right to manage the business of the partnership.

22  That is what Ms. Tamaro was doing throughout the entire

23  compliance period, without any claim for removal.  That

24  includes things from repairing the property, painting,

25  setting rents, dealing with bedbugs and how you kill them,

 1    and so on.

 2        And Section 7.3A gives the exclusive right to them.  And

 3    Section 7.4 says you must exercise your best efforts.  The LP

 4    expressly authorizes the GP to appoint a managing agent,

 5    which she, did Trieste Holdings.  And by contrast, AMTAX's

 6    role, as you would expect, is passive investor.

 7        The idea that's embedded in the partnership agreement is

 8    not unusual in the least.  The GP has this discretion, that

 9    is what she does, for your benefit.  You invest.  You are

10    entitled to audits, you are entitled to financial

11    information, which she always got.  That's exactly what

12    happened.

13        Now, I want to address HUD's duties and repairs.  I am

14    nearing the end here.  This is very important.  One of

15    AMTAX's claims is the GP made unnecessary repairs.  It cost

16    too much.  Parkway's financed by a HUD ensured loan which was

17    entered in 2002, and it was renewed in 2015.  The limited

18    partnership agreement specifically provides that each

19    partner, the limited partner and the GP, owes duties to HUD.

20    The breach of those duties would be a very serious matter.

21        The HUD note, which you will see in evidence,

22    Your Honor -- we will have some testimony about this --

23    requires the property be kept in good repair.

24        Ms. Tamaro will explain various code of federal

25    regulations standards, local and state law standards that

1  she's familiar with, about how you do that as a manager of

2  property.

3      HUD itself assessed in 2014 that the repairs would require

4  over $2 million other the next ten years.  This is a HUD

5  report.  To free up cash for the repairs and to address

6  issues identified in the report, HUD encouraged Parkway to be

7  refinanced.  The HUD project manager actually reached out to

8  the limited partner to encourage them to approve it.

9      Here is what HUD told the invested limited partner, four

10  years before the option was exercised, and I am quoting,

11  "Though the property has been plagued by certain financial

12  performance issues, I believe Catherine Tamaro has made

13  drastic improvements to the physical condition and

14  management."

15      Your Honor will also see due diligence documents that

16  acknowledge the need for these repairs going all the way back

17  to 2006 and 2012.  AMTAX now contends that it was a breach of

18  duty, warranting removal, to put in, to replace single-pane

19  windows, for which the partnership received a rebate from

20  PSE.  But in 2006, you will see that AMTAX knew that the

21  windows were experiences condensation and needed to be

22  replaced.  This was discussed between Ms. Tamaro and AMTAX

23  and its predecessor along the way.

24      AMTAX contends it is a breach of duty to replace balconies

25  that were rotted.  And that justifies removal.  But in 2012,

a commissioned report by AMTAX said:  Of concern, however, is
the subjects articulated facade system.  This is Exhibit 50.
The balconies, which require a high level of preventative
maintenance.  These are the types of, quote, damage claims
for which AMTAX and its expert, Mr. Krabbenschmidt, are
seeking removal.

     Ms. Tamaro will testify she told Mr. Newbold, who was an
Alden Torch asset manager, that substantial capital repairs
were necessary.  And you will see emails back and forth, some
of which I prevail.  Exhibit 70, for instance, "Parkway is in
need of major capital infusion to repair major dry rotted
siding."  This is now a basis for removal.  She also told him
how much of it would have to be paid for from her own pocket,
because the cash flow was insufficient.  AMTAX knew about
this all along.  And Mr. Newbold, in fact, in Exhibit 91,
summed this up by saying, "Parkway is paying for labor out of
the operating income, although the GP anticipates they have
to lend money to the partnership to cover some of the bills."
Mr. Newbold also received a copy of HUD's report and
witnessed the repairs being done.

     AMTAX is also saying that the rents weren't sufficiently
increased, which is just not true, and seeking removal on the
basis that during the compliance period she should have more
aggressively increased the rents.

     You will see she provided monthly rent rolls, Your Honor,

to the limited partner.  Not surprising.  Here is what the

rent are.  AMTAX received and reviewed those on a regular

basis.  To the extent that issues were raised, you will see

in Exhibit 60, she offered to answer them.  Here is

Mr. Newbold saying, in response to the comment, "Yes, the

property has strong occupancy right now, but it is an older

property."  She's saying, "It is an older property.  If we

raised rents, it would trigger a number of move outs."

Mr. Newbold says, "Understood."

Now, we are told that not raising the rents more

aggressively is a basis to remove her and block the buyout.

In 2012 Novogradac, the firm that employs Mr. Krabbenschmidt,

the same firm, wrote a property analysis saying, "We conclude

that the subject's rents are reasonable."  This is the same

firm that is now investigating the basis for removal based on

the rents.

In fact, the rents were raised every year from 2012 and

are currently at allowable levels under the low-income

housing tax credit regulations.

Ms. Tamaro will explain that setting rents takes into

account not just how much can you get from the residents for

the benefit of a limited partner, but many, many other things

like the location, the low-income nature of the tenants, the

obligations to the non-profit partner, and so on.  And she

did all of that for 15 years.  The objective is not just to

1   maximize the profits of a passive investor.  That is

2   important, but that is not it.  It is to manage the property

3   properly under HUD.  That is what the business judgment rule

4   allows her to do.

5       Finally, the remainder of AMTAX damage claims involve what

6   it contends are unauthorized fees dating back to 2002, nine

7   years before it even invested.  AMTAX experts list any and

8   every fee, so far as I can tell, without even attempting to

9   look at the statute of limitations or what work was known.

10  Everything they can think of.  Exhibit 161 gives you a sense

11  of that.

12      All of these fees were not only proper, but they were

13  necessary to meet the HUD requirements.  Only fees after

14  2012, under the statute of limitations, are even arguably

15  appropriate for a damage claim.  The evidence will show that

16  of these fees, $1.695 million are beyond the statute of

17  limitations.  Mr. Krabbenschmidt didn't even attempt to

18  address subject an issue.

19      All of these fees were fully disclosed in financial

20  statements, audited financial statements filed with HUD and

21  delivered to AMTAX, Your Honor, every single year.  They are

22  right in the financial statements.

23      In 2014, Mr. Newbold and Mr. Blake instructed John Thomas,

24  an accountant, to give priority to reviewing the

25  partnership's 2013 audited financials, and you will see

1    Exhibit 73 requests that.  The 2013 audited financial

2    statements disclosed the same categories of fees that AMTAX

3    is currently challenging.  And that is in Exhibit 67.  These

4    are the very same types of fees AMTAX damage claim that were

5    disclosed year-in and year-out, in the audited financial

6    statements.

7        After asking Ms. Tamaro about these fees, the same fees it

8    is raising now, AMTAX said:  We are on the same page with

9    respect to the 2013 audit.  So during the whole compliance

10   period, none of this is a problem.  All of a sudden, remove

11   her.

12       During the 15-year compliance period AMTAX never ones

13   claimed removal.  Never claimed breach of fiduciary duty

14   justifying removal.  In fact, Alden Torch reported to its

15   investor that the GP was not in default.  This is Exhibit 90.

16   Not in default.

17       It was only in 2018, after Ms. Tamaro proceeded with the

18   buyout option, that AMTAX claimed defaults that warranted

19   removal.  Removal is a dramatic remedy after 15 years.  It is

20   not even close to appropriate in this case.

21       I will just mention, Ms. Lindal, the auditor, she withdraw

22   from auditing the partnerships, because of accusations of

23   malpractice by AMTAX's expert, Mr. Krabbenschmidt.  We have

24   had correspondence about that.  Ms. Tamaro is now looking for

25   a new auditor to replace her.  We have had correspondence

1   about that.  She will be here, Ms. Lindal will be here to

2   testify and explain that she had been providing audits and

3   that she withdrew, and she withdrew because of these, what

4   she considered to be very serious threats from AMTAX.

5       In conclusion, Your Honor, the fundamental right of the

6   general partner, after 15 years, is to exercise the buyout

7   option.  By honoring that right, both parties can and should

8   get what they bargained for.  In Parkway, AMTAX's position

9   extreme and unfair after all these years.  After someone has

10  invested her own money to care for a property that they

11  reaped financial rewards from for 15 years, to say she's out

12  on her ear.  And that's exactly what is happening, because

13  they want this property.  That is what this is about.

14      She is not obligated to squeeze every penny out of these

15  properties by declining to repair them, by raising rents as

16  aggressively as possible.  That's not her obligation.  She

17  managed these properties well.  And we're proud of her.  We

18  are proud of what she did.  We are proud of her, frankly, for

19  standing up to this.  The LP is clearly trying to block an

20  established right.

21      We respectfully request, Your Honor, that you enforce the

22  GP's right to exercise the option and get us to a place where

23  we can have an option price for both properties.  She either

24  can or she can't pay it.  If she can't pay it, they can

25  market their interest on the market, and the market will

1   decide.  But it is not right, what they are doing is not

2   right to block her option after all these years.

3        Thank you.

4        THE COURT:  Thank you, Mr. Goodnight.  This is a

5   little early for our mid-morning break.  Who is speaking

6   for --

7        MR. PETTIT:  I am.  That would be fine.  I have about

8   the same amount of time as Mr. Goodnight.

9        THE COURT:  We will take a 15 minute break and we

10  will be back shortly.  Court will be at recess.

11                              (Recessed.)

12       THE COURT:  Mr. Pettit, you are up.

13       MR. PETTIT:  Thank you, Your Honor.  Good morning,

14  Your Honor.

15       THE COURT:  Good morning.

16       MR. PETTIT:  As you heard, the plaintiffs in this

17  action are seeking to compel the two AMTAX entities the

18  parties refer to collectively as AMTAX to sell their interest

19  in two affordable housing partnerships to plaintiffs pursuant

20  to a contractual option in the limited partnership agreements

21  governed in the partnerships.

22       In your summary judgment order, you found, based on

23  undisputed facts, that the plaintiffs' principal,

24  Catherine Tamaro, had manipulated what was supposed to be an

25  independent appraisal process for determining the option

1   price for one of the two partnerships known as Hidden Hills.

2       I highlighted some of the key language from your order on

3   the screen, but the bottom line is that you held that the

4   appraisal process was not independent and was tainted beyond

5   salvation as a matter of law.  Your Honor went on to hold

6   that AMTAX was also entitled to summary judgment on its claim

7   that an environmental indemnity agreement it entered into

8   with the plaintiffs at the inception of it, with Hidden Hills

9   Partnership, required plaintiffs to bear the risk of any

10  environmental claim or loss, including any reduction in the

11  appraised value of the Hidden Hills property contributable to

12  environmental contamination or remediation estimates.

13      Although your summary judgment order resolved some of the

14  key disputes between the parties, you found triable issues of

15  fact as to whether plaintiffs are still contractually

16  entitled to compel the sale of defendants' interests in the

17  partnership, notwithstanding Ms. Tamaro's malfeasance, and,

18  if so, at what price.

19      The evidence at trial will show that plaintiffs are not

20  entitled to the relief they seek for three independently

21  sufficient reasons.  First, plaintiff s held the contractual

22  options on which they rely by virtue of their status as

23  general partners of the two partnerships at issue, and

24  accordingly lost their option price when they were validly

25  removed from those positions.

1    The evidence will show that the defendants were

2    contractually entitled to remove plaintiffs from their

3    positions of authority, including because Ms. Tamaro

4    manipulated the Hidden Hills appraisal process and engaged in

5    a variety of other misconduct aimed at improperly and

6    artificially reducing the option prices plaintiffs would have

7    to pay to force a sale of defendants' interests in the two

8    partnerships.

9    Second, the evidence of Ms. Tamaro's conduct establishes

10   that plaintiffs come to the court with unclean hands and thus

11   are not entitled to the equitable declaratory relief they

12   seek.

13   Finally, even if plaintiffs are still entitled to force

14   defendants to sell their interests in the partnerships,

15   notwithstanding all of the malfeasance established by the

16   evidence, the prices plaintiffs seek to pay are far less than

17   what defendants are entitled to receive.

18   Before I go into each of these points in greater detail, I

19   would like first to spend a couple of minutes providing some

20   context by briefly describing the industry in which this

21   dispute arose.

22   Congress created the low income housing tax credit, often

23   referred to by the acronym LIHTC, to incentivize private

24   investment in affordable housing.  The LIHTC program, which

25   is codified in Section 42 of the Internal Revenue Code,

 1    provides tax credits to owners of qualified affordable

 2    housing projects to agree to charge eligible tenants below

 3    market rents within limits set by Congress.  These take

 4    credits are earned over a 15-year period known as the

 5    compliance period.

 6        In typical LIHTC deals, investors and real estate

 7    developers form limited partnerships that develop and own the

 8    LIHTC properties.  The real estate developer typically serves

 9    as a general partner of a LIHTC partnership and is

10    responsible for developing and operating the property.

11    Contrary to what Mr. Goodnight suggested in his opening

12    statement, the developer general partner earns substantial

13    fees throughout the life of the project, throughout the

14    compliance period, including developer fees and other

15    management fees, and so the idea that the only value that a

16    general partner gets is at the back end of these deals is not

17    in conformance with how these deals work.

18        The investor, in turn, serves as limited partner of the

19    LIHTC partnership and is responsible for providing the

20    capital necessary to fund the project.

21        Mr. Goodnight suggested in his opening statement that the

22    reason why investors invest in these types of vehicles was

23    for the tax credits.  While it certainly is the case that the

24    tax credits are one of the reasons why investors invest in

25    these deals, investors enter into these partnership

agreements expecting to receive and entitled to receive all of the benefits conveyed in the partnership agreement. And most of these partnership agreements, including the two at issue in this case, have waterfalls that anticipate that the investor will receive cash on the back end of the deal, to the extent there is any.

As I will discuss in more detail in a few minutes, because the typical LIHTC partnership structure gives the developer general partner a substantial amount of authority and control over the investor limited partner's capital investment, the general partner owes fiduciary duties to its limited partner that are typically memorialized in the limited partnership agreement governing the LIHTC partnership.

These partnership agreements also often include provisions entitling the investor to remove the developer as the partnership's general partner in the event that the developer breaches its contractual or fiduciary duties.

This case involves two LIHTC partnerships referred to by the parties as Hidden Hills and Parkway. Hidden Hills and Parkway were both created in 2001 for the purposes of developing, owning, operating, and ultimately disposing of affordable housing projects eligible to receive LIHTC under Section 42.

I just want to pause for a moment here and make sure -- and I think Mr. Goodnight would agree, and he didn't suggest

1  to the contrary, regardless of the outcome of this case,

2  regardless of how the property is ultimately -- who it ends

3  up with, the rent restrictions are subject to a restrictive

4  covenant that is filed, that is recorded on the property and

5  runs with the land.  This case is not about affordable

6  housing.  The affordable housing will continue.  The tenant

7  will continue to reside there irrespective of the outcome of

8  this case.

9      The Hidden Hills property is located in University Place.

10  The Parkway property is located in Federal Way.  Together,

11  they provide more than 400 individual affordable housing

12  units.  Hidden Hills and Parkway completed their 15-year

13  compliance periods on December 31st, 2016 and December 31st,

14  2017, respectively.  They both continue to own the properties

15  in dispute.

16      The plaintiffs in this case are Hidden Hills Management,

17  LLC and 334th Place 2001, LLC, who Mr. Goodnight referred to

18  as the general partners, and I may do the same.

19      Hidden Hills Management and 334th Place are both special

20  purpose entities created by a developer named

21  Catherine Tamaro to serve as general partners of Hidden Hills

22  and Parkway.

23      Tamaro has an impressive educational and professional

24  background that evidences her intelligence and

25  sophistication.  She has two bachelor degrees from Stanford

1    University, including one in economics and one in mechanical

2    engineering, as well as a master of science with

3    concentration of environmental toxicology that she received

4    in 2016 from the University of Washington.

5        Prior to becoming a real estate developer, about 20 years

6    ago, Tamaro worked in investment banking.  Including Hidden

7    Hills and Parkway, Tamaro owns and controls the general

8    partners of nine individual LIHTC partnerships, only two of

9    which AMTAX is also involved in.

10        At least some of the general partners controlled by Tamaro

11   are co-owned by her husband Steven Arterberry, who is himself

12   an attorney as well as a licensed professional engineer.

13        In addition to these nine general partner entities, Tamaro

14   and her husband co-own a property management company called

15   Trieste Holdings, LLC.  Trieste has property management

16   agreements with LIHTC partnerships managed by Tamaro,

17   including Parkway.  That's one of the ways Ms. Tamaro earns

18   fees during the life of the project, is that she has a

19   company that contracts with the partnership to provide

20   property management services and receives fees as a result

21   for that work.

22        The defendants in this action, referred to collectively as

23   AMTAX, are the investor limited partners of Hidden Hills and

24   Parkway.  AMTAX contributed millions of dollars to fund a

25   development of the two LIHTC properties at issue and have a

1  99.9 percent ownership interest in Hidden Hills and Parkway.

2      In addition to being the limited partners of the project

3  partnerships, the AMTAX entities are themselves limited

4  partnerships with fiduciary duties to their own limited

5  partners who received tax credits and other benefits that

6  flow up the through the AMTAX entities.

7      The AMTAX entities are managed by Alden Torch Financial,

8  LLC, which is based in Denver, Colorado, and manages a

9  portfolio of investments of LIHTC properties located all over

10  the United States.  Alden Torch is not a syndicator.  Alden

11  Torch manages, for fund level investors, interests in these

12  LIHTC properties and has fiduciary duties to those investors

13  that it must respect.

14      According to Department of Housing and Urban Development,

15  which is charged with administering LIHTC, the program is the

16  most important resource for creating affordable housing in

17  the United States today and resulted in more than three

18  million affordable units being placed in service between 1987

19  and 2016.  The LIHTC program could not succeed without the

20  investors whose interest Alden Torch is responsible for

21  managing.

22      AMTAX's representative at trial in this case is Alden

23  Torch's director of transactions, Chris Blake, who is sitting

24  at counsel table.

25      Mr. Blake was directly involved in the underlying events

1   giving rise to this dispute and has been involved in this

2   litigation since its inception.  Blake has significant

3   experience in the LIHTC industry and will be providing

4   percipient information as well as admissible lay opinions

5   about the partnership and Tamaro's conduct.

6       Hidden Hills and Parkway and the rights and obligations of

7   their partners are governed by substantially similar limited

8   partnership agreements referred to by the parties as the

9   Hidden Hills LPA and the Parkway LPA.

10      As general partners of Hidden Hills and Parkway,

11  plaintiffs owed fiduciary duties to the partnership and to

12  defendants in their capacity as investor limited partners

13  pursuant to Section 7.4.F and 7.4.G of the Hidden Hills LPA

14  and the Parkway LPA.  Section 4.5.A.4.2 of the Hidden Hills

15  LPA and the Parkway LPA permit defendants to remove

16  plaintiffs from their positions as general partners for

17  various enumerated reasons including the breach of

18  contractual or fiduciary duties under the partnership

19  agreement.

20      In addition, Section 4.5.A.4.6 of the LPA separately

21  provides that defendants shall have the right to remove

22  plaintiffs upon their failure to furnish reports as required

23  in Section 12.1.

24      ^ section 1.1.B.2, in turn, requires plaintiffs to cause

25  an audited financial statement to be prepared annually and

must provide that statement to defendants by March 15th for

Hidden Hills and February 15th for Parkway.  Unlike removal

based on breaches of other contractual or fiduciary duties,

removal based on failure to provide the required reports does

not require a showing that economic detriment can reasonably

be expected to result.

Section 7.4.J of the Hidden Hills and Parkway LPAs grants

plaintiffs an option, for a limited time following the end of

the 15-year compliance period, to purchase defendants' 99.9

percent ownership interest in Hidden Hills and Parkway and

sets forth an independent appraisal process that applies when

determining the price that plaintiffs must pay for their

interest.

Once the fair market value of the property is determined

through the appraisal process, that number is then run

through the sales proceed waterfall in Section 6.2.B of the

LPAs to determine what the limited partners would be entitled

to receive, and that amount becomes the option price.

With this background about the industry and relevant

players out of the way, I would like to return to the three

reasons why plaintiffs will not be able to establish they are

entitled to the relief they seek.

First, the evidence will show that defendants have validly

and effectively exercised their contractual rights to remove

plaintiffs from their positions as general partners of Hidden

Hills and Parkway.

With respect to Hidden Hills, this Court has already found that plaintiffs, at Tamaro's direction, improperly interfered with the option process described in Section 7.4.J of the Hidden Hills LPA, and that plaintiffs' exercise of its option under Section 7.4.J did not immunize it from being removed based on its conduct.

All that remains to be determined at trial is whether plaintiffs' breaches of Section 7.4.J were material and, if so, whether they could reasonably be expected to cause economic detriment to the partnership or the project.  The evidence will establish that the answer to both of these questions is yes.

With respect to materiality, the magnitude and egregiousness of plaintiffs' breach of Section 7.4.J can't be fully appreciated without an understanding of the events leading up to Tamaro's secret and unilateral appointment of Colliers to perform the third appraisal.

This chronology, which I will only summarize here, will establish that Tamaro's decision to appoint Colliers to perform the third appraisal, without informing AMTAX, was not simply an innocent mistake or a good faith misreading of Section 7.4.J, but rather the culmination of a carefully developed and executed plan to force her partner out of the partnership for as low a price as possible.

Tamaro first set her plan in motion in 2016, which was the year leading up to the end of the 15-year compliance period in Hidden Hills.  In February of that year, Todd Henderson of CBRE issued an appraisal of Hidden Hills that Tamaro had commissioned.  While the February 2016 appraisal acknowledged that the property had contained arsenic concentrations above current clean-up levels, it also noted that an environmental escrow now totalling approximately 1.5 million had specifically been set aside at the inception of the partnership in order to cover any such cost, and assumed, quote, "that this amount will fully cover the soil remediation and clean-up cost and no further cost is required for this environmental issue," end quote.

Apparently unsatisfied with this assumption, Tamaro devised a plan to undercut it.  First, she reached out to Environmental Partners, Inc., or EPI, an environmental consulting company that had performed soil testing in Hidden Hills back when the project was being developed in 2001, and hired them to prepare a Phase I environmental site assessment at the partnership's expense.

EPI issued its Phase 1 environmental site assessment on November 3, 2016.  Although the site assessment states in its introduction that it has been requested by the Hidden Hills Partnership as part of a refinance of the subject property, Chris Blake will testify that Tamaro did not inform AMTAX,

whose consent would be necessary for any refinance, that she hired EPI, nor did she provide AMTAX with a copy of the site assessment.  In its findings and conclusions, EPI acknowledged the existence of the environmental escrow, but recommended reevaluating the planning level cost estimate for remediation and updating the financial reserve as necessary.

Although Tamaro agreed with EPI's recommendation to update the planning level cost estimate, her purpose was not to determine whether the environmental reserve needed to be updated; instead, to use the updated information as leverage in connection with her efforts to drive the buyout price for AMTAX's interest as low as possible.

Indeed, in an email exchange on November 8, 2016, in which she hired EPI to prepare the remediation cost estimate, Tamaro was not bashful about admitting to EPI's principal, Brett Carp, the true reason why she wanted the updated cost estimate.  She tells Carp, "For now, I need the planning level cost estimate.  I will present that to the limited partner right after January 1," which, Your Honor, is, incidentally, the first day they could exercise their option under 7.4.J.  "Their response will tell me whether I need to obtain actual quotes.  If the LP challenges the planning level estimate, then I will need to obtain actual quotes."

About a month later, on December 7, 2016, Tamaro sent a followup email to EPI reiterating why she wanted the cost

1   estimate that she hired EPI to provide, using partnership

2   funds.  She writes to Carp, "I am okay right now, but was

3   planning to start negotiations with the limited partner right

4   after January 1 so hopefully can you get me -- get some

5   numbers to me some time in December."

6       EPI issued its cost estimate which it referred to as a

7   technical memorandum on January 3, 2017, three days after the

8   end of the compliance period and two days into plaintiffs'

9   24-month window to exercise its option.

10       As you can see from the chart on the screen, which is

11   included in the technical memorandum, EPI estimated

12   remediation costs as being anywhere between 1.5 million and

13   $2.5 million depending on whether one foot or two feet of top

14   soil were removed from the site.

15       Tamaro immediately provided EPI's technical memorandum to

16   Todd Henderson, at CBRE, and CBRE issued a second appraisal

17   for Hidden Hills on January 30th, 2017.

18       CBRE's new appraisal differed from the initial one in a

19   couple of key respects.  First, the new appraisal referenced

20   the cost estimates in EPI's technical memorandum.  Second,

21   unlike in its final initial appraisal where CBRE assumed that

22   the environmental escrow would offset any remediation costs,

23   CBRE's new appraisal stated, quote, "Based on information

24   provided by ownership, the escrow is not transferrable in the

25   event of a sale and concluded that it is likely that a

1  potential buyer would require the site to be cleaned prior to

2  sale.  We have included this amount as a below the line

3  deduction to arrive at an as is value for the subject."

4      Of course, CBRE's reference to ownership here was

5  referring exclusively to Tamaro, as AMTAX was kept completely

6  in the dark about this appraisal, despite its status as a

7  limited partner with a 99.9 percent equity interest in the

8  property's owner.

9      On March 14th, 2017, Tamaro sent a letter to Blake

10  purporting to exercise plaintiffs' option to purchase AMTAX's

11  interest in the Hidden Hills Partnership pursuant to Section

12  7.4.J in the Hidden Hills LPA.  The exercise letter did not

13  disclose the partnership's retention of EPI or CBRE, which

14  Tamaro continued to hide from AMTAX, but nonetheless

15  asserted, quote, "The cost of remediating the property's

16  environmental liability fully must be included in the

17  valuation.  The appraiser must consider the arsenic

18  contamination of the soil, the cost of remediating the

19  arsenic, and the impact of the contamination and remediation

20  costs on market value."

21      AMTAX registered its disagreements with plaintiffs'

22  efforts to instruct the independent appraisers on how to do

23  their job, which prompted Tamaro to write to Carp from EPI on

24  April 28, 2017.  She wrote, "The LP and I are negotiating the

25  buyout terms and are not even close to an agreement.  Don't

1    close your file yet," exclamation point.

2        Contrary to Tamaro's description, however, she was not in

3    negotiation with AMTAX, but instead had exercised a

4    contractual purchase option under Section 7.4.J and was bound

5    to follow the independent appraisal process set forth in that

6    section of the LPA in order to arrive at a fair and objective

7    purchase price for AMTAX's interest.

8        Despite objecting to plaintiffs' efforts to interfere with

9    the appraisal process, AMTAX nonetheless complied with its

10   obligation under Section 7.4.J to obtain an appraisal of the

11   Hidden Hills property.  The appraisal, which was prepared by

12   Andy Noble at Cushman & Wakefield, was delivered to AMTAX on

13   May 10, 2017.  AMTAX emailed it to Tamaro the following day.

14       On the same day she received the Cushman & Wakefield

15   appraisal, Tamaro immediately commenced a concerted campaign

16   to undercut it.  First, she emailed her go-to appraiser,

17   Todd Henderson at CBRE, about performing yet another

18   appraisal of the Hidden Hills property.  In that email

19   exchange, Tamaro asked Henderson, "What do you know about

20   Andy Noble?"  That same day, which, again, was the day she

21   received the appraisal, Tamaro also reached out to another

22   CBRE employee, Tim Flint, about obtaining a broker's opinion

23   of value for the Hidden Hills property.  In her email to

24   Flint, Tamaro did little to disguise her effort to influence

25   his opinion, writing, "Tim, when you have a chance, I would

1   like to have a conversation because this property has

2   environmental issues (from the Tacoma Plume)."

3       Tamaro's efforts did not end there, however.  To the

4   contrary.  The evidence will show that Tamaro complained to

5   AMTAX about what she perceived to be shortcomings in the

6   Cushman & Wakefield appraisal, and even went so far as to

7   reach out to Andy Noble directly to try to get him to modify

8   his value determination downward, which he declined to do.

9       CBRE delivered its third appraisal to Tamaro on June 7,

10   2017.  Like its second appraisal, the third CBRE appraisal

11   referenced EPI's estimate of the remediation cost as between

12   1.5 and $2.5 million, and quote, "included this amount as a

13   line item deduction to arrive at an as is value for the

14   subject."

15       Even though AMTAX and Mr. Blake specifically, repeatedly

16   asked Ms. Tamaro, both before she received the CBRE

17   appraisal -- actually, the day that she received the CBRE

18   appraisal -- what the status was of the GP's appraisal

19   process.  Tamaro did not provide the third appraisal to AMTAX

20   right away.  Nor did she provide CBRE's opinion of value,

21   which she received the day after the CBRE appraisal, which

22   valued the property at more than $7 million higher, which was

23   also higher than the Cushman & Wakefield appraisal that AMTAX

24   had provided.

25       Instead, Tamaro waited until after she had secretly

1    retained EPI to prepare another technical memorandum further

2    inflating remediation estimates for Hidden Hills before

3    delivering the CBRE appraisal to AMTAX.  She did not provide

4    CBRE's opinion of value to AMTAX at all.

5        EPI delivered its second technical memorandum for Hidden

6    Hills on August 8, 2017.  EPI's second memorandum closely

7    resembled the one it had prepared in January, except that the

8    low end of EPI's previous range of estimated remediation cost

9    was dropped completely and the high end was increased by an

10   additional 50 percent for unknown contingencies.

11       Tamaro did not provide a copy of EPI's second technical

12   memorandum to AMTAX, nor did she tell AMTAX that she had

13   in -- she intended to instruct the first two appraisers to

14   jointly appoint a third appraiser.  Instead, Tamaro secretly

15   and unilaterally took it upon herself to hire Colliers to

16   perform the third appraisal, which this Court has already

17   found to have violated Section 7.4.J of the Hidden Hills LPA.

18       On September 13th, 2017, Tamaro sent an email to

19   Brett Carp at EPI that stated, quote, "Hi Brett, the LP and I

20   decided to get one more appraisal done on the property so we

21   are waiting for the results.  I appreciate having the new

22   cleanup estimate because it makes it easier to value," close

23   quote.

24       Contrary to Tamaro's claim, she and the LP had not decided

25   to get one more appraisal.  In fact, the LP had no idea what

was going on.  Instead, she secretly and unilaterally decided
to get a third appraisal herself while leading AMTAX to
believe that she was exploring the possibility -- she was
interested in exploring the possibility of marketing the
property as a less contentious means of determining its fair
market value.

I want to respond here to the claims in Mr. Goodnight's
opening that AMTAX here is seeking to take the property away
from Ms. Tamaro or is trying to steal the property away from
her.  The fact is that throughout this process, they
repeatedly said if we want to determine a fair market value
of our interest, the best way to do it is to put the property
on the market, let the market decide, and then we will give
you a right of first refusal so you can buy the property
at -- you can buy us out at that value.  She would not accept
it.  The reason why she would not accept it is because she
cannot manipulate the market in the same way she can
manipulate the appraisal process.

Tamaro, moreover, appreciated the new cleanup estimate,
not because it made it easier to value the property, but
rather because it reduced the appraised value, which, in
turn, increased the price plaintiff would have to pay to
purchase AMTAX's interest.

Three minutes after she emailed Carp, Tamaro emailed the
two appraisers from Colliers that she had hired,

1   John Campbell and Cory Hutsell, to discuss the property.

2   Once again, Tamaro could not resist inserting herself into

3   the appraisal process, requesting to meet them at the

4   property, quote, "to talk about the environmental issue."

5       Tamaro sent AMTAX the Colliers appraisal on October 23rd,

6   2017.  The Colliers appraisal noted that the subject site has

7   been identified by the Washington State Department of Ecology

8   as having confirmed or suspected contamination and that the

9   owner provided a budget to clean up the contamination.  The

10  appraisal went on to state that the estimated total cost of

11  $3,760,450, which included $1,220,150 in contingency, the

12  remediation costs are taken into account in the indicated

13  retrospective value.

14      The evidence will show Your Honor that in addition to this

15  reduction, Ms. Tamaro also convinced the Colliers appraiser,

16  after she received a draft of their appraisal that had the

17  value at $3 million higher, to knock of an additional $3

18  million of its determined value for reasons that had nothing

19  to do with its environmental condition, all of this without

20  consulting with AMTAX.

21      Of course, at the end of the day, all of Tamaro's efforts

22  to use the environmental condition of the property to depress

23  its value were unsuccessful because this Court correctly

24  held, not only that the general partner had tainted beyond

25  salvation the appraisal process required by Section 7.4.J,

but also that the environmental indemnity the general partner

had committed to at the inception of the project nearly two

decades ago required the general partner, not the limited

partner, to bury costs or losses associated with

environmental remediation.

The fact that Tamaro's plan was ultimately futile,

however, does not change the fact that plaintiffs' breaches

of the Hidden Hills LPA were in furtherance of its efforts to

take advantage of its limited partner, and accordingly were

material, particularly in light of the plaintiffs' fiduciary

duties.

The evidence will also establish that plaintiffs' breaches

could reasonably be expected to cause economic detriment to

the Hidden Hills Partnership.  Mr. Goodnight may have pointed

out in his opening that we have not asserted claims for

derivative damages affirmatively on behalf of the Hidden

Hills Partnership, and that is true.  But, Your Honor, there

is nothing in the limited partnership agreement that sets an

affirmative obligation to bring derivative claims on behalf

of the partnership in order to show that certain conduct was

reasonably likely to cause economic harm.  That requirement

is not anywhere in the partnership agreement.

What the partnership agreement says is that removal is

appropriate if you show the breach and if you show that the

breach is material and it is reasonably -- it reasonably

1  could be expected to cause harm to the partnership or the

2  project.

3      The evidence will establish that all of the costs

4  associated with the various reports by EPI, and the numerous

5  CBRE appraisals were paid for by Hidden Hills Partnership,

6  not plaintiffs.  Because those costs were unnecessary and

7  incurred solely for the benefit of the general partner, they

8  should not have been borne by the partnership and resulted in

9  economic detriment.

10      Second, Tamaro's multiyear scheme was specifically

11  targeted at driving down the fair market value of the Hidden

12  Hills property, which can only be to the economic detriment

13  of the partnership that owns the property.  These facts

14  compel the conclusion that plaintiffs' breach was both

15  material and reasonably likely to cause economic detriment to

16  the partnership and thus triggered AMTAX's contractual right

17  to remove the general partner.

18      As if that were not enough, Your Honor, the evidence will

19  show that even after being rebuked by the Court not for

20  following the appraisal process required by Section 7.4.J,

21  Tamaro has continued to purposefully deviate from that

22  process in order to gain what she perceives as a strategic

23  advantage.  Specifically, as Mr. Goodnight discussed in his

24  opening statement, and as you can see on the screen, Tamaro

25  sent a letter just five days after this Court issued its

1     summary judgment order in which she purported to accept the
2     stale two-year-old appraisal performed by Cushman & Wakefield
3     and claimed that as a result, plaintiffs' purchase price for
4     the limited partners' interest, quote, "will be $4,968,506."
5          Since that time, AMTAX has pointed out even if the
6     Cushman & Wakefield value determination could be used to
7     establish the fair market value of the property, which we
8     dispute, the purchase price reflected in the May 7th letter
9     is less than what AMTAX would be entitled to receive based on
10    a proper application of the sales proceeds waterfall in
11    Section 6.2. B of the Hidden Hills LPA.
12         After we pointed that out to the general partner, she
13    responded by bringing her number up an additional $700,000,
14    which was significantly higher than what she had declared
15    just earlier would be the controlling price, but still
16    significantly lower than what AMTAX would be entitled to
17    receive if the 19.7 million value reflected in the Cushman
18    appraisal were run through the sales proceeds waterfall.  You
19    will see in -- the evidence we will present is that
20    throughout this case, the plaintiffs' number for what the
21    proper option price should be has gone up and up and up.  It
22    started at 500,000 at the beginning of this trial, went up to
23    a million when they realized they made a mistake.  It went up
24    to 4.9 million after the Court's summary judgment order.
25    When we pointed out additional mistakes in the calculation,

1    the GP said, whoops, okay, here is another $700,000.

2        We can't rely on that price, just like we couldn't rely on

3    any of the other prices that they had quoted.

4        Chris Blake will explain for the Court exactly how Tamaro

5    is arriving at a lower value, and why that amount is

6    incorrect.

7        Defendants respectfully submit that enough is enough.

8    Tamaro has demonstrated by her conduct that she's unable or

9    unwilling to act as fiduciary and instead continues to look

10   for any available angle to avoid paying full price for the

11   defendants' interest in the partnership.

12       Mr. Goodnight talks about the possibility of marketing the

13   property as if somehow we were the ones who are standing in

14   the way of that.  That is not the case.  They want to rely on

15   a two-year-old appraisal to determine the fair market value

16   of the property as opposed to a current marketing effect that

17   would provide an objective measure of fair market value.

18   They are not contractually entitled to do that, based on

19   their own rule.

20       The Hidden Hills LPA contains a contractual removal right

21   that AMTAX specifically bargained for in order to ensure

22   there was a mechanism in place to protect its capital

23   investment in the unlikely event that the general partner

24   violated its contractual or fiduciary duties in a manner that

25   could reasonably be expected to cause harm to the partnership

1    or the property.  AMTAX will demonstrate at trial that its

2    contractual removal right was triggered by plaintiffs'

3    conduct and that AMTAX validly and effectively exercised its

4    removal right on November 30th, 2017.

5        Your Honor, removal is not only the correct result here,

6    but also the fair result, as Tamaro will retain her economic

7    interest in the partnership and will only be required to

8    relinquish her control over the partnership's operations.  To

9    put it in terms that even my six-year-old son would

10   appreciate, once you get caught sneaking cookies, you may

11   still get more cookies in the future, but you lose your right

12   to be in charge of the cookie jar.  This principle is

13   particularly important here because in the absence of

14   removal, Tamaro will remain in control of the very process

15   she has repeatedly manipulated and will suffer no adverse

16   consequences from her prior malfeasance that might deter

17   future misconduct.

18       I would like to turn now to Parkway.  Tamaro's conduct

19   with respect to the Parkway Partnership differed in its

20   particulars, but had the same overall objective as her

21   actions on Hidden Hills, to minimize the purchase price that

22   AMTAX would receive in connection with plaintiffs' exercise

23   of its option.

24       Chris Blake will testify that once Tamaro's bad faith came

25   to light on Hidden Hills, AMTAX did a deep dive into

1   Parkway's finances and discovered multiple improper

2   transactions that appear to have been designed specifically

3   to divert money from any capital event away from defendants

4   and into plaintiffs' pockets.

5       First, Tamaro used her control over Parkway to cause the

6   partnership to pay her affiliates unauthorized, excessive or

7   otherwise improper fees.  Tamaro, for example, directed the

8   Parkway Partnership to pay a property management fee to her

9   management company Trieste that was hired in the maximum fee

10  permitted under the Parkway Partnership agreement.  This

11  excessive fee was only corrected after it was discovered by

12  AMTAX, the limited partner to whom the general partner owes

13  fiduciary duties.  The evidence will show that more than

14  $100,000 of prior overcharges have not yet been restored to

15  the partnership.

16      In addition, Tamaro had the Parkway Partnership pay her

17  affiliate Trieste a, quote, "repair supervision fee" for

18  oversight of repairs and maintenance in amounts totalling

19  more than $460,000, as well as other fees that were double

20  dipped, i.e., paid separately to Trieste and other Tamaro

21  affiliates, even though the work for which the fees were

22  charged was included within the scope of responsibilities for

23  which Trieste already received a property management fee

24  pursuant to its property management agreement with the

25  Parkway.

1          Second, Tamaro abused her authority by directing Parkway

2     to misclassify and misallocate income and expenses in a

3     manner that violated the Parkway LPA, including, one, failing

4     to make a capital contribution to pay the interest on the

5     general partner's deferred developer fee as required under

6     the Parkway LPA, and subsequently including that unpaid

7     interest when consolidating all of -- all of Parkway's

8     liabilities to the general partner.

9          And two, improperly authorizing Parkway to make a

10    developer fee payment in an amount totaling $356,685 out of

11    AMTAX's capital contribution in 2009, even though the

12    applicable cash flow waterfall instead required that

13    contribution to be used to satisfy Parkway's outstanding and

14    future liabilities.  In other words, it used the money to pay

15    itself rather than to pay the partnership's liabilities.

16         Third, Tamaro improperly authorized a large and

17    unnecessary rolling rehab of the project immediately before

18    the exercise of the general partner's option.  You heard

19    Mr. Goodnight talk about this quite a bit.  This action

20    dramatically increased partnership expenses and depleted

21    AMTAX's capital account in order to decrease plaintiffs'

22    buyout price based on renovations for which AMTAX, as a

23    divested partner, would receive no return.

24         You heard Mr. Goodnight say in his opening statement

25    today, well, what is the harm to AMTAX here because if all of

1    these repairs happen, and it is an owner of the property,

2    then all the increased market value would inure to the

3    benefit of AMTAX as the -- as the partial owner of the

4    property.

5        That's not what they are asking for here.  They are not

6    asking for us to go out and market the Parkway property today

7    and then run that number through the waterfall.  They are

8    asking for you to enforce an option exercise based on

9    something they did in January of 2018.  To the extent that

10   there is later rehab that has been done since that time that

11   increased the value, we don't get to see any piece of that.

12       This was specifically designed in a way to maximize the

13   general partner's debt, so that when the liquidation of the

14   partnership's interest ultimately happened, there is a

15   waterfall that it goes down.  At the bottom of the waterfall,

16   the investor limited partner gets 99 percent of residual

17   proceeds and the general partner gets 1 percent of the

18   residual proceeds.  The fatter the account payable that is

19   owed to the general partner is up at the top, the less money

20   that goes down to the limited partner.  All of this was done

21   as a strategy to reduce the buyout price for the limited

22   partner, not to improve the property and be a good property

23   management person.

24       How do we know that?  Well, these things, as you hear from

25   with Chris Blake and Jon Krabbenschmidt, the typical way this

1    works is you do a resyndication or a refinance, and you use

2    those funds to perform any necessary capital improvements at

3    the property.

4         That's not what Ms. Tamaro did. Instead, she loaded up the

5    partnership with debt to do rehab that were not considered by

6    HUD as critical repairs, that HUD had provided a ten-year

7    timeline until 2024 to complete.  And that in one instance

8    she went out and spent $250,000 on additional siding during

9    the time immediately before she exercised her option, and the

10   reason she gave was that siding color was going -- the brand

11   was terminating and so she had to spend $250,000 on that

12   siding immediately before she exercised her option.

13        Finally, Tamaro misclassified these unnecessary

14   expenditures as operating expenses which results in an even

15   less general split of sale proceeds, and by extension, a

16   lower option price for AMTAX.

17        These actions could reasonably be expected to harm the

18   Parkway Partnership.  Defendants have, in fact, asserted

19   counterclaims seeking to wipe out general partner loans that

20   should never have been made to cover expenses that should

21   never have been incurred.

22        AMTAX sent a letter to Tamaro on May 8, 2018 that

23   identified all of the improper payments that AMTAX had

24   discovered, but offered the general partner an opportunity to

25   cure its breaches, avoid removal, and move forward with the

1    option process by cancelling and relinquishing partnership

2    debt that the general partner held by virtue of its

3    unauthorized payments.

4        Tamaro unfortunately rejected that offer.  Instead, moved

5    successfully to have the parties' dispute over Parkway heard

6    as part of this action, prompting AMTAX's removal of

7    Parkway -- of the general partner on July 2nd, 2018.

8        Plaintiff will seek to convince the Court that all of the

9    payments for which defendants now take issue were fully

10   disclosed to and approved by AMTAX at the time they were

11   incurred, and that any derivative claims are accordingly

12   untimely.

13       The evidence will show -- and I am not going to get into

14   the law.  This is an opening statement.  The evidence will

15   show that Tamaro's disclosures to AMTAX were often incomplete

16   or misleading, and that it was reasonable for AMTAX to accept

17   Tamaro's explanations without additional inquiry based on

18   their expectation that she would not exploit her role as

19   fiduciary to take unfair advantage of her partner.

20       In any event, AMTAX's removal rights are not subject to

21   any statute of limitations.  Tamaro should not be able to use

22   the delay in AMTAX's realization of the extent of her

23   malfeasance as a means of avoiding removal.

24       Defendants' designated expert, Jon Krabbenschmidt, is a

25   principal at Novogradac & Company, which is the preeminent

accounting firm in the LIHTC sphere.  He has spent his career focusing on LIHTC partnerships, including the rights, obligations and relationships among general and limited partners in such partnerships.  In addition to his professional expertise, Mr. Krabbenschmidt also has experience serving as a general partner of a real estate partnership.

Mr. Krabbenschmidt will testify that the Parkway misconduct that AMTAX identified is inconsistent with industry standards relating to the management of LIHTC partnerships by general partners and that Tamaro's actions had a negative economic impact on the Parkway Partnership.

Recently, as you heard Mr. Goodnight preview and as we discussed a little bit at the beginning of trial, the auditor for Hidden Hills and Parkway, Laura Lindal, unexpectedly withdrew from her engagement on both partnerships and refused to sign off on the 2018 audited financial statements. Lindal's withdrawal came just one day after this Court entered its summary judgment order, and more than a month after the deadline for the financial statements to be delivered as set forth in Section 12.1 of the partnership agreements had elapsed.

While Tamaro seeks to shift the blame for her failure to deliver required reports on plaintiffs and/or Ms. Lindal, the partnership agreements for Hidden Hills and Parkway both

1   confirm that the responsibility for the timely delivery of
2   audited financial statements resides solely with the general
3   partner.  In addition, the Hidden Hills and Parkway LPAs
4   confirm the failure to provide required financial reports
5   poses a risk to the limited partners so severe as to be
6   presumptively harmful, such that defendants need not show any
7   quantifiable risk of economic detriment to AMTAX or to the
8   partnership in order to remove plaintiffs from their general
9   partner role, based on their failure to provide the reports.
10  The contract couldn't be more clear on this point.  It is
11  unambiguous.
12      Although the reason for all of these recent events remains
13  shrouded in mystery, at least on our side of the V,
14  plaintiffs have demonstrated by their recent conduct that
15  they are incapable of delivering final 2018 audited financial
16  statements for either of the partnerships.  Indeed, Tamaro
17  will confirm that plaintiffs reached out to several
18  accounting firms about stepping in as the replacement
19  auditor, but not one of them would accept the engagement.
20      The evidence will further show that in the last week or
21  so, plaintiffs have essentially given up on engaging a
22  replacement auditor and have asked the defendants to find one
23  instead.  Even more egregiously, when the limited partners
24  responded by locating an accounting firm that was potentially
25  interested in accepting the engagement and well-qualified to

1   do so, Tamaro refused to make herself available for a call

2   with Chris Blake and the potential auditor.

3        These recent events leave no doubt that plaintiffs remain

4   incapable of performing even the most basic general partner

5   functions.  Their inability to find a replacement auditor

6   after the original auditor resigned under suspicious

7   circumstances causes AMTAX grave concern about the status and

8   continuing integrity of their capital investment.  They

9   haven't seen the financial reports, Your Honor.

10       Returning to my roadmap slide, defendants -- I am wrapping

11  up -- defendants will present evidence at trial that even if

12  plaintiffs' misconduct did not foreclose them from forcing

13  AMTAX to sell their interest pursuant to the option in

14  Section 7.4.J, plaintiffs still should not be entitled to the

15  affirmative relief they seek because specific performance is

16  equitable remedy and plaintiffs come to the Court with

17  unclean hands.

18       Defendants expect that plaintiffs will attempt to pass off

19  their malfeasance as a good faith negotiating strategy that

20  was not unfair given AMTAX's size and sophistication.

21  Defendants, however, are not arguing that there is anything

22  wrong with business negotiations between a general partner

23  and a limited partner over the terms of the limited partner's

24  exit from a partnership.  In fact, these types of

25  negotiations happen all the time and, in fact, are the most

1   common way for LIHTC partnerships to wind up following the

2   end of the compliance period.

3       That is not what happened here.  Indeed, rather than

4   negotiating a voluntary buyout in good faith, plaintiffs

5   instead elected to invoke their contractual rights to force

6   AMTAX out of the partnerships against their will and engage

7   in unauthorized conduct to try to bring the mandatory sale

8   price down as low as possible.  That is not negotiation,

9   Your Honor.  That is breach of contract and breach of

10  fiduciary duty.

11      In addition, the evidence will show that plaintiffs

12  breached their duty of candor by hiding or delaying the

13  transmittal of pertinent information to AMTAX, including

14  plaintiffs' decision to hire EPI and to unilaterally appoint

15  a third appraiser on Hidden Hills, as well as their

16  authorization of improper fees for Parkway without full

17  disclosure.

18      Finally, Your Honor, even if the Court were now to find at

19  the end of the trial plaintiffs have not been removed and not

20  barred by the doctrine of unclean hands from obtaining the

21  equitable relief they seek, the evidence will show that the

22  option prices plaintiffs have purported to calculate are far

23  lower than the actual amounts defendants are entitled to

24  receive under the Hidden Hills and Parkway LPAs, and that

25  plaintiffs have not yet successfully completed the appraisal

1   process for either of the two partnerships.

2       By the end of the trial, the evidence will show that

3   plaintiffs engaged in a pattern of misconduct aimed at

4   forcing the AMTAX entities to relinquish their ownership

5   interest in Hidden Hills and Parkway for amounts that are far

6   less than what AMTAX is contractually entitled to receive.

7       For this reason and others, the AMTAX entities validly and

8   effectively exercised the contractual removal rights and

9   plaintiffs are not entitled to the affirmative relief they

10  seek.  In addition, the evidence will show that the Parkway

11  Partnership suffered derivative damages as a result of

12  plaintiffs' misconduct and are entitled to recover fees and

13  expenses that plaintiffs improperly authorized the Parkway

14  Partnership to pay.

15      Thank you.

16          THE COURT:  Thank you, Mr. Pettit.

17      Mr. Goodnight, you may call your first witness.

18          MR. GOODNIGHT:  Thank you.  We call Ms. Tamaro.

19          THE COURT:  Ms. Tamaro, please come forward to the

20  lectern, stand at the microphone, raise your right hand and

21  be sworn.

22                      CATHERINE TAMARO,

23          having been sworn under oath, testified as follows:

24          THE COURT:  Please be seated in the witness stand

25  immediately to my left.  Keep the volume of your voice up so

1  people in the courtroom can hear you and speak slowly enough

2  so the court reporter can keep up with you.

3      Ms. Latsinova, you may proceed.

4          MS. LATSINOVA:  I will wait for Ms. Tamaro to sit

5  down. She needs extra time.

6                      DIRECT EXAMINATION

7  BY MS. LATSINOVA:

8  Q   Please state your name.

9  A   Catherine Tamaro.  Is that loud enough?

10 Q   Yes. Can you hear me?

11 A   Yes.

12 Q   Can you please state your work address?

13 A   3236 78th Avenue Southeast, Suite 202, Mercer Island,

14 Washington.

15 Q   Can you please tell us about your education?

16 A   I have a master's of science degree from the University of

17 Washington, and two bachelor's degrees from Stanford

18 University.

19 Q   May I call you Catherine for this examination?

20 A   Yes.

21 Q   Catherine, what is your role in the Hidden Hills

22 Partnership?

23 A   I am the managing member of the general partner.

24 Q   What is your role in the Parkway Partnership?

25 A   Same.  I am a managing member of the general partner.

1  Q   Are both Hidden Hills and Parkway Partnerships LIHTC

2  properties?

3  A   Yes, they are.

4  Q   LIHTC stands for what?

5  A   Low-income housing tax credits.

6  Q   We will refer to it as LIHTC throughout our testimony.

7  All right?

8  A   Yes.

9  Q   Now, can you tell us how long you have been involved in

10  the LIHTC industry?

11  A   Going on 23 years.  My first project, I closed that in

12  1996.  It is Westside Estates Apartments on North Pearl

13  Street in Tacoma.

14  Q   Was there any local regulatory agency involved in that?

15  A   When I purchased that property, the Tacoma Housing

16  Authority issued the bonds for that property.  Washington

17  State Housing Finance Commission awarded tax credits to the

18  property.

19  Q   How many units are there?

20  A   448 at that property.

21  Q   Do you still own it?

22  A   Yes, I own it and manage it.

23  Q   Is it still affordable housing?

24  A   It is, yes.

25  Q   Can you please tell us about some of your other LIHTC

1    projects?

2    A    I own three properties here in Tacoma in partnership with

3    the Tacoma Housing Authority who issued the tax exempt bonds

4    for those projects.  I renovated a vacant apartment building

5    on North I Street in the Stadium District which is now senior

6    housing.  I have other properties in University Place, Des

7    Moines and Federal Way.

8    Q    How many total LIHTC projects are you involved in in

9    Washington State?

10   A    In Washington, I manage about 1340 units.

11   Q    Have you owned them since their inception as LIHTC

12   properties?

13   A    Yes, all of them I have.

14   Q    Are they all still affordable housing?

15   A    Yes, developed them all.  They are all affordable housing.

16   Q    More generally about the LIHTC program, what is the

17   purpose of it?

18   A    It was -- it came out of the Tax Reform Act of 1986 as a

19   way to encourage private developers to invest in affordable

20   housing.

21   Q    How does the program work?

22   A    Well, the developer locates a property and applies for tax

23   exempt bond financing, applies for tax credits.  The tax

24   exempt bond financing can be done by local housing

25   authorities or by the state.  The State Housing Finance

1    Commission awards the loan providing tax credits.  The

2    property is purchased, renovated with funds from the closing.

3    The investor is brought in to take advantage of the tax

4    benefits, then the property itself is operated as an

5    affordable housing with rent restrictions and income

6    restrictions under a regulatory agreement that is put in

7    place by the Washington State Housing Finance Commission.

8    Q    So what agencies would typically be involved in a LIHTC

9    project?

10   A    Washington State Housing Finance Commission, whichever

11   housing authority issues the bonds.  All of my projects have

12   non-profit partners, either non-profits or the Tacoma Housing

13   Authority.  There is a limited partner who invests capital in

14   the project and the general partner who puts it together and

15   then operates the partnership over the years.

16   Q    So how is the typical LIHTC deal structured?

17   A    They were -- earlier they were done as limited

18   partnerships.  Now they tend to be done as LLCs.  They are

19   all structured so the investor has a large ownership share in

20   order to maximize the amount of tax credits and depreciation

21   that flow to that investor.

22   Q    There is a general partner as well?

23   A    Yes, general partner or nowadays it is more likely a

24   managing member of an LLC.

25   Q    What is the time frame?

1   A   It can take a while to put together.  It can take at least

2   a year.  Hidden Hills took three years to put together.  The

3   regulatory agreement has two phases of compliance.  The first

4   phase is 15 years.  That is the period of time in which the

5   tax credits are earned.  At the end of the 15 years, if

6   compliance has been met, tax credits are issued.  They

7   consider it to be safe.  They are no longer subject to

8   recapture.

9       Then there is a second period of compliance that lasts for

10  another 15 years.  There actually are ways to get out from

11  under that second period of compliance.

12  Q   Have you ever done that in any of the projects?

13  A   No, I have not.

14  Q   Now, let's talk about the roles of the parties.  What is

15  the role of the general partner?

16  A   In addition, as I said, to putting the deal together, to

17  locating the property and obtaining financing for the

18  property, obtaining tax credits, tax exempt bonds, funding

19  the limited partner, the general partner then goes on to

20  manage the partnership, which involves -- in this case, one

21  of the important roles is to oversee the compliance to make

22  sure that we meet all the requirements that we have to

23  follow, the tenants are qualified, the rents are appropriate,

24  and the credits are delivered.

25  Q   I think I interrupted you.  I don't think you finished

1    your answer.

2    A   We managed -- in addition, an important part is the

3    compliance.  We oversee the -- we hire the property manager.

4    We oversee the activities of the property manager who is

5    working on site at the property.  We do reporting to a

6    variety of agencies, including the State Housing Finance

7    Commission.  We report to HUD.  We report to the limited

8    partner.  We report to the Department of Revenue because of

9    the property tax exemption.  We report to the entity, the

10   housing authority that obtained the tax exempt bonds.

11   Q   Is there also a management agent involved?

12   A   Yes, the management agent is the entity who is working on

13   site to manage the property.

14   Q   What does a management agent do typically?

15   A   They have a lot of duties.  They hire the employees.  They

16   train them.  They are the front lines for analyzing -- each

17   applicant has to have their income analyzed so that we make

18   sure they are in fact qualified to live in these units

19   because the rents are discounted for the units so that site

20   staff has to be trained in that.

21       They manage the tenant base.  They collect the rents.

22   They put money in the bank.  They maintain the tenant units.

23   We have maintenance staff who performs maintenance on the

24   property and on the tenant units.  They manage emergencies.

25       Two weeks ago at Parkway the sewer backed up into one of

1   the buildings.  They managed that.  That's an example of what
2   they do.
3   Q   You talked about the role of the limited partner.  I want
4   to ask you specifically, does the limited partner have any
5   management responsibilities?
6   A   No, they are a limited partner.
7   Q   Are they a passive investor?
8   A   They are.
9   Q   Now, you mentioned that the general partner and the
10  management agent are both involved in the case of general
11  partner compliance, in the case of management agent
12  day-to-day renting the units and such.  So are the two
13  independent?
14  A   Not necessarily.  There is quite a lot of coordination
15  between what the partnership management is doing and what the
16  property management is doing, especially at the financial
17  level and at the loan from housing tax credit compliance
18  level.
19  Q   Are they affiliated in any way?
20  A   They often are affiliated, yes.
21  Q   Is that allowed by the -- generally by the LIHTC
22  agreement?
23  A   Yes, it is.
24  Q   What happens after the initial 15-year compliance period
25  ends?

1    A    Typically the limited partner wants to get out.  There are

2    no further tax benefits.  They are not particularly

3    interested in remaining as the property continues its life as

4    affordable housing.

5    Q    How does this typically happen?

6    A    It depends on how the partnership or LLC agreement was

7    written.  There are different mechanisms.  There is usually

8    some way to buy out the limited partner.  Sometimes the

9    property is put on the market.  Variety of ways.

10   Q    But the project itself continues as an affordable housing

11   project beyond the first 15 years; is that right?

12          MR. PETTIT:  Objection,leading.

13          THE COURT:  Pardon?

14          MR. PETTIT:  She's leading the witness.

15          THE COURT:  This is just background.  I should

16   disclose, I have been, in my former life, an investor in

17   low-income housing as a limited partner and the like.

18       This is background.  I will allow latitude.  Please

19   proceed.

20   BY MS. LATSINOVA:

21   Q    My question, I think I can reconstruct it.

22          Does the project itself continue after the initial

23   15-year compliance period?

24   A    There is -- yes, there is continuation under the

25   regulatory agreement, although there are certain possible

1  ways to get the project out from under its affordability

2  requirements.

3  Q    You have never done that?

4  A    I have never done that.

5  Q    Now, you mentioned you had several properties in

6  Washington.  Do you have any outside of Washington?

7  A    Yes, a partner and I developed six affordable housing

8  projects in Nevada.

9  Q    Do you still own them?

10  A    We still own three of them.  We sold two of them to a

11  non-profit housing organization in kind of the dark days of

12  the Nevada real estate market.  I traded my interest to him

13  for one of them.  Yes, we still own three of them.

14  Q    So what happened to the other ones?

15  A    We sold -- we had one in Reno and one in Las Vegas that

16  had HUD subsidy.  We sold both of those to a non-profit

17  housing organization.

18  Q    And who was the buyer?

19  A    Nevada Hand is who they were.

20  Q    Is that the non-profit?

21  A    Yes.

22  Q    So I think that leaves another one or two that you used to

23  own but no longer do.  What happened to those?

24  A    There was another one in Las Vegas where I traded my

25  interest to my partner.  He ended up with the entire

1    property.

2    Q    So you had two in Nevada.  And who was the limited partner

3    there?

4    A    There were a variety.  AMTAX actually was the original

5    investor in three of them.  U.S. Bank -- U.S. Bank was the

6    investor in two.  Key Bank was the investor in one.

7    Q    Did I understand you correctly that one of your limited

8    partners in Nevada was AMTAX, the same or related entity that

9    is involved in this case?

10   A    Yes.

11   Q    So did I understand you correctly you bought AMTAX out in

12   Nevada?

13   A    Of the -- okay, of the three that I do -- that I no longer

14   own, one of those properties that was sold was one in which

15   AMTAX was an investor.  That was sold in 2014.  The one in

16   which I traded my interest to my partner was an AMTAX

17   property.  Then one of the ones -- of the three that we still

18   own, we purchased AMTAX's interest under 7.4.J in 2015.

19   Q    When you mention 7.4.J, what are you referring to?

20   A    Section 7.4.J of the partnership agreement, because it was

21   identical to Parkway and Hidden Hills.

22   Q    Am I understanding you correctly that you exercised your

23   option and bought out AMTAX in a couple of properties in

24   Nevada pursuant to 7.4.J, which is identical to the LPAs that

25   are involved in this case?

1    A    We bought out the interest of AMTAX under 7.4.J in a

2    property in Las Vegas.  The other property, which was in

3    Reno, was simply sold to the housing non-profit.

4    Q    So following up on the option exercised as to AMTAX, what

5    was the -- was that controversial?

6    A    It was uneventful.

7    Q    What was the state of the real estate market in Nevada

8    when this uneventful buyout occurred?

9    A    This was 2014 and 2015.  The real estate market in Nevada

10   was still depressed.

11   Q    Okay.  AMTAX did not accuse you of breaching your

12   fiduciary duties in that case?

13   A    They did not.

14   Q    They didn't seek your removal?

15   A    They did not.

16   Q    Now, are there any unique features in managing low-income

17   housing LIHTC properties?

18   A    The two features that are unique to low-income housing tax

19   credit property are compliance aspect and the increased

20   inspection schedule that we experience.  We have to screen

21   every applicant's application, every member of the household

22   has to be screened for income, which is fairly detailed work.

23   The housing finance commission has a procedure in which they

24   train us on how to do it.  Then we have to screen them again

25   annually to determine their income.  In fact, if their income

1   rises above the limits, they don't have to move out, but we

2   do have to report that to the housing finance commission.

3   The properties are inspected.  Let's see.

4       The Washington State Housing Finance Commission does a

5   tenant file review every year.  They do a physical inspection

6   of the property every three years.  In the case of Parkway,

7   that lender is HUD.  HUD has a very formalized process where

8   they inspect and they score the property.  Depending on the

9   score, they will come back one to three years later,

10  depending on our score.

11      We have inspections from the limited partner.  We get

12  inspections from our property casualty insurer also.

13  Q   So can you summarize -- I think you just answered the

14  question, but can you please summarize for the Court why is

15  compliance so important in LIHTC properties?

16  A   Ensuring that the tenants are all earning less than the

17  maximum is critical for tax credit delivery.  If we allowed

18  tenants to move in who are overqualified, we could cause the

19  project to be reported to the IRS.  That causes it to go out

20  of compliance and the tax credits could be recaptured.

21  Q   Has this ever happened in any of your projects?

22  A   No.

23  Q   Now, do you provide information to the passive investor,

24  the limited partner in the projects you manage as a general

25  partner?

Tamaro - Direct

1   A    Yes, I do.

2   Q    How do you do that?

3   A    Limited partners, they want essentially the same

4   information.  They want to see the rent roll.  They want to

5   see the property financials.  In the early years, especially

6   in a lease up period which each unit is being qualified by

7   the first low-income tenant to move in, they want to see

8   every tenant's file, and it has been my experience that

9   they -- they will independently verify each of those move-in

10  files.  They want to see all the reports that we send to the

11  agencies that we report to.  They want to see results.  They

12  especially care about the results of the housing finance

13  commission's annual tenant file review.  Then they can have a

14  variety of questions depending on who they are.

15  Q    How often do they receive the rent reports -- did you call

16  them rent rolls?

17  A    Depends on who they are.  Some of them want the

18  information quarterly, and others want it monthly.

19  Q    Is there anybody else that you submit reports to as a

20  general partner?

21  A    At year-end we have to submit reports to -- we have to

22  file with the IRS on the tax exempt bonds.  We have to file a

23  very detailed report with the Washington State Housing

24  Finance Commission on the tenant and compliance information.

25  We file a report with the Washington Department of Revenue to

1   support -- to support our continuing property tax exemption.

2   We have to file financials, including with our lenders and

3   partners.

4   Q   Do you sometimes receive questions from the passive

5   investor about your management?

6   A   Yes, I receive questions on a regular basis.

7   Q   Is there typically an asset manager or person from the

8   limited partner that is assigned to a specific property?  How

9   does it work?

10  A   On the property operations, the limited partner will have

11  someone who is, yes, called an asset manager who is in charge

12  of maintaining contact with me, reviewing the property

13  results, and usually visiting on whatever schedule that

14  person decides to visit on.

15  Q   Would this asset manager typically be your primary

16  contact?

17  A   Yes.

18  Q   So how do you, generally speaking, respond to questions

19  when they arise from the limited partner?

20  A   I answer the questions.  I answer promptly.  Sometimes it

21  takes a phone call.  Sometimes they want information.

22  Sometimes I can answer in an email.

23  Q   Now, moving on to another aspect --

24          THE COURT:  Let's keep that until after the break.

25  We will take our lunch break and we will be at recess until

Tamaro - Direct

1    1:30.   Court is at recess.

2                              (Recessed.)

1          AFTERNOON SESSION

2          THE COURT:  Ms. Latsinova, you may proceed.

3    BY MS. LATSINOVA:

4    Q    Catherine, as a general partner, do you keep the books and

5    records of LITHC property?

6    A    Yes.

7    Q    And do you arrange for audits of financial statements?

8    A    Yes, that's a general partner duty.

9    Q    Is that the case in all LITHC properties?

10   A    All that I know of, yes.

11   Q    Okay.  And so what is the auditor's role versus general

12   partner's role in preparing financial statements and having

13   them audited?

14   A    We actually prepare the financial statements and the

15   auditor reviews and analyzes them to ensure that they are

16   complete and accurate and done according to generally

17   accepted accounting principles.

18   Q    Is that known as GAAP?

19   A    Yes.

20   Q    And you mentioned, you said, "We prepare financial

21   statements."

22   A    In my office, I work with a controller, and she does most

23   of the work.  But we are the entity that prepares the

24   financial statements.

25   Q    And who receives them?

1    A    The audits?

2    Q    Yes.

3    A    We send the audits to the limited partner.  We send the

4    audits to the securities repositories when there are tax

5    exempt bonds outstanding.  We send them to the lenders.

6    Q    Anybody else?

7    A    HUD actually has its own process for financial statements.

8    They have a computer system where the data is entered, and

9    they have their own specific requirements on what they want

10   to see.

11   Q    Do you know if there's a difference between the HUD

12   requirements and GAAP?

13   A    HUD requires GAAP as a baseline, and then they have

14   additional details that they want to know about.

15   Q    Okay.  So is HUD filing separate or the same as the

16   regular financial statements that are audited then given to

17   the limited partner, for example?

18   A    It's a different process.

19   Q    Now, has there ever been a LITHC property where you did

20   not provide audited financial statements in a particular

21   year?

22   A    Well, not on Hidden Hills and Parkway, until 2018.  Before

23   that, I always provided audits to the limited partnership.

24   Q    What happened in 2018?

25   A    Well, we got started on the audit, and the auditor has

1  disengaged.  We were almost finished.  We had the HUD filing

2  completed.  We had everything ready to draft and she

3  disengaged.

4  Q   We'll talk about that later.  But did you hear Mr. Pettit

5  say in his opening statement that you failed to deliver any

6  financial information for 2018 to the limited partner, either

7  for Hidden Hills or Parkway?

8  A   Yes.

9  Q   Let's look at Exhibit 156, please.  You have Exhibit 156,

10  which has been admitted already.  Can you please explain what

11  this is?

12  A   Well, this is the followup letter, after our auditor

13  disengaged from completing the audits on the two

14  partnerships.

15  Q   In your own words, what does it say?

16  A   Well, it says I did not ask the auditor to delay her work

17  until May.  Because we obviously had gotten it done in a

18  timely manner.  And that I have a consistent track record of

19  delivering audits.

20  Q   Let's look at Exhibit 148, please, Adam.

21       The date of the letter is May 8th, May 9th; is that

22  correct?

23  A   Yes.

24  Q   And, Adam, let's look at 148.

25       What is Exhibit 148, please?

1    A    This is the draft of Parkway's audit.

2    Q    To your knowledge, was it provided to the limited partner?

3    A    This document has been provided, yes.

4    Q    Do you know the date when it was provided?

5    A    I do not recall.

6    Q    Was it around the time of the cover letter, if you recall?

7    A    Yes.

8    Q    Okay.  Let's look at Exhibit 147, please, Adam.

9         What's Exhibit 147, if you know?

10   A    This is the draft of Hidden Hills' 2018 audit.

11   Q    Was it provided to the limited partner?

12   A    Yes, it was.

13   Q    Do you know when it was provided to the limited partner?

14   A    On the same date that Parkway's was provided, which was

15   around the time of that letter.

16   Q    Thank you.  You can close that, Adam?  Thank you.

17        Catherine, during all those years for all the

18   properties that you have been involved in, LITHC properties,

19   I mean, have you ever been accused of a breach of fiduciary

20   duty by a limited partner?

21   A    No.

22   Q    Have you ever been accused of a breach of duty of any kind

23   by a regulatory agency?

24   A    No.

25   Q    Have you ever been sued by an investor or a limited

1  partner seeking to remove you?

2  A    No.

3  Q    Have you ever been accused of failing to provide audited

4  financial statements?

5  A    No.

6  Q    And until this dispute arose, has any limited partner ever

7  requested your removal from these properties, before AMTAX

8  did so in this case?

9  A    No.

10  Q    And has any regulatory agency ever requested or demanded

11  your removal?

12  A    No.

13  Q    Okay.  Now, you mentioned compliance periods, early.  Do

14  you recall that?

15  A    Yes.

16  Q    Now, when did the compliance period end for the Hidden

17  Hills property?

18  A    On the last day of 2016.

19  Q    Okay.  And what about the Parkway?

20  A    It was on the last day of 2017.

21  Q    So by the end of the compliance period for each of these

22  properties, were all tax credits delivered to the limited

23  partner by you as the general partner?

24  A    Yes.  The amount that was promised and the schedule that

25  was promised were delivered.

1  Q   Now I want to direct you to the actual agreements for each

2  of the properties and have you show us where these amounts

3  are.

4      Adam, can you please pull up the Exhibit 2, the Hidden

5  Hills LPA?

6      Catherine, you'll see on your screen the Hidden Hills

7  LPA has been admitted.  Can you please show us where there's

8  a schedule of tax credits, tax losses that the general

9  partner promised to deliver?

10 A   Do you want me to flip through it?

11 Q   I'll help you.  I think the relevant pages are 15 and 16.

12     So first of all, what do we see here on Schedule A?

13 A   This is the schedule of capital contributions from the

14 general partner and limited partner.

15 Q   And so how much capital is the limited partner investing?

16 A   $3.36 million.

17 Q   Now, let's see what they get for it.

18     Can you scroll to 15, 16, please, Adam.

19     So 3.3, and --

20 A   Let's see, go down.  It's this definition.  This is in the

21 definitions of the partnership agreement.  This is what --

22 these are the numbers that we fill in at the very end as far

23 as what the credits are going to be.

24 Q   So this is just the beginning of the definition.  Could we

25 go to the next page, Adam, please?

1          And it continues?

2   A   And it continues right there and describes the credit

3   delivery.

4   Q   So if we add up all the numbers that are there in that

5   paragraph, we would -- what would we have?

6   A   There was over $3 million of tax credits there.

7   Q   And does the limited partner get anything else?

8   A   The limited partner gets depreciation write-offs.

9   Q   Where are they in the agreement?

10  A   I believe they are at the very back of that partnership

11  agreement.

12  Q   I think that's Schedule B.  Adam, let's go there.

13          Okay.  You have Schedule B in front of you.  Can you

14  please explain what it is?

15  A   This is the projected schedule of losses that they will

16  write off of their tax return.

17  Q   Okay.  And so their combined tax benefit would be the sum

18  of the tax credits and tax losses; is that correct?

19  A   Yes, for limited partner, yes.

20  Q   Okay.  Now, let's look at the Parkway LPA.  That's

21  Exhibit 3.  And I think the Parkway is easier because it's

22  all on the same page, or pages next to each other.  You see

23  in front of you the Parkway LPA.  Do you recognize it?

24  A   Yes.

25  Q   Let's go to A and B, please, Adam.

1           So --

2    A    So, again, this is the capital contribution of the limited

3    partner.

4    Q    How much is that?

5    A    $2.89 million.

6    Q    Let's see Schedule A and B, please.

7    A    So this is their -- these are their write-offs, their

8    projected write-offs.

9    Q    Okay.  That's Schedule A?

10   A    This is Schedule B.

11   Q    And what's Schedule A?

12   A    We would go, again, to the definition section of the

13   projected credits.

14   Q    I think we actually have a better exhibit where it's all

15   on the same page.

16          Adam, let's go to 31.  Okay.  Do you recognize

17   Exhibit 31?

18   A    Yes.  Second amendment to the partnership agreement.

19   Q    For Parkway?

20   A    For Parkway, yes.

21   Q    Let's look at Schedules A and B.

22   A    There we go.  This is their write-offs and their tax

23   credits.

24   Q    So both on the same page?

25   A    Yes.

1   Q    And that's the total tax benefits to the limited partner?

2   A    Yes.

3   Q    And conveniently, we have a demonstrative exhibit from the

4   opening statement where it all fits on the same page.

5        Could you please go to that chart, Adam?

6        So is this a summary?

7   A    Yes, this is adding up the credits and the tax write-offs.

8   Q    You, as a general partner, were responsible for delivering

9   all these tax benefits to the limited partner during the

10  compliance period?

11  A    Delivering this and the credits needed to be on time.

12  Q    And did you do so?

13  A    Yes.

14  Q    Both for Hidden Hills and Parkway?

15  A    Yes.  Actually, in Parkway we delivered some extra

16  credits.

17  Q    How do you get extra credits?

18  A    At the end of the rehabilitation, we do an audit and add

19  up all the costs and we apply the formula.  And we came out a

20  little bit ahead.

21  Q    Okay.  Now, you also -- switching subjects here a little

22  bit -- you talked about the buyout option in LITHC deals.  Do

23  you recall that?

24  A    Yes.

25  Q    Are they common?

1    A    I believe so.  They're common in my partnerships.

2    Q    Have you exercised options before?

3    A    Yes, I have.

4    Q    How many times?

5    A    Three times in Washington and two times in Nevada.

6    Q    Okay.

7    A    Not counting these.

8    Q    So, is there a buyout option in the Hidden Hills

9    Partnership agreement?

10   A    Yes, there is.

11   Q    Let's go to --

12   A    Excuse me, in Nevada we bought out five partners.  I

13   misspoke.

14   Q    Now, going back to the Hidden Hills.  Let's look at

15   Section 7.4J.  Is that the option mechanism?

16   A    Yes, this is the buyout option.  This paragraph right

17   here.

18   Q    Is there a similar section in the Parkway LPA?

19   A    It's essentially identical, yes.

20   Q    It's also 7.4J; right?

21   A    Correct.

22   Q    All right.  Was this Section 7.4J important to you when

23   you agreed to serve as general partner?

24   A    Yes, it was.  It was actually one of the reasons I did

25   business with AMTAX, so I would have the right to buy their

1    interest at the end of the compliance period.

2    Q    Why was that?

3    A    Because I wanted to buy their interest, own the property,

4    and operate it as affordable housing.

5    Q    Now, once the option is exercised, can you please explain

6    how the buyout price is calculated?

7    A    Well, we reach a fair market value.  And then we run

8    through a waterfall, which is essentially a formula to arrive

9    at an ending dollar amount that the general partner would pay

10   to the limited partner.

11   Q    Adam, can we go to 6.2B, please?

12        Now, we're using Parkway in this case.  But let's look

13   at the Section 6.2B, what you call the waterfall.  Can you

14   please explain how this works?

15   A    It's a series -- it's modeling a hypothetical sale.

16   Q    Can you walk us through the steps?

17   A    Yeah.  We start at --

18   Q    Do you have enough water there?

19   A    I'll take another sip.  Thank you.

20        We start with our fair market value, and then -- that's

21   our capital proceeds.  And we subtract all the bills that are

22   outstanding, because at any given time a partnership always

23   has just regular bills.  Then we work through these steps and

24   we see, for example, was there any credit recapture?  And if

25   there is, then I would owe them something.  In this case,

1   there was no credit recapture.

2   Q   Where is the credit recapture?

3   A   That would be little Roman numeral "ii".

4   Q   Okay.

5   A   So we skipped that step.  There was no credit deficiency.

6   So then we pay off, in our hypothetical model, we pay off the

7   debts and the liabilities of the partnership.

8   Q   Okay.

9   A   Those are outside debts.  So that would really be the

10  mortgage, in our hypothetical sale.  And then we pay an asset

11  management fee to the limited partner, if we owe them

12  anything.  Then we move on to -- we can skip credit recovery

13  loans, because there weren't any of those.  That, again,

14  applies to credit deficiencies.

15  Q   Okay.

16  A   Then the limited partner gets a priority distribution.

17  Then if there's still money in our hypothetical sale, we keep

18  moving.  So then we would pay any outstanding deferred

19  developer fee, if there is one.  We would pay off the

20  subordinated loans to the general partner.  So we're down

21  around here at this point.

22      Then we do a capital account adjustment, which sometimes

23  applies, sometimes doesn't.  And then the investor gets

24  another priority distribution.  And we split the balance.

25  Q   And at the end of this waterfall, you arrive at an option

1   price?

2   A   Correct.

3   Q   Okay.  Now, moving specifically to the Hidden Hills and

4   Parkway properties, and starting with Hidden Hills, can you

5   please describe your involvement in the Hidden Hills Project?

6   A   I put it together.  I started in 1999.  I found the

7   property.  I got it under contract.  Hidden Hills was a

8   uniquely difficult closing; it took three years to actually

9   close that.

10  Q   And why was that?

11  A   Well, at the time Hidden Hills had -- Tacoma Water

12  Utilities went out in 1998 and was sampling soil around town,

13  and Hidden Hills ended up being one of the properties they

14  sampled.  They were doing their own survey.  They got

15  interested in the question of how far the stack ash had

16  traveled from the smelter.

17  Q   Do you recall the year when that testing was done?

18  A   That was 1998.

19  Q   Okay.

20  A   And what happened was, it was unexpected, it made lenders

21  uncertain as to what to do with the property.  So the seller

22  ended up having a number of soil samples taken in the

23  following year.  And I had -- I worked with three different

24  lenders.  The first two dropped out.  Again, it was uncertain

25  as to how to handle the property.  We ended up -- the seller

1  cut the price about nine percent.  The city rezoned it from

2  PUD to multifamily.  Then we cleaved off a portion of the

3  acreage that was undeveloped.  And the part that is the

4  Hidden Hills Apartments now excludes some of the original

5  acreage.

6  Q   Why does it exclude -- can you please explain why the

7  rezone and the carving out a separate parcel was part of the

8  deal?

9  A   Hidden Hills was originally zoned as planned unit

10  development, so the buildings were all clustered at the front

11  end of the parcel.  And the back was actually some wetlands

12  and had never been graded.  And so the back portion had much

13  higher readings of arsenic than -- the front was kind of hit

14  and miss.  There were some hotspots and clear spots, but the

15  back was showing higher signs of arsenic.

16  Q   Do you recall how much arsenic -- do you recall what the

17  readings were?

18  A   Well, across the property, they varied from zero up to

19  over 200 parts per million.

20  Q   Okay.  And so was there any additional testing done in

21  1998?

22  A   The seller had two series of soil testings done.  And

23  actually EPI did that soil testing.

24  Q   Okay.  And so you mentioned that you put this deal

25  together, found the property, and such.  Do you recall saying

1  that?

2  A   I did.

3  Q   And did that putting the deal together include investment

4  of your own funds?

5  A   Yes.  At the end, in order to close the deal -- well, one

6  of the things -- I'll back up.  What was an unusual feature

7  of this loan is that the final lender, who was Fannie Mae,

8  required that we fund an escrow in the amount of what was

9  anticipated at the time to be the cost of remediating.  So

10 there was this large escrow that was an extra obligation that

11 we had to finance.

12 Q   What was the year of that original agreement and the

13 escrow, the escrow agreement?

14 A   It closed in 2002.  And in order to close the deal, I had

15 to loan-in $700,000.

16 Q   Of your own money?

17 A   Of my own money, yes.

18 Q   Okay.  What happened to that money?

19 A   It has not yet been repaid.  It's still an obligation of

20 the partnership.

21 Q   Was that a condition of the deal?  Would the deal have

22 closed without your investment of $700,000?

23 A   No.

24 Q   And that amount is still owed to you?

25 A   Yes.

Tamaro - Direct

1  Q   Okay.  Now, how does the Hidden Hills deal compare to the

2  other LITHC deals you were involved in?

3  A   As far as a property goes, it's a regular LITHC deal.  But

4  as far as closing the loan, it was quite difficult at that

5  time.

6  Q   Okay.  And was the current ownership of AMTAX involved in

7  any of that?

8  A   No.  They came in at the very end.  They came in probably

9  the last 60 days.  They relied pretty heavily on the due

10  diligence of the construction lender, who was KeyBank.

11  Q   How about Alden Torch, the present owner of AMTAX.  When

12  did they come in?  Were they part of any of this early

13  history that you describe?

14      MR. PETTIT:  Objection, Your Honor.  It's a

15  mischaracterization of Alden Torch's role with AMTAX.  It's

16  not the owner of AMTAX.  It's responsible for managing

17  AMTAX's interests.

18      THE COURT:  I'll overrule the objection.  If there's

19  any confusion, you're allowed an opportunity to inquire.  Go

20  ahead.

21  A   To clarify, AMTAX, the limited partner, has been present

22  the entire time.

23  Q   Okay.

24  A   There was an asset manager that goes along with that

25  limited partner.  And Alden Torch, as asset manager, came in,

1   I believe, the end of 2011.

2   Q   And what was the name of the original asset manager of

3   AMTAX?

4   A   Paramount.

5   Q   Okay.  Now, you have managed Hidden Hills for how many

6   years now?

7   A   My partner managed it the first three years, until 2005.

8   Then I took over.

9   Q   And how long ago was that?

10  A   2005 -- where are we?  Fourteen years.

11  Q   Now, how many -- you mentioned that the original LP was

12  Paramount; is that correct?

13  A   They were the first asset manager.

14  Q   The original asset manager, I apologize, was Paramount; is

15  that right?

16  A   Yes.

17  Q   And how many different asset managers have there been

18  since the beginning?

19  A   I wasn't really clear, because there was this period of

20  time around 2008/2009 where there was some change.  It was a

21  company called Capmark that appeared.  So I would say at

22  least three, but I am not certain.

23  Q   And did you get along with the Paramount people?

24  A   We had a good working relationship, yes.

25  Q   And did you get along with -- Capmark, did you say?

1    A    Capmark.

2    Q    The Capmark people?

3    A    I have less memory of them.  But there was -- I mean,

4    nothing bad happened during that time.

5    Q    Okay.  So when was the first time you had any issue with

6    an asset manager?

7    A    Difficulties, you mean?

8    Q    Yes.

9    A    Actually, there were -- well, with Hidden Hills, there

10   were no issues with the asset manager until the litigation

11   started.

12   Q    Okay.  Now, have you provided the limited partner the

13   audited financial statements for every year you were

14   involved?

15   A    Yes.  Up until, unfortunately, this year, yes.

16   Q    Okay.

17   A    Prior to that, yes, I have.

18   Q    And how many -- did you have the same auditor or different

19   auditors during that time period?

20   A    There have been a total of three different auditors.

21   Q    Who was the first one?

22   A    The first one was -- well, now they're Loveridge Hunt.

23   They were Bloom Loveridge at the time.  They are a Bellevue

24   firm.  And they did the audits up through, I believe it's

25   2010.  Then I switched to a smaller firm, Squires Maddux

1   starting with the 2011 audit.  And Squires Maddux did the

2   work through 2015.  And then Squires Maddux lost one of their

3   key auditors, so we found Laura Lindal, who started in 2016.

4   Q   What was the reason for changing from Loveridge Hunt to

5   Squires Maddux?

6   A   They were smaller, and I got more personal service than I

7   had received at Loveridge Hunt.

8   Q   And prior to this year, did any of the LPs raise any

9   issues with the audits or the auditors?

10  A   No.

11  Q   Now, when did you exercise your option under Section 7.4J

12  for Hidden Hills?

13  A   March 14th of 2017.

14  Q   Let's look at Exhibit 120, Adam, please.

15       So, you have in front of you Exhibit 120.  Do you

16  recognize it?

17  A   Yes, I do.

18  Q   What is it?

19  A   This is a letter that I wrote to Chris Blake, exercising

20  my option.

21  Q   Was this exercised timely?

22  A   Yes.  I had two years after 2016 to exercise my option.

23  Q   Okay.

24       And now, you reference -- there are a few proposals

25  that are part of the letter.  Do you see that?

```
 1   A   I do.
 2   Q   No. 5 says that the cost of remediation -- that's one of
 3   your proposals -- must be included in the valuation.  Do you
 4   see that?
 5   A   I do.
 6   Q   And why did you make this proposal?
 7   A   I based this on my experience in closing the original
 8   loan.  And I recognize that the world may have changed, but I
 9   had had a certain experience when I purchased that property,
10   with the lenders.  And so based on that experience, I had
11   thought that the property needed to be -- the value needed to
12   be offset by the remediation cost.
13   Q   Okay.  Now, let's -- I want to draw your attention to the
14   last paragraph in this letter.
15           Can we go there, please, Adam?
16           So, in the last paragraph, and please take time to
17   review it, you say, among other things, that the limited
18   partner cannot force a sale.  Do you see that?
19   A   I do.
20   Q   And can you please explain what prompted you to include
21   this in your letter?
22   A   I had received a letter, just before I sent my letter, in
23   which the limited partner exercised its right to sell the
24   property.  And that is actually not consistent with the
25   partnership agreement.  The limited partner has the right to
```

1  force a sale of its interest in the property, which is

2  different.

3  Q   And what happened after you sent this letter?

4  A   Well, there was some back and forth with Chris.  And then

5  Chris sent an appraisal.  And I hadn't realized he had gotten

6  one, but he sent me the appraisal.  So I went and completed

7  an appraisal as of my exercise date.

8  Q   And so was there a third appraisal done?

9  A   Well, I sent my appraisal to Chris.  And as you can

10  imagine, things were getting tense.  The third appraisal was

11  done the following fall.

12  Q   Okay.  And so why did you bring this lawsuit, originally?

13  A   Because AMTAX was seeking to remove Hidden Hills

14  Management as the general partner.

15  Q   And do you understand what AMTAX is accusing you of?

16  A   I do.

17  Q   What is your understanding?

18  A   I guess I would say tainting the appraisal process.

19  Q   And are you aware of Judge Leighton's ruling that the

20  third appraisal was, in fact, tainted?

21  A   Yes, I am.

22  Q   And are you aware of Judge Leighton's ruling that the

23  appraisal should not include the cost of remedying the

24  contamination?

25  A   Yes, I am.

Tamaro - Direct

1   Q   And did you take any steps to correct that taint?

2   A   I sent a letter to AMTAX in which I accepted their

3   appraisal, which did not include the environmental condition

4   in the valuation.

5   Q   Let's look at Exhibit 155, Adam, please.

6       Please take a look at Exhibit 155.  What is this

7   exhibit, do you recognize it?

8   A   My typo.

9   Q   You said there's a typo.

10  A   Yeah, the date, sorry.  I sent this letter to Chris Blake

11  and I accepted their valuation.

12  Q   Why did you think that this would remedy any taint in the

13  appraisal process?

14  A   Well, this is their appraisal.  They ordered it.  And it

15  does not -- there's no reduction in value for any

16  environmental condition.

17  Q   So did the appraisal that you accepted, did it value the

18  property as if it was clean?

19  A   It did, yeah.

20  Q   Okay.  And so did you also go into more full calculations?

21  A   I did.  I didn't -- I neglected to include it in this

22  letter, so I sent it several days later.

23  Q   Okay.  Let's look at Exhibit 159, please, Adam.

24      Okay.  And several pages into this exhibit, there

25  should be a waterfall.

1    A    Yes.   That's my Excel spreadsheet.

2    Q    Can you please explain what you did in this waterfall?

3    A    Well, as I said, the property still has this escrow, this

4    environmental escrow.   So I divided it up according to the

5    partnership agreement.

6    Q    Why don't you start from the beginning.   Can you walk us

7    through it from the first line down to the bottom?

8    A    So we start right here.   This is the amount that Hidden

9    Hills is still carrying on its balance sheet.   So, again, I'm

10   modeling a hypothetical sale.   So I take that value and walk

11   through the formula in the partnership agreement.   So there's

12   my loan that gets paid off, and the interest.   And then we do

13   a 90/10 split of whatever is left.

14   Q    When you say "my loan," what line are you talking about?

15   A    That is line 5.

16   Q    Can you please explain that?

17   A    Right here.   That line 5 is the money that I had

18   loaned-in, back in 2002 when we closed the deal.

19   Q    So that's the initial $700,000 that you loaned that you

20   talked about?

21   A    Yes.

22   Q    All right.   What else are you deducting here?

23   A    Well, there was some associated interest on the loan.   And

24   then, as I said, we do a 90/10 split, according to the

25   partnership agreement.

1  Q   Okay.

2  A   Then this is their valuation.  This is their appraised

3  value.  Again, in my hypothetical sale, I add in bank

4  accounts that the property has, and get to a number.  I

5  subtracted my estimate of hypothetical sales costs to get

6  down to this number here, which is where we start dividing

7  things up.

8       So that's line 23, which continues to line 26.  So I take

9  that capital proceeds as our hypothetical number, subtract

10 out the mortgage, subtract out some of these costs that would

11 be associated with paying off the mortgage, then I subtract

12 off this deferred developer fee that I earned back in 2002

13 that, again, is still outstanding.

14 Q   Can you please explain what a deferred developer fee is?

15 A   That would be line 32.  When these deals are structured,

16 one of the fees that's allowed is a developer fee, that goes

17 to the developer.  And it's added into the costs.  And

18 actually, tax credits are calculated on that number, so it

19 brings in more tax credits.  And then it needs to be repaid.

20 My experience has been that it can take years and years

21 before it's repaid.  So it's called "deferred."

22 Q   Is the deferred -- you said "developer," in this case, is

23 developer the same as general partner?

24 A   The developer is the party who put the deal together.

25 Q   So the deferred developer fees owed to the general partner

1    who put the deal together; is that correct?

2    A   They may be separate legal entities.  But in my case, they

3    were -- there was obviously an identity of interest between

4    the developer and the general partner.

5    Q   Okay.  Please go on.  And I'm sorry for interrupting you

6    there.

7    A   Okay.  So I guess we're down to line 32, and that's

8    repayment of the deferred developer fee.

9    Q   Okay.

10   A   Then, again, we start getting into the splits.  So the

11   investor gets a 10 percent priority, as we're moving through

12   this.  Then the administrative general partner, which would

13   be me, gets 33 percent of gross revenue.  So I get a share of

14   the property.  Then the balance goes to -- back to the

15   investor.

16   Q   And so what option price do you arrive at in this

17   waterfall?

18   A   It would be that $4.968 million to them.  Then the other

19   partnership gets $377.

20   Q   So what happened next?

21   A   Eric Pettit sent an e-mail to my counsel and disagreed

22   with some of this.  And I had showed them this before, but

23   they came back with some comments and we reviewed the

24   comments.  And I accepted several of them.  They wanted to

25   simplify all these hypothetical costs of sale down to

1   3 percent.  And I agreed that I would do that.  That seemed

2   reasonable.

3   Q   Before you go further, let's actually look at the

4   document.  Is this the Alden Torch letter responding to your

5   May 7th letter?

6   A   Yes.  This was actually their first letter.

7   Q   Did it attach a waterfall or was it separate?

8   A   This one actually did not.  This one just rejected my

9   offer.

10  Q   Okay.  But they did give you a waterfall of their own; is

11  that right?

12  A   Yes.  Several steps later, yes.

13  Q   So let's look at Exhibit 293 and see if that's it.  It

14  should be further down.  Is that the waterfall you received

15  from AMTAX?

16  A   Yes.

17  Q   Can you please -- it's a different format.  And, again, I

18  need to move, because I can't see the screen.

19  A   Yes.  They're working with the same value.

20  Q   Okay.  So why don't you walk us through the document,

21  because I cannot stand here and see the screen at the same

22  time.

23  A   Again, this was them modeling it, if they were in

24  agreement.

25  Q   So the starting point is the same?

Tamaro - Direct

1   A   Same value.

2   Q   Okay.

3   A   And then --

4   Q   That's based on their appraisal, right?

5   A   Correct.

6   Q   Okay.  Please go on.

7   A   Minus the simplified 3 percent of sales proceeds.

8   Q   Okay.

9   A   Theirs is -- okay.  So then they -- they subtracted some

10  numbers.  And I have to admit, I don't totally follow where

11  they got their release of reserves.  But they put that number

12  in.  So we get down to -- we're still using the same

13  approach.  And we get down to the subtractions.  And their

14  amount that they believe they are owed is this right here,

15  the $7.591 million.

16  Q   And you mentioned that there was some assumptions that

17  they made in their waterfall that you agreed with.  What were

18  they?

19  A   Well, I changed my approach, number one, to just simplify

20  the selling costs down to 3 percent.  And then in my

21  waterfall, and actually on our books, I had paid a couple of

22  loans in the wrong priority.  And they wanted that corrected.

23  And I agreed to do that, because they were right.

24  Q   And changing priorities changed the end result?

25  A   Yes.  Those two changes were favorable to them.  And so my

1   number increased.

2   Q   And so did you provide another waterfall with these

3   corrections that you just described?

4   A   Yes, I did.

5   Q   And I think that's Exhibit 165, Adam.

6       So, is this your corrected waterfall?

7   A   Yes, it is.

8   Q   Or adjusted waterfall?

9   A   Yes.

10  Q   However you call it.  So please explain what changed

11  between the previous waterfall and this one?

12  A   Let's see.  There were some changes right here.  Changes

13  in those two numbers.  Lines 5 and 6 changed.  But it

14  resulted in -- it brought in more money to them.

15      And then this dropped.

16  Q   Okay.

17  A   So the net result is this increased.

18  Q   So yours went up approximately $700,000; is that right?

19  A   Yes, approximately.

20  Q   So how far apart are you from AMTAX's waterfall, based on

21  the same valuation?

22  A   We're about $1.9 million apart.

23  Q   Okay.  And now what is the driver of this difference?  You

24  are now starting from the same point, and you agree to some

25  of the assumptions.  But you're still close to $2 million

1    apart.  What is the driver?

2    A   I am modeling my numbers based on the date that I

3    exercised my option.  And they are modeling their numbers as

4    of year-end 2019.

5    Q   So is this a timing issue?

6    A   Correct.

7    Q   Can you explain why you are modeling -- why are you

8    modeling your numbers as of the date of the exercise?

9    A   Well, I understood that that was the correct way to do it.

10   Q   Okay.  And so do you recall Mr. Pettit stating, in his

11   opening statement, words to the effect that your numbers keep

12   changing.  Do you recall that?

13   A   I do.

14   Q   And what is your reaction to that statement?

15   A   Well, he also talked about the normal negotiation process.

16   And that is how it goes sometimes.  There's some back and

17   forth.  And multiple parties look at a calculation and each

18   one makes some changes.  And it does result in a different

19   number.

20   Q   Okay.  So what are you asking the Court to do in Hidden

21   Hills?

22   A   I'm asking the Court to set the option price.

23   Q   And if the Court does that, what will happen then?

24   A   Well, if I can afford to, I will pay cash to AMTAX 114 for

25   their interest in the property.  And then if not, they have

1    the right, under Section 7.4K of the partnership, to sell

2    their interest to another party.

3    Q    Okay.

4         Let's look at -- Adam, let's put up 7.4J and K on the

5    screen.

6         So, you say you mentioned cash.  Where in 7.4J does it

7    require you to pay in cash?

8    A    Right there.

9    Q    Okay.  If the price is such that you don't have enough

10   cash to pay it, what happens then?

11   A    Well, they have the right to move on.  They can force a

12   sale of their interest to any party.  And I have the first

13   right of refusal, again, if I can afford to pay it.

14   Q    What section is that?

15   A    That would be the following section, which is 7.4K.

16   Q    Okay.  Let's go to K.  So, you mentioned that under 7.4K,

17   they have a right to sell their interest.  Where does it say

18   that?

19   A    "Its interest."

20   Q    Okay.  And if it goes to K, and they market their

21   interest, what do you have?

22   A    I would still remain the general partner.

23   Q    Would you have a right of first refusal?

24   A    I have the right of first refusal.  If they market it and

25   I cannot afford it, it would go to whoever the purchaser

1   would be.

2   Q   That's the purchase of their interest; is that correct?

3   A   Of the interest, not of the property itself.

4   Q   Can you point to where it mentions the right of first

5   refusal?

6   A   That would be right there, to purchase the interest.

7   Q   Okay.  Now, did you hear Mr. Pettit say, in his opening,

8   words to the effect that you wouldn't agree for them to sell

9   the property?

10   A   Well, under this partnership agreement, they don't have

11   the right to sell the property.  Excuse me, they don't have

12   the right to force a sale of the property.  I suppose if we

13   both agreed.  But I don't want to sell the property.

14   Q   So, a few more questions on that subject.  Now, do you

15   understand -- so if AMTAX sells its interest in Hidden Hills

16   and there's a new -- it goes, for example, you cannot afford

17   to pay in cash under 7.4J, and now there's a new limited

18   partner, would you be willing to stay as general partner with

19   a new limited partner?

20   A   Yes.

21   Q   Okay.  Now, you understand that AMTAX is seeking your

22   removal from Hidden Hills?

23   A   Yes, I do.

24   Q   And are you aware of any damage claims against the general

25   partner, either by the limited partner, or derivatively on

1  behalf of the partnership?

2  A   My understanding is that there are none.

3  Q   Okay.  Now, why do you think AMTAX seeks your removal,

4  even after you have essentially accepted or are close to

5  accepting the option price based on their own appraisal?

6        MR. PETTIT:  Objection, Your Honor.  She's asking her

7  to read into our my client's mind.  We're obviously here

8  articulating our position, but that's not really appropriate

9  for her to opine on.

10        MS. LATSINOVA:  I'm questioning her on her

11  understanding.  If she does, she does.  If she doesn't, she

12  doesn't.

13        THE COURT:  Overruled.

14  A   I believe AMTAX is trying to remove me as general partner

15  so it can sell the entire property.

16  Q   Now, let me ask you this question:  If you exercise the

17  option, would you keep the property as low-income housing?

18  A   Yes, I would.  That's what I've done with all of my

19  properties.

20  Q   Okay.

21        MS. LATSINOVA:  Your Honor, I don't have a watch.

22        THE COURT:  We're fine.  We've got 20 minutes before

23  recess.

24        MS. LATSINOVA:  Okay.  Good.  There it is.

25  Q   Now, let's switch subjects here and talk about audited

1  financial statements.  Did you provide audited financial

2  statements to the limited partner for Hidden Hills and

3  Parkway every year until this year?

4  A   Yes.

5  Q   And I think you mentioned that in previous years, the

6  limited partner had no issues; is that correct?

7  A   Correct.

8  Q   Now, do you have audited financial statements for

9  financial year 2018 to provide to the limited partner?

10  A   Well, what I do have is completed financial statements,

11  which I have forwarded to them.  And the completed HUD

12  filing.  But what I do not have is the auditor's opinion.

13  Q   Okay.  And so you mentioned that Laura Lindal withdrew?

14  A   Correct.

15  Q   Do you know why she withdrew?

16  A   I would refer to her letter as the explanation.

17  Q   Okay.  And do you recall Mr. Pettit saying, in his opening

18  statement, that Ms. Lindal withdrew under suspicious

19  circumstances?

20  A   I did hear that.

21  Q   Okay.  So let's look at Exhibits 153 and 154, Adam,

22  please.

23       Do you recognize Exhibit 153?

24  A   Yes.  This is the letter that Laura sent to me where she

25  disengaged.

1    Q    Is disengaged the same as withdraw as the auditor?

2    A    I think disengaged is the CPA term.

3    Q    Okay.  Let's look at Exhibit 154.  Is this Laura Lindal's

4    withdrawal letter from Parkway?

5    A    Yes, it is.

6    Q    And so beyond what you can read in this letter, do you

7    have any knowledge about the reasons for her withdrawal or

8    disengagement?

9    A    I would need to just refer to this letter, again, for her

10   reasons.

11   Q    Did you know Laura was going to disengage?

12   A    No.

13   Q    Did you ask her to delay the issuance of audited financial

14   statements for either Parkway or Hidden Hills for the year

15   2018?

16   A    No.

17   Q    Now, is there any financial information related to the

18   financial condition of Hidden Hills or Parkway that the

19   limited partner doesn't have at this point?

20   A    They have all the financial information.

21   Q    Okay.  Now, did you hear Mr. Pettit say, in his opening

22   statement, words to the effect that the general partner, that

23   is you, is incapable of finding a replacement auditor?  Do

24   you recall that?

25   A    I did hear that, yes.

1   Q   Okay.  So, can you please -- well, my question is:  Have

2   you taken steps to engage a new auditor?

3   A   I contacted five firms in Seattle and Bellevue to see if

4   they could essentially start over and do audits of Parkway

5   and Hidden Hills.

6   Q   Which firms did you contact?

7   A   I contacted Clark Nuber in Bellevue, Peterson Sullivan or

8   Sullivan Peterson.  I hadn't worked with any of them, so I

9   wasn't familiar with their names.  Watson McDonell.  I did

10  know who they were.  Moss Adams.  And, I'm sorry, there's a

11  fifth that I don't remember, that was in Seattle.

12  Q   What did they say?

13        MR. PETTIT:  Objection, Your Honor, hearsay.  Calls

14  for hearsay.

15        THE COURT:  Overruled.

16  Q   You can answer.

17  A   Okay.  One of them -- the name -- I left several messages

18  with the name I had been given at Moss Adams.  And I just

19  never heard back from that person.  The other -- three of

20  them immediately said no.  One of them wanted to look at the

21  documents, and actually never responded to me.  And I have

22  not had a chance to follow up with them.

23  Q   Do you recall Mr. Pettit saying that the limited partner

24  is now involved in the search for a new auditor?  Do you

25  recall that?

1    A    I heard that, yes.

2    Q    Do you recall Mr. Pettit saying that you were somehow

3    refusing to cooperate in that process?

4    A    I did hear that, yes.

5    Q    Is this accurate or not accurate?

6    A    I don't believe it's accurate.

7    Q    Can you please explain what happened with the limited

8    partner's search for an auditor?

9    A    They contacted my counsel and said that they had a firm --

10   a large firm, I know the name, and that that large firm was

11   willing to consider stepping in and doing the audits.  They

12   wanted me to get on the phone on Friday, three days ago.  And

13   it just happened that I was not able to do that on Friday.

14   So my counsel agreed that we're all available this week and

15   we could confer on how to move forward on getting audits for

16   the partnerships.

17   Q    Now, in your experience -- well, I should ask you --

18   strike that.

19        In your tenure as a general partner of LITHC

20   partnerships, have you ever had an auditor withdraw or

21   disengage?

22   A    No.

23   Q    Now, what's the effect of having no auditor to complete

24   the audit of financial statements?

25   A    Well, it means I can't do what I'm supposed to do, which

Tamaro - Direct

1    is to provide an audit.  I'm supposed to provide an audit to

2    the limited partners.  Hidden Hills is supposed to be

3    providing an audit to the securities repositories, because

4    there are taxes and bonds outstanding on that.  So I can't

5    fulfill my obligations.

6    Q    And have the HUD filings --

7    A    The HUD filing for Parkway was completed.

8    Q    How about Hidden Hills?

9    A    Hidden Hills has -- doesn't have a HUD loan, so there's

10   not the same requirement.  Hidden Hills has the securities

11   repository requirement, and I have not been able to forward

12   this year's disclosure.

13   Q    Okay.  Thank you.

14            MS. LATSINOVA:  Your Honor, I was about to go into a

15   whole different area.  So, however --

16            THE COURT:  Please proceed.

17   Q    Now, let's talk about Parkway.

18   A    Okay.

19   Q    Now, can you please describe the Parkway project?

20   A    Parkway has 208 units.  It's located near the intersection

21   of Southwest Campus Drive and 21st Avenue Southwest in

22   Federal Way.

23   Q    So is that King County or Pierce County?

24   A    That is King County.

25   Q    Okay.  But how far is it from Pierce County?

1    A    I think it's two miles down the road to Tacoma.

2    Q    I see.

3    A    It's kind of a dense site, densely built site.  Like I

4    said, 208 units.  And one and two bedroom units.  There are a

5    lot of services that are within walking distance, which is a

6    nice feature.  The bus stops right on 21st, near the

7    property.

8    Q    When was it built?

9    A    I believe 1976.

10   Q    So that's an older property than Hidden Hills?

11   A    It is, yes.

12   Q    Okay.  Now, are there any issues that are unique to

13   Parkway?

14   A    I would say Parkway has -- Parkway sits in an area with a

15   little bit more crime.  Parkway is located in a low-income

16   census tract.

17   Q    What does that mean?

18   A    Well, it means the surrounding neighborhood is a

19   low-income neighborhood.

20   Q    Okay.

21   A    I would say those are the unique features of Parkway.

22   Q    Okay.

23   A    A lot of non-English speaking residents live there.

24   Q    Can you please describe your involvement?  Were you

25   involved from the start?

1   A    Again, yes, I put the deal together.  Located the

2   property.  Got it under contract.  In this case, the issuer

3   of the tax exempt bonds was the Washington State Housing

4   Finance Commission.  Whereas, with Hidden Hills the issuer is

5   the Pierce County Housing Authority.

6   Q    Were you the person that submitted an application for tax

7   exempt bonds?

8   A    Yes.  That process starts with the application for tax

9   exempt bonds, then the tax credits follow.

10  Q    You did all that work?

11  A    Yes.

12  Q    What else did you do?

13  A    Worked to get the HUD loan in place.

14  Q    So there's a HUD loan?

15  A    There's a HUD loan on Parkway.

16  Q    So how does that work?  Is it that HUD actually lends

17  money?

18  A    HUD guarantees the loan through a HUD lender.  The lender

19  is Prudential, and the loan is guaranteed by the Government

20  National Mortgage Association.

21  Q    So it's considered a HUD project because of the loan?

22  A    It's considered a HUD-insured project, yes.

23  Q    So what else did you do to put the deal together?

24  A    Negotiated with the limited partner.  Closed the deal.

25  And then we did a rehabilitation on the property.

Tamaro - Direct

1   Q   And you mentioned -- what year was that?

2   A   We closed it in June of 2002.  And the rehab went on for

3   roughly nine months.

4   Q   Okay.  And so what sort of rehab was done?

5   A   We -- what I remember is we did a lot of interior work.

6   We put in new appliances, new carpeting, in some cases new

7   countertops.  We redid all the roofs.  I know that we had to

8   bring the main office building up to ADA standards.  I

9   remember that.  We repaired some parking structures.  We had

10  to repair the swimming pool.  And there may be other details

11  that I do not remember.

12  Q   Do you recall how much the rehab cost in 2001?

13  A   It was around -- we put in about $1.6 million into the

14  rehab.

15  Q   What sort of condition was the property in at that time?

16  A   Well, I could just say Parkway needed the money.

17  Q   Did you do everything you wanted to do in 2002/2001?

18  A   At that time, I wanted to replace the windows with --

19  they're single-pane, and I wanted to replace them with

20  double-pane, but that came up a little bit after we started

21  the rehab, and we did not have the money to do it.  So we

22  lived with single-pane windows, and we replaced them kind of

23  ad hoc as they were failing.

24  Q   Okay.

25      Now, is there anything else unique to Parkway?

1    A    I would say the HUD loan.  Parkway -- probably the HUD

2    loan adds a little bit of complexity to managing the

3    property.

4    Q    In what way?

5    A    HUD sets the standard for lenders.  They set the standard

6    for lender inspections, and the condition of the property.

7    And they do their inspections.  And they have -- they have

8    high expectations of how we will maintain that property.

9    Q    Is there a special compliance that's required in HUD

10   properties?

11   A    HUD has a formalized inspection process.  And the

12   standards they use are the Uniform Physical Condition

13   Standards that are set out in the Code of Federal

14   Regulations.  They will come every one, two, or three years,

15   depending on how well we scored on the previous inspection.

16   Q    Can you please explain the score?

17   A    They score from zero to 100.  If you score below 60, you

18   have failed and they can take action.  A score between 60 and

19   70 is okay.  They'll be back the next year.  If you get 70 or

20   greater, they won't be back for two years.  So there's your

21   reward for keeping the property up.  Then if you can manage

22   to get your score over 80, they won't be back for three

23   years.

24   Q    So how have you done on the HUD score over the years?

25   A    In the -- HUD started their inspections in 2005, after we

1   finished the renovation.  And in the first few years, we were
2   -- I think we were in the 70s, then our score started
3   slipping, and HUD was back every year.  And I was hearing
4   from the asset managers in Seattle that they didn't think
5   those were very good scores and they wanted to know why.  And
6   that went on for --
7   Q   Are you referring to HUD asset managers?
8   A   The HUD asset management people.  They were the ones
9   looking at those scores.  Because we were scoring barely
10  above 60, which is not a great score.
11          And we were trying to do better.  And we eventually
12  actually found a consulting firm that helped us with the
13  REACs, the REAC inspections.  And they would help us prepare.
14  And they would come out months ahead of time, walk the
15  property, and tell us what we needed to do.  And the on-site
16  staff had a better understanding of how to prepare the
17  property.  And our scores started going up.
18          And I think it was maybe 2010, or so, we managed to get
19  above 80.  And we've managed to keep our score there ever
20  since.  So we get inspected less often.
21  Q   Can you please back up a little and explain what REAC is?
22  A   Real Estate Assessment Center.  That's HUD's formalized
23  system in which they inspect, according to the UPCS and the
24  federal code.  And then their REAC system also extends to the
25  financial reporting system, where we deposit our annual

1    financial results.

2    Q    Do you know if there's any, in your own words, if you

3    understand, if you know, is there any legal significance to

4    the HUD involvement in Parkway?

5    A    As I said, HUD is a demanding lender.  And they want --

6    the condition -- this is in the federal code, and it's in all

7    their communications, they expect the property to be

8    maintained in a decent, safe, sanitary condition, and in good

9    repair.

10   Q    Let's look at the LPA.

11        Adam, Exhibit 3.  I think it's page 71.  LPA Section

12   13.11.

13   A    Yes.  The partnership agreement had a whole section

14   included addressing FHA -- that's HUD -- financing.

15   Q    And so can you please -- and, again, I can't see the

16   screen, I think it's in the subsection C.  Do you recall that

17   one?

18   A    Yes.  What it is saying is that the partner's obligation

19   is first to HUD, before the obligation to other partners, if

20   there's any conflict.

21   Q    Where is that?

22   A    That would be right there.  Any conflict between the

23   partnership agreement and the documents, and any conflict

24   between the partnership agreement and this section.

25   Q    So does it mean -- do you understand --

1   A    So the HUD controlling is right here.  And then if there's

2   any other conflict, then we refer to this particular section

3   on the FHA loan.

4   Q    So are you saying that the HUD obligations to HUD are

5   senior?

6   A    The obligation to the lender comes ahead of -- in the

7   event of any conflict, the obligations -- the partners'

8   obligations to HUD come ahead of the obligation to the

9   partnership.

10  Q    And what happens if you don't comply with something that

11  HUD requires?  I think that's subsection D, Adam.

12       Do you recognize subsection D?

13  A    Yes.

14  Q    What does it say?

15  A    It says each of the partners shall be liable to HUD under

16  the HUD regulatory agreement, in its individual capacity.

17  Q    And what's the HUD regulatory agreement?

18  A    HUD places a regulatory agreement on the property that

19  contains the conditions of the loan.  And it also has a cross

20  default provision to the deed of trust.  So if you violated

21  the regulatory agreement, HUD can actually foreclose if they

22  think that's appropriate.

23  Q    So the HUD regulatory agreement would have been entered

24  into in 2002, when everything was put together?

25  A    Correct.  At the time the deal closed, yes.

Tamaro - Direct

1  Q   Adam, let's look at Exhibit 7, please.  Do you recognize

2  Exhibit 7 as the HUD regulatory agreement?

3  A   Yes.  This is the first HUD regulatory agreement.

4  Q   So you mentioned something about the condition that the

5  property is supposed to be kept in?

6       Let's go to subsection 7 on page 3, Adam.  This is way

7  too small for me to read, so you'll have to help me out.

8  That's much better.

9  A   Yes.  Owners shall maintain the mortgaged premises,

10 accommodations, and the grounds and equipment appurtenant

11 thereto in good repair and condition.

12 Q   Is that the HUD standard for the physical condition of the

13 property?

14 A   Yes.  That's what's in the federal code.

15 Q   And under that subsection we saw before, is the general

16 partner liable for failure to keep the property?

17 A   In this condition?

18 Q   In this condition?

19 A   Not only is the general partner responsible, but I

20 personally am responsible.

21 Q   Is the limited partner similarly responsible, if you know?

22 A   The limited partner actually is also.  All of the partners

23 are responsible to HUD.

24 Q   Okay.  And so do you recall if this HUD regulatory

25 agreement from 2002 was ever amended?

1    A    Well, HUD updated its own documents in 2011.  And those

2    new documents ended up being placed against the property when

3    we refinanced our HUD loan in 2015.

4    Q    Okay.  Let's look at Exhibit 163, Adam, please.

5         And so on page 3, what does it say about the principals

6    of the partnership, their liability to HUD?

7    A    The key principals of the partnership identified in the

8    regulatory agreement are liable in their individual

9    capacities.

10   Q    And this includes the physical condition of the property?

11   A    Everything in the regulatory agreement, which does include

12   the physical condition of the property.

13   Q    Okay.  And so you mentioned that HUD actually inspects the

14   physical condition of the properties that it guarantees or

15   loans --

16   A    Yes.  They have a system where they hire inspectors who

17   come out and inspect, according to the UPCS, and enter it

18   into the HUD database.  So anyone at HUD can tell at any time

19   what the history of our REAC scores is.

20   Q    Do you know what standard these inspectors use when they

21   inspect the properties that are subject to similar regulatory

22   agreements?

23   A    The HUD inspectors all use the UPCS, the Uniform Physical

24   Condition Standards.  Because this is HUD, they're in the

25   federal code.

1    Q   Okay.  Let's look at --

2              THE COURT:  All right.  We're going to take our

3    recess.  So we'll be at recess for 15 minutes.

4                        (Recess.)

5              THE COURT: You may proceed.

6    BY MS. LATSINOVA:

7    Q   Catherine, before the break you mentioned uniform physical

8    condition standards, I believe, that are, you said, in the

9    Code of Federal Regulations.  Do you recall that?

10   A   Yes.

11   Q   Let's look at the CFRs.  So does this CFR look familiar?

12   It is entitled 24.

13   A   Yes.

14   Q   What does it say about the standard in which HUD

15   properties are supposed to be maintained?

16   A   They must be decent, safe, sanitary and in good repair.

17   Q   What does that mean to you?

18   A   That is broad.  As a general partner, I interpret it, as

19   the situation arises, using my judgment of what decent, safe,

20   sanitary and in good repair means.  My judgment is criticized

21   or supported by the REAC inspections.

22   Q   Now, did you use your best efforts to maintain the Parkway

23   property in the standard required by the Code of Federal

24   Regulations?

25   A   I believe I did.

1   Q    Was there a HUD project manager assigned to Parkway?

2   A    Yes.  They -- until about a year or so ago, they were

3   based in Seattle.  I had maybe three of them.  I had good

4   relations with all of them.  They were -- certainly their

5   first priority was the condition of the project.  They were

6   there as a resource.  I knew them all.

7   Q    Now in addition to HUD inspections you talked about, were

8   there any other inspections done of the Parkway property?

9   A    HUD -- every ten years HUD requires a -- it is called a

10  physical capital needs assessment where the lender takes care

11  of it.  The lender sends someone to the property to do a

12  physical survey and determine the capital needs for the next

13  decade.  They set a budget.  They adjust our reserve deposit.

14  We are expected -- that is the work that is set out for us

15  for the next ten years.

16      The housing finance commission inspects every third year.

17  The housing finance commission also uses the UPCS, uniform

18  physical condition standards.  Those are our two main

19  physical inspections.

20  Q    Does the limited partner sometimes conduct physical

21  inspections as well?

22  A    Yes, they do.  They do.

23  Q    Now, we would have an exhibit that has been objected to.

24  So I need to lay some foundation before I ask any substantive

25  questions.

1          Let's take a look at 23, please.  So, does -- do you
2    recognize this document?
3    A   Yes, I do.
4    Q   What is it?
5    A   This was a report from Paramount, who was the first asset
6    of AMTAX, the limited investor. It is a report on the
7    condition of the property after we finished our
8    rehabilitation.
9    Q   This Paramount, you testified, is AMTAX's predecessor?
10   A   Alden Torch's predecessor.
11   Q   What is the date of the report?
12   A   January 26, 2006.
13   Q   This was a report by Alden Torch's predecessor about the
14   physical condition of the property, Parkway, prepared in
15   2006; is that right?
16   A   Yes.
17          MS. LATSINOVA:  Your Honor, we move to admit Exhibit
18   23.
19          THE COURT:  Objection?
20          MR. PETTIT:  We don't believe it is relevant.  I
21   recognize it is a bench trial and no objection.
22          THE COURT:  Well said.  It is admitted.
23                  (Exhibit 23 admitted.)
24   BY MS. LATSINOVA:
25   Q   So you are familiar with this report?

1    A    Yes.

2    Q    Do you recall the terminology used about conditions?

3    A    I --

4    Q    Let's take a look.  I believe there is a page that talks

5    about what different terms mean.  It is towards the front.

6    A    Yes, I would -- E, G, F and P, which I presume means

7    excellent, good, fair and poor.

8    Q    I think you are right about that.  There is a definition

9    section in the beginning.

10        Can you get us there, please?

11   A    General notes on the condition of the property.  There are

12   some pictures.

13   Q    I will find it.  Do you recall what this report says about

14   the condition of the windows?

15   A    There are a few comments about the single-pane windows.

16   Q    What does it say about the condition of the windows?

17   A    There are several comments on how it notes condensation.

18   Q    So --

19   A    There we go.

20   Q    There you go.  So I think still on page 2?  Okay.  So,

21   this is Paramount's report about the condition of the windows

22   in 2006.  Is this consistent with your memory of what the --

23   of what condition the windows were in at that time?

24   A    We did not replace them during the rehabilitation.  They

25   continued to be the original single-pane windows.

1  Q  Also, this report says, on page 2, there is a comment on

2  the right side.  It says that you have been feeding the

3  property.  Can we zoom in?  Do you see that comment on page

4  2?

5  A  Yes.

6  Q  I take it you spoke to the Paramount people who -- when

7  they prepared this report?

8  A  I can't say definitively yes or no.  Most likely because

9  they quote me in it.

10  Q  So, well, this says you have been feeding the property to

11  maintain an adequate status in lieu of the low occupancy

12  rate.  Do you know what this refers to?

13  A  In the partnership agreement, the general partner is

14  obligated to advance funds up to $600,000 for operating

15  expenses.  I actually advanced past $600,000, but they are

16  referring to that action I was taking which is to advance

17  funds to the property for operating purposes.

18  Q  Let's find that in the LPA.  Let's go to Exhibit 3, page

19  50, Section 7.9.  Where does it require you to feed the

20  property, to use the phrase from the Paramount report?

21  A  This would carry over to the next page.  It is in the --

22  yeah, continues on up here.

23  Q  What does it say?

24  A  That the general partner has an obligation to advance

25  funds up to $600,000.

1    Q    What happens to the funds that are so advanced?

2    A    Well, it is the obligation of the partnership.  In future

3    years, if there is enough cash flow to pay them off, they are

4    paid off.  If they are not there, they would remain there.

5    If the property is sold, they have to be repaid, or in a

6    buyout, they have to be considered as a debt as we do our

7    hypothetical sale model.

8    Q    Where does it say that?  What sentence says that?

9    A    Explain your question to me.

10   Q    Well, I think I will dare touch the screen and see what

11   happens.  Okay.

12   A    Oh, okay.  All right.  Yes, non-interest bearing, they are

13   repayable under Article VI, which is 6.2 is the formula we

14   would go through if there was a sale or in our hypothetical

15   model in the buyout.

16   Q    Is that because Article VI is the article that has the

17   waterfall?

18   A    Correct.

19   Q    Now, going back to inspections, we looked at the Paramount

20   inspection.  Do you recall the inspection in 2012?

21   A    I do.

22   Q    Who prepared that, if you recall?

23   A    The physical inspection?  There were two reports from

24   2012.

25   Q    This is another exhibit that has been objected to.  Let's

1   take a look at 50.  I will ask you some general questions

2   about this report.  Do you recognize this report?

3   A   I recognize it, yes.

4   Q   Who was it prepared for, by and when?

5   A   This was the point at which Alden Torch or their

6   predecessor organization had purchased this partnership in

7   the secondary market.  They were doing their due diligence,

8   so Alden Torch commissioned this report.  They were called

9   HCP, Pacific Asset Management, originally.  They commissioned

10  this report for themselves, for the limited partnership to

11  determine what the physical condition was of this property

12  that they had picked up.

13          MS. LATSINOVA:  Your Honor, we move to admit 50.

14          THE COURT:  Any objection?

15          MR. PETTIT:  We withdraw our objection.

16          THE COURT:  Exhibit 50 is admitted.

17                  (Exhibit 50 admitted.)

18  BY MS. LATSINOVA:

19  Q   Now, let's go to page that is stamped 27038, Adam.

20      It says -- do you see where it says it was requested

21  for acquisition purposes?  Do you see that?

22  A   Okay.

23  Q   So, 2012, was that around the time when AMTAX -- when

24  Alden Torch took over AMTAX?

25  A   Yeah, my understanding was they had purchased this

1   partnership, I believe late in 2011.

2   Q   So let's look at page 10, which is Bates stamped 27051.  I

3   want you to explain to us your understanding of the

4   terminology that is used in this report.  It talks about

5   good, fair, satisfactory, poor.  Goes to the next page, HUD

6   conditions.

7   A   They sent an inspector to walk the property.  I was not

8   present.  These employees were present.  April Ochoa was the

9   manager.  She is still the manager.  Very dedicated,

10  actually.  They evaluated the property on this system of

11  good, fair, satisfactory.  They examined individual building

12  components.

13  Q   What was the report's conclusion about the overall

14  physical condition of the property?

15  A   Well, generally considered to be in good condition with

16  respect to the major systems with some deferred maintenance

17  that needed to be remedied.

18  Q   So do you recall if this report has an estimate of how

19  much money it would take to address this deferred

20  maintenance?

21  A   This report did, yes.

22  Q   Is that on page 3?  Should be stamped 27044.  There is a

23  box on top.  How much did the AMTAX report estimate it would

24  cost to address the different maintenance?

25  A   Over a 12-year period, the inflated cost was 1.02 million

1  that the property would need to repair building systems.

2  Q   Now, let's look at the specific components the report

3  describes.  What does the report say about the paving, if you

4  recall?  What condition is the paving in?

5  A   Paving, generally poor condition.

6  Q   What about siding?  I think it is on pages 22 -- 21 and

7  22.  What does it say about siding?

8  A   Is this the right page?  Siding in fair condition.

9  Q   It also describes some siding that has been replaced with

10  plywood?

11  A   Note that overall the T1-11 siding was approximately ten

12  years past its useful life.

13  Q   What does it say about the trim and gutters on pages 21

14  and 22?

15  A   Some damage due to leaking, overflowing.

16  Q   Does it mention that the trim and gutters are rotting?

17  A   Yes, they advise removing the rotted and deteriorated trim

18  and replace with new wood trim and then paint everything.

19  Q   What does it say about balconies on page 22?  Does it say

20  the balconies are rotting?

21  A   Balconies are -- says good to fair condition.  Most of the

22  deficiencies were considered minor, however a number of

23  balconies exhibit algae growth which can accelerate

24  deterioration of the lumber.

25  Q   Is the deterioration of the lumber the same as rot, if you

1    know?

2  A    They are the same.

3  Q    What does it say about windows again?  What condition are

4    the windows in?

5  A    Design consisted of single-pane glass with aluminum frame.

6  Q    What condition term do they use -- does the report use?

7  A    Satisfactory with no major deficiencies.  They noticed

8    that we had replaced some of them.  As I said, we were doing

9    them on a piecemeal basis as they fail.

10  Q    In the hierarchy of conditions in this report,

11    satisfactory is a step below fair; is that correct?

12  A    Can we go back to that?

13  Q    Let's go back to the terminology, Adam.  Page 10.

14       So satisfactory is worse than fair; is that right?

15  A    It is, yes.

16  Q    Now, do you recall if there were any other reports about

17    the physical condition of the property?

18  A    In 2014 we had the physical condition needs assessment

19    that HUD requires.

20  Q    So it would be two years later?

21  A    Correct.

22  Q    Let's look at 81, Adam, please.

23       So do you recognize Exhibit 81?

24  A    Yes.

25  Q    What is it?

Tamaro - Direct

1    A    This is the firm that -- the lender Prudential.  They are

2    in charge of getting the report arranged.  So they hired a

3    consulting group and sent them to the property.

4    Q    Prudential is the lender?

5    A    Yes.

6    Q    HUD is the guarantor?

7    A    Correct.

8    Q    Prudential hires this MB Consulting group to prepare a

9    report that is prepared every ten years?

10   A    Correct.

11   Q    Is this the last ten-year report that you have?

12   A    Well, to close the deal in 2002, took a few years to do

13   the renovation, ten years after that is when this was due.

14   It occurred in May of 2014.

15   Q    This report would be required by HUD?

16   A    Correct. It is referred to in the HUD regulatory

17   agreement.

18   Q    Would this report be using HUD guidelines to report the

19   condition?

20   A    Yes.

21   Q    Now, let's go through some items on page 4 where it talks

22   about the condition and the repairs.  So what does the report

23   conclude about the items that need to be repaired?

24   A    Long-term repairs, their inflated price over the next ten

25   years was 1.55 million.

1    Q    That is ten years from 2014?

2    A    Correct.

3    Q    HUD says, according to HUD standards, the partnership

4    needs to spend $1.5 million on repairs?

5    A    Correct, then they list those repairs right below that

6    chart.

7    Q    What are they?

8    A    Restripe the parking spaces and parking stalls, repair and

9    reseal the asphalt, re-surface the asphalt, repair concrete

10   flat work, which means the sidewalks and curbs, replace and

11   repaint exterior siding, replace windows, replace sliding

12   glass doors, replace exterior siding, which they duplicated,

13   and inspect and repair sewer lines.

14   Q    Do they also recommend some interior?

15   A    Yeah.  They put money in also because on a regular basis

16   we have to replace appliances and carpet, vinyl, countertops,

17   sometimes we have to replace cabinetry, water heaters.  They

18   wanted us to replace gutters, refinish the swimming pool.

19   Q    How much was the work going to cost, according to HUD?

20   A    This was a calculation for the annual deposit where we had

21   to put 104,000 into a reserve that the lender holds.

22   Q    Did this report recommend you increase the reserve?

23   A    It did more than recommend.  It said this is -- based on

24   this report, the lender said, "This is what your new deposit

25   will be."

1   Q    So what was the old deposit and what is the new deposit?

2   A    The old deposit was maybe 300 per unit.  Don't quote me on

3   that. It was definitely less.

4   Q    What is the new deposit?

5   A    Now we have to put in $500 per unit per year; we have to

6   put in $104,000 annually into a reserve that the lender

7   holds.

8   Q    So you received this report as a general partner?

9   A    Yes.

10  Q    Would this report have gone to the limited partner as

11  well?

12  A    It did, yes.

13  Q    What does this report mean to you as a general partner of

14  Parkway when you received it?

15  A    It is my instructions from HUD and from the lender on what

16  needs to be done to the property in the next ten years.  As a

17  general partner, we evaluate what we saw as the urgent  or

18  critical issues.  We needed to get started on those because

19  this kind of work goes slowly and it is expensive.  It can

20  take a while to do some of these major systems.

21  Q    Do you recall Mr. Pettit saying in his opening statement

22  words to the effect that you failed your duty as a general

23  partner by delaying some of these repairs until after the

24  compliance period?  Do you remember that?

25  A    I heard that.

1   Q   Do you have any reaction to that statement?

2   A   I have a duty as the general partner, first to HUD, second

3   to the partners.  I do not consider it my duty to fail to

4   repair the property to save money for the buyout.

5   Q   Do you have a duty as a general partner to hold off on

6   repairs identified by HUD's physical inspection report until

7   after the compliance period?

8   A   That is certainly not the partnership agreement.

9   Q   Now, you said this work goes slowly.  Did you do it over

10  time?

11  A   Yes, we got started.  We kind of touched on the fact the

12  property was refinanced in early 2015.  In conjunction with

13  the refinance, we deposited about another half million into

14  the reserve which had been agreed upon in this report.  There

15  was a report and then the refinance.  We put money into the

16  reserve.  The refinance saved the property about $20,000 a

17  month in debt service savings.  So between the debt service

18  savings and the deposit into the repair and the annual

19  deposit, we used those funds to start working on the

20  property.

21  Q   What did you start with?

22  A   I believe we started with the windows, replacing the

23  single-pane windows, which is not quite the order that this

24  report had called out. We took advantage of a pretty sizable

25  energy conservation rebate from Puget Sound Energy.

1    Q    Do you recall how much rebate money was available?

2    A    We ended up receiving almost 120,000.

3    Q    Did you as general partner apply for the rebate?

4    A    I did. I did all the work.

5    Q    What did you do next?

6    A    Once we had finished the windows, we had the trash

7    compactor, which was an unforeseen emergency that came along.

8    We had to deal with that.  That didn't take long.  We had to

9    replace it.  We started in on the deck supports.  We

10   addressed the decks and deck supports before we addressed the

11   siding because the decks and deck supports were more

12   critically in need of repair.

13   Q    Were they safe?

14   A    Some of them were not, no.  We found -- this report had

15   referenced the fact that some of them were shaded and would

16   be moist.  We were finding dry rot in the supports and the

17   footings, and dry rot -- it is an old form because everybody

18   used wood back in the '70s.  Building systems have improved.

19   You wouldn't build it that way.  With all that wood, there is

20   a high susceptibility to dry rot.

21   Q    I want to look at the demonstrative exhibit we used in the

22   opening that lists the repairs that were done and the cost.

23   Do you see that?

24   A    I do.

25   Q    Is this consistent with your recollection of what repairs

1   were done and how much they cost?

2   A   Yes, it is.

3   Q   Are any items on this list -- are any items there that are

4   included on this list not present on the HUD inspections?

5   That is not a good question.  What I meant to say is:  Did

6   you do anything that HUD didn't list --

7   A   HUD had not anticipated the trash compactor.  The other

8   items are all on that PCNA inspection report.

9   Q   The siding was on the HUD report?

10  A   Yes.

11  Q   The deck replacement was on the HUD report?

12  A   Yes.

13  Q   The paving and windows and roofs?

14  A   Yes, the roofs actually failed.  I mean, you do roofs --

15  again, that is an emergency.  You have to do them if they are

16  failing.  We had a winter where we had five roofs that needed

17  to be completely redone.

18  Q   How many buildings are there in Parkway?

19  A   22.

20  Q   Can you tell us more about the roof replacement?

21  A   Well, they had all been reroofed back in 2002.  We had

22  five of them fail one winter, so we did the reroofing

23  ourselves with a crew that works for an affiliate of the

24  general partner.

25  Q   This trash compactor, you mentioned it was an emergency.

Tamaro - Direct

1    Can you please describe what happened with the trash

2    compactor?

3    A   We had an old compactor that was open at the bottom so

4    liquid waste could flow out into the storm water system.  The

5    city of Federal Way figured out that it was our trash

6    compactor.  They approached us and said that this is a

7    problem that needs to be addressed immediately.  We needed a

8    new trash compactor.

9    Q   The trash compactor serves the entire Parkway project?

10   A   Yes.  The way it works on the property, they have smaller

11   bins scattered around the property.  The residents deposit

12   their trash into these smaller bins.  Parkway has a truck.

13   We tow the bins to the trash compactor.  They fit into a

14   certain space.  The compactor lifts them up, dumps them in

15   and compacts it so when waste management comes and takes the

16   dumpster from the trash compactor, the trash has been

17   compacted.

18   Q   So what was the issue that the city of Federal Way

19   identified?

20   A   It was that they were allowing contaminants to flow into

21   the surface water system, which was a code violation.

22   Q   What did you have to do to fix that?

23   A   We had to get a new trash compactor right away.  That was

24   somewhat unexpected.  My husband actually worked with the

25   city of Federal Way.  He worked with the vendor to get the

1    appropriate model.  When the trash compactor showed up, it

2    was wired for three-phase power, which is what is required to

3    drive a heavy motor.  The Parkway is a residential property.

4    It doesn't deliver three-phase power.  He had to find the old

5    phase invertor, which was buried underground, not a very safe

6    condition.  We didn't know it.  We had to dig that up and get

7    a new phase transformer and build a safe enclosure for it so

8    nobody would be electrocuted.  He had to do that quickly

9    because we had the trash compactor out of service, which is a

10   different code violation.

11   Q    Is your husband an engineer?

12   A    My husband is a licensed professional engineer in this

13   state.

14   Q    How much did this work cost, between the labor and the

15   actual compactor?

16   A    The compactor was about $32,000.  My husband's engineering

17   services were the balance of it.

18   Q    Now, did you do any repairs on Parkway that you, in your

19   best judgment, believed were unnecessary?

20   A    No.

21   Q    Who were the people doing the physical work?

22   A    I have an -- Trieste Holdings, which is the management

23   company, employs approximately six -- the number fluctuates a

24   little bit -- approximately six carpenters, three are

25   journey-level carpenters.  They have -- right now we have a

1   couple in the state's apprentice program.  We have a laborer.

2   They did that work.

3   Q   Is Trieste Holdings an affiliate of the general partner?

4   A   Yes, it is.

5   Q   What does the LPA say about the use of affiliates?

6   A   Says the general partner is allowed to hire affiliates to

7   work on the property.

8   Q   Let's look at the LPA.  It is Exhibit 3, page 50, Section

9   7.7.B, I believe.  Can you please point us to where it says

10  that the use of affiliates is allowed?

11  A   Right here, "designated affiliate," that is who they are.

12  Q   So in what way is Trieste a designated affiliate of the

13  general partner in this case?

14  A   Trieste Holdings is owned by my husband and me.  It serves

15  as the property manager, and then it also has a contractor --

16  general contractor's licensed in this state.  We are

17  licensed, bonded and insured as a general contractor.

18  Q   Did Trieste Holdings supervise the work that was done as a

19  general contractor?

20  A   Yes.

21  Q   How much did it charge for its supervision?

22  A   We charged reasonable fees.  General contractors charge a

23  percentage of the work.

24  Q   Did you charge fees that general contractors charge on

25  similar work?

Tamaro - Direct

A    Yes.

Q    Now, going back to the repairs that were projected in the
HUD 2014 report, did you exceed the cost that HUD put in
their report?

A    We did in some cases, yes.  We saved money in some other
categories.  For example, they had a line item for painting
the siding.  We used prepainted hardy board.  We won't need
to paint in the future.  We don't need to spend money on a
swimming pool because we demolished that.  It was getting old
and HUD said it needed to be re-surfaced.  We decided because
of the liability to get rid of it.  Yes, some of them it did
go over.

Q    Do you recall how much over?

A    I know the paving cost more.  Paving was done by a
third-party company.  I know the paving did cost more.  I
think we overall may have gone over HUD's budget on the
siding.  As I said, that was somewhat offset by not needing
some of the line items.  With the windows, we got the very
large rebate which brought the cost way down.

Q    What property condition were you trying to achieve when
you did all these repairs and supervised them?

A    I am trying to reach the HUD standard of "in good repair."
Safe also applies too because of the balcony situation.

Q    Was the limited partner aware of the physical condition of
the property and the repairs that were being done?

1  A   Yes.  In those years the asset manager was named

2  Gary Newbold.  He was based in Southern California.  He

3  worked for Alden Torch.  He visited the property.  I know it

4  was at least twice.  It may have been three times.  It was at

5  least twice.  He saw the work.  Gary was very hands on.  We

6  had a lot of email communication on what I was up to.  I

7  described this work.  I wasn't hiding anything.  I told him

8  what we needed to do, the condition of the property.  I

9  thought they understood that one of the benefits of the

10  refinance was to free up money for repairs.

11 Q   Now, did you send Gary Newbold the 2014 HUD report?

12 A   I believe I did.

13 Q   Did you send him an estimate of how much the repairs would

14 cost, the budget of some kind?

15 A   We sent annual budgets that go out in the late fall.  They

16 are for the whole property.  Those count of capital items

17 would have been included in our budget.

18 Q   Did he ever express the concern that the work that was

19 being done was unnecessary?

20 A   No, he did not.

21 Q   Or that it was being done earlier than he -- than AMTAX

22 wanted it to be done?

23 A   No.

24 Q   Did he ever express any concern that the work that was

25 being done was being done during the compliance period as

1  opposed to later?

2  A   No, he did not.

3  Q   Was he, this person Gary Newbold, was he your primary

4  contact from Alden Torch?

5  A   Yes, he was.

6  Q   How often -- you mentioned that he came to inspect or came

7  to visit several times.  How often did you communicate with

8  him apart from his visits?

9  A   I would just say regularly.

10 Q   How did you communicate?

11 A   Almost always by email.  Gary was -- he traveled a lot.

12 Q   So let's look at Exhibit 70.  Is this your email

13 communication with Gary Newbold?

14 A   Yes.

15 Q   Do you discuss repairs?

16 A   Not in this one.  Keep going.  There we go.  All right.

17 Right here, I told him that Parkway is in need of a major

18 capital infusion to repair dry-rotted siding, replace

19 windows, needs to re-surface parking lots.  I did reference

20 the trash compactor here.

21 Q   Did he ever write back to you saying don't do this, don't

22 do these items?

23 A   No.

24 Q   Did anybody else from Alden Torch or AMTAX write to you,

25 call you, and say, no, don't do these things?

Tamaro - Direct

1   A    Not at that time.

2   Q    Now, in Exhibit 17, in your email, you mentioned that you

3   say to him the best course to do these repairs is to

4   refinance the loan.  Do you see that?

5   A    Yes.

6   Q    So what is the connection between refinance and repairs?

7   Can you explain?

8   A    Parkway stood to save money by refinancing its existing

9   loan into a new loan with a lower interest rate.

10  Q    Were you proposing to use the savings to do the repairs?

11  A    That's what I was saying, is the best course of action

12  would be to refinance the property and borrow some money to

13  complete the repairs.

14  Q    Now in discussing this potential refinance, did you also

15  communicate with the HUD people at Alden Torch other than

16  Gary Newbold?

17  A    Yes.

18  Q    Who was that?

19  A    The other names on the email thread which does include

20  Chris Blake.

21  Q    And Chris Blake is here in the courtroom?

22  A    Yes.

23  Q    Chris Blake was involved in the discussions of the repairs

24  that needed to be done?

25  A    I would say not exactly in the nitty-gritty, but in the

1    overall.  We were -- at that time we were working through

2    potential buyout and my refinance proposal, and Chris was

3    involved because he approves those kinds of things.

4    Q   Chris was involved because he would be the person to talk

5    to about the refinance; is that correct?

6    A   Correct.  At that time, the buyout proposal, that was his

7    area compared with Gary who was concerned with managing the

8    asset day-to-day.

9    Q   So let's look at Exhibit 77.  Do you recall this exhibit?

10   A   I do.

11   Q   It is a series of emails between you and Gary Newbold and

12   a copy to Chris Blake and John Thomas.  Do you see that?

13   A   I do.

14   Q   Can you tell us about this email exchange?  The emails go

15   back to March and April of 2014.

16   A   Yes, we were at that time -- like I said, we were working

17   through proposed refinance and potentially a proposed buyout.

18   They had a series of questions based on the results of the

19   audit from the previous year, which would have been 2013.

20   Q   There is one more person on the chain, John Thomas.  Do

21   you see that?

22   A   I do.

23   Q   Who is John Thomas?

24   A   I never spoke to him.  I understand him to be a CPA at

25   Alden Torch.

1   Q    Why is he included in this email, if you know?

2   A    I was going to say it was -- it was all in Alden Torch's

3   choice to include him.  I didn't know the reasons.

4   Q    Do you recall Mr. Pettit saying in his opening statement

5   that Alden Torch recently did a deep dive in your financial

6   statements?

7   A    I did hear that.

8   Q    Do you know who did the deep diving?

9   A    I heard that it was given to John Thomas and someone else

10  at Alden Torch.

11  Q    Okay.  Do you know if the John Thomas who was copied on

12  this email back in 2014 is the same John Thomas who did the

13  deep dive recently?

14  A    That's my understanding.

15  Q    Okay.  Well, more about this later.

16        Now, going back to this email exchange.  Was one of the

17  items discussed in this email the repair supervision fee

18  charged by Trieste?

19  A    Yes.

20  Q    Can you show us where it is and what you said about it or

21  what was asked and what was said about the repair supervision

22  fee?

23  A    They wanted to know what was included.  Entity expenses is

24  a terminology from HUD accounting.  It is referring to

25  related-party expenses.

1   Q    So what was your answer?  What was your explanation?

2   A    I explained what I was doing and that we were acting as

3   the general contractor, that any general contractor would

4   expect to be paid separately for the work so I was charging a

5   separate fee to be doing that work under our contractor's

6   license.

7   Q    What was the response from Alden Torch?

8   A    They seemed to accept it.

9   Q    Did they ever tell you at the time, no, we don't accept

10  it?

11  A    At that time, they did not.

12  Q    Okay.  Did they ever tell you in 2015, a year later, they

13  didn't accept it?

14  A    Not at that time, no.

15  Q    Did they tell you in 2016 they didn't accept it?

16  A    Not at that time.

17  Q    Okay.  Now, let's look at Exhibit 78.  Do you recognize

18  Exhibit 78?

19  A    Yes, I do.

20  Q    So what is he saying to you in this email?  It is May 1,

21  2014; is that correct?

22  A    Yes.

23  Q    This email, 78, would have been after the exhibit -- the

24  previous exhibit where you go back and forth about specific

25  repair items?

Tamaro - Direct

1   A   Yes.

2   Q   So what does Chris Blake tell you about the audits?

3   A   His words are, "I think we are on the same page with

4   respect to the audit and can move forward with the discussion

5   of selling the LP interest."

6   Q   Why were you discussing the selling of the LP interest at

7   that time?

8   A   Oh, I had made a proposal to them to purchase their

9   interest.

10  Q   Was it connected to the refinance?

11  A   They weren't dependent on one another.  It was just part

12  of the timing of what if we do this, what if we do that.

13  Q   And did the buyout go through?

14  A   It did not.  No.

15  Q   Did the refinance go through?

16  A   It did.

17  Q   Is it your understanding that Chris Blake looked at the

18  audits to evaluate the refinance?

19  A   That was my understanding at the time.

20  Q   By the way, where was HUD on the refinance?

21  A   HUD was very enthusiastic about the prospect of

22  refinancing the property and saving money to use towards the

23  property repairs.

24  Q   Let's look at Exhibit 87, please.  Do you recognize this

25  email?

1    A    I do.

2    Q    What is it from?

3    A    John Demboski was our asset manager at HUD at the time.

4    Q    What does he say in the email?

5    A    He said, "Hi, my name is John Demboski."  He gives a

6    little bit of background.  He said that the property had been

7    plagued by certain financial performance issues, but believes

8    I made drastic improvements to the physical condition and

9    management.  He discusses the loan and the -- at the time we

10   had a loan, interest rate of six-and-a-quarter percent.

11   Q    What did you refinance to?

12   A    We were, I think -- I know we were below four percent.

13   This was very favorable.  Down close to three percent.

14   Q    HUD was in favor?

15   A    Yes.

16   Q    And did John Demboski contact the limited partner?

17   A    He did do that, yes.

18   Q    So how much a month did you save in debt services as a

19   result of the refinance?

20   A    Very substantial.  I calculated about $20,000 a month.

21   Q    How were the savings used?

22   A    We used them to repair the property.

23   Q    Going back to Chris Blake's May 1, 2014 email, Exhibit 78,

24   let's go back to that email where he says he is on the same

25   page with the audits.  How did you interpret that email at

Tamaro - Direct

1  the time?

2  A   I relied on that.

3  Q   In what way?

4  A   In terms of the fees that were being charged by affiliates

5  to work on the property.

6  Q   So does Chris Blake ever contact you later, until this

7  litigation, and say no, I didn't mean I am on the same page?

8  I am actually not on the same page, or words to that effect?

9  A   No.

10  Q   Now, do you understand in this litigation AMTAX is

11  challenging some of the same items that were discussed in

12  Exhibits 77 and 78?

13  A   Exhibits 77 and 78 are -- remind me again which ones.

14  Q   Let's look at 77.  Let's go to 77.  That is the long email

15  exchange, the question and answer.  There are some specific

16  items that are discussed.

17  A   Yes, down there --

18  Q   Questions for you and your answers.

19  A   Down under 3, yes, they are challenging some of those

20  fees.

21  Q   In this litigation?

22  A   In this litigation, yes.

23  Q   Now, do you understand what AMTAX says about the same

24  items now?

25  A   I should not have charged them.

1    Q    Do you understand they are saying that you breached your

2    duty by doing the same things that you told them about in

3    2014 and they accepted?

4              MR. PETTIT:  Objection, Your Honor.

5              THE COURT:  That is better served in argument.  Let's

6    move on.  I know what the answer is.

7    BY MS. LATSINOVA:

8    Q    Now, let's talk about rents.  Whose responsibility is it

9    to set rents at the Parkway?

10   A    The property manager does it -- because of the

11   affiliation, it is the property manager on the general

12   partner.

13   Q    Where does the LPA say that?

14             Adam, let's go to Exhibit 3, page 41, 7.3.A.

15             Can you please point us to where in the LPA?

16   A    General partner in this partnership agreement is given the

17   exclusive right to manage the business of the partnership.

18   Q    So does this include setting rents?

19   A    It would, I believe.

20   Q    Does the limited partner, according to this paragraph,

21   have any role in setting rents?

22   A    Not under this paragraph.

23   Q    Are you aware of any other paragraph in the limited

24   partnership agreement where the limited partner has a role in

25   setting rents?

Tamaro - Direct

1    A    I am not, no.

2    Q    Can you please describe the process of setting rents and

3    adjusting rents?

4    A    There are multiple factors to take into account.  At

5    Parkway, the rents are derived from the median income of the

6    King County area, median income which is actually King and

7    Snohomish Counties, which HUD publishes once a year.

8         We start with the median income.  The residents who are

9    allowed to live there when you do the filtering, they are the

10   bottom 30 percent of earners in King County.  That is who may

11   move into there.  We have a rent limitation derived from the

12   HUD median income.  Then we have income limitations, the

13   tenants, they have to be in the bottom third.  We have

14   additional set aside at Parkway where they have to be in the

15   bottom 25 percent -- the bottom 30 percent or the bottom 25

16   percent.  We have those restrictions.

17        Parkway has a non-profit general partner who brings us

18   property tax exemption, and we receive a full property tax

19   exemption if three-fourths of the units are rented to those

20   bottom 25 percent of earners.

21        I take those restrictions into account.  I consider the

22   local market.  I consider what the competition is charging.

23   Then we set our rents.

24   Q    Is it fair to say it is a balancing process?

25   A    It is a balance among the various competing factors, yes.

Tamaro - Direct

1    Q    What are some of the competing factors you have to take

2    into account?

3    A    We do want to maximize our revenue so we have enough money

4    to operate the property.  Our rent increase -- and going back

5    in time, this market right now, in the last two, three years

6    is quite unusual because of the high demand for housing

7    compared to the supply.  Parkway has not always operated in

8    that kind of market.  It has operated in some very down

9    markets, especially after 2008.  We had the neighborhood

10   around Parkway, the city of Federal Way, had a much higher

11   vacancy around 2010, 2011.  We were trying to fill units in

12   the face of the vacancy.

13        I would say by 2012 the market was stabilizing again.  We

14   have to take that into account.  If we raise our rents, is

15   that a futile gesture when there is high vacancy around us.

16        We can have people move out.  When you consider these are

17   the low end of the earners in King County, some of them will

18   just be unable to pay and they stop paying.  We have

19   evictions and that expense.  Vacant units.  Raising rents

20   results in more revenue, but it can result in higher

21   vacancies also.

22   Q    You mentioned earlier this morning, I believe, that you

23   submit monthly rent rolls to the limited partner?

24   A    To the limited partner, yes.

25   Q    So during the compliance period, did the limited partner

1    ever write you, call you and say, we are looking at the

2    rentals and we don't like what we see, you should do more?

3    A    There were no specific comments on the rentals.  When

4    Gary Newbold would visit, he -- we would discuss the rents,

5    are the rents appropriate.

6    Q    What was the result of this conversation?

7    A    Gary never communicated -- I mean, Gary didn't set the

8    rents.  Gary didn't try to set the rents.  He would suggest

9    maybe we should raise our rents.  I would say, well, yes or

10   maybe not right now, depending on what we were experiencing

11   at the property.

12   Q    Let's look at Exhibit 65.  I think it is an exhibit --

13   example of the rent roll you submitted to the limited

14   partner.

15   A    Yes.

16   Q    Can you describe what is shown here and --

17   A    This is the first page of the rent roll.  It goes through

18   all 208 units.  It shows the unit number.  These happen to be

19   one-bedroom, one-bath units.  That is the type right there.

20   That is the unit number.  This is the tenant's name, square

21   footage.

22       Market rent is our rent in a perfect world.  We strive for

23   that number.  Then we have the reality over here which is --

24   in this case we actually were -- we had been able to write

25   many of our leases at our perfect rent.  Some of them were

 1    lagging.  You can see a few of them lagging behind.  We have

 2    other information on the tenant, when the tenant's lease

 3    expired, security deposit.

 4    Q    So reports like this were submitted every month?

 5    A    Correct.

 6    Q    AMTAX never said the rents are too low?

 7    A    They did not reply to me in those words.

 8    Q    Now, you are aware -- are you aware that AMTAX is accusing

 9    you in this case of breaching the LPA by insufficiently

10    raising the rent at Parkway?

11    A    Yes.

12    Q    What is your reaction to that accusation?

13    A    I have several responses.  One of them is that the history

14    of rent increases during this period shows we definitely were

15    increasing our rents.  We were increasing our rents at a rate

16    faster than the area median income was increasing.  We were

17    at an appropriate level with our rents.

18    Q    Let's look at Exhibit 60.  Do you recognize the email

19    exchange?

20    A    Yes.

21    Q    It is with Gary Newbold?

22    A    Yes.

23    Q    What is the discussion of rents in this email?  Is there a

24    discussion of rents in this email, in paragraph 3?

25    A    Yes, he had inquired about the rent, were they

1   appropriate.  I replied with what I thought was the

2   appropriate response.

3   Q   What was your response?

4   A   That we had strong occupancy, but it was an older

5   property.  We had stiff market competition.  We felt raising

6   rents would trigger move-outs.

7   Q   What was his response?

8   A   He said, "Understood."

9   Q   What did that mean to you?

10  A   I understood it to mean that he had read my response and

11  accepted that response.

12  Q   Did he ever write again, call, and say, "I didn't mean

13  understood, I meant something else"?

14  A   I don't believe so.

15  Q   Now, what else is discussed in this email on Exhibit 60?

16  Is there something about payroll?

17  A   We were discussing the general contractor situation, the

18  fact we were using my carpenters and my general contractor

19  license on the property to do the repairs.

20  Q   You explained that in your email to him?

21  A   Yes, I did.

22  Q   You said the carpenters were working on roofs and siding?

23  A   Yes, I did.

24  Q   What was his response?

25  A   He replied, "Understood."

1    Q    How did you understand that?

2    A    I understood that to mean that he accepted my response.

3    Q    Did he ever write back or call and say, "I didn't mean

4    that, I meant something else"?

5    A    Not that I recall.

6    Q    Was there any study of rents at Parkway by a third party?

7    A    Yes, there was.

8    Q    When was that?

9    A    That was part of the due diligence in 2012 that Alden

10   Torch or HCP Pacific was undertaking to assess this

11   partnership they had purchased.

12   Q    Let's look at Exhibit 52, please.  Is this the report you

13   were talking about?

14   A    Yes, it is.

15   Q    So this is the report prepared by Novogradac & Company?

16   A    Yes.

17   Q    Novogradac is the same company that employs AMTAX's expert

18   witness in this case; is that right?

19   A    That's my understanding, yes.

20   Q    Do you understand one of his opinions to be that the rents

21   were not raised aggressively enough?

22   A    Yes.

23   Q    So how did you become familiar with this exhibit -- with

24   this report?

25   A    In discovery it was submitted by AMTAX 169.

1   Q   Let's look at page 43406.  Does this report analyze rents

2   at Parkway?

3   A   Yes.

4   Q   What does it say?

5   A   It says, "We conclude that the subject's current rents are

6   reasonable and that a slightly higher rent for its

7   one-bedroom units is possible."

8   Q   Have rents at Parkway gone up since 2012?

9   A   Yes, they have.  In fact, we have also been able to

10   discontinue concessions such as an upfront discount.

11   Q   Now, let's -- we have a slide from the opening that

12   summarizes rent increases.  Let's look at that.  Does this

13   slide reflect the rent increases at Parkway since 2012?

14   A   Yes, it does.

15   Q   So how much did the rents go up?

16   A   About $185 for the one-bedrooms.  Looks like $205 for the

17   two-bedroom units.

18   Q   How much did the King County HUD median income go up in

19   this same time?

20   A   It went up around 10.6 percent.  Income is rising slower

21   than rents are increasing in this period of time.

22   Q   If you raise the rents more aggressively as

23   Mr. Krabbenschmidt insists, what would happen, based on your

24   experience?

25   A   Well, then we go back to the balancing act.  As I said,

1    one of the important factors I keep in mind is our non-profit

2    partners that run the property tax exemption, and in

3    return -- to get that exemption, three-fourths of the units

4    have to be leased to this bottom 25 percent of the earners.

5    We raise rents, but it would be pointless for me to raise the

6    rents to the point where we lose all our tenants that bring

7    us the property tax exemption.  The exemption is more

8    valuable than these kinds of rent increases.  I felt we were

9    at an appropriate level with our rents.

10   Q    Do you feel that you are at an appropriate level now?

11   A    I do.

12   Q    Switching back to the audit.  I asked you some questions

13   about the audits already.  I have a few more.  Did AMTAX ever

14   challenge the audits -- let me back up.  Did you provide the

15   audited financial statements to AMTAX every year except this

16   year?

17   A    Yes.

18   Q    Did AMTAX ever challenge them in any way?

19   A    They did not challenge those audits.

20   Q    Did AMTAX ever use its forensic in-house accountants to do

21   a deeper inquiry into the audits, if you know?

22   A    They did in that year that we were discussing the

23   refinance and/or the buyout, which I think that would have

24   been the 2013 audit.

25   Q    Following that inquiry, Mr. Blake called you and said he

1   was on the same page about the audits; is that correct?

2   A   That is correct.  They were not challenging the work of

3   the auditor.  We were discussing certain of the related-party

4   fees.

5   Q   Did AMTAX ever seek to communicate to the auditor

6   directly?

7   A   I would not necessarily know that.  I didn't -- I don't

8   believe I heard about it.

9   Q   Do you know if AMTAX were free to do so?

10  A   Yes, yeah.

11  Q   So AMTAX never challenged the accuracy of the financial

12  statements during the compliance period; is that right?

13  A   AMTAX did not challenge the work of the auditor who at

14  that time was Squires Maddux.  There were questions certainly

15  in 2013, and I think a year earlier, about some of the

16  related-party fees themselves.

17  Q   You mentioned -- changing subjects again a little bit.

18  You mentioned earlier that Parkway had cash flow problems.

19  Do I recall that correctly?

20  A   That would be fair to say that about Parkway, yeah.

21  Q   So we looked at the section of the LPA that required you

22  to contribute 600,000, up to 600,000 --

23  A   Yes.

24  Q   -- in the event the partnership had cash flow problems; is

25  that correct?

Tamaro - Direct

1    A    Yes.

2    Q    So you mentioned, I think, when we talked about that, you

3    actually contributed a lot more than that?

4    A    I did, yeah.

5    Q    So can you please describe what amounts you contributed

6    and how they were used?

7    A    I contributed in several ways.  One way was to make direct

8    advances to the partnership.  I also -- I covered payroll and

9    didn't -- normally I would cover payroll and then Parkway

10   would reimburse me.  Parkway couldn't afford to.  I covered

11   payroll and left the invoicing with the payables.  Same with

12   the management fee.  I didn't get paid the management fee

13   because Parkway didn't have the cash flow.  Those are

14   different ways in which I was supporting the property.

15   Q    What happened to the advances that could not be paid back

16   at the time from cash flow?

17   A    They are still on the partnership balance sheet as an

18   obligation.

19   Q    Until this litigation, did AMTAX ever -- by the way, let

20   me back up.  Strike the previous question.

21        So the loans from you to the partnership would be

22   reflected in the audited financial statements every year,

23   would they not?

24   A    Yes.

25   Q    AMTAX received them?

Tamaro - Direct

1    A    Yes.

2    Q    Did they ever, until this litigation, challenge the

3    amounts that were listed as amounts due to you for the

4    amounts you advanced to the partnership?

5    A    They did not.

6    Q    Do you know how much money -- how much of your own funds

7    you advanced to the partnership over the years?

8    A    Between the direct advances and then just covering payroll

9    and the management fee, Parkway owes me more than several

10   million dollars.

11   Q    Now, under the LPA, how are these loans repaid?

12   A    Well, if cash flow were to pick up sufficiently, then they

13   would be paid after the regular bills of the property.  The

14   property would pay the regular bills, pay debt service and

15   would repay me.

16   Q    If the cash flow does not pick up?

17   A    I just don't get paid.  The obligations just sit on the

18   balance sheet.

19   Q    So what does subsection VI of the LPA say about how the

20   loans are repaid?

21   A    In a true sale of the property, those loans have to be

22   repaid.  In the buyout situation we have been discussing,

23   they are included in this formula for obligations that have

24   to be considered and paid off before there is money to pay

25   the limited partner.

1  Q    Let's look at Exhibit 3, subsection 6.2.B. This is the

2  waterfall we looked at before.  This time it is the Parkway

3  waterfall, which is very similar to the Hidden Hills

4  waterfall you talked about before.  What is this sixth

5  priority there?

6  A    No. 6 is repayment of subordinated loans of the managing

7  general partner, which would be 334th Place, which is me.

8  Q    The amounts you loaned to the partnership are converted to

9  subordinated loans and they are paid as the sixth priority

10  under the waterfall?

11  A    Yes.

12  Q    What is fifth priority?

13  A    If the developer fee I earned back when I put the deal

14  together is still unpaid -- it is called the deferred -- the

15  deferred portions would be repaid also.

16  Q    So the financial statements, audited financial statements

17  that were provided to AMTAX ever year, did they reflect both

18  the deferred developer fee and the subordinated loans to you

19  as amounts due to you?

20  A    Yes.

21  Q    Did AMTAX, until this litigation, ever say -- take an

22  issue with that?

23  A    Not that I recall.

24  Q    Now, let's look at Exhibit 90.  Does -- are you familiar

25  with Exhibit 90?

1    A    Yes.

2    Q    What is it?

3    A    This was a letter -- this was something that AMTAX

4    deposited in discovery.  It is a letter to Morgan Stanley who

5    I believe was the investor at the time.  We were working

6    through this refinance.  They were seeking approval from

7    Morgan Stanley to move forward with this refinance.

8    Q    This is a funding request from AMTAX to Morgan Stanley and

9    you were not copied.  It is internal; is that right?  It

10   wasn't copied to you at the time?

11   A    I didn't receive it at the time.

12   Q    So what do you understand to be the relationship between

13   Morgan Stanley and AMTAX?

14   A    This is what I think.  I think Morgan Stanley was the

15   actual corporate investor.

16   Q    And what does it say?  What does AMTAX say to its

17   corporate investor, Morgan Stanley, about the loans that you

18   made to the partnership?

19   A    There we go.  All right.  Refunding the deficit by

20   deferring payroll from the affiliated management company.

21   They consider the 2002 rehab to be what they call light.

22   Talked about the renovations.  Single-pane windows weren't

23   part of the scope.  Property appears to be suffering from

24   water intrusion, rot due to damp environment in some areas.

25   Q    Did you understand that AMTAX now challenges the same

Tamaro - Direct

1   expenses as unnecessary in this litigation?

2   A   That's my understanding.

3   Q   It also talks about the loans from you to the partnership.

4   I think that is a separate paragraph.  Please review this

5   paragraph.

6   A   (Witness complies.) They said the refinance was

7   advantageous from a dispositions perspective because they

8   improved operating cash flow and would pay down the loan

9   amount of GP receivables by end of compliance.

10  Q   Do you understand what dispositions perspective refers to?

11  A   Not necessarily.  I didn't receive this communication.

12  Q   It says, in the last sentence of this paragraph that we

13  see on the screen, that the higher replacement reserve

14  requirements of 500 per unit annually should also help to

15  maintain/improve the property's physical condition, which may

16  preserve residual value.  Do you see that?

17  A   I do see that, yes.

18  Q   Do you recall Mr. Pettit saying in his opening statement

19  today that improvements of Parkway's physical condition did

20  not really flow to the LP's benefit in a waterfall?

21  A   I recall something like that.

22  Q   Now, there is another sentence in this exhibit that I

23  cannot find right now.  I need a moment.  Let's go to the

24  page, to the box.  The waterfall, please.  Okay.

25          On page 7 of this report -- can you go back up one

1    page, please?  Okay.

2         On page 7 of this report, the last paragraph, it says

3    that Trieste Holdings, LLC is an affiliate of the

4    administrative general partner.  The first quarter of 2014

5    was positive, but the property has a history of

6    underperforming with both 2012 and 2013 showing deficit

7    operations of $135,000.  Then it says that the GP has been

8    supporting the deficit by deferring payroll from the

9    affiliated management company.  Do you see that?

10   A    I do.

11   Q    So when you were talking about the -- when you were

12   talking about the loans that you made to the partnership, did

13   the loans include funding the payroll deficit with your own

14   money?

15   A    Yes, that's one of the ways in which I was supporting

16   Parkway.

17   Q    Let's go to the box.  Then right below, there is a line

18   about GP defaults.  Do you see that?

19   A    I do.

20   Q    There are two boxes, yes and no.  The "no" box is checked.

21   A    Yeah, the general partner was not in default.

22   Q    So my question to you is:  Did AMTAX ever tell you, until

23   this litigation, that you were in default under the LPA for

24   Parkway?

25   A    They did not.

1  Q    Did AMTAX ever demand -- demand from you, before this

2  litigation, that you should give up your accounts payable?

3  A    No.

4  Q    Did AMTAX ever demand that you give up the amounts that

5  you loaned to the partnership to meet payroll or other

6  expenses?

7  A    Not until this litigation.

8          MS. LATSINOVA:  It would be a good time to stop

9  because I have a whole other --

10          THE COURT:  Okay.  Some of this is repetitive.  This

11  last topic is not.  This is new material.  Just work on it

12  tonight to tighten it up.

13          MS. LATSINOVA:  I will.

14          THE COURT:  I hear the same thing three times, it is

15  in there.

16          MS. LATSINOVA:  Got it.

17          THE COURT:  All right.  Have a nice evening.  We will

18  see you tomorrow morning at 9:30.

19                                  (Recessed.)

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3

4       I certify that the foregoing is a correct transcript from

5     the record of proceedings in the above-entitled matter.

6

7

8

9     /s/ Angela Nicolavo
          Debbie Zurn

10

      ANGELA NICOLAVO
11    DEBBIE ZURN
      COURT REPORTERS

12

13

14

15

16

17

18

19

20

21

22

23

24

25