

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

_____

HIDDEN HILLS MANAGEMENT,       )
LLC, and 334th PLACE 2001,     )
LLC,                           )
                               )
Plaintiffs,                    )
                               )
v.                             )  3:17-cv-06048-RBL
                               )
AMTAX HOLDINGS 114, LLC, and   )  TACOMA, WASHINGTON
AMTAX HOLDINGS 169, LLC,       )
                               )  June 4, 2019
Defendants.                    )
                               )  9:30 a.m.
_____ )
                               )  Bench Trial
AMTAX HOLDINGS 114, LLC,       )
AMTAX HOLDINGS 169, and        )
PARKWAY APARTMENTS, LP,        )
                               )
                               )
Counter-Plaintiffs,            )
                               )
v.                             )
                               )
HIDDEN HILLS MANAGEMENT,       )
LLC, and 334th PLACE 2001,     )
LLC,                           )
                               )
Counter-Defendants.            )

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE

_____

Proceedings stenographically reported and transcript
produced with computer-aided technology

```
1                          APPEARANCES

2

3    FOR THE PLAINTIFF &              DAVID R. GOODNIGHT
     COUNTER-DEFENDANTS:             MARGARITA V. LATSINOVA
4                                     J. SCOTT PRITCHARD
                                      Stoel Rives
5                                     600 University Street
                                      Suite 3600
6                                     Seattle, Washington

7

8

9    FOR THE DEFENDANT &             CRAIG H. BESSENGER
     COUNTER-PLAINTIFFS:             ERIC S. PETTIT
10                                    GRAYCE S. ZELPHIN
                                      Boies Schiller & Flexner
11                                    725 South Figueroa Street
                                      31st Floor
12                                    Los Angeles, California.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1
 2                        EXAMINATION INDEX
 3   EXAMINATION OF:                                        PAGE
 4    CATHERINE TAMARO     DIRECT EXAMINATION (Cont.)          4
                           BY MS. LATSINOVA
 5                         CROSS EXAMINATION                  23
                           BY MR. PETTIT
 6
 7
 8
                            EXHIBIT INDEX
 9
10   EXHIBITS ADMITTED                                      PAGE
11    Exhibit A-2                                             68
      Exhibit 168                                             21
12    Exhibit 170                                             20
      Exhibit 171                                             16
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1     THE COURT:  Good morning.  Anything before we begin?

2     MS. LATSINOVA:  I don't think so.

3     THE COURT:  Ms. Latsinova, please proceed.

4                  CATHERINE TAMARO

5   Having previously been sworn, testified further as follows:

6                  DIRECT EXAMINATION (Cont.)

7   BY MS. LATSINOVA:

8   Q   Good morning, Catherine.

9   A   Good morning.

10  Q   You talked yesterday about your option exercised in Hidden

11  Hills.  Did you also exercise your option in Parkway, under

12  Section 7.4J under the Parkway LPA?

13  A   Yes, I have.

14  Q   When did that happen?

15  A   I believe it was the third day of January 2018.

16  Q   At that point, the compliance period was over?

17  A   Yes.  It had ended on the last day of 2017.

18  Q   And all the tax credits and losses had been delivered to

19  AMTAX?

20  A   Yes, they had.

21  Q   And so let's look at Exhibit 128, Adam, please.

22      Do you recognize Exhibit 128?

23  A   Yes.

24  Q   What is it?

25  A   This is the letter that I sent to AMTAX 169 exercising my

1   option to purchase their interest in the partnership, the

2   Parkway Partnership.

3   Q   Did you also provide an appraisal as required by 7.4J of

4   the Parkway LPA?

5   A   I indicated that I had selected an appraiser and

6   anticipated that the result would be completed at the end of

7   January.

8   Q   Let's go to 129, please, Adam.

9        Do you recognize Exhibit 129?

10  A   Yes, I do.

11  Q   Is this the CBRE appraisal that you provided to AMTAX?

12  A   Yes, it appears to be.

13  Q   Do you recall what the appraisal value was that CBRE

14  arrived at?

15  A   Not precisely.

16  Q   Okay.  Now, did AMTAX respond?

17  A   No.

18  Q   What did you do?

19  A   I waited.  And in February, I wrote another letter to

20  AMTAX.

21  Q   Let's go to 131.  Is Exhibit 131 another letter you wrote?

22  A   Yes, it is.

23  Q   And what are you saying in there?

24  A   I'm pointing out that I have -- that the general partner

25  has exercised its option under 7.4J, and that the appraisal

1    was completed, and I had it, that all the year-end documents

2    had been submitted to AMTAX, and that I had not received any

3    acknowledgment of my previous letter.

4    Q    Okay.  So what are you asking AMTAX to do?

5    A    I asked them to inform me of the date when they

6    anticipated receiving their completed appraisal.

7    Q    Did you get an appraisal?

8    A    From AMTAX, I did not.

9    Q    Okay.  Did you get anything from AMTAX?

10   A    I believe I got a letter after this one.

11   Q    Okay.  All right.

12   A    After my letter.

13   Q    Let's go to 132, please.

14        Is this a letter you got?

15   A    Yes, it is.

16   Q    And what does it say, in summary?

17   A    Well, they asked to see the appraisal.  And they said they

18   were evaluating questionable activity by the general partner

19   at Parkway, including failure to maximize rental income, and

20   other things.

21   Q    Now, did you respond to the letter that we see here as

22   Exhibit 132?

23   A    Yes, I did.

24   Q    And let's go to 133, please, Adam.

25        Is your response in Exhibit 133?

1    A    Yes.  This is my response.

2    Q    And what are you saying in that response to AMTAX?

3    A    I reminded them that -- well, in this letter, I had

4    forwarded a copy of the CBRE appraisal.  I pointed out that

5    Parkway had been managed professionally, and with great care,

6    by my affiliated management company.  The property was

7    positioned appropriately in the rental market.  It is

8    providing decent, safe and sanitary housing to low-income

9    residents, which it is supposed to be doing.

10        I noted that this was the first time that they had raised

11   these complaints, that the property had been managed

12   appropriately financially, and if they had any questions they

13   were free to contact me or to inspect the records, which I

14   keep at my office.

15   Q    Did they -- did AMTAX take you up on that offer?

16   A    No, they did not.

17   Q    What did they do?

18   A    I don't believe they did anything.

19   Q    Let's look at Exhibit 135, Adam.

20        Do you recall receiving this letter from AMTAX?

21   A    Yes, I do.

22   Q    And what's the date of the letter?

23   A    This is dated May 8th.

24   Q    So it's now May 8th and you still don't have an appraisal

25   from them; is that correct?

1   A   Correct.

2   Q   What does the letter say?

3   A   It says, let's see, as a threshold matter the breadth,

4   complexity and opacity of my misconduct have made it

5   difficult and time consuming to uncover.  And they had

6   identified what they considered to be a number of breaches of

7   the general partner's obligation under the partnership

8   agreement.  And they went on to list what they believed those

9   breaches would be.

10  Q   And as you sit here today, have you received a second

11  appraisal of the Parkway property from AMTAX?

12  A   In accordance with the partnership agreement, no, I have

13  not.

14  Q   Did you receive any appraisal from AMTAX?

15  A   AMTAX's counsel indicated that it had commissioned an

16  appraisal of the property for legal advice to AMTAX.  But to

17  my knowledge, AMTAX itself has not appraised this property in

18  accordance with their obligation.

19  Q   Let's look at Exhibit 136, Adam.

20      What is Exhibit 136?

21  A   This is an appraisal of Parkway Apartments that was

22  commissioned by AMTAX's counsel.

23  Q   Do you recall receiving this from AMTAX, or how did you --

24  when did you first see it?

25  A   I believe I received this -- I believe 334th received it

Tamaro - Direct (Cont.)

1   through its own counsel.

2   Q    In the context of this litigation?

3   A    Correct.

4   Q    In discovery, if you know?

5   A    I do not recall.

6   Q    Okay.  Now, Parkway was added to the Hidden Hills' dispute

7   later; is that correct?

8   A    Yes.

9   Q    And can you explain, in your own words, why did you choose

10  to seek to add Parkway to the Hidden Hills' dispute?

11  A    Parkway -- I sought to add Parkway in order to complete

12  the buyout process for Parkway Apartments under the

13  provisions of the partnership agreement.

14  Q    Now, do you understand that in this litigation, AMTAX is

15  challenging some of the fees that were reflected in the

16  audited financial statements?

17  A    Yes, I do.

18  Q    Now, I want to ask you some questions about some of these

19  specific fees.  Now, are you aware that AMTAX is challenging

20  advances that you made to the partnership to pay the managing

21  general partner fee?

22  A    I am, yes.

23  Q    And who is the general managing partner?

24  A    The managing general partner is actually Hearthstone

25  Housing Foundation, who is our nonprofit partner.

1   Q   When did Hearthstone come into the partnership?

2   A   I recruited Hearthstone to the partnership in 2005.  And I

3   gave them half of my general partnership share, which is how

4   they ended up as the managing general partner.  And then

5   334th became the administrative general partner.

6   Q   Did the LPA have to be, and all the governing documents,

7   have to be amended to allow for that change?

8   A   Yes.  All of the partners signed an amendment admitting

9   Hearthstone as the managing general partner.

10  Q   And so can you please explain what Hearthstone is and what

11  it does?

12  A   Hearthstone Housing is a nonprofit organization who

13  provides services to the partnership -- services to the

14  residents, as well as being responsible for applying for our

15  property tax exemption.

16  Q   Okay.  And what services to the residents does it provide?

17  A   As an example, one thing they do is they provide school

18  backpacks and school supplies to all the children living in

19  the complex every year, over the summer, so those children

20  are prepared for school.

21  Q   And so is Hearthstone compensated for its services?

22  A   Yes.  Hearthstone -- yes, we agreed to pay Hearthstone an

23  annual fee.

24  Q   What is that fee?

25  A   It's a little bit less than $10,000 per year.

1  Q    And so you mentioned that Hearthstone provides a tax

2  savings to the partnership?

3  A    Yes.  Hearthstone files the annual application to the

4  Washington Department of Revenue for our property tax

5  exemption.

6  Q    So did Hearthstone deliver the tax savings that it can

7  provide?

8  A    Yes.  They have done that for us every year.

9  Q    And so you mentioned they're paid $10,000 a year.  And

10  what are the tax savings they bring, annually?

11  A    Oh, right now approximately $180,000 a year on property

12  tax savings.

13  Q    And so where does -- what happens when the cash flow of

14  the partnership is insufficient to pay Hearthstone its fee?

15  A    The way we drew up that amendment had to do with -- had to

16  do with tax law.  I can remember that.  So Hearthstone's fee

17  is supposed to be paid only after the property pays all its

18  other obligations, including its obligations to the general

19  partner.  And it didn't have that kind of money.  So every

20  year, I advanced funds to Parkway to make sure that

21  Hearthstone's fee was paid timely.

22  Q    Okay.  And were these advances reflected in the financial

23  statements?

24  A    Yes, they were.  Every year.

25  Q    And so if there is cash flow, Hearthstone is paid out of

1  cash flow.  If there is no cash flow, you advance the fee.

2  Are you aware that there's some third way to deal with

3  Hearthstone?

4  A  I am not.

5  Q  Okay.  And do you recall Mr. Krabbenschmidt's deposition

6  testimony where he suggested there's a third way?

7  A  Well, he suggested that we shouldn't have been paying

8  Hearthstone, and that Hearthstone would just continue to

9  provide its services for no fee.

10 Q  Okay.  And are you aware of any nonprofit managing general

11 partner that provides its services, such as Hearthstone

12 provided here, for free?

13 A  I am not.

14 Q  Okay.  Now, do you think that Parkway Partnership would be

15 better off if Hearthstone's fee was not paid?

16 A  Parkway would clearly not be better off if Hearthstone

17 stopped applying for the property tax exemption.

18 Q  In the years when you advanced Hearthstone's fee because

19 cash flow was insufficient, can you calculate the total tax

20 savings to the partnership that it's received?

21 A  Since the time that Hearthstone entered Parkway Apartments

22 LP, through the end of the compliance period, the savings to

23 the partnership were about $1.6 million.

24 Q  Okay.  And do you understand that AMTAX is seeking the

25 amount of your advances to Hearthstone, for Hearthstone's

1    fees, as damages in this case?

2    A    Yes, I am.

3    Q    Okay.  Now, another item I want to ask you about, another

4    fee that they're challenging.  Are you aware they're

5    challenging the legal services, the cost of legal services to

6    the partnership?

7    A    I am.

8    Q    Yes.  And so who provided legal services, first of all?

9    A    My husband, Steven Arterberry, provided occasional

10   services to Parkway Apartments.

11   Q    You testified yesterday that your husband is a licensed

12   engineer.  Is he also a lawyer?

13   A    Yes.  He's a member in good standing of the Washington

14   Bar.

15   Q    Was he an engineer first or a lawyer first?

16   A    He was an engineer first.

17   Q    Now, and why did Parkway need legal services?

18   A    Small matters come up, kind of on a regular basis.  So my

19   husband has -- for example, tenants will file suit against us

20   in small claims court.  And my husband has represented

21   Parkway in small claims court.  My husband has worked with

22   certain state agencies that come into the property, for

23   example, Department of Labor and Industries will do

24   inspections.  And he is the contact with Labor and

25   Industries.

1       My husband spent a lot of time, one year, working with the

2   homeowner's association next door, because we discovered we

3   had a very active drug house, and a lot of the customers were

4   coming over to Parkway and looking for things to steal.  And

5   my husband spent a lot of time with that HOA and Federal Way

6   Police to get that drug house shut down.  So those are the

7   kinds of services he provides to Parkway.

8   Q   And did he bill, did your husband bill Parkway for the

9   legal services he provided?

10  A   He did.

11  Q   What kind of fees did he charge?

12  A   His fees are reasonable.

13  Q   Were they reflected in the audited financial statements?

14  A   Yes.

15  Q   Did AMTAX complain about these fees, prior to this

16  litigation?

17  A   They did not.

18  Q   Now, very quickly, about the -- I want to touch on the

19  repair supervision fee.  We talked about this yesterday.  I

20  have just a few more questions.

21       So are you aware that AMTAX is challenging repair

22  supervision fees charged by Trieste Holdings?

23  A   Yes, I am.

24  Q   And so Trieste Holdings has a general contractor's

25  license?

 1   A    Yes, it does.  Since 2011, it has had a general

 2   contractor's license.

 3   Q    Okay.  And does Trieste Holdings supervise construction?

 4   A    Yes.  We have acted as general contractor for the repairs

 5   we have been discussing at the property.

 6   Q    Does that include the roofing?

 7   A    That did include the roofing, yes.

 8   Q    Did it include the siding?

 9   A    Yes.

10   Q    Did it include the balconies?

11   A    Yes, it did.

12   Q    Did it include the paving?

13   A    Yes, it did.

14   Q    So did Trieste get permits for the work when permits were

15   required?

16   A    We had to obtain permits for the balconies.  And we

17   obtained permits for the swimming pool demolition.

18   Q    Did you hire architects?

19   A    We did, for the balconies, yes.

20   Q    Let's look at Exhibit 171.

21        MS. LATSINOVA:  Your Honor, 171 has not been admitted

22   yet.  It has been exchanged.  So we need to lay some

23   foundation here.

24   Q    Catherine, what is exhibit -- what is the document you see

25   on the screen here?

1   A   This is the cover sheet from our architect, James Castino,

2   who submitted the architect drawings for the new balconies to

3   the City of Federal Way.

4   Q   That was commissioned by Trieste Holdings?

5   A   Yes.

6       MS. LATSINOVA:  We move to admit 171.

7   A   It was -- to be accurate, it was commissioned by Parkway

8   Apartments LP.

9       THE COURT:  Any objection?

10      MR. PETTIT:  No, Your Honor.

11      THE COURT:  Exhibit 171 is admitted.

12          (Exhibit 171 was admitted.)

13  Q   And so are you aware of anything in the Parkway LPA that

14  requires Trieste Holdings to perform general-contractor type

15  work for free?

16  A   No, I am not.

17  Q   And did Trieste Holdings charge fees for the general

18  contractor work that general contractors normally would not

19  charge?

20  A   No.

21  Q   Did Trieste Holdings charge more than a general contractor

22  would charge, in your experience?

23  A   I don't believe so.

24  Q   Now, okay, so I want to ask you about the employee rent

25  subsidy.  Are you aware that AMTAX is challenging a subsidy

1  that some of the employees received in Parkway?

2  A   Yes, I am.

3  Q   And what's the -- what's that subsidy and who received it?

4  A   For employees who live on site, I give them a rent credit

5  equal to a one-bedroom unit, because it's important to have

6  employees available in the case of emergencies at nights and

7  on weekends.

8      So we've had -- the number fluctuates, but we usually, we

9  almost always have several employees living on site.  And a

10  situation came up, I had -- an affiliate of mine had

11  purchased several small dwellings right next door to Parkway.

12  I actually picked them up in the foreclosure years.  And

13  several of the employees moved over next door.  And it was

14  for reasons of family size, because Parkway has one and two

15  bedroom units, and they had larger families, so they moved

16  over next door.  They were still available.

17      What I did is when they were living in the unit, Parkway

18  did not receive full rent.  When they moved out of the unit,

19  Parkway rented to someone and got full rent.  And that rent

20  credit was paid to the unit next door, which was owned by my

21  affiliate.  The employees paid the balance.  If they want to

22  live in a two-bedroom unit or if they want to move next door

23  to these larger -- they're duplexes -- they have to pay the

24  difference.  Those employees were willing to pay more.  There

25  was no net financial difference to Parkway.  Parkway either

1    rented a unit for less than full price to an employee, or it

2    paid that amount to my affiliate and received full rent from

3    a new tenant.

4    Q   What's your understanding, what would these individuals

5    that you're describing have done if they didn't receive the

6    subsidy?  Would they have stayed in the unit?

7    A   They would have continued living in their -- we had a

8    situation with multiple children living in that unit.  It was

9    better for them, but they would have remained in Parkway at

10   the discounted rent, because it was a discount.

11   Q   Okay.  Now, another item.  Are you aware that AMTAX is

12   challenging interest accrued on the deferred developer fee as

13   damages in this case?

14   A   I am.

15   Q   Yes.  And so is there an issue about -- how -- when is

16   interest due?  How is it calculated?

17   A   The partnership agreement says that interest is accrued on

18   the deferred developer fee until ten years after the first

19   building has been placed in service.

20   Q   Okay.  So if the buildings were placed in service in 2002,

21   then how was the interest calculated?

22   A   Then interest would stop in 2012.  If the buildings -- the

23   way we ended up with the calculation is that the interest was

24   stopped ten years after June 30, 2003, which is the date on

25   record with the Washington State Housing Finance Commission

Tamaro - Direct (Cont.)

1   for the first placed in service.

2   Q   And so would that information be found somewhere on the

3   Washington Housing Commission's website?

4   A   Yeah, on their website, they have an easily available --

5   they have a whole big list of every property that they're

6   overseeing with the first-placed-in-service date for the

7   building.

8   Q   So do you understand Mr. Krabbenschmidt's position to be

9   that the buildings were placed in service in 2002 as opposed

10  to 2003?

11  A   I understand that, yes.

12  Q   And the difference between his position and yours is a

13  year of interest?

14  A   A year of interest, yes.

15  Q   Okay.  Well, let's go to the source.

16      170, please.

17      MS. LATSINOVA:  And, again, Your Honor, this has not

18  been admitted.  So I need to ask some foundation questions.

19  Q   What is Exhibit 170?

20  A   This is the first page of the list that can be found on

21  the Washington State Housing Commission's website.

22      MS. LATSINOVA:  Move to admit 170, please.

23      THE COURT:  Any objection?

24      MR. PETTIT:  No, Your Honor.

25      THE COURT:  Exhibit 173 is admitted.

1          MS. LATSINOVA:  It's 170.

2          THE COURT:  170?

3          MS. LATSINOVA:  Yes.

4          THE COURT:  I'm sorry, 170.

5                    (Exhibit 170 admitted.)

6   Q   So, can you find Parkway Apartments there?

7   A   Yes.

8   Q   So what does it say about when it was placed in service?

9   A   The first building was placed in service, according to the

10  Washington State Housing Finance Commission, on June 30,

11  2003.

12  Q   Now, that's all the questions I have for you today about

13  these specific damage items.

14          Now, in conclusion, have you provided AMTAX with a

15  waterfall calculation for Parkway?

16  A   For Parkway?

17  Q   For Parkway.

18  A   Yes, I have.

19  Q   Let's go to Exhibit 168, please.

20          MS. LATSINOVA:  This is another exhibit that has not

21  been admitted, Your Honor.

22  Q   So, Catherine, what is Exhibit 168?

23  A   This is the waterfall calculation under Section 6.2 of

24  Parkway's partnership agreement, showing the formula by which

25  we arrive at a buyout price.

1        MS. LATSINOVA:  We move to admit 168.

2        THE COURT:  Any objection?

3        MR. PETTIT:  No, Your Honor.

4        THE COURT:  Exhibit 168 is admitted.

5                (Exhibit 168 was admitted.)

6   Q   Please explain how you put together this waterfall.

7   A   Okay.  Again, this is our modeling of a hypothetical sale.

8   So we start with our appraised value right there, and add in

9   any money in the bank accounts.  Kind of keep going through

10  that and take off 3 percent of the appraisal price to model

11  our cost of sale.  And we have capital proceeds right there

12  of $16,745,000.  Then we subtract all of the accounts payable

13  at the property.  We subtract the HUD mortgage.  We subtract

14  the interest paid in arrears.  And then we -- the next number

15  actually is current liabilities, which is -- those are the

16  old payroll and management fees that are still owed to me.

17      We subtract the remainder of the deferred developer fee

18  right here, we subtract interest on the deferred developer

19  fee, and we subtract my subordinated loans, to get down to

20  $4.9 million of profits.  Then we start doing our splits,

21  according to the partnership agreement, and end up at the

22  $2.373 million.

23  Q   Okay.  And so this is based on the CBRE appraisal?

24  A   Correct.

25  Q   That's the only appraisal that's been done in this case?

 1    A    Yes.

 2    Q    And now the 904 and 289, this is the DDF and the interest

 3    on DDF; is that correct?

 4    A    Yes, that is correct.

 5    Q    And so let's flip, hopefully, to Exhibit 3, Section 6.2B.

 6         This is the waterfall in Section 6.2B of the Parkway

 7    LPA.  So I just want you to show us exactly where the DDF is

 8    required to be repaid, in what priority?

 9    A    It's repaid -- well, number five, it's the fifth payment

10    we subtract in our hypothetical sale.

11    Q    The waterfall requires the DDF to be paid in fifth

12    priority?

13    A    Yes.

14    Q    What about interest on DDF?

15    A    Well, I added in the interest, because it isn't

16    specifically called out in this waterfall.

17    Q    Okay.  Let's go back to your waterfall, which was 168.

18         Now, you highlighted this before.  Line 27,

19    administrative general partner subordinated loans,

20    $1.5 million?

21    A    Yes.  Yeah, those were direct advances I made to the

22    partnership.

23    Q    These have been on the audited financial statements every

24    year?

25    A    Yes.

1    Q    And let's flip back to the waterfall, Adam.  Okay.  6.2B,

2    back to the waterfall.  Okay.

3         Can you please point us to the priority that requires

4    repayment of your subordinated loans?

5    A    That would be the sixth.

6    Q    So right after the DDF?

7    A    Yes, correct.

8    Q    And so now, one last question.  Does that general partner

9    have an obligation to deliver the credits to the limited

10   partner?

11   A    In this partnership agreement, yes, the general partner

12   has guaranteed the tax credits, which is probably the main

13   reason why I was advancing funds to this partnership so

14   regularly.

15         MS. LATSINOVA:  Thank you.  That's all the questions

16   I have.

17         THE COURT:  Mr. Pettit?

18         MR. PETTIT:  Thank you, Your Honor.  If you can give

19   me 30 seconds to get myself situated.

20         THE COURT:  Certainly.

21         MR. PETTIT:  Thank you.

22                        CROSS EXAMINATION

23   BY MR. PETTIT:

24   Q    I believe there's a set of our trial exhibits as well,

25   Ms. Tamaro.  Can you confirm there are binders that have

1   exhibits that have an "A" prefix there?  I want to make sure

2   you have our exhibits.

3   A   Where am I looking?  I see Volume 1, 2, 3 and 4.

4           THE CLERK:  Do you need all of them all at once?

5   Q   We're going to be showing exhibits on the screen.  If you

6   ever want to look at the paper copy and check pages I'm not

7   showing you on screen, just let me know and we'll bring you a

8   paper copy so you can look at it.  I want you to have the

9   ability, when I'm talking about an exhibit, if there's any

10  page you want to see, we can also bring it up on the screen

11  too.  So if there's any point that you want to look at the

12  full paper copy of the document, let me know, and we'll make

13  sure you have it in front of you.

14  A   Okay.

15  Q   Good morning, Ms. Tamaro.  Do you recall providing a

16  declaration in support of a request for temporary restraining

17  order and preliminary injunction that you filed in December

18  of 2017, before this case was removed to federal court?

19  A   No.

20  Q   You don't recall that?

21  A   No.

22  Q   Okay.  I've got hard copies of that declaration here, and

23  I'm also going to put it up on the screen, just so you can

24  take a look at it and confirm that this is, in fact, a

25  declaration that you submitted in connection with --

1           MR. PETTIT:  And I have a copy for counsel.  Your

2  Honor, may I approach?

3           THE COURT:  You may.  You may.

4  Q  So, Ms. Tamaro, take a minute to look at that and confirm

5  that this was a declaration that you submitted in this

6  action.

7  A  That is my signature, yes.

8  Q  Okay.  And this is dated December 5, 2017; is that right?

9  A  Yes.

10  Q  Okay.  And you submitted this under penalty of perjury; is

11  that right?

12  A  Yes.

13  Q  Okay.  And do you also recall verifying discovery

14  responses on behalf of the general partners, Hidden Hills and

15  334th Place?  Let me bring them up; maybe that will help

16  refresh your recollection.

17       Let's bring up Exhibit A-239 on the screen.  And if you

18  go to page -- those are the responses, you'll see on the

19  first page, from Hidden Hills Management.  Do you see that

20  "Hidden Hills Management hereby responds to AMTAX as

21  follows."  Do you see that?

22  A  Yes.

23  Q  Then if you go to page 12 of that exhibit, do you see

24  there's a verification there signed by you from January of

25  2018?

Tamaro - Cross

1   A   Yes.

2   Q   And so you -- does this refresh your recollection that you

3   verified discovery responses in this action?

4   A   Yes.

5   Q   And let's bring up Exhibit A-263.  Now, those are the

6   interrogatory responses from 334th Place in connection with

7   the Parkway portion of this action.  Do you see that?

8   A   Yes.

9   Q   And if we go to page 14 of Exhibit A-263, you'll see

10  there's a verification there as well, that it appears that

11  you signed in October of 2018.  Do you see that?

12  A   I do.

13  Q   Okay.  And so does this confirm, to your satisfaction,

14  that you provided discovery responses under penalty of

15  perjury in this action?

16  A   Yes.

17  Q   And in addition to providing a declaration and discovery

18  responses, you were deposed in this case over the course of

19  three days, not only in your individual capacity, but also as

20  a representative of the general partners; is that correct?

21  A   Yes.

22  Q   And you understood at the time of your deposition and your

23  discovery responses that those statements that you made in

24  those settings were all under penalty of perjury.  You

25  understood that?

1    A    Yes.

2    Q    Given that you've already spoken under oath about this

3    case multiple times, there may be occasions during the course

4    of this examination where I refer back to your prior

5    testimony to help refresh your recollection or to clarify

6    something.  Okay?

7    A    All right.

8    Q    You testified during your direct examination that you have

9    a bachelor's degrees from Stanford in both economics and

10   mechanical engineering; is that right?

11   A    Yes.

12   Q    Did you pursue those degrees jointly or in succession?

13   A    I received them at the same time.

14   Q    And I think you also said that you received a master's of

15   science from the University of Washington in 2016; is that

16   right?

17   A    Yes.

18   Q    And was that -- when did you receive your degrees from

19   Stanford?

20   A    In 1984.

21   Q    Okay.  And during the time in between you getting your

22   degrees from Stanford and your master's at the University of

23   Washington, you worked for a number of years in investment

24   banking; is that right?

25   A    Yes, I did.

1  Q   And you also got involved in real estate development, I

2  believe you said, in 1996 or thereabouts?

3  A   Yes.

4  Q   And just closing out on your educational background, your

5  concentration for your master's was environmental toxicology;

6  is that right?

7  A   Yes.

8  Q   I just have to ask, because of the timing, was your

9  pursuit of a master's in environmental toxicology in 2016 in

10  any way motivated by your focus on the environmental

11  condition of the Hidden Hills property?

12  A   No.

13  Q   Have you ever taught at the university level?

14  A   I have not.

15  Q   Now, going back to your investment banking career.  Can

16  you just very briefly describe what you did in investment

17  banking?

18  A   I worked with municipal bond underwriting.

19  Q   Did you work for a firm?

20  A   Yes.

21  Q   What firm did you work for?

22  A   The first firm I worked for was called Seattle Northwest

23  Securities.  And the second firm was called Edward Jones.

24  Q   And that was -- you did that until approximately 1999 or

25  2000; is that right?

1  A    Yes.

2  Q    But in or around 1996, you also became involved in real

3  estate development; is that right?

4  A    Yes.

5  Q    And your experience in real estate development has been

6  focused on LITHC developments, right?

7  A    Yes.

8  Q    Do you have any experience, out of the LITHC context, with

9  real estate development?

10 A    Real estate development?  The properties I have developed

11 have all been LITHC properties.

12 Q    Okay.  And you currently manage the general partner

13 interests in nine LITHC partnerships in the State of

14 Washington, including Hidden Hills and Parkway; is that

15 right?

16 A    Yes.

17 Q    You also have a property management company called Trieste

18 Holdings; is that correct?

19 A    Yes.

20 Q    That's co-owned by you and your husband, Steven

21 Arterberry?

22 A    Yes.

23 Q    How long has Trieste been in existence?

24 A    To be honest, I'd have to look it up.

25 Q    Okay.  Am I pronouncing it correctly, Trieste?

1   A   Yes.

2   Q   I'd like to now turn to the two partnerships in dispute,

3   Hidden Hills and Parkway.

4       You testified on direct examination that you were

5   directly involved in the negotiation surrounding the

6   formation of both of those partnerships; is that right?

7   A   Yes.

8   Q   And so if there was some term in either the partnership

9   agreement or any other partnership document that you did not

10  agree with, you had an opportunity at the time to say

11  something during the negotiation process; is that right?

12  A   Presumably, yes.

13  Q   And you noted, in your direct examination, that entities

14  responsible for managing AMTAX's interests in Hidden Hills

15  and Parkway have changed over time, but the AMTAX entities

16  have been the limited partners in these partnerships since

17  their inception; is that correct?

18  A   Yes.

19  Q   And AMTAX provided the capital to fund the redevelopment

20  of these two properties; is that right?

21  A   Yes.

22  Q   Would you agree with me that private capital investment is

23  necessary for a LITHC partnership to be viable?

24  A   That's a broad statement.  But these two partnerships did

25  need that much money, yes, that came in from the limited

1   partner.

2   Q   Of the nine partnerships, LITHC partnerships where you've

3   served as the general partner, have any of them not involved

4   private investment of capital?

5   A   No.

6   Q   So all nine have involved private investment?

7   A   Correct.

8   Q   Do you recall testifying on direct examination that tax

9   credits and losses are the primary reasons why limited

10  partners invest in LITHC?

11  A   Do I recall?  I don't recall.  But if it's in the

12  testimony, then I would have said it.

13  Q   You don't recall.  Well, do you agree with the statement

14  that tax credits and losses are the primary reasons why

15  limited partners invest in LITHC?

16  A   They have their reasons for investing.  I understand what

17  I see at my end, as the general partner.  And from the

18  general partner's perspective, it's important to the limited

19  to receive tax credits and losses.

20  Q   And have you or any entity you control ever been a limited

21  partner in a LITHC partnership or been responsible for

22  managing the interests of a LITHC limited partner?

23  A   No.

24  Q   So to the extent that you are making general statements

25  about what motivates LITHC investors, that would be

1    speculation on your part; is that right?

2    A    I suppose.

3    Q    But even assuming that tax credits and losses are a

4    primary motivation for investment in LITHC, that does not

5    mean that those are the only benefits to which an investor

6    limited partner is contractually entitled to receive, does

7    it?

8    A    You've made a correct statement.

9    Q    In fact, in order to answer that question, you'd need to

10   look at the terms of the partnership agreement, the specific

11   partnership agreement in question and any other documents

12   governing the partnership; is that right?

13   A    Certainly.

14   Q    I'm sorry?

15   A    Yes.

16   Q    So let's go ahead and pull up on the screen, the Hidden

17   Hills limited partner partnership agreement, which I may

18   refer to as the LPA, just to save syllables.  And that's

19   Exhibit 2.  And given that the two agreements at issue in

20   this case, the two partnership agreements are virtually

21   identical with respect to the various provisions we're going

22   to be discussing, please assume that these questions apply to

23   both the Hidden Hills LPA and the Parkway LPA.  And let me

24   know if my description of the agreement is inaccurate with

25   respect to either of the documents.  Okay?  That will make

1   things much more efficient.

2       First, do you understand that the general partners of

3   Hidden Hills and Parkway owed fiduciary duties to the

4   partnership and to AMTAX as the investor limited partner?

5   A   Yes.

6   Q   And, in fact, if we pull up on pages 44 and 45, Sections

7   7.4F and 7.4G on to the screen.  We can do them one at a

8   time, Christian, whatever is easiest.  Actually, if you just

9   blow up, Chris, the first sentence of 7.4F for now.

10      Do you see there that the 7.4F of the partnership

11  agreement says that the general partner shall have fiduciary

12  responsibility for the safekeeping and use of all funds and

13  assets of the partnership, whether or not in their immediate

14  possession or control?

15  A   Yes.

16  Q   So that's a contractual memorialization of the general

17  partner's fiduciary duty, correct?

18  A   I believe so, yes.

19  Q   Then if we go over, Chris, to 7.4G, which is much shorter.

20  We can highlight that whole piece.

21      It says, "No general partner shall contract away the

22  fiduciary duty owed at common law to the limited partners."

23  Do you see that?

24  A   Yes.

25  Q   That's actually incorporating common law standards of

1     fiduciary duty into this contract, right?

2            MS. LATSINOVA:  Objection.  Calls for a legal

3     conclusion.

4            THE COURT:  I'm sorry, I can't understand you.

5            MS. LATSINOVA:  The question calls for a legal

6     conclusion.

7            THE COURT:  Overruled.

8     A    Could you repeat your question?

9     Q    Sure.

10           This provision, Section 7.4G, incorporates into the

11    partnership agreement common law fiduciary duties that a

12    general partner owes to a limited partner in the partnership;

13    is that right?

14    A    Again, I'm not an attorney, so I would just repeat the

15    language that's in the partnership, which says, "No general

16    partner shall contract away the fiduciary duty owed at common

17    law to the limited partners."

18    Q    Fair enough.

19           Do you recall testifying on direct examination that

20    AMTAX was a passive investor and that the ability to manage

21    or control the partnership belonged to the general partner?

22    A    I don't know if I recall or not.

23    Q    You don't recall referring to AMTAX as a passive investor?

24    A    I simply don't recall.

25    Q    Okay.  Well, do you agree with the statement that AMTAX is

1   a passive investor?

2   A   Can you define "passive"?

3   Q   Well, I guess I'm defining it -- maybe we can pull up the

4   -- we'll come back to this, and I'll pull up the quote and we

5   can take a look at this.  We'll return to this.

6           So you don't feel able to, based on your understanding

7   of the term "passive," to opine on whether you agree that

8   AMTAX is a passive investor?

9   A   AMTAX is a limited partner, I know that.

10  Q   Okay.  And so if you testified on direct examination that

11  they were a passive investor, would you now want to change

12  that testimony?

13  A   I don't believe so.

14  Q   So you would continue to say they're a passive investor?

15  A   Yes.

16  Q   But you'd agree with me that the general partner's --

17  well, actually, yeah, so you'd agree with me that the general

18  partner's fiduciary duties prevent it from exploiting its

19  control over the management of the partnership in order to

20  take advantage of or hide information from the limited

21  partner, correct?

22  A   Can you repeat that, please?

23  Q   Sure.  Would you agree with me that the general partner's

24  fiduciary duties prevent it from exploiting its control over

25  the management of the partnership in order to take advantage

1   of or hide information from the limited partner?

2   A    I'm sorry, I don't know.

3   Q    So you think there's a possibility that you -- that a

4   general partner could exploit its control over the management

5   of the partnership in order to take advantage of or hide

6   information from the limited partner and still be acting

7   consistently with its fiduciary duties?

8   A    Repeat that again, please.

9   Q    Sure.  If a general partner was exploiting its control

10  over the management of the partnership in order to take

11  advantage of or hide information from the limited partner, in

12  your mind, would that constitute a breach of fiduciary duty?

13  A    To be honest, I would want to see a definition of "Take

14  advantage of."

15  Q    The partnership agreement refers to the general partners

16  as a fiduciary; is that right?

17  A    It does say that, yes.

18  Q    You are the general partner, correct?

19  A    Correct.

20  Q    So you have an obligation to comply with the terms of the

21  partnership agreement; isn't that right?

22  A    Yes.

23  Q    And if you don't have an understanding of what a

24  fiduciary's responsibilities are to its limited partner, then

25  that will -- that would hinder your ability to fulfill your

1    responsibilities under the agreement, would it not?

2    A    Not necessarily.

3    Q    Well, going back to AMTAX's control over the partnership,

4    the Hidden Hills LPA and the Parkway LPA, do require the

5    limited partner's consent to certain major capital events,

6    including, for example, a sale or refinancing of the

7    property; is that right?

8    A    Yes.

9    Q    And in addition to the consent rights, the limited partner

10   also has the right to receive certain financial information

11   about the partnership, including an annual audited financial

12   statement; is that right?

13   A    Yes.

14   Q    Let's take a look at Section 12.1 at page 64 of Exhibit 2.

15        I want to specifically direct your attention to Section

16   12.1B Romanette ii.  So it's at the bottom of page 64.  And I

17   really just need that, and then I guess up to B.

18        So, do you understand, Ms. Tamaro, that this Section

19   12.1Bii requires the general partner to deliver an audited

20   financial statement to the limited partners for the

21   partnership no later than March 15th of the calendar year

22   following the year that is being audited?

23   A    Yes.

24   Q    And you understand that's your obligation, correct?

25   A    Yes.

1   Q   Do you see -- are there any exceptions in that section

2   that you're aware of?

3   A   Not that I see, no.

4   Q   Are you just -- generally, are you aware of any exceptions

5   in the partnership agreement to the requirement that the

6   audited financial statement be delivered no later than

7   March 15th?

8   A   I'm not aware of any.

9   Q   Okay.  And do you recall entering into an amendment of the

10  Parkway LPA that moved this reporting deadline from

11  March 15th to February 15th?

12  A   Yes.  That was included in the amendment that admitted

13  Hearthstone.

14  Q   Yeah.  That's Exhibit 31.  And it's at page 2, Section

15  3.2.1.  Is that what you're referring to:  The partnership

16  agreement is hereby amended, by deleting the reference to

17  March 15th set forth herein and replacing it with a reference

18  to February 15th?

19  A   Yes.

20  Q   And this continues to be the operative deadline for the

21  Parkway audited financial statement?

22  A   Yes.

23  Q   Staying with the various provisions of the partnership

24  agreement that are at issue here, I'd like to direct your

25  attention to Section 4.5, which is at pages 25 and 26 of

1    Exhibit 2.

2         And I'd like to direct your attention, in particular,

3    to Section 4.5A Romanette iv -- excuse me, (2).  And Chris is

4    going to highlight that for you.  It's on page 26 and it's

5    the item -- it's near the top, that paragraph (2) there.

6    Now, Ms. Tamaro, you understand that this provision allows

7    the limited partner to remove the general partner from its

8    general partner position in the event that the general

9    partner violates any material provision in Article VII, or

10   elsewhere in the agreement.  And that the misconduct can

11   reasonably be expected to cause economic detriment to the

12   partnership or the project.  Do you see that?

13   A    I do.

14   Q    Is that consistent with your understanding of the limited

15   partner's removal rights for a breach of the limited

16   partnership agreement?

17   A    They do have this right in the partnership agreement.

18   Q    Now, I'd like to also direct your attention -- oh, and the

19   other thing I wanted to ask you about is, is there any

20   language that you're aware of in Section 4.5 that requires

21   the limited partner to bring an affirmative derivative claim

22   on behalf of the partnership in order to invoke or exercise

23   its removal rights?

24   A    I don't know.

25   Q    You don't know the answer to that?

1    A    I do not.

2    Q    Now, I'd like to also take a look -- staying with 4.5 --

3    I'm sorry, Chris, stay up there.  I'd like to go down to --

4    on page 26, item 6.

5         Would you agree with me, Ms. Tamaro, that this

6    provision allows the limited partner to remove the general

7    partner based on a failure to furnish reports as required in

8    Section 12.1?

9    A    It does.

10   Q    And are you aware of any language in the partnership

11   agreement that imposes the same requirement that the limited

12   partner demonstrate a reasonable expectation of harm to the

13   partnership or project in order to enforce its removal rights

14   based on this provision?

15   A    I'm sorry, I don't know.

16   Q    You don't know.

17        I'd like to look now at Section 7.4J of the partnership

18   agreement, which is at pages 45 and 46.  Chris, if you could

19   bring the whole section, both pages up, and blow them up so

20   we can all see them as best you can.

21        But I'm just going to ask, do you agree, Ms. Tamaro,

22   that the purpose of Section 7.4J is to ensure that the

23   limited partner receive the same amount that it would receive

24   upon a sale of the property to a third party?

25   A    The language says that the property is valued through the

1   appraisal process.

2   Q   Now, you were involved in the drafting of this partnership

3   agreement; is that right?

4   A   I didn't draft it, no.

5   Q   You were involved in the negotiations that led up to the

6   execution of this partnership agreement?

7   A   The partnership agreement was drafted by the limited

8   partner.  And then there were subsequent changes and

9   negotiations before it was executed.

10  Q   But presumably, you reviewed it before you signed it?

11  A   Yes.

12  Q   And did you understand at the time that you signed this

13  agreement that section -- the purpose or intent of Section

14  7.4J is to put the limited partner in the same position

15  economically upon the exercise of your option as they would

16  be if the property were sold to a third party?

17  A   Would you repeat that?

18  Q   Sure.  Did you understand, at the time you signed the

19  partnership agreement, that the intent of Section 7.4J was to

20  put the limited partner in the same place economically, upon

21  the exercise of your option, as they would be if the

22  partnership were to sell the project to a third party?

23  A   I can only say that that language is not included in this

24  Section 7.4J.

25  Q   Well, I'm asking you about if you had an understanding

1   about the intent behind this agreement.

2   A   My understanding of the intent was to provide a mechanism

3   for the general partner to purchase the limited partner's

4   interest.

5   Q   But you don't know if that mechanism was intended to give

6   the limited partner the value they would receive if it was

7   sold, if the project was sold to a third party?

8   A   I do not know.

9   Q   Let's take a look at the mechanisms that are put in here.

10  So the mechanism is that there's an appraisal process,

11  correct?

12  A   Correct.

13  Q   And the appraisal process is one where an independent MAI

14  appraiser appraises the fair market value of the property; is

15  that right?

16  A   Yes.

17  Q   And the option price -- it says, if you look at the

18  sentence above what's highlighted there -- the option price

19  shall be the equal of the greater of the fair market value of

20  the interest, without offset, for any lack of control or

21  inability to control management of the investor limited

22  partner.  Do you see that?

23  A   Yes.

24  Q   And so the limited partner's entitled to receive the fair

25  market value of their interest; is that right?

1   A   Yes, that is what this language says.

2   Q   And the language goes on to provide a method by which to

3   determine the fair market value of that interest.  And I

4   think we already mentioned the first step is to get an

5   appraisal of the property by an independent MAI appraiser; is

6   that right?

7   A   That is correct.

8   Q   And each partner appoints their own appraiser, and then

9   those two appraisers, if they can't agree on a value, they

10  appoint a third appraiser jointly.  And the determination of

11  that appraiser will be final and binding; is that right?

12  A   That is what the language says.

13  Q   Okay.  And the appraiser, the third appraiser, the value

14  that they're coming up with is the value of -- their fair

15  market value determination for the property; is that right?

16  A   Yes.

17  Q   And so this is their, based on their professional

18  experience and expertise, their best guess of what the

19  property would sell for if it were marketed; is that right?

20  A   I don't know if that's the correct definition that the

21  appraiser would use.

22  Q   Do you have a different understanding of what appraisers

23  do?

24  A   They're establishing a value.

25  Q   And value is determined by what the market would pay,

1   correct?

2   A   Presumably.

3   Q   Right.  And now that's only the first step, right?  Now

4   you've determined the value of the property.  But now you

5   actually have to translate that into the option price by

6   running that value through the sales proceed waterfall that's

7   in Section 6.2B; is that right?

8   A   In this partnership agreement, yes.

9   Q   And in the other partnership agreement that we're

10  discussing?

11  A   In the Parkway and Hidden Hills Partnership agreements.

12  Q   Sorry, I didn't mean to interrupt.  So the partnership

13  agreements that are relevant to this dispute both have this

14  language; is that right?

15  A   Yes.

16  Q   And the sales proceed waterfall in Section 6.2B, that

17  tells you how much each partner gets if the property is sold

18  to a third party, correct?

19  A   If the property is sold, then you would follow that

20  formula to split the sales proceeds.  If the property is not

21  sold, then you would follow that formula to establish a

22  hypothetical sales price and resulting payments.

23  Q   Right.  So if there's an actual sale, then 6.2B applies,

24  right?

25  A   Correct.

1    Q    If there's a hypothetical sale under Section 7.4J, then

2    6.2B also applies; is that right?

3    A    We have used 6.2B to model our hypothetical sale.

4    Q    Because 6.2B applies under the terms of this agreement; is

5    that right?

6    A    Well, it's in the agreement, that's true.

7    Q    You wouldn't model it based on that if that wasn't what

8    was required by the agreement?

9    A    We had turned to Section 6.2B to model our hypothetical

10   sales price.

11   Q    You wouldn't do that unless that's what the contract told

12   you to do, right?

13   A    This contract doesn't directly say go to 6.2B.  But we

14   have utilized that because that's the only mechanism in the

15   partnership to run through a waterfall.

16   Q    Everyone is in agreement on that, right?

17   A    I don't know.

18   Q    I think that's one of the few areas where we actually are

19   all in agreement, is that 6.2B applies.  But I'm not asking

20   you to commit to what my clients are saying.  I just want you

21   to agree that that's your interpretation; is that right?

22   A    We have used 6.2B to model our hypothetical sales price.

23   Q    Now, if the general partner exercises this option and the

24   appraisal process proceeds as it's supposed to, then I think

25   we already touched on the third appraisal is final and

1   binding, correct?

2   A   That's what this language says.

3   Q   Right.  So the limited partner is required to sell at the

4   option price arrived at by running that value determination

5   through the sales proceed waterfall, correct?

6   A   Yes, I believe so.

7   Q   I mean, isn't that why you're here, because you think you

8   have a right to force us to go through this process?

9   A   Correct.

10  Q   So, the limited partner does not have the right to refuse

11  to sell at that option price, if they think it's too low,

12  right?

13  A   That's a good question.  I don't know.

14  Q   You don't know if you think that --

15  A   I don't know.

16  Q   So you think that -- well, I guess that's kind of why

17  we're here.  I guess that's part of why we're here.  But

18  you're saying it's not your position that you -- that this is

19  a mandatory option, that if you invoke it properly, that you

20  can compel us to sell even if we don't want to?

21  A   Yes, I would agree.

22  Q   I thought you might.

23       So, the general partner's exercise of its rights under

24  Section 7.4J does not involve a negotiation over the option

25  price, does it?

1    A    What's your definition of "negotiation"?

2    Q    What's your definition of "negotiation"?

3    A    Back and forth.

4    Q    Right.  So that's what I'm saying is there's no back and

5    forth here.  There's just a strict application of the formula

6    that spits out a number, and that's the number that the

7    limited partner is obligated under the contract to accept to

8    sell their interest; is that right?

9    A    Yes, I would agree.

10   Q    Okay.  I'd now like to spend a few minutes going over some

11   of the statements that you made in your direct examination

12   about the limited partner's return on their investments in

13   Hidden Hills and Parkway.

14        Chris, can you bring up Slide 6 of plaintiffs' opening

15   statement?  Ms. Tamaro, this slide, which Ms. Latsinova asked

16   you about in your direct examination, purports to show

17   AMTAX's return on its investment for Hidden Hills and

18   Parkway, based exclusively on tax benefits and losses,

19   correct?

20   A    And fees, yes.

21   Q    And fees?

22   A    Yes.

23   Q    So the graphic says, under "return," in parentheses there,

24   federal tax credits and losses.  Do you see that?

25   A    I do.

1    Q    So is that a mistake?  Should that also say, "and fees"?

2    A    I need to look at my numbers.

3    Q    You don't know, sitting here today?

4    A    I have to go back and look at my numbers.

5    Q    On direct examination, Ms. Latsinova asked you how you

6    came to this number, and my understanding at the time that

7    you gave your examination was that you looked at the tax

8    credits that the partner would receive, based on their

9    investment, you looked at the anticipated tax losses?

10   A    Yes.

11   Q    And those two components comprised this number.  And I

12   don't recall you mentioning anything about fees.  Did you --

13   that's consistent with your recollection?

14   A    Yes.

15   Q    Okay.  So let's take a look, then, at the -- maybe just

16   walk me through it.  Let's put back up the documents that

17   Ms. Latsinova showed you.

18        So first let's start with Parkway.  Chris, can you

19   bring up Exhibit 31 at page 7?  Okay.

20        So, Ms. Tamaro, I'll represent to you that this was the

21   document that Ms. Latsinova showed you when she was asking

22   you about this return on investment.  And can you explain to

23   me how you determined, based on this, what AMTAX's return on

24   its investment based on tax credits and losses were?

25   A    I added them.

Tamaro - Cross

1   Q   So, you took -- we've actually prepared a slide here.  But

2   before we get to that slide, when you say you've added them,

3   I note that the tax losses are in parentheses, so that

4   suggests that those are negative, right?  That's what that

5   signifies?

6   A   Yes.

7   Q   It says right up there that's losses?

8   A   Yes.

9   Q   And I note that the 2002 date has -- does not have

10  parentheses around it.  Do you see that?

11  A   I do.

12  Q   And so in order to -- when you say "add them up" on the

13  tax losses, did you add up all of the negatives and then

14  subtract the positive to get to the losses?  It seems that

15  would be the right way to do it, I just wanted to make sure

16  that is how you did it.

17  A   I believe so.

18  Q   Because the loss here is a positive, right?  The loss is a

19  good thing for the investor, right?

20  A   Yes.

21  Q   Because the loss then allows them to take that loss and

22  reduce their income on their income taxes and pay less income

23  taxes, correct?

24  A   Yes.

25  Q   So that's why it's a benefit to the limited partner; is

1  that right?

2  A   Yes.

3  Q   Okay.  So what you did was -- and let's bring up the

4  slide, if we could, Chris, that has -- well, maybe let's go

5  to Hidden Hills first.  Can you go to the source document,

6  which is Exhibit 2 at page 20?

7       And if you look at the top paragraph there, that's what

8  Ms. Latsinova showed you.  That's the $4,257,838 in tax

9  credits, right?

10 A   Yes.  Is this Parkway or Hidden Hills?

11 Q   I believe this is Hidden Hills, based on the notation down

12 on the bottom left corner of the document, it says, "Hidden

13 Hills."

14 A   Okay.

15 Q   This is from Exhibit 2, which is definitely Hidden Hills.

16      And then the tax losses -- I actually don't have in my

17 notes here where that is.  I think it might be on Schedule A.

18 But instead of trying to find that, we went ahead and made an

19 Excel spreadsheet.

20      And, Chris, maybe you can bring that up.

21      THE COURT:  Why don't we hold that thought.  We'll

22 take our midmorning break, and we'll be at recess for

23 15 minutes.

24      MR. PETTIT:  Thank you, Your Honor.

25                     (Recessed.)

1          THE COURT:  Mr. Pettit, you may proceed.

2          MR. PETTIT:  Thank you, Your Honor.

3      Before we go back into the return on investment to the

4  limited partners, I wanted to pull up the testimony from

5  direct examination regarding passive investors.  Can you pull

6  that up, Chris?

7                   CROSS-EXAMINATION (Resumed)

8  BY MR. PETTIT:

9  Q   Do you see there, Ms. Tamaro, that on direct examination

10  Ms. Latsinova asked you, "You talked about the role of the

11  limited partner.  I want to ask specifically, does the

12  limited partner have any management responsibilities?"  You

13  answered, "No, they are a limited partner."  She went on to

14  ask you, "Are they a passive investor?"  You said, "They

15  are."

16      Do you see that?

17  A   I do.

18  Q   Is that consistent with your position as you sit there

19  right now?

20  A   I would say yes.  If the opposite is an active investor,

21  that is not their role.

22  Q   Right.  Maybe the reason why there is some hesitation is

23  they do have some significant consent rights; is that right?

24  A   Consent rights, to me, are different than management

25  rights.

1  Q   I guess I am trying to understand why you are hesitating

2  to refer to them as passive if you think --

3  A   I am thinking through the definition.  If the opposite

4  would be active, I don't perceive them to be active investors

5  because they are a limited partner.

6  Q   They are a limited partner that has specifically

7  enumerated contractual rights in the partnership agreement,

8  correct?

9  A   They do.

10  Q   The partnership agreement goes on to say that the

11  management in control of the partnership will belong to the

12  general partner; is that right?

13  A   It does say that.

14  Q   Let's go back to trying to unpack this slide that was

15  prepared and you testified about on direct examination.  What

16  I am going to do is I have -- now that you have explained

17  what you did, I am going to have Chris bring up an Excel

18  spreadsheet, just because it helps validate that all this

19  math is correct.

20  A   I would like to comment that actually what I did do is go

21  through the K-1s on the actual tax returns to get those

22  numbers.  Those were not pulled from the schedules -- the

23  projected schedules.

24  Q   Okay.  What you are saying is your methodology is as you

25  described, but the numbers that you used are different than

1   what Ms. Latsinova showed you on direct examination?

2   A    I used the actual tax returns.

3   Q    That's not what she showed you, right?

4   A    She is showing the projections from the partnership

5   agreement looking forward.  I have used the actual returns.

6   Q    So when she walked you through to have you explain how you

7   arrived at those numbers, that was inconsistent with how you

8   actually did it; is that right?

9   A    I used the actual tax returns to get those numbers.

10  Q    Well, putting -- maybe we don't need to look at the Excel

11  spreadsheet, and we can cut through some of this.

12       There were a couple of things I wanted to ask you about

13  with respect to the methodology. Now, I believe you said you

14  added up all the tax losses, and then you added that to the

15  tax credits, and that gave you your return; is that right?

16  A    Yes.

17  Q    Now a dollar in tax losses is not worth a dollar, is it?

18  A    A dollar in tax losses is not worth a dollar?  I would say

19  that does depend on what happened.

20  Q    Are you aware of any taxpayer in this country that has 100

21  percent tax rate?

22  A    No, I hope not.

23  Q    By definition, if you are taking a tax loss to reduce your

24  income tax, you are not getting the full dollar benefit of

25  that tax loss, correct?

1   A    That would be correct.

2   Q    Yeah, so if you have a 40 percent taxable rate, for

3   example, on your income, and you have enough income to

4   actually take advantage of the losses, then the value of that

5   dollar of tax loss would be 40 cents, correct?

6   A    Yes.

7   Q    All right.  Did you take that fact into account when you

8   were calculating the return on investment to the limited

9   partner?

10  A    I added up the gross losses.

11  Q    Sorry.  Can you answer my question?

12  A    I added up the gross losses, the total losses, the

13  total write-offs.

14  Q    Would you agree with me that is misleading or inaccurate

15  in terms of the return that they actually enjoyed in

16  connection with the losses?

17  A    I am not going to comment on how they calculate their

18  return.  What I am showing is the losses and the tax credits

19  as they flowed through the K-1s.

20  Q    Are you continuing to say that you think it is appropriate

21  for a tax -- a dollar of tax loss to be considered a dollar

22  return on their investment?

23  A    I think that would be their tax question, not mine.

24  Q    You don't have an answer to that question?

25  A    I don't.  I can't opine on their tax return.

1   Q   You have a bachelor's degree in economics, correct?

2   A   I do.

3   Q   You are the general partner of nine LITHC partnerships,

4   correct?

5   A   I am.

6   Q   You prepare the tax returns for the partnerships?

7   A   No, I do not.

8   Q   Do you coordinate with an accounting firm to prepare the

9   tax returns for those partnerships?

10  A   I give the tax accountant the information and he prepares

11  the returns.

12  Q   You are unable to give an answer as to whether the fact

13  that a taxpayer doesn't pay 100 percent in taxable rate means

14  that a dollar in tax losses is not worth a dollar?

15  A   I cannot comment on AMTAX's tax position.  You are -- your

16  statement in general is correct, that a loss is, what shall

17  we say, connected with your tax bracket.

18  Q   You didn't take that into account in doing your

19  calculations?

20  A   I did not.

21  Q   If you did take that into account, that would reduce the

22  amount of return that you would calculate for the limited

23  partner; isn't that right?

24  A   Possibly.

25  Q   The other thing about tax losses is you can only take

1    advantage of them if you have income; is that right?

2    A    That's my understanding, yes.

3    Q    When the partnership generates tax losses, who gets the

4    benefit of those losses?

5    A    It depends -- well, it is allocated between the limiteds

6    and the general partner, depending on a number of factors.

7    Depends on if the -- the capital account has reached zero.

8    Another factor is if the general partner has been advancing

9    funds, then, as I understand it under tax law, some of the

10   losses are allocated over to the general partner.

11   Q    When the limited partner's capital account balance reaches

12   zero, then tax losses are allocated to the general partner;

13   is that right?

14   A    In this partnership, yes, that is what we have done.

15   Q    In both partnerships?

16   A    In both of them, yes.

17   Q    Once the investor's capital account is at zero, if there

18   are any further losses generated by the partnership, any tax

19   benefits associated with those losses would go to you, not

20   the limited partners, correct?

21   A    Yes, that is what has happened thus far.  I have been

22   allocated losses -- once -- my understanding, and the

23   partnerships that I have seen, are that the investor wants to

24   get the benefit of the full write-off when they reached a

25   zero capital account, then they tend to allocate the losses

1  to the general at that point.

2  Q   Does the -- doesn't the schedule -- the schedules that we

3  were looking at forecast that the tax losses and the

4  depletion of the limited partner's capital account will occur

5  gradually over time so that the limited partner has the

6  ability to take advantage of those tax losses over multiple

7  tax seasons?

8  A   That is tax planning on their side.  They made their best

9  guess at projections when they put their projections

10 together.  That's what they anticipated would happen.

11 Q   Do you know whether the capital account of the limited

12 partners in these partnerships depleted at a more accelerated

13 pace than what was anticipated?

14 A   I would have to look at the tax returns.

15 Q   Let's pull up Exhibit A-78.

16       Exhibit A-78 is an email exchange that you had with

17 Gary Squires.  Who is Gary Squires?

18 A   Gary Squires does the tax returns.

19 Q   That is your accountant?

20 A   He is with Squires Maddux.

21 Q   You write to him on February 1st, 2016, "Zero capital

22 account for the LP," exclamation point, exclamation point,

23 exclamation point, exclamation point. Do you see that?

24 A   I do.

25 Q   The subject line is "Parkway."  Do you see that?

1   A   I do.

2   Q   This email relates to Parkway Partnership that is at issue

3   in this litigation, correct?

4   A   It does.

5   Q   Why the four exclamations points?

6   A   I don't recall, actually.

7   Q   Is it because once -- as we have been discussing, once the

8   general partner's capital account reaches zero, all of the

9   taxable losses can be used by you to offset your income and

10  therefore providing economic benefit to you?

11  A   No, it was because one of -- one of the things I was

12  supposed to do as general partner was to bring them to a zero

13  capital account, and I had done that.

14  Q   Oh, you just said a minute ago you didn't know why you

15  were putting the exclamations points there, but now is it

16  that you are saying you are commending yourself for a good

17  job at accomplishing bringing the capital account down to

18  zero, that's why you put the exclamations points there?

19  A   Could be.

20  Q   You just don't know?

21  A   It has been a few years since I wrote the email.

22  Q   You don't recall the reason why you sent that?

23  A   I recall that in that return the investor's capital

24  account had reached zero, and that was one of the goals of

25  all these partnerships.  I have seen partnerships where the

1  capital account didn't reach zero, and you have to give the

2  capital back.  The goal, as they enter into it, is to reach

3  zero, and we had reached zero that year for Parkway.

4  Q   Just so I am clear, this email exchange relates to the

5  filing of Parkway's tax returns; is that right?

6  A   It does.

7  Q   Now I would like to discuss with you what the general

8  partner -- we have talked about what the limited partner

9  contributed in terms of their investment and their return on

10 their investment.  I would like to discuss now what the

11 general partner contributed and received for its involvement

12 in the two partnerships.  First, I would like to pull up

13 Schedule A for the two partnerships, which are at Exhibit 2

14 at 82 and Exhibit 3 at 80.

15     Ms. Tamaro, is it -- am I reading this correctly, the

16 managing general partner's initial capital contribution was

17 $3,028?

18 A   On the capital side, yes, it was $3,028.

19 Q   We are talking about equity investment here.

20 A   Equity, correct, not debt.

21 Q   On the managing general partner for the other partnership,

22 the Parkway Partnership, the equity contribution was $260; is

23 that right?

24 A   Yes.

25 Q   Does this accurately identify the equity contributions of

```
 1   the general partner to the two partnerships in dispute here?
 2   A   Yes, it is set up this way so that the -- you can see that
 3   the limited partner owns -- we are trying to maximize the
 4   ownership share of the limited partners so we maximize the
 5   tax benefits going to them.
 6   Q   Right.  That is how these vehicles are set up, right?
 7   A   Yes.
 8   Q   You still -- it is still a fact that you only had to put
 9   $3,000 of equity into Hidden Hills and $260 of equity into
10   Parkway?
11   A   Of equity, yes.
12   Q   Let's discuss what the general partner gets in return for
13   that investment.  We just addressed the fact that the general
14   partner gets tax losses that can offset income.  The ability
15   to take those losses on your tax returns flows up to you as
16   owner of the GP, correct?
17   A   Would you repeat that?
18   Q   Does the ability to take the losses on the tax returns
19   ultimately flow up to you?
20   A   I'm sorry, I am not following your question.
21   Q   Do you get the benefit of the tax losses that flow to the
22   GP?
23   A   Okay, if the GP receives an allocation of --
24   Q   Yes.
25   A   -- gains or losses --
```

1    Q    Of losses.

2    A    -- the GP is an LLC, it flows through to the LLC members;

3    if I am a member, yes, it would flow through to me.

4    Q    And you are a member?

5    A    Of which one?  Of the general partners?

6    Q    Yes.

7    A    Yes.

8    Q    So you are one of the people to whom these tax benefits or

9    the benefits from the tax losses would ultimately flow up to,

10   correct?

11   A    Yes.

12   Q    So to the extent that you are filing your personal income

13   tax statement and you have a significant amount of positive

14   income, you can take advantage of tax losses that were

15   suffered -- of losses that were incurred by the operating

16   partnerships here; is that right?

17   A    Possibly, yes.

18   Q    Have you done that in the past?

19   A    I have offset income with losses, yes, from partnerships.

20   Q    From these two partnerships?

21   A    I believe so, yes.

22   Q    So that is the tax losses.  You get that.

23         Now, I think you also said in your direct examination

24   that one of the prime motivations for you to enter into these

25   partnerships as a general partner was to secure the option,

1    that we are discussing here, to purchase the limited

2    partner's interest in the partnerships at the close of the

3    compliance period; is that right?

4    A    Yes.

5    Q    Now, I recognize and am in no way intending by this

6    question to minimize the importance of having control over

7    the disposition of the project, which I know you value very

8    highly.  As we discussed earlier, the price that you were

9    required to pay under the Section .4.J is the full amount

10   that the limited partner would receive in the event the

11   project was sold to a third party; is that right?

12   A    The price is the price as calculated in Section 7.4.J.  It

13   doesn't refer to what would otherwise happen.  It simply

14   refers to Section 7.4.J, we get three appraisals and work

15   through.

16   Q    Fair enough. I don't want to go through that again.

17          THE COURT:  I know the point. I get it.

18   BY MR. PETTIT:

19   Q    Setting aside the value of the control, you are not

20   getting any discount on the limited partner's economic,

21   right?

22   A    Again, I am not following you.

23   Q    You are not getting a discount on what the limited partner

24   would otherwise get if the project were sold to a third

25   party.  You are not paying them less than what the

1    partnership would have to pay out to them through the sale

2    proceeds waterfall; is that right?

3    A    Can you --

4    Q    I will --

5          THE COURT:  There is no management discount.

6          MR. PETTIT:  Correct.

7    BY MR. PETTIT:

8    Q    No lack of control discount for the limited partner; is

9    that right?

10   A    That is correct.  That is not in the paragraph.

11         MR. PETTIT:  Thank you, Your Honor, much clearer.  I

12   appreciate it.

13   BY MR. PETTIT:

14   Q    Now, you also receive lots of -- when I say "you," I mean

15   the general partners here and affiliates, receive lots of

16   other economic incentives for your role in developing and

17   operating Hidden Hills and Parkway; isn't that right?

18   A    There are -- there are economic incentives for us to do

19   it, yes.

20   Q    Those incentives are independent of your option right,

21   correct?

22   A    They are.

23   Q    For example, you were the developer on these projects,

24   right?

25   A    Well, I would have to look.  It may have been an

1    affiliate.  It would have been at least an affiliate, yes.

2    Q    For the purposes of these questions, you can assume when I

3    say "you," I mean you or someone with whom you are -- some

4    person or entity with whom you are affiliated.

5         You received developer fees for your role as developer

6    of the two projects, right?

7    A    Yes.

8    Q    And that is as the developer you get those fees.  Then you

9    are also entitled, in your capacity as general partner, to a

10   partnership management fee that is described in Section

11   7.10.C of the limited partnership agreement; is that right?

12   A    Well, it has never been paid.  It is in the partnership

13   agreement, but it has never been paid.

14   Q    That is a fee you are entitled to receive under this

15   partnership agreement?

16   A    If there were money, I would be entitled to it.

17   Q    If we go down do the next section, Section 7.10.D, there

18   is an incentive supervisory fee that you are entitled to in

19   your capacity as the managing general partner, correct?

20   A    If there were money to pay it, I would be entitled to it,

21   yes.

22   Q    If there were a sale of the property to a third party,

23   then that would generate proceeds that could potentially be

24   used to pay those fees, correct?

25   A    Yes.

1    Q    In addition to those fees -- so we have the developer

2    fees, we have all the general partner fees, then you also

3    have the right, as the general partner, to select the

4    management agent; isn't that right?

5    A    Yes.

6    Q    The management agent for these two properties is Trieste,

7    correct?

8    A    Yes.

9    Q    Trieste, in its capacity as the managing agent for these

10   two partnerships, gets fees itself, correct?

11   A    It does.

12   Q    Those are actually set out in the partnership agreement,

13   right?

14   A    Yes.

15   Q    It is four percent of rental income?

16   A    The partnership would pay anyone to manage the property.

17   If the management company is an affiliate, yes, the

18   management company receives that fee -- the affiliate

19   receives that fee.

20   Q    Of four percent?

21   A    Yes.

22   Q    That affiliate -- here the managing agent is Trieste for

23   this property?

24   A    Correct.

25   Q    So you get paid that way, too?

1  A   Correct.

2  Q   Then, if you need to hire some other person to help the

3  partnership, like let's say, for example, if you had to hire

4  a lawyer to help the partnership, who gets to make that

5  decision?

6  A   Typically the general partner would make that decision.

7  Q   That would be you, right?

8  A   Correct.

9  Q   To the extent that you exercised that authority to pick an

10 affiliate to perform those services, then the partnership

11 pays the affiliate the fees incurred in connection with the

12 services that they perform; is that right?

13 A   Because it is an affiliate, the fees have to -- they

14 simply have been incurred.  They haven't been paid yet.

15 Q   They just go on the balance sheet?

16 A   Correct.

17 Q   They have to get paid at some point, correct?

18 A   Hopefully, yes.

19 Q   Yeah.  If there is enough money through the waterfall,

20 then that is how they get -- they get paid through the sale

21 proceeds waterfall, right?

22 A   Yes, if there has not been sufficient cash flow over the

23 life of the project.

24 Q   Right.  There is actually provisions where they could be

25 paid through operating cash flow; is that right?

1   A   Yes, if there were sufficient operating cash flow.

2   Q   If there was insufficient operating cash flow, then they

3   could be paid through the proceeds upon the liquidation of

4   the partnership; is that right?

5   A   Correct.

6   Q   Have you attempted to quantify all of these economics to

7   come up with a projection of the general partners' return on

8   their investment as you did with the limited partners?

9   A   No, I have not.

10  Q   I want to talk specifically about the Hidden Hills

11  project.  Do you recall discussing on direct examination

12  yesterday the fact that there was known arsenic contamination

13  on the Hidden Hills property at the time of the formation of

14  the partnership?

15  A   I recall.

16  Q   You mentioned that there was an environmental escrow

17  created to cover the costs of environmental remediation,

18  should it be required; is that correct?

19  A   Yes.

20  Q   I would like to bring up Exhibit A-290 on the screen.  I

21  just want to confirm that that is the escrow agreement you

22  were referring to in your direct examination?

23  A   Yes.

24  Q   Now, you testified at your deposition that you don't

25  specifically remember anything about the negotiations

1   surrounding the creation of this agreement; isn't that right?

2   A    Yes.

3   Q    Now, at the same time that this environmental escrow was

4   established, the general partner also entered into an

5   agreement to indemnify AMTAX against any costs or losses

6   associated with the environmental condition of Hidden Hills;

7   is that right?

8   A    Yes.

9   Q    I am going to put Exhibit A-2 up on the screen.  I am not

10  going to spend any time on this because Your Honor has

11  already ruled on this.  I just want to confirm that Exhibit

12  A-2 is the environmental indemnity that you gave to AMTAX

13  when they committed to investing in Hidden Hills?

14  A    Yes.

15       MR. PETTIT:  I ask that Exhibit A-2 be admitted into

16  evidence.

17       THE COURT:  Any objection?

18       MS. LATSINOVA:  No.

19       THE COURT:  A-2 is admitted.

20            (Exhibit A-2 admitted.)

21  BY MR. PETTIT:

22  Q    Just to be clear, Ms. Tamaro, at the time you entered into

23  these agreements, there was no affirmative obligation from

24  any regulatory agency for the owner to perform any mandatory

25  remediation on the property, correct?

1    A    That is correct.

2    Q    In fact, to this day, as far as you are aware, there is no

3    requirement from Washington's Department of Ecology or any

4    other state or federal agency obligating the property owner

5    to perform any remediation work; is that correct?

6    A    Yes.

7    Q    I understand at some point the playground area was cleaned

8    up; is that right?

9    A    Yes.

10    Q    That work was voluntary, not mandatory, correct?

11    A    Yes.

12    Q    I would like to take you now -- I am going to move as

13    quickly as I can.  I want to take you through the chronology

14    of the events leading up to your appointment of Colliers as a

15    third appraiser.  I would like to bring up Exhibit A-77 on

16    the screen.

17           A-77 is an email exchange between you and Will Bennett

18    at CBRE from January of 2016; do you see that?

19    A    I do.

20    Q    Is it your understanding that at or around this time you

21    commissioned CBRE to perform an appraisal of this project?

22    A    Yes.

23    Q    Is it your understanding this email was sent in connection

24    with those efforts?

25    A    Yes.

1   Q   If you look at the middle of page, the email from you, you

2   say, "I am mailing you a packet of documents in

3   correspondence regarding the documentation of the lead and

4   arsenic in the soil at Hidden Hills which documents the work

5   we did to come up with the remediation plan.  You will

6   probably have questions, so feel free to call."  Do you see

7   that?

8   A   Yes.

9   Q   Now, you brought up this environmental contamination to

10  CBRE; is that right?

11  A   I did.

12  Q   At the time that you retained -- you told them this

13  because you wanted them to take the presence of the

14  environmental contamination into account when performing

15  their appraisal; is that right?

16  A   It had been taken into account when we purchased the

17  property, and so in my experience that was an appropriate

18  thing to adjust for.

19  Q   That is why you sent this information to them?

20  A   Yes.

21  Q   Again, this was in connection with an appraisal you

22  commissioned from CBRE in early 2016; is that right?

23  A   Yes.

24  Q   You didn't tell the limited partner that you were

25  commissioning this appraisal; is that right?

1   A   No, I did not.

2   Q   Who paid for this appraisal?

3   A   Hidden Hills paid for it.

4   Q   When you say "Hidden Hills"?

5   A   Hidden Hills, the partnership, paid for it.

6   Q   Not Hidden Hills Management?

7   A   Correct.

8   Q   So let's take a look at Exhibit A-79.  Is that the CBRE

9   appraisal from early 2016?

10  A   Yes.

11  Q   If you go to page 2 -- actually, sorry, give me a moment.

12  No, sorry. We can move past this document.

13       Let's go to -- pardon me, Your Honor.

14       Chris, can we please pull up A-79?  That is the

15  exhibit.  Sorry.  Let's go to the next page.  Next page.

16  Next page.  Keep going until I tell you to stop.  Keep going.

17  Keep going.  Keep going.  Okay.  Go back one page.  Let's

18  highlight the last bullet point there.

19       Ms. Tamaro, CBRE wrote in its appraisal in February of

20  2016, "It is our understanding that portions of the subject's

21  surface soil contains concentrations of arsenic above the

22  current clean-up and action levels of the Department of

23  Ecology in the State of Washington.  It is also our

24  understanding that approximately $1.5 million has been set

25  aside in escrow since the subject was originally purchased in

1   2002 for the clean-up of the soil contamination.  We are

2   making the extraordinary assumption that this amount will

3   fully cover the soil remediation and clean-up costs and no

4   further cost is required for this environmental issue." Do

5   you see that?

6   A   Yes.

7   Q   Was it your understanding, based on this language, that

8   the CBRE appraisal in February of 2016 did not reduce its

9   value determination based on the presence of environmental

10  contamination on the property?

11  A   What I discussed with Will Bennett is how to -- how to

12  bring forward the estimates that we had done back in 2001.

13  He didn't really know how to do it.  He just put in this

14  extraordinary assumption that said, I know about it, and at

15  this point all we can do is estimate this cost that I had

16  been dealing with, that I had had on record since 2001, would

17  be equal to the amount of the escrow.

18  Q   So there was no reduction?

19  A   I would have to look at this appraisal to recall.

20  Q   The fact that it says "no further cost is required for

21  this environmental issue" doesn't tell you that there was no

22  reduction?

23  A   That is a different question than what the value would

24  have been to bring forward our 2001 reports, and that is what

25  Will and I were discussing, is how to bring forward the 2001

1    results and bring them up-to-date, and then he put this in as

2    an extraordinary assumption that said, "We know it is there,

3    but we don't know how to account for it."

4    Q    Okay.  Now, let's take a look at Exhibit --

5    A    I would also like to note that I was using this for

6    property tax purposes.

7    Q    Okay.  Now, in November of 2016, so several months after

8    you obtained this appraisal, you reached out to EPI, which is

9    an environmental consulting company; is that right?

10   A    Yes.

11   Q    You commissioned -- now EPI was involved in testing at the

12   property back when the partnership was formed; is that right?

13   A    They had worked for the seller, yes.

14   Q    In connection with their work for the seller, they did

15   some testing at the property; is that right?

16   A    They did, yes.

17   Q    You reached out to them and asked them to prepare an

18   updated Phase I environmental site assessment, correct?

19   A    Yes.

20   Q    Why did you do that?

21   A    I actually had contacted them to -- again, to bring

22   forward our 2001 report.  My memory is that Brett Carp said

23   the way we do it is with the Phase I.

24   Q    The Phase I comes first and it is sort of a prerequisite

25   to have a Phase I report before you can get an updated cost

Tamaro - Cross

1    estimate; is that right?

2    A   I remember that he wanted to do a -- update the Phase I

3    first before he looked at updating the cost.

4    Q   You came to him and said I want to get an updated cost

5    estimate.  He said, well, if you want to do that you have to

6    get an updated Phase I first; is that right?

7    A   I don't know if he said it in those words.  I know that

8    that is how they proceeded was to first do a Phase I report.

9    Q   Your objective from the outset was to get an updated cost

10   estimate; is that right?

11   A   Yes.

12   Q   The reason why you wanted to get an updated cost estimate

13   is because you wanted to have that cost estimate to share

14   with appraisers in connection with their appraisals of the

15   property in the future; is that right?

16   A   I was getting the cost updated because, as I said, to me

17   that -- they had been very relevant based on -- it was

18   difficult to close that deal.  This issue at the time had

19   been very relevant to the lenders.  I needed to see -- in my

20   mind, I needed to see what the cost would look like today

21   compared to 15 years ago to know where the property stood.

22   Q   Why did you need to know where the property stood?

23   A   It still had the same issue, which was the contamination.

24   Q   Okay.  But why were you getting an updated report, is what

25   I am trying to understand?

1   A   Well, to bring the cost current.

2   Q   To what objective?  To what end?

3   A   So that I would understand what the current cost looked

4   like compared to what I had from 2001.

5   Q   Was it so you would have an ability to negotiate with the

6   limited partner for as low a buyout price as possible and use

7   this as leverage as part of those negotiations?

8   A   It was so I had all the information that I thought was

9   relevant on the property.

10  Q   Let's take a look at Exhibit A-92.  Ms. Tamaro, is that

11  the Phase 1 ESA that EPI prepared?

12  A   Yes.

13  Q   November 3rd, 2016; is that right?

14  A   Yes.

15  Q   You commissioned them to prepare this; is that right?

16  A   Hidden Hills commissioned them.

17  Q   The partnership commissioned the report?

18  A   Correct, that's what it says.

19  Q   The person who actually contacted EPI was you; is that

20  right?

21  A   Correct.

22  Q   In your capacity as the general partner of the Hidden

23  Hills Partnership?

24  A   Correct.

25  Q   So who paid for this?

1    A    The partnership paid for this.

2    Q    And let's go to Exhibit A-93.  Ms. Tamaro, if --

3         Can you go to the second page, Chris?  Go to the first

4    email in the sequence here.

5         So, Brett Carp, who is Brett Carp?

6    A    He is a senior environmental scientist at Environmental

7    Partners.

8    Q    Was he your primary point of contact in connection with

9    work that was performed by EPI for Hidden Hills?

10   A    He was.

11   Q    So this is an email from Mr. Carp to you dated November 8,

12   2016.  It says, "Hi Catherine, I forgot to talk over one item

13   yesterday.  What level of detail do you need for the

14   remediation cost estimate?  I see two options."  Do you see

15   that?

16   A    Yes.

17   Q    Do you recall having a conversation with Brett Carp at EPI

18   immediately before this November 8, 2016?

19   A    I don't recall.  The email does refer to it.

20   Q    Okay.  Is the email -- in addition to referring to having

21   a call, is the email consistent with your recollection that

22   your purpose in getting the Phase I ESI was to take a first

23   step with the ultimate objective of getting a cost estimate?

24   A    Yes.

25   Q    Was this communication that you had with EPI sort of part

1  of the second step of then going ahead and getting the cost

2  estimate?

3  A   Yes.

4  Q   He gives you a couple of different options for cost

5  estimates.  You write back on the same day, "For now, I need

6  the planning level cost estimate.  I will present that to the

7  limited partner right after January 1 and their response will

8  tell me whether I need to obtain the actual quotes.  If the

9  LP challenges the planning level estimate, then I will need

10 to obtain actual quotes."  Do you see that?

11 A   I do.

12 Q   Does this refresh your recollection as to your purpose for

13 obtaining the environmental remediation cost estimates for

14 the Hidden Hills property at this time?

15 A   Yes.

16 Q   Wasn't the reason for you obtaining these cost estimates

17 so that you would have -- be able to present them to the

18 limited partner in connection with what you expected would be

19 a negotiation about their buyout price?

20 A   Would you repeat that?

21 Q   Sure.

22          MR. PETTIT: Can you read the question back?

23              (Reporter read back the requested portion.)

24 A   I felt this information was relevant to the value of the

25 property.

1   Q    Can you answer my question?

2   A    Can you read it one more time?

3                  (Reporter read back the requested portion.)

4   A    I can only respond and say I felt that was information

5   relevant to the price of the property.

6   Q    Before we move off of the Phase I ESA and into the

7   technical memorandum, you didn't tell the limited partner

8   about the fact that you had -- or I should say that the

9   partnership had hired EPI to prepare the Phase I ESA; is that

10  right?

11  A    Not at that time.

12  Q    You understood that any Phase I ESA that you obtained,

13  including the one you did end up obtaining, would need to be

14  disclosed to potential buyers; is that right?

15  A    Say that again.

16  Q    You understood that the Phase I ESA would need to be

17  disclosed to potential buyers of the property, correct?

18  A    I had this one, and I had others that were done on the

19  property over the years.  I have more than one which

20  presumably would all need to be disclosed, yes.

21  Q    Including this new one you prepared in November of 2016?

22  A    Yes.

23  Q    Let's take a look at Exhibit A-95.  This is a later email

24  exchange between you and Mr. Carp, and I will represent to

25  you, you were asking about -- in the bottom of the email you

1    ask about the report.  I think what you are looking for is a

2    link to the ESI report.  He sends you a fresh link and he

3    said, "I must apologize that I am behind on getting the

4    planning level cost estimate over to you.  We have had a

5    scramble.  We are trying to wrap up projects.  I am working

6    to get it out to you before the holiday at the latest."  Do

7    you see that?

8    A    I do.

9    Q    You responded, "I am okay" -- you responded on December 7,

10   "I am okay right now, but was planning to start negotiations

11   with the limited partner right after January 1.  So hopefully

12   you can get some numbers to me sometime in December."  Do you

13   see that?

14   A    I do.

15   Q    You wrote that, right?

16   A    Yes.

17   Q    When you wrote that, weren't you communicating that you

18   intended to use the technical memorandum and cost estimate

19   that EPI was preparing in negotiations with the limited

20   partner right after January 1?

21   A    That is what it appears to be, yes.

22   Q    That would be January 1, 2017, correct?

23   A    Yes.

24   Q    That was the first day of your option exercise period for

25   Hidden Hills; is that right?

Tamaro - Cross

1   A   Yes.

2   Q   Why did you think this would be helpful in negotiations?

3   A   I believed it to be relevant to the value of the property.

4   Q   I'm sorry.  Can you say that again?  I misunderstood.

5   A   I believed it to be relevant to the value of the property.

6   Q   How would that help you in negotiations?

7   A   It would be taken into account in the pricing of the

8   property.

9   Q   It would help bring the buyout price down?

10  A   That would leave me with contaminated property, yes.

11  Q   Contaminated property that you were under no regulatory

12  obligation to clean up; is that right?

13  A   Under no regulatory agreement, you are correct.

14  Q   In fact, you don't have any current plan in place to

15  perform in remediation, do you?

16  A   Right now, I do not, no.

17  Q   You understood at the time, however, that when you

18  solicited the technical memorandum in late 2016, that if

19  remediation happened while the investor limited partner was

20  still a partner, then the general partner would be

21  responsible for paying for those remediation costs, correct?

22  A   Can you read the question back?

23  Q   Sure.  You understood at the time that you commissioned

24  the Phase I ESI and the technical memorandum that under an

25  environmental indemnity agreement, if the remediation

1   happened while AMTAX was still a limited partner, then the

2   general partner would be responsible for covering those

3   costs, correct?

4   A   I am going to say that was not the understanding at the

5   time that the agreement was signed, but it has been decided

6   since then.

7   Q   Well, let's take a listen and look at video clip 240,

8   which is from your deposition in this matter, which preceded

9   the Court's summary judgment, specifically at page -- page

10  376, lines 17 through 22.

11                          (Video clip played.)

12  Q   That was your testimony in your deposition; is that right?

13  A   Correct, that was regarding the voluntary clean-up

14  program.

15  Q   Is there -- I am not sure I understand.

16  A   You were referring to an external requirement, which is

17  different than the voluntary clean-up program.

18  Q   You are saying that if there was a mandatory obligation to

19  clean up the property, then -- while AMTAX was still a

20  partner, then the general partner wouldn't be responsible?

21  A   No.  I am just saying that is what my testimony was about,

22  was the voluntary clean-up program.

23  Q   Let me ask you right now, outside of the context of the

24  voluntary clean-up program, if there was a mandatory

25  requirement that the partnership clean up the property while

1   AMTAX was still a partner, who would pay for it?

2   A   We would first draw down the environmental escrow, then if

3   there was more, then, yes, it would turn to the general

4   partner.

5   Q   Did you take that fact into account when you were deciding

6   to use the environmental costs associated with remediation in

7   your negotiations with the limited partner?

8   A   No, I did not.

9   Q   In fact, you still thought that, notwithstanding that

10  fact, it was appropriate to reduce the appraised value for

11  purposes of determining the limited partner's interest based

12  on contamination; is that right?

13  A   Say that again.

14  Q   Notwithstanding the fact that you as the general partner

15  would be required to remediate the property and pay for it if

16  AMTAX was still a partner, you still thought it was

17  appropriate to reduce the appraised value for purposes of

18  determining AMTAX's buyout price based on the environmental

19  contamination, didn't you?

20  A   Yes.

21  Q   Let's take a look at Exhibit A-104.  So Exhibit A-104 is

22  the technical memorandum?

23  A   Yes.

24  Q   This is the first one, correct?

25  A   Yes.

1  Q    There was a second one, too, later, correct?

2  A    Yes.

3  Q    This one is from January 3rd, 2017; is that right?

4  A    Yes.

5  Q    This is what you hired EPI to do.  This is what you wanted

6  from them, their cost estimate, correct?

7  A    Yes.

8  Q    Let's go to page 9.  I'm sorry.  Give me one moment.

9  Let's go to page 7.  This is their estimate, right?

10 A    Yes.

11 Q    This is their estimate from January 2017.  There is a high

12 end and a low end; is that right?

13 A    Yes.

14 Q    Low end is about 1.5 million, the high end is about 2.5

15 million; is that right?

16 A    Yes.

17 Q    You can see under Task 5 there is a -- under "excavation"

18 it has -- shows a one-foot-low and two-feet-high.  Do you see

19 that?

20 A    Yes.

21 Q    The price for the low and the high there, one is twice

22 what the other one is, right?

23 A    Yes.

24 Q    So does this suggest to you that EPI was giving a cost

25 estimate based on two potential remediation approaches, one

1    that removed one foot of top soil and the other two feet of

2    top soil?

3    A    It would suggest that, yes.

4    Q    Do you know whether or not EPI reached a conclusion as to

5    whether it would be necessary for Hidden Hills to remove two

6    feet of top soil in order to comply with clean-up standards

7    from Department of Ecology for arsenic?

8    A    With this report?

9    Q    At any time.

10   A    I don't know.

11   Q    Now, you didn't provide this technical memorandum to the

12   limited partner at this time, did you?

13   A    At this time, no.

14   Q    You didn't tell them that the partnership had hired EPI to

15   perform -- or to calculate this estimate, right?

16   A    I told them in a letter a little bit later, but not at

17   this time, no.

18   Q    And the partnership paid for this, right?

19   A    Correct.

20   Q    And what benefit was the partnership getting for this

21   report -- preparation of this report?

22   A    Updated information.

23   Q    Why was that updated information valuable to the

24   partnership?

25   A    So it understood the current cost of the clean-up.

Tamaro - Cross

1   Q   Like the Phase I ESI, you understood that the technical

2   memorandum would need to be disclosed to potential buyers,

3   correct?

4   A   I was not thinking about potential buyers at that time.

5   Q   You understood that the technical memorandum would need to

6   be provided or disclosed to potential buyers, right?

7   A   To my mind, that report is not any different than the 2001

8   report, which would also have to be disclosed.  This one

9   brought it current.

10   Q   Did the 2001 report include a cost estimate of remediation

11   of $2.5 million?

12   A   It was less at that time.

13   Q   Okay.  So there is some difference between the two

14   reports, isn't there?

15   A   There has been, yes, over time.

16   Q   If a potential buyer received the 2001 report, there would

17   be nothing in there to suggest would it cost $2.5 million to

18   remediate the property; is that right?

19   A   If they received the old one?

20   Q   Yes.

21   A   Correct.

22   Q   If the new one didn't exist, they wouldn't see anything

23   that says it would cost $2.5 million to remediate the

24   property, right?

25   A   Based on that, yes.

1    Q   Going back to my question, because I don't think you

2    answered it, you understood that it would have to be

3    disclosed to potential buyers, right?

4    A   Presumably, yes.

5    Q   In fact, you testified to that in your deposition, didn't

6    you?

7    A   Okay.

8    Q   Let's take a look at Exhibit A-105.

9           THE COURT:  Let's save that for after the lunch

10   break.  We'll be at recess for an hour and a half.  We will

11   see you back at 1:30.

12                              (Recessed.)

13          THE COURT:  Mr. Pettit, you may proceed.

14          MR. PETTIT:  Thank you, Your Honor.

15   Q   Good afternoon, Ms. Tamaro.  I'd like to start by showing

16   you Exhibit 120.

17          Now, Ms. Tamaro, you talked about this exhibit on your

18   direct examination.  This is the letter that you sent on

19   March 14, 2017 exercising the Hidden Hills option or Section

20   7.4J; is that right?

21   A   Yes.

22   Q   And I'd like to direct your attention to the first page,

23   item 5.

24   A   Yes.

25   Q   So in your letter you state that the cost of remediating

Tamaro - Cross

1    the property's environmental liability fully must be included

2    in the valuation.  The appraiser must consider the arsenic

3    contamination of the soil, the cost of remediating the

4    arsenic and the impact of the contamination and remediation

5    cost on market value.  Do you see that?

6    A    I do.

7    Q    So what you were proposing was instructing the appraiser

8    to reduce the value of the property by the amount of the

9    contamination; is that what you were suggesting there?

10   A    I was attempting to reach agreement with the limited

11   partner that the value would include this offset for the

12   environmental condition.

13   Q    But you wanted the limited partner to agree to instruct

14   its appraiser to reduce any value determination by the cost

15   of the estimated remediation; is that what you were

16   suggesting?

17   A    Yes.

18   Q    The reason that was important to you is because that would

19   help bring down your option price, right?

20   A    I believed, as I said, based on everything that happened

21   when I purchased this property, that the value of the

22   property should be reduced by the cleanup costs.  That is how

23   we had purchased this property.

24   Q    But why didn't you just let the appraisers figure that

25   out?

1   A   In my experience, it had been the bank that drove that

2   requirement.  And the appraisers followed.

3   Q   Can you clarify what you mean by that?

4   A   The lenders dictated that the appraised value would be

5   offset by the cost of remediation.  And the appraisers simply

6   followed their instructions.  That is how it had been when I

7   bought the property.

8   Q   In 2001?

9   A   Correct.

10   Q   And so why didn't you let the appraisers communicate with

11   the lenders and have the lenders give them whatever

12   information that they needed in order to determine a fair

13   market value?

14   A   Well, we didn't have a lender in 2017.

15   Q   So there was no lender, but you still wanted to impose

16   requirements that -- the origins of which came from a

17   previous lender; is that right?

18   A   The origins of which came from my experience with the

19   purchase in 2001.

20   Q   And you said that that experience was that the lender was

21   the one who required this subtraction from the fair market

22   value determination?

23   A   Yes.

24   Q   And in your letter -- if you could, Chris, if you could

25   jump off of that and go into the second page after the

1    enumerated list there -- you say, "For your information, the

2    managing general partner has already identified CBRE as its

3    appraiser, and is ready to proceed with its appraisal."  Do

4    you see that?

5    A    I do.

6    Q    Had you retained CBRE at this time to perform an appraisal

7    in connection with the exercise of your option?

8    A    I don't recall the exact date that I retained them.

9    Q    Well, recognizing you don't recall the exact date, do you

10   recall whether it was before or after you sent this letter?

11   A    I'm sorry, I don't recall.

12   Q    Okay.  But you knew that you were going to use CBRE for

13   this, because in January of 2017 they provided an appraisal

14   to you that did, in fact, reduce the fair market value

15   determination by the cost of remediation; is that right?

16   A    There's more than one part to your sentence.  I did know

17   in January that I would, in all likelihood, be using CBRE as

18   my appraiser, yes.

19   Q    That was because you knew that they would reduce the value

20   of the property by the amount of the remediation costs,

21   right?

22   A    No.  That was because I had just worked with them in the

23   past, and they would be -- I knew they would be the fastest

24   ones to be able to get an appraisal done.

25   Q    You worked with them in the past, including in connection

1    with Hidden Hills, right?

2    A    Correct.

3    Q    In fact, you had them do an appraisal in early 2016 for

4    Hidden Hills, right?

5    A    Yes.

6    Q    That one did not reduce any amount for contamination,

7    correct?

8    A    I believe it did not, correct.

9    Q    Then you got another one after you got all the

10   environmental information to CBRE, and that one did reduce

11   the price, right?

12   A    Yes.

13   Q    It was that experience that you had working with CBRE that

14   made you want to choose them as the appraiser for purposes of

15   exercising your option, correct?

16   A    No.

17   Q    And I think you already said you don't recall whether you

18   had retained CBRE to perform the option appraisal at this

19   point?

20   A    I don't recall when I signed their engagement letter for

21   that appraisal.

22   Q    Let's take a look at Exhibit A-116 at page 2.

23        So I want to direct your attention to the last

24   paragraph on this page.  Now, that says -- this is a

25   letter -- actually, why don't we go back to the first page,

1    Chris.  I'm sorry, I need to establish what this is.

2           Do you see, Ms. Tamaro, that this is a letter from you

3    to Chris Blake dated March 30, 2017?

4    A    I do.

5    Q    Do you see it says, at the top there, "I received your

6    e-mail of March 23, 2017."  And then goes on to discuss some

7    of the back and forth that had been happening about the

8    ground rules for the appraisal; is that right?

9    A    Yes.

10   Q    Now let's go to page 2.  Let's highlight that last

11   paragraph.

12          You write, "The administrative GP has obtained a

13   Phase I environmental site assessment dated 11/3/2016, and a

14   planning-level remediation cost estimate dated January 3,

15   2017, both from Environmental Partners, Inc."  Now, that was

16   the first time that you informed the limited partners that

17   Environmental Partners, Inc. had been retained in any

18   capacity; is that right?

19   A    I believe so, yes.

20   Q    And although you reference the Phase I ESA and the

21   technical memorandum from January of 2017, you don't attach

22   them to this letter, right?

23   A    Correct.

24   Q    You did not send those to the limited partners at this

25   time?

1    A    Not in this communication, no.

2    Q    That didn't come until later; is that right?

3    A    Correct.

4    Q    But you do go on to say, "The cost of soil remediation has

5    increased substantially beyond what was estimated in 2001."

6    What was the basis for that statement?

7    A    That would have been the planning-level remediation cost

8    dated 1/3/17.

9    Q    That's the technical memorandum?

10   A    Correct.

11   Q    You go on to say, "It is unclear whether the investor LP

12   intends to withhold material information from its appraiser

13   or to instruct its appraiser to ignore material information.

14   In either case the administrative GP will not agree to an

15   appraisal process in which the appraisers do not take into

16   account the highly material facts of the property's

17   environmental contamination."  Do you see that?

18   A    I do.

19   Q    Was there ever any point in time that the limited partner

20   or any representative of the limited partner told you that

21   they would not provide information to their appraiser?

22   A    No.

23   Q    Okay.

24        Let's go to Exhibit A-118.  So, Ms. Tamaro, Exhibit

25   A-118 is an e-mail exchange between you and Brett Carp of

1    EPI.  And the top line e-mail -- let's look at the top two

2    e-mails.  Brett Carp sends you an e-mail on April 28, 2017,

3    "Hi Catherine.  Just wanted to check in to see how things

4    were progressing for you."  And you respond that same day,

5    and you say, "The LP and I are negotiating the buyout terms

6    and are not even close to agreement.  Don't close your file

7    yet."

8         Did you consider this to be a negotiation with the

9    limited partner?

10   A    Versus what?  I'm sorry.

11   Q    Well, versus the exercise of a contractual right.

12   A    I don't know.  I didn't think about it.

13   Q    And you say that you're not even close to an agreement.

14   Then you say, "Don't close your file yet" exclamation point.

15   Why didn't you want Mr. Carp to close his file?

16   A    Because I didn't know if I would need further services

17   from them.  And if they close their file, they have to open

18   their file.  And it takes time.  And they charge to do it.

19   Q    And you thought you might need their services in the

20   future to help you with the negotiations that were ongoing;

21   is that right?

22   A    At that time I wasn't sure.

23   Q    So you wanted to keep your options open and instructed EPI

24   not to close their file; is that right?

25   A    Correct.

1    Q   Okay.  Let's go to Exhibit A-122.

2        So, Exhibit A-122 is an e-mail from Christopher Blake

3    to you dated May 11, 2017.  And it -- if you could blow up

4    the text of the e-mail.  That's fine.  Mr. Blake writes,

5    "Hi Catherine.  Following up on our letter from last week,

6    the limited partner's appraisal is attached.  Based on your

7    prior concerns, I want to specifically emphasize that the

8    appraiser, who is familiar with the Tacoma Smelter Plume, was

9    deliberately alerted to the property's soil contamination,

10   and provided with all environmental and soil cleanup

11   documents in our possession.  Please forward a copy of the

12   managing general partner's appraisal promptly upon receipt."

13   Do you see that?

14   A   I do.

15   Q   Mr. Blake's e-mail attached a copy of the Hidden Hills

16   appraisal performed by Cushman & Wakefield, correct?

17   A   Correct.

18   Q   That appraisal was dated May 10, 2017; is that right?

19   A   Correct.

20   Q   So within one day he sent that over to you, right?

21   A   Yes.

22   Q   And the value determination by Cushman & Wakefield was

23   $19.7 million; is that right?

24   A   Yes.

25   Q   All right.  And at the time that you received this, had

1   you retained CBRE to perform an appraisal in connection with

2   the exercise of your option?

3   A   I do not recall specifically what the date was.

4   Q   Okay.  Well, let's take a look at Exhibit A-124.  That

5   might help refresh your recollection.

6        So, if you go -- start at the e-mail at the bottom.

7   There's an e-mail May 11, 2017, which is the same day you got

8   the appraisal from Alden Torch, and you write, "Hi, Todd.

9   Could you do an update on the Hidden Hills appraisal as of

10  March 31, 2017?  I exercised my option to purchase on

11  March 13, 2017, but I neglected to run a rent roll on that

12  date, so I guess the appraisal should be dated March 31st."

13  Do you see that?

14  A   Yes.

15  Q   Does that refresh your recollection as to when you

16  retained Mr. Henderson at CBRE to perform an appraisal in

17  connection with your option?

18  A   Yes.

19  Q   And was it May 11, 2017, or thereabouts?

20  A   Yes.

21  Q   And you say, "Could you do an update on the Hidden Hills

22  appraisal?"  What did you mean by that?

23  A   Well, he already has much of the data.  So he's not

24  starting from scratch.

25  Q   Okay.  So you didn't want him to start from scratch, you

1  wanted him to use what he had used before and then do an

2  update on that; is that right?

3  A   Well, he would have had -- he would have had prior

4  information relevant to the property.  So he didn't -- we

5  didn't need to recreate that.

6  Q   Okay.

7      Let's look at Exhibit A-125.  Now, this is an e-mail

8  exchange that you had with Timothy Flint.  And who is Timothy

9  Flint?

10 A   He is a broker at CBRE.

11 Q   And if we go to the second page of this document, you can

12 see there's an e-mail from you, and it says, "Tim, I am the

13 general partner of the Hidden Hills Apartments in University

14 Place.  The property has completed its 15-year initial LITHC

15 compliance and I am working to buy out the limited partner's

16 interest.  I'm not sure yet if I will be selling or not.

17 Would your firm be able to produce a broker opinion of value

18 for the property?  And if so, what information do you need

19 from me?"  Do you see that?

20 A   Yes.

21 Q   At that time you were considering possibly selling the

22 property?

23 A   Well, I wasn't sure if I would be selling it or not.

24 Q   Mr. Flint responds the same day -- and we're now on the

25 first page of Exhibit A-125 -- and he writes, "Yes, would be

1    more than happy to provide a valuation for you."  Then it has

2    some other information that he'll need in order to prepare,

3    some information about timing.

4         If you click out of that, you look at -- you say, "The

5    timing is fine.  Thanks for responding."

6         Then you send him another e-mail on May 11th.  And it

7    says, "Tim, when you have a chance, I would like to have a

8    conversation, because this property has environmental issues

9    from the Tacoma Plume."  Do you see that?

10   A    I do.

11   Q    Why did you want to discuss that with Mr. Flint?

12   A    For exactly the reason it states, because this property

13   had this particular condition, that was unique to it.

14   Q    Why was that of significance to you?

15   A    Based on my experience purchasing the property, it was

16   very significant.

17   Q    And you wanted to make sure Mr. Flint incorporated that in

18   the work that he performed?

19   A    I wanted to make sure that he understood that, yes.

20   Q    And did you talk to Mr. Flint about the environmental

21   condition of the property?

22   A    I believe I did.

23   Q    Now, you didn't tell the limited partner that you had

24   reached out to Tim Flint at CBRE to perform a broker's

25   opinion of value; is that right?

1    A    Mr. Flint was very clear that, A, he knew Chris Blake;

2    and, B, all of the partners would receive that information.

3    He was extremely clear about that.

4    Q    So is the answer to my question, no?

5    A    I did not directly inform Chris Blake, because I

6    understood from Tim Flint that he would inform Mr. Blake.

7    Q    Okay.  So if Tim Flint hadn't said that, you would have

8    called up Mr. Blake and told him what you had done?

9    A    I don't know.

10   Q    Let's take a look at Exhibit A-130.  The top line e-mail

11   is an e-mail from Andy Noble to Kori Gibbs at Alden Torch

12   saying, "Hi Kori.  Forwarding my exchange with Catherine

13   Tamaro, just in case it comes up."  Do you see that?

14   A    I do.

15   Q    Do you recall having an e-mail exchange with Andy Noble in

16   May 2017 regarding his appraisal of the Hidden Hills project?

17   A    I had looked at a couple of expense items that were

18   actually unrelated to the environmental, and I had some

19   questions about them.

20   Q    Let's go to the next page of the exhibit.  Let's go to the

21   page after that.  Are these the issues that you were

22   referring to?

23        And can you blow that up, Chris, so she can see it

24   better?

25   A    Yes, those are the issues.

Tamaro - Cross

1   Q   Was it your position that Mr. Noble had not properly taken

2   these issues into account in formulating his opinion -- his

3   appraisal?

4   A   When I read his appraisal, I did not see these items in

5   his list of expenses.

6   Q   And these items, if they were taken into account, the

7   effect would be to bring the appraised value lower; is that

8   right?

9   A   If he had left out some pertinent fees, then his appraisal

10  would be higher.

11  Q   By incorporating them, that would bring the appraisal

12  down?

13  A   That would bring the appraisal down, yes.

14  Q   That's what you were advocating for, right?

15  A   I did not see those fees in his appraisal.

16  Q   And you were --

17  A   He did, in fact, respond that, yes, they were in there,

18  they were in a different section.

19  Q   But you reached out to him because you didn't see them

20  there and you thought they should be there, right?

21  A   Correct.

22  Q   Did you inform the limited partner that you would be --

23  that you intended to reach out to Mr. Noble, before you

24  contacted him?

25  A   I don't believe I did.

Tamaro - Cross

1   Q   So let's take a look at Exhibit A-132.  Exhibit A-132 is

2   the CBRE appraisal from June of 2017.  If we go to the next

3   page, do you see that's June 7, 2017?  That's the appraisal

4   that you commissioned in connection with the exercise of your

5   option?

6   A   I do.

7   Q   And this is the third appraisal that you had gotten from

8   CBRE for the Hidden Hills project, since February of 2016,

9   right?

10  A   Yes.

11  Q   Let's take a look at Exhibit A-133.  Exhibit A-133 is an

12  e-mail from Mr. Blake, to you, and he writes, "I was notified

13  that you contacted the LP's appraiser questioning several

14  assumptions that were clearly explained in his appraisal.

15  Please do not contact the LP's appraiser without Alden

16  Torch's prior approval.  We've instructed the appraiser to

17  ignore further inquiries from the GP intended to influence

18  his valuation.  When can we expect to receive the GP's

19  appraisal?"  Do you see that?

20  A   Yes.

21  Q   The day you received the appraisal, Mr. Blake was asking

22  for it.  Do you recognize that?

23  A   Yes.

24  Q   Did you give it to him on that day?

25  A   I don't recall.

1   Q   Do you recall when you gave it to him?

2   A   Not precisely, no.

3   Q   Do you know if it was that week?

4   A   Not precisely.

5   Q   Is there a reason why you didn't give it to him right

6   away, if you had it and he had asked for it?

7   A   Not that I recall.

8   Q   You can't think of any reason why that would be the case?

9   A   I just don't remember.

10   Q   Let's take a look at Exhibit A-134.  That's the broker's

11   opinion of value that was prepared by CBRE and issued the

12   next day, June 8, 2017.  Do you see that?

13   A   I do.

14   Q   Okay.  Now, let's -- do you recall that the value

15   determination that CBRE arrived at in this report was in a

16   range between $20.8 million and $21.8 million for the

17   property?

18   A   I do.

19   Q   Did you provide -- I think you've already testified you

20   did not provide this to the limited partner, correct?

21   A   I was told that Mr. Flint would be passing along this

22   information.

23   Q   Did you ever call Chris Blake to make sure that he had

24   received what Mr. Flint said he was going to pass along?

25   A   No.

1   Q   Let's take a look at Exhibit A-135.  This is an e-mail

2   from Mr. Carp to you saying -- dated June 14, 2017.  So this

3   is one week after you have received the CBRE appraisal.  And

4   he writes to you, "Thank you for your call today.  I'm

5   working on a scope to tighten down the remediation cost

6   estimate."

7           Ms. Tamaro, do you know why he was working on a scope

8   to tighten down the remediation cost estimate?

9   A   I think I had asked him to do exactly that, which is

10  tighten down the remediation cost estimate.

11  Q   So you had asked him to prepare an updated remediation

12  cost estimate; is that right?

13  A   He had prepared an updated remediation cost estimate with

14  a range.  And in 2001 I had worked with a single number.  So

15  to me it was logical to ask Mr. Carp to get it down to a

16  single number.

17  Q   When you received his report, the initial technical

18  memorandum in January of 2017, did you ever tell him that

19  this is not what I was looking for, because it gives me a

20  range instead of a single number?

21  A   When he did the report initially he asked -- getting to a

22  single number took additional work and effort from him.  And

23  so in the beginning he asked, was a range acceptable.  And at

24  that time I said yes.

25  Q   Okay.  And the additional work would be for -- I think

1    what he referred to earlier in his e-mail -- for a

2    planning-level cost estimate; is that right?

3    A    I believe so.

4    Q    And that's what you were retaining him to do now?

5    A    He called it a planning-level estimate.  In my mind I was

6    asking for a single number, because that is what I had worked

7    with previously.

8    Q    Okay.  Is there any reason why you just didn't take the

9    low-end number that he had provided as a conservative way of

10   saying this is an adequate number to use?

11   A    I didn't know if the low end or the high end would be the

12   correct number.  So I asked him to get to a single number.

13   Q    Did you have any idea that it would be outside of the

14   range between the low end and the high end.

15   A    I did not, actually.

16   Q    But it was, correct?

17   A    It did turn out to be, yes.

18   Q    Significantly higher than the high end, right?

19   A    It was.

20   Q    Now, notwithstanding the fact that you e-mailed Mr. Carp

21   on June 14, 2017 and asked for an updated remediation

22   estimate, it's true, isn't it -- Ms. Tamaro, that you never

23   intended to remediate this property, correct?

24   A    Well, as they say, "Never say never."  I wouldn't

25   categorically say "never."

1   Q   Do you recall testifying in your deposition that you

2   thought that Mr. Carp had made a misstatement regarding the

3   possibility that you might remediate because that's not

4   something that you would ever say?

5   A   I didn't intend to remediate it.  I don't intend now.  I

6   can't categorically say never.  That's a different scope of

7   time.

8   Q   Well, let's play your video deposition, and we'll find out

9   precisely what you said there.  It's at pages 439, line 4,

10  through 440, line 23.

11                      (Video clip played.)

12  Q   So does that refresh your recollection as to what your

13  mindset was?

14  A   Yes.

15  Q   Let's take a look at Exhibit A-140.  Exhibit A-140 is a

16  letter dated June 19, 2017, from you to Mr. Blake, and it

17  says, "Dear Chris, enclosed is a copy of CBRE's fair market

18  value appraisal of Hidden Hills Apartments."  Do you see

19  that?

20  A   Yes.

21  Q   You waited until June 19th to send the appraisal over to

22  Mr. Blake; is that right?

23  A   Yes.

24  Q   Was there a reason for that?

25  A   I do not recall.

1    Q   Was it because you wanted to talk to EPI before you sent

2    the appraisal over to the limited partner and you weren't

3    able to do that until June 14th?

4    A   I just don't recall.

5    Q   In the first paragraph of the letter, the last sentence of

6    that paragraph says, "Also enclosed is a copy of a Phase I

7    environmental site assessment dated November 3, 2016,

8    describing environmental conditions at the property."  Do you

9    see that?

10   A   I do.

11   Q   So this June 19, 2017 letter was the first time that you

12   had provided a copy of the Phase I ESA to the limited

13   partners; is that right?

14   A   Yes.

15   Q   But you didn't provide a copy of the January 2017

16   technical memorandum as part of this letter, did you?

17   A   No.

18   Q   And that's the document that actually included an estimate

19   for cost remediation, right?

20   A   Yes.

21   Q   That was not included in the Phase I ESA, right?

22   A   Correct.

23   Q   I want to look at the second-to-last paragraph of this

24   letter that starts with "Cushman & Wakefield."

25           You write, "Cushman & Wakefield's appraisal of Hidden

1    Hills Apartments, commissioned by Alden Torch on behalf of

2    the limited partner, includes no mention of the property's

3    contaminated soil, nor any reference to the many

4    environmental consultant reports that have been generated

5    since 1999.

6         "In my letter dated March 30, 2017, I disclosed to you

7    that I had commissioned an updated Phase I environmental site

8    assessment in 2016; you did not request a copy of this

9    document and presumably you did not disclose its existence to

10   Cushman & Wakefield."

11        Do you see that?

12   A   Yes.

13   Q   So you were criticizing the limited partner for not

14   providing its appraiser with a document that you had not

15   provided to the limited partner?

16   A   Yes.

17   Q   Let's take a look at Exhibit A-146.

18        Exhibit A-146, Ms. Tamaro, is an e-mail -- a lengthy

19   e-mail from you to Todd Henderson.  And the subject is "Short

20   summary of the arsenic at Hidden Hills."  Do you see that?

21   A   Yes.

22   Q   And the top of the e-mail says, "Hi Todd.  To assist when

23   you talk to Andy Noble, I have written a short version of the

24   history of the soil contamination at Hidden Hills."  Do you

25   see that?

1    A    Yes.

2    Q    You go on to say, in that same paragraph, "I would like

3    both you and Andy Noble to have these figures before you try

4    to reach agreement on a fair market value, so don't worry

5    about contacting Andy yet.  As soon as I have the updated

6    cost figures, I will pass them on to you."  Do you see that?

7    A    Yes.

8    Q    Why was it so important to you to have Mr. Henderson get

9    these updated cost memos and then share them with Mr. Noble?

10   A    So that they both had this information.

11   Q    Was it because you wanted them to reduce the appraised

12   value of the Hidden Hills property by the amount of the

13   remediation?

14   A    It had been my experience that that's how the property was

15   appraised.  That's how it was appraised when I purchased it.

16   Q    And you thought that your experience was superior to that

17   of professional appraisers in assessing environmental

18   condition on the property?

19   A    I was -- I had had a certain experience in purchasing that

20   property, in that the appraisal -- the bank instructed the

21   appraiser on how to do it.  The bank thought that that was

22   relevant.  That was how I had seen it handled.

23   Q    Under Section 7.4J, no one is supposed to be instructing

24   the appraisers how to do their job; is that right?

25   A    Yes.

1    Q    Let's take a look at Exhibit A-154.

2         This is a letter from you to Mr. Blake dated July 17,

3    2017.  Your first paragraph says:  "This letter is to

4    acknowledge receipt of your e-mail of June 28, 2017," and

5    expresses no interest in selling the property.  It points out

6    that the investor limited partner cannot compel a sale.  Then

7    you go on to say, "Environmental Partners, Inc. of Issaquah,

8    Washington is obtaining cost figures from an excavation

9    contractor in order to complete a remediation plan, with

10   accurate pricing.  Environmental Partners' planning-level

11   remediation cost estimate completed in January 2017 stated

12   that the estimated cost to obtain a no-further-action letter

13   from the Department of Ecology would be $1.5 million to

14   $2.5 million, which, after accounting for inflation, is in

15   the same range as the 2001 cost estimate of $1.5 million."

16   Do you see that?

17   A    Yes.

18   Q    And so at this point -- this is the first time that you've

19   referenced the existence of the January 2017 technical

20   memorandum, right, to the limited partner?

21   A    I guess so.

22   Q    And you didn't enclose a copy of the January 2017

23   technical memorandum with this letter, did you?

24   A    No.

25   Q    Can you close out of that blowup?  Can you blow up the

1  last paragraph, please?

2       The last paragraph says, "Once Environmental Partners,

3  Inc. receives a response from DOE, it can complete its cost

4  figures.  I will forward that information to you and CBRE.

5  At that point the appraisers from CBRE and Cushman &

6  Wakefield can, in accordance with Section 7.4J of the

7  partnership agreement, attempt to agree on the fair market

8  value of Hidden Hills Apartments."  Correct?  Do you see

9  that?

10  A    Yes.

11  Q    And you wrote that, right?

12  A    Yes.

13  Q    Did you ever forward the second technical memorandum from

14  Environmental Partners to the limited partner?

15  A    I don't believe so.  But I'm not certain.

16  Q    Well, why don't we play a clip from your deposition that

17  will hopefully answer that question or refresh your

18  recollection.  It's pages 471, line 6, through 472, line 1.

19                    (Video clip played.)

20  Q    Let's take a look at Exhibit A-155.

21       So, this is an e-mail, Ms. Tamaro, from Chris Blake to

22  you dated July 18, 2017.  Do you see that?

23  A    I do.

24  Q    So that's the day after you sent your letter, correct,

25  that we just looked at?

Tamaro - Cross

1   A   Yes.

2   Q   So he says, "You received a copy of the limited partner's

3   appraisal on May 11, 2017."  This is Exhibit A-155.  "The

4   general partner's appraisal was completed more than a month

5   ago, on June 7, 2017, and the appraisal you obtained from

6   CBRE was delivered the following day, on June 8, 2017."  And

7   then he says, "For the reasons laid out in my previous e-mail

8   from three weeks ago, I believe it is in all of the partners'

9   best interests to list the property with CBRE.  If the GP is

10  not willing to market the property, a third appraiser needs

11  to be selected immediately, as it is apparent that our

12  appraisers do not agree on value.  Please let me know how you

13  would like to proceed by close of business July 21st."  Do

14  you see that?

15  A   Yes.

16  Q   He goes on to say, "If you intend to continue the

17  appraisal process under the GP's option, please consult with

18  CBRE and provide the names of five appraisers in your

19  response.  Rather, if you prefer that Cushman & Wakefield

20  identify five appraisers, we will deliver a list of

21  appraisers to you and CBRE by the end of the week.  In either

22  case, prior to engaging the final appraiser, I think it is

23  necessary for us to have a conversation about what

24  information will be shared with the third appraiser, and

25  rules for communicating with that appraiser.  I will set up a

1    conference call as soon as the third appraiser is selected.

2    I look forward to your prompt response."

3         Do you see that?

4    A    Yes.

5    Q    So the limited partner at this point is indicating a

6    willingness to go along with the selection of a third

7    appraiser, correct?

8    A    Yes.

9    Q    And has affirmatively asked you to communicate with them

10   and coordinate with them in connection with the selection of

11   the third appraiser, correct?

12   A    Yes.

13   Q    But you didn't do that, did you?

14   A    I did not.

15   Q    Let's take a look at Exhibit A-162.  This is a letter from

16   me to you.  And it's dated August 2, 2017.  Do you recall

17   receiving this letter?

18   A    Yes.

19   Q    And I want to direct your attention specifically -- I'll

20   get past all the lawyer speak and -- give me one moment -- so

21   if you look at the third page of the letter, the last two

22   paragraphs, I write, "In conclusion, to the extent the

23   managing general partner has concerns about the appraisal

24   process, the solution is not to modify that process

25   unilaterally, but instead to agree to market the property for

Tamaro - Cross

1   sale.  Indeed, listing the property for sale and entertaining

2   actual third-party offers, surely is the most accurate and

3   transparent way to determine fair market value, and the

4   investor limited partner would be willing to give the

5   managing general partner a right of first refusal to purchase

6   the property at the price determined by this bidding

7   process."

8       Do you see that?

9   A   Yes.

10  Q   It goes on to say, "Please let us know if you are

11  interested in marketing the property for sale in order to

12  determine its fair value.  If not, we demand that you

13  participate in the appraisal process set forth in Section

14  7.4J, by working with the investor limited partner to select

15  a third appraiser on or before August 16th, and reserve the

16  right to take legal action based on your continuing breaches

17  of the partnership agreement."

18      Do you see that?

19  A   Yes.

20  Q   So, at this point the limited partner is offering to sell

21  you the property at fair market value, correct?

22  A   That's not quite right.  They're asking to put the

23  property on the market.

24  Q   Right.

25  A   Yes.

1    Q    In order to determine its fair market value, right?

2    A    To sell the property.

3    Q    Well, was it to sell the property, or is it, instead, as I

4    wrote in my letter, the most accurate and transparent way to

5    determine fair market value that we would then be willing to

6    give you a right of first refusal to purchase the property at

7    that price?  Is there some reason why that seemed unfair to

8    you?

9    A    I'm not sure how to answer that.

10   Q    Well, was it unfair -- did you accept this proposal?  Let

11   me ask you that.

12   A    To put it on the market?  No, I did not.

13   Q    And accept the right of first refusal to purchase?

14   A    At this time we didn't do anything.  But I have not

15   accepted this proposal.

16   Q    You never accepted this proposal.  And the reason why you

17   didn't is because marketing the property would prevent you

18   from having any influence on what the ultimate value

19   determination is; isn't that right?

20   A    No.

21   Q    Let's take a look at Exhibit A-170.

22         Exhibit A-170 is a letter dated August 11, 2017 from

23   Joseph McCarthy at Stoel Rives.  And it's addressed to me.

24   Have you seen a copy of this letter before?

25   A    Yes.

1   Q   All right.

2       I'd like to direct your attention to -- let's go to the

3   next page.  Next page.  Okay.  Let's look at that large

4   paragraph there in the middle of the page.

5       So, this is a letter from your lawyer to me on

6   August 11, 2017.  And you write -- and I'm looking at the

7   third sentence here.  Excuse me, I'm looking at -- let's

8   start at the top.

9       "Ms. Tamaro hoped that the appraisal process would be

10  sound and meaningful.  Alden Torch's demand that the

11  appraisers not receive information about the hazardous

12  materials and not consider the impact of those materials on

13  value, suggests that the process will not work well.  As a

14  result, Ms. Tamaro is giving serious consideration to your

15  request that the partnership market the property.  If Alden

16  Torch honestly wants to know the market value, disclosure and

17  marketing will tell us."  Do you see that?

18  A   I do.

19  Q   And did you authorize your counsel to include that in the

20  letter that he sent to me?

21  A   Yes.

22  Q   And then there are additional conditions that he places

23  about the need to comply with disclosure, and the condition

24  which we had proposed that you get a right to purchase the

25  property at the final price.  And then there are additional

1    conditions.  Do you see that?

2    A    Yes.

3    Q    So your lawyer was suggesting that we go down this road

4    and explore the possibility of marketing the property in

5    order to determine its fair market value, as an alternative

6    to the appraisal process, right?

7    A    My lawyer and I discussed a sale.  And although I really

8    didn't want to sell, I agreed I would consider this proposal.

9    Q    Do you recall testifying at your deposition that you were

10   genuinely interested in selling the property at the time

11   counsel sent his letter?

12   A    I don't recall that.

13   Q    Let's play page 489, at lines 20 through 23.

14                       (Video clip played.)

15   Q    And I believe I misspoke there.  You said that you were

16   giving serious consideration to it; is that right?

17   A    Yes.

18   Q    Was that a true statement?

19   A    Yes.

20   Q    Well, let's take a look at Exhibit A-152.

21        Exhibit A-152 is notes from a call that you had with

22   Tim Flint on July 11, 2017.  Do you see that?

23   A    Yes.

24   Q    Tim Flint is the person from CBRE who performed the broker

25   opinion of value at your request, correct?

1    A    Yes.

2    Q    Let's go to the second page.  The last paragraph there

3    says, "I told Tim that I would not agree to a sale until

4    Alden Torch was out of the partnership, because if we sell

5    now, Alden Torch gets all the money.  I said Alden Torch

6    cannot force a sale right now, and I would only consider a

7    sale after Alden Torch is out."  Do you see that?

8    A    Yes.

9    Q    Were you telling Mr. Flint the truth there?

10   A    Well, I did write that down.

11   Q    Okay.  So you weren't giving serious consideration to

12   selling the property, were you?

13   A    Well, this was dated in June, and then your letter was

14   subsequent to that.

15   Q    This letter was in July -- sorry.  This is not a letter,

16   this is --

17   A    These are notes to my file --

18   Q    Right.

19   A    -- recounting my experience with Tim Flint in June.  And

20   then your proposal was in, I believe, August, right?

21   Q    So your testimony is that -- let's go back to the first

22   page of this document.

23         So first of all, at the top, what's the date there?

24   A    That is July of 2017.

25   Q    So not June.  July?

```
 1   A    Yes.

 2   Q    And I think the date of my letter was August 2nd.   So

 3   about three weeks later?

 4   A    Yes.

 5   Q    So is it your testimony that over the course of those

 6   three weeks you went from a position that you would

 7   unequivocally not sell the property while Alden Torch

 8   remained as a partner, to giving serious consideration to

 9   Alden Torch's proposal to list and sell the property?

10   A    No.

11   Q    Now, at the time that Mr. McCarthy sent his letter on

12   August 11, 2017, saying that you were seriously -- you were

13   giving serious consideration to selling the property, you had

14   already received the technical memorandum, the second

15   technical memorandum from EPI, correct?

16   A    Yes.

17   Q    Let's pull up Exhibit A-169.  And that's dated August 8,

18   2017, correct?

19   A    Yes.

20   Q    And so that was three days before Mr. McCarthy sent his

21   letter, correct?

22   A    Yes.

23   Q    But Mr. McCarthy's letter did not include a copy of the

24   August 2017 technical memorandum, did it?

25   A    No.
```

Tamaro - Cross

1  Q   In fact, that's true, despite the fact that you had

2  previously told Chris Blake that you would be providing that

3  report, correct?

4  A   I'm sorry, what's the question?

5  Q   You didn't provide that report, through your counsel,

6  notwithstanding the fact that you previously told the limited

7  partner that you would be providing that report, correct?

8  A   Counsel did not provide it.

9  Q   And neither did you, correct?

10 A   Correct.

11 Q   So, instead of providing a copy of the environmental

12 report or following up with the limited partner about the

13 suggestion that they sell, your decision was to -- without

14 disclosing to the limited partner -- reach out to the two

15 appraisers and have them recommend to you a third appraiser;

16 is that right?

17 A   I did do that.

18 Q   You didn't tell the limited partner that's what you were

19 doing, correct?

20 A   Well, we were communicating through counsel.

21 Q   Did your counsel tell the limited partner that's what you

22 were doing?

23 A   I don't believe so.

24 Q   I don't believe so either.

25      And did you instruct your counsel not to provide

1    information to the limited partner relating to your reaching

2    out to these appraisers?

3    A    I don't recall doing that.

4    Q    You knew, from Chris Blake's e-mail in July of 2017, and

5    my letter from August of 2017, that the limited partner had

6    concerns about your attempts to influence the appraisal

7    process, correct?

8    A    There was a great deal of disagreement on how to get that

9    property appraised.

10   Q    They had concerns about what they believed were efforts by

11   you to influence the process, correct?

12   A    They may have.

13   Q    They told you that they did, didn't they?

14   A    They did.

15   Q    They told you that because they did, it was important to

16   them that you coordinate with them in connection with the

17   selection of the third appraiser, right?

18   A    They did say that.

19   Q    But you chose not to do that, correct?

20   A    We were communicating through counsel at this time.

21   Q    And you chose not to tell your counsel to communicate

22   that, correct?

23   A    No.

24   Q    So it's your counsel's fault that didn't get communicated?

25   A    I think you'd have to ask counsel.

1   Q   So let's take a look at the September 6, 2017 e-mail,

2   which is Exhibit A-172.  And this is an e-mail from Todd

3   Henderson to you, Ms. Tamaro, and copying Andy Noble.  Do you

4   see that?

5   A   Yes.

6   Q   Dated September 6, 2017, correct?

7   A   Yes.

8   Q   And it says, "Catherine, Andy and I discussed the

9   appraisers we would recommend for Hidden Hills.  Both names

10  and contact information are below and are taken from the

11  Appraisal Institute's website.  Please let Andy or I know if

12  you need anything further from either of us."  Do you see

13  that?

14  A   Yes.

15  Q   Did you forward this e-mail to the limited partner and ask

16  that you coordinate on selecting one of these two potential

17  appraisers?

18  A   No.  We were communicating through counsel.

19  Q   Ms. Tamaro, my question just asks for a yes or no answer.

20  Did you do that?

21  A   I was not communicating with the limited partner at this

22  point.

23  Q   So your answer was no, you did not do that?

24  A   I did not, no.

25  Q   And Mr. Henderson's e-mail specifically says, "Please let

1   Andy or I know if you need anything further from either of

2   us."  Did you contact Mr. Henderson and say:  Well, gee whiz,

3   Todd, this agreement requires you to pick one appraiser and

4   you have given me two here.  So you guys have to get back and

5   tell me which one of these two you are appointing.  Did you

6   do that?

7   A    No.

8   Q    No.  Instead you took it upon yourself to reach out to

9   Colliers and engage them to perform the third appraisal,

10  without telling the limited partner, correct?

11  A    I did not notify the limited partner.

12  Q    Let's take a look at -- give me one second.

13       Let's take a look at Exhibit A-183.  This is an e-mail

14  dated September 13, 2017.  So it's one week after you

15  received the names of the two potential appraisers from

16  Mr. Henderson, correct?

17  A    Yes.

18  Q    And on September 11, 2017, Mr. Carp from EPI reached out

19  to you and said, "Hi Catherine.  Just wanted to check in to

20  see how things are progressing for you.  I trust all is

21  well."

22       And you responded on September 13, 2017, and you wrote,

23  "Hi Brett.  The LP and I decided to get one more appraisal

24  done on the property, so we are waiting for the results.  I

25  appreciate having the new cleanup estimate because it makes

1   it easier to value the property."  Do you see that?

2   A   Yes.

3   Q   Now, the first sentence of your e-mail was a false

4   statement, correct?

5   A   Yes.

6   Q   Did you ever correct that statement?  Did you ever inform

7   Mr. Carp that, as a matter of fact, you had not agreed with

8   the limited partner to get a third appraisal, but instead you

9   were going behind the limited partner's back to get that

10   appraisal without their knowledge?

11   A   I did not correct that statement.

12   Q   Let's take a look at Exhibit A-184.  And this is an e-mail

13   exchange between you and the appraisers from Colliers, also

14   dated September 13, 2017.  Do you see that?

15   A   Um-hum.

16   Q   And at the top of this exhibit is an e-mail from you where

17   you say, "Hi John and Cory."  And John is John Campbell and

18   Cory is Cory Hutsell; is that right?

19   A   Yes.

20   Q   And those are both appraisers at Colliers?

21   A   Yes.

22   Q   And they performed the Colliers appraisal at issue in this

23   action, correct?

24   A   Yes.

25   Q   You wrote, "Hi John and Cory.  I realized you've just

1  gotten started on this property, but I was wondering if we

2  could set a date for your inspection?  I'd like to meet you

3  there to talk about the environmental issue.  I teach at UW,

4  and school is starting in a couple weeks, so I'm trying to

5  set my schedule."

6          So, first of all, why did you want to meet Mr. Hutsell

7  and Mr. Campbell at the property in order to discuss the

8  environmental issue?

9  A    So that they could see the property.

10 Q    Did they need you there in order to see the property?

11 A    It's easier if I'm there.

12 Q    But that's not the reason that you gave in your e-mail for

13 why you wanted to meet them there, right?

14 A    I said, "I'd like to meet you there to talk about the

15 environmental issue."

16 Q    You didn't say:  I'd like to meet you there because it

17 will be easier for you to walk the property if I'm there,

18 right?

19 A    No.  You asked me why I would meet them there and I gave

20 that answer.

21 Q    Okay.  So when you said in your e-mail, "I'd like to meet

22 you there to talk about the environmental issue," that wasn't

23 truthful?

24 A    I'm sorry, what is your question?

25 Q    My question is whether you invited them to the property

1    because you wanted to talk to them about the environmental

2    issue.

3    A    Yes.

4    Q    Okay.  And you wanted to talk to them about that,

5    notwithstanding the fact that you had already provided all of

6    the environmental reporting, including the most recent

7    technical memorandum from EPI, correct?

8    A    Yes.

9    Q    You wanted to make sure that notwithstanding the fact that

10   they had all that information, you wanted to give them your

11   color and your interpretation of what that information said,

12   right?

13   A    I wanted to show them the property.

14   Q    You wanted to talk about the environmental issue.  That's

15   what you wrote, correct?

16   A    Yes.

17   Q    Then you go on to say, "I teach at UW, and school is

18   starting in a couple of weeks, so I'm trying to set my

19   schedule."

20   A    Yes.

21   Q    Now, you testified -- I asked you specifically at the

22   beginning of your examination whether you had taught before,

23   and you said no.  And I asked -- we asked at your deposition

24   if you had taught at the university level before, and you

25   said no.  Why were you telling him that you teach at UW?

1  A   I assist my advisor with her seminar.  And that is what I

2  was referring to here.  I am not an appointed instructor at

3  the University of Washington.

4  Q   But you didn't want to make that clarification when I

5  asked you if you taught at the university?

6  A   You just asked if I teach there.  I'm not an appointed

7  teacher there.

8  Q   So when you say on your e-mail, "I teach at UW," that's a

9  false statement?

10  A   I am not an appointed instructor at the University of

11  Washington.

12  Q   Now, isn't it true, Ms. Tamaro, that you did not inform --

13  and, in fact, neither you nor your counsel informed the

14  limited partner, or its counsel, that you had hired Colliers,

15  until September 22, 2017?

16  A   If that is the date when my counsel notified them, then

17  that would be correct.

18  Q   Do you recall at the beginning of the examination I asked

19  you about providing a declaration to the Court, when this

20  case was still in state court, in support of a motion for a

21  preliminary injunction?

22  A   Yes.

23  Q   Do you remember that?

24  A   Yes.

25  Q   And we took a look at that this morning?

1   A   Yes.

2   Q   I'd like to direct your attention to -- and we're going to

3   put this up on the screen -- the declaration at pages 5 and

4   6.  It's actually paragraph 18.

5       Paragraph 18 says, "I provided Colliers with the same

6   documentation and information that I previously provided to

7   CBRE.  On September 22, 2017, HHM informed AMTAX's counsel

8   that HHM had retained Colliers to conduct the third appraisal

9   and provided AMTAX with Colliers' contact information."  Do

10  you see that?

11  A   Yes.

12  Q   And you gave this statement under oath, correct?

13  A   Yes.

14  Q   And so presumably this is a truthful statement that the

15  first time you disclosed the existence of the third appraiser

16  was September 22, 2017?

17  A   Presumably.

18  Q   So you waited more than two weeks, even though you knew

19  that the parties were discussing marketing the property as an

20  alternative to appraisal, and further knew that the limited

21  partners were concerned you would manipulate the process; is

22  that right?

23  A   I'm sorry, repeat that.

24  Q   So you waited more than two weeks, even though you knew

25  that the parties were discussing marketing the property as an

1    alternative to getting a third appraisal, and even though you

2    also knew that the limited partners were concerned that you

3    were manipulating the process?

4    A    We were communicating through counsel.

5    Q    Let's take a look at Exhibit A-204.   Now, this is a draft

6    of the Colliers appraisal that was ultimately issued on

7    Hidden Hills.   Do you see that?

8    A    Yes.

9    Q    Okay.   Let's go to the second page of that.   And the value

10   determination there is $16,510,000.   Do you see that?

11   A    Yes.

12   Q    So in the draft that Colliers sent to you, the proposed

13   value or the value determination they made was a little over

14   $16.5 million; is that right?

15   A    Yes.

16   Q    Let's go to the third page of this document.   And let's go

17   down to the extraordinary assumptions.   And I want to

18   specifically direct your attention to the third paragraph

19   there.

20        "The costs to remediate the contaminated soil are

21   estimated at $3,760,450, and based on the technical

22   memorandum provided by Environmental Partners.   Also the

23   report's findings would not have been different if the report

24   was published in March, 2017."   Do you see that?

25   A    Yes.

1    Q    So at the time of this draft report, they had already

2    reduced the value by the $3.76 million amount that was

3    reflected in the second technical memorandum.  Correct?

4    A    Yes.

5    Q    And so that $16 million is already discounted, based on

6    environmental contamination, right?

7    A    I believe so.

8    Q    So let's take a look now at A-205.

9         A-205, if we scroll down -- or if you go to the next

10   page.

11        So the bottom e-mail there is from Cory Hutsell to you.

12   And it says, "Catherine, please find the attached invoice and

13   draft report for Hidden Hills."  Do you see that?

14   A    I do.

15   Q    And so you had an opportunity to review a draft of the

16   Colliers report before it was finalized; is that right?

17   A    Yes.

18   Q    At the time that you received a draft of the report, did

19   you, or did you instruct your counsel to forward it along to

20   the limited partner so that they would have the same

21   opportunity to comment?

22   A    I don't believe so.

23   Q    Okay.  I don't want to go through all of your comments

24   here because I don't want to take up additional time.  Let's

25   go back to the first page.  But you have a number of comments

1   here regarding the appraisal -- or the draft appraisal that

2   Colliers had performed, correct?

3   A   Yes.

4   Q   And you sent these -- you see the e-mail -- you sent these

5   along to Cory and John at Colliers on October 19, 2017.

6   Correct?

7   A   Yes.

8   Q   Let's take a look, now, at A-210, which is the final

9   Colliers appraisal.  Let's go to page 2 there.

10          And if you look at the value there on the October 23,

11  2017 final determination of value on the final appraisal,

12  it's $3 million lower.  Do you see that?

13  A   I do.

14  Q   And that was because of suggestions or issues that you

15  raised in your comments on October 19th, correct?

16  A   In my comments, Cory Hutsell -- Hidden Hills has two

17  different regulatory agreements and a somewhat complex

18  set-aside structure for its low-income units --

19  Q   Ms. Tamaro, I'm just asking you whether this reduction was

20  made because of a suggestion you made?

21  A   Yes.  And Cory Hutsell had not understood the second

22  regulatory agreement from the Pierce County Housing

23  Authority.  And I was clarifying for him how the second

24  regulatory agreement worked.

25          When he incorporated that information into his model, it

1   resulted in this different value.

2   Q   Okay.  So after you educated him on why his price was too

3   high, he brought it down another $3 million; is that right?

4   A   I educated him on how the second regulatory agreement

5   worked, under the Revised Code of Washington.

6   Q   Did you give the limited partner an opportunity to weigh

7   in on whether your interpretation of that issue was accurate?

8   A   No.  I was confident in my interpretation of that

9   information.

10  Q   So you provided a copy of the final Colliers appraisal to

11  the limited partner, correct?

12  A   Someone did.

13  Q   And you took the position that this was the final and

14  binding appraisal, for the purposes of 7.4J, of the limited

15  partner agreement?

16  A   Yes.

17  Q   And did the limited partners remove you as the general

18  partner of the partnership at that time?

19  A   That was what they attempted to do, yes.

20  Q   Well, that's not what they did right away, was it?  There

21  were further overtures to try to resolve this issue without

22  having to remove you.  Isn't that right?

23  A   There was further communication.

24  Q   Yeah.  Let's take a look at Exhibit A-212, which is

25  another letter from me.  This one is dated November 3, 2017.

1   It's a very lengthy letter.  I'm not going to go through it

2   all, but I do want to direct your attention to page 6, the

3   bottom half of that page.

4        And I write, "In an effort to resolve this dispute as

5   efficiently as possible, the investor limited partner is

6   willing to accept any of three possible options:  The first

7   option is for the managing general partner to agree to allow

8   the investor limited partner to work with CBRE and to market

9   and sell the property.  As you acknowledged in your

10  August 11, 2017 letter, marketing the property for sale will,

11  by definition, provide us with the most accurate

12  determination of fair market value.

13       "The second option is for the managing general partner

14  to purchase the investor limited partner's interest, based on

15  the property's midpoint value as determined by CBRE, in the

16  BOV that you commissioned and subsequently hid from the

17  investor limited partner, i.e., $21.3 million.

18       "The third option is for your client to cooperate

19  voluntarily with its removal as the managing general

20  partner."

21       Then it goes on to say, "To the extent that the

22  managing general partner refuses to accept any of the three

23  options, the investor limited partner will have no choice but

24  to exercise its right to remove your client."

25       Do you see that?

Tamaro - Cross

1   A   I do.

2   Q   And you did not accept any of those three options, did

3   you?

4   A   No.

5   Q   The last sentence of my letter asks that you -- you to

6   please advise -- this is written to your lawyer, so it says,

7   "Please advise as to how your client wishes to proceed, no

8   later than next Wednesday, November 8, 2017."  Do you see

9   that?

10  A   I do.

11  Q   And did your lawyer respond on August 8, 2017?

12  A   On August --

13  Q   I'm sorry?

14  A   What date was this letter written?

15  Q   This letter was written -- I'm sorry.  Did I say August?

16  A   Yes.

17  Q   I meant November.  My apologies.  This was written on

18  November 3, 2017, and requested a response by November 8,

19  2017.  And my question is:  Do you know if your counsel ever

20  provided a response to that letter?

21  A   Most likely, yes.

22  Q   You're right, he did.  So let's take a look at A-214.

23      So this is a letter -- another letter from Joseph

24  McCarthy at Stoel Rives, November 8, 2017.  And it says,

25  "Dear Mr. Pettit.  I received your lengthy letter on Friday,

1    November 3rd.  You imposed a November 8th deadline for a

2    response.  Your deadline is unreasonable, in light of the

3    length and rhetoric of your letter, and your client's threat

4    to remove the general partner unless it accedes to your

5    demands.  I will respond by the 15th."  Do you see that?

6    A   I do.

7    Q   And Stoel Rives responded before November 15th; isn't that

8    right?

9    A   Well, November 8th is before the 15th, yes.

10   Q   Well, this letter says, "I will respond by the 15th."  So

11   I understand that to mean that Stoel Rives would further

12   respond to my November 3rd letter by November 15th.  Is that

13   how you take it?

14   A   I'm sorry, what's the question?

15   Q   My question is whether you understood this letter to be

16   communicating to me that Stoel Rives would get back to me by

17   November 15th.

18   A   Mr. McCarthy wrote this letter.

19   Q   And so are you saying that you don't understand what this

20   letter is saying?

21   A   I see what it says.  Yes.

22   Q   What do you understand it to be saying?

23   A   Well, exactly what it says, yes.  And it said he would

24   respond by the 15th.

25   Q   I'm not trying to trick you on anything here.  I promise.

1       So let's take a look at a letter -- this has not been

2   marked as an exhibit, but it's a letter from counsel at Stoel

3   Rives, November 14, 2017, so the day before Mr. McCarthy said

4   he was going to get back to me on the options that I had

5   suggested at the behest of my client.

6       And on November 14, 2017 Mr. Pritchard -- excuse me,

7   Mr. McCarthy from Stoel Rives says, "I am responding to your

8   letter of November 3rd.  In your letter you reject the

9   Colliers appraisal and demand that the general partner either

10  let the limited partner market and sell the property, or

11  purchase the limited partner's interest at a value of

12  $21.3 million, or resign as general partner."

13      Then the letter goes on to say, "After discussing your

14  letter with my client, we have concluded there is no reason

15  to discuss this matter further.  Enclosed please find a copy

16  of the complaint in Hidden Hills Management versus AMTAX 114

17  that was filed in the Superior Court for Pierce County,

18  Washington today."  Do you see that?

19  A   Yes.

20  Q   During a time Mr. McCarthy asked me to forbear because he

21  needed to review my letter and get back to me, he was

22  preparing a complaint to file in state court; is that right?

23  A   Presumably.

24  Q   Okay.  And at that point, on November 14, 2017, you had

25  not been removed as the general partner; is that right?

1    A    I believe so.

2    Q    And, in fact, let's take a look at Exhibit A --

3              THE COURT:  Mr. Pettit, let's take that up after the

4    midafternoon break.  We'll be at recess for 15 minutes.

5                        (Recess.)

6              THE COURT:  Mr. Pettit, you may proceed.

7                   CROSS-EXAMINATION (Resumed)

8    BY MR. PETTIT:

9    Q    Ms. Tamaro, I would like to show you Exhibit A-222.  You

10   will see that this is an email from Anthony Olivo at Alden

11   Torch to you, attaching correspondence.  Do you see that?

12   A    Yes.

13   Q    The date is November 30th, 2017?

14   A    Yes.

15   Q    If you go to the next page of this exhibit, you will see

16   there is a letter there reporting to remove you, Hidden Hills

17   Management, as the general partner of Hidden Hills.  Do you

18   see that?

19   A    I do.

20   Q    This is the removal notice that is being challenged by you

21   in this case, correct?

22   A    Correct.

23   Q    That was served on you after you had filed a lawsuit

24   against your limited partner; is that right?

25   A    Yes.

1   Q   Quickly, for purposes of making sure I have the right

2   record here, I would like to pull up Exhibits A-94, A-101,

3   A-148, A-159 and A-171.  Those are all invoices from

4   Environmental Partners, Inc., and we can go through them one

5   by one, or you can just -- if you feel confident without

6   having to confirm them.  My question is whether the

7   partnership paid all of these invoices to EPI?

8   A   Yes, it did.

9   Q   Now, over the course of this lawsuit, your calculation of

10  the option price to which AMTAX is entitled, based on your

11  exercise for Hidden Hills, has evolved, is that fair to say,

12  or changed over time?

13  A   There have been some adjustments, yes.

14  Q   Let's take a look at your declaration that we were looking

15  at before, which you filed in state court in late 2017.  I

16  would like to particularly direct your attention to pages 6

17  and 7 of that document.  All right.  I do have the right

18  document.  Let's go back one page.  I'm sorry.  I will come

19  back to this.  I'm sorry.

20       Let's go to Exhibit 239, page 6.

21          THE COURT:  Exhibit A-239?

22          MR. PETTIT:  I'm sorry.  Yes, Exhibit A-239.

23  BY MR. PETTIT:

24  Q   Ms. Tamaro, Exhibit A-239 are interrogatory responses that

25  the general partners served in connection with the Hidden

1    Hills portion of this dispute.  Interrogatory No. 8 asks you

2    to describe the factual basis of your allegation in paragraph

3    31 of the complaint that you have calculated the purchase

4    price you must pay in connection with the exercise of the

5    buyout option to be $531,748.  Do you see that?

6    A    Yes.

7    Q    In your response to that interrogatory you say, "HHM sent

8    to AMTAX's counsel a letter dated December 18th, 2017 in

9    which HHM revised the relevant calculation of the purchase

10   price and acknowledged a total due to the limited partners of

11   $1,051,856."  Do you see that?

12   A    Yes.

13   Q    Says, "The previous purchase price of 531,748 was arrived

14   at because HHM, in accordance with 6.2.B.8 of the LPA,

15   included a distribution of the positive balance in its

16   capital account in the spreadsheet.  After consulting with a

17   tax attorney, HHM adjusted its capital account by the amount

18   of HHM's deferred developer fee that had been converted to a

19   capital contribution.  Once that adjustment was made, the

20   amount due to the investor limited partner and special

21   limited partner increased to a little over one million."  Do

22   you see that?

23   A    Yes.

24   Q    The number that you put in the complaint you filed was

25   inaccurate; is that right?

1  A   No.  I would not say inaccurate.

2  Q   Well, your tax attorney thought it needed to be adjusted;

3  is that fair to say?

4  A   I consulted with the tax attorney.  Tax issues are not

5  always straightforward.  Tax attorney gave me his conclusion,

6  and I modified my spreadsheet to reflect the tax attorney's

7  conclusion.

8  Q   It was the tax attorney's conclusion that 531,748 was too

9  low; is that right?

10 A   It was the tax attorney's conclusion that in that

11 particular line item of the spreadsheet, I needed to make an

12 adjustment and the adjustment was in favor of AMTAX 114.

13 Q   Okay. He didn't say anything about the number.  He just

14 said there needs to be an adjustment, and the result of the

15 adjustment was that the number went up?

16 A   Correct.

17 Q   Okay. I would like to show you Exhibit 155, which is

18 something that you were asked about on direct examination.

19 This is a letter from you to Chris Blake at Alden Torch

20 Financial.  It is dated May 7, 2020.  I think you

21 acknowledged on direct examination that that is a typo, and

22 that the correct date this was sent was May 7, 2019; is that

23 right?

24 A   Yes.

25 Q   The first paragraph of your letter there says, "Pursuant

1   to Section 7.4.J of the limited partnership agreement, Hidden

2   Hills Management accepts the Cushman & Wakefield appraisal of

3   $19,700,000 as the basis for calculating the fair market

4   value of the interest of AMTAX 114 and Protech."  Do you see

5   that?

6   A   I do.

7   Q   It goes on to say, "Pursuant to Sections 6.2.B.2 and 7.8.D

8   of the LPA, HHM's payment to AMTAX and Protech will be

9   $4,968,506."  Do you see that?

10  A   I do.

11  Q   First of all, we already talked about Section 6.2.B.2,

12  that's the sales proceed waterfall; is that right?

13  A   Yes.

14  Q   What is Section 7.8.D?

15  A   That is the section that covers the disposition of the

16  environmental escrow.

17  Q   In the partnership agreement for Hidden Hills, there is

18  actually a separate section that deals with how you -- to the

19  extent that there is still money in the environmental

20  reserve, how that would be distributed among the partners

21  upon dissolution or liquidation; is that right?

22  A   Correct.

23  Q   First of all, where in Section 7.4.J of the partnership

24  agreement does it allow one of the partners to accept the

25  appraisal performed by the other partner?  Is that anywhere

1    in Section 7.4.J?

2    A    No, there is not such a provision.

3    Q    In fact, Section 7.4.J lays out a very specific process

4    for how the option price is determined; is that right?

5    A    It does.

6    Q    It requires each of the limited partners to appoint an

7    appraiser, and if those appraisers can't agree, then they

8    jointly select a third appraiser, and that appraisal will be

9    final and binding; is that right?

10   A    Yes.

11   Q    That's not what you are purporting to do in the May 7th,

12   2019 letter, is it?

13   A    We are accepting the appraisal in order to calculate the

14   value of the interest under Section 7.4.J.

15   Q    Isn't it true, Ms. Tamaro, that you were accepting this

16   appraisal that happened two years before because you were,

17   once again, trying to circumvent or avoid the process that's

18   specifically described in Section 7.4.J?

19   A    No.

20   Q    Let's look at Exhibit A-295.  This is an email from your

21   counsel, Mr. Goodnight, to me dated May 21st, 2019,

22   responding to an email I sent to him a couple days earlier --

23   a few days earlier regarding the waterfall calculation for

24   Hidden Hills.  Do you see that?

25   A    I do.

1  Q   I had responded to the letter suggesting that the purchase

2  price be 4.9 million by raising issues with the fact

3  calculation and stating that, while disagreeing that

4  Cushman & Wakefield was the controlling appraisal, even under

5  that appraisal, the amount that you had was too low; is that

6  right?

7  A   You had highlighted three areas where you said there were

8  differences between my calculations and AMTAX 114's

9  calculations.

10  Q   Those calculations resulted in an option price that was

11  lower than it would otherwise be; is that right?

12  A   I don't know "otherwise be."

13  Q   That's fair.

14  A   I made some assumptions when I was putting together my

15  spreadsheet.  For example, this 3 percent, this could have

16  been resolved a long time ago.  There had not been dialogue

17  between the general partner and limited partner, but that is

18  two different parties making their own assumptions, and I

19  agreed to accept AMTAX's assumption on that 3 percent.

20      On the priority of loan repayment, I received your

21  comment, and I looked at the financial statements.  I looked

22  at the partnership agreement, and I agreed that AMTAX had

23  caught an error.  I corrected it, and it will get corrected

24  in the financial statements.

25  Q   Is it the responsibility of the limited partner to catch

Tamaro - Cross

1   errors that the general partner makes that result in material

2   negative adverse impact -- economic impact on the limited

3   partner?

4   A   I cannot imagine why they wouldn't look at the numbers

5   also and come back and say this is what we see.

6   Q   Do they have an affirmative obligation to do that or can

7   they trust that their fiduciary will provide a correct

8   calculation?

9   A   I would expect them to review the numbers on their own.

10  Q   When you were asked about this change in the number over

11  time, and particularly this change from the 4.9 million to

12  the 5.6 or 5.7 million, you said, well, this is a negotiation

13  process and that's how it goes sometimes.  Do you remember

14  testifying to that?

15  A   In terms of the back and forth on making corrections to

16  the spreadsheet, for example, the 3 percent, that is nobody's

17  error.  That is two different interpretations of how to

18  approach modeling a hypothetical sale.  AMTAX had their way

19  to do it, and I agreed to use their way.  That is nobody's

20  error.  The financial statements I had, yes, I had applied

21  loan repayments in the incorrect priority.  I acknowledged

22  that, and I corrected it.

23  Q   Did you -- in your mind, was this a negotiations -- I

24  mean, you describe it as a negotiations process.  Were you

25  using a lower number and sort of hoping that that could

1  squeak by, and only when the limited partner raised a concern

2  about it you said, oh, well, I will correct this and make it

3  higher; is that what happened?

4  A   No.

5  Q   I would like to turn your attention to Parkway. I would

6  like to spend a couple minutes going over the documents you

7  looked at in direct examination regarding Parkway's exercise

8  of its option.

9          If you could pull up Exhibit 128, please.

10          So Exhibit 128, Ms. Tamaro, is your letter purporting

11  to exercise the general partner's option under Section 7.4.J

12  of the Parkway LPA; is that right?

13  A   Yes.

14  Q   This is two days or three days after the beginning of the

15  option period for Parkway; is that right?

16  A   Correct.

17  Q   In this letter you say, in the last sentence, "The

18  administrative general partner has identified CBRE as its

19  appraiser, and estimates CBRE will be ready to proceed with

20  its appraisal by the end of January 2018." Do you see that?

21  A   Yes.

22  Q   Was it Todd Henderson again who you went to, to perform

23  this appraisal?

24  A   Correct.

25  Q   You didn't -- was it the case that when you sent this

1   letter on January 3rd the appraisal hadn't been completed

2   yet?

3   A   It takes us about to the end of the month to post all the

4   bills for the previous year, which gives accurate profit and

5   loss.  We can't do it right on the 3rd day of January because

6   Todd wants to see profit and loss, and that includes expenses

7   and invoices.  They can take a few weeks to all be collected

8   by us.

9   Q   I see.  So what you are saying is that it will be -- they

10  won't be -- this is actually not reading it more clearly.

11  They will be ready to proceed with their appraisal by the end

12  of January 2018; is that right?

13  A   Correct.

14  Q   That was for the reason you just described?

15  A   Correct.

16  Q   So at the time that you sent that letter, there was -- you

17  hadn't even gotten an appraisal yet; is that right?

18  A   I had not obtained an appraisal dated at the end of 2017.

19  I had told Todd that it would take us through the month of

20  January, which is not unusual for the -- all of the year end

21  invoices to be received and posted so that he had accurate

22  profit and loss figures for 2017.

23  Q   Even if the limited partner had gotten back to you on

24  January 4th, 2018, the next day and said, we appoint this

25  person, they wouldn't be able to start their appraisal at

Tamaro - Cross

1   that point, right, they would have to wait?

2   A   It would be advisable to wait for the December invoices to

3   all be received and posted.

4   Q   So there was no real urgency to have a response to your

5   letter immediately when you sent it on January 3rd, 2018,

6   correct?

7   A   I am not sure what you mean by that.

8   Q   What I mean is that in your letter you say that CBRE, the

9   appraiser you have identified, isn't going to even begin

10  starting their appraisal until the end of the month, so there

11  wasn't any urgency reflected in your letter that you needed

12  to have an immediate response, was there?

13  A   I'm sorry.  I don't know how to answer that.

14  Q   Is there anything in your letter that requested immediate

15  response?

16  A   No.

17  Q   Let's take a look at Exhibit 131.  This is a February

18  15th email -- February 15th letter, also from you, also to

19  Mr. Blake.  At this point, on February 15th, you say that

20  334th Place 2001, LLC, which is the general partner, has

21  completed its appraisal requirement and has in hand an

22  appraisal by CBRE dated January 1st, 2018.  Do you see that?

23  A   I do.

24  Q   Now, you did not provide the limited partners with a copy

25  of CBRE's appraisal with this letter, did you?

1  A    It was not included with this letter, no.

2  Q    You had it in hand, but you elected not to provide it,

3  correct?

4  A    Yes.

5  Q    And your -- the last paragraph of your letter says, "AMTAX

6  has received all documentation necessary for it to obtain an

7  appraisal of the project.  As of this date, the GP has not

8  received any acknowledgement or response, therefore I am

9  requesting that you inform me of the date when you anticipate

10  receiving completed appraisal of the project."  Do you see

11  that?

12  A    Yes.

13  Q    You were asking for a response there, correct?

14  A    Yes.

15  Q    You got a response on March 6th, 2018; is that right?

16  A    Yes.

17  Q    Let's look at Exhibit 132.  This is a letter from Alden

18  Torch to you dated March 6, 2018.  If you look at the -- you

19  will see that it is responding to the letter to Chris Blake,

20  February 15th, 2018, which was received on February 21st,

21  2015 (sic).  You will see that paragraph goes on to say, "You

22  claim that you have an appraisal in hand.  Your letter fails

23  to enclose a copy of the CBRE appraisal or to provide any

24  information about how it was obtained.  Given what we believe

25  and have alleged was bad faith conduct on your part in the

1   appraisal process for the Hidden Hills Apartments, a matter

2   which, as you know, is currently the subject of ongoing

3   litigation, we must have an opportunity to review the CBRE

4   appraisal and understand the circumstances surrounding its

5   preparation.  We accordingly request you send us a copy of

6   the CBRE appraisal referenced in your letter as well as any

7   communications you had with CBRE appraiser concerning the

8   Parkway Apartments."  Do you see that?

9   A   I do.

10  Q   The litigation that is being referenced there is this

11  litigation, correct?

12  A   Yes.

13  Q   This litigation was already in process at the time that

14  you exercised your option for Parkway; is that right?

15  A   Yes.

16  Q   Now let's look at the next paragraph of this letter, which

17  is at the bottom of the first page of Exhibit 132.  Says,

18  "AMTAX is also in the process of evaluating questionable

19  activity by the general partner in its capacity as a general

20  partner, including a failure to maximize rental income, the

21  growth of operating expenses at rates that are

22  disproportionately higher than comparable properties, and the

23  payment of fees and distributions to 334th Place or its

24  affiliates that either are not permitted by or in excess of

25  amount permitted by the partnership."  Do you see that?

 1   A   I do.

 2   Q   The limited partner is telling you we are working our way

 3   through this, right?  They say, "We are in the process of

 4   evaluating questionable activity," correct?

 5   A   They say they are in the process of evaluating

 6   questionable activity.

 7   Q   They go on to give you a general description of some of

 8   the activity they were investigating, correct?

 9   A   Yes.

10   Q   You knew they were following up on your exercise, right?

11   A   I knew what they said in this letter.

12   Q   Just wasn't quickly enough for you; is that fair to say?

13   A   No.

14   Q   Do you think that they were not being honest about the

15   evaluation that they were doing or that they referenced in

16   their letter?

17   A   No.

18   Q   No, you don't think they were being honest?

19   A   I'm sorry.  What is your question?

20   Q   I will strike the question.  I will withdraw the question.

21   The judge has to strike it.  I withdraw.

22        135.  Let's look at Exhibit 135.  May 8, 2018.  This is

23   the letter that substantively responds and addresses all of

24   the issues that they have been evaluating; is that right?

25   A   This is their response.

Tamaro - Cross

1   Q   This letter includes a number of items that have now

2   become the subject of this litigation, correct?

3   A   They have listed what they have listed.

4   Q   The things they have listed there are some of the things

5   that they have challenged in this lawsuit in their

6   counterclaims, correct?

7   A   Yes.

8   Q   Let's talk about some of these fees.  I want to start with

9   one of the fees that Ms. Latsinova addressed with you, which

10   is the Hearthstone -- what -- how is that fee referred to?

11   What is the title of the fee they are entitled to receive?

12   A   Hearthstone is the managing general partner, so it would

13   be the managing general partner fee.

14   Q   The managing general partner fee. I think you testified

15   that is approximately $10,000 a year?

16   A   Approximately, yes.

17   Q   That was a fee that they received in exchange for agreeing

18   to serve as a general partner of the Parkway Partnership; is

19   that right?

20   A   It is their fee for their services to the Parkway

21   Partnership.

22   Q   As a general partner?

23   A   As the managing general partner.

24   Q   One of the benefits that they are able to deliver to the

25   partnership is a property tax exemption because they are

1   non-profit; is that right?

2   A   Yes.

3   Q   Let's take a look at the amendment to the partnership

4   agreement where they became involved.  I believe that is

5   Exhibit 28.  Is this the amendment to the Parkway Partnership

6   Agreement that admits Hearthstone Housing Foundation as a

7   general partner or the managing general partner for Parkway?

8   A   Yes.

9   Q   Is this the document that lays out the fees that

10  Hearthstone is entitled to receive?

11  A   Yes.

12  Q   Does is this document also describe the how those fees are

13  to be paid?

14  A   It does.

15  Q   Let's go to page 2.  If you look at Item 5.  It says,

16  "Section 6.2A is hereby amended by inserting the following

17  new provision fourth and re-numbering the remaining

18  provisions of Section 6.2A accordingly."  Then it says,

19  "Fourth to the payment of the general partner fee."

20  Ms. Tamaro, Section 6.2A is the cash flow waterfall for the

21  Parkway LPA; is that right?

22  A   It is.

23  Q   To the extent that the Parkway Partnership has cash flow

24  sufficient to reach the fourth tier of the cash flow

25  waterfall, then that money would go to pay the managing

1    general partner fee, and to the extent there is surplus funds

2    after that, it would go down to the fifth tier of the

3    waterfall; is that right?

4    A   Yes.

5    Q   Is there any provision in this amendment for what happens

6    if there is insufficient cash flow to pay the managing

7    general partner fee?

8    A   In this agreement, no, there is not.

9    Q   Typically when there is insufficient funds to pay a fee

10   under the partnership agreement, what happens to that fee?

11   A   If there are insufficient funds, then usually I would

12   advance funds to cover the invoice.

13   Q   Well, what I am asking is not what you would do normally.

14   I am asking you, is there a provision in the partnership

15   agreement that identifies what happens when there is

16   insufficient funds to pay a fee that someone is entitled to

17   receive under the partnership agreement?

18   A   There is not a separate provision, no.

19   Q   Well, like, for example, I think you testified earlier in

20   your examination that you had -- we went through some of the

21   fees that you were entitled to receive.  I think one of them

22   was an incentive fee.  We can go back and look.  You had

23   testified you never received that fee; is that right?

24   A   Correct.

25   Q   What I am asking is, does that mean that you don't get

1    that fee or does it get booked as something that is a payable

2    to you at the point where there is sufficient cash flow to

3    cover that?

4    A   Well, that particular fee is non-commuted.  It just

5    disappears if it is not paid that year.

6    Q   What about the managing general partner fee?

7    A   We have to look in the agreement to see what it says.

8    Q   You would agree with me that the agreement controls

9    whether the managing general partner fee can be paid; is that

10   right?

11   A   I don't know if I would say "can be paid."  I would say

12   can be paid out of cash flow.

13   Q   Well, do you think that the limited partnership agreement

14   provides you with a contractual right to pay the managing

15   general partner fee from sources other than cash flow under

16   Section 6.2A?

17   A   I am really not clear on your question.

18   Q   What I am asking you is whether there is any contractual

19   provision that allows for the payment of the managing general

20   partner fee from funds other than operating cash flow in the

21   waterfall as described in this 5 here that we have pulled up?

22   A   I am still just not sure how to answer your question.

23   Q   Is it that you don't understand my question?

24   A   Yeah.

25   Q   Okay.  What I am trying to find out is, so this tells you

1  how to pay the managing general partner.  It says you pay it

2  out of operating cash flow.  Correct?

3  A   Correct.

4  Q   Now, what I am asking you is, is there any provision that

5  gives you any alternative way -- in the partnership agreement

6  that gives you any alternative way to pay the managing

7  general partner fee?

8  A   In the partnership agreement it says it shall be paid out

9  of cash flow.

10  Q   There is no other --

11  A   It is not addressed twice in the agreement.

12  Q   Okay.  If there is insufficient cash flow under the

13  partnership agreement, it is not supposed to be paid; is that

14  right?

15  A   Correct.

16  Q   You went ahead and paid it anyway; is that right?

17  A   I did.

18  Q   And you made advances to the non-profit partner to pay

19  that fee; is that right?

20  A   I did.

21  Q   You booked those advances as subordinated loans to be

22  repaid by the partnership when there were sufficient funds to

23  do so; is that right?

24  A   I did.

25  Q   Where in the partnership agreement are you permitted to do

1    that?

2    A    I may not be.

3    Q    Where in the partnership agreement is -- now, let's go to

4    the last page of this amendment.  One page earlier.  One page

5    earlier.

6          This was signed by Coco Vasquez at Hearthstone Housing

7    Foundation; is that right?

8    A    It was.

9    Q    This is a binding contractual agreement by Hearthstone

10   that they are legally required to comply with; isn't that

11   right?

12   A    This is the agreement by which they joined the

13   partnership.

14   Q    Now, I think you testified in direct examination that you

15   felt like you needed to pay the fee because if you didn't,

16   they would walk away from the project; is that right?

17   A    I didn't testify I felt to.  I was told directly by

18   Coco Vasquez.

19   Q    Did Coco Vasquez point to you any provision in this

20   agreement that allows them to unilaterally withdraw from the

21   partnership?

22   A    I believe they have that right.

23   Q    Where is that?

24   A    You have to look at the agreement.

25   Q    Let's take a look.  The entire partnership agreement or

1    just this amendment?

2    A    It would be -- well, their withdrawal would be in this

3    amendment.

4    Q    Okay.  Do you want -- well, never mind.  The document

5    speaks for itself.

6         Let's take a look at Exhibit 2.  Sorry, Exhibit 3.

7    This is the Parkway Partnership Agreement.  I want to direct

8    your attention specifically to Section 7.9, which is on page

9    50 of this exhibit.  You see at Section 7.9 down at the

10   bottom of page 50, "obligation to provide for project

11   expenses."  Do you see that?

12   A    Yes.

13   Q    This is a provision that allowed the managing general

14   partner to discharge project expenses through subordinated

15   loans; is that right?

16   A    Yes.

17   Q    Do you see that there is a parenthetical at the top of

18   this where it says that the managing general partner agrees

19   that if the partnership requires funds to discharge project

20   expenses, and then says in parentheses, "other than that to

21   make payments to partners."  Do you see that?

22   A    I do.

23   Q    So this managing -- management fee that goes to

24   Hearthstone, Hearthstone is a partner; isn't that right?

25   A    Yes, they are.

Tamaro - Cross

1  Q   Did you ever ask the limited partner if you could -- they

2  would be willing to amend the partnership agreement so that

3  you could make these advances to the non-profit?

4  A   What I can say, and I am not a tax attorney, but I have --

5  they were put in as that partner and in that priority for tax

6  reasons.  It is not necessarily something that could be

7  amended.

8  Q   So you just decided to unilaterally amend it by advancing

9  them money?  I don't understand.

10 A   I decided to continue paying them their fee to keep them

11 in the partnership.

12 Q   You are saying that there may be tax implications behind

13 that decision?

14 A   There were reasons why this agreement was structured the

15 way it was.

16 Q   Okay.  And have you -- by paying them in a way that is

17 different from the way that is required under this agreement,

18 do you know whether that is creating tax issues for the

19 partnership?

20 A   I have not been told that.

21 Q   Did you consult with an accountant before you made a

22 decision to pay these fees out of subordinated loans?

23 A   Yes, John Maddux was well aware of what I was doing.

24 Q   Did he give you assurance that paying these fees through

25 advances would not run afoul of the tax code?

Tamaro - Cross

1   A    He did not.

2   Q    He did not give you that confidence?

3   A    We did not discuss that issue.

4   Q    What did you discuss?

5   A    We discussed the fact that I was paying Hearthstone

6   Housing to keep them in the partnership so that the

7   partnership could continue to benefit from their membership

8   in the partnership.

9   Q    What was it that you were asking him?

10  A    That John was aware that I was advancing funds to the

11  partnership to pay Hearthstone.

12  Q    Were you asking for his advice on anything?

13  A    I was disclosing to him that -- he knew it, he could see

14  the bill, that I was advancing funds to pay for Hearthstone.

15  Q    Did he express any concern to you about what you were

16  doing from the tax perspective?

17  A    He did not.

18  Q    Again, going back to my question, did you ever reach out

19  to the limited partner and say, gee, can we amend the

20  partnership agreement so I can make these advances to

21  Hearthstone because otherwise they are not going to get paid,

22  and they really need to get paid?

23  A    I do not -- I am not certain that it could be amended in a

24  satisfactory way.

25  Q    I guess I am hung up on why you think doing something that

Tamaro - Cross

1  would not be -- that you couldn't memorialize wouldn't

2  potentially cause you problems.  If you think that it

3  couldn't be amended, then how is it that you are able to go

4  ahead and do the thing that you are saying the amendment

5  can't do?

6  A   Again, I am not sure how to answer your question.

7  Q   I want to talk about the excess management fee that was

8  charged by the management agent that you testified about in

9  your deposition.  Let's look at Exhibit 29.  That is a

10  property management agreement between Parkway and Trieste

11  Holdings.  Do you see that?

12  A   I do.

13  Q   Trieste is your property management company; is that

14  right?

15  A   Yes.

16  Q   This is an agreement whereby Trieste is agreeing to become

17  the management agent for the Parkway Partnership; is that

18  correct?

19  A   Yes.

20  Q   There was a subsequent amendment -- this agreement was

21  subsequently amended in 2010; is that right?

22  A   I believe so.

23  Q   Let's take a look at Exhibit 40.  You see that is also a

24  property management agreement between Trieste and Parkway.

25  This one is dated May 2010.  Do you see that?

Tamaro - Cross

1   A   I do.

2   Q   If you turn -- if we could take a look at page -- first of

3   all, who drafted this property management agreement?

4   A   Robert Sullivan.

5   Q   Who is Robert Sullivan?

6   A   He has been my counsel.

7   Q   A transactional attorney?

8   A   Correct.

9   Q   Let's go to page 9.  If you look at the bottom of this

10  page, Article 8 under "compensation," if you could blow that

11  up, please.  "The manager will be compensated for its

12  services under this agreement by a monthly fee to be paid out

13  of the operating account and treated as a project expense.

14  Such fee will be payable on the first day of each month of

15  the agreement.  Each monthly fee will be equal to ten percent

16  of the effective gross rental income." Do you see that?

17  A   I do.

18  Q   When you asked Mr. Sullivan to prepare this document, did

19  you give him a copy of the partnership agreement?

20  A   I am not sure how to answer that.  I guess I am not sure

21  what you are asking.

22  Q   Did you ask Mr. Sullivan to draft this agreement, the

23  property management agreement?

24  A   This is an agreement Mr. Sullivan has drafted that he

25  provided to me.

Tamaro - Cross

1   Q   At your request?

2   A   He had provided this to me several years prior.

3   Q   In 2007?

4   A   May have been.  May have been a different year.  He had

5   provided it to me prior to this.

6   Q   Presumably since he's an attorney that you are hiring, he

7   does these things because you have asked him to do them;

8   isn't that right?  He wouldn't do it without you instructing

9   him to do it, would he?

10  A   I am still not clear what you are asking.  I'm sorry.

11  Q   What I am asking is did you ask Mr. Sullivan to prepare

12  this document, whether it was in 2006, 2007, 2010, when

13  you -- when this document was first created, was it because

14  you had asked him to prepare a property management agreement

15  for Trieste and Parkway?

16  A   Mr. Sullivan had already prepared this agreement and

17  forwarded it to me.

18  Q   How did he know to prepare it?

19  A   He had already prepared it.  I don't know.

20  Q   I am asking you, before he prepared it, how did he know to

21  go about preparing it?

22  A   Mr. Sullivan did not do this exclusively for me.  This was

23  an agreement that Mr. Sullivan had -- you asked who drafted

24  it.  Mr. Sullivan drafted it.  He provided a copy to me.

25  Q   Who else was involved?

1    A    In that transaction?

2    Q    Yes.

3    A    It was just me and Rob Sullivan.

4    Q    I thought you said there were other people involved in

5    this.

6              THE COURT:  I think she's describing a model

7    agreement.

8    BY MR. PETTIT:

9    Q    Is that what you are saying, there was a template that he

10   worked off; is that what you mean?

11   A    Mr. Sullivan has provided property management agreements

12   to others of his clients in addition to me.

13   Q    Presumably only when they ask for them, right?

14   A    Yes.

15             MS. LATSINOVA:  Objection.  Speculation.

16             THE COURT:  Wait, just a second.

17             MS. LATSINOVA:  Objection, calls for speculation.

18             THE COURT:  Shortly.  This is cross-examination.  I

19   don't think this is very productive.

20             MR. PETTIT: I will move past this.  I apologize,

21   Your Honor.

22   BY MR. PETTIT:

23   Q    You would agree the ten percent rate that is reflected in

24   this agreement is higher than the maximum rate permitted

25   under the Parkway Limited Partnership Agreement?

1   A   I would agree, yes.

2   Q   That is something that I think you testified to resulted

3   in an overpayment being made in 2011 that you said was

4   returned in 2012; is that right?

5   A   Yes.  It was corrected. I would use the word "corrected"

6   in 2012.

7   Q   Okay.  What I am asking is were the funds returned to the

8   partnership?

9   A   My recollection is that in 2012 they were returned to the

10  partnership, and in 2011 there had been an adjustment to

11  compensate for it.

12  Q   Do you know if the return and adjustment resulted in

13  putting the partnership back to where it would have been if

14  the excessive fee had never been charged?

15  A   I believe so.

16  Q   Now, I think you testified at your deposition that this

17  ten percent number was put in at the auditor's suggestion; is

18  that right?

19  A   Yes.

20  Q   So was the auditor communicating with Mr. Sullivan in

21  connection with the preparation of this document?

22  A   I don't believe so.

23  Q   The auditor communicated to you that ten percent was the

24  right amount and you communicated that to Mr. Sullivan?

25  A   I modified the existing agreement.  Mr. Sullivan didn't do

1    this modification.

2    Q    Oh, so you put the ten percent in there?

3    A    Yes.

4    Q    Okay.  That clarifies things.  Thank you.

5         When you put the ten percent in there, did you look at

6    the limited partnership agreement to see if that was within

7    acceptable limits?

8    A    I neglected to.

9    Q    Who figured out this was an issue?

10   A    Gary Newbold.

11   Q    Who is Gary Newbold?

12   A    Alden Torch.

13   Q    If Alden Torch hadn't been on their toes, this excess fee

14   could continue to be paid today; isn't that right?

15   A    I can't answer that.

16   Q    Well, you didn't discover this issue, correct?

17   A    Alden Torch -- Gary Newbold said, "That's too much."  I

18   said, "You are correct," and I acknowledged it.

19   Q    You put the ten percent in there.  You didn't check the

20   partnership agreement.  You didn't realize you made a

21   mistake, and it was only after the limited partner pointed

22   out the mistake, then you corrected; is that right?

23   A    Yes.

24   Q    I would like to just very briefly identify the affiliates

25   of yours at issue in this case.  We have already talked about

1   Trieste.  Trieste is your property management company?

2   A   Yes.

3   Q   You co-own that with your husband, Mr. Arterberry?

4   A   Yes.

5   Q   Trieste is the property manager of Parkway and Hidden

6   Hills; is that right?

7   A   Yes.

8   Q   Is Trieste the property manager of your other seven LIHTC

9   properties?

10  A   Yes.

11  Q   In addition to being the property manager, Trieste, I

12  think you testified, is also performing general contractor

13  functions at the partnership separate and distinct from its

14  responsibilities as the managing agent; is that right?

15  A   Yes.

16  Q   The other affiliates that are at issue here, one is your

17  husband, Mr. Arterberry, who has done some work for the

18  partnership; is that right?

19  A   Yes.

20  Q   That's both legal work and engineering work?

21  A   Yes.

22  Q   Then there is an entity called Westside Estates that

23  provided services related to extermination, bed bug

24  extermination; is that right?

25  A   North Pearl Street, which owns Westside Estates, is the

1  affiliate which provided the services.

2  Q   Okay.  So North Pearl Street is the actual owner of the

3  bed bug heater?

4  A   North Pearl Street, LP.

5  Q   Then I think I have this right.  The adjacent property

6  where the general contractor who provides services at Parkway

7  and gets a rent credit, that is North City Landing; is that

8  right?

9  A   Yes.

10  Q   I would like to ask you a few questions about the charges

11  that your husband, Mr. Arterberry, charged to the Parkway

12  Partnership.  I would first like to look at the engineering

13  services he provided.  Let's take a look at Exhibit A-43.

14  That, I believe, is the invoice related to services that he

15  provided in connection with the installation -- or the

16  procurement and installation of a trash compactor; is that

17  right?

18  A   Yes.

19  Q   You didn't competitively bid this project?

20  A   To be honest, I don't competitively bid professional fees

21  in most cases.

22  Q   And that is true even if you are planning on hiring an

23  affiliate?

24  A   His fees are reasonable.  This was a situation where we

25  needed counsel, we needed an engineer, we needed to address

1    the situation.  Mr. Arterberry is qualified to do this.  I am

2    allowed to hire affiliates.

3    Q   My -- I think you testified that you don't normally bid

4    out jobs that involve professional services.  My question

5    was, whether you make an exception for that when the

6    professional who you are hiring is your husband or some other

7    affiliate?

8    A   Not necessarily.

9    Q   And you didn't in this case, correct?

10   A   No, I did not.

11   Q   I think you testified in your direct examination that your

12   husband was involved in selecting the trash compactor and

13   researching that issue; is that right?

14   A   Yes.

15   Q   I think you also testified that the trash compactor that

16   he selected was incompatible with Parkway's wiring; is that

17   right?

18   A   Yes.

19   Q   So as a result, he needed to do additional work in order

20   to make the trash compactor compatible -- or make the wiring

21   at Parkway compatible with the trash compactor; is that

22   right?

23   A   Not make the wiring compatible.  It is an electrically

24   wrong compactor, and the Parkway isn't a -- a residential

25   area is not typically wired to deliver that type of power.

1  Q   Do you know if your husband made any inquiry into what

2  type of power would be necessary for this compactor before he

3  ordered it for the partnership?

4  A   It would be unlikely -- it would be highly unlikely that

5  you could find a trash compactor that you could simply plug

6  into the wall.

7  Q   Do you know if he tried?

8  A   I do not know.  What he did is procure a suitable

9  compactor for Parkway, and then get it operational.

10 Q   You testified that it was incompatible with Parkway's

11 wiring; isn't that right?

12 A   That is not unusual.  It is a 20-horse-power motor.

13 Q   Did you know at the time you ordered the trash compactor

14 that you would need to do the additional work to make it

15 function in the Parkway Apartments?

16 A   I do not know.

17 Q   Do you know whether you ever informed the limited partner

18 that you were hiring your husband to perform engineering

19 services in conclusion with the installation of the trash

20 compactor?

21 A   Probably not.

22 Q   I would like to ask you some questions about the charges

23 that Mr. Arterberry made to the partnership related to legal

24 services.  I think you testified on direct examination that

25 Mr. Arterberry's -- he was an engineer first and then became

1    a lawyer later; is that right?

2    A    That's the sequence.

3    Q    When did Mr. Arterberry graduate law school?

4    A    1999.

5    Q    Does Mr. Arterberry have -- maintain an active legal

6    practice?

7    A    He does.

8    Q    Does he have clients that are not affiliated with any of

9    the entities that he and -- he and/or you have an ownership

10   interest in?

11   A    From time to time.

12   Q    Is the majority of the work that he does as an attorney

13   work that he does for affiliates?

14   A    Much of his work is for the affiliate, yes.

15   Q    I think you testified that you gave some examples of some

16   of the work that he did.  You said that occasionally the

17   partnership will get brought to small claims court by

18   residents; is that right?  That he would sometimes appear for

19   the partnership in small claims court?

20   A    Yes.

21   Q    Is he allowed to appear as an attorney in small claims

22   court?

23   A    Yes.

24   Q    Is it because he has ownership interest?

25   A    Yes.

Tamaro - Cross

1    Q    I see. Then working, you also mentioned that there was

2    some unit where there was drug activity going on and that he

3    coordinated with the homeowners association in order to deal

4    with that issue; is that right?

5    A    Yes.

6    Q    Do you know whether the limited partners are challenging

7    any charges Mr. Arterberry made to the partnership in

8    connection with either of those two types of work?

9    A    They are challenging all of his work.

10   Q    Your understanding is they are challenging -- they are

11   challenging all of the work Mr. Arterberry has done?

12   A    Well, they are challenging his entire fee.

13   Q    Let's take a look at Exhibit A-71.  This is an invoice, a

14   billing record, with a Paul -- is it Dienes, Deans, do you

15   know?

16   A    Something like that.

17   Q    This is work that he did, legal work that he did; is that

18   right?

19   A    Correct.

20   Q    He is charging the Parkway Apartments for this work?

21   A    Yes.

22   Q    Let's take a look at A-70.  A-70 has that same name,

23   Paul Dienes.  It references a case number, Paul Dienes vs

24   Trieste Holdings.  Do you see that?

25   A    Yes.

1    Q    What was Paul -- what is Paul Dienes vs Trieste Holdings?

2    A    Had to do with -- this person had complained to Labor &

3    Industries that he felt the job worksite at Parkway was

4    unsafe.

5    Q    Who was he employed by?

6    A    He was employed by Trieste Holdings.

7    Q    Was the Parkway Apartments named as a defendant in that

8    action?

9    A    I do not know.

10   Q    Did you do anything to determine whether the partnership

11   had been named as a defendant in that action?

12   A    I don't recall.

13   Q    Do you believe that the partnership has an obligation to

14   indemnify Trieste Holdings in connection with this action?

15   A    I believe that since this claim involved Parkway's

16   worksite that it would be appropriate for Parkway to pay for

17   this.

18   Q    Do you know whether Parkway faces any potential of

19   liability in connection with this action?

20   A    Well, it has all been settled.  Nobody faces any

21   liability.

22   Q    At the time before it settled, did you know whether the

23   Parkway Apartments faced any risk of liability in connection

24   with this action?

25   A    I don't know.

1  Q    Do you know whether Trieste Holdings ever made a demand

2  for indemnity from the Parkway Partnership?

3  A    I don't know.

4  Q    Did you ever do any type of investigation to determine

5  whether it was appropriate for the partnership to be paying

6  the legal fees of Trieste Holdings, its managing agent, in

7  connection with an action brought against Trieste?

8  A    Can you repeat that?

9  Q    Did you ever do any research to determine whether it was

10 appropriate for the Parkway Partnership to be paying legal

11 fees for an action that was brought against its managing

12 agent, Trieste Holdings?

13 A    No.

14 Q    You just paid the bill; is that right?

15 A    I felt that it was appropriate for Parkway to cover this

16 expense since the work was being done for the benefit of

17 Parkway.

18 Q    Did you ever inform the limited partner about this

19 lawsuit?

20 A    I may not have.

21 Q    Did you ever inform the limited partner that you had hired

22 Mr. Arterberry, your husband, to handle this lawsuit?

23 A    I may not have.

24 Q    Did you ever -- do you have any document or anything else

25 that you can point to that in your mind would suggest that

1    the partnership has an obligation to pay for legal fees

2    incurred by Trieste Holdings, LLC?

3    A    What kind of document?

4    Q    Any kind of document.  Is there anything you can think of

5    that would give the Trieste Holdings, as a managing agent,

6    the ability to ask the partnership to cover its legal fees?

7    A    No.

8    Q    Is there anything in the partnership agreement that allows

9    you, as the general partner, to make a determination to pay

10   legal fees that are not incurred by the partnership?

11   A    It doesn't say either way.

12   Q    Let's talk about the repair supervision fee.  The repair

13   supervision fee was paid by the partnership to Trieste; is

14   that right?

15   A    Yes.

16   Q    What was that fee paid for?

17   A    That was paid for the services of overseeing the work

18   being done at Parkway.

19   Q    So Trieste is the property manager at Parkway; is that

20   right?

21   A    Yes.

22   Q    In its capacity as the property manager, it has certain

23   obligations with respect to running the operation of the

24   Parkway Apartments; is that right?

25   A    Yes.

1   Q    And in addition to being the property manager, you are

2   saying that Trieste was also hired to perform contractor work

3   at the property; is that right?

4   A    Yes.

5   Q    So then it was paid -- who performed the actual work?

6   Were those Trieste employees?

7   A    Yes.

8   Q    So Trieste had its own employees.  The property manager --

9   the managing agent had its own employees doing this work and

10  it charged the partnership for that labor; is that right?

11  A    Charged the partnership -- the labor costs were passed

12  through to Parkway.

13  Q    The labor costs were passed through to Parkway.  Those --

14  those were paid through operating advances; is that right?

15  A    They were paid from project cash flow.

16  Q    You didn't loan the partnership the money to pay those

17  fees?

18  A    A lot of those invoices have been deferred.  A lot of them

19  are unpaid.  They were put in as invoices.  As there were

20  funds available, some of those invoices have been paid.

21  Q    What does that mean, "they were deferred"?

22  A    That means there is an invoice, it is an obligation on the

23  books that is unpaid.

24  Q    Does it show up on the balance sheet for the partnership?

25  A    It shows up -- yes.

Tamaro - Cross

1    Q    How is it described on the balance sheet?

2    A    Current liabilities, I believe, or could be in accounts

3    payable.

4    Q    Where does that get paid in the waterfall?

5    A    Those would -- depends on how much money is available.

6    Q    What do you mean?

7    A    I would have to look at our books, to be honest, to see

8    what went on month to month.

9    Q    Trieste gets paid a managing agent fee.  Trieste gets paid

10   for the labor to do these improvements.  Then on top of that,

11   you charged a repair supervision fee that was 15 percent of

12   the cost of labor and materials to the Parkway Partnership;

13   isn't that right?

14   A    Trieste Holdings did charge a repair supervision fee for

15   the labor that was -- and the supervisory work that was done.

16   Q    That is 15 percent?

17   A    Not always.  It did charge a percentage.

18   Q    Let's look at Exhibit A-263, at page 6. I would like to

19   direct your attention, Ms. Tamaro, to your response to

20   Interrogatory No. 9.  You say, "Trieste Holdings, LLC, holds

21   a Washington State general contractor license and employs

22   four journey-level carpenters, three carpenter apprentices

23   and one carpenter's assistant.  These carpenters have

24   upgraded Parkway substantially by replacing doors, windows,

25   roofs, balcony and sidings.  Trieste Holdings charged Parkway

1   a reasonable fee of 15 percent of construction costs,

2   materials and labor for its general contractor overhead and

3   profit."  Do you see that?

4   A   I do.

5   Q   So they get paid for managing the property, they get paid

6   for doing the labor, they get paid a 15 percent premium on

7   top of that.  All of those go to the affiliate that you were

8   an owner of; is that right?

9   A   They are all different jobs.

10  Q   Did you bid out this project?

11  A   I did not.

12  Q   As -- you have no basis to conclude whether this is a

13  reasonable fee or not, do you?

14  A   I would disagree with that.

15  Q   You didn't test the market, though, did you?

16  A   I went through an analysis with Gary Newbold when we

17  reroofed five buildings.  I did actually go to two roofers

18  and ask them what their costs would be.  We compared the

19  scope of the work, and the conclusion was that my employees

20  had provided the most work and that our fees were competitive

21  and reasonable.

22      We also pointed out to Gary that certain sales taxes were

23  not incurred when we did the work, which saved the property

24  money.

25  Q   Trieste has a general contractor's license?

Tamaro - Cross

1   A   Yes.

2   Q   Presumably is there some contract that the Parkway

3   Management entered into with Trieste in connection with this

4   work that is being done?

5   A   I did not sign a formal contract, no.

6   Q   Why not?

7   A   I just didn't.

8   Q   Was it because you feel like you are the general partner

9   and you can just sort of do with it whatever it is that you

10  want?  Is that why you didn't get a contract?

11  A   No.

12  Q   Now you testified at direct examination about something

13  called a REAC score.  Do you recall that?

14  A   Yes.

15  Q   I believe REAC is an acronym; is that right?

16  A   Yes.

17  Q   Do you know what the acronym stands for?

18  A   Real estate assessment center.

19  Q   I had no idea.

20      The real estate assessment center is HUD's -- is a

21  HUD -- sorry, what is REAC?  I know it is affiliated with

22  HUD.  Can you describe again what it is?

23  A   I might direct you to look it up.  It is, yes, affiliated

24  with HUD.

25  Q   The reason why I ask is you testified about it in your

1  direct examination.  You seem to have a familiarity with it.

2  I know that you had testified, I believe, that HUD comes in

3  and inspects the property in connection with the issuance of

4  this REAC score; is that right?

5  A   They do.

6  Q   Depending on the score that you get, the frequency of

7  those inspections can be either once a year or as

8  infrequently as once every three years; is that right?

9  A   Yes.

10  Q   I think you also testified that back in the middle of the

11  last decade, the REAC score for Parkway was quite poor; is

12  that right?  It was very low; is that correct?

13  A   Yeah, I don't know if I would say quite poor.  That seems

14  to be even lower.  It was close to the bottom of the passing

15  range.

16  Q   Close to the bottom of the passing range, which was

17  approximately?

18  A   60 out of 100.

19  Q   60 out of 100.  Okay.  Then you testified that because of

20  work that you had done, that you were able to increase the

21  REAC score above 80 in 2010; is that right?

22  A   Yes.

23  Q   That the REAC score has been at or above 80 since that

24  time; is that correct?

25  A   Yes.

1  Q   The REAC score from HUD went up -- and is 80 a comfortable

2  place to be in terms of a REAC score, from your perspective?

3  A   Yes.

4  Q   The property was in a comfortable place with its REAC

5  score in 2010 before any of the work that we are discussing

6  had been performed; is that right?

7  A   We had done other work to prepare for the REAC, yes.

8  Q   But the -- for example, all of the replacement of the

9  siding and all of the work that the contractors had been

10 doing on a rolling basis over the last two years where

11 Trieste is charging a 15 percent repair supervision fee, all

12 of that post dated the increase of the partnership's REAC

13 score to 80 or above; is that right?

14 A   Yes.

15 Q   Let's take a look at Exhibit 50.  This is a document that

16 was shown to you by your counsel, Ms. Latsinova, in your

17 direct examination.  This is a property condition report that

18 was prepared for HCP Pacific Asset Management in March of

19 2012.  Do you see that?

20 A   I do.

21 Q   I think you testified that HCP Pacific Management is a

22 predecessor to Alden Torch; is that right?

23 A   I don't know if I testified to it.  That's my

24 understanding.

25 Q   Okay.  That's your understanding?

Tamaro - Cross

```
 1    A    Yes.

 2    Q    That's my understanding, too.

 3         So this is a report that was commissioned by the

 4    limited partner; is that right?

 5    A    That's my understanding.

 6    Q    That's your understanding.  Let's go to page 8.  Let's

 7    go -- maybe we need to go to page 8 of the actual -- strike

 8    page 8 of the --

 9              THE COURT:  Why don't we call it a night and pick it

10    up at 9:30 tomorrow.  I do need to know what trajectory we

11    are on now.  It is going slow.  It is -- clearly Ms. Tamaro

12    is the most important fact-intensive witness.  It is not with

13    criticism.

14              MR. PETTIT:  I could finish up in about 15 minutes.

15    I can do it in the morning, too.

16              THE COURT:  Okay.  All right.  Who are the next

17    witnesses coming in tomorrow?

18              MR. GOODNIGHT:  We think that we could call

19    Laura Lindal out of order, if that is acceptable.

20              THE COURT:  Sure.

21              MR. GOODNIGHT:  Mr. Blake.

22              THE COURT:  We are flexible, especially in a bench

23    trial.

24              MR. GOODNIGHT:  Our redirect of Ms. Tamaro will be

25    quite short.
```

1        THE COURT:  All right. Have a great evening.  We will

2    see you tomorrow.

3                    (The proceedings adjourned.)

4

5

6

7                    C E R T I F I C A T E

8

9

10      I certify that the foregoing is a correct transcript from

11    the record of proceedings in the above-entitled matter.

12

13

14

15    /s/ Angela Nicolavo
          Debbie Zurn

16

      DEBBIE ZURN
17    ANGELA NICOLAVO
      COURT REPORTERS

18

19

20

21

22

23

24

25