1        UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF WASHINGTON AT TACOMA

3  _____

4                                    )
   HIDDEN HILLS MANAGEMENT,           )
5  LLC, and 334th PLACE 2001,         )
   LLC,                               )
6                                     )
   Plaintiffs,                        )
7                                     )
   v.                                 )  3:17-cv-06048-RBL
8                                     )
   AMTAX HOLDINGS 114, LLC, and       )  TACOMA, WASHINGTON
9  AMTAX HOLDINGS 169, LLC,           )
                                      )  June 5, 2019
10 Defendants.                        )
                                      )  9:30 a.m.
11 _____       )
                                      )  Bench Trial
12 AMTAX HOLDINGS 114, LLC,           )
   AMTAX HOLDINGS 169, and            )
13 PARKWAY APARTMENTS, LP,            )
                                      )
14                                    )
   Counter-Plaintiffs,                )
15                                    )
   v.                                 )
16                                    )
   HIDDEN HILLS MANAGEMENT,           )
17 LLC, and 334th PLACE 2001,         )
   LLC,                               )
18                                    )
   Counter-Defendants.                )
19 _____

20 _____

          VERBATIM REPORT OF PROCEEDINGS
21      BEFORE THE HONORABLE RONALD B. LEIGHTON
          UNITED STATES DISTRICT JUDGE
22 _____

23       Proceedings stenographically reported and transcript
              produced with computer-aided technology

24

25

APPEARANCES

FOR THE PLAINTIFF & COUNTER-DEFENDANTS:

DAVID R. GOODNIGHT
MARGARITA V. LATSINOVA
J. SCOTT PRITCHARD
Stoel Rives
600 University Street
Suite 3600
Seattle, Washington

FOR THE DEFENDANT & COUNTER-PLAINTIFFS:

CRAIG H. BESSENGER
ERIC S. PETTIT
GRAYCE S. ZELPHIN
Boies Schiller & Flexner
725 South Figueroa Street
31st Floor
Los Angeles, California.

1                              EXAMINATION INDEX

2      EXAMINATION OF:                                           PAGE

3       CATHERINE TAMARO    CROSS-EXAMINATION (Resumed)            4
                            BY MR. PETTIT                          4
4                           REDIRECT EXAMINATION                  42
                            BY MS. LATSINOVA                      42
5
        LAURA LINDAL        DIRECT EXAMINATION                    64
6                           BY MR. GOODNIGHT
                            CROSS EXAMINATION                     88
7                           BY MR. PETTIT
                            RECROSS-EXAMINATION
8                           BY MR. PETTIT                        118

9       CHRISTOPHER BLAKE   DIRECT EXAMINATION                   124
                            BY MR. PRITCHARD

10

11

12

13
                               EXHIBIT INDEX

14

15     EXHIBITS ADMITTED                                         PAGE

16      Exhibit 173                                               57
        Exhibit 176                                              139
17      Exhibit 177                                              161
        Exhibit A-209                                             5
18

19

20

21

22

23

24

25

 1                                    MORNING SESSION

 2                                    JUNE 5, 2019

 3           THE COURT:  Good morning.  Anything to take up at

 4   this point?

 5           MR. GOODNIGHT:  We have coordinated on this.

 6   Ms. Lindal will be here at 11:00.  We are hoping to take her

 7   out of order so she can be done presumably by lunch.

 8           THE COURT:  Great.

 9       Mr. Pettit, you may proceed.

10                   CROSS-EXAMINATION (Resumed)

11   BY MR. PETTIT:

12   Q   Good morning, Ms. Tamaro.

13   A   Good morning.

14   Q   Do you recall yesterday I showed you a copy of a

15   declaration you signed in September of 2017 in this

16   litigation?

17   A   Yes.

18   Q   I was under the mistaken impression that it had not been

19   marked as a trial exhibit when, in fact, it had been.  To

20   quickly correct this oversight on my part, I would like you

21   to take a quick look at Exhibit A-223 and confirm for the

22   record this is the same document that we were talking about

23   earlier.

24   A   I believe so.

25           MR. PETTIT:  I believe this has already been

 1   admitted, Your Honor.

 2            THE COURT:  Yes.

 3   BY MR. PETTIT:

 4   Q   Do you recall answering questions during trial testimony

 5   during the environmental escrow for Hidden Hills?

 6   A   Yes.

 7   Q   I learned last night that document has not yet been

 8   admitted into evidence.  I would like to show you Exhibit

 9   A-290 and confirm that is, in fact, the Hidden Hills

10   environmental escrow agreement we have all been discussing?

11   A   Yes.

12            MR. PETTIT:  Your Honor, I ask Exhibit A-290 be

13   admitted in evidence.

14            THE COURT:  Any objection?

15            MS. LATSINOVA:  None.

16            THE COURT:  Exhibit A-290 is admitted.

17                 (Exhibit A-209 admitted.)

18   BY MR. PETTIT:

19   Q   I would like to ask you some additional questions about

20   Parkway.  Do you recall testifying on direct examination that

21   you directed Parkway to give employees a rent credit equal to

22   a one-bedroom unit because it is important to have employees

23   available on site in case of emergencies at night and on

24   weekends?

25   A   Yes.

1    Q   Do you also recall testifying that several employees moved

2    next door from the Parkway Apartments to some adjacent

3    dwellings owned by an affiliate of yours, and the rent

4    credits were paid to your affiliate?

5    A   Yes.

6    Q   Do you recall being asked questions about this in your

7    deposition?

8    A   I believe so.

9    Q   Well, there are several differences between what you

10   testified to at trial and what you said in your deposition

11   that I would like to briefly explore.

12        First, at your deposition, you only identified one

13   individual who moved next door and had her rent credit paid

14   to your affiliate; isn't that right?

15   A   I do not recall.

16   Q   Chris, let's play the deposition video clip.  This is page

17   68 at lines 8 through 17.

18                              (Video clip played.)

19   Q   Ms. Tamaro, do you recall, as you sit here today, how many

20   Parkway rent credits were paid to your affiliate, North City

21   Landing?

22   A   Over the years, there have been a total of four staff

23   members who have lived next door at various times.

24   Q   How many are there right now?

25   A   Two.

1  Q   At trial, you referenced "employees."  You just used the

2  term "staff members."  At your deposition, you confirmed the

3  one individual you identified was not an employee but instead

4  an independent contractor; is that correct?

5  A   That is correct.

6  Q   Finally, you said at trial the reason for the rent credit

7  is to have employees on site in case of emergency at night

8  and on weekends.  At your deposition, you testified that the

9  one individual who you identified as using the rent credit to

10  pay your affiliate provides cleaning services to the

11  property.  Do you recall that?

12  A   Yes, she does.

13  Q   Do you consider someone who provides cleaning services,

14  emergency personnel?

15  A   Well, the other thing she does for us is translate because

16  she's bilingual, and we have a number of residents at Parkway

17  whose first language is not English.

18  Q   Is she the only person who performs services for Parkway

19  who speaks Spanish?

20  A   We have two bilingual employees at Parkway currently.  The

21  other one lives about 30 miles away.

22  Q   If translation was needed, that could also be done over

23  the phone; isn't that right?

24  A   I suppose, yes.

25  Q   I would like to now ask you some questions about the

1   expenses at Parkway.  Isn't it correct that the project

2   expenses, as that term is defined in the Parkway LPA,

3   increased every year from 2014 through 2017?

4   A   Do you want me to look at the definition of "project

5   expenses"?

6   Q   Do you know the definition of project expenses?

7   A   I do know it is in the partnership agreement.

8   Q   Knowing what you know sitting here today, without looking

9   at any documents, do you know whether it is correct that

10  project expenses, as that term is defined in the Parkway LPA,

11  increased every year from 2014 to 2017?

12  A   I would like to refer to my books and records to answer

13  that question accurately.

14  Q   Let's take a look at Exhibit A-263.  Exhibit A-263 is the

15  Parkway general partner's responses to interrogatories that

16  my clients served in this action.  I would like to direct

17  your attention specifically to Interrogatory No. 22, on page

18  11 of the exhibit, which asks you to explain why project

19  expenses doubled from 2014 to 2017.  Do you see that?

20  A   Yes.

21  Q   You responded that project expenses did not double from

22  2014 to 2017, but then you go on to identify project

23  expenses, as that term is defined in the LPA, for 2014, 2015,

24  2016, 2017.  Do you see that?

25  A   Yes.

1    Q    Would you agree with me that the project expenses there

2    went up every year from 2014 to 2017?

3    A    They did increase, yes.

4    Q    You verified these discovery responses, correct?

5    A    Yes.

6    Q    So this confirms that project expenses did go up every

7    year, correct?

8    A    Yes.

9    Q    In fact, the change from 14 million -- $1,424,202 in 2014

10   to $2,140,692 in 2017 represents an increase of a little over

11   50 percent; isn't that right?

12   A    Presumably, yes.

13   Q    Are you aware what the inflation rate was over the time

14   period from 2014 to 2017?

15   A    It was less than 50 percent.

16   Q    Drastically less than 50 percent, correct?

17   A    It was less, yes.

18   Q    If we turn to the next page of your interrogatory

19   response, you go on to describe the work that was done.  You

20   say --

21        If we highlight the top paragraph there, Chris.

22        It says, "In 2015, all of the single-pane windows and

23   sliding doors were replaced.  In 2016, the site was repaved

24   and 104 balconies were replaced.  In 2016 and 2017, the

25   carpenters commenced replacement of rotting siding on all 22

1    buildings.  In 2017, the siding manufacturer announced it was

2    discontinuing the color being installed at the property, so

3    the property made a large purchase, $250,000, all the siding

4    needed for the remaining buildings."

5        Is the information I just read to you accurate?

6    A    I believe so.

7    Q    Now I would like to put on the screen what was Slide 23

8    from plaintiff's opening statement, which is a summary of

9    Parkway's repair costs.  We have gone ahead and added up the

10   costs that you identified in the slide and included that

11   total cost at the bottom there.  You can see the total repair

12   costs, based on the numbers your attorneys provided in the

13   slide, were a little under 2.2 million.  You see that?

14   A    Yes.

15   Q    Were you involved in preparing the cost information

16   presented in this slide?

17   A    Yes.

18   Q    Do you know where these numbers came from?

19   A    They came from our books and records.

20   Q    Where specifically?

21   A    You mean QuickBooks.

22   Q    You found these in QuickBooks?

23   A    Yes.

24   Q    Those are -- you maintain the QuickBooks software in

25   connection with your management of the Parkway Partnership?

1    A    Yes.

2    Q    Do you know what period these repair costs were incurred?

3    A    2013 through 2017.

4    Q    What happened in 2013?

5    A    2014.  I may not have the year accurately.  The first

6    project we worked on was replacing the rest of the windows --

7    single-pane windows and single-pane sliding doors.

8    Q    Let's go back to Exhibit 263 on page 12. It says at the

9    top there, lines 1 and 2, "In 2015, all single-pane windows

10   and sliding doors were replaced."

11   A    Yes.

12   Q    That was 2015, correct?

13   A    We may have started in 2014.  I know it carried over a

14   calendar year.

15   Q    You said that was the first thing that you did?

16   A    Yes.

17   Q    At a minimum, these expenses were all incurred from no

18   earlier that 2014 to 2017; is that right?

19   A    Yes.

20   Q    Presumably from 2017 to 2019, additional expenses have

21   been incurred?

22   A    They are continuing to work on the siding.

23   Q    And that has resulted in additional expenses being

24   incurred?

25   A    Yes.

1   Q   So let's take a look -- let's go back to the slide.

2   Sorry, the Parkway repair slide.  You see at the bottom it

3   says "bed bug extermination $7,200"?

4   A   I do.

5   Q   I think you testified that was in connection with a

6   heating device that was used that was owned by an affiliate

7   of yours; is that right?

8   A   Yes.

9   Q   Did you do any competitive bidding of the bed bug

10  extermination before you hired your affiliate to do that work

11  and have them charge $7,200?

12  A   I had experience with a third-party vendor who did this

13  type of work at a different property because, as I have said,

14  this issue of bed bugs had started to appear in apartments.

15  That company used heat treatment on eight units at a

16  different property.

17      What I recognized is that we needed to be prepared to deal

18  with perhaps large numbers of units with bed bugs.  My

19  husband designed the heating system that HUD recommends for

20  heat treatment of an infested unit.  We bought a generator

21  that weighs about 300 pounds.  It has a towing trailer and

22  full-size pickup that carries it around.  Another property

23  owns it.

24      What I did is when we had an infested unit -- this is for

25  a total of six units.  The person who operates that equipment

1  arrives.  He works with the resident.  It is an all-day

2  process.  He works with the resident to get their belongings

3  spread out so everything can be heated evenly.  He sets up

4  the temperature monitors in the unit.  He runs it for at

5  least two hours at 150 degrees.  When the unit cools down, he

6  goes in and puts -- it is a desiccant he puts under the

7  baseboards for the insects.

8  Q   Is the answer "no," you did not get competitive bidding?

9  A   There is not a comparable bid on the services we provide.

10  Q   Did you try to get a competitive bid?

11  A   We asked around.  Took us a long time to find one company

12  that would do it.

13  Q   Who was that?

14  A   I have to look at the invoice.  That was the company that

15  treated the eight units at my other property.

16  Q   Let's bring Exhibit 81 up on the screen.  Exhibit 81 is

17  something you testified about quite a bit on your direct

18  examination.  It is a physical capital needs assessment or

19  PCNA from May 2014.  Do you recall testifying about this

20  document in your direct examination?

21  A   Yes.

22  Q   You testified that this report was required by HUD and

23  used HUD guidelines, correct?

24  A   Yes.

25  Q   That is because HUD is the guarantor of Parkway's

 1  mortgage, correct?

 2  A   Yes.

 3  Q   Let's take a look at Section 2.1 of the report at the top

 4  of page 12.  It says, under "purpose," it says, "The purpose

 5  of property inspection report and statement of resources and

 6  needs is to observe the general condition of the building,

 7  site and other improvements at the referenced location and to

 8  prepare a preliminary capital replacement reserve for the

 9  immediate and long-term future.  The report will identify

10  those areas that will require remedial repair work and will

11  assign them to an associate estimated remedial cost.  This

12  report include opinions of costs to remedy the physical

13  deficiencies as well as to provide capital replacement

14  reserve schedule over the next 20 years."  Do you see that?

15  A   I do.

16  Q   Did I read that correctly?

17  A   Yes.

18  Q   Is that consistent with your understanding of the purpose

19  of this report?

20  A   Yes.

21  Q   I believe you testified that as a result of this report,

22  the capital replacement reserve was increased from $300 per

23  unit to $500 per unit; is that right?

24  A   If my memory serves, the $300 is correct.  We are at $500

25  per unit per year now.

 1    Q    This is an increase of over 60 percent in the amount of

 2    funds the partnership was required to set aside for capital

 3    repairs beginning in 2014, correct?

 4    A    Yes.

 5    Q    Were these increased reserves used to help pay for the

 6    repair costs that we were looking at earlier?

 7    A    Repair reserve can be used to reimburse for the list of

 8    items that HUD has approved.

 9    Q    My question was:  Were these increased reserves used to

10    help pay for the repair costs we were looking at earlier?

11    A    They are used to pay for any repairs at Parkway.

12    Q    Including the ones we were looking at earlier?

13    A    Possibly, yes.

14    Q    Let's take a look at your deposition transcript at page

15    276, lines 1 through 7.  You see there is actually a

16    correction there.  This --I will represent to you, we can

17    look at the page before, but this is talking about the

18    siding.

19         Chris, can you go to the question before?  I want to

20    make sure I have the context here.  Lines 24 and 25 there.

21    Then also highlight just above. What I was hoping, Chris, was

22    you could clip 24, 25, put that at the top, and put lines 1

23    through 7 at the bottom all blown up.  Perfect.  Thank you.

24         Ms. Johnson, my co-counsel, asked, "Was that included

25    in the critical repairs portion of the report?"  This is

1    talking about the roofs.  You answered, "Not in the critical

2    repairs.  It was included in the ten-year project list."

3    Then Ms. Johnson asked, "And you said there was money put

4    into the reserves for that."  Then your original answer was

5    "yes."  Then it looks like maybe you interjected that while

6    she was finishing her question.  You changed that "yes" to

7    "no," but then the second "yes" stayed "yes."  I am trying to

8    understand what it was you were trying to clarify there.

9    A   I'm sorry, I don't recall.

10   Q   You don't know why you changed "yes" to "no" there?

11   A   I am not sure if I was the one who did that or not.

12   Q   You don't recall?

13   A   I just don't recall.  Sorry.

14   Q   Do you recall reviewing your deposition transcript and

15   indicating to your counsel you had some corrections that

16   needed to be made?

17   A   I do.

18   Q   Was this one of those corrections?

19   A   I'm sorry, I don't recall.

20   Q   Do you know whether -- did your counsel ever tell you that

21   anyone other than you would be permitted to make corrections

22   to this deposition transcript?

23   A   I don't think she said.

24   Q   You can't -- sitting there today, you don't have any

25   understanding of why that change was made?

1  A   As I said, I just don't recall.

2  Q   Now, the report -- going back to the report, Exhibit 81,

3  that concluded that Parkway was in overall good condition

4  based upon the date of construction and property management,

5  correct?

6  A   This is our PCNA report?

7  Q   Yes.

8  A   Can you repeat the question?

9  Q   The report concluded that Parkway was in overall good

10 condition based upon the date of construction and property

11 management, correct?

12 A   (No response.)

13 Q   Let's pull up Exhibit 81, bottom of page 7, Section 1.2.

14 That might help. Look at the first sentence there.  You see

15 that?

16 A   Yes.

17 Q   That's their conclusion about the general physical

18 condition of the property, correct?

19 A   Yes.

20 Q   The report does provide a list of critical and

21 non-critical repairs that need to happen within one year of

22 the report; is that right?

23 A   Yes.

24 Q   Then it also includes an inflated and uninflated estimate

25 of costs of capital repairs for the first and second decade

1   following the report, correct?

2   A   Yes.

3   Q   If we look at the bottom half of page 8 of Exhibit 81, we

4   see that it includes a list of repairs that are considered

5   necessary to maintain the overall condition of the property

6   over the next ten years.  Do you see that?

7   A   Yes.

8   Q   And so that is -- that would be -- since this was in 2014

9   of this -- this report was issued, that is between 2014 and

10  2024, correct?

11  A   Yes.

12  Q   The inflated estimate that includes an inflationary rate

13  of 1.5 percent per year is 1. -- 1,141,248, correct?

14  A   Yes.

15  Q   Again, we are talking about a ten-year period from 2014 to

16  2024, correct?

17  A   Yes.

18  Q   Let's bring your Parkway repair slide up to compare it.

19  As you can see, the actual Parkway repairs from 2014 through

20  2017, according to your numbers, is $2,178,031; is that

21  right?

22  A   Yes.

23  Q   This means that you spent nearly twice of the HUD estimate

24  in less than half of the time they suggested it be spent,

25  correct?

 1   A   We have spent more than the HUD report projected we would

 2   need to spend.

 3   Q   Over a shorter period, correct?

 4   A   We did this in less than ten years, yes.

 5   Q   Now, let's turn to the next page -- we were on page 8 of

 6   Exhibit 1.  We are going to turn to the next page.  I have to

 7   clarify, this document was produced by the general partner.

 8   I realized last night that pages 3 and 4, I believe, were out

 9   of order.  We are going to go to page 10 of the exhibit.  It

10   is actually --

11        Is that page 10 of the exhibit, Chris? That's the next

12   page after the page we were looking at, which is page 3 of

13   her report.

14        You see up at the top half of the page, there is a list

15   of specific repairs that are included in that list of repairs

16   from year 11 to year 20?

17   A   Yes.

18   Q   You will see that on the list of these non-critical

19   repairs, many -- included are many of the items that we have

20   been discussing in the trial and saw on the slide from your

21   opening statement, correct?

22   A   Yes.

23   Q   Re-surfacing the parking lot, replacing the siding,

24   replacing the windows and replacing the sliding glass doors,

25   correct?

1    A    Yes.

2    Q    It also includes -- if you could bring that back up,

3    Chris -- that list, it also includes a number of other

4    repairs or replacements that have not been completed yet,

5    correct?

6    A    Many of these are just as you go.  So some units have been

7    addressed.  We have restriped, repaired -- actually, we had

8    to repave, repair the concrete.  We don't have to repaint

9    exterior siding and trim.  We replaced the roofs as we need.

10   We have replaced gutters.  We got rid of the swimming pool.

11   We have not yet repaired -- well, sewer lines get repaired as

12   needed.  The rest of it is as -- it is done as we go.

13   Q    It has not been done yet?

14   A    Depends on the unit.

15   Q    Wasn't included in the expenses of over $2 million between

16   2014 and 2017, correct?

17   A    The cost of appliances was probably not included in that

18   list of unit appliances.

19   Q    None of the things you just mentioned are included on that

20   list that we looked at that your counsel --

21   A    Yes, some of them are included.

22   Q    Let's take a look at the list again, the slide, Parkway

23   repair slide, please.  I see siding, deck replacement,

24   paving, sliding doors and windows, new roofs, trash

25   compactor, and bed bug extermination.  That's all that is

1   there, right?

2   A    Yes.

3   Q    Going back to the list of non-critical repairs.

4   A    Could I just say paving encompasses all the things like

5   sidewalks and curbs that are on the previous list.

6   Q    Thank you for clarifying that.

7   A    Where it says "replace asphalt shingled roofs," that is

8   the roofing on the other chart.

9   Q    Balconies are not listed on this list, correct?

10  A    They are not.

11  Q    They are not even considered a non-critical repair, as the

12  report of 2014, correct?

13  A    Critical repair to HUD means it has an aspect of life

14  safety to it.

15  Q    Right.  So I am talking about -- first of all, I am not

16  talking about critical repairs.  I am not talking about

17  non-critical repairs.  It is not on the list of non-critical

18  repairs, correct?

19  A    It was not on that list, no.

20  Q    It was also not on the list of critical repairs, correct?

21  A    Correct.  I believe paving was on the list of non-critical

22  repairs because we had to do a separate reserve for the

23  paving when we refinanced.

24  Q    Ms. Tamaro, I am asking you about the balconies.  Let's go

25  to page 21 of Exhibit 81.

1          Up at the top, Chris, if you could blow that up.

2          Do you see there it refers to, sort of in the middle,

3    the decking was observed to be in fair to good condition with

4    individual boards replaced as an operation expense.  Do you

5    see that?

6    A    Yes.

7    Q    Is there anything in this report that calls into question

8    the structural integrity of the balconies at Parkway?

9    A    I am looking at the part that says "exterior metal

10   railings."  I was wondering what those were.  I see that.

11   Q    You see there is nothing in this report that suggests

12   there are any issues with the structural integrity of the

13   balconies, correct?

14   A    Correct.

15   Q    In fact, you are not aware of any other evidence or any

16   other documentation of issues relating to the structural

17   integrity of the balconies, are you?

18   A    We have the evidence of our inspections.

19   Q    Were those inspections put into writing?

20   A    We had photos of what we were finding at the time, yes.

21   Q    Were those produced in discovery?

22   A    I don't believe they were.

23   Q    You have some photographs, but that doesn't say anything

24   about the structural integrity of the balconies, does it?

25   A    No.

1    Q    You testified on direct examination -- let's go back to

2    the repair cost slide again.  That is deck replacement,

3    right, those are the balconies?

4    A    Yes.

5    Q    That is $463,000 through 2017.  Have there been additional

6    monies spent on deck replacement since 2017?

7    A    No.

8    Q    You testified on direct examination that Parkway

9    refinanced its debt in 2014, correct?

10   A    Closer in 2015.

11   Q    You sought approval for the refinance in 2014, the

12   refinance closed in early 2015; is that right?

13   A    Yes.

14   Q    That required the consent of the limited partner, correct?

15   A    Yes.

16   Q    AMTAX gave that consent, did it not?

17   A    It did.

18   Q    Let's look at Exhibit 90.  This is something that you also

19   went over on your direct examination.  This is a memo dated

20   August 28, 2014 from Hunt.  You understand Hunt was one of

21   the predecessors to Alden Torch?

22   A    Yes.

23   Q    It is to Ann Morrison and others at Morgan Stanley.  You

24   see that?

25   A    Yes.

1   Q   So this is Alden Torch seeking consent from the investor

2   of the LIHTC fund in which this property sits for approval of

3   the refinance, correct?

4   A   Yes.

5   Q   Let's go over -- let's go to page two and blow up the last

6   full paragraph.

7          The paragraph says, "The refinance is advantageous from

8   a dispositions perspective because the improved operating

9   cash flow will pay down a greater amount of GP receivables by

10   the end of compliance when the LP's option to force at fair

11   market value can be executed."

12   A   Yes.

13   Q   I first want to ask you about the LP's option to force a

14   sale at fair market value.  That option does not exist,

15   correct?

16   A   The sale of their own interest, they can force that.

17   Q   So to the extent that this is referring to a sale of the

18   property, that -- that would be inaccurate, but if it is a

19   sale of their interest, they do have that right?

20   A   Yes.

21   Q   Do you agree that the improved operating cash flow could

22   create an ability for the partnership to pay down GP

23   receivables at a faster rate?

24   A   It could have, yes.

25   Q   The last sentence of this paragraph says -- talks about

1    the higher replacement reserve that we were talking about,

2    the $500 per unit.

3    A    Uh-huh.

4    Q    It says, "The higher replacement reserve requirement of

5    500 per unit annually should also help to maintain or improve

6    the property's physical condition which may preserve residual

7    value."  Do you see that?

8    A    Yes.

9    Q    It was Alden Torch's understanding that the increase in

10   the replacement reserve could help with some of the repairs

11   that were needed, capital repairs at the property?

12   A    Say that again.

13   Q    Based on this memo, it was Alden Torch's understanding

14   that the refinance, in addition to the increased replacement

15   reserve, could create greater funds for making capital

16   repairs for the partnership; is that right?

17   A    I can't speak to their understanding.

18   Q    Based on your review of this document, isn't that what

19   they are saying?

20   A    Well, based on this review of the document, they were

21   anticipated to -- savings from the refinance, which is why we

22   were doing it.

23   Q    Right.  You testified on direct examination that this

24   refinance reduced Parkway's debt service by about $20,000 a

25   month?

1   A   Yes.

2   Q   Between this savings and the higher replacement reserve

3   that HUD was requiring, the amount of funds available for

4   capital repairs increased significantly in 2014, 2015,

5   correct?

6   A   Yes.

7   Q   These increased funds, however, were insufficient to cover

8   all the capital repair costs you were racking up; isn't that

9   right?

10  A   I would need to look at my QuickBooks to answer that

11  accurately.

12  Q   Do you recall testifying at your deposition that the

13  siding replacement was paid for, in part, by operating

14  advances from the general partner?

15  A   Yes, it was.

16  Q   Would you have made those operating advances if there were

17  sufficient funds from the savings on the debt service and

18  there was sufficient reserve in place to cover the cost of

19  those repairs?

20  A   No, if there is sufficient cash at the property, I don't

21  need to make the advance.

22  Q   Is it fair for us to then conclude, logically speaking, if

23  you were making advances that there were insufficient funds

24  to cover those costs of repairs?

25  A   There would not have been sufficient cash flow to cover

 1  some of the repairs if I were making advances.

 2  Q   It is not just cash flow, it is also replacement reserves;

 3  is that right?

 4  A   Reserves.  The reserves are reimbursement that they cycle

 5  in afterwards.  Sometimes I do have to advance ahead of the

 6  reserves.

 7  Q   Okay.  Let's take a look at the Parkway waterfall you

 8  provided, which is Exhibit 168.

 9       Chris, can -- I want the whole thing.  See if we can

10  make it a little bigger on the screen there.  Okay.

11       Who prepared this waterfall?

12  A   I did.

13  Q   Did anyone help you with preparing it?

14  A   No.

15  Q   You seem unsure.

16  A   I am wondering if I understood the question correctly.

17  Q   I am asking you whether anyone assisted you in preparing

18  this document?

19  A   No.

20  Q   Did Ms. Lindal have any role in preparing this document?

21  A   She did not prepare it.  Over time, I had asked her

22  questions on how to interpret provisions in 6.2.

23  Q   Over what time?

24  A   Probably the previous year.

25  Q   Before or after she withdrew from --

 1   A   Well before.  Well before.

 2   Q   From the point when she disengaged, she did not assist

 3   with the preparation of this waterfall?

 4   A   No.

 5   Q   And nobody else did?

 6   A   Correct.

 7   Q   So I want to start out at the top.  You see where it says

 8   "CBRE" up there?

 9   A   Yes.

10   Q   Then it has $16,975,000?

11   A   Yes.

12   Q   That is the appraisal that you got for Parkway, correct?

13   A   Yes.

14   Q   You are starting with your appraisal number; is that

15   right?

16   A   Yes.

17   Q   In fact, the number from the Novogradac appraisal was

18   several million dollars higher than that; is that right?

19   A   It is higher, yes.

20   Q   Let's look at line 19 where it says "accounts payable."

21   What does that line represent?

22   A   Accounts payable, bills to pay.

23   Q   How many of those bills are owed to affiliates?

24   A   Some of them are.  I can't give you a number without

25   looking at QuickBooks.

1    Q    Is this -- is it broken down in the partnership's

2    financial statement as accounts payable to third parties

3    versus accounts payable to affiliates?

4    A    Depends on the date.

5    Q    Sorry?

6    A    It depends on the date.

7    Q    What do you mean by that?

8    A    Periodic -- well, you would have to print the accounts

9    payable to look at them and differentiate.  It just prints a

10   list of who the vendors are.

11   Q    I am asking about the financial statements.

12   A    The financial statements, I believe that Laura would have

13   identified those in the year-end audit.

14   Q    Broken down between non-affiliated accounts payable and

15   affiliated accounts payable?

16   A    Not the way you are describing, no.

17   Q    In any other way that would be discernible to someone who

18   was reading the financial statement?

19   A    In the notes, she references all of the third party

20   invoices that have been accrued in the past year.

21   Q    And gives dollar totals for each one?

22   A    Yes.

23   Q    So line 19, just to conclude, has -- includes within it

24   some payments that are owed to affiliates, but from looking

25   at this document, you can't tell what percentage that is; is

 1   that right?

 2   A   Correct.

 3   Q   Based on your knowledge, independent of this document, do

 4   you have a sense of what percentage of the nearly $500,000 in

 5   accounts payable are owed to affiliates?

 6   A   Maybe a half to two-thirds.

 7   Q   So -- all right, a half to two-thirds.  Let's take a look

 8   at line 22, "current liabilities."

 9   A   Yes.

10   Q   $871,321, correct?

11   A   Yes.

12   Q   What does that line represent?

13   A   Those are old payroll and management fee invoices.

14   Q   Who are those owed to?

15   A   Owed to Trieste Holdings.

16   Q   Current liabilities there, $871,000, that is all money

17   owed to your property management company, correct?

18   A   Correct.

19   Q   That all comes out of the sales waterfall, right?

20   A   Yes.

21   Q   The 500,000 accounts payable, the 871,000 in liabilities

22   owed to your affiliate, and then let's look at line 27, "AGP

23   subordinated loans."  Do you see that?

24   A   Yes.

25   Q   $1,571,375, correct?

1   A   Correct.

2   Q   That is money that is owed to the general partner,

3   correct?

4   A   Correct.

5   Q   Line 36, that is the incentive supervisory fee that we

6   were talking about yesterday, correct?

7   A   Yes.

8   Q   I think you testified yesterday, that has never been paid?

9   A   The partnership agreement reads that it can be paid -- can

10  be calculated and paid at the end of the year based on

11  previous year's operations or at the time of sale or -- of

12  the property of the partner's interest is calculated and

13  added in.

14  Q   My question was:  Has this -- I think you testified

15  yesterday that no incentive supervisory fee has ever been

16  paid on Parkway; is that a correct statement?

17  A   Yes.

18  Q   This is the fee that you would be owed, and you would get

19  a full payment of that on the sale of the property under this

20  waterfall, correct?

21  A   Correct.

22  Q   And then line 42.  This is the balance of such proceeds'

23  portion of the waterfall which sometimes is called the

24  residual split, do you understand that?

25  A   Yes.

1    Q    And it is called residual because you only get there if

2    there is enough money to get all the way down to the bottom

3    of the waterfall, correct?

4    A    Yes.

5    Q    Under the residual split in the partnership agreement, if

6    there are residual proceeds at the end of the waterfall, 99

7    percent of the balance of those proceeds go to the investor

8    limited partner, correct?

9    A    Yes.

10   Q    So assuming there is enough cash to get down to the

11   residual split at the bottom of the waterfall, which is what

12   this waterfall shows, for every dollar that subordinated

13   loans or accounts payable or current liabilities go up, 99

14   cents of that expense comes out of the limited partner's

15   pocket; is that right?

16   A    Presumably.

17   Q    Yeah.  Not only that, but many of the subordinated loans

18   that you made to the partnership were made to pay your own

19   affiliates; is that right?

20   A    Some of them are.

21   Q    So you are authorizing these payments to yourself, and

22   then you are putting an IOU on the partnership's books that

23   at the end of the day will come almost entirely from the

24   limited partner's share of the sale of the proceeds; is that

25   right?

1    A    They come from the waterfall and the way it was designed.

2    Q    That was designed to give 99 cents of every dollar of

3    residual proceeds to the limited partner; is that right?

4    A    That's one of the line items in Section 6.2.B.

5    Q    So for every dollar that doesn't get to the residual split

6    portion of the waterfall, 99 cents of that dollar comes out

7    of the limited partner's pockets, correct?

8    A    Yes.

9    Q    Before I sit down, I have a few questions about the

10   auditor, Ms. Lindal's, recent withdrawal.  First of all, when

11   did you first -- you testified on direct examination that you

12   prepared the audit, and then the auditor reviews the audit;

13   is that right?

14   A    No.  I prepare the financial statements, and she reviews

15   them and she prepares the audit.

16   Q    You prepare the financial statements.  What is the

17   distinction you are drawing between the financial statements

18   and the audit?

19   A    The financial statements are the data that I have in

20   QuickBooks.

21   Q    The financial statements are the thing that is being

22   audited; is that right?

23   A    Yes.

24   Q    The way that typically works is that the auditor, upon

25   conducting an audit of the financial statements, will issue

1    an independent auditor opinion letter; is that right?

2    A    Say that again.

3    Q    The way it normally works is when you have someone audit

4    your financial statements, when they are done and the

5    financial statements are to their satisfaction, they issue an

6    auditor opinion letter stating their independence and

7    endorsing the financial statement; is that right?

8    A    Yes.

9    Q    When did you first provide a draft financial statement for

10   Ms. Lindal to review?

11   A    I am not sure I could answer that question because it may

12   have been my controller who provided the first numbers.  I

13   don't know the exact date.

14   Q    Do you know an approximate date?

15   A    When Laura Lindal starts the audit process, she gives us a

16   list of items that she needs, and she does that the previous

17   year, for example, November, December, so that she can get

18   started on certain things, and then for us to give complete

19   books and records, we usually send it right after the end of

20   January.

21   Q    Did you make Ms. Lindal aware at any point, when she was

22   engaged as the auditor, of the deadlines in the limited

23   partner agreements to deliver audited financial statements to

24   the limited partners?

25   A    She had the partnership agreement, she had the amendments,

1  and she also had her instructions from -- she gets

2  instructions every year from Alden Torch as to what they want

3  in the audit and what their deadlines are.

4  Q   Ms. Tamaro, I am asking about whether you made her aware

5  of the deadlines?

6  A   I did my best, yes.

7  Q   When you say you did your best, does that mean on February

8  15th, when the Parkway audit wasn't delivered, you called her

9  up and said, "Hey, I have to give this to the limited

10  partner, where is it"?

11  A   I understand what you are asking, that an amendment, the

12  deadline had been moved up.  The investor at the time had a

13  November 30th year-end, which is why that deadline was moved

14  up.  Then something happened, I don't know what.  The

15  deadline -- the calendar year went back to year-end.  To be

16  honest, we -- at my end, we forgot that there was a November

17  15th -- February 15th deadline, and so we always aimed for

18  mid-March, which was the normal deadline for partnerships

19  with a year-end fiscal year.

20  Q   You just forgot about your contractual obligation to

21  deliver the report by February 15th?

22  A   We had lost track of that date, yes.

23  Q   So your understanding is the deadline for both of the

24  partnerships was March 15th; is that right?

25  A   That is the deadline that we thought was applicable, yes.

1  Q    So when March 15th rolled around, did you call up

2  Laura Lindal and ask her where the audits were?

3  A    For this one?

4  Q    Parkway or Hidden Hills.

5  A    I may not have.

6  Q    Do you know how and when Ms. Lindal obtained a copy of

7  John Krabbenschmidt's deposition transcript?

8  A    I do not.

9  Q    Did you provide it to her?

10 A    No.

11 Q    Did you ever discuss it with her?

12 A    I indicated to her that one of the defendants' experts was

13 John Krabbenschmidt.  At that point, counsel was involved.

14 Q    Okay.  So you told her that John Krabbenschmidt had given

15 an expert opinion in this case and that you passed the

16 communications over to counsel; is that right?

17 A    I think she -- she already had counsel involved.

18 Q    Why did you tell her about John Krabbenschmidt's

19 deposition?

20 A    Came up in a conversation.  She was aware of this

21 litigation.

22 Q    How did it come up?

23 A    I don't recall.

24 Q    Did you bring it up?

25 A    I don't recall.

1  Q   Do you recall what you said about Mr. Krabbenschmidt's

2  testimony?

3  A   Not really, no.

4  Q   Did you tell Ms. Lindal that Mr. Krabbenschmidt had

5  accused her of malpractice?

6  A   I believe she found that by reading the transcript.

7  Q   Is there anything in the deposition transcript of

8  Mr. Krabbenschmidt where he accuses her of malpractice?

9  A   Mr. Krabbenschmidt, as I understand it, indicated that she

10 had issued materially misleading statements.  He made that

11 same statement about all the previous auditors on the

12 partnership.

13 Q   Wasn't his statement that you had provided material -- you

14 misstated information to the auditor?

15 A   My understanding was that he had focused on the audits,

16 which would implicate an auditor.

17 Q   That's what you told Ms. Lindal; is that right?

18 A   I don't recall, yeah.

19 Q   Did you have any discussion with Ms. Lindal about her

20 potential disengagement before she sent you the withdrawal

21 letters?

22 A   No, I called her and I said, "Can we finish the audits?"

23 That was the conversation, and then she called me back later

24 and said she had to disengage.

25 Q   So when that was?

1   A    Right before that letter was dated.

2   Q    Same day?

3   A    It may have been the same day.

4   Q    Do you recall that I sent an email to your counsel several

5   weeks before asking about where the audits were?

6   A    I do.

7   Q    Do you recall that your counsel responded to me that there

8   were no finalized issue yet so there was nothing for them to

9   deliver?

10  A    Yes.

11  Q    At that point, when the audits are now more than a month

12  overdue, and the limited partner is specifically asking for

13  them, did you pick up the phone and call Ms. Lindal and find

14  out what was going on with the audits?

15  A    I don't recall when I contacted her to ask her to issue

16  the finalized audit.

17  Q    But you recall that the same day you contacted her about

18  issuing the final audits, she told you she needed to

19  disengage; is that right?

20  A    I do recall that it was very shortly after.  I don't know

21  if it was the same day or within a few days.  It was soon

22  after.

23  Q    So if you had reached out in April to Ms. Lindal, you

24  would have known about her disengagement within a few days of

25  that time?

1   A   I can't say.  I don't know.

2   Q   Isn't that what you just said?

3   A   I'm sorry?

4   Q   Didn't you testify that the longest period between when

5   you spoke to her and when she told you that she was

6   disengaging, was a few days?

7   A   Yes.

8   Q   So you didn't have any discussions with her, prior to her

9   informing you that she was disengaging, about her plan to

10  disengage?

11  A   Correct.

12  Q   When you spoke to her on the phone, what did she say the

13  reasons were for her disengagement?

14  A   She just said, "I'm sorry," and she sent me her letter.

15  Q   She didn't give you any reasons on the phone?

16  A   No.

17          MR. GOODNIGHT:  Excuse me, Your Honor.  Sorry to

18  interrupt.  Can I inquire about timing?  I was under the

19  impression we were going to be done with this cross

20  yesterday.  I am becoming increasingly concerned about the

21  schedule for the case.  I hope we can finish tomorrow.

22          MR. PETTIT:  On my last page.

23          THE COURT:  I don't think you are going to finish

24  tomorrow, but we can see.

25          MR. PETTIT:  I anticipate being done in the next few

 1    minutes.  I am on the last page.

 2          MR. GOODNIGHT:  Thank you.

 3    BY MR. PETTIT:

 4    Q   Let's take a look at Exhibit 151.  This is the submission

 5    of the Parkway 2018 audit to HUD's REAC system that you

 6    testified about in your direct examination; is that right?

 7    A   Yes.

 8    Q   Do you know whether HUD permits you to file a draft audit

 9    with REAC?

10    A   I do not know.

11    Q   Let's take a look at the second to last page of this

12    exhibit.  I want you to look at the very bottom line item

13    there.  Can we blow that up, please?  See where it says "date

14    of independent auditor report, January 29, 2019"?

15    A   Yes.

16    Q   Do you know whether Ms. Lindal issued an independent

17    auditor's report in connection with the 2018 audit for

18    Parkway?

19    A   To HUD?

20    Q   To anyone?

21    A   She had not issued her opinion on that date.  She had it

22    in draft form.

23    Q   There is nothing on there that indicates it is a draft; is

24    that right?

25    A   Correct.

1   Q    So when was this filed, do you know?  I couldn't find a

2   date on it.

3   A    Is it on the front page?

4   Q    I don't think so.

5   A    Then I am not certain.

6   Q    Why didn't you send the limited partner the draft audits

7   when Ms. Lindal filed them with HUD?

8   A    I don't typically send the drafts.

9   Q    Even when the final was already overdue?

10  A    Okay.  I see what you are asking.  I did not send them.

11  Q    When you reached out to replacement auditors after

12  Ms. Lindal disengaged, what did you tell them?

13  A    I explained that there was litigation between the partners

14  and that Laura Lindal had disengaged and we needed to start

15  again with the audit.

16  Q    Did you say -- did you provide any explanation for the

17  reasons why Ms. Lindal disengaged?

18  A    I explained that she, according to her letter -- and I

19  don't believe I gave her letter to -- I did not give her

20  letter to any of auditors that I contacted.  I explained

21  there was litigation, and that she had disengaged in response

22  to the independent expert.

23  Q    You told them about Krabbenschmidt as well?

24  A    I explained that she had disengaged in response to AMTAX's

25  independent expert.

1  Q   You said -- you testified nobody -- none of the other

2  auditors were willing to accept this engagement; is that

3  right?

4  A   Not so far.

5  Q   Did any of them tell you why they weren't interested in

6  getting this work?

7  A   They heard the word "litigation."

8  Q   That's the word you told them; is that right?

9  A   Yes.

10        MR. PETTIT:  No further questions, Your Honor.

11        THE COURT:  Redirect.

12                    REDIRECT EXAMINATION

13 BY MS. LATSINOVA:

14 Q   Catherine, good morning.  Mr. Pettit asked you some

15 questions yesterday about your teaching at the University of

16 Washington.  Do you recall that?

17 A   I do.

18 Q   I think there was a suggestion that you misrepresented the

19 statement that you taught at the University of Washington.

20 Do you recall that?

21 A   I do.

22 Q   Can you please explain exactly what you teach, or taught?

23 A   I actually am currently enrolled at the University of

24 Washington in the PhD program in environmental health.  My

25 academic advisor manages a weekly seminar for graduate

1   students during the school year.  My advisor travels a lot,

2   and so I was tasked with growing the graduate student seminar

3   when she was gone which means I attended all of them and I

4   taught the ones at which she was absent.

5   Q   What is she advising you on or for?

6   A   Well, as I said, I am currently enrolled as a graduate

7   student.

8   Q   Are you pursuing your PhD at the University of Washington?

9   A   Trying.

10  Q   What subject?

11  A   Environmental health.

12  Q   What would be the subject of your thesis?

13  A   Pesticides and children's exposure.

14  Q   The graduate students that you are teaching at the

15  seminar, what was the subject that you were teaching?

16  A   The purpose of the seminar is to teach graduate students

17  to read and critique scientific papers.

18  Q   You still do that today?  Do you teach the seminars?

19  A   I have not -- I had to stop attending early in the spring.

20  Q   Spring of this year?

21  A   Yes.

22  Q   So do you recall, Catherine, yesterday counsel asked you

23  when was the first time you disclosed the EPI technical

24  memorandum to AMTAX.  Do you recall that?

25  A   I do.

 1  Q   Counsel showed you Exhibit A-154.  Let's look at that

 2  exhibit, please.  Do you recall counsel showing you Exhibit

 3  A-154 and asking the question I just referred to?

 4  A   Yes.

 5  Q   What is the date of Exhibit A-154?

 6  A   This is July 7th, 2017.

 7  Q   Is the July date the first date when you discussed the EPI

 8  technical memo with AMTAX?

 9  A   No, I had referenced it in a previous communication.

10  Q   Let's look at Exhibit A-116, please, Adam.

11      What is Exhibit A-116?

12  A   This is my letter to Chris Blake dated March 30th, 2017.

13  Q   Does it reference the EPI technical memorandum?  Look at

14  the last paragraph on the second page.  Let's look there.

15  A   Yes, it does.

16  Q   Can you please point us to where you reference the EPI

17  technical memorandum on March 30th, 2017, which is the date

18  of Exhibit A-116?

19  A   Yes, in that paragraph.

20  Q   Why did you disclose the EPI technical memorandum to AMTAX

21  at that time?

22  A   Again, this grew out of my experience in closing the loan

23  where we needed to know what the estimated cost of a

24  hypothetical clean up would be, and so I brought those

25  numbers current.

1    Q    Now, Adam, can you get Exhibit A-172 ready.

2         Do you recall yesterday, Catherine, counsel asked you

3    why you did not discuss with AMTAX that Colliers was

4    appointed as the third appraiser; do you recall that?

5    A    I do.

6    Q    Do you recall who suggested Colliers as the third

7    appraiser?

8    A    My understanding, from listening to Mr. Noble's

9    deposition, he had suggested Colliers as the third appraiser.

10   Q    Mr. Noble is the AMTAX appraiser; is that right?

11   A    Yes.

12   Q    He provided appraisal No. 2?

13   A    Yes.

14   Q    Why did you pick Colliers -- so, now, looking at Exhibit

15   A-172.  I jumped ahead.  I apologize.  What is Exhibit A-172?

16   A    This is an email I received from Todd Henderson at CBRE

17   with the names of two appraisers he and Andy felt would be

18   appropriate to value this property.

19   Q    The first one on the list is Colliers, Cory Hutsell?

20   A    Yes.

21   Q    Why did you choose Cory Hutsell as opposed to the second

22   person there?

23   A    It was actually just random.  I picked the first name on

24   the list.

25   Q    Did you know of Cory Hutsell, or ever have any dealings

1   with Cory Hutsell or John Campbell, prior to that time?

2   A   No, I had never met either of them.

3   Q   Now, counsel referenced this exhibit yesterday and

4   criticized you for not informing AMTAX that Cory Hutsell was

5   selected on the date of that exhibit, which is September 6;

6   is that right?  Do you recall that?

7   A   Yes.

8   Q   Now, let's pull up Exhibit A-177, please, Adam.

9        Do you recall Exhibit A-177?

10  A   I do.

11  Q   What is it?

12  A   This is an email from Andy Noble to Kori Gibbs and

13  Christopher Blake at Alden Torch forwarding his communication

14  in which he and Todd Henderson had come up with these two

15  names that were appraisers.

16  Q   Let's scroll to the bottom of this email and look at it

17  from the bottom.  The bottom part of the email is -- on

18  Exhibit A-177 is the September 6 email.  Do you see that?

19  A   Yes.

20  Q   What is the next one?  What is the next one?

21  A   The next date is September 7th.

22  Q   What happened on September 7?

23  A   On September 7th, Andy Noble forwarded this information to

24  Kori Gibbs at Alden Torch.

25  Q   Andy Noble to Kori Gibbs on September 7th?

1    A    Yes.

2    Q    What is he saying?  He is forwarding the September 6

3    email; is that right?

4    A    Yes, these are the appraisers he and Todd recommended.

5    Q    Is Kori Gibbs a he or she, do you know?

6    A    I think a she.

7    Q    Who is she?

8    A    I believe Kori Gibbs works for Chris Blake.

9    Q    As of September 7th, Chris Blake, or somebody working for

10   Chris Blake, was aware that Colliers was selected as the

11   third appraiser; is that right?

12   A    They would have been informed of this information on that

13   date, yes.

14   Q    Did AMTAX, Kori Gibbs or Chris Blake, or anybody at AMTAX,

15   reach out to you after September 7th and say, "Well, we now

16   know that Colliers has been nominated as a third appraiser,

17   but we don't like him anymore and we don't want him as a

18   third appraiser"?  Did they ever saying something like that?

19   A    I received no communication from AMTAX.

20   Q    Mr. Pettit asked you yesterday if you received drafts of

21   the Colliers' appraisal, and whether you commented on them.

22   Do you recall that?

23   A    Yes.

24   Q    How many appraisals do you estimate you have commissioned

25   over the course of your role as general partner for various

1    LIHTC properties?

2    A    Probably at least ten.

3    Q    So in your experience, is it common for appraisers to

4    share drafts with the owner?

5    A    My experience is they always give me drafts to look at to

6    make sure they have got the details correct.

7    Q    So in this case, Mr. Hutsell shared the draft with you,

8    did he not?

9    A    Yes.

10   Q    Why did he do that?

11   A    Again, he gave it to me to review to make sure he had the

12   details correct.

13   Q    So did you comment -- what kind of details did he want

14   corrected?

15   A    I responded to him with the email that I did because I

16   could tell that Cory Hutsell -- Hidden Hills has two

17   regulatory agreements, one from the Housing Finance

18   Commission and one from the Pierce County Housing Authority.

19   They are different in how they restrict tenant incomes and

20   tenant rents.  I could tell that he had not understood how

21   the Pierce County Housing Authority regulatory agreement

22   worked, so I sent him an email explaining how it worked and

23   how it affected rents and where he could find in the RCW the

24   language describing these particular restrictions.

25   Q    And to your knowledge, did he use his independent judgment

1  to arrive at the appraisal or the information you gave him?

2  A   He took the information and recognized that he needed to

3  modify his projections in order to accurately reflect the

4  second regulatory agreement, and he did do that.

5  Q   Now, counsel asked you a lot of questions about your

6  communications with EPI.  Do you remember that?  That was

7  yesterday.

8  A   Yes, yes, I do.

9  Q   Counsel asked you a lot of questions about the

10  environmental contamination on the property.  Do you remember

11  that?

12  A   Yes, I do.

13  Q   When was the first time you became aware of the

14  contamination at the property at Hidden Hills?

15  A   In 1999, spring of 1999 when I first had the property

16  under contract with the seller.  The seller handed over books

17  and records as part of their due diligence requirement, and

18  contained within their documents was a copy of the letter

19  from Tacoma Water Utilities dated 1998 in which Tacoma Water

20  Utilities had tested soil at Hidden Hills and forwarded

21  results to the seller of the property and to the Department

22  of Ecology.

23  Q   Now, were you the only one who knew about that

24  contamination?

25  A   No.

1   Q    So all this was done before the Hidden Hills deal came

2   together?

3   A    Yes, very much so.

4   Q    So you testified, I believe, that you put your own money

5   into -- to fill a gap in the environmental escrow; is that

6   correct?

7   A    Yes, I had to advance $700,000 to close the deal.

8   Q    And so let's look at Exhibit 120, please, Adam.

9        Do you recognize Exhibit 120?

10  A    Yes, I do.

11  Q    We talked about that exhibit with you.  Mr. Pettit asked

12  you a lot of questions about bullet point No. 5.

13  A    Yes.

14  Q    So what did you -- first of all, backing up, what is

15  Exhibit 120?

16  A    This is a letter I sent to Chris Blake on March 14th of

17  2017.

18  Q    Was it following up on the option exercise?

19  A    I believe this is the one in which I exercised my option.

20  Q    Why did you include No. 5?

21  A    Again, this goes back to my experience closing the

22  property, that the lender really drove this, but the cost of

23  the environmental liability at the time needed to be included

24  in the valuation of the property.

25  Q    Did you ever make it a secret of that position in your

 1   conversations with AMTAX?

 2   A   No, I never did.

 3   Q   So AMTAX disagreed with you; is that right?

 4   A   They did.

 5   Q   Are you aware of Judge Leighton's order basically agreeing

 6   with AMTAX and disagreeing with you and ruling that the

 7   appraisal process was tainted by you and that the

 8   environmental issues should not be considered in any

 9   appraisal for the purposes of the option exercise?

10   A   Yes, I am aware of that.

11   Q   What is your response to that ruling?

12   A   I accept it.

13   Q   What did you do to accept it?

14   A   I then accepted AMTAX's appraisal of Hidden Hills

15   Apartments in which there is no consideration of the

16   environmental condition at Hidden Hills.

17   Q   So counsel also asked you a lot of questions yesterday

18   about the EPI invoices.  Do you recall that?

19   A   I do.

20   Q   The EPI invoices were paid by the partnership?

21   A   Yes, they were.

22   Q   Now, in light of the Court's order that environmental

23   costs should not be considered, would you reimburse the

24   partnership for the amount of the EPI invoices?

25   A   Yes, I will do that.

1    Q    Now, let's look at Exhibit A-212, please, Adam.

2         Now, counsel asked you a lot of questions about Exhibit

3    A-212 yesterday?

4    A    Yes.

5    Q    Do you recall that?

6    A    Yes.

7    Q    So what is that?  What is that exhibit?

8    A    This is a letter from Mr. Pettit to Mr. McCarthy.

9    Q    Is that the letter that gives you three choices?

10   A    This is it, yes.

11   Q    Now, yesterday counsel asked you repeatedly whether the

12   exercise of the option is a negotiations process or a

13   straight application of the limited partnership agreement.

14   Do you recall that?

15   A    Yes.

16   Q    Let's look at the choices given here.  What are the

17   choices that you were faced with, based on this letter?

18   A    The first choice was to agree to allow AMTAX to market and

19   sell the property.

20   Q    Do you recall Mr. Pettit testifying -- Mr. Pettit

21   mentioning earlier this morning that there is no right to

22   market the property in the LPA?

23   A    That is correct.

24   Q    So actually, let's look at -- Adam, can we have a split

25   screen and have this Exhibit 212 on one side and the LPA on

1   the other side.  I am interested in 7.J and K.

2        The first choice given to market the property, I think

3   we all agree now is not in the LPA; is that right?

4   A   That is correct.

5   Q   So actually on Section 7.4 J, can AMTAX market anything?

6   A   AMTAX can market its interest in the partnership -- not

7   under 7.4.J. Under 7.4.K, they can market their interest in

8   the partnership.

9   Q   What is the difference between marketing the property and

10  marketing their interest in the partnership?

11  A   Well, the property is the apartments and their interest is

12  AMTAX 114, LLC.

13  Q   Option 1, we all agree, is not in the LPA.  Well, I

14  shouldn't use the word "option" because then there will be

15  confusion.  Choice 1 is not in the LPA; is that right?

16  A   Correct.

17  Q   Let's look at Choice 2.  What is Choice 2 that you were

18  given in Exhibit A-212?

19  A   My second choice was to purchase the property for $21.3

20  million.

21  Q   Do you recall what AMTAX's own appraisal was that was

22  prepared by Mr. Noble?

23  A   19,700,000.

24  Q   What is the difference between the number that appears on

25  this three choices letter and their own appraisal?

1    A    This number is $1.6 million higher.

2    Q    Can you see anything in the LPA that requires you to

3    accept an appraisal that is $1.6 million above the highest

4    appraisal that is available at that time?

5    A    No.

6    Q    So moving to your third choice.  What is your third

7    choice?

8    A    Third choice is to resign as general partner.

9    Q    Are you aware of any provision in the LPA that requires

10   you to step down as general partner after 17 years of working

11   on this project and initially having put it together, in

12   response to LP's demand that you do so?

13   A    I do not believe so.

14   Q    Let me turn to Parkway very briefly for a few minutes.

15   There was a suggestion yesterday in Exhibit 133, I believe,

16   that you delayed showing the CBRE appraisal to AMTAX.  Do you

17   recall that?

18   A    Yes.

19   Q    Let's look at Exhibit 133, please, Adam.

20        So, 133, does it help you remember when you shared the

21   CBRE appraisal with AMTAX?

22   A    March 7th, 2018 is when I sent this.

23   Q    Now, is there -- there was a lot of discussion yesterday

24   about you as general partner advancing money for -- to the

25   partnership for various items.  Do you recall that?

1    A    Yes.

2    Q    Counsel asked you about whether there was a specific

3    provision in the LPA that allows you to, for example, advance

4    funds to pay Hearthstone's fee when the cash flow was

5    insufficient to pay it.  Do you recall that?

6    A    Yes.

7    Q    What provision in the LPA did you rely on when you made

8    these advances?

9    A    Hearthstone's fee kind of slips between the cracks of the

10   LPA.  We categorized it as a subordinated loan.

11   Q    My question was different.  I apologize if I -- my

12   question wasn't clear.  Let me ask it this way:  Do you

13   believe, sitting here today, whether you need a special

14   provision in the LPA that allows you specifically to advance

15   funds to the partnership to cover Hearthstone's fee if there

16   is insufficient cash flow?

17   A    No, I don't believe so.

18   Q    Now, you were asked questions yesterday about legal fees

19   paid to -- pay by Trieste to your husband who took care of

20   some legal matters.  Do you recall that?

21   A    Yes.

22   Q    Counsel asked specific questions about the Dienes case?

23   A    Paul Dienes was his name.

24   Q    So can you please clarify or summarize what happened in

25   the Paul Dienes case?

1   A    There was an investigation by the Department of Labor &

2   Industries because Paul Dienes had filed a complaint about

3   the workplace.  The investigator investigated and held a

4   hearing and found there was insufficient evidence so

5   Paul Dienes' complaint was dismissed.

6   Q    Mr. Arterberry, your husband, represented Trieste Holdings

7   and represented you in that dispute; is that correct?

8   A    Yes, he did.

9   Q    What happened?  What was the outcome?

10  A    The state dismissed the complaint.

11       MS. LATSINOVA:  Your Honor, I have an additional

12  exhibit.  I apologize for the lateness.  I don't have it

13  electronically.  I have paper copies.  May I share?

14       THE COURT:  You may.

15       MR. PETTIT:  I have not received a copy.

16       THE COURT:  I know.  You get a copy.

17       THE CLERK:  It is Exhibit 173.

18  BY MS. LATSINOVA:

19  Q    Can you please look at what has been -- what is in front

20  of you and identify this document?

21  A    This was a letter sent by the Department of Labor &

22  Industries to -- actually to Paul Dienes, and we received a

23  copy of it.

24  Q    Is it the order dismissing the Dienes matter?

25  A    Yes.

1  Q    So did Trieste Holdings incur any penalty or any fine or

2  any liability in connection with this matter?

3  A    No, we did not.

4         MS. LATSINOVA:  Your Honor, we offer 173 at this

5  time.

6         THE COURT:  Any objection?

7         MR. PETTIT:  No.

8         THE COURT:  Exhibit 173 is admitted.

9              (Exhibit 173 admitted.)

10 BY MS. LATSINOVA:

11 Q    So do you recall yesterday, counsel asked you questions

12 about whether there is any obligation by the partnership to

13 indemnify Trieste Holdings for legal fees that Trieste incurs

14 in dealing with legal matters that involve the partnership?

15 Do you recall that?

16 A    I do.

17 Q    Let's look at Exhibit 49, Adam.  So stay on the first

18 page.

19      What is this exhibit?

20 A    The property management agreement.

21 Q    So looking at the definition section, here is -- I wish I

22 had better glasses.  Okay.  So Parkway Apartments, LP limited

23 partnership is defined as the owner.  Do you see that?

24 A    Yes.

25 Q    Trieste is defined as the manager?

1  A    Yes.

2  Q    So now, let's look at Section 5.7 on page 8.  It says, "To

3  the extent permitted by the law, owner" -- that is the

4  partnership -- "agrees to defend, indemnify and save harmless

5  manager" -- that is Trieste -- "from all claims and suits in

6  connection with the project."  Do you see that?

7  A    Yes, I do.

8  Q    Is there an indemnity from the partnership to Trieste for

9  legal fees such as the ones incurred in the Dienes matter?

10 A    Yes, there is.

11 Q    Now, you were asked a lot of questions yesterday about the

12 trash compactor.  I would be remiss if I didn't mention that.

13 Now, let's look at Exhibit 174.

14      MS. LATSINOVA: Your Honor, this one has been exchanged

15 and is available electronically.  It hasn't been admitted.

16      THE COURT:  All right.

17      MS. LATSINOVA:  I need to ask some foundation

18 questions.

19 BY MS. LATSINOVA:

20 Q    Adam, can we have 174, please.

21      Ms. Tamaro, what do we see in this picture?

22 A    This is the trash compactor in the background and the

23 assistant manager in the foreground.

24 Q    Who took this picture?

25 A    The site manager took the picture.

1  Q    The trash compactor is in the back?

2  A    Yes.

3  Q    Do you recall yesterday, counsel asked you why you as GP

4  and/or your husband ordered a trash compactor that couldn't

5  just be plugged into the wall?  Do you recall that?

6  A    I do.

7  Q    This is the trash compactor.  How big is it?

8  A    You can see it is large.  It is bigger than a full-sized

9  pickup.  I think it weighs about five tons.

10  Q    Has it been working well since it was installed?

11  A    Yes.

12  Q    How long has it been in service now?

13  A    Since we bought it, whatever year that was.

14  Q    Now, why did you choose this particular compactor?

15  A    If you recall, the City of Federal Way had determined that

16  our old trash compactor was not sealed, therefore as it

17  compressed the liquid waste in the garbage, the liquid waste

18  was allowed to drain into the storm water system, and the

19  City of Federal Way determined that our compactor was doing

20  this, which is in violation of their surface water management

21  codes.  The City of Federal Way told us we needed to replace

22  it.  This compactor is sealed and does not allow liquid to

23  drain out.  That's why we purchased this model.  In addition,

24  it has the appropriate capacity for 208 units.

25  Q    So switching back to another subject briefly. Counsel

 1  asked you some questions about the waterfall?

 2  A   Yes.

 3  Q   Let's put up 168 on the screen, please, Adam.

 4      Now, counsel asked you specifically questions about

 5  Line Item 19 and Line Item 27 and then line item --

 6          THE COURT:  22.

 7  BY MS. LATSINOVA:

 8  Q   Do you recall that?

 9  A   Yes, I do.

10  Q   Am I missing anything?

11          THE COURT:  Line 22.

12  BY MS. LATSINOVA:

13  Q   And Line Item 22.  You see that?

14  A   Yes.

15  Q   Counsel -- let me ask you this:  Line Item 19, accounts

16  payable.

17  A   Yes.

18  Q   Was that amount disclosed in every financial -- audited

19  financial statement from 2002 through 2018?

20  A   In every financial statement, there is disclosure of every

21  amount that was charged by an affiliate.  It is all in the

22  notes to the financials.

23  Q   So AMTAX received them ever year?

24  A   They did until this year.

25  Q   Until this year, until this litigation began, they never

1    said, "No, the accounts payable, both the $498,000 roughly in

2    this case, is inappropriate"?  Did they ever say that?

3    A    Not until this litigation began.

4    Q    Did they ever question the line item on line 26, the

5    interest on the deferred developer fee or the AGP

6    administrative general partner subordinated loan, which is on

7    line 27?

8    A    On line 26, they did not.  There was some back and forth

9    with Gary Newbold five or six years ago on when to stop

10   accruing interest.

11   Q    Okay.  That's line 26?

12   A    Line 26.

13   Q    There was back and forth on line 26?

14   A    Yes.

15   Q    Was there back and forth on line 27?

16   A    No, not until litigation began.

17   Q    So counsel suggested -- counsel stated that, and you

18   agreed, that the split, the final split result depends on how

19   many items are subtracted higher up in the waterfall such as

20   lines 26 --

21   A    Yes.

22   Q    -- and 19; is that correct?

23   A    That definitely is part of what determines their final

24   payoff, yes.

25   Q    Is that the function of something you did or is it a

1    function of the structure of the LPA?

2    A    Well, it is what it is in the LPA, and actually, in fact,

3    I get quite a lot less in incentive supervisory fees in this

4    partnership than I did in Hidden Hills.

5    Q    Were any of the items that appear on the waterfall not

6    disclosed in the annual financial statements?

7    A    All of -- everything that is owed to an affiliate is

8    disclosed clearly, especially because this is a HUD-insured

9    project.

10   Q    Now, just a couple questions about repairs.  Now, you were

11   asked questions about the PCNA report.  Now, I lost track of

12   the exhibit numbers.  Can we see the PCNA report?  Great.

13   Thank you.  Looking at the PCNA report.  You were asked a lot

14   of questions about balconies, do you remember that?

15   A    Yes.

16   Q    Can you please go to page 15, the balcony section.  Yeah.

17   Okay.  Thank you.

18        The PCNA report says that the decking of the balconies

19   was observed to be in fair to good condition with individual

20   boards replaced as operation expenses.  Do you see that?

21   A    Yes.

22   Q    It also says that -- above, that the painted wood railings

23   were measured to be 42 inches in height with spindles greater

24   than four-inch spacing.  When replaced, the railings should

25   be installed to current code. Do you see that?

1   A    Yes.

2   Q    Was the railing up to code at that point?

3   A    It was not.

4   Q    So the decking here says it is in fair to good condition.

5   Now, let's look at the definition section.  Can you please,

6   Adam, take us to page 6, definition section.  Okay.

7        Now, looking at the terminology here, one of the

8   definitions of fair condition says, "Repair or replacement is

9   required to prevent further deterioration, restore to good

10  condition, prevent premature failure, or to prolong its

11  expected useful life."  Do you see that?

12  A    Yes, I do.

13       THE COURT:  We are going to take our break.  We will

14  pick this up after Ms. Lindal because this is dragging.  I

15  have heard -- like I said, I have heard this stuff more than

16  three times now.  I look stupid, but I am not. Just clean it

17  up, and we will take our 15 minute break and we will get back

18  with Ms. Lindal.

19                           (Recessed.)

20       THE COURT:  You want to call Ms. Lindal?

21       MR. GOODNIGHT:  Yes, Your Honor.  Thank you.

22       THE COURT:  Ms. Lindal, if you would, raise your

23  right hand and be sworn.

24

25

```
 1                     LAURA LINDAL

 2        Having been sworn under oath, testified as follows:

 3                    DIRECT EXAMINATION

 4   BY MR. GOODNIGHT:

 5   Q   Please state and spell your last name.

 6   A   Laura Lindal, L-I-N-D-A-L.

 7   Q   And, Ms. Lindal, are you represented by counsel here

 8   today?

 9   A   Yes.  Mrs. Haddad over there.

10   Q   Where do you reside?

11   A   In Blaine, Washington.

12   Q   And the Judge is familiar with the two partnerships that

13   we've been talking about in this case.  Were you the auditor

14   for these two partnerships for a period of time?

15   A   Well, if you're talking about Parkway Apartments Limited

16   Partnership and Hidden Hills 2001 LP, yes.

17   Q   All right.  Thank you.  I have some questions about your

18   role as an auditor and why you disengaged from the audit.

19   But first of all let me ask you, when were you first engaged

20   as an auditor for either one of the partnerships?

21   A   Well, I was initially engaged in August 2016, to do the

22   2016 audit.  Or did you mean for the 2018 audit?

23   Q   No.  The first time you were engaged.  So the 2016 audit?

24   A   Yes.

25   Q   What was the scope of your engagement, briefly?
```

1    A    For 2016 or 2018?

2    Q    Both.

3    A    The scope of my audit was to give an opinion on the

4    financial statements and an opinion on compliance with the

5    HUD program.

6    Q    Okay.  Thank you.

7         And are you a CPA?

8    A    Yes.

9    Q    How long have you been a CPA?

10   A    I was licensed in California in 1995 sometime.

11   Q    All right.  Are you licensed in Washington as well?

12   A    Yes.

13   Q    And how long have you been doing auditing work?

14   A    I started auditing in 1991.

15   Q    What kind of entities have you audited?

16   A    That's changed over my career.  Since 2001 I have audited

17   entities that receive government money, for the most part.

18   Q    All right.  And have you taught any courses in your

19   specialty of practice?

20   A    Yes, I have.

21   Q    Can you explain that briefly to the Court?

22   A    Sure.  I have written and taught courses in a variety of

23   subjects, but most of them focus on either auditing

24   procedures, yellow book -- I'm sorry, that's the slang for

25   government auditing standards or audits of HUD programs.

1    Q    Okay.  Thank you.

2         And have you received any awards as a CPA or an

3    auditor?

4    A    Well, as a CPA or auditor, no, I have not received any

5    awards.

6    Q    It looks like you received an award as an instructor; is

7    that correct?

8    A    Yes, that is correct.

9    Q    What was that for?

10   A    It was an excellent instructor of the year.  I've received

11   that award from the Association of International Certified

12   Public Accountants, referred to as AICPA.  I also received

13   that award just recently from the California Education

14   Foundation.

15   Q    All right.  Thank you.  Have you audited LITHC properties

16   before?

17   A    Yes.

18   Q    When did you first audit LITHC properties?

19   A    Starting in 2001.

20   Q    And are you a sole practitioner?

21   A    Yes, I am.

22   Q    And approximately how many audits have you conducted each

23   year?

24   A    Currently I'm doing about 30 per year.

25   Q    And how many of those would you say are LITHC properties?

1   A    At the current time, slightly less than ten.

2   Q    I'm sure Judge Leighton is very aware of this, but can you

3   just briefly explain your understanding of your role as an

4   auditor for Parkway and Hidden Hills?

5   A    Well, my role as an auditor, regardless of the entity, is

6   to obtain sufficient appropriate evidence to support my

7   opinion.

8   Q    All right.  Now, the first time you and I ever met was

9   about ten minutes ago out in the hallway; is that correct?

10  A    Yes, sir.

11  Q    All right.  Is there any specific language that auditors

12  use when the audit is complete?

13  A    Well, are you asking what language we use in our report?

14  Q    Yes.

15  A    Well, I'm guessing you have my reports.  But the opinion

16  -- the reports are more than a page.  But the opinion that an

17  auditor gives, unless they modify it, so an unmodified

18  opinion, the language is something similar to -- it says:  In

19  my opinion the financial statements identified above, which

20  is identified in a preceding paragraph, for such and such

21  entity, and the name of the legal entity is included, fairly

22  state the financial position as of, for example, December 31,

23  2016.

24  Q    Okay.

25  A    And the related operations and cash flows for the year

1   then ended.

2   Q   All right.  Let's pull up Exhibit 130.  And I'll ask if we

3   could go to page 2 of that exhibit.

4   A   Okay.  Do I need to do something on this?

5   Q   No.  It will appear magically on the screen and we'll go

6   to page 2.

7   A   That would be PDF page 2?  Do you mean the audit report

8   page 2, which would be PDF page 4?

9   Q   Yes.  And do you see the statement that you just referred

10  to, that the financial statements present fairly?

11  A   Yes, I do.

12  Q   Where is that?

13  A   It's at the top of page.

14  Q   Is this the audit for Parkway?

15  A   Yes, it is, for 2017.

16  Q   All right.  What does this opinion, in your professional

17  experience, represent?

18  A   What does it represent?  You mean what does it -- I'm not

19  sure I understand what you're asking.

20  Q   What are you communicating when you offer this opinion in

21  an audit?

22  A   I am communicating that the financial statements referred

23  to above present fairly in all material respects the

24  financial position, the results of operations and cash flows.

25  I'm not trying to be smart.

1    Q    That's perfectly fine.

2    A    That's what it says.  Okay.

3    Q    What are the standards that you're held to as an auditor

4    when you offer such opinions?

5    A    Well, at least generally accepted auditing standards.  In

6    this particular audit you will notice, if you go to the

7    previous page, that I also performed the audit in accordance

8    with government auditing standards.  Those are additional

9    standards that I am also required to comply with.

10   Q    Okay.  And that was true for Parkway, but I gather not for

11   Hidden Hills; is that correct?

12   A    Hidden Hills' audit is not subject to government auditing

13   standards.

14   Q    So was the Parkway audit more substantial or stringent

15   than the Hidden Hills audit?

16   A    I would say it this way, if you don't mind:  So the audit

17   of the financial statements is the same.  But Parkway also

18   had an opinion on compliance with the HUD program, which is

19   not required for Hidden Hills, because it is not -- it

20   doesn't have any HUD funding.

21   Q    All right.  I understand.  Thank you.

22        Now, independence is one of the standards that applies

23   to you; is that correct?

24   A    Yes.

25   Q    And what does independence mean, in your understanding?

1  A    Well, independence means that there is an absence of

2  circumstances that would compromise my integrity, objectivity

3  or professional skepticism.

4  Q    In all the years you've been auditing, have you ever had

5  your independence questioned before this case?

6  A    No.

7  Q    When were you first retained to be the independent auditor

8  for Parkway and Hidden Hills?

9  A    August of 2016, for the 2016 financial statements.

10  Q    Okay.  And let me pull up A-86 and A-87, and ask you if

11  you would just identify these as your engagement letters.

12  This is A-86.  Is that one of your engagement letters?

13  A    There are A-86 -- yes, that is my engagement letter to

14  perform the audit.

15  Q    And A-87?

16  A    Is an engagement letter to perform agreed-upon procedures

17  on the electronic submission to HUD.

18  Q    Okay.

19        Now, when you take on responsibilities as an auditor,

20  do you have any professional standards that require you to

21  speak with anyone when you're retained?

22  A    So, generally accepted auditing standards require me to

23  speak with management.  I mean, there are a number of

24  inquiries that I make, not just when I'm retained, but

25  throughout the audit process, including the audit process.

1      When I am taking over from another auditor, which was the

2   case in 2016, I'm referred to as the successor auditor.  I am

3   required to make inquiries of the predecessor auditor.  I

4   will note they are actually not required to respond, but I am

5   required to ask.

6   Q   Did you do that in this case?

7   A   Yes, I did.

8   Q   Who was that person?

9   A   John Maddux of Squires Maddux.

10  Q   And did you know him before taking on this assignment?

11  A   I was familiar with who he was, yes.

12  Q   And did you know why Hidden Hills and Parkway were looking

13  for a new auditor in 2016?

14  A   My understanding was that John had lost some staff in his

15  firm, so he was reducing the number of audits that he was

16  taking on.

17  Q   Okay.

18  A   Or that he was performing.

19  Q   Now, do limited partners in LITHC properties, like AMTAX

20  here, receive the audits?

21  A   I presume that they do, yes.

22  Q   What is the role, if you know, of the limited partner in

23  the audit process?

24  A   I'm not aware that they have a role, as I would say.  I

25  mean, it may be that if there is debt outstanding to the

1  limited partner, one of the audit procedures may be to

2  confirm that debt with the limited partner.

3  Q    All right.

4  A    I don't know that I necessarily consider that a role,

5  but --

6  Q    Okay.  Did you ever have communications with Alden Torch

7  or AMTAX about the due dates of the audits?

8  A    They sent e-mails identifying what the due date was, but

9  other than that, no.

10 Q    Let me pull up Exhibit 166 on the screen.  And this is an

11 e-mail from Alden Torch to you and Ms. Tamaro.  Do you see

12 that?

13 A    Yes, sir.

14 Q    And its dated November 2, 2018, correct?

15 A    Yes.

16 Q    Now, if you can remove that blowup, Adam.

17       It indicates in this paragraph that the draft tax

18 return, due 3/3/2019, and then final tax return -- it goes

19 on.  Do you see that?

20 A    Yes.

21 Q    And just below that there's a reference to the audit date.

22 As soon as possible, but no later than March 17, 2018.  Do

23 you see that?

24 A    You mean 2019?

25 Q    Yes, 2019.

1    A    Yes, sir.

2    Q    Did Mr. Blake ever speak with you about the audits?

3    A    No.

4    Q    All right.  Let me go back, if I could, to the

5    Exhibit 130.  This is the audit ending 2017.  And I want to

6    go to note 6, if we can find that.

7         Now, my understanding, Ms. Lindal, is that somebody

8    else had done the audit for the year 2015; is that correct?

9    A    Yes.

10   Q    All right.  So when we get to note 6 -- here it is --

11   there is a "going concern" note.  Do you see that?

12   A    Yes.

13   Q    Why was that included?  And what is, in your experience,

14   the meaning of that note?

15   A    Okay.  That's two questions.  Can I just take them one at

16   a time, please?  So your first question was...

17   Q    Why was it included?

18   A    Why was this included?  In my professional opinion, if

19   someone were to read the financial statements of Parkway, it

20   could raise the question as to how can this entity continue,

21   not only a net loss, which may not be -- which is not an

22   indicator in and of itself.  But when you take a look at the

23   cash flow, the debt that was outstanding, and if there could

24   be a question whether an entity can continue as a going

25   concern, generally accepted accounting principles require

1    management to address that in the note disclosures.  So that

2    would be why this was included, to address any question that

3    could come up.

4    Q   Okay.  Thank you.

5    A   Then your second question was?

6    Q   You've answered it.  Thank you.

7         Did you render an opinion on Parkway management

8    functions of any kind?

9    A   No, not on management functions, specifically.  But maybe

10   -- can I explain?  Am I allowed to do that?

11   Q   Yes.

12   A   Maybe could we go to the auditor's report on the major HUD

13   program, which, I don't know, I'm going to guess is maybe PDF

14   page 34 or 36, something like that?  Yes, here we go.

15        So, you'll notice that my report on compliance for the

16   major HUD program, it identifies the direct and material

17   compliance requirements, that are there in the middle of the

18   page.  It starts, "Federal financial reports," and continues

19   on.  "Management functions" is on that third line.  And

20   there's quite a few compliance requirements listed there.

21   Q   Okay.

22   A   So, my opinion on compliance for a major HUD program is

23   it's not on each one of those separately and distinctly, it

24   is on those in aggregate.

25   Q   Okay.

1    A    And I did give an opinion on compliance with those

2    compliance requirements.

3    Q    The ones that are highlighted now on the screen?

4    A    My screen has a whole bunch of stuff highlighted.

5    Q    The compliance requirements you're referring to are the

6    ones that are blown up here?

7    A    Oh, yes, sir.

8    Q    What was your opinion?

9    A    On the next page, I believe, or is it lower on that page?

10   My opinion was that they complied in all material respects

11   with the compliance requirements that could have had a direct

12   and material effect on the major HUD program.

13   Q    Okay.  For HUD projects, does HUD itself have financial

14   reporting requirements?

15   A    Yes.

16   Q    And where are those contained?

17   A    In the Consolidated Audit Guide of Audits of HUD Programs.

18   Q    And did you make a finding on behalf of Parkway that those

19   requirements were met?

20   A    I'm sorry, did I make a finding on behalf of Parkway that

21   those compliance requirements were met?

22   Q    Yes.

23   A    That question doesn't -- can I answer what I think maybe

24   you might be asking?

25        Okay.  So first of all, there's -- a finding has a

1    different connotation, in my profession.  So I don't want to

2    say that I made a finding.  A finding is something different.

3    Q   I understand.  Okay.

4    A   If you're asking did the partnership comply with the

5    financial reporting requirements required by HUD, the

6    financial reporting requirements are in a format, and it

7    would be in the supplementary information to the financial

8    statements --

9    Q   Okay.

10   A   -- and that starts after the end of the notes.

11   Q   All right.  And did you look at that information?

12   A   Yes.  And the only assurance that I provide regarding that

13   is -- I'm sorry, now we have to go back to PDF page 4.  And

14   you will notice that under the paragraph heading that says

15   "Other matter - report on supplementary information."  And

16   you'll see that this supplementary information is required by

17   HUD.  And the very last sentence says, "In my opinion the

18   information is fairly stated in all material respects to the

19   financial statements."

20   Q   Okay.  Thank you.

21        So, do you do a separate HUD filing, then?  Or is a

22   separate HUD filing done, should I ask?

23   A   Management is required to file or to submit financial and

24   compliance data to HUD.

25   Q   And was this done in 2016, to your knowledge?

1   A    Yes.

2   Q    And 2017?

3   A    Yes.

4   Q    2018?

5   A    Yes.

6   Q    And is it being processed in 2019, for that year?

7   A    2019 isn't done yet.

8   Q    So it's being worked on, but we're still in the middle of

9   that?

10  A    Um, well, I wouldn't say it like that.  Because you can't

11  really put the information together until the period is

12  completed.

13  Q    Okay.

14  A    So you wouldn't start working on that until 2019 is

15  completed, we finish that year.

16  Q    All right.

17       In your experience with LITHC projects, have you found

18  it unusual that HUD projects operate at a loss at times?

19  A    Um, well, okay.  So are you asking me is it usual that

20  LITHC properties operate at a loss or that HUD properties

21  operate at a loss?

22  Q    I'm including LITHC's HUD, like Parkway, that they operate

23  at a loss at times.  Is that unusual?

24  A    No.

25  Q    Is it unusual for the general partner, at times, to

1    advance funds or defer payments on a HUD project, due to

2    insufficient cash flow?

3    A    If the project is not sufficiently cash flowing, it is not

4    unusual.

5    Q    Who was the primary point of contact for you for the

6    Parkway audit?

7    A    Catherine Tamaro.

8    Q    Okay.  And did she help to gather the information, the

9    financial statements that you need to conduct the audit?

10   A    She was responsible to provide me whatever I asked.

11   Q    Was she cooperative?

12   A    Yes.

13   Q    Was there ever a time when she refused to provide you with

14   information that you wanted?

15   A    No.

16   Q    Do you know when you first received the financial

17   statements for 2018 financial year?

18   A    I don't recall the exact date.  It was the end of January.

19   Late January.

20   Q    Okay.  When would you typically have a draft audit

21   prepared?

22   A    Early February.

23   Q    All right.  And when were the audited financial statements

24   due in Hidden Hills, if you know?

25   A    I don't recall.

1  Q    Okay.

2  A    My guess is the beginning of March.

3  Q    I think that's right.

4       When were the audits finalized for 2016 and 2017, if

5  you recall?

6  A    I don't.  But if you can get rid of this big blowup -- so,

7  for 2017 you will see my audit report is dated February 13th.

8  I would imagine they were issued within a couple of days of

9  that.

10  Q    Is the process that you've been through with Hidden Hills

11  different than the process you've been through with Parkway,

12  other than the HUD requirements, in terms of getting

13  information from Ms. Tamaro?

14  A    No difference.

15  Q    And I'm not going to go through the Hidden Hills audit and

16  ask the same questions, but the process was the same?

17  A    Correct.

18  Q    Ms. Tamaro was cooperative in all respects in both

19  processes?

20  A    She provided everything I requested, yes.

21  Q    Did you ever have a feeling she was withholding any

22  information from you?

23  A    No.

24  Q    Did you have any prior relationship with Ms. Tamaro before

25  you were retained for this work?

1    A    I had worked at a different firm in the early 2000s.  I

2    was aware of who she was, but I did not ever have any

3    dealings with her or any of the entities that she worked

4    with.

5    Q    All right.  Now, the Judge knows that you withdrew from

6    the audit.  And I want to pull up your two letters,

7    Exhibits 153 and 154.

8         These are your two letters of withdrawal?

9    A    This is the letter of withdrawal.

10   Q    No. 153.  And let's pull up 154 as well.

11   A    Okay.

12   Q    Why did you withdraw from the audit?

13   A    I was aware that there were allegations that there were

14   material misstatements in the 2016 and 2017 financial

15   statements.  And as such, that could create influences, or a

16   reasonably informed third party could come to the conclusion

17   that I was no longer objective.  My independence was

18   impaired.  By professional standards, I'm required to

19   withdraw.

20   Q    When did you first make the judgment that you should

21   withdraw?

22   A    Well, I'm going to answer it this way:  So once I became

23   aware of the allegations of material misstatements, I knew

24   that at that point my independence was impaired.  I did not

25   make the decision to withdraw at that time, because I was

1    under the understanding that the parties were going to go to

2    mediation at the end of April.  And if the parties had

3    settled, then that might put a different light on that

4    impairment to my independence.  It might make it mitigated,

5    so I could go ahead and issue the audit.

6        That did not happen.  And at the end of April, I believe

7    it was April 25th, Catherine Tamaro sent me an e-mail

8    requesting that the audits be issued.  And at that point I

9    knew I had to -- now I had to do a formal withdrawal.

10   Q    Did Ms. Tamaro ask you to withdraw?

11   A    No.

12   Q    How did you become aware of these -- I think you used the

13   word "accusations" -- but how did you become aware of the

14   concerns, I'll say, that had been expressed?

15   A    I was performing concluding audit procedures on the

16   Parkway audit.  And as a part of my concluding audit

17   procedures is to ask management, has anything occurred

18   subsequent to the last time we talked or the last time I

19   obtained evidence, which would have been early February.  And

20   I specifically asked about:  So, has anything happened in the

21   lawsuit that I should be aware of?  She responded, "Yes, you

22   need to be aware of some testimony that was provided on

23   February 28th."

24   Q    Okay.

25   A    And at that point I requested that information from my

1   legal representative.

2   Q    Who provided you with that information?

3   A    My legal representative.

4   Q    Who was that at the time?

5   A    It was Dylan Johnson.

6   Q    What information was provided to you?

7   A    A deposition that I understood was taken -- I mean, it was

8   dated February 28th, 2019 -- of Mr. Krabbenschmidt of

9   Novogradac.

10  Q    And what about that deposition led you to the conclusion

11  that you needed to withdraw?

12  A    There are multiple statements in there that the financial

13  statements have material misstatements -- there are multiple

14  declarations, I'll say, that the financial statements have

15  material misstatements.

16  Q    Okay.

17       Is there any code of professional conduct that, in your

18  judgment as you made that decision, was important to you?

19  A    For the Parkway audit?  Yes.  Not only the code of

20  professional conduct that I'm required to follow for any

21  engagement that I'm on, that I am performing, but with

22  Parkway I also have to comply with government auditing

23  standards.

24  Q    Okay.  Did you tell Ms. Tamaro that you were going to

25  withdraw before you actually sent the letters?

1    A    I let her know about an hour before I sent the e-mail.

2    Q    Okay.  Now, had you started working on a draft audit for

3    the 2018 fiscal year, in February?

4    A    No, I started -- well, actually I started the audit work

5    way back in -- I did preliminary engagement activities in

6    October.  Once those were complete, I sent the engagement

7    letter dated November 1st.  I did testing on December 5th.

8    And then when I received the financial information after the

9    year had been concluded, I was performing audit procedures

10   starting late January.

11   Q    Okay.  When you read the Krabbenschmidt deposition, did

12   you note that he was taking issues with certain fees of the

13   partnerships?

14   A    Yes, I did.

15   Q    And what, in particular, do you recall him noting?

16   A    I'm not sure what you're asking.  I mean, it's a pretty

17   long deposition.

18   Q    Yes, I appreciate that.  I apologize.

19        Do you recall questions about Hearthstone?

20   A    Yes.

21   Q    And how the finances were dealt with in Hearthstone?

22   A    You mean the payment of fees to Hearthstone?

23   Q    Yes.

24   A    Yes.

25   Q    Is there anything about the payment of fees to Hearthstone

1    that you believed was improper, based on all of your work for

2    the two partnerships?

3    A    No.

4    Q    Do you recall him questioning a management -- project

5    management fee?

6    A    Yes.

7    Q    And you were familiar with that project management fee?

8    A    Yes.

9    Q    For Trieste Holdings LLC?

10   A    It was paid to them -- it was earned by them, yes.

11   Q    And is there anything in your review of the financials and

12   your audit work for these two entities, that you ever

13   considered improper about the use of, or payments to or from,

14   Trieste Holdings?

15          MR. PETTIT:  Objection, Your Honor.  This is really

16   leading the witness to the extreme extent.

17          THE COURT:  Overruled.

18          MR. GOODNIGHT:  Thank you, Your Honor.

19   A    I want to be clear, because you were asking a question

20   about the project management fee.  Then you turned it into a

21   question of all payments.  So let me just address each of

22   those, because it seems like that's two questions.

23          Did I have any question regarding the payments that were

24   made on the project management fee?  No.  Did I have any

25   question regarding fees earned by an affiliated entity,

1  including Trieste Holdings?  No.

2  Q    Thank you.

3       Do you recall Mr. Krabbenschmidt raising some questions

4  about the extermination services, in his deposition?

5  A    Yes.

6  Q    Did you have any concerns or question about the

7  extermination services payments?

8  A    I'm not sure that they were paid.  Those expenses may have

9  been accrued.  But, no, I did not have any questions about

10 the expenses.

11 Q    Do you recall him raising questions about the repair

12 supervision fee?

13 A    Yes.

14 Q    Did you have any concerns about the way the repair

15 supervision fee was handled by the two partnerships?

16 A    No.  By the two partnerships?  I think you just mean

17 Parkway.

18 Q    Parkway?

19 A    Yes.

20 Q    You had no concerns?

21 A    I didn't have any concerns.

22 Q    Do you recall him raising questions about the tenant file

23 review?

24 A    The tenant file review fee?  Yes.

25 Q    Did you have any concerns about that, based on your

1   experience auditing the entities?

2   A   So I want to be sure I'm limiting my answers to Parkway,

3   because I'm not sure that those fees exist on Hidden Hills.

4   Q   Fair enough.

5   A   Okay.  So, no, I had no concerns on how that fee was on

6   Parkway.

7   Q   Thank you.

8        Do you recall him raising concerns, also, about the

9   deferred developer fee?

10  A   Yes.

11  Q   And did you have any concerns about the way that was

12  handled?

13  A   I'm not sure that that related to the years that I

14  audited, the allegations that he made.

15  Q   Did you note that he had concerns about the siding

16  replacement and the way that was charged?

17  A   Yes.  I'm aware of what his questions or allegations were.

18  Q   And what were his questions or allegations?

19  A   He was discussing that he believed the accounting

20  treatment to be incorrect, that the costs related to the

21  replacement of the siding should have been capitalized versus

22  expensed.

23  Q   And did you agree with that?

24  A   No, I did not.

25  Q   What's your view?

1   A    So, if you would indulge -- so, generally accepted

2   accounting principles require that if costs of a

3   replacement/repair item extend the life of the asset, they

4   are required to be capitalized.  If they do not extend the

5   life of the asset, they are expensed.

6        And when you think about the asset, the building of

7   Parkway, it's estimated to have a 40-year life.  The siding

8   was being replaced at about approximately year -- let's say

9   anywhere between year 14 and year 16.  And there was every

10  expectation the siding would have to be replaced again before

11  year 40.  Therefore, it is not extending the life of the

12  asset beyond that original 40 years.  So generally accepted

13  accounting principles would say you expense it, which is what

14  management had done.  And I concurred with their

15  classification.

16  Q    Okay.  Thank you very much.

17       I just have two more questions, then I'll be done.  The

18  first is this:  Do you stand by your audits in both Hidden

19  Hills and Parkway?

20  A    If you're asking if I would change my opinion on the

21  financial statements, the answer is no.

22  Q    Nothing Mr. Krabbenschmidt has said would change your

23  opinions?

24  A    Nothing he has said would change my opinions on the

25  financial statements or compliance.

1   Q   My final question is this:  If Mr. Krabbenschmidt had not

2   testified as he did, is it your expectation that you would

3   still be the auditor for both partnerships today?

4   A   It's my expectation that those audits would have been

5   issued, yes.

6   Q   Thank you very much for coming in.  Thank you.

7           THE COURT:  Mr. Pettit.

8           MR. PETTIT:  Yes, Your Honor.  Just so I'm clear, are

9   we going to go until noon, then stop?

10          THE COURT:  How long do you think you have?

11          MR. PETTIT:  Maybe a half an hour.

12          THE COURT:  All right.  I'll give you a half hour.

13          MR. PETTIT:  Okay.  Fair enough, Your Honor.

14          THE COURT:  Then we'll take our lunch break.

15                      CROSS EXAMINATION

16  BY MR. PETTIT:

17  Q   Good morning, Ms. Lindal.

18  A   Hi.

19  Q   My name is Eric Pettit.  I'm an attorney for the

20  defendants in this case, who are the AMTAX entities.

21  A   Okay.

22  Q   So I just -- I want to start by asking you a question

23  about something that Mr. Goodnight asked you on direct

24  examination.  He said, had you ever had your independence

25  questioned before this case.  Do you recall that?

1   A    Yes.

2   Q    And you answered that, no, you hadn't had your

3   independence called into question before this case, correct?

4   A    Correct.

5   Q    Who's calling your independence into question in this

6   case?

7   A    My understanding is that you sent a letter, that I was

8   presented, to Stoel Rives, saying that the code of

9   professional conduct did not support that there could be an

10  impairment to my independence.

11  Q    Right.  So we sent a letter saying that there was not an

12  impairment to your independence; is that right?

13  A    Correct.

14  Q    I'm asking you who is questioning your independence?

15  A    Who is saying that I may not be independent?

16  Q    Yeah.

17  A    I'm making that determination.

18  Q    Okay.  Because he asked you whether anyone had -- before

19  this case, if anyone had questioned your independence before.

20  And I just want to make it clear that neither the general

21  partner nor the limited partners have questioned your

22  independence here; isn't that right?

23  A    Correct.  You're questioning the fact that I said I could

24  not -- I may not have independence.

25  Q    Our position was that your claim that you are -- your

 1  independence has been impaired, is an incorrect claim; is

 2  that right?

 3  A   That's my understanding.

 4  Q   That's the opposite of questioning your independence,

 5  right?

 6  A   Yes, sir.

 7  Q   Okay.  So, do you recall receiving a trial subpoena in

 8  this matter?

 9  A   Yes.

10  Q   Okay.  And that was served on your -- Dylan Johnson, who

11  was your counsel at the time; is that right?

12  A   Well, I was thinking about the one that I received in

13  January.  I received that myself.

14  Q   Okay.  So there are actually two subpoenas here.  There

15  was a document subpoena that you got in January to produce

16  documents in this case?

17  A   Yes.

18  Q   That's the one you're thinking of?

19  A   Yes.  But you are correct, there was another one that my

20  attorney accepted on my behalf.

21  Q   And that was for your appearance here at trial?

22  A   Yes, sir.

23  Q   And did you -- I don't want to have you communicate any

24  communications with counsel -- but did you understand that

25  that subpoena requested that you produce documents in

1  connection with your appearance here at trial?

2  A   Yes.

3  Q   And do you understand that on Monday, June 3rd, so Monday

4  of this week, that your counsel sent a letter enclosing

5  responsive documents to that trial subpoena?

6  A   Okay.

7  Q   I'm asking if you're aware of that.  You were not aware of

8  that?

9  A   Yes.  I am aware.  And -- yes.

10 Q   Let's put that up on the screen here.  That's Exhibit

11 A-303.

12      And if we could just blow up the text of that.  And

13 you'll see -- so, this was signed by Mary Haddad?

14 A   Yes.

15 Q   That's your current counsel?

16 A   Yes.

17 Q   And it's a letter -- and I'll represent to you that

18 "Grayce," is Grayce Zelphin, my co-counsel.  And Ms. Haddad

19 writes, "Enclosed, please find responsive documents to your

20 trial subpoena dated" -- I can't read that, I think it's

21 May 10, 2019 -- "the documents are Bates numbered.  And also

22 enclosed is a privilege log."  Do you see that?

23 A   Yep.

24 Q   And it goes on to say, "We will continue reviewing the

25 deposition of Mr. Krabbenschmidt to identify, more

1   specifically, statements that were made that supported

2   Ms. Lindal's withdrawal."  Do you see that?

3   A   Yes.

4   Q   Did your counsel -- did you review Mr. Krabbenschmidt's

5   deposition to identify specifically the statements that

6   supported your withdrawal?

7           MS. HADDAD:  I just want to make an objection and

8   instruct the witness not to testify about anything we

9   discussed, as attorney-client privilege.

10          THE COURT:  Rephrase your question.

11  BY MR. PETTIT:

12  Q   My question is whether you reviewed -- I don't want to

13  have any communications with counsel -- whether you, Laura

14  Lindal, reviewed the deposition transcript, and identified

15  the specific places where you thought your independence was

16  impaired because of those comments?

17  A   So did I review the deposition?  Yes.  Did I identify

18  specific places that I believed caused the -- someone could

19  look at that and say my objectivity had been impaired?  I

20  identified quite a few of them, yes.

21  Q   And, again, not going into anything that you -- any

22  discussions you had with counsel, did you communicate to your

23  counsel where those portions of the deposition transcript

24  were?  Did you say, page 152, page 178?  And I'm using these

25  as examples.

 1  A    Sure.  But isn't that me telling you what I told her?

 2  Q    I'm asking you whether you identified, by page number, the

 3  specific areas and whether you then gave that to your lawyer.

 4  I don't want to hear anything about what you discussed with

 5  your lawyer.

 6         MS. HADDAD:  I'll make an objection and instruct the

 7  witness not to answer.  I think that's attorney-client

 8  privilege.

 9         THE COURT:  Well, I'm not sure there's a "so what" in

10  this.  This is a "nothing burger."  You want to ask her what

11  her objection to Mr. Krabbenschmidt, or whatever his name

12  is --

13         MR. PETTIT:  Your Honor, we're trying to understand

14  why she withdrew.  So we want to know --

15         THE COURT:  To what end?

16         MR. PETTIT:  Because we think that there may be some

17  communications that happened, or that there may be some

18  issues around her decision to withdraw that could create some

19  credibility issues for Ms. Tamaro and could also call into

20  question whether she's acting in compliance with her

21  fiduciary duties as a general partner.

22         THE COURT:  Ask those questions, then.

23         MR. PETTIT:  Okay.

24  Q    So, you testified, Ms. Lindal, that you were -- you

25  received some financial statements from Ms. Tamaro that you

1    reviewed in connection with your audit of the Parkway and

2    Hidden Hills 2018 financial statements?

3    A    Correct.

4    Q    And do you recall when, specifically, you received those?

5    A    No, I do not recall specifically.  It was late January.

6    Q    Okay.  And you knew at that time that the Parkway

7    Partnership agreement required that that audited financial

8    statement be submitted by February 15th; is that right?

9    A    No, that's not correct.

10          MR. PETTIT:  Okay.  I'm going to mark an exhibit --

11   this hasn't been previously marked.  May I approach, Your

12   Honor?

13          THE CLERK:  A-301.

14   Q    So, Ms. Lindal, I'm handing you what has been marked as

15   Exhibit A-310.  And this is an e-mail from Dylan Johnson --

16          THE COURT:  It's A-301.

17          MR. PETTIT:  I'm sorry, I think A-301 has already

18   been marked.

19          THE COURT:  It's identified with a sticker as A-301.

20   We can take care of it later.

21          MR. PETTIT:  Yeah.  It may have been on my part.  And

22   I apologize, Your Honor.

23   Q    Whether it's A-301 or A-310 --

24   A    I'll leave that up to you.

25   Q    But this is an e-mail from your counsel to Ms. Zelphin

 1  dated February 1, 2019; is that right?

 2  A   Yes.

 3  Q   And I think that you identified earlier that you

 4  understood that you had previously received a document

 5  subpoena in this case; is that right?

 6  A   Yes.

 7  Q   And is it your understanding that -- is it Mr. Johnson or

 8  Ms. Johnson?

 9  A   Mister.

10  Q   Mister.  And Mr. Johnson communicated with Ms. Zelphin

11  about that subpoena; is that right?

12  A   Yes.

13  Q   And in this e-mail he writes:  "However, as mentioned,

14  Ms." -- let me read it all in.  "In my most recent

15  communications with Ms. Lindal, production of audit files by

16  next" -- and I don't know if that was supposed to be week --

17  "is feasible.  Certainly one of the years by early next week.

18  In regards to the e-mails, at this time February 17th seems

19  reasonable.  However, as mentioned, Ms. Lindal is currently

20  working on the 2018 audit in which AMTAX is a limited

21  partner, which is due by February 15th."

22       Do you know where Mr. Johnson got the information that

23  the audited financial statements for Parkway were due

24  February 15th?

25  A   My guess is is that he's -- he is misinformed or

1  misunderstood, and wrote this information incorrectly.

2  Because that is not what I would have said.

3  Q   You didn't communicate to him that it was due by

4  February 15th?

5  A   No.

6  Q   And you have no idea where he got that information?

7  A   I can guess what I had said in my communication with him,

8  even though that's with an attorney.

9  Q   I don't want you to speak --

10  A   I had told --

11       THE COURT:  Ma'am, ma'am, ma'am, don't talk over his

12  question.  He'll try not to talk over your answer.  All

13  right?

14       THE WITNESS:  My apologies, sir.

15       THE COURT:  One at a time.

16  Q   And I apologize.  I didn't mean to speak over you.  I'm

17  worried about protecting the privilege.  So I don't want to

18  get into any communications with counsel, and I also don't

19  want you to speculate.  I just want you to answer questions

20  where you have a factual basis.

21  A   Then I don't know why he would say this.

22  Q   Okay.  Okay.  So let's pull up Exhibit 145.  And this is a

23  draft of a letter from you.  Do you see that?  Is that your

24  letterhead up at the top?

25  A   Yes.

1    Q    And it's -- it looks like it has a watermark on there

2    saying "Draft 1/29/19."  Do you see that?

3    A    Yes.

4    Q    Who prepared this document?

5    A    I did.

6    Q    Okay.  And let's take a look at Exhibit 147.  Is this the

7    draft audit that would accompany that letter that we just

8    looked at?

9    A    Yes.

10   Q    So these were in draft form as of the end of January,

11   2019; is that right?

12   A    Yep.

13   Q    Did you provide those drafts to anyone?

14   A    This information was sent to Catherine Tamaro.

15   Q    Was it sent to the -- did you have any role in sending it

16   to the limited partners?

17   A    No.  That is not my responsibility.

18   Q    But is it consistent with your recollection and this

19   watermark that Ms. Tamaro had the draft audits by the end of

20   January 2019?

21   A    Or very soon thereafter, yes.

22   Q    Let's look at Exhibit 146.  This is the same one for

23   Parkway.  Do you see that?

24   A    Yes.

25   Q    If we look at 148, and that's the financial statement that

1    goes with that letter; is that right?

2    A    Yes.

3    Q    And I'll note the watermark on that looks about a week

4    later; is that right?

5    A    Yes.

6    Q    So do those watermarks indicate to you that as of

7    February 8, 2019, Ms. Tamaro had a draft of the Parkway

8    financial statement?

9    A    Or very soon thereafter.

10   Q    Okay.  Certainly before February 28th when

11   Mr. Krabbenschmidt gave his deposition?

12   A    I would guess.

13   Q    Okay.  And did Ms. Tamaro provide you with any comments

14   about your draft audits?

15   A    Yes.

16   Q    And what were her comments, if you recall?

17   A    I don't recall exactly.  I would have to look at my work

18   papers.

19   Q    Okay.

20        I'd like to ask you some questions about the auditing

21   standards.  And you produced these in your -- with your

22   production earlier this week.  And are you familiar with the

23   AICPA Code of Professional Conduct?

24   A    I'm familiar with parts of it, yes.

25   Q    That's Exhibit 307.  Let's pull it up on the screen.

 1          Do you understand that this is a code of professional

 2   conduct that would have application to your role as an

 3   auditor in connection with these partnerships?

 4   A    Yes.

 5   Q    And do you understand that this AICPA set of rules has a

 6   conceptual framework approach for determining whether your

 7   independence has been compromised?

 8   A    Yes.

 9   Q    And that's in -- let's turn to page 42 of the exhibit.

10   And let's blow up the bottom there, conceptual framework for

11   independence.  Do you see that?

12   A    Yes, sir.

13   Q    And does that -- these rules go on to identify specific

14   types of threats to independence; isn't that right?

15   A    Yes, sir.

16   Q    So let's go to page 44 of the exhibit.

17          And these are types of threats.  And if we could -- I

18   want to -- let's take the first three first, so I can blow

19   them up so you can see them a little bit better.

20          Which of these threats do you think is implicated here

21   to your independence?  Which of these types of threats do you

22   think your impairment falls under?

23   A    I would include it under adverse interest.

24   Q    Okay.  Let's keep scrolling down, Chris.

25          And tell us when to stop.

1          Wait, go back up to advocacy.  I want to give her a

2    chance to look at these all.

3    A    I'm familiar with what they are.

4    Q    I'm sorry.

5    A    No.  That's okay.  That's okay.

6    Q    Any others?

7    A    You can keep going.

8    Q    Keep going.  And it goes on to the next page, too.  So

9    we'll let --

10   A    I would also include it under the self-interest threat.

11   Q    Okay.

12   A    And I would also include it under the undue influence.

13   Q    Let's take those in turn.  Let's go up to the first one.

14   Let's go back to the top, the adverse interest threat.

15   A    Yes.

16   Q    Okay.  "The adverse interest threat is the threat that a

17   member will not act with objectivity, because the member's

18   interests are in opposition to the interests of an attest

19   client.  An example is" -- how do you pronounce it, attest?

20   A    Yes.

21   Q    "An example is either the attest client or the member

22   commencing litigation against the other, or expressing the

23   intent to commence litigation."  Do you see that?

24   A    Yes.

25   Q    Who is the attest client for the Parkway Partnership?

 1  A   The attest client is the partnership itself.  Parkway --

 2  Q   The limited partner is not the attest client; is that

 3  right?

 4  A   Correct.

 5  Q   What about for Hidden Hills, who is the attest client

 6  there?

 7  A   The partnership itself, Hidden Hills 2001 LP.

 8  Q   Who speaks on behalf of the partnership?

 9  A   Management.

10  Q   Right.  So the limited partner does not have any role in

11  speaking on behalf of the partnership; is that right?

12  A   I am not going to say they have no role.  I mean, I'm sure

13  in some, you know -- but as far as obtaining me as the

14  auditor, that's management's responsibility.

15      But can I just make a comment?  Remember that this is a

16  framework.  So the way that the AICPA Code of Professional

17  Conduct has established the requirements regarding

18  independence is that it is a conceptual framework.  It is not

19  a set of exact rules.  You know, it's not -- it's not an

20  exact flowchart that you follow this down, and the answer is

21  either yes or no.  This is a conceptual framework on which

22  the auditor, or whatever attest service you are providing,

23  you are required to consider.

24  Q   Right.  I'm asking you to consider it here today.

25  A   Yes.

1   Q   So the limited partner has no role in the management

2   functions of the partnership, who is the attest client; is

3   that right?

4   A   The partnership is the attest client.  Who speaks on

5   behalf of the partnership is management.  And the limited

6   partner has no role in that.  You are correct.

7   Q   So why would criticism by an expert retained by a limited

8   partner, who is both not the attest client and has no ability

9   to speak on behalf of the attest client, threaten your

10  independence under the adverse interest threat?

11  A   Because they are users of the financial statements.

12  Q   And in what way -- where does it say any user of the

13  financial statement could create an adverse interest threat?

14  A   It doesn't say that.

15  Q   Okay.  Then it goes on to say, "An example is either the

16  attest client or the member commencing litigation against the

17  other, or expressing the intent to commence litigation."  Has

18  the partnership threatened to commence litigation against you

19  or vice versa?

20  A   No.  The partnership has not expressed that interest.

21  Q   Has the limited partner expressed any -- said anything to

22  suggest that it was considering commencing litigation against

23  you?

24  A   Not that it is commencing litigation against me.

25  Q   Did Mr. Krabbenschmidt in any way, at any point in his

1  declaration, accuse you of malpractice?

2  A    That word was mentioned in the deposition, yes.

3  Q    The word "malpractice"?

4  A    Yes.

5  Q    By Mr. Krabbenschmidt?

6  A    Yes.  At least that's my understanding when I read through

7  it.

8  Q    That was the basis for your withdrawal?

9  A    Not that piece specifically.  That part -- that was part

10 of it, yes.

11 Q    Okay.  So let's go down to the next one that you

12 identified.  Self-interest threat.  "The threat that a member

13 could benefit financially or otherwise from an interest in or

14 relationship with an attest client or persons associated with

15 the attest client."

16 A    Yes.

17 Q    What was the self-interest threat here?

18 A    With allegations of material misstatements in the 2016 and

19 2017 financial statements, there could be the allegation that

20 by issuing the audit for 2018, when I was aware of those

21 allegations, that I was not objective.

22 Q    How would that allow you to benefit financially or

23 otherwise?

24 A    Well, otherwise, it may be in my best interests to

25 continue -- I mean, it could -- I'm not saying this is the

1    case, but when you consider an impairment to independence

2    includes the appearance of independence.  So not just

3    independence in mind, it also includes the independence in

4    appearance.  And it could appear that I am continuing to

5    issue my opinions on the audit to support previous opinions

6    that were given.  And if those allegations were proven to be

7    true, it could -- at that point it could look like, to an

8    outside party, they could reasonably conclude that I am

9    continuing to issue audit opinions to support what I had

10   previously done.

11   Q    So that would be your self-interest there?

12   A    Yes.

13   Q    Okay.  But you went back -- you testified on direct

14   examination, that you went back and looked at your audited

15   financial statements; is that right?

16   A    Yes.

17   Q    And you stand by them?

18   A    That's correct.

19   Q    But notwithstanding the fact that you stand by them and

20   disagree with the criticisms of Mr. Krabbenschmidt, you still

21   feel that you have no choice but to disengage from this?

22   A    Yes, sir.

23   Q    Let's go to the next one that you identified, the undue

24   influence threat.

25   A    Yes.

1    Q    Can we get to the undue influence threat?  Okay.

2          "The threat that a member will subordinate his or her

3    judgment to that of an individual associated with the attest

4    client, or use that individual's reputation or expertise,

5    aggressive or dominant personality, or attempts to coerce or

6    exercise excessive influence over the member."

7          So how was the undue influence threat met here?

8    A    So, it could be perceived that I was -- you know, that my

9    opinion was affected by -- or that my audit procedures were

10   affected by the opinions, the allegations of

11   Mr. Krabbenschmidt.

12   Q    Okay.  Do you recall testifying about a submission to

13   HUD's REAC system, on direct examination?

14   A    Yes.

15   Q    You said that was done by Ms. Tamaro and not by you; is

16   that right?

17   A    No.  I believe what I said is, it's management's

18   responsibility to file the HUD submission, and that it had

19   been done for 2016, 2017 and 2018.

20   Q    Who submitted to REAC for 2018?

21   A    I was contracted.  That's the engagement letter that

22   someone had brought up earlier -- I was contracted to submit

23   that financial and compliance data to HUD for 2018.  And I

24   did so.

25   Q    When did you do that?

1    A    I don't recall the exact date.  Middle of March.

2    Q    Does HUD allow you to file with the REAC system, even if

3    the draft -- even if the audit has not been completed?

4    A    The questions in the HUD -- part of the submission is has

5    the audit been issued.

6    Q    And had the audit been issued as of that time?

7    A    No, it had not.

8    Q    Let's look at Exhibit 151.  Is that the REAC submission

9    for Parkway?

10   A    Can you scroll up so I can see the end of it?  The last

11   page.

12   Q    The last page?  Yeah.

13   A    Yes.

14   Q    Let's stay on that last page.  And I want to look at the

15   last line item on that last page.

16   A    I'm sorry, can I ask a question?

17   Q    Sure.

18   A    This seems to not be complete as a document, because this

19   should have been marked "draft."  Now, the information that

20   comes out of HUD's electronic database, it does not allow a

21   watermark to go on that.  But there should have been an

22   identification that this was a draft.  This was not the

23   final.

24   Q    So let's go back to the first page.  So you're saying that

25   this was not -- I'm trying to understand what you're saying.

1   You say this was not submitted to REAC?

2   A   So this information is not what was submitted.  This is a

3   draft.  Typically when I send them to management, this piece

4   would be included with -- there should have been an

5   additional four pages that would have the draft watermark.

6   Unfortunately, because this comes right out of HUD's

7   database, the draft watermark, it won't accept it.  You can't

8   get a draft watermark on this.

9   Q   I guess I'm having trouble understanding.  So you're

10  saying you can submit a draft to REAC, but you have to

11  watermark it?

12  A   No, no.  My apologies.

13      So the information would have been input into HUD's

14  database, and not submitted, just input.  And then that

15  information is printed, which I believe is what you see here.

16  That information, once it's been printed, but not yet -- so

17  it's been entered, printed, not yet submitted, that goes to

18  management for their approval.

19  Q   Okay.

20  A   And that's why I said it would be in draft form, because

21  this would not have been the information that was submitted

22  to HUD.

23  Q   So is it your understanding that this was a draft that you

24  prepared and then sent to Catherine?

25  A   Yes, sir.

1    Q    Okay.  Thank you.

2    A    Sorry.

3    Q    No, I apologize.  That's helpful.

4         Can I go to the second-to-the-last page now?  And the

5    last line item there.  It says, "Date of independent

6    auditor's report January 29, 2019."

7    A    Exactly.  And that is how I knew that this was a draft,

8    because this was dated a similar date to the draft of the

9    financial statements.  So this date would change once it was

10   submitted to HUD.

11   Q    Do you know whether it was actually submitted to HUD?

12   A    I do know.  And, yes, it was.

13   Q    And how do you know that?

14   A    Because I did it.

15   Q    So you made the submission?

16   A    I made the submission.

17   Q    Do you know if you produced that document in connection

18   with your trial subpoena here, or your document subpoena

19   earlier?

20   A    Um, it should -- so there is -- so once it's submitted to

21   HUD, there's no document that comes out of that.  There is --

22   I typically print the screen that says REAC -- or HUD has

23   accepted that submission.  And that had to relate to 2018,

24   which I have now forgotten the status, I apologize, of where

25   the -- the document subpoena asked for 2016, 2017.  My

1   understanding is that I have given everything related to

2   that.  At that time 2018 was scoped out until the audit was

3   completed.  And with the withdrawal of the audit, I'm not

4   aware of where all of that stands.

5   Q   Okay.  Did you ever talk to Catherine Tamaro, before your

6   withdrawal, about Mr. Krabbenschmidt's deposition testimony?

7   A   Other than when I asked -- on my concluding audit

8   procedures I asked if there was anything that I should be

9   aware of.  She said, "Yes, there was a deposition on

10  February 28th."  And so there was that discussion.  I'm not

11  aware I discussed it with her any further.

12  Q   Now, I think you testified on direct examination that you

13  learned from Ms. Tamaro that there was a mediation, and that

14  was in April.  And so you held off on your withdrawal because

15  of that?

16  A   Yes.  Yes.

17  Q   Did you inform anyone from the limited partner that you

18  were -- you believed you had a --

19  A   I did not inform anyone, except my legal representative.

20  Q   So when did you inform your legal representative?

21  A   I mean, definitely the same day that I reviewed

22  Mr. Krabbenschmidt's deposition.  But I don't recall what

23  exactly that date was.  But it was around the middle of

24  March.

25  Q   Okay.  And do you recall submitting a privilege log in

1   connection with the documents that you provided?

2   A   I am aware my attorney submitted that.  I don't -- I did

3   not do that.

4   Q   But you did have communications with your counsel before

5   -- and not into the substance -- but you had conversations

6   with your counsel before the date that you sent your

7   disengagement letter?

8   A   Yes, sir.

9   Q   Just going back to the REAC, because I want to close out,

10  so did you submit the HUD completed report to REAC?

11  A   Yes.

12  Q   What date was that?

13  A   I apologize, I don't recall.  But there should be a

14  picture that I took when REAC accepted the submission.  I've

15  seen it in some of the documents that somebody showed me

16  related to this case.  But my apologies, I don't recall the

17  exact date.

18  Q   HUD permits you to submit a completed report, even though

19  the financial statement -- the audit of the financial

20  statement has not been completed yet?

21  A   Thank you for asking me that again.  So the audit is

22  supposed to be completed.  And I went ahead and submitted the

23  information to HUD, anticipating that I would be immediately

24  issuing the audit.  And within that timeframe of a day or

25  two, I became aware of the testimony by the expert witness.

1    And I did not issue the audit.

2    Q    Did you notify HUD?

3    A    I'm in the process of doing that.

4    Q    Is there a reason why you didn't do that earlier?

5    A    Yes.  The withdrawal letter went out May 3rd, and I'm in

6    the process of notifying HUD.

7    Q    So you were sort of keeping your fingers crossed that this

8    would go away and you'd be able to stay with the engagement?

9    A    At least that this would go away.

10   Q    Do you understand that there's a conceptual framework for

11   independence that suggests that you should determine whether

12   there are any safeguards that would protect your

13   independence, before withdrawing?

14   A    I'm sorry, can you say that to me again?

15   Q    Sure.  Let's look at Exhibit A-308, at page 221.  Have you

16   seen this before?

17   A    Yes.

18   Q    So this is part of the conceptual framework for

19   independence.  And do you see there's kind of a decision tree

20   there?

21        Can we blow that up, Chris?

22   A    Yes.  But I would like to just clarify that earlier the

23   questions were about the AICPA code of conduct, and this is

24   about the conceptual framework under government auditing

25   standards.

1  Q    Thank you for clarifying that.  I appreciate that.

2       But you're familiar with this sort of --

3  A    Yes.

4  Q    -- decision tree.

5       And do you see that there's, sort of midway down,

6  "Identify and apply safeguards."  Do you see that?

7  A    Yes.

8  Q    Did you make any attempts to determine whether there were

9  any safeguards that could be applied that would mitigate or

10  eliminate any threats to your independence?

11  A    So, at the beginning of the engagement, yes.  But then if

12  you are asking specifically about the potential impairments

13  from the deposition, yes.

14  Q    Yes, you did look for ways to --

15  A    Yes.

16  Q    -- address it?

17  A    And that was part of my consideration in not withdrawing

18  immediately, because my thought was if the two parties had

19  settled, not that it takes away the allegations, but at that

20  point they may be mitigated, the effect of that may be

21  mitigated, so that I could continue with the audit.

22  Q    Did you call up the limited partner and say:  Gee whiz,

23  I'm worried that you maybe think I'm not objective here?

24  A    No, sir.

25  Q    You didn't do any of that?

1    A    (Shakes head.)

2    Q    You could have, though, right?

3    A    No.

4    Q    You could not have called the limited partner?

5    A    Um, no.  It's not appropriate for me to ask some of the

6    parties -- users of the financial statements that I am

7    auditing, regarding my independence.  That's a decision that

8    the auditor makes.

9    Q    But you don't have any ability to try to apply safeguards

10   to address perceived lack of independence?

11   A    I do have the ability to identify and apply safeguards to

12   independence.

13   Q    Let's look at Exhibit 156.  Exhibit 156 is a letter from

14   Stoel Rives to me, and it has to do with your withdrawal from

15   the engagement.  You see it's dated May 9, 2019?

16   A    Yes, sir.

17   Q    That's a little less than a week after you disengaged.

18        And if you look at the second page of the letter,

19   Mr. Pritchard writes at the top paragraph -- can you blow

20   that up, please -- "Nevertheless, we reached out to

21   Ms. Lindal's counsel to determine if there was anything that

22   could be done for her to agree to complete and finalize the

23   partnerships' audits.  Her counsel advised us that Ms. Lindal

24   is willing to finalize and publish the 2018 audited financial

25   statements for both partnerships if all parties, including

1    AMTAX, agree in writing to retract and withdraw any

2    allegations or testimony challenging the partnerships'

3    audited financial statements in the context of this

4    litigation or otherwise, including any claim that the audits

5    are materially misstated in any respect, as well as a release

6    from any potential claims resulting from her work for the

7    partnerships."

8         Do you see that?

9    A   Yes.

10   Q   Do you recall having a communication -- I don't want you

11   to get into communications with counsel -- but was it your

12   understanding that a proposal was made to address your

13   perceived lack of independence that would satisfy your

14   concerns?

15   A   When I was asked if there was anything that could

16   alleviate the potential impairment to my independence, I

17   responded, yes.  Because I believe that the allegations of

18   material misstatements in the audit is what created it.  If

19   those were withdrawn or retracted, then I believe that would

20   remove any potential impairments to my independence.

21   Q   And is there anything that prevented you from making that

22   suggestion before you withdrew from the engagement?

23   A   Ask me that again, I'm sorry.  Is there anything --

24   Q   Is there anything that would have prevented you from

25   making this suggestion before you withdrew?

1  A   Well, at the time, the audits were requested, and I was

2  required to withdraw.

3  Q   Okay.  Do you understand that -- do you have any knowledge

4  of the fact that Ms. Tamaro is trying to locate a replacement

5  auditor?

6  A   I would imagine that she would.  I mean, the entities are

7  required to be audited.  If I withdrew, my understanding is

8  that requirement is still there.

9  Q   Okay.  And do you know -- has anyone -- have any auditors

10 reached out to you to discuss potentially getting engaged as

11 the auditor for either of these partnerships?

12 A   No, sir.

13 Q   Why did you feel like your independence was impaired in

14 connection with the Hidden Hills project?

15 A   Well, because the impairment of my independence was coming

16 from a particular party, the expert witness that testified on

17 behalf of AMTAX.  Unfortunately, anywhere that party occurs,

18 I lose my independence.

19     So, for example -- I don't know if this is okay to say --

20 but even if there had been a limited partnership that AMTAX

21 was a limited partner in and there was a completely different

22 general partner, not anyone related to Catherine Tamaro, my

23 independence on that entity would have also been impaired.

24     So the impairment was with regard to the party, the users

25 of the financial statement, AMTAX, the limited partner.  So

1  anywhere they occurred, my independence was impaired.

2  Q   Okay.  So have you had any discussions with anyone, other

3  than your counsel, regarding your decision to withdraw from

4  these engagements?

5  A   Well, I did give Catherine a heads-up that I was sending

6  her a letter that I was withdrawing, about an hour before I

7  e-mailed them to her.

8  Q   Subsequent to your disengagement, have you had any

9  conversations with anyone, other than counsel?

10 A   No.  No.

11 Q   Okay.

12     During the time when you were sort of putting on hold

13 whether you were going to withdraw or not, you knew that the

14 deadline for these audits to be provided to the limited

15 partner had come and gone over that period; is that right?

16 A   Yes, sir.

17 Q   Okay.  And did Ms. Tamaro express any concerns to you

18 about the fact that the deadline to provide the audited

19 financial statement to the limited partner had come and gone?

20 A   I'm not aware that we had any conversations after she

21 identified that the -- that I should look at the deposition

22 on May -- I'm sorry, not May -- on February 28th.  So when I

23 was doing my concluding audit procedures, to say, is there

24 anything else I should be aware of, what's the status of it?

25 She said, you would want to be aware of the testimony that

1   was provided February 28th.  At that point I contacted my

2   legal representative to get a copy of that deposition.  I'm

3   not aware that we had any conversations until the e-mail

4   requesting that the audits be issued the end of April.

5   Q   So she did not express any concern to you about the delay

6   in the providing of the audited financial statements?

7   A   I had no communication with her during that time.

8           MR. PETTIT:  No further questions.

9           THE COURT:  Any followup?

10          MR. GOODNIGHT:  No, Your Honor.

11          THE COURT:  All right.  Ms. Lindal, you are excused.

12  Thank you very much.

13          THE WITNESS:  Thank you.

14          THE COURT:  All right.  We will be at recess until

15  2:00.

16                              (Recessed.)

17

18

19

20

21

22

23

24

25

 1                              AFTERNOON SESSION

 2                              JUNE 5, 2019

 3          MS. LATSINOVA:  We have nothing further.

 4          THE COURT:  Nothing.  Any followup?

 5          MR. PETTIT:  Just a few minutes.

 6          THE COURT:  Sure.

 7                     RECROSS-EXAMINATION

 8   BY MR. PETTIT:

 9   Q   Good afternoon, Ms. Tamaro.  I would like to take a look

10   at Exhibit 173, which was marked by your counsel in your

11   redirect examination.  Do you have that?

12          MR. PETTIT:  Do you have a copy of Exhibit 173?  It

13   is the Department of Labor & Industry's letter.

14          THE CLERK:  Here is 175.  That is a one-page letter

15   from L&I.  That is 175.

16          THE COURT:  Now it is 175?

17          MR. PETTIT:  175.  May I approach the witness?

18          THE COURT:  You may.

19   BY MR. PETTIT:

20   Q   You testified on redirect that it was your understanding

21   that Parkway Partnership had an obligation to indemnify

22   Trieste Holdings in connection with this matter that is

23   referenced in this letter; is that right?

24   A   Yes.

25   Q   You cited a particular provision of the property

1   management agreement; is that right?

2   A   Yes.

3   Q   Let's bring up the property management agreement, which is

4   Exhibit 49.  I would like to specifically address your

5   attention to page 8, and the indemnification provision at the

6   bottom of page 8 that you were referring to.  Section 5.7,

7   "indemnification of the manager," Trieste is the manager,

8   right?

9   A   Yes.

10  Q   That was the provision you were discussing in redirect

11  examination; is that right?

12  A   Yes.

13  Q   It says, "To the extent permitted by law, owner agrees to

14  defend, indemnify and save harmless manager from all claims

15  and suits in connection with the project, provided that such

16  claims and suits are attributable to bodily injury, sickness,

17  disease or death, or to injury or destruction of tangible

18  property, and such claims and suits arise or are alleged to

19  arise, in whole or in part, out of any negligent act or

20  omission of owner, its officers, employees or agents."  Do

21  you see that?

22  A   Yes.

23  Q   Referring back to Exhibit 173, you say in the re line

24  there, it is described as a discrimination complaint?

25  A   Yes.

1   Q   Is it your view that a complaint brought against Trieste

2   Holdings, LLC for discrimination would fall under this

3   indemnification category?

4   A   It was a discriminatory action for voicing safety or

5   health concerns in the workplace.

6   Q   Did it involve bodily injury?

7   A   It was -- no, he was not injured.

8   Q   Did it involve sickness, disease, or death?

9   A   No.

10  Q   Did it involve injury to or destruction of tangible

11  property?

12  A   No.

13  Q   This indemnification provision would not apply to this

14  claim; isn't that right?

15  A   I don't know.

16  Q   I would like to direct your attention to Exhibit A-212,

17  which was my lengthy letter from November 2017.  You took a

18  look, with Ms. Latsinova, at page 6 of the letter. Let's go

19  there.

20       Chris, if you could highlight everything starting with

21  "in an effort."

22       This starts with, "In an effort to resolve this dispute

23  as efficiently as possible, the investor limited partner is

24  willing to accept any of the three possible options." Do you

25  see that?

1   A    Yes.

2   Q    Isn't it clear that what was being suggested here is a

3   negotiated resolution in lieu of the invocation of a

4   contractual right?

5   A    Well, your last paragraph says, "If I refuse to accept any

6   of them, you will exercise the right to remove me."  That's

7   not exactly back and forth, is it?

8   Q    Well, isn't -- what I am communicating here, don't you

9   read that as, you have these options, and you are free to say

10  no to any of them.  If you do say no to any of them, then we

11  are going to invoke our contractual right.  Isn't that what

12  is being communicated here?

13  A    That's what it appears to be.

14  Q    There is nothing in this letter that suggests that any of

15  these three options are things that we could compel you to do

16  under the partnership agreement; is that right?

17  A    What I said is none of them are choices in the partnership

18  agreement.  There is a certain aspect of coercion here.

19  Q    But there is no suggestion that any of these three options

20  are things we are contractually entitled to compel you to do;

21  is that right?

22  A    No, you cannot.

23  Q    The very last thing, and I am hoping the Judge will

24  indulge me, because I have been informed I made a mistake in

25  going over the PNCA report with you.  It is because these

1    pages are out of order.  I want to look at pages 3 and 4 of

2    the report, which I think, Chris, will be, let's see, 8 and

3    10 of Exhibit 81.

4         On 3, we have at the bottom of 3, the near term repairs

5    for the years 1 through 10.  Do you see that?

6    A    Yes.

7    Q    That is for the years from 2014 to 2024; is that right?

8    A    2024 is when they will be back, yes, ten years out.

9    Q    As we talked about earlier in this report, it covers a

10   20-year period; is that right?

11   A    No, ten-year period.

12   Q    Let's go back to --

13   A    Let me clarify that.  They will do another one of these

14   reports in ten years.  They do their own 20-year assessment.

15   The report is done on a ten-year cycle.

16   Q    You agree this is a 20-year assessment.  It has repairs to

17   do in the first decade and repairs to do in the second

18   decade, right?

19   A    It does.

20   Q    I had suggested that the items that were on your repair

21   list were in this first ten-year period, when, in fact, isn't

22   it true that they are in the second ten-year period, meaning

23   that these are repairs that would need -- replacements that

24   would need to be done between 2024 and 2034?

25              THE COURT:  Aren't they in both?

1            THE WITNESS:  That's what I am looking at.

2            MR. PETTIT:  That's what I thought, Your Honor, until

3    it was pointed out that I was wrong.

4    BY MR. PETTIT:

5    Q   If you look down, for example, the third bullet point down

6    on the 11 to 20 is re-surface the asphalt parking and

7    driveways, whereas the second bullet on the first ten years

8    is repair and reseal the asphalt.

9            The first ten years there is a lot of repair, repair,

10   repair.  The re-surfacing of the parking lot is 11 through

11   20.  Replace and repaint exterior siding is 11 through 20.

12   Replace windows is 11 through 20.  Replace sliding glass

13   doors is 11 through 20, and then it says replace siding

14   again.  None of those appear in years 1 through 10; isn't

15   that right?

16   A   Correct.

17           MR. PETTIT:  No further questions.

18           THE COURT:  Follow up?

19           MS. LATSINOVA:  No, Your Honor.

20           THE COURT:  Ms. Tamaro, you are excused.  Thank you

21   very much.

22       You may call your next witness.

23           MR. GOODNIGHT:  We call Mr. Blake.

24           THE COURT:  Mr. Blake, if you would go to the lectern

25   and raise your right hand and be sworn.

1                        CHRISTOPHER BLAKE,

2              having been sworn under oath, testified as follows:

3              THE COURT:  Please be seated at the witness stand

4    immediately to my left.  Keep the volume of your voice up so

5    people in the courtroom can hear you and speak slowly enough

6    so the court reporter can keep up.

7                        DIRECT EXAMINATION

8    BY MR. PRITCHARD:

9    Q   Hello, again, Mr. Blake.

10   A   Can you hear me okay?

11   Q   I can, yeah.  Thanks.

12       You are the corporate representative for AMTAX 114 and

13   Hidden Hills and AMTAX 169 and Parkway, correct?

14   A   Yes.

15   Q   You have been designated to speak on their behalf in this

16   litigation?

17   A   Yes.

18   Q   You understand the testimony you give today and you gave

19   in your depositions is binding on AMTAX?

20   A   Yes.

21   Q   You are the director of capital transactions at Alden

22   Torch, right?

23   A   Right.

24   Q   Can you tell me briefly what your duties are?

25   A   Capital transaction generally falls into three broad

 1  categories, which is purchase or sale of the property,

 2  purchase or sale of a partnership interest, or a refinance or

 3  other debt restructuring.  I am in charge of negotiating and

 4  evaluating those type of transactions.

 5  Q   As it pertains to capital transactions and other duties

 6  that you just described, you are a representative of AMTAX;

 7  is that right?

 8  A   Yes.

 9  Q   You have a degree in finance and accounting from NYU,

10  right?

11  A   That is correct.

12  Q   You know how to read and understand audited financial

13  statements?

14  A   Yes.  I am not a CPA, but I do read audited financial

15  statements.

16  Q   Your answer is "yes" --

17  A   Yes.

18  Q   -- you do know how to read and understand audited

19  financial statements?

20  A   Yes.

21  Q   Both Parkway and Hidden Hills were required to complete

22  annual audited financial statements; is that right?

23  A   Can you restate that?  Sorry.

24  Q   Both Hidden Hills and Parkway were required to complete

25  annual audited financial statements; is that right?

1    A    Yes, GP was required to deliver those.

2    Q    Alden Torch employs asset managers to monitor the limited

3    partners' investment in a particular property?

4    A    That's right.

5    Q    For Parkway, that was Gary Newbold?

6    A    Was, yes.

7    Q    Until he left Alden Torch in 2016; is that right?

8    A    That's my understanding.

9    Q    One of the responsibilities of an asset manager would be

10   to review the partnership's audited financial statements,

11   right?

12   A    That is right.  It is a high level review.  Again, Gary is

13   not a CPA.  He is looking for any major changes year-to-year.

14   It is a very high level, cursory review.

15   Q    There is a formal process at Alden Torch in place for the

16   review of annual partnership audited financial statements,

17   right?

18   A    Yes.

19   Q    Can we look at Exhibit 103, Adam.

20        This is an email from Gary Newbold to Catherine Tamaro

21   dated May 11, 2015.  Is it fair to say this is Gary Newbold's

22   comments on the 2014 Parkway audit?

23   A    That's what it says, yes.

24   Q    It has here a review of the developer fee payments; is

25   that right?

1    A    Yes.  I am not sure what aspect of developer fee payments,

2    but that's what it says.

3    Q    What's that?

4    A    That's what it says.

5    Q    It looks like it is going over some of the notes as well;

6    is that right?

7    A    Yes.

8    Q    So would you say that's fairly representative of the kind

9    of review that an asset manager would do at AMTAX of audited

10   financial statements?

11   A    I am not sure.  I don't recognize that management.  I know

12   the process has evolved over time.  At that time, I think it

13   was.

14   Q    That's what Gary Newbold did in 2015, right?

15   A    Yes.

16   Q    Now, the annual audited financial statements are subject

17   to AMTAX's review and approval, right?

18   A    I don't know if we have a formal approval right.  We do

19   review them and provide comments back to the general partner.

20   Q    Let's take a look at your deposition testimony.  That was

21   from October 26th, 2018.  Do you remember -- if you could

22   call up page 91, lines 2 through 6.

23        We are referring to the audited financial statements

24   here.  I asked you, I said, "They are subject to AMTAX's

25   approval."  Your response was, "Our review, yeah."  I said,

1    "Review or approval or both?  You said, "Both," right?

2    A    Yes.

3    Q    So when a capital transaction is involved, you would look

4    at the audited financial statements as well, in addition to

5    Gary Newbold; is that right?

6    A    That's right.

7    Q    There were capital transactions that occurred in Parkway

8    in the 2013, 2014 time frame?

9    A    We evaluated a refinance and ultimate consent to it, so

10   yes.

11   Q    You were involved in that?

12   A    Yes, from the capital transactions perspective.

13   Q    AMTAX reviewed the annual audit every year, at least since

14   Hunt took over the management function in 2011, right?

15   A    Yes.

16   Q    Every single one of the fees that AMTAX has put at issue

17   in its counterclaims in this case were disclosed in Parkway's

18   audited financial statements, weren't they?

19   A    I believe most, if not all, were.  You know, again, it is

20   a high level review where we have asset managers that are

21   spot checking, looking for large inconsistencies.  A lot of

22   these things may not have been large enough or material

23   enough to have been detected in that type of review.

24   Q    Okay.  Let's go back to your deposition testimony, then.

25   Can we pull up page 94.  I apologize, maybe 95.

1          THE WITNESS:  Can I grab a water?

2          MR. PETTIT:  May I approach?

3          THE COURT:  You may.

4          MR. PRITCHARD:  I apologize, I will have to come back

5    to that one.

6    BY MR. PRITCHARD:

7    Q    AMTAX isn't claiming that any of the audited financial

8    statements in Parkway are inaccurate, is it?

9    A    No.

10   Q    So AMTAX isn't taking issue with the level of disclosure

11   in the audit, right?

12   A    Depends on the audit.  The more detail, the better.  I

13   think that it is hard to detect what is going on.  A lot of

14   things have come to light just through this litigation as to

15   the detail related to legal fees and other items that we do

16   question.  Those are generally in a single line item in the

17   audit, which you can't parse out that level of detail.  Is it

18   unusual?  No.  But would more detail be better?  Obviously,

19   it would.

20   Q    Can we please go to page 157, lines 4 through 7.  Do you

21   remember when I asked you the question, "Is AMTAX taking

22   issue with the level of disclosure from the audit, that it's

23   not sufficient?"

24   A    Yes, I believe the specific response was related to a

25   single audit, one year.  Not the audits in general.  I think

 1   that complicated matters.  I think we were talking about the

 2   2013 audit.

 3   Q   In fact, AMTAX isn't challenging or even questioning

 4   Parkway's audited financial statements in this litigation, is

 5   it?

 6   A   We are not questioning the accuracy of the audits.  We

 7   think the audits accurately reflect conduct by the general

 8   partner, and that conduct doesn't match or, I should say, is

 9   in violation of provisions of the partnership agreement and

10   the management agreement.

11   Q   Parkway's LPA has been amended several times through the

12   years?

13   A   Right.

14   Q   It was amended for the second time November 15, 2007; is

15   that right?

16   A   I don't have them memorized.

17   Q   Can we pull up trial Exhibit 31, page two.  If you could

18   pull up the 12.B(ii), please.

19        So, just all I am asking, this is the amendment that

20   makes Parkway's audited financial statements due on February

21   15, right?

22   A   That is right.

23   Q   Now, can we turn to the -- so this would have made the

24   2007 audited financial statements due on February 15 of 2008,

25   right?

 1    A    Yes.

 2    Q    Let's turn to the 2007 audited financial statement,

 3    Exhibit 33.  What is the date on this document?

 4    A    April 30th, 2008.

 5    Q    That's well after the amended due date, isn't it?

 6    A    It is.

 7    Q    The limited partner never sought to remove the general

 8    partner for that delay, did it?

 9    A    No, of course not.

10    Q    In fact, you can't point to a single document or instance

11    over the 15-year compliance period in which the LP even

12    complained about the timeliness of the audited financial

13    statements; is that right?

14    A    Not until 2018.  Again --

15    Q    Not until 2019, right?

16    A    Right, regarding the 2018 audit.

17    Q    About a month ago, right, that was the first time?

18    A    Because they hadn't been delivered.  If they were

19    delivered a little bit late, we certainly, you know, wouldn't

20    have responded in the same way.

21    Q    The limited partner never tried to remove the general

22    partner over the 15-year compliance period for failure to

23    provide timely audits; is that right?

24    A    Right.

25    Q    So it was about a month before trial when the limited

1    partner is now asking the Court for the general partner's

2    removal because there is no 2018 auditor's opinion?

3    A    That is right.  The audited financials, they still haven't

4    been delivered, and that is a breach of the partnership

5    agreement.

6    Q    Do you recall when Mr. Pettit said in his opening argument

7    that AMTAX does not have the 2019 financial reports?

8    A    I don't recall that specifically.

9    Q    Let's refresh your recollection. Can you pull up the June

10   3rd daily, page 67, please?  Can you pull up the line, "They

11   haven't seen the financial reports, Your Honor."  That was

12   referring to AMTAX, right?

13   A    That's right.

14   Q    That statement is not true, is it?

15   A    It is clearly discussing the audits.  We haven't seen a

16   final audit.

17   Q    But AMTAX has every drafted audited financial statement

18   for 2018, doesn't it?

19   A    Right, but if AN auditor won't sign off on the audit, we

20   have concerns over those financial statements, and if four to

21   five other CPA firms won't take the engagement, that gives us

22   even more concern as to issues with those audited financials.

23   Q    AMTAX has the draft audited financial statement for

24   Parkway for 2018, right?

25   A    Yes.

1  Q   It has the draft audited financial statement for 2018 for

2  Hidden Hills, right?

3  A   That's right.  We are missing the finals.

4  Q   It has the trial balance for Hidden Hills, right?

5  A   I believe so.

6  Q   It has the trial balance for Parkway, right?

7  A   Right.

8  Q   It has the filings with REAC as well, right?

9  A   I think so, yes.

10  Q   Alden Torch is still seeking the general partner's removal

11  for failure to timely provide an audit opinion, right?

12  A   Yes, that is required by the partnership agreement.

13  Q   You just saw the testimony of Ms. Lindal, didn't you?

14  A   I did.

15  Q   AMTAX is still taking that position?

16  A   Yes.

17  Q   In fact, we actually were just given a letter over the

18  break that is removing -- there is a lot of words here.  I

19  think this is a removal notice for the failure to provide the

20  audited financial statements for 2018; is that right?

21  A   Yes, which I think everyone is aware of.

22  Q   Your counsel just gave this to us about an hour ago?

23  A   Yes, I believe so.

24  Q   I want to ask a few questions about Alden Torch.  Alden

25  Torch manages interests in investment funds that own

1    affordable housing, right?

2    A    Right.

3    Q    Alden Torch receives asset management fees in that role;

4    is that true?

5    A    Yes.

6    Q    Alden Torch manages the largest affordable housing

7    multifamily portfolio in the country, right?

8    A    As of today, I am not sure.  We certainly were in the

9    past.

10   Q    The portfolio includes over 1200 properties; is that true?

11   A    I think that is stale.

12   Q    More now?

13   A    Less.

14   Q    Less?

15   A    That's why I am saying it may not be today.  We may not be

16   the largest.

17   Q    Do you know about how many properties Alden Torch manages

18   today?

19   A    I would say partnerships, but I think it is in the 800 to

20   900 range.

21   Q    So I guess maybe it is no longer true.  I just saw this on

22   the website.  The assets under Alden Torch management is over

23   13 billion in value?

24   A    Potentially.  It depends on how that is defined.  I don't

25   know if that is property value.  I am not sure what that is a

1    reference to for the partnership interests themselves.

2    Q   Do you have any reason to believe that what is on Alden

3    Torch's website isn't right?

4    A   Again, I don't know what it is in reference to.  I am not

5    saying it is right or wrong.

6    Q   You alone work with approximately 200 properties; is that

7    true?

8    A   That's right.

9    Q   How many employees does Alden Torch have?

10   A   I don't know specifically.  Over 100.

11   Q   Do you know what the dispositions group is?

12   A   It is synonymous with capital transactions.

13   Q   You are a member of the dispositions group?

14   A   Capital transactions group, yes.

15   Q   That is -- they are the same thing?

16   A   I believe in the past, it was called dispositions.

17   Q   Alden Torch employs CPAs?

18   A   Yes.

19   Q   Do you know how many?

20   A   I don't.

21   Q   More than five?

22   A   Yes.

23   Q   Do you know how many investment funds Alden Torch manages?

24   A   No.

25   Q   AMTAX 114 would be one of the funds that Alden Torch

 1  manages, right?

 2  A    It is the fund that owns AMTAX, yes.

 3  Q    So it is by property?

 4  A    What is by property?

 5  Q    I will withdraw that question.

 6         Parkway would then be one of the maybe eight to 900

 7  properties that Alden Torch manages?

 8  A    That's fair, yeah.

 9  Q    Hidden Hills is another?

10  A    Yes.

11  Q    I think it is clear, but Alden Torch's predecessor was

12  Hunt Companies; is that right?

13  A    Yes.  It was effectively a name change.

14  Q    Alden Torch effectively had an interest in managing the

15  AMTAX funds as of 2011; is that fair to say?

16  A    It was called Hunt at the time, but yes.  The management

17  responsibilities haven't changed.  Everybody's jobs are the

18  same.

19  Q    One of the benefits that investors receive in LIHTC

20  properties are tax credits, right?

21  A    Yes, that is one of them.

22  Q    One of them.  Another would be sale proceeds?

23  A    Correct.

24  Q    After the end of the compliance period, the properties are

25  typically sold or one of the partners buys out the other;

1    isn't that right?

2    A    Yes.

3    Q    Can we go to the Hidden Hills LPA?  I would like to look

4    at Section 7.4.K.  Are you familiar with that provision,

5    7.4.K?

6    A    Yes.

7    Q    It says, "The limited partner shall have an option to

8    force a sale of its interest in the real estate, fixtures and

9    personal property comprising the apartment complex for a

10   period of 24 months following the close of the compliance

11   period as determined by the code."  Do you see that?

12   A    Yes.

13   Q    Section 7.4.K gives the general partner a right of first

14   refusal to purchase the limited partner's interest; is that

15   right?

16   A    That's right.

17   Q    This provision, it didn't give the limited partner a right

18   to sell the property, does it?

19   A    This provision doesn't.

20   Q    Just the limited partner's interest in the partnership --

21   well, in the real estate, right?

22   A    That is right.  I believe there are provisions that allow

23   us to force the sale of the property.  Section 7.4.K does

24   not.

25   Q    There are provisions that do allow that, you said?

1    A    I believe so.

2    Q    In the LPA, in the Hidden Hills LPA?

3    A    Yes.

4    Q    Under the circumstances -- can you show me which one?

5    A    Can we go to 7.4.I, please?

6    Q    Has AMTAX ever referenced Section 7.4.I in connection with

7    any discussions of the exit from the partnership in this

8    case?

9    A    Not in Hidden Hills.  The general partner to exercise

10   their option, we participated in that in good faith and

11   thought we could sell our interest for fair market value so

12   we didn't see much of a difference between the two.  As we

13   know, that didn't go as planned.  That's why we didn't bring

14   this up.

15   Q    You said you thought AMTAX could sell its interest for

16   fair market value; is that right?

17   A    Right, whether we sell our interest for fair market value

18   or whether we sell the property for fair market value and

19   receive the fair market value for our interest, we don't see

20   a distinction between the two.  It should be the same dollar

21   amount.

22   Q    In Hidden Hills, the compliance period ended on December

23   31st, 2016, right?

24   A    Right.

25   Q    Now, are you aware of a January 3rd, 2017 letter that

1    AMTAX sent to the general partner?

2    A    Yes, I am.

3    Q    That was three days after the compliance period ended,

4    right?

5    A    That's right.

6    Q    You were copied on that letter?

7    A    I believe so.  You can bring it up.

8              MR. PRITCHARD:  I would like to offer Exhibit 176

9    into evidence.

10             THE COURT:  176.  All right.  Do you have a copy of

11   that?

12             MR. PRITCHARD:  We emailed you a copy.

13   BY MR. PRITCHARD:

14   Q    Is this the letter I was just referring to?

15             THE COURT:  Is there any objection?

16             MR. BESSENGER:  No objection.

17             THE COURT:  Exhibit 176 is admitted.

18                  (Exhibit 176 admitted.)

19   BY MR. PRITCHARD:

20   Q    Is this the letter?

21   A    Yes.

22   Q    Can we take a look at the first sentence?  Can you call

23   that up?

24        It says, "This letter is being delivered to the general

25   partner of the partnership and constitutes the special

1    limited partner's required sale notice under Section 7.4.I,

2    7.4.J and 7.4.K of the amended and restated agreement of the

3    limited partnership."  This letter was sent out by mistake,

4    right?

5    A    That is correct.

6    Q    Because there is no such thing as a required sales notice

7    in the limited partnership agreement, is there?

8    A    That's right.

9    Q    It also says here that you are -- the first sentence of

10   the second paragraph, "You are hereby notified that the

11   special limited partner requires that the general partner

12   promptly use its best efforts to obtain a buyer for Hidden

13   Hills, the apartment complex, in the most favorable terms

14   available."  Do you see that?

15   A    Yes.

16   Q    The general partner sent a letter later the same month

17   pointing out that there was no basis for that in the limited

18   partnership agreement, right?

19   A    That's right.

20   Q    This letter also said that the buyer and the terms of any

21   proposed sale shall remain subject in all respects to the

22   consent of the limited partner, right?

23   A    That's what it says.  Again, we acknowledged it was an

24   error.  We have several -- we have six deals called Parkway,

25   I believe, and several Hidden Hills.  I think someone pulled

1    the language from the wrong partnership agreement, so that's

2    why it is referring to terms and rights that don't exist

3    within the correct Hidden Hills partnership agreement.  We

4    acknowledged that and withdraw -- withdrew our letter.

5    Q    Is it the general partner's obligation to identify every

6    instance in which the limited partner makes mistakes about

7    what the LPA does and doesn't require?

8    A    They should review their rights with counsel.  I think it

9    is pretty obvious.  It is an unfortunate error, but it

10   happened.  We acknowledged the mistake and withdrew the

11   letter.

12   Q    AMTAX wanted to put the Hidden Hills property on the

13   market after the compliance period ended, didn't it?

14   A    That would have been an option we would have considered.

15   Q    That was actually its preferred way to exit the

16   partnership, wasn't it?

17   A    I think putting the property on the market provides the

18   most transparency into what the fair market value is.  It

19   also eliminates the time and cost associated with going

20   through potentially three appraisals with uncertain outcomes.

21   I think it would have been preferred.

22   Q    So the answer is yes, it was AMTAX's preferred way to exit

23   the partnership?

24   A    I believe so, yeah.

25   Q    Let's move forward a few months to March 2017.  On March

1   8, 2017 AMTAX sent the general partner a letter notifying the

2   general partner it was exercising its rights under Section

3   7.4.K, right?

4   A   Yes.

5   Q   Can we pull up Defendants' Exhibit A-110?  Says here,

6   second paragraph, "On January 3rd, 2017, the special limited

7   partner delivered a letter to you purporting to exercise the

8   limited partnership option under Section 7.4 of the

9   partnership agreement, the prior letter.  The prior letter

10  did not, however, conform with the terms of the partnership

11  agreement.  Accordingly, please disregard the prior letter."

12          Now, Adam, could you pull up the following paragraph,

13  please.

14          Right after that, it acknowledges the mistake. Then the

15  letter says, "This letter constitutes the investor limited

16  partner's notice of its election to exercise the limited

17  partner option under Section 7.4.K of the partnership

18  agreement to force the sale of the project for a price equal

19  to or greater than the fair market value."  Do you see that?

20  A   Yes.

21  Q   That also doesn't refer to the limited partner's interest

22  in the project, does it?

23  A   It doesn't.

24  Q   No.  And that was about a week before the general partner

25  sent the notice regarding the exercise of the option?

1   A    I believe so.

2   Q    In closing out the letter AMTAX stated, "We look forward

3   to continuing to work with you to find an effective exit for

4   the limited partners."  Again, where in Section 7.4.K is

5   there a right for the limited partner to force a sale of the

6   project?

7   A    I am not sure.

8   Q    It is not there, is it?

9   A    I don't think so.

10  Q    This March 8th letter was wrong too, wasn't it?

11  A    I believe so.  The reference to the project, not the

12  interest.

13  Q    Yeah, and both of those letters refer to a requirement

14  that the general partner sell the property, but that doesn't

15  actually exist in 7.4.K, does it?

16  A    It doesn't.  We have been having discussions with the

17  general partner about potentially selling the property.

18  Q    Yeah.  The general partner has an interest in the project,

19  too, right?

20  A    Of course.

21  Q    There is no option in the LPA that AMTAX has to buy out

22  the general partner's interest, right?

23  A    I don't believe so.

24  Q    AMTAX's right under Section 7.4.K is subject to the

25  general partner's right to exercise option under J, right?

1   A    Yes.

2   Q    Now, let's assume the option price is too high and the

3   general partner decides not to exercise, so then AMTAX would

4   have the right to sell its interest to a third party, right?

5   A    Yes.

6   Q    That is the contractual specified exit mechanism for AMTAX

7   in this case, isn't it?

8   A    Under that option.

9   Q    That is how the agreement is supposed to work, right?

10  A    It is.  But when you have a general partner that is

11  tainting these environmental reports and completely

12  manipulated the process --

13  Q    Right, but AMTAX availed itself of this right to sell its

14  interest under 7.4.K on March 8, 2017, right?  Even though it

15  misrepresented what the agreement said, it did exercise that

16  right on March 8, 2017, right?

17  A    Yes.

18  Q    Let's move forward a few more months.  November 3rd, 2017,

19  AMTAX's counsel wrote a letter to general partner's counsel,

20  right?  We just looked at that.  That was Eric Pettit's

21  letter from November 3rd, 2017.  Do you remember that?

22  A    I believe that is correct, yes.

23  Q    This letter accurately represented AMTAX's position at the

24  time, right?

25  A    Yes.

1    Q    There were three choices that were offered at the end of

2    this letter.  There weren't any references to a sale of the

3    limited partners' interest, though, were there?

4    A    There weren't.  I think the point he was making is that

5    these are not within the partnership agreement.  These were

6    ways to avoid litigation, after this whole process has been

7    manipulated.

8    Q    It was a choice that was provided to market and sell the

9    property, that was the first choice?

10   A    One of the choices, yes.

11   Q    AMTAX selected Andy Noble at Cushman & Wakefield to do

12   AMTAX's appraisal for Hidden Hills, right?

13   A    Yes.

14   Q    His appraisal report valued the property at 19.7 million;

15   is that right?

16   A    That sounds right, yes.

17   Q    The Cushman & Wakefield appraisal didn't reduce the value

18   of the property for anything related to the environmental

19   contamination on site, right?

20   A    That's right.

21   Q    It appraised the property as if it were clean?

22   A    Yes.

23   Q    On May 7, 2019, the general partner wrote a letter to

24   AMTAX accepting the Cushman & Wakefield appraisal as the

25   basis for calculating the LP's interest under the option,

1    right?

2    A    Attempted to accept the offer.

3    Q    Okay.

4    A    At that point, she had no right to accept that.  That was

5    completely outside of the option process.

6    Q    Okay.  So this letter, then, set an option price of --

7    calculated an option price of approximately 4.9 million?

8    A    That's what she reported.  That's not the option price.

9    Q    What is the option price?

10   A    The option was -- the appraisal process was manipulated.

11   Option couldn't be carried through to completion because of

12   that manipulation.

13   Q    Are you saying there is no option price?

14   A    No.

15   Q    But AMTAX provided its own waterfall calculations based on

16   the Cushman & Wakefield appraisal, right?

17   A    We did to compare to the general partners to show various

18   disagreements.  I don't think we reported that was the option

19   price either.

20   Q    Let's pull that up.  It is A-293.  Can we go to page 9?

21        Is that the waterfall that AMTAX provided?

22   A    Yes, several waterfalls.  This is our model.

23   Q    It shows an option price of approximately 7.6 million?

24   A    Again, it is not an option price.  This is our calculation

25   of the limited partners' proceeds.  The analysis was a side

 1  by side comparison of our waterfall and the general partner's

 2  waterfall just highlighting the disagreements or

 3  interpretations we had related to the waterfall.

 4  Q    Did you prepare this --

 5  A    Yes.

 6  Q    -- document?

 7  A    Yes.

 8  Q    This document is based on the Cushman & Wakefield

 9  appraisal?

10  A    We did keep the price consistent, just so it would be an

11  apples to apples comparison.

12  Q    Is AMTAX willing to accept its own number as the option

13  price?

14  A    Now I don't believe so at this point.

15  Q    AMTAX won't -- why is that?  Why won't it accept its own

16  price?

17  A    Our position is the general partner has been removed.

18  Q    So it won't accept its own appraisal?  What if the price

19  was a million higher, still wouldn't accept?

20  A    I can't unilaterally agree to that here.  I don't know.

21  Again, our position is the general partner has been removed.

22  We are not negotiating a price or the option is not in

23  effect.

24  Q    In March 2017, you proposed that the general partner and

25  the limited partner have reached the two appraisals if they

1  were within ten percent of one another; isn't that right?

2  A   That's right, and the general partner rejected that

3  proposal.

4  Q   You proposed it, didn't you?

5  A   Yes.

6  Q   So now AMTAX won't accept its own appraisal?

7  A   No.  Again, this whole process has been manipulated over

8  years, for several years.  We were sued.  It came to light

9  that the general partner has manipulated the appraisal

10  process and deserves to be removed, which is the remedy under

11  the partnership agreement.  So, no, this is a completely

12  different situation.

13  Q   I guess I am trying to determine here why -- is it that

14  the appraisal is stale?  Is that AMTAX's position?

15  A   It is two years stale, but if the general partner could

16  attempt to manipulate the appraisal process to deprive us of

17  proceeds, and then gets caught, and then all we have to do is

18  revert back to an appraisal from two years ago, then there is

19  really no consequences or deterrent.

20  Q   Sitting here today, would AMTAX agree to a new third

21  appraisal?

22  A   Again, our position is that the general partner has been

23  removed.  If the general partner is not removed, we certainly

24  wouldn't want her having any role in that appraisal process.

25  Q   How would AMTAX be harmed by accepting its own appraisal?

1    A    There is multiple issues in dispute here.  The appraisal

2    is a couple years old.  The property may have appreciated

3    since then.  The mortgage balance has been paid over those

4    two years as well.  The cash balances are different.  The

5    other issue in dispute -- or one of the other issues in

6    dispute is the time limit.  I believe the general partner's

7    position is that this would all be run through the waterfall

8    as of March 2017, which would deprive us of proceeds.

9    Q    It is AMTAX's position that the fair market value should

10   be determined as of the date -- as of today's date or the

11   date a new third appraisal is commissioned?

12   A    Yes, it should be.

13   Q    That would be outside of the compliance period, though,

14   right?

15   A    Yes, this right can't be exercised until after the

16   compliance period.  So by default, it would be.

17   Q    AMTAX isn't bringing a damage claim in Hidden Hills in

18   this case, right?

19   A    I don't believe so.

20   Q    It is not seeking damages on behalf of the partnership,

21   right?

22   A    I don't think so, no.

23   Q    In fact, AMTAX never brought any claim that the general

24   partner and Hidden Hills mismanaged the property during the

25   compliance period, right?

1   A    Can you restate that?

2   Q    AMTAX never brought any claims that the general partner in

3   Hidden Hills mismanaged the property during the compliance

4   period, right?

5   A    I believe she was defaulted for paying a developer fee out

6   of order.

7   Q    AMTAX never brought any claim --

8          MR. BESSENGER:  Can he please let the witness finish

9   his testimony before he interrupts?

10         THE COURT:  I don't want to hear any more

11  negotiations, settlement in front of me.  You questioned him

12  a half an hour on what AMTAX would do, would not do.  If

13  you -- I would love to have you guys meet and discuss a

14  solution.  It is not appropriate to engage in that

15  negotiation in front of me.

16         MR. PRITCHARD:  I will move on.

17         THE COURT:  You can ask your question.

18     Do you have anything more to say on that answer?

19         THE WITNESS:  I don't.  Thank you.

20  BY MR. PRITCHARD:

21  Q    AMTAX never brought any claims that the general partner

22  and Hidden Hills incurred any improper fees during the

23  compliance period, right?

24  A    I don't believe so.

25  Q    The only claims of wrongdoing against the general partner

1  were during the appraisal process after the option had been

2  exercised?

3  A   I think that is the case.

4  Q   If the general partner is removed, would it be able to

5  complete the buyout option under 7.4.J?

6  A   No.

7  Q   If the general partner is removed, the limited partner

8  plans to appoint an affiliate as the new general partner,

9  right?

10 A   I think in the interim.  We have no interest in owning the

11 property.  We would certainly put an entity in there so we

12 could sell the property.

13 Q   So the answer is "yes"?

14 A   Then the former general partner would receive the fair

15 market value for their interest.

16 Q   An AMTAX affiliate, right?

17 A   Who else would it be?

18 Q   Okay.

19 A   Or an affiliate of Alden Torch, I would say, but yes.

20 Q   Now I want to turn to Parkway for a while.  Parkway's

21 compliance period ended later than Hidden Hills, didn't it?

22 A   A year later.

23 Q   It was December 31st, 2017?

24 A   Yes.

25 Q   The Hidden Hills litigation started in November 2017?

1    A    Yes, I think so.

2    Q    The general partner provided notice of the exercise of the

3    option on January 3rd, 2018?

4    A    Yes.

5    Q    It stated that it identified its appraiser and would have

6    an appraisal by the end of January, right?

7    A    I think so.

8    Q    The general partner wrote again on February 15th; is that

9    right?

10   A    Okay.  Sure.  I didn't memorize the dates.

11   Q    Let's pull up trial Exhibit 131, please.  This just

12   informed the limited partner that the appraisal had been

13   completed, the 2017 audited -- the financial audit of Parkway

14   has been completed by Laura Lindal, the draft tax returns had

15   been completed, the documents had been submitted to AMTAX,

16   year-end rent rolls have been provided, unaudited financial

17   statements had been submitted.  The required -- so,

18   essentially it is saying AMTAX has received the documentation

19   necessary to obtain an appraisal, right?  Do you see that

20   there?

21   A    Yes.

22   Q    Had AMTAX responded at this point?

23   A    I don't believe so at this point.

24   Q    It responded for the first time on March 6th?

25   A    That sounds correct.

1    Q    The following day, the GP -- after that letter, the GP

2    actually forwarded a copy of the CBRE appraisal, right?

3    A    Yes.

4    Q    And also offered to answer any questions regarding the

5    operation of the property or to forward any financial

6    requested by AMTAX, right?

7    A    I think so. I don't have a letter in front of me.

8    Q    Let's just put it up quickly.  Exhibit 133, please.  Pull

9    up the last paragraph.  GP writes, "As has been my consistent

10   practice in the past, I will answer any questions you have

11   regarding the operations of the property and forward whatever

12   financial information you request.  You may call or email me

13   with your questions."

14        Do you know if AMTAX ever took her up on that request?

15   A    I don't think so.  I don't think there is a need to.

16   Q    Right, because it already had all the audited financial

17   statements, right?

18   A    That's not the only item we need for an appraisal.  I

19   think we had anything an appraiser would request.  If

20   questions came up in their analysis that required the input

21   of the general partner, maybe we would have taken her up on

22   that offer.  I don't think that happened.

23   Q    Can we go to your deposition, page 76, lines 6 through 12.

24   I asked, "Do you know if AMTAX ever took 334th Place up on

25   that offer?"  Your response was, "I don't know.  I don't

1    think that additional information was necessary from the GP

2    given that we had all prior year audits." Do you see that?

3    A    Yes. I don't think that is inconsistent with what I just

4    said.

5    Q    AMTAX sent the general partner another letter on May 8,

6    2018, didn't it?

7    A    I assume so.

8    Q    That letter contains a number of allegations of

9    mismanagement and improper fees, right?

10   A    I think so, yes.

11   Q    And it stated -- can we pull it up, Adam? The third page.

12        It states here that, "Unless and until the general

13   partner takes steps to cure the multiple material breaches

14   described above, the general partner cannot effectively

15   invoke its purchase option under 7.4.J of the partnership

16   agreement. Any cure, moreover, would require, at a minimum,

17   an agreement by the general partner to immediately cancel and

18   relinquish all accounts payable." That was estimated to be

19   $2.7 million, right?

20   A    I believe that is correct.

21   Q    At that point, it had been more than four months since the

22   general partner sent the notice exercising the option in

23   Parkway, right?

24   A    Right.

25   Q    What that is saying is AMTAX wouldn't move forward with

1   the appraisal process unless the general partner gave up more

2   than 2.7 million in funds owed to it by the partnership,

3   right?

4   A   Yes, based on the malfeasance that we uncovered.  I think

5   it was appropriate for the general partner to cure its

6   defaults before we could proceed.  You really can't carry

7   7.4.J through to conclusion unless you have accurate

8   financials or financials that reflect cure of those defaults.

9   Q   You said accurate financials?

10  A   Yes.  I know I have testified that I agree -- that we

11  believed the audits are accurate.  What I am saying is, we

12  would need to account for the amounts that the general

13  partner paid itself that were not in accordance with the

14  partnership agreement and that would be reflected in the

15  ultimate option price for our interest.

16  Q   At some point in the spring, Alden Torch's counsel engaged

17  an appraiser to value Parkway, right?

18  A   Yes.

19  Q   You don't know when that happened, though, do you?

20  A   No, I wasn't involved in that.

21  Q   Can we pull up the appraisal that counsel obtained,

22  Exhibit 136.  This was prepared by Novogradac & Company?

23  A   Yes.

24  Q   Novogradac employed AMTAX's expert in this case?

25  A   Yes, they do.

1    Q    This report states that the report date is May 10, 2018,

2    right?

3    A    Yes.

4    Q    That would have been two days after the letter had been

5    sent?

6    A    Yes.

7    Q    Is AMTAX's position this appraisal was obtained for the

8    purpose of using it in the process called for under 7.4.J?

9    A    Yes, I believe so.

10   Q    You don't know when that was provided to the general

11   partner, do you?

12   A    I don't know specifically.

13   Q    You don't know?

14   A    Not off the top of my head.

15   Q    You never spoke to any of the appraisers at Novogradac

16   about this appraisal, did you?

17   A    No.

18   Q    You never asked anyone at Novogradac to meet with the CBRE

19   appraiser to see if they could agree on the property's value,

20   right?

21   A    Right.  Again, that wouldn't be appropriate until the

22   defaults had been cured, but that would be the next step.

23   Q    This appraisal states that it was prepared for Eric Pettit

24   of Boies Schiller, right?

25   A    Right.

1   Q   That is AMTAX's outside counsel in this litigation, isn't

2   it?

3   A   Yes.

4   Q   If you look at the cover letter on page 3, it refers to --

5   first line of the large paragraph in the middle there --

6   Boies Schiller is the client in this engagement.  Do you see

7   that?

8   A   Yes.

9   Q   It states that Boies Schiller intends to use the report

10  for the purposes of providing legal advice to their client

11  Alden Torch Financial.  That is defined as the stated

12  purpose, do you see that?

13  A   Yes.

14  Q   Then it states that all of the services provided by

15  Novogradac in connection with this appraisal were provided

16  solely for the purposes of providing legal advice.

17          Now, I would like bring up another line here.  It is in

18  the middle of the paragraph.  They agree not to use the

19  report.  It is saying here that Boies Schiller agrees not to

20  use the report for anything other than the stated purpose,

21  and Alden Torch agrees to indemnify us of any claims, damages

22  or losses we may incur as a result of the use of the report

23  for other than the stated purpose.  Do you see that?

24  A   Yes.

25  Q   You also have no idea if Eric Pettit told anyone at

1    Novogradac that the appraisal report might be used in a

2    dispute over a buyout under Section 7.4.J, right?

3    A   I already testified I wasn't involved in that process.  I

4    am not sure what they were told.

5    Q   AMTAX provided a waterfall calculation in this case as an

6    exhibit on May 30th, 2019, right, for Parkway?

7    A   Yes, I think so.

8    Q   Can we pull that up?  This shows an option price of

9    approximately 9.6 million?

10   A   Yes.

11   Q   This is based off of the Novogradac appraisal?

12   A   Yes, it is.

13   Q   Again, you never had anyone from Novogradac speak to

14   anyone at CBRE, right?

15   A   I have already said we haven't yet, no.  We expect the

16   defaults to be cured before the process continues, if that's

17   what happens.

18   Q   So if there is litigation with a partner -- I want to ask

19   you another question here.  Let's call up the GP loans.  You

20   see here there is a line for GP loans, and it is just a dash,

21   right?

22   A   That's right.

23   Q   So is that the 2.7 million that would be there if -- under

24   normal circumstances, is that where it would be accounted for

25   in the waterfall?

1  A    I don't know what the current balance is today.  If the

2  defaults are not cured and all the GP receivables are still

3  in the books -- I should say if the GP receivables were

4  legitimate, that's where they would show up, yes.

5  Q    The GP receivables were on the books, right?  They were on

6  the audited financial statements every year since 2002,

7  weren't they?

8  A    Some were, yes.

9  Q    Some were?  There are none on this, right?  They are all

10  wiped out?

11  A    That's right.

12  Q    Now, if there is a litigation with a partner in any

13  partnership, it is Alden Torch's policy to examine all

14  related properties or partnerships to determine whether there

15  is a default; is that right?

16  A    Yes, if we are in active litigation, we review financial

17  statements of all the deals we have with the same general

18  partner as a standard practice.

19  Q    Alden Torch engaged in that practice with respect to

20  Parkway and its general partner, right?

21  A    Yes, we did.

22  Q    AMTAX asked Alden Torch CPAs to review Parkway's audited

23  financial statements to look for misconduct going back to

24  2002, right?

25  A    Say that again.

1   Q    AMTAX asked Alden Torch CPAs to review Parkway's audited

2   financial statements to look for misconduct going back to

3   2002, right?

4   A    That's correct.

5   Q    One of those CPAs was a person named John Thomas, right?

6   A    Yes.

7   Q    The other was someone named Caley Dias?

8   A    Yes.

9   Q    In fact, you emailed Caley Dias to initiate this

10  investigation, didn't you?

11  A    Yes.

12  Q    Can we pull up trial Exhibit 125?

13          THE COURT:  Why don't we hold that.  We will take our

14  afternoon break.  We will be at recess for 15 minutes.

15                                        (Recessed.)

16          THE COURT:  Mr. Pritchard, you may proceed.

17          MR. PRITCHARD:  Thank you, Your Honor.

18  Q    Now, we talked about this briefly before the break, but I

19  want to refer back to a letter that we received over the

20  lunch hour.

21          MR. PRITCHARD:  I have two copies.  May I approach

22  the witness?

23          THE COURT:  You may.

24          MR. PRITCHARD:  The other one is for Your Honor.

25          THE COURT:  Does Mr. Pettit have one?

 1              MR. PETTIT:  We do, Your Honor.  We delivered it.

 2    This is our letter.

 3              THE COURT:  Okay.  All right.  All right.

 4    Q   I don't have too many questions about it, and I don't have

 5    it in front of me anymore, but it's another removal notice,

 6    right?

 7    A   That's right.

 8    Q   And it was just issued to us this afternoon, right?

 9    A   Right.

10    Q   And it's for removal based on a failure to provide the

11    2018 audited financial statements?

12    A   Yes.

13    Q   And that's signed by Alison Wadle; is that right?

14    A   That's right.

15    Q   She's in the courtroom today?

16    A   Yes.

17              MR. PRITCHARD:  Your Honor, I'd like to offer that

18    into evidence as Exhibit -- I believe it's 177 that we're on.

19              THE COURT:  Exhibit 177.  Any objection?

20              MR. BESSENGER:  No objection, Your Honor.

21              THE COURT:  Exhibit 177 is admitted.

22                   (Exhibit 177 was admitted.)

23              MR. PRITCHARD:  Thank you.

24    Q   Now, I want to move back to the December 2017 timeframe.

25    And so we were talking about the CPAs that you directed to

1    look into the audited financial statements to determine

2    whether there were any defaults.

3         Can we bring up Trial Exhibit 125?  Can we call up the

4    first and second sentences of the e-mail at the bottom of the

5    page, please?  The second paragraph.

6         So, you write here, "We have one other deal with her

7    called Parkway, and I was wondering if you can add this to

8    your forensic accounting to-do list.  Pasted below are some

9    notes from the audit where the GP is receiving fees for

10   services that are normally provided by on-site staff or the

11   management company, without additional compensation."

12        Can we go to the next page, please?  Are these the

13   notes from, I guess it would have been at that time, the 2016

14   audit; is that right?

15   A   That's right.

16   Q   And I think you testified earlier that it's very difficult

17   to find the fees at issue when going through the audited

18   financial statements.  Did you say that?

19   A   Not exactly.  I said that sometimes there's not enough

20   detail and it's difficult to tell what's going on and how

21   certain fees were arrived at, and whether they're valid or

22   not.

23   Q   Okay.  Can we call up the first of these pasted-in notes

24   here?

25        This is just taken from a note from the 2016 audit and

1  pasted into this e-mail, isn't it?

2  A   Yes.

3  Q   And this is the repair supervision fee that AMTAX is

4  challenging in this case, right?

5  A   Right.  The repair supervision fee doesn't appear in the

6  partnership agreement or the property management agreement.

7  It's a service that the property manager is supposed to

8  provide, and they receive a fee for it.  So why not

9  investigate that.

10 Q   Okay.  So, in response to this e-mail the Alden Torch CPAs

11 came up with a list of fees that they claimed were

12 unauthorized, right?

13 A   Right.

14 Q   And this list was based on a review of the audited

15 financial statements, in conjunction with the partnership and

16 regulatory agreements, correct?

17 A   Correct.

18 Q   And they provided that list to you in January 2018?

19 A   I'm not sure when they completed their work, but it would

20 have been in the first quarter of 2018.

21 Q   Okay.  Let's pull up Trial Exhibit 144, please.  If you go

22 to page 3.

23      Is this the list that the CPAs came up with?

24 A   Yes.

25 Q   Now, if we go through these, this is essentially

1  everything in terms of fees that AMTAX is claiming are

2  unauthorized?

3  A   Those are the fees.  The timing is different.  The

4  activity is continuing:  We believe it's going to continue in

5  2018.  But this is through 2016.  So that's the only

6  qualification.

7  Q   Because you only had the 2016 audit at the time?

8  A   At this time, yes.

9  Q   All right.  If we -- I just want to take a look at --

10 let's bring up the total write-downs row, please.

11      Now, this is what -- the Alden Torch CPAs added up all

12 these alleged unauthorized fees and came up with this number

13 and they called it write-downs, right?

14 A   They did, yes.

15 Q   And so there's a separate box below it, it's called

16 "Amount payable to AGP and affiliates."  Correct?  Can we go

17 to that, please?

18      Okay.  So this here, that refers to money that the

19 general partner is owed per the 2016 audit, right?

20 A   That's right.

21 Q   And then we have another $114,000 in payables to the AGP

22 affiliates, and that's also for the 2016 audit?

23 A   Right.

24 Q   The one that Laura Lindal did, right?

25 A   Yes.  She was the auditor at the time.

1    Q   Yes, she was.

2         And so that means that -- well, let's go to the audit,

3    quickly.  Exhibit 115, please, PDF, page 6.

4         Now, if you look here, this says, "Note payable from

5    surplus cash due to administrative general partner."  And

6    there's, it's a total of $2,668,173.  And it doesn't line up

7    exactly, but is that a part of what the Alden Torch CPAs are

8    referring to in total payables?

9    A   Yes.  In 2015, I believe the general partner tried to

10   consolidate not all, but most of its receivables into a

11   single surplus cash note.

12   Q   And those receivables were separated out, in years prior,

13   in the audited financial statements that were submitted to

14   AMTAX every year, right?

15   A   Yes, I believe so.

16   Q   Yeah.

17        Now, let's go back to the CPA list, please.  Exhibit

18   144, page 3.

19        If you look below the amounts payable, there is a row

20   that says, "Total payables less write-downs."  Can you pull

21   that up?

22   A   Right.

23   Q   So this here, the approximately $1.3 million, that's a

24   number that would actually still be owed to the GP and the

25   affiliates after zeroing out all of the fees that AMTAX

1    claims are unauthorized, right?

2    A    Just the fees, yes.

3    Q    Yeah, just the fees.  And so that would be a total that

4    would still be owed to the GP, right, per the audited

5    financial statements?

6    A    Per the audit, yes.

7    Q    But in the May 8th letter, AMTAX demanded that the general

8    partner give up that entire balance as well, right?

9    A    That's right.  So --

10   Q    Because you have claims for more than fees, right?  So

11   that's the difference, right?

12   A    Right.  So we think that the GP would owe more than the

13   amount that she is owed.  So, yes, we expected her to write

14   off the full amount.

15   Q    So after the CPAs came up -- on January 8, 2018, they came

16   up with a list of unauthorized fees, and there was still

17   $1.3 million in "damages" that AMTAX needed to come up with

18   in order to match the $2.7 million that it demanded the GP

19   give up in May 2018, right?

20   A    Sorry, can you repeat that?

21   Q    There is another $1.3 million, in addition to the fees

22   that AMTAX needed to figure out a way to claim were

23   unauthorized or were damages in some way to justify a demand

24   that the GP give up $2.7 million in account payables, right?

25   A    That's not how I would characterize it.  We've identified,

1    I would say, you know, three prongs to this scheme to deprive

2    the limited partner of residual proceeds.  And one of those

3    is incurring unauthorized fees.  One of those is failure to

4    raise rents to appropriate levels.  And the third is rapidly

5    increasing operating expenses, which is due to the

6    unnecessary rehabilitation or repairs and maintenance,

7    however you want to characterize that, which resulted in a

8    property that shouldn't have been running at a deficit, to

9    run deficits.  And the GP advanced funds which contributed to

10   an amount that would be owed to the partnership that we think

11   exceeds $1.3 million.

12   Q   I understand.  I understand AMTAX's position.  There's

13   nothing about any of that in this list, is there?  It doesn't

14   refer to rents.  It doesn't refer to operating expenses, does

15   it?

16   A   That's right.  They were looking at fees.

17   Q   Right.  And then Krabbenschmidt came up with the rest,

18   right, John Krabbenschmidt, AMTAX's expert?

19   A   No.  I believe he looked into that, but that was something

20   we were aware of.

21   Q   So you don't know what rents were attainable in past

22   years, do you?

23   A   We would have to look at comparable properties at the

24   time.  So, again, not exactly.  But I think Ms. Tamaro

25   testified that our asset manager suggested that we raise

1    rents multiple times in the past.  We asked her why the

2    property was running at 100 percent occupancy, and she says,

3    you know, the rent decision is a balance.  But if you're at

4    100 percent occupancy, there's no balance.  You don't know

5    how high you can raise rents if your occupancy is

6    100 percent.  And the fact that, you know, you're not leasing

7    a new unit at a higher rent -- I should say, industry

8    standard is to have a 5 percent vacancy.  That's the balance.

9    So I'll leave it at that.

10   Q   So, you didn't do anything to calculate what operating

11   expenses should have been incurred in years past, did you?

12   A   We knew where the property was operating historically, and

13   operating expenses doubled.  So...

14   Q   I'd like to go back to your deposition.  This is from

15   October 2018.  Can we please pull up page 107, line 25,

16   through 108, line 7?

17        So, this was the answer that you gave me in

18   October 2018.  "You know, we've argued that we don't believe

19   rents were raised to higher attainable levels.  We also

20   believe that operating expenses exceeded what a normal

21   property should run at.  But to go back in time and say how

22   much was attainable at that time or what was the exact amount

23   of operating expenses that the property should have been

24   running at, at the time, is nearly impossible at this point.

25   But the combination of those two factors led to the operating

1    deficits that the GP funded."

2         Was that your answer?

3    A    Yes.

4    Q    So, in fact, your criticism on rents and operating

5    expenses is that the property was not being run optimally; is

6    that right?

7    A    That's right.  But also that there were repairs and

8    maintenance expenditures that weren't necessary in the first

9    place.

10   Q    Right.  Because you don't believe that the property was

11   being run optimally.  That's your position, right?

12   A    From the rent side, especially.  But, yes.  But I think

13   that's two different issues.

14   Q    Now, you dealt with LITHC properties during the financial

15   crisis in the late 2000s, right?

16   A    Yes, I did.

17   Q    But you weren't working for Alden Torch at that time?

18   A    It was Capmark, which is a company that was in bankruptcy,

19   that Hunt purchased out of bankruptcy in 2011, I believe.  So

20   it would have been part of -- part of our portfolio today is

21   assets that I was working on during the financial crisis.

22   Q    And so you saw general partners that had unexpectedly high

23   operating expenses during that period?

24   A    I think the issue during that period was high vacancy and

25   properties that couldn't make their debt service payments.

1    So there were dozens of debt restructurings and foreclosures.

2    But there's -- operating expenses wouldn't increase

3    dramatically due to a financial crisis.

4    Q   In your experience during the financial crisis, you came

5    across some general partners that didn't have the financial

6    wherewithal to cover deficits on low-income housing

7    properties, right?

8    A   Right.

9    Q   But Catherine Tamaro did pay for Parkway's deficit during

10   the financial crisis, right?

11   A   She did fund deficits in the past.  I'm not sure to what

12   extent the property was impacted by the financial crisis.

13   Not all --

14   Q   Right.  Because you weren't involved in the management of

15   the property at that time, were you?

16   A   We were in the same role we are today.  We were the

17   manager of the fund.

18   Q   During the financial crisis?

19   A   Yes, at Capmark.

20   Q   Capmark.  Okay.

21       So, the GP was required by the LPA to advance a certain

22   amount to the partnership, if necessary, to remain in

23   compliance, right?

24   A   What was the part about compliance?

25   Q   Well, the LPA provides for the general partner to advance

1   a certain amount to the partnership if it's necessary to

2   remain in compliance.  Do you agree with that?

3   A   I just wouldn't say to remain in compliance.  The general

4   partner is obligated to fund operating deficits up to a

5   certain dollar amount.  I think it was $600,000 in this

6   partnership agreement.

7   Q   Right.  But the GP here advanced more to Parkway than that

8   number, right?

9   A   I believe so.

10  Q   And you knew in 2014 that the GP had made significant

11  advances to the partnership; isn't that right?

12  A   That's right.  And that's exactly why we -- I think all

13  partners understood that this property had struggled at a

14  certain point, and had physical needs, and ran at or below

15  break-even during certain years.

16      And the general partner proposed a refinance that would

17  provide capital to fund the physical needs and the property

18  would generate positive cash flow going forward under that

19  proposal.

20  Q   Right.  And you're talking about going forward from 2014.

21  But my question was:  You knew in 2014 that the GP had made

22  significant advances to the partnership; is that right?

23  A   That's right.  And the cash flow from that refinance would

24  have gone to pay her back for those advances, is where I was

25  going with that.

1    Q    And -- okay.

2         Okay.  I'll move on.  In addition to the CPA list that

3    we just looked at, AMTAX also gave us another document that

4    pertained to the calculation of fees that AMTAX is claiming

5    as damages in this case, right?

6    A    I believe so.

7    Q    Yes?

8    A    Yes.

9    Q    Could you pull up Trial Exhibit 161, please?

10        And this is another list of all the fees and expenses

11   that AMTAX are claiming is unauthorized?

12   A    This is basically an updated analysis that includes 2017.

13   But it's very similar to the one that we already looked at

14   that was prepared by the CPAs.

15   Q    So this has been updated based on the 2017 audit; is that

16   right?

17   A    Yes.

18   Q    The one performed by Laura Lindal?

19   A    Yes.

20   Q    And at the bottom of this document it has Categories A

21   through N.  Then it says "damages" at the bottom.  Right?

22   A    Right.

23   Q    So is AMTAX claiming that all of these listed fees are

24   damages that it has incurred in this case?

25   A    I would say it's a component of the damages that we

1   suffered.

2   Q    Okay.  Well, let's look at the extermination services fee.

3   And if you see it there, it's D.  There's a listing of

4   $7,200.  Do you see that?

5   A    That's right.

6   Q    Now, these were fees paid to an affiliate for work done to

7   treat bedbugs, right?

8   A    That's right.

9   Q    AMTAX isn't claiming the GP should not have treated

10  bedbugs, is it?

11  A    Of course not.

12  Q    It's only claiming the fee is not reasonable and should

13  have been lower?

14  A    No.  It's that it was provided -- I should say the

15  services were provided by an affiliate, and the general

16  partner did not obtain bids, as far as I know.

17  Q    So the fee wasn't reasonable?

18  A    Potentially.  We don't know.  This wasn't disclosed to us.

19  But bedbugs are a problem across the country, and we've

20  spoken with GPs, and we have properties that we own where

21  we've seen the treatments performed by an exterminator for a

22  couple hundred dollars.  So it seems excessive.  But we

23  didn't have enough information at the time or were not made

24  aware of it.  And that's the issue.

25  Q    Okay.  So AMTAX is saying that it has a right to be

1    informed about every instance in which the general partner

2    treats for bedbugs?  Is that what you're saying?

3    A   I'm saying if an affiliate is providing services, they

4    need to be necessary, and they need to be at a cost at or

5    less than what a third party would provide in an arm's-length

6    transaction.  And I think it's apparent from Ms. Tamaro's

7    testimony that she didn't know if that amount was reasonable

8    or not.

9    Q   Okay.  But let's just say --

10   A   We certainly want to treat the bedbugs.  It's reasonable

11   to.

12   Q   Okay.  Let's just assume if AMTAX is right, and say bedbug

13   treatments should have cost $2,500, then shouldn't the damage

14   listing be the difference between $7,200 and $2,500?

15   A   Potentially.  But we don't know.  We don't know what the

16   reasonable number is.

17   Q   Right.  So the CPAs just took numbers out of the audited

18   financial statements and just listed them as damages on this

19   schedule, right?  That's what it says at the bottom, doesn't

20   it?

21   A   Right.  If the GP didn't verify that that amount was

22   appropriate, they should put the full amount back.

23   Q   Okay.  All right.

24       So, I'd like to move back to the 2013/2014 timeframe.

25   You negotiated a potential voluntary buyout of the limited

1    partner's interest in the spring of 2014, right?

2    A    Yes, that sounds right.

3    Q    And you negotiated with Catherine Tamaro --

4    A    Yes.

5    Q    -- over that time?

6         And so -- and just as part of the background for this,

7    although there's a 15-year compliance period, the tax credits

8    are typically fully delivered to the limited partner over a

9    10- to 11-year period; is that right?

10   A    That's typical, yes.

11   Q    And after the delivery of the tax credits are complete,

12   then an investor might be willing to entertain a voluntary

13   buyout of the limited partner's interest?

14   A    Yes.

15   Q    And so Ms. Tamaro made an offer to buy out the interest of

16   the limited partner in December 2013; is that right?

17   A    I think so.  Again, I didn't memorize dates, but that's

18   about the right timeframe.

19   Q    Is it fair to say at that time the tax credits had been

20   fully delivered?

21   A    I think so.

22   Q    And around the same time there was also a discussion of

23   refinancing Parkway's loan, right?

24   A    Right.

25   Q    And both of those are capital transactions?

 1    A    They are.

 2    Q    So that's why you got involved, to interact with the

 3    general partner, right?

 4    A    That's correct.

 5    Q    Okay.  And so when you get involved, that would have

 6    triggered your and your team's review of the audited

 7    financial statements, wouldn't it?

 8    A    Certainly.

 9    Q    And that's part of the due diligence that your team would

10    do in connection with any capital transaction, right?

11    A    Right.

12    Q    And you did this in the spring of 2014, didn't you?

13    A    Yes.

14    Q    Okay.  Can we pull up Trial Exhibit 73, please?

15         This is an e-mail from Gary Newbold dated March 27,

16    2014; is that right?

17    A    Yes.

18    Q    And you're copied?

19    A    Correct.

20    Q    Now, can we go back to the first e-mail on this string on

21    page 6, please?  At the bottom here it's an e-mail from

22    Catherine Tamaro saying, "I set up a spreadsheet of the

23    distribution of cash in the event of a sale, using a BOV of

24    $11,550,000."

25         Now, this is a similar modeling exercise to what would

1    occur in the event of a buyout under Section 7.4J, right?

2    A    Right.  You'd use the same waterfall.

3    Q    Right.  And on February 18th -- if we could move up in the

4    chain.  The previous page, please.  I'm sorry, no, it's at

5    the top.  Could you pull up, "Catherine, given the time of

6    year" -- pull up that sentence, please.

7         And so you write here, "Given the time of year, I think

8    it makes sense to use audited 2013 balances rather than

9    estimates.  When do you expect the final tax return audit to

10   be completed?"  And you wrote that?

11   A    Yeah.  It says, "Thanks, Chris."  Yes.

12   Q    That would have been to evaluate the general partner's

13   offer to buy out the LP's interest, right?

14   A    Right.

15   Q    And the general partner provided those audited financial

16   statements to you, right?

17   A    Yes, I believe so.

18   Q    Because the general partner provided timely audited

19   financial statements every year during the compliance period,

20   right?

21   A    Well, I think you've shown me instances where they were

22   after the deadline.  But we didn't default.

23   Q    You've received audited financial statements, the limited

24   partner received audited financial every year, right?

25   A    Yes, through 2017.

1    Q   Now, can we go to the top of the chain?

2        It says here at the bottom, "John, can you make this

3    audit a priority to review?"

4        Can you pull that up?  And that's from Gary Newbold.

5    And that's addressed to John Thomas, right?

6    A   Yes, it is.

7    Q   And that's the same Alden Torch CPA that reviewed the

8    audited financial statements in 2018, right?

9    A   Yes.

10   Q   Can we go --

11   A   Although in a different -- I would just say he was an

12   analyst, or a lower-level accountant at that time.  He wasn't

13   performing forensic accounting.

14   Q   He was a CPA then, right?

15   A   He was.  I'm just saying he wasn't in a forensic

16   accounting role in 2014.

17   Q   He's a CPA now, right?

18   A   Yes.

19   Q   Okay.  Can we go back to the damages schedule,

20   Exhibit 161?  Thank you.

21       So this is, "MGP fee paid despite insufficient cash

22   flow."  That refers to the fee paid to the managing general

23   partner, Hearthstone; is that right?

24   A   Yes.

25   Q   And AMTAX views the property tax exemption as -- well,

1  that was a fee that was paid to the managing general partner

2  in order to obtain a property tax exemption, right?

3  A    I believe as long as the managing general partner is a

4  partner in the partnership, we receive the exemption.

5  Q    So the managing general partner doesn't actually have to

6  do anything in order to receive --

7  A    No.  I believe they have to provide social services and

8  other services to the tenants.  But we don't get the

9  exemption because they're paid a fee.  We pay them a fee to

10  cover their expenses.

11  Q    Does AMTAX view the property tax exemption as a benefit to

12  the partnership?

13  A    Definitely.

14  Q    You never quantified how much of a benefit that exemption

15  provides though, did you?

16  A    I can't say that we never did.  I don't believe that I

17  ever did.

18  Q    And that fee was disclosed in the audited financial

19  statements every year since 2007, right?

20  A    Right.

21  Q    And AMTAX is claiming damage on this schedule going back

22  to 2007, right?

23  A    I can't see the rest of the spreadsheet.  But I'll take

24  your word for it.

25  Q    Let's expand it, please, Adam.  Top row.

1    A    Yes.

2    Q    And you believe that AMTAX kind of uncovered the issue

3    with the managing general partner fee during the

4    investigation in 2018?

5    A    It may have been brought up earlier.  I know we've

6    identified a lot of these fees going back to 2012 and 2013.

7    And Gary Newbold asked about a number of them.  I brought

8    some of these up in phone conversations with Catherine.

9    There's a history there.  It's not just as a part of that

10   analysis at the end of 2017 or early '18.

11   Q    And the issue, as you perceive it, is that because Parkway

12   had no available cash flow, the fee shouldn't have been paid

13   because there are other partnership obligations that should

14   have been paid first.  Is that your position?

15   A    That's right.  It should have accrued, and higher

16   priorities in the waterfall would have been paid, subject to

17   available cash flow.

18   Q    Okay.

19        Can we pull up Trial Exhibit 77, please?  If you look

20   at the top line here, this is from Catherine Tamaro.  It

21   says, "Gary, my responses to your questions are attached as a

22   separate document, along with the audit letter and LPA

23   amendment that you requested."

24        And this was on April 22, 2014, right?

25   A    Right.

1    Q    And this was in response to questions from Gary Newbold

2    related to the 2013 audit?

3    A    I think that's right.

4    Q    And that was in connection with your due diligence per

5    refinance or a potential buyout of the limited partner's

6    interest during that period, right?

7    A    It may have been related, yes.  It may have just been an

8    audit review.

9    Q    Are you involved in standard audit reviews?

10   A    No.  But I may bring an inconsistency to the attention of

11   an asset manager.

12   Q    Okay.  And you're copied on this e-mail, right?

13   A    I am.

14   Q    And John Thomas is copied on this e-mail, right?

15   A    Right.

16   Q    And we just looked at an e-mail where Gary Newbold asked

17   John Thomas to make that audit a priority to review, right?

18   A    Right.  As an asset manager, not as a member of capital

19   transactions.

20   Q    Okay.  Now, let's go to the -- there's a document where

21   Catherine Tamaro attaches a separate document that provides

22   responses to Gary Newbold's questions.

23         Can we turn to page 5, please?  And if you look at

24   No. 5.  Can we pull that up, please?

25         It says here:  The First Amendment admitted Hearthstone

1    Housing Foundation as the managing general partner and

2    modified the amended and restated agreement of limited

3    partnership, Section 6.2, application and distribution of

4    cash flow.  I presume that the next question is why the

5    managing general partner's fee was paid out of the order

6    established in the partnership agreement in the First

7    Amendment.  In 2013 as in all other years, the managing

8    general partner's fee was paid from advances from affiliates

9    which totaled $144,226 in 2013.  That's exactly the issue

10   that AMTAX brought in its counterclaims on July 2, 2018,

11   right?

12   A    I think so.

13   Q    And that's exactly what AMTAX is claiming damages for in

14   this case, right?

15   A    Yes.  That the advances were inappropriate.

16   Q    That's exactly what AMTAX now claims entitles it to not

17   provide an appraisal, right?

18   A    There's a litany of fees and payments that we dispute.

19   That's one of them.

20   Q    Right.  And we're going to go through them.  That is one

21   of them.

22        So, let's go back to Gary Newbold's questions, please.

23   If you refer to No. 3 there.  Would you pull that up?

24        It says -- Gary Newbold writes, "Can you please let me

25   know what is included in the entity expenses."  Then it

1  refers to management fee, repair supervision fee, and tax

2  compliance fee.

3      And the general partner provided an answer to that

4  question too, right?

5  A  I believe she did.

6  Q  She did?

7  A  I think so.  It's blocked on the screen.

8  Q  And if we go back to Trial Exhibit 161.  Maybe we could

9  pull them up side-by-side.  If we could just call up the

10  categories, please.

11      Okay.  So we've already discussed the managing general

12  partner fee, and that issue was raised here.  And so No. 3,

13  the management fee, that would refer to Category B, the

14  excess project management fee incurred, right?

15  A  Right.

16  Q  Okay.  And now there's a repair supervision fee that's

17  being questioned here.  And that would refer to Category F,

18  the repair supervision fee on this schedule of damages from

19  fall of 2018, right?

20  A  Right.

21  Q  Okay.  And this tax compliance fee, that would track with

22  the tenant file review fee, which is Category G, right?

23  A  Right.

24  Q  And the -- if we -- Adam, could you scroll to the next

25  page on the e-mail, please?

 1          There's an issue here, employee concession.  And that's

 2   pasted from the 2013 audited financial statements, right?

 3   That's one of the notes?

 4   A    Right.

 5   Q    Right?

 6          And if you go back to this list from the fall of 2018,

 7   that refers to rent paid for employees, Category H; doesn't

 8   it?

 9   A    It does.

10   Q    It does?

11   A    I said it does, yes.

12   Q    Okay.  So we have there -- and, again, another reference

13   to the repair supervision fee.

14          Now, can we pull up Trial Exhibit 78, please?  Okay.

15   So if you could scroll to the next page.

16          At the top here -- this is the same e-mail we just

17   looked at, right, the e-mail from the general partner,

18   Catherine Tamaro, responding to Gary Newbold, and says, "My

19   responses to your questions are attached."  So this is what

20   we just went through, right?

21   A    I believe so, yes.

22   Q    That was on April 22, 2014?

23   A    Right.

24   Q    Can we go to the first page?  The next e-mail in this

25   chain is from you and it's responding to what Catherine

1   Tamaro wrote on April 22, 2014, right?

2   A   That's right.

3   Q   And so you wrote on May 1st, "Hi, Catherine, I think we

4   are on the same page with respect to the audit, and can move

5   forward with discussion of selling the LP interest."  Did you

6   write that?

7   A   Yes.

8   Q   Okay.  So let's go back to Trial Exhibit 161.  If you

9   could pull up -- so we had excess project management fees

10  incurred.  And those fees were also disclosed in the audited

11  financial statements every year since the partnership's

12  inception, right?

13  A   Right.

14  Q   And AMTAX is claiming damage going back to 2004 on this

15  one, right?

16  A   If that's how long she's been charging excess management

17  fees, yes.

18  Q   And then so next on the damages schedule is Category C,

19  legal services fee.  There's one on here listed as damages

20  from 2007, right?

21  A   I believe so.  Again, I can't see the spreadsheet.  But,

22  yes, I'll take your word for it if that's when it was

23  expensed.

24  Q   So if we look at legal services, there's one here from

25  2007, right?

1  A    That's right.

2  Q    And you -- the CPAs got that from the 2007 audited

3  financial statement?

4  A    It seems so.

5  Q    You don't have any additional information about it though,

6  do you?

7  A    No.  I believe it came from the audit.

8  Q    It came from the audit?

9  A    I think so.

10  Q    So despite not knowing anything about the services that

11  were provided, AMTAX listed that as a damage, didn't it?

12  A    Um --

13  Q    Maybe I should say Alden Torch listed it as a damage?

14  A    I just wouldn't say we didn't know anything else about it.

15  I'm not sure what they knew about it.

16  Q    Do you know anything about it?

17  A    Just what I've heard in testimony over the last couple of

18  days.  And I'm not sure, you know, where this expenditure

19  fits in the services provided by Mr. Arterberry.

20  Q    You don't know if it was services provided by

21  Mr. Arterberry, do you?

22  A    Well, I believe it was.  I mean, it was paid to a GP

23  affiliate, so presumably the GP affiliate provided the legal

24  services.  And she's testified that her husband provides

25  legal services on behalf of the partnership.

1  Q   Are you sure that one was an affiliated fee?

2  A   That's who it was paid to.  It was paid to an AGP

3  affiliate.

4  Q   Now, there are additional legal services fees, and we have

5  talked about those, from 2017, 2016, 2015, right?

6  A   Right.

7  Q   That was work provided by Steven Arterberry?

8  A   That's my understanding, yeah.

9  Q   Now, did AMTAX ever raise any issue regarding that work in

10 2015?

11 A   I'm not sure.

12 Q   How about in 2016?

13 A   I don't know.

14 Q   So is it only in 2018, after the Hidden Hills litigation

15 was underway and you tasked Alden Torch's CPAs to come up

16 with a list of unauthorized fees?

17 A   It may be.  Again, we didn't know the full extent of a lot

18 of these activities.  And it didn't come to light until

19 discovery and depositions, and even this hearing.

20 Q   AMTAX never did any investigation to determine the cost of

21 comparable legal services, right?

22 A   I think the service has already been provided, so it would

23 have been too late.  But the GP didn't, either.

24 Q   But you're listing them as damages, but you have no basis

25 to determine what was a reasonable fee, do you?

1    A    The services shouldn't have been performed.

2    Q    At all?

3    A    They could have been performed by an unaffiliated entity,

4    or the general partner could have determined what a third

5    party would charge, and that the legal services were

6    reasonable in the first place.  But that's not what happened.

7    Q    Okay.

8    A    So, again, that money should be put back into the

9    partnership.

10   Q    So if it was a third-party fee, then there wouldn't be any

11   issue from AMTAX's perspective?

12   A    I think there's more transparency there.

13   Q    Okay.

14   A    And Catherine, or Ms. Tamaro, keeps saying that her

15   husband's rates are reasonable.  She hasn't said what her

16   husband's rates are.  So we still don't know if it's

17   reasonable.

18   Q    Okay.  The LPA provides for affiliate transactions, right?

19   A    Subject to conditions that I've described.

20   Q    Whether the fees are reasonable?

21   A    That's one of the conditions, yes.  But that the fees --

22   that the services are necessary in the first place.

23   Q    All right.  Now, I'd like to talk a little bit about the

24   repair supervision fee.  That fee was first incurred in 2010,

25   right?

1    A    Yes.

2    Q    And it's been disclosed in the audited financial

3    statements every year since, right?

4    A    Yes.

5    Q    And so AMTAX is, again, claiming damage going back to 2010

6    this time?

7    A    Yes.  That's when the activity started.  So, yes.

8    Q    And it's AMTAX's position that all this work should have

9    been done for the flat 4 percent fee in the property

10   management agreement?

11   A    The property manager is tasked with supervising repairs.

12   And they receive a fee for that.  So the GP doesn't get to

13   charge another fee for providing the same services.  So

14   they're effectively getting paid twice for a single service.

15   Q    You don't think it's even relevant to consider which

16   projects are at issue for which fee, right?

17   A    No.  If they're paid to provide that service, the project

18   is irrelevant.  They already have that obligation and are

19   compensated for it.

20   Q    So it's AMTAX's position that no matter what repair work

21   needed to be done on the property, Trieste is only entitled

22   to a 4 percent fee under the property management agreement?

23   A    I believe so, yeah.

24   Q    Can you pull up trial Exhibit 59, please?

25        And this is an e-mail chain dated June 26, 2013, right?

1   A   Yes.

2   Q   And this relates to -- I'd like to turn right to it.

3   Finding No. 3, please.  Page 2 of the PDF.

4        So here, this is Gary Newbold saying, "Hunt views

5   supervision of repairs as part of the general partner's

6   normal responsibilities and tends not to agree with them in

7   general.  Please explain what these fees are and why they

8   were charged."  Do you see that?

9   A   Yes.

10  Q   And Ms. Tamaro responds on page 1:  "Trieste employs a

11  qualified, experienced and highly competent job

12  superintendent who supervises capital repairs.  These types

13  of repairs require that building permits be obtained by a

14  licensed general contractor, thus Trieste Holdings is

15  providing general contracting services which are not provided

16  by property managers as part of the property management fee."

17       Now, that's exactly the issue we're talking about right

18  now, right?

19  A   It is.

20  Q   And that's what's in the counterclaims from July 2, 2018?

21  A   Yes.

22  Q   And that's another issue that AMTAX now claims entitles it

23  not to proceed with the appraisal process?

24  A   Right.  Our position is until all the defaults are cured,

25  then we can't proceed.

 1   Q   Can we go to Trial Exhibit 75, please?

 2           THE COURT:  We're going to leave it alone for now.

 3   We're going to start tomorrow morning at 9:30.  I've got a

 4   plea at 9 o'clock.  So just clear the desks.  Leave your

 5   stuff here, but clear the desks for the plea tomorrow

 6   morning.

 7       And what do you expect is happening tomorrow?  What

 8   witnesses?

 9           MR. GOODNIGHT:  This will be our last witness, and

10   then a rebuttal witness.

11           MR. PETTIT:  We're planning on calling John

12   Krabbenschmidt as our expert witness.  And I believe that

13   will be our only witness.

14           THE COURT:  Okay.  All right.  Good.  All right.

15   Thanks.

16       Have a good evening, and we'll see you at 9:30.

17                        (Recess.)

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3

4        I certify that the foregoing is a correct transcript from

5    the record of proceedings in the above-entitled matter.

6

7

8

9    /s/ Debbie Zurn

10   /s/ Angela Nicolavo

11   DEBBIE ZURN
     ANGELA NICOLAVO
12   COURT REPORTERS

13

14

15

16

17

18

19

20

21

22

23

24

25