

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

_____

HIDDEN HILLS MANAGEMENT,          )
LLC, and 334th PLACE 2001,        )
LLC,                              )
                                  )
Plaintiffs,                       )
                                  )
v.                                )  3:17-cv-06048-RBL
                                  )
AMTAX HOLDINGS 114, LLC, and      )  TACOMA, WASHINGTON
AMTAX HOLDINGS 169, LLC,          )
                                  )  June 6, 2019
Defendants.                       )
                                  )  9:00 a.m.
_____      )
                                  )  Bench Trial
AMTAX HOLDINGS 114, LLC,          )
AMTAX HOLDINGS 169, and           )
PARKWAY APARTMENTS, LP,           )
                                  )
                                  )
Counter-Plaintiffs,               )
                                  )
v.                                )
                                  )
HIDDEN HILLS MANAGEMENT,          )
LLC, and 334th PLACE 2001,        )
LLC,                              )
                                  )
Counter-Defendants.               )

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE
_____

Proceedings stenographically reported and transcript
produced with computer-aided technology

```
1                              APPEARANCES

2

3    FOR THE PLAINTIFF:              DAVID R. GOODNIGHT
                                     MARGARITA V. LATSINOVA
4                                    J. SCOTT PRITCHARD
                                     Stoel Rives
5                                    600 University Street
                                     Suite 3600
6                                    Seattle, Washington

7

8

9    FOR THE DEFENDANT:              CRAIG H. BESSENGER
                                      ERIC S. PETTIT
10                                   GRAYCE S. ZELPHIN
                                     Boies Schiller & Flexner
11                                   725 South Figueroa Street
                                     31st Floor
12                                   Los Angeles, California

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    EXAMINATION INDEX

2  EXAMINATION OF:                                    PAGE

3   CHRISTOPHER BLAKE    DIRECT EXAMINATION (Resumed)    4
                        BY MR. PRITCHARD
4                        CROSS EXAMINATION               37
                        BY MR. BESSENGER
5
    JOHN                DIRECT EXAMINATION              43
6   KRABBENSCHMIDT      BY MR. BESSENGER
                        DIRECT EXAMINATION (Resumed)    68
7                        BY MR. BESSENGER
                        CROSS EXAMINATION              111
8                        BY MR. GOODNIGHT

9

10

11                     EXHIBIT INDEX

12

    EXHIBITS ADMITTED                                 PAGE
13
    Exhibit 19                                          84
14  Exhibit 93                                          18
    Exhibit A-282                                       52
15  Exhibits A-311 and A-312                            40

16

17

18

19

20

21

22

23

24

25

1             MORNING SESSION

2              JUNE 6, 2019

3    THE COURT:  Good morning.  Please be seated.

4  Mr. Pritchard, you may proceed.

5        DIRECT EXAMINATION (Resumed)

6  BY MR. PRITCHARD:

7  Q   Good morning, Mr. Blake.

8  A   Good morning.

9  Q   So when we left off yesterday, we were talking about the

10  repair supervision fee.

11  I want to open that up, Adam, if you would, to Category

12  F on the damages schedule.

13  I had a few more questions for you on that. I want to

14  refer to trial Exhibit 75.  This is an email chain between

15  you and Gary Newbold in the spring of 2014, correct?

16  A   Yes.

17  Q   This was also in connection with Alden Torch's due

18  diligence for a potential buyout of the limited partner's

19  interest at the time?

20  A   That's right.

21  Q   You questioned the repair supervision fee.  If we could go

22  to the second page in the middle.  Do you know anything about

23  the AGP repair supervision fee and employee concession

24  mentioned in the audit on page 11?  Do you see that there?

25  A   Yes.

1    Q    So in response, Gary Newbold says -- at the top, Adam,

2    please -- "The AGP supervision is due to the ongoing repairs.

3    The GP claims to have a GC license and is entitled to a

4    supervision fee for major repairs.  I am following up on the

5    employee concession."  Do you know what "GC" stands for

6    there?

7    A    General contractor.

8    Q    Can you pull up trial Exhibit 43, please.

9         Do you know what this document is?

10   A    I don't.

11   Q    Does it look like a general contractor license to you?

12   A    Sure.  It doesn't say "license."  It may be.

13   Q    For Trieste Holdings?

14   A    Yes.

15   Q    So that's the repair supervision fee.  The next one on the

16   list is Category G from 161, please, Adam.  This one is

17   called a tenant file review fee; is that right?

18   A    Yes.

19   Q    So the tenant file review fee involved fees associated

20   with work that Trieste did with regard to ensuring that

21   tenants were in compliance, correct?

22   A    Correct.

23   Q    That would have been with respect to numerous different

24   state and federal agencies, their compliance requirements

25   across the board; is that right?

1  A    That's right.  That is all spelled out in the property

2  management agreement.

3  Q    This fee was first incurred in 2010?

4        Can you zoom it out for me?  Thanks.

5  A    Yes, that looks correct.

6  Q    It was disclosed in the audited financial statement every

7  year since 2010, correct?

8  A    I believe so.

9  Q    AMTAX is seeking damages going back to 2010 for this fee?

10 A    That's right.

11 Q    You contend that all of this work should have been done

12 for the flat four percent fee in the property management

13 agreement, right?

14 A    Yes, the property management agreement requires the

15 manager to perform the file review in compliance with the

16 applicable affordability programs, so yes.

17 Q    That is the same analysis as the repair supervision fee we

18 just discussed, right?  It is covered by the management

19 agreement?

20 A    That's right.

21 Q    Can we go back to -- it was an email chain we looked at

22 yesterday -- Trial Exhibit 59.  This one is from June 26th,

23 2013, right?

24 A    Yes.

25 Q    And so I want to bring it back up just to refresh

1  everyone's memory on it.  If we look at the second page, I

2  believe, Adam.  There is something here, it is from

3  Gary Newbold.  If you look at No. 3 it says, "Hunt views

4  supervisions of repairs as part of the general partner's

5  normal responsibilities and tends not to agree with them in

6  general."  That's the criticism of the repair supervision

7  fee, right, that it should be covered by the property

8  management agreement?

9  A    That's correct.

10  Q    Can we go to No. 4?  It says, "Here, the administrative

11  general partner charged the partnership 13.7K, 12.3 and 12.8K

12  in 2012, 2011, 2010 for monitoring the project's compliance

13  with WSHFC requirements."  So Gary Newbold's response is,

14  "Correction required.  See correction No. 3."  That refers

15  back to the same issue, right, the repair supervision fee

16  issue that we just looked at, right?

17  A    That's right.  They are similar.

18  Q    Same problem under the same property management agreement?

19  A    Correct.

20  Q    That's what AMTAX is contending is the problem today,

21  right?

22  A    Yes, we contended it is a problem since this time.

23  Q    So -- and Ms. Tamaro responds -- could you bring up

24  No. 4? -- "Trieste Holdings, LLC has had to hire an

25  affordable housing specialist who oversees compliance not

1  only with WSHFC, but also the Washington Department of

2  Revenue, which is an activity not contemplated by the

3  original partnership agreement.  The fees you reference are

4  partial reimbursement for the affordable housing specialist

5  salary applicable to time spent at Hidden Hills.  HUD allows

6  add-on fees for affordable housing compliance by property

7  managers."

8       Now, that was in 2013.  Was the issue ever raised again

9  until now?

10 A  I believe so.  We had conversations throughout the

11 negotiations for disposition.  I believe these were brought

12 up over and over again.  We never received a response that we

13 felt was satisfactory.

14 Q  Right, except in -- it was brought up again in the spring

15 of 2014?

16 A  I am sure it was.

17 Q  That was when you ended up saying, "I think we are on the

18 same page with respect to the audit, and we can proceed with

19 the buyout," right?

20 A  I understood her position.  As a capital transactions

21 representative where I am negotiating the sale of our

22 interest, I don't necessarily need to agree with her

23 position.  If I can kind of negotiate a sales price that I

24 think makes us whole for the general partner's fees that were

25 unauthorized, then I can essentially clean up the books by

1  getting a price that I think fixes all of those inappropriate

2  fees.  That way, we don't need to get legal involved.  We

3  don't need to send a default letter, and we don't end up in

4  litigation.  It is a much cleaner way to fix issues like

5  that.

6  Q   Well, let's look at another one.  Trial Exhibit 71.  This

7  is a February 3rd, 2014 email.  This one is from Gary Newbold

8  to Ms. Tamaro saying, "Who handles compliance review for

9  tenant files in your staff or is it contracted out to a third

10 party?  If a third party, what is the contact info?"

11      Would AMTAX say that a third party would be entitled to

12 be paid for doing this work?

13 A   Certainly.

14 Q   In fact, your expert's firm Novogradac provides the same

15 service, right?

16 A   They do.  This general partner entered into -- I should

17 say, this property management company, which is an affiliate

18 of the general partner, entered into a management agreement

19 requiring them to provide this service for a negotiated fee.

20 If the circumstances were different, yes, we may be willing

21 to pay a third party to provide those services.  That was

22 never brought to us for approval.

23 Q   You knew that's what was happening, right, in 2013?

24 A   Knew what was happening?

25 Q   That this fee was being charged?

1    A    Right, which is why we were questioning it.

2    Q    I thought you just said it wasn't brought to your

3    attention, wasn't disclosed?  Did I mishear you?

4    A    No.  I am saying if the general partner or the management

5    company wanted to hire a third party to provide these

6    services, they could have made a proposal, we would have

7    considered it, and if it was reasonable we may have accepted

8    it, but that's not what happened.  Again, it is the general

9    partner paying themselves twice for providing one service.

10   Q    Let's go to the next one, Category H, Exhibit 161, please.

11        This is labeled here as "rent paid for employees."  So

12   do you know if providing the rent concession that I think

13   Ms. Tamaro's spoke about a bit in her testimony, providing

14   that actually made any net monetary difference to the

15   partnership?

16   A    I am not sure.

17   Q    Do you think that would have been something to think about

18   when coming up with a list of damages in this case?

19   A    Yes, but based on the explanations we received, it doesn't

20   seem like these amounts were valid.  Employees are allowed,

21   and often do receive a rent concession, but they are

22   typically a property manager or maintenance person that is on

23   call for emergencies.  In this case, it sounds like the

24   employee rent credit was provided to an independent

25   contractor, which isn't permitted, and then that person

1    ultimately moved to another property.  As I understand it, I

2    don't think it is valid.  That's why there are these damages.

3    Q   When you say "not valid," is that the same as saying it is

4    unauthorized?

5    A   Yes.

6    Q   So it sounds to me like you are not drawing any

7    distinction between whether or not something was authorized

8    and whether it actually damaged the limited partner or the

9    partnership; is that right?

10   A   No, I don't think that is right.

11   Q   It's not right?

12   A   Can you repeat that?  Sorry.

13   Q   It sounds to me from your testimony right now that you are

14   not drawing any distinction between whether or not a fee was

15   unauthorized versus whether it actually caused any harm to

16   the limited partner or the partnership; isn't that right?

17   A   No, I don't think that is the case.

18   Q   No?  It is the case with this one, though, right, because

19   you didn't actually ever look up whether there was any net

20   monetary difference to the partnership?

21   A   If the fee wasn't permitted, then there was -- that's a

22   waste of the partnership's resources.

23   Q   You know that the asset manager, Gary Newbold, also asked

24   about this in 2013, correct?

25   A   Yes.

1  Q   You asked Gary Newbold about it when reviewing the audited

2  financial statements in connection with the spring of 2014

3  due diligence, right?

4  A   Yes.

5  Q   I don't need to bring up the email, but it is in there.

6  Next on the damages schedule is Category G, bookkeeping fees.

7  This item was first disclosed in the audited financial

8  statements in 2011, correct?

9  A   Yes.

10  Q   AMTAX is claiming damages going back to 2011?

11  A   That's right.

12  Q   Do you know if this was actually a fee?  Was it a

13  reimbursement to a third-party payroll company?

14  A   Yes, I believe we ultimately discovered that.

15  Q   You didn't take it off the damages list, though, did you?

16  A   We didn't find out until after the fact, so I think that

17  is something we have withdrawn.

18  Q   It is?  Good.  Well, all right, we have one cleared up.

19  Great.

20  A   Great.

21  Q   Progress.

22       All right.  So the developer fee, that's categories J

23  and K.  So will you agree with me that there is no dispute

24  that the actual amount of the developer fee, which was

25  approximately 1.2 million, that was owed to the general

Blake - Direct

1   partner, right?

2   A   Yes.

3   Q   I know the limited partner has a number of issues with

4   this.  One of them is the order of a payment made on the

5   developer fee from 2009?

6   A   Yes.

7   Q   That was approximately, I think -- well, that is the

8   $341,000 right there?

9   A   That is correct.

10  Q   It was paid in the wrong order in the cash flow waterfall?

11  That is AMTAX's position?

12  A   No, I don't think that is correct.  I think the issue

13  is -- the 341,685 is the final capital contribution made by

14  the limited partner.  As you know, the property has been

15  struggling and had significant physical needs, but I think

16  the general partner testified around that time she wanted to

17  replace all the windows, and there were issues with siding

18  and roofs.  The property is operating at a deficit in some

19  years.  Rather than using those funds to -- and applying them

20  to those issues, the general partner paid themselves that

21  full amount.  There shouldn't have been cash flow to go -- to

22  apply to the waterfall.

23  Q   This payment was disclosed in the 2009 audit, correct?

24  A   I believe so.

25  Q   Can we go to Trial Exhibit 38, page 9, please.  It says

1   here on the last line, "Payments made during the year

2   totalled 341,000 approximately," that's the fee we are

3   talking about, right, or that is the payment that the -- at

4   issue in this case?

5   A    Right.

6   Q    Is there -- so AMTAX is claiming damage based on something

7   that happened and was disclosed in audited financial

8   statements in 2009?

9   A    Yes.

10  Q    The balance of the DDF fee, minus that payment, has been

11  disclosed on every audited financial statement every year

12  since then, right?

13  A    No, I don't believe so.

14  Q    We will come back to that.  Can we go back to 161?

15       Category L is next.  This is for construction costs not

16  eligible for repayment.  The total is $120,197.  This issue

17  was related to a May 2002 construction contract, correct?

18  A    I believe so.

19  Q    So let's look at the partnership's 2003 audited financial

20  statement, Trial Exhibit 13, page 13.  You look --

21       Call up the construction contract, please, Adam.

22       Says, "The partnership has entered into a $1,240,809

23  construction contract, all of which was earned as of November

24  30, 2003, with a general contractor which is an affiliate of

25  the managing general partner.  As of November 30, 2003,

1    construction payables totalled $120,197."  That is the same

2    number on AMTAX's damages schedule, right?

3    A    That's right.

4    Q    This is from the 2003 audit, right?

5    A    Right.

6    Q    That was a payable that remained on the books as owed to

7    the general partner every single year since 2003, isn't it?

8    A    It has.

9    Q    It was disclosed in 12 consecutive audited financial

10   statements?

11   A    I would actually amend my previous answer to say:  In

12   2015, all of the GP receivables were consolidated into a

13   larger surplus cash note.  I don't think it appears after.

14   Q    Fair enough.

15   A    Yes --

16   Q    But it was -- I think we did go over this.  It was

17   previously separated out in every audit?

18   A    Right.

19   Q    This is another item that AMTAX contends is the reason not

20   to provide an appraisal, correct?

21   A    Yes.

22   Q    AMTAX is claiming damage for $120,000 based on something

23   that happened in 2003, correct?

24   A    Yes.

25   Q    Let's go to the next one. This is Category M,

1   uncharacterized miscellaneous payments to the general

2   partner.   Now, these are for fees from the audited financial

3   statements that were accrued in 2003, 2005 and 2016, correct?

4   A   Yes.

5   Q   The 2003 fee was actually a charitable contribution,

6   wasn't it?

7   A   Yes, I believe so.

8   Q   It was to the Tacoma Area Coalition For Individuals with

9   Disabilities, wasn't it?

10  A   I don't know.

11  Q   Do you know that that contribution was made in -- as a

12  part of a 2002 application for tax exempt bonds?

13  A   I believe that is what the GP has stated, so yes.

14  Q   You don't have any basis to dispute that because Alden

15  Torch wasn't around in 2003, was it?

16  A   No.   Capmark was.

17  Q   No one ever raised an issue with it at Capmark, right?

18  A   I don't know.   I wasn't there at the time.

19  Q   The other two fees, AMTAX just couldn't identify what they

20  were or what they were for, right?

21  A   That's right.   It is unclear in the audits.   There is a

22  broad category called "entity expenses" that includes several

23  fees paid to the GP, some of those were explained.   If you

24  add those fees up, it doesn't match the total entity fees, so

25  it is just the excess amount that the auditor didn't

1  identify, but it was a payment or accrual to the GP or an

2  affiliate.

3  Q   You might as well tack it on to damages and reach that 2.7

4  million figure required to erase all the accounts payable,

5  was that the strategy?

6  A   That was the GP can't demonstrate that they earned a fee

7  and took money that wasn't categorized.  If there is a valid

8  explanation, we are always willing to hear them out.  I don't

9  think we have been given one to date.

10 Q   Asset management fee, last one.  This is actually -- this

11 is a fee that AMTAX is claiming that its own fee was

12 underpaid, right?

13 A   Right.

14 Q   Can we call up the broader -- how far back this one goes,

15 please.

16      This one goes all the way back to 2002, $2,000 there,

17 it was underpaid in 2002.  Is that the -- so Alden Torch is

18 claiming that asset management fees were underpaid in years

19 before Alden Torch was involved with the limited partner; is

20 that right?

21 A   Yes, it has been underpaid every single year since

22 partnership inception.

23 Q   The limited partner sends an invoice to the general

24 partner for these asset management fees, correct?

25 A   In some cases, we do.  I am not sure if we sent invoices

1  on this property specifically.

2  Q   Let's look at one.  Exhibit 93, please.  This was objected

3  to on relevance grounds.  Is this an example of an asset

4  management fee invoice sent by AMTAX?

5  A   Looks like it.

6          MR. PRITCHARD:  I would like to offer it in evidence.

7          THE COURT:  Any objection?

8          MR. BESSENGER:  No objection.

9          THE COURT:  Exhibit 93 is admitted.

10                  (Exhibit 93 admitted.)

11  BY MR. PRITCHARD:

12  Q   This is the invoice that Alden Torch would send for its

13  own fees to the general partner, right?

14  A   Right.

15  Q   It is AMTAX's contention in this litigation that the

16  general partner had a duty to independently verify that the

17  invoices that AMTAX sent were accurate, and if not, the

18  general partner had to correct those invoices; is that your

19  position?

20  A   Yes, they are charged with managing partnership funds.

21  They could have taken a very simple definition from the

22  partnership agreement, applied the appropriate growth rate,

23  which again is just coming from published government data,

24  and could have corrected us if we were wrong or they could

25  have just paid us the correct amount.  They did neither.

1  Q   Okay.  We made it through the fees.  Next is rents.

2       AMTAX is claiming the general partner didn't raise the

3  rents high enough, correct?

4  A   Correct.

5  Q   And historically, operating expenses were too high?

6  A   Historically, they were low.  Recently, they have

7  skyrocketed related to the unnecessary repairs and

8  maintenance that the GP has been performing the last couple

9  of years in this kind of renovation of the property on a

10 rolling basis, so yes.

11 Q   Reviewing rent rolls is another asset management function

12 at Alden Torch, correct?

13 A   I am not sure they review rent rolls.  We collect rent

14 rolls as part of our investor reporting.  I am not sure

15 actually how much they review rent rolls.

16 Q   Can we go to your -- Mr. Blake's deposition, please, page

17 42, lines 1 through 9.  I asked you, "So before the break, I

18 think you testified that AMTAX typically reviews rent rolls,

19 compliance issues, taxes, things of that nature; is that

20 right?"  "That's right."  Part of -- your answer was, "That's

21 right. So part of an investor reporting process that we

22 provide to our investors."  That was your answer, right?

23 A   Right, which I think is wholly consistent with what I just

24 said.  I said I think they may quickly review them.  I don't

25 think that is inconsistent.

Blake - Direct

1   Q   I asked you, "And did AMTAX do that in connection with

2   Parkway?"   Did I read that right?

3   A   Yes.

4   Q   Your answer was, "Alden Torch, our asset management group

5   and our accounting groups, would have done it."  Was that

6   your answer?

7   A   Yes.

8   Q   Gary Newbold started Alden Torch around 2013, correct?

9   A   I don't know when he started.  That could be true.

10  Q   Can we go to Trial Exhibit 58, please?  This is an email

11  May 21st, 2013 between Gary Newbold and Catherine Tamaro.

12  Looks to me like this is a communication between them about

13  where Ms. Tamaro is supposed to submit the rent rolls to

14  Alden Torch; is that fair?

15  A   Yes.

16  Q   Trial Exhibit 60, please.  We know Gary Newbold reviewed

17  the rent rolls.  This is another email from him in June of

18  2013.  He wrote --

19        Can you go to the next page, Adam? No. 3, could you

20  call that up?

21        "The property is at 100 percent occupancy.  Are the

22  rents at max?" Do you see that?

23  A   Yes.

24  Q   Ms. Tamaro responds --

25        No. 3, Adam.

1      She said, "Yes, the property has strong occupancy right

2   now, but it is an older property with stiff market

3   competition.  We feel if we raise rents, it would trigger a

4   number of move-outs.  We have discussed this internally, and

5   right now we feel it is better to leave well enough alone."

6   Do you know what the "GLN" underneath is?

7   A   I assume it is Gary's initials.

8   Q   And he wrote, "Understood," didn't he?

9   A   Yes.

10  Q   AMTAX solicits market studies from third-party firms with

11  respect to its properties?

12  A   In some cases.

13  Q   Do you know if it did that with Parkway?

14  A   I wouldn't call it a market study.  I think there were

15  site inspections that were provided by third parties.  I am

16  not sure of an actual market study.

17  Q   Are you aware of a report from Novogradac from 2012?

18  A   Yes.  I think that identified that they thought rents

19  could be raised.

20  Q   Also says that we -- well, let's go to it, please, page

21  17.  Can you pull up the last sentence of the paragraph in

22  between the two boxes.

23      Novogradac, same firm that is AMTAX's expert in this

24  case -- that employs AMTAX's expert, concluded, "The

25  subject's current rents are reasonable."  You had mentioned

1  that there was room for -- it does say, "And that a slightly
2  higher rent for its one-bedroom units is possible."  Do you
3  see that?
4  A   If you look at the preceding sentence it says, "The
5  subject's LIHTC rents at the 50 percent annual level for
6  one-bedroom units are below the range for the comparables.
7  Subject's two-bedroom units at the 50 percent level are below
8  the average but within the range.  Both are below average, in
9  which case I think there could have been modest rent
10 increases."
11     I know in the opening statements we are accused of wanting
12 to increase rents, evict tenants, and that is just not true.
13 We think all properties at 100 percent occupancy, the GP
14 needs to raise rents -- if vacancy increases dramatically,
15 that can be pulled back.  If you are at 100 percent
16 occupancy, you don't know, but clearly they were below
17 average.  The general partner has an obligation to maximize
18 income and wasn't raising the rents.
19 Q   You don't feel as though you are substituting your own
20 judgment for the general partner making these kinds of
21 decisions about what rental rates are appropriate, do you?
22 A   I am entitled to my opinion.  The general partner is
23 entitled to theirs, but I don't have -- I should say the
24 general partner has an obligation -- a contractual obligation
25 under the partnership agreement that requires her to maximize

1    income.  It is not just a matter of opinion.

2    Q   You don't view the setting of rental rates as a management

3    function?

4    A   I do, that the GP is charged with --

5    Q   Excuse me.  Sorry.  Continue.

6         Did you see Ms. Tamaro -- did you hear Ms. Tamaro's

7    testimony explaining how she did, in fact, increase the rent

8    at Parkway over the years?

9    A   Yes.

10   Q   Are you disputing that fact?

11   A   No, it is relevant.  It is what comparable properties were

12   charging and what the market would support, not that rents

13   were increased.  Just to finish that.  Every time a unit goes

14   vacant, I believe that the general partner should have been

15   renting that unit at a rent that was consistent with what

16   other comparable properties in that market were charging.

17   Based on this analysis and subsequent analysis, I don't think

18   that is what happened.

19   Q   Subsequent analysis by John Krabbenschmidt?

20   A   No.

21   Q   Let's go to Trial Exhibit 60.  This is a -- the same

22   actually June 23rd -- or, excuse me, June 27, 2013 email, and

23   Gary Newbold also, he had a question about payroll trending

24   up, correct?

25        Can we grab that, Adam?

1     No. 1, says, "Payroll seems to be trending up from the

2     third quarter of 2012 with a market increase in the first

3     quarter of 2013."  So then Ms. Tamaro responds -- let me go

4     back to No. 1.  I won't read it through.  We have seen this.

5     It explains Trieste and who Trieste employs, the work they

6     are doing on the property, and that as property repairs

7     increased, so did payroll.  Gary Newbold understood that as

8     well, didn't he?

9     A   He said he understood.

10    Q   Let's go to Trial Exhibit 91.  So this is an email from

11    Gary Newbold to Susan, I am not going to pronounce her name

12    correctly.  Do you know?

13    A   Kwarciak.

14    Q   And Bryan Townsend, who are they?

15    A   Sue is the head of investor relations.  Bryan is our chief

16    credit officer.

17    Q   What is the role of the head of investor relations?

18    A   To communicate with our investors.

19    Q   She would be the person responsible for actually obtaining

20    permission from the ultimate investors to engage in a capital

21    transaction like a refinance or buyout; is that accurate?

22    A   That's right, so as soon as we have internal committee

23    approval, she would go to investors to request their consent.

24    Q   You are copied on this email?

25    A   Yes.

1    Q    I think here at the bottom, this is from Anne Morrison at

2    Morgan Stanley.  Morgan Stanley was the investor, at least at

3    this time, right?

4    A    Yes, I think so.

5    Q    2014?

6    A    Yes.

7    Q    It looks like there is a question from her.  It says,

8    "There is a reference to windows and wet areas.  Will the

9    required repair amounts cover all of these issues?" So, then,

10   Gary Newbold responds to that and, you know, it is a long

11   email, but is it fair to say this is his explanation of what

12   he knew about what was happening at the property in 2014 and

13   the repairs that were done, and he gets into all the

14   specifics here, doesn't he?

15   A    Some specifics, yes.  That is exactly why we consented or

16   sought investor consent to the refinance to free up funds to

17   take care of issues like these.  Based on the projections we

18   received at the time, that refinance was more than

19   adequate -- I should say the cash in reserves provided by the

20   refinance were more than adequate to deal with issues like

21   this.

22   Q    So one of AMTAX's claims in this case is that the general

23   partner did too many repairs on Parkway, right?

24   A    Yes, after the refinance, I think the behavior pre and

25   post refinance was dramatically different.  We have these

small little fees that are being incurred every year.  We

questioned those.  I would say they are immaterial, but

relative to what happened after the refinance where the GP is

advancing hundreds of thousands, if not million of dollars to

complete repairs, that should need to be -- shouldn't have

been necessary until '25 or 2035 based on the physical needs

report.

Q    So the work should have been done after the limited

partner exited the partnership?

A    Based on -- I mean, work is going to be done throughout

the life of this property.  The GP accelerated millions of

dollars of work that was supposed to be done or anticipated

to be done between 2025 and 2035.  Did that, in the two to

three years leading up to the end of compliance and funded

those with massive advances.  Those advances go on to the

balance sheet.  When the general partner exercises its

option, the limited partner's proceeds are reduced dollar for

dollar for that amount.  It is a very similar scheme to what

was done on Hidden Hills.  It is just GP advances in place of

suppressing the value through -- yeah, inflated and

unnecessary environmental remediation costs.

Q    Let's just be clear. It didn't just go on the balance.  It

went into audit the financial statements, right?

A    The operating expenses, yes.

Q    You --

1    A    They clearly rose, and that is mentioned in the audited

2    financial statements.

3    Q    You have never been to Parkway, have you?

4    A    I have.

5    Q    You have?

6    A    Yeah.

7    Q    Since the last deposition?

8    A    Yes.

9    Q    When?

10   A    After the mediation, I was going down to Portland to meet

11   some friends.  I drove by both properties and a couple others

12   that we own.

13   Q    About a month ago is the first time?

14   A    I think that is right.  Generally, the capital

15   transactions person wouldn't visit the site.  That would be

16   an asset management role.

17   Q    Right.  So it was Gary Newbold that actually had been to

18   the property, and it was Gary Newbold that was actually the

19   contact for the GP, right?

20   A    From an asset management perspective, yes.

21   Q    He had been to the property multiple times, hadn't he?

22   A    Yes.

23   Q    Yeah.  He is not here testifying today on AMTAX's behalf,

24   is he?

25   A    He is not.

1   Q    No.

2        Do you feel like you are in a position to sit here and

3   make judgments as to what should and shouldn't have been

4   repaired at the Parkway Apartments when the first time you

5   have ever been there was a month ago?

6   A    I do.  I have reviewed the financials.  We have reviewed

7   the physical needs report.  I think this is unprecedented.  I

8   have never seen anything like this in my career.  It spans 15

9   years.  I have underwritten thousands of deals, and I have

10  never seen operating expansions double on a property that

11  didn't have a fire or was hit by a flood or hurricane.

12  Q    Let's be clear.  There is no one from AMTAX that is

13  testifying here today that had actually been to Parkway

14  except for your visit, drive-by, about a month ago, right?

15  A    Right.  I think it is apparent from the financials and the

16  due diligence we did during the refinance in 2014 and '15

17  that this work was completely unnecessary and it is just a

18  deliberate scheme to depress the value of our interest so she

19  can exercise her option and get us out at a discount.  As

20  soon as she does that, she has a property that is in almost

21  new condition and the limited partner doesn't realize the

22  benefit of that, of those expenditures, and she's paid for

23  that work with our equity.

24  Q    Okay.  So let's move on.  I guess since you don't have any

25  firsthand knowledge of Parkway's condition, can you just

1   agree with me generally that fixing a leaky roof would be

2   necessary?

3   A   Absolutely.

4   Q   AMTAX isn't claiming in this case that any of this work

5   wasn't actually completed, right?

6   A   No.

7   Q   Before Alden Torch came along, the limited partner's

8   investments were managed by Paramount Financial Group,

9   correct?

10  A   Can you repeat that?

11  Q   Before Alden Torch came along, the limited partner's

12  investments were managed by Paramount Financial Group?

13  A   It would have been Capmark.

14  Q   Is Paramount an affiliate of Capmark?

15  A   Paramount became Capmark.  Capmark went into bankruptcy

16  and was purchased by Hunt.  Hunt become Alden Torch.

17  Q   I know it is a convoluted --

18  A   Many changes.  It is hard to follow.

19  Q   Ms. Tamaro has managed the same property since 2002,

20  right?

21  A   Right, the investor has been the same since 2002.

22  Q   Just a lot of different management?

23  A   Correct.

24  Q   Let's look at the 2006 by Paramount, Exhibit 23, please.

25  Do you have any basis to refute what is in this report that

1   was done by Paramount?

2   A   I am not sure what is in it.  This predates me.

3   Q   Do you see the third-party report that AMTAX solicited in

4   2012?  If we go to Trial Exhibit 50.  Are you familiar with

5   this report?

6   A   Yes.

7   Q   You have seen that there are issues in this report related

8   to Parkway's balconies.  Do you see that?

9   A   I don't know what the specific language is.  If you would

10  like me to take a look at it, I am happy to comment.

11  Q   We went through it already.  Let's move on.

12          You referred to the project capital needs assessment

13  report earlier in your testimony?

14  A   Right.

15  Q   That is -- are you familiar with HUD's regulations and

16  standards generally that must be met when a partnership has a

17  HUD insured loan?

18  A   Generally.  Many of our properties are financed with loans

19  that are guaranteed by HUD or insured by HUD.

20  Q   You don't know the specific roles or responsibilities of

21  HUD in connection with its oversight of the Parkway property,

22  do you?

23  A   Generally, I do.  We have refinanced other properties that

24  we own outright.  We have gone through a process that was

25  similar to this.  It is not something that is completely

1    foreign.  Do I know every single requirement or oversight

2    role?  I don't.  I generally understand.

3    Q    You have never spoken to the HUD project manager at

4    Parkway, have you?

5    A    I know he emailed in the past lobbying for a refinance.  I

6    think he sent emails to me.  I haven't spoken to him on the

7    phone or in person.

8    Q    You have not?

9    A    I don't believe so.

10   Q    The reason for that would be because interacting with HUD

11   would be the role of the general partner, right?

12   A    Usually, yeah.  It doesn't mean that a limited partner

13   can't communicate with HUD.

14   Q    Do you know if Gary Newbold received the PCNA report?

15   A    I would assume so.  It would have been his responsibility

16   to submit the committee memo and work with the investor

17   relations to submit consent requests.  I believe he would

18   have.

19   Q    The general partner also submitted annual budgets to the

20   limited partner for anticipated repairs, correct?

21   A    Yes.

22   Q    AMTAX's asset manager, Gary Newbold, would have reviewed

23   that budget and asked questions about it, right?

24   A    I believe so.

25   Q    As we have seen through all of these emails, the general

1   partner communicated with the asset manager directly

2   regarding any repairs, correct?

3   A   Yes.

4   Q   So let's just -- I am going to skip a couple of these

5   examples.  I think we went through maybe enough.

6        Trial Exhibit 66, please.  This is another example from

7   2013.  I think this is an email from Gary Newbold where he

8   had questions about Parkway's 2014 budget.

9        Can you just blow up the first line there, Adam.

10       He has questions.  Let's look at one of Ms. Tamaro's

11   answers.  No. 2.  He has these questions about the money. It

12   is hard to see.  I think Ms. Tamaro's response starts at

13   "each," and she writes, "Each of the capital improvements we

14   listed in the Hunt budget is necessary.  That said, we

15   realize we will only complete a few of the needed repairs in

16   the budget.  What isn't completed in 2015 will roll over into

17   the 2015 budget until all of the necessary repairs are

18   completed."  Do you see that?

19   A   Yes.

20   Q   Trial Exhibit 70, please.  This is from 2013.  Can we go

21   to page 5, last paragraph.

22        This is in connection with Ms. Tamaro's 2013 voluntary

23   buyout offer of the LP's interest.  It says, "Parkway is in

24   need of a major capital infusion to repair dry-rotted siding

25   and replace single-pane window.  It needs to re-surface its

1    parking lots and the local jurisdiction is requiring we

2    purchase a new trash compactor."  Is it the LP's position in

3    this case that the GP needed to inform it as to the type and

4    size of the trash compactor that it buys, if it is a problem

5    with the old one?

6    A    Depends on where the funds come from.  If it comes from

7    the replacement reserve, then certainly.

8    Q    She did inform the LP anyway, right?

9    A    She informed us that the local jurisdiction was requiring

10   its purchase.  I am saying we would have had an approval

11   right, if the funds used to purchase the trash compactor came

12   from the replacement reserve.

13       We did agree to a major capital infusion, which was the

14   2014 and '15 refinance to address issues like repair of

15   dry-rotted siding.

16   Q    Let's go to Trial Exhibit 90.  This is the one we just

17   looked at where Gary Newbold is explaining the work that is

18   being done on the property to Susan Kwarciak and

19   Bryan Townsend, right?

20   A    Right.

21   Q    That was in connection with the refinance to get approval

22   from it from the ultimate investor?

23   A    That is right.

24   Q    The investor ultimately did approve the refinance, right?

25   A    Right.

1    Q    And actually, the day before this email, Susan Kwarciak --

2    A    You can just say "Sue."

3    Q    -- actually sent a memorandum to Morgan Stanley seeking

4    approval for the refinance, correct?

5    A    Correct.

6    Q    That is Trial Exhibit 90.  Look at page 2, paragraph 3.

7    At the bottom here it says, "The single-pane windows were not

8    part of the scope.  The AM noted instances of condensation

9    leading to mold around the window seals during the most

10   recent site inspection.  Additionally, the property appears

11   to be suffering from water intrusion and rot due to damp

12   environment in some areas."  Do you know what "AM" stands

13   for?

14   A    Asset manager.

15   Q    That would have been Gary Newbold that noted the issues

16   with the windows, right?

17   A    Right.

18   Q    And now replacing those windows are a breach of fiduciary

19   duty, right?

20   A    No.  You know, the AM noticed instances of condensation.

21   Instances can be repaired.  It doesn't require all windows to

22   be replaced.  Again, the physical needs assessment or PCNA

23   didn't believe the full replacement of every window is

24   required until the second ten-year period, which was 2025 to

25   2035.

1  Q    Do you know -- sorry, continue.

2  A    So repairs and total replacement are not the same thing.

3  What we believe is a breach of fiduciary duty is advancing

4  millions of dollars to perform that work that wasn't

5  necessary and, you know, depressing the value of our interest

6  in sale, in addition to all the other items that we noted,

7  the rents, unauthorized fees and accruals.

8  Q    Let's go to another paragraph on this.  The last full

9  paragraph, please, Adam.

10      I think the reference here, this is a memo from the

11  dispositions group; is that right?  We can --

12  A    This is the consent request to Morgan Stanley.

13  Q    There is a reference here to "according to disposition

14  group estimates"?

15  A    Right, as part of the capital transaction, they would ask

16  our opinion.

17  Q    It says here, the end of the first sentence, "When the

18  LP's option to force a sale at market value can be executed."

19  We discussed this issue in the context of Hidden Hills in

20  2017, right, whether or not the limited partner actually has

21  a right to force a sale of the property?

22  A    I believe the language is the same or substantially the

23  same in both agreements.

24  Q    Yeah, right.  This is another mistake?

25  A    No.  Doesn't say what it is forcing a sale of.  You know,

1   we believe the LP can force a sale of either the property or

2   its interest to get fair market value for its interest.

3   Q   You don't think there is any difference between those two

4   things, do you?

5   A   That's not what I said yesterday.

6            THE COURT:  All right.  We are going to take our

7   mid-morning break.  The Court will be at recess for 15

8   minutes.

9                         (The proceedings adjourned.)

10           THE COURT:  Mr. Pritchard, you may proceed.

11  Q   I just have a few more questions.  If we could go back to

12  the memo we were just looking at, Adam, page 9.

13           It shows here in the box at the bottom that as of

14  6/30/2014 the GP's advances were $1,097,000.  Is that right?

15  A   Yes.

16  Q   And then if we look at page 6, there's another box I want

17  to draw your attention to.  And it has here -- there's the

18  box for GP defaults.  And that says "no," doesn't it?

19  A   It does.  We would only check the box "yes" if we had

20  formally defaulted the general partner, which doesn't mean

21  that we agreed with all of the activity, but if we hadn't

22  sent a formal default notice, then "no" would be checked.

23  Q   And we talked a bit about this, but you are aware that

24  every year the general partner provided a budget to the

25  limited partner, right?

1   A    I believe so.

2   Q    And that budget included anticipated expenses for the

3   repairs that were done on the property?

4   A    In some cases, I think so.

5   Q    And so we've gone through a lot of documents, the audited

6   financial statements, the e-mails, the budgets.  And are you

7   aware of a single repair or improvement to the property that

8   was not disclosed to the limited partner?

9   A    I don't review budgets.  I'm not sure if the full extent

10  of those expenditures were disclosed or not.

11  Q    Okay.

12           MR. PRITCHARD:  Nothing further.

13           THE COURT:  Thank you.  Is it Mr. Merriman?

14           MR. BESSENGER:  No, Mr. Bessenger, Your Honor.

15  There's a whole slew of us over here.

16                          CROSS EXAMINATION

17  BY MR. BESSENGER:

18  Q    Mr. Blake, you testified that there was a transition from

19  Capmark to Hunt to Alden Torch Financial; is that right?

20  A    That's right.

21  Q    Did management change during those transitions?

22  A    No.  Most of the employees were the same at Capmark, Hunt

23  and Alden Torch.

24  Q    And have you worked at all three, in other words, Capmark,

25  Hunt and Alden Torch Financial?

1  A    Yes.

2  Q    And the investor limited partner entities and partnerships

3  that we're dealing with in this action are the same since the

4  inception of the partnership?

5  A    Yes.

6  Q    Mr. Blake, on whose behalf is AMTAX seeking damages in

7  this case?

8  A    I believe on behalf of the partnership.

9  Q    And what direct relief is AMTAX seeking?

10 A    Removal of the general partner.

11 Q    Why is it doing that now?

12 A    Um, as I explained, I think the magnitude of the breaches

13 have significantly ramped up over the last couple of years,

14 and given our experience with the manipulated appraisal

15 process on Hidden Hills, and the ongoing breaches at Parkway,

16 we just don't believe the general partner can be trusted or

17 relied upon to get a fair value for the property or our

18 interests.

19 Q    In the event of removal, does the removed general partner

20 still receive value of its interest?

21 A    They would receive fair market value.

22 Q    I'd like to show you an exhibit marked A-177.  And,

23 Mr. Blake, you were shown this e-mail chain during your

24 direct examination; is that right?

25 A    I think so, yes.

1  Q   And this e-mail chain reflects that on September 7, 2017,

2  Andy Noble e-mailed Kori Gibbs regarding a recommendation

3  from Ms. Tamaro to conduct a third appraisal?

4  A   Yes.

5  Q   When did Ms. Gibbs forward you that e-mail from Mr. Noble?

6  A   September 25th.

7  Q   So it was 18 days after she received it?

8  A   Yes.

9  Q   And was September 25, 2017 the first time you saw this

10  e-mail from Mr. Noble that she forwarded to you?

11  A   Yes, it was.

12  Q   Did the e-mail forwarded from Mr. Noble reflect that

13  Ms. Tamaro had actually selected a third appraiser?

14  A   No.  It just has the names of two recommended appraisers.

15  But we didn't know that -- I don't think I knew one had been

16  selected at that time.

17  Q   Did Ms. Tamaro ever tell you, or tell you directly that

18  she had selected a third appraiser?

19  A   No.  I think we found that out through counsel, after the

20  fact.

21  Q   Mr. Blake, the general partner is responsible for

22  providing audited financial statements to the limited partner

23  by a certain date each year; is that right?

24  A   That's correct.

25  Q   And everyone is in agreement that Alden Torch has not

1  received the final audited financial statements for 2018,

2  correct?

3  A   I'm sorry?

4  Q   Everyone is in agreement that Alden Torch has not yet

5  received the final audited financial statements for 2018?

6  A   That's correct.

7  Q   And I'd like to show you two letters that were delivered

8  to plaintiffs' counsel yesterday.  These are Trial Exhibits

9  A-311 and A-312.

10      And you were shown one of these letters, I believe, on

11  your direct examination yesterday.  And just for the sake of

12  clarifying the record, I wanted to make sure these were both

13  introduced into evidence.  Do you recognize these?

14  A   Yes.

15  Q   And these are removal notices, correct?

16  A   That's correct.

17      MR. BESSENGER:  Your Honor, I'd ask the Court admit

18  these two exhibits into evidence.

19      THE COURT:  A-311 and A-312 are admitted.

20      (Exhibits A-311 and A-312 were admitted.)

21  Q   Mr. Blake, has the limited partner been cooperating in an

22  effort to find a replacement auditor for the partnerships?

23  A   Yes.  Last week I had spoken with a partner at

24  CohnReznick, which is a large CPA firm.  And they have a

25  specialty in affordable housing.  And they expressed

1   willingness to take on the engagement.

2   Q   And just one last question.  You had discussed, in your

3   direct examination, that there had been back and forth

4   between AMTAX and the general partner regarding some of these

5   issues in the past.  You mentioned with respect to there not

6   being a formal default taken, in the document that you looked

7   at most recently in your examination?

8   A   Right.

9   Q   Why is it that previously AMTAX had not issued a formal

10  default or taken other formal action against the general

11  partner?

12  A   I think it's a matter of materiality.

13  Q   How so?

14  A   Again, we noticed smaller breaches in the past.  We asked

15  the general partner about them.  We didn't necessarily agree

16  with those, but as I mentioned, if there's small defaults

17  that can be repaid through a capital transaction, then I

18  think that's always our preference.  I think litigation is a

19  last resort.  So I think that was the plan moving forward.

20      The magnitude of the breaches was significantly higher in

21  the last couple of years, and I think that's why the response

22  was different.

23          MR. BESSENGER:  Nothing further, Your Honor.

24          THE COURT:  Any redirect?

25          MR. PRITCHARD:  No, Your Honor.

```
 1              THE COURT:  Mr. Blake, you're excused.  Thank you
 2     very much, sir.
 3              THE WITNESS:  Thank you, Your Honor.
 4              THE COURT:  Mr. Goodnight?
 5              MR. GOODNIGHT:  Thank you, Your Honor.  We rest our
 6     case.
 7              THE COURT:  All right.  Very well.  Mr. Pettit or
 8     Mr. Bessenger?
 9              MR. BESSENGER:  Yes, Your Honor.  We are going to
10     call John Krabbenschmidt to the stand.
11              MR. PETTIT:  I'm going to go get him.
12              THE COURT:  Sure.  I better learn how to say his
13     name, quickly.
14              MR. BESSENGER:  I was chuckling about that
15     pronunciation yesterday.  I haven't shared it with him,
16     though.
17              THE COURT:  Mr. Krabbenschmidt, if you would come
18     forward to the lectern and stand next to Mr. Bessenger and
19     raise your right hand and be sworn, sir.
20                        JOHN KRABBENSCHMIDT
21        Having been sworn under oath, testified as follows:
22              THE COURT:  Please be seated in the witness stand
23     immediately to my left.  Please keep the volume of your voice
24     up so people in the courtroom can hear you.  And speak slowly
25     enough so the court reporter can keep up with you.
```

```
 1              THE WITNESS:  Thank you.

 2              THE COURT:  Mr. Bessenger, you may proceed.

 3              MR. BESSENGER:  Thank you, Your Honor.

 4                      DIRECT EXAMINATION

 5    BY MR. BESSENGER:

 6    Q    Good morning.  Will you state your name for the record?

 7    A    John Krabbenschmidt.

 8    Q    What is your present occupation, Mr. Krabbenschmidt?

 9    A    I am a certified public accountant.

10    Q    How long have you been an accountant?

11    A    Since 1982.

12    Q    Do you hold any other professional licenses?

13    A    I have a license to practice law in the state of

14    California.

15    Q    When were you admitted to the bar of California?

16    A    1979.

17    Q    Where are you currently employed?

18    A    Novogradac & Company LLP.

19    Q    What's your position there?

20    A    I'm a partner.

21    Q    How long have you been employed at Novogradac?

22    A    Since 1991.

23    Q    And, briefly, what is Novogradac?

24    A    Novogradac is a national public accounting firm with

25    approximately 30 offices and 700 employees.
```

1  Q    Where were you employed prior to Novogradac?

2  A    Prior to Novogradac I started my career -- when I

3  graduated from law school, I started at Arthur Anderson in

4  their tax department as tax staff, worked my way up to tax

5  manager after five years.

6      I then went to work for a client of mine that was

7  purchasing and managing various real estate.  And the

8  portfolio was about a $700 million portfolio.  And I worked

9  there for five more years.

10     And then I left that and went back and helped start

11 Novogradac in its early years.

12 Q    So shifting back to Novogradac, now, do you have a

13 specialization there?

14 A    I do.

15 Q    What is that?

16 A    It's low-income housing tax credits.

17 Q    How long have you been involved professionally with the

18 LITHC industry?  I'm referring to low-income housing tax

19 credits by its acronym LITHC; do you understand?

20 A    Yes.

21     It was shortly after I started with Novogradac that I

22 started working with my first client that was a developer of

23 low-income housing tax credits.

24 Q    Within the LITHC industry, what type of clients have you

25 represented?

A    I've represented a full range, from developers to the general partners of low-income housing tax credits projects. I represent syndicators that have funds that invest in low-income housing tax credit projects.  And so I've covered all of those.

And probably the only thing I have not represented is the corporate investor, you know, typically they have corporate investors that invest in various funds.  And I have not worked for one of those companies before.

Q    What professional services do you offer your LITHC clients?

A    Personally, or Novogradac?

Q    Let's start with you personally, first.

A    Personally, I do audits of financial statements of low-income tax credit projects.  Tax returns for those same projects.

In addition, I have worked on various consulting engagements, including bond application to obtain financing for low-income housing tax credit projects, or buyouts of limited partners.  So I have worked with a general partner buying out its other partners in a partnership -- low-income housing tax credit partnership.  And I helped do the calculations, structure the transaction for them.

In addition, I act as an expert witness on low-income housing tax credits.

1   Q    In addition to those professional services that you offer

2   for LITHC clients, do you have any personal experience in the

3   area of property management?

4   A    I do.

5   Q    And what is that?

6   A    I've been a long-time investor in real estate.

7        But starting in 2013, one of my key partners in those real

8   estate transactions died, and then I took over his role in

9   running all of the properties that I was involved with.

10       And even prior to that, there had been a problem with one

11  of the properties in 2011.  And I stepped in, restructured

12  the transaction, refinanced the transaction.  And that

13  specific one is a 304-unit apartment complex in Reno, Nevada.

14       Then the other remaining partnerships that I manage are in

15  Citrus Heights, California, right next to Sacramento.  And

16  one is a 72-unit project.  Another one is a 268-unit project.

17  So I'm the managing partner now on those two.  And it wasn't

18  something I wanted to do, but it was something I had to do.

19       And then now I am working on -- I have a 40-acre parcel of

20  land bordering Dallas, Texas.  And I'm working on the

21  entitlements for building another 600 units of apartments on

22  that site.

23       And when I was in law school, my dad put me in charge of

24  running a small multifamily project right next to his office

25  building.  And I had to act as the property manager, leasing

1   agent, repair guy, all of that.

2   Q   So with respect to the housing complexes that you're

3   currently involved in some capacity in the property

4   management, do you have any experience with hiring and

5   supervising construction crews, for example?

6   A   I do.

7   Q   And what is that?

8   A   So, again, when I took over running the two Sacramento

9   projects, they were in very poor condition, and I ended up

10   hiring a contractor to replace the siding, windows and doors

11   on one of the projects.  So I negotiated the contract.  I

12   oversaw the work that he did.

13        And then subsequent to that, I brought in some of my -- I

14   also had an office building in San Francisco that I managed

15   and leased as part of our Novogradac operations.  But I took

16   some of the employees out of that project, when we left that,

17   and I moved them to Sacramento.  And I've now got an HVAC

18   mechanical guy, and then two carpenters.  And then they each

19   have helpers.

20        And then I also have a crew of landscape guys that help do

21   all the flat work, the concrete.  So we rebuilt the pools,

22   rebuilt the clubhouse, and numerous different things.  But

23   that's the crew of people I shifted out of San Francisco and

24   moved them to Sacramento.  And they're now working on those

25   projects.

KRABBENSCHMIDT - Direct

1    Q    Are these market-rate properties that you're describing?

2    A    Yes.

3    Q    What's the difference, if any, between property management

4    duties for a market-rate property versus a LITHC property?

5    A    Um, they all have the same exact characteristics, except

6    for a low-income housing tax credit property, you have to

7    abide by what's called a land use restriction agreement,

8    which is imposed by the state housing authority.  That land

9    use restriction agreement identifies that you can only rent

10   units to tenants at certain -- at restricted income levels

11   and at restricted rents.

12        And so in order to make sure that you comply with that,

13   you have to certify the income of the tenant, you have to

14   keep the files that support that certification.  You have to

15   annually recertify it.  And then periodically you have to

16   report to the housing agencies, or they'll come and audit

17   your project, do an inspection, and they'll go through it.

18        So that extra step of the certification of the files, and

19   working with the state, is the extra step required for a

20   LITHC project.

21   Q    In addition to the personal and professional experience

22   that you've just discussed, have you authored or contributed

23   to any LITHC-related publications?

24   A    Yes.

25   Q    What are those?

1    A    There's two LITHC publications, or actually there's more

2    than that -- but the main one is the low-income housing tax

3    credits handbook.  This began a publication and publisher

4    West -- it was originally West, that was eventually bought

5    out by Thomson Reuters.  So we annually republish that.  It's

6    a handbook.  It's about a thousand pages long.  Mike

7    Novogradac was the original author of that handbook, and then

8    I became a contributing author.  And then annually updating

9    that handbook, rewriting significant sections of it and

10   adding new material.

11        In addition to that, I helped write another handbook

12   called Year 15 handbook, which is basically all about what do

13   you do at the end of the 15th year of a low-income housing

14   tax credit project, decisions that are made by the general

15   partner, how they work with the limited partner in terms of

16   what you do with that property from that point on.

17        In addition, I have had a couple articles in our Journal

18   of Tax Credits about various minor subjects.  Anyway, so

19   that's -- I guess that's the extent of that question.

20   Q    Have you ever lectured on the topic of LITHC, just

21   briefly?

22   A    Yes.

23        So Novogradac has annual conferences, usually a couple

24   times a year, on low-income housing tax credits.  I have

25   either presented a topic before at that conference, or I've

KRABBENSCHMIDT - Direct

1   hosted tax panels.  So they'll bring tax attorneys in from

2   around the country and I'll be the moderator of the panel.

3        In addition to that, I've -- at those conferences I've

4   taught advanced low-income housing tax credits, called

5   LITHC 301.  And it's primarily about various advanced issues.

6   We have an intra-section that's taught by others.  But I do

7   that section.

8        And in addition I do webinars, usually once or twice a

9   year, on low-income housing tax credits, very specific

10  subjects about that.

11  Q   Thank you.

12       Could you briefly describe the topic on which you've

13  been engaged to provide expert testimony in this lawsuit?

14  A   I was engaged to look at Parkway Apartments' financial

15  statements from inception to the end of 2017, to determine if

16  fees and expenses were paid to related parties that were in

17  excess of the limited partnership agreement and the other

18  controlling documents, that caused damages to the

19  partnership, which also then caused damages to the limited

20  partner.

21  Q   Have you personally inspected the premises at Parkway

22  Apartments?

23  A   I have.

24  Q   What did that inspection consist of?

25  A   I went to the site.  I walked it.  It consists of 20

1    buildings, or 21 if you include the clubhouse.  But I walked

2    the site.  I inspected the materials being used.  Half the

3    project had been refinished.  Half the project had not.  So I

4    went over to the half of the project that had not been

5    finished.  I poked and stuck my hands on the materials to

6    determine, you know, the integrity of the materials and other

7    things.

8         Then I spoke with one of the tenants there, asked them

9    what had been happening to the project, what their

10   observations were about the project.

11   Q    Thank you.

12        MR. BESSENGER:  Your Honor, I would tender

13   Mr. Krabbenschmidt as an expert on the issue of damages.

14        THE COURT:  Just ask your questions.  I don't vouch

15   for anybody.

16        MR. BESSENGER:  Very good.  Thank you, Your Honor.

17   Q    Mr. Krabbenschmidt, can you tell me what materials you

18   reviewed in forming your opinions in this case?

19   A    The materials that I reviewed --

20   Q    You can summarize.

21   A    -- included the financial statements during the life, the

22   audited financial statements that were issued throughout the

23   life of the project, the tax returns during the same period,

24   the pleadings and the depositions of Ms. Tamaro and the other

25   gentleman.  I can't remember his name right now.

1   Q   Mr. Blake?

2   A   Mr. Blake, thank you.

3       And then in addition to the depositions, there was exhibit

4   materials attached to those depositions.

5   Q   All right.  And did you set out your opinions in a written

6   report?

7   A   Yes, I did.

8           MR. BESSENGER:  Your Honor, we would ask to move into

9   evidence Exhibit A-282.  This report was disclosed on our

10  pretrial exhibit list.  The only objection is to relevance.

11  The report is certainly relevant to the nature and extent of

12  AMTAX's damages, and I think --

13          THE COURT:  Any objection?

14          MR. GOODNIGHT:  No, Your Honor.

15          THE COURT:  If it were a jury trial, I wouldn't allow

16  it.

17          MR. BESSENGER:  That's what I figured.  We have time

18  constraints we're conscious of, so we thought this would

19  facilitate the exam.

20          THE COURT:  Thank you, it's admitted.

21              (Exhibit A-282 was admitted.)

22          MR. BESSENGER:  May I approach to hand the witness a

23  hard copy?

24          THE COURT:  Absolutely.

25          MR. BESSENGER:  Does the Court need a hard copy as

1  well?

2        THE COURT:  If it's in the binder, I can get it.

3  Q   Mr. Krabbenschmidt, do you understand that one of the

4  claims AMTAX 169 -- which I'll probably refer to throughout

5  this exam simply as AMTAX -- but do you understand if I say

6  AMTAX, I'm referring to the investment limited partner in the

7  Parkway Partnership?

8  A   Yes, I do.

9  Q   Do you understand that one of the claims AMTAX is

10  asserting in this action is the right to remove the general

11  partner under the terms of the limited partnership agreement?

12  A   Yes.

13  Q   And one of the bases for the removal is its allegations

14  that the general partner incurred unnecessary expenses and

15  paid unnecessary excessive fees at various times?

16  A   Yes.

17  Q   In your experience in the LITHC industry, have you seen

18  other general partners removed pursuant to these contractual

19  removal provisions?

20  A   Yes.  I've had two different clients that were removed by

21  the limited partner for different reasons, on those

22  partnerships.  And it wasn't just a partnership, they were

23  removed from a group of partnerships, in both cases.

24  Q   And you testified that you reviewed the limited

25  partnership agreement for the Parkway Partnership in the

1  process of preparing your report and your opinion; is that

2  right?

3  A    That's correct.

4  Q    Okay.  If we could pull up Trial Exhibit 3, at exhibit

5  page 28.

6        And directing your attention to Section 4.5-Aiv.  This

7  provides that one of the rights of the investor limited

8  partner is to remove the general partner, correct?

9  A    Correct.

10 Q    And based on industry custom and practice, in your

11 experience, what is the purpose underlying this type of

12 removal provision?

13 A    The purposes that the limited partner that invests in

14 LITHC partnerships, you know, are limited in their ability to

15 do anything with regard to the management of the property.

16       And it's usually spelled out in the limited partnership

17 agreements as to the things that they get to approve or vote

18 on.  So, therefore, it gives a lot of discretion to the

19 general partner to manage the property in the way they see

20 fit.  But to the extent it's later determined that the

21 general partner has managed it incorrectly, or to the

22 detriment of the limited partner, this provision allows the

23 limited partner, therefore, to exercise that right of

24 removal, so that they can then -- there's always a standby

25 limited partner, or a general partner that is ready to step

1    into their shoes.  And it's for that very specific reason of

2    trying to make sure that the property is run well and

3    prudently.

4    Q    All right.

5         I'd like to jump into the substance of your report.

6    On page 3 you address property management and unauthorized

7    property management fees.  Based on your review of materials

8    and your expertise, did you form an opinion on the payment of

9    property management fees in this matter?

10   A    I did.  I have.

11   Q    In your opinion, were the property management fees

12   overpaid for a number of years?

13   A    They were.

14   Q    And in the course of forming that opinion, did you review

15   the property management agreements?

16   A    I did.

17   Q    Can we please pull up Trial Exhibit 29?

18        Mr. Krabbenschmidt, briefly, what is the purpose of a

19   property management agreement?

20   A    The property management agreement establishes the services

21   that would be provided by the property management company,

22   the type of services they're to provide, and the amount they

23   are to be paid for those services.

24   Q    And what entity, if you know, with respect to the Parkway

25   Partnership, is performing those services?

1   A    It's my understanding it's Trieste Holdings LLC.

2   Q    You understand that Ms. Tamaro owns and operates Trieste?

3   A    I do.

4   Q    And looking at Exhibit 29, down at the bottom it says,

5   "Services of manager."  And then the next couple of pages --

6   if we could go to the next page -- there is a list here --

7   and going to the next page.  Qualified rental use.  And it

8   keeps going.  Do you understand that these pages describe the

9   services the management agent is expected to provide?

10  A    Yes.

11  Q    And is Trieste compensated for providing those services?

12  A    They are.

13  Q    If we could look at the exhibit, page 9.

14       Article 8 at the bottom there reads, "Compensation."

15  Do you see that?

16  A    Yes.

17  Q    It states that the manager will be compensated for its

18  services by a monthly fee that will be equal to -- you see in

19  the second sentence there, third sentence there -- 10 percent

20  of effective gross rental income.  Correct?

21  A    Correct.

22  Q    Now, is that the measure of compensation in this case?

23  A    It's the limitation of the compensation, pursuant to this

24  agreement.  But this agreement is overridden and subordinate

25  to the limited partnership agreement which provides an

1    additional reduction of that fee.

2    Q   Can we pull up Trial Exhibit 3, at page 64?

3         And this reads that, in fact, the fee is not to exceed

4    the lesser of 4 percent of net rental income or the maximum

5    amount permitted by each agency or lender; is that right?

6    A   Yes, that's what it says.

7    Q   And in your experience, is this further limitation of the

8    property management agreement, the fee set out in the limited

9    partnership agreement, typical in the LITHC industry?

10   A   It is.  The limited partnership agreement typically sets

11   out limitations on fees that could be charged or paid to

12   related parties, specifically to make sure that there's a

13   very clear understanding of how much they can pay themselves

14   for various services.

15   Q   Now, given that this fee is tied into net rental income,

16   in the course of forming your opinion, did you determine what

17   that relevant rental income was?

18   A   Yes.  We went back and I recomputed that number.

19   Q   Is that set out in Exhibit E to your report?

20   A   It is.

21   Q   If we could pull up Trial Exhibit A-282, at page 32.  And

22   to the extent you can blow that up, it's a little bit

23   difficult to read.  I apologize.  That's the problem with

24   spreadsheets.

25        And did you find that the property management fee,

1   based on your analysis, exceeded the 4 percent limit set in

2   any given year?

3   A    Yes.  After we recomputed the net rental income and we

4   applied the 4 percent limit to that amount, we determined

5   that there was excess property management fees paid in all

6   years except for three.

7   Q    And the total there is on the bottom right-hand corner,

8   $200,750; is that right?

9   A    $754.

10  Q    You noted -- there was a note here, note A at the bottom

11  of your exhibit that says, "It has been represented to me

12  that there was a reimbursement for a portion of the fee paid

13  in 2012, and the damages calculation should be reduced to the

14  extent that such amount was repaid."

15       So in other words, you would agree that the total

16  amount of property management fees you found to be overpaid

17  should be reduced by whatever the amount of that

18  reimbursement was.  You don't dispute that?

19  A    That's correct.

20  Q    Why did you not look at fees from 2002 to 2006?

21  A    For two reasons.  One is that there was a different

22  property management company in place at that point in time.

23  And I think it was called Pacific Cap, if I remember that

24  correctly.  And to the extent that during that period of time

25  either those fees were negotiated and paid to that company,

1    or to a related party, but at a lower rate, the fee agreement

2    -- or, sorry, the limitation in the limited partnership

3    agreement says not to exceed 4 percent.

4         And, therefore, if they had determined that they were

5    willing to provide the services for less than 4 percent

6    during those initial years, then that should be the measure

7    of compensation they should be paid.

8    Q    In other words, in your opinion, the fees could

9    permissibly be less than 4 percent in a given year?

10   A    Correct.

11   Q    All right.  Let's jump into the repair supervision fee.

12   Did you form an opinion on a fee with that name?

13   A    I did.

14   Q    It's on page 4 of your report.

15   A    Yes.

16   Q    And based on your review of the evidence in this matter,

17   Mr. Krabbenschmidt, what is your understanding of the

18   services that were performed for this fee?

19   A    It was my -- it's my understanding, from reading

20   Ms. Tamaro's deposition, that the repair supervision fee was

21   for various repair maintenance activities that took place at

22   the property.

23        And then I also looked at the financial statements.  And

24   the financial statements, which are the work product of

25   Ms. Tamaro, as the general partner of the partnership,

1    they're her responsibility and her work, it specifically says

2    that the administrative general partner supervised certain

3    repairs and replacements made at the project.  The

4    administrative general partner charged the partnership a

5    repair supervision fee.

6        So it's a combination of her testimony and that statement

7    that I concluded that it was for basically repair and

8    maintenance at the project.

9    Q    And did you total up that fee in Exhibit F to your report?

10   A    I did.

11   Q    And what was the total amount of repair supervision fee

12   that, in your opinion, was not warranted?

13   A    Yes.  So the repair supervision fee started in 2010 at

14   $15,000, and then by 2017 it had grown to $140,000 per year.

15   But when you total up that period of time, it's $460,557.

16   Q    You just commented that in the course of the years that

17   you examined, in particular between 2015 and 2017, it more

18   than doubled, as it goes from $59,525 in 2015 to $137,087 in

19   2017?

20   A    Correct.

21   Q    Do you have an understanding as to why there was that

22   increase during that period of time, running really from 2013

23   through 2017?

24   A    So in the earlier years it seems like it's linked to just

25   the normal repair and maintenance work that was being done at

1    the property.  But starting in 2015, there was substantial

2    construction that started taking place at the property, which

3    was a very large amount -- dollar amount.  And so, therefore,

4    the way this was calculated was based on this additional

5    construction activity that was done, starting primarily in

6    '15, '16 and '17.

7    Q   In your opinion, should there have been any additional

8    amounts paid for the supervision of repairs at this property?

9    A   It's my opinion that no additional amount should have been

10   paid to Trieste Holdings or Ms. Tamaro for any repair

11   supervision fees.

12   Q   Is that based, in part, on an industry custom and practice

13   with respect to that?

14   A   Yes.  So in the LITHC industry, the repairs and

15   maintenance of a property -- let me back up.  Whoever the

16   property manager is and the general partner, is required to

17   maintain the property in good condition.  And good condition

18   means in the form that it is received at the time of the

19   start of this whole investment process.

20       And so it's normal for the -- in the LITHC industry -- for

21   the general partner to have to -- and the property manager,

22   to have to just maintain the property in its current

23   condition in good use.  And that is part of the property

24   management fee that they normally are paid.

25   Q   And in addition to that standard industry practice, in

1   this case is your opinion supported by the property

2   management agreement itself?

3   A    Exactly right.

4   Q    Would you please pull up Trial Exhibit 29, at page 4?  And

5   blow up Section 3.7.

6        And is this the language that you were just referring

7   to?

8   A    Yes.  So if you look at paragraph 3.7, the introductory

9   section to that, it's called, and titled, "Maintenance and

10  repairs."  And then it specifically states that the manager

11  shall maintain the project at all times in a condition

12  acceptable to the owner, including but not limited to

13  cleaning, painting, decorating, plumbing, carpentry, grounds

14  care, and such other maintenance and repairs as may be

15  necessary.

16       To me, that language is very broad language.  It says you

17  need to keep that property in good condition, using normal

18  methods for repair and maintenance, so that it's usable by

19  the tenants the way it originally started at the beginning of

20  the low-income housing tax credit period.

21  Q    Do you understand that in this case there -- Ms. Tamaro's

22  Trieste entity actually holds a general contractor's license?

23  A    It's been represented to me that they hold a general

24  contractor's license, yes.

25  Q    Does that affect your opinion in any way?

1   A    No.

2   Q    And why is that?

3   A    So, for instance, on my properties in Citrus Heights, or

4   the Reno property, we have to pull permits periodically.  And

5   we have the option, we can either have the contractor go down

6   and pull a permit, if they're doing the work.  Or we can go

7   down and pull the permit as the owner of the project.

8   Q    Let's move on to the tenant file review fee.  If we could

9   go back to Exhibit F to your report, which is A-282, at page

10  31.

11         Very briefly, Mr. Krabbenschmidt, can you tell us what

12  your understanding is of a tenant file review fee?

13  A    Based upon the testimony that I've read in this particular

14  case, the tenant file review fee relates to an employee that

15  is employed by Ms. Tamaro at Trieste Holdings, that has

16  specialized training in low-income housing tax credit files,

17  and that that person obtains the tenant files, reviews them

18  for quality control, to make sure that they're being done in

19  accordance with Internal Revenue Code Section 42 rules.

20  Q    Did you form an opinion as to whether or not that tenant

21  file review fee was appropriate here?

22  A    I determined it was not appropriate.

23  Q    And why is that?

24  A    Because, again, the property management agreement

25  contemplates -- the property management agreement and the

1   limited partnership agreement both contemplate that the

2   property manager has sufficient background and training to be

3   able to manage the property as a low-income housing tax

4   credit property, and that the services or the work that is

5   done on the preparation of the tenant files is done by the

6   on-site property manager, and the assistant leasing person in

7   the on-site office.

8        And there is, again, nothing in the property management

9   agreement that allows her to be paid for this extra service.

10  So that's my primary reason.

11  Q   If I were to represent to you that there was a particular

12  state-level certification or review requirement, would that

13  affect your opinion in any way?

14  A   No.

15  Q   And you totaled up that amount there as $79,064 in

16  Exhibit F; is that right?

17  A   Correct.

18  Q   And let's talk about the bookkeeping fees, staying on

19  Exhibit F.  It's the first line item there.  Are you still of

20  the opinion that bookkeeping fees were improperly paid?

21  A   No.  Subsequent to preparing this report, it was

22  represented to me that the bookkeeping fees represent a fee

23  paid to a third-party data processing company for payroll.

24  And to me that would be a normal operating expense of the

25  partnership.  And so as I sit here today, I would say that

1  this is not an improper fee and should not be a measure of

2  damage.

3  Q   And now moving down in order, staying on Exhibit F, we

4  have legal services fee.  Does HUD, to your understanding,

5  require legal expenses to be classified by type of services

6  provided?

7  A   It does --

8  Q   I'm sorry, go ahead.

9  A   So the financial statements that are submitted -- every

10 year the financial statements are audited by an independent

11 auditor.  But then they have to be uploaded into the HUD's,

12 what's called the REAC filing, where it is posted in.  And

13 then HUD can have access to all that information.

14 Q   Based on your review of the evidence in this case, are the

15 fees at issue here, the type of routine legal expenses that

16 would be incurred in running the property?

17 A   Yeah.  And as part of this HUD filing, what they require

18 you to do is take the legal services fee and divide it into

19 two different types.

20    One is regular property-level legal fees.  And that might

21 be evictions, or if for some reason there is some dispute

22 with the tenants, or otherwise, that would go into this one

23 category.  And it has a specific account number, 6340.

24    And then other legal fees that are incurred that are at

25 the partnership level, that have nothing to do with the

1    underlying property, are required to be classified in a

2    separate account number, 7120.

3        And so the information that we have for the legal services

4    fee here were the expenses that were classified in this

5    special category, 7120.

6    Q    Those total $61,444 in Exhibit F?

7    A    Correct.

8    Q    Why, in your opinion, would it be improper for the

9    partnership to pay these legal expenses?

10   A    So normally if you had a third-party law firm providing

11   legal services, it would be a proper expense.  But in this

12   particular case, from reading the testimony of Catherine

13   Tamaro -- Ms. Tamaro -- it indicated that the legal fees were

14   incurred because there was an unsafe work condition at the

15   property, that some of the workers had a complaint that legal

16   fees were incurred to defend against that complaint.

17       But in this particular case, Ms. Tamaro was required to

18   provide repair and maintenance services.  They're required to

19   do it in a non-negligent, safe manner.  And to the extent it

20   was unsafe work conditions, it was something that was created

21   by her and her company.  And, therefore, would not be an

22   allowable item to be reimbursed.

23   Q    And do you know to whom these legal fees were actually

24   paid in this case?

25   A    It's my understanding that it was paid to Ms. Tamaro's

KRABBENSCHMIDT - Direct

1    husband.

2    Q   Okay.  Let's discuss --

3              THE COURT:  Let's hold that thought until 1:30.

4    We'll take our lunch break and see you at 1:30.

5                         (Recess.)

Krabbenschmidt - Direct

```
 1                                    AFTERNOON SESSION

 2                                    JUNE 6, 2019

 3            THE COURT:  Mr. Bessenger, you may proceed.

 4                   DIRECT EXAMINATION (Resumed)

 5   BY MR. BESSENGER:

 6   Q   Mr. Krabbenschmidt, good afternoon.  Just to orient us to

 7   where we left off, we were talking about the property

 8   management agreement, correct?

 9   A   Yes.

10   Q   That provides that Trieste has, broadly speaking, duties

11   involving the leasing, maintenance and operations on the

12   property; is that correct?

13   A   Correct.

14   Q   Under certain circumstances set out in the property

15   management agreement and other documents we talked about,

16   including the limited partnership agreement, it can receive a

17   fee in return for those services?

18   A   Correct.

19   Q   We went on, and you opined in certain years it was paid

20   that fee when it should not have been, correct?

21   A   Correct.

22   Q   We started getting into the fees, additional fees that

23   were paid for services that, in your opinion, were already

24   covered by and paid for by the property management agreement;

25   is that right?
```

Krabbenschmidt - Direct

1    A    Right, under the normal fee provided in the property

2    management agreement.

3    Q    That's right. For example, the tenant file review fee,

4    which we talked about.  If you could pull up Exhibit 29.  If

5    we could go to the next page.  If we look at, for example, in

6    the context of the tenant file review fee, Section 3.3,

7    rentals, then sub (c), requires that one of the, "Pursuant to

8    its rental responsibilities, manager shall," and then it

9    says, "Comply with leasing and other requirements contained

10   in Section 42 of the Environmental Revenue Code (sic) 1986,"

11   and it goes on.  Would that be an example of the section of

12   the property management agreement that, in your opinion,

13   already encompasses the tasks performed in the context of the

14   tenant file review?

15   A    Yes, Section 42 of the Internal Revenue Code includes

16   provisions by which the property manager or the property must

17   lease to tenants, include certification, recertification of

18   those tenants, the leases themselves, and so this is broadly

19   covering all those activities.

20   Q    Speaking of the certification and recertification, if we

21   could blow up sub (e), 3.3, this provides for exactly that,

22   correct?

23   A    Correct, it talks about certification and recertification

24   of the tenants.

25   Q    This is another example of how the property management

1  agreement language expressly covers the task that is

2  ostensibly being paid for a second time by the tenant file

3  review fee; is that right?

4  A    Correct.

5  Q    If we could pull up Section 3.4, which may be on the next

6  page.  3.4.B.2(a), right there. Yep.  What does this provide

7  for?

8  A    Again, it is talking about that the manager will require

9  each tenant to certify on a lease application the tenant's

10  annual family income, family size and other information

11  required to enable the owner to obtain the credits or

12  otherwise reasonably requested by the owner.  Then it goes on

13  to say that it will require the tenant to recertify those

14  amounts on an annual basis.

15      Generally, like this is a very, again, broadly worded

16  provision that says that the normal certification

17  requirements, when you have a prospective tenant come to the

18  property, they are required to provide their income and

19  certify that income, and all that must be in the tenant file.

20  This is talking about that process and those documents that

21  are required.

22  Q    Then in a similar sense, the repair supervision fee, we

23  looked at a component of the property management agreement

24  that kind of covered the repair section of it.  Let's pull up

25  4.2 of the agreement, which is on the next page.

1          Does this, in fact, also support your opinion with

2     respect to the supervision component of the repair

3     supervision fee?

4     A    Yes.  So this is going on to say that to the extent the

5     property manager engages in what is called here independent

6     contractor for the performance of duties as the manager deems

7     necessary, the manager has the responsibility to supervise

8     the performance of such duties.

9     Q    Could we go back a page to Section 3.9, please.  What does

10    that provide for?

11    A    Sorry.  I am going to read it for a second.

12    Q    Sure.  It is lengthy.

13    A    It says that to the extent that the manager employs

14    various people on the project that --

15    Q    Specifically --

16    A    -- they will be reimbursed.  The last sentence clearly

17    says that the hiring, training and supervision, discharge of

18    those employees are the sole responsibility of the manager.

19    Again, it is reflecting that any employees and others that

20    are working on site are the responsibility of the manager in

21    this case.

22    Q    And specifically with respect to the last sentence there.

23    A    "Manager employees who work at the manager's corporate

24    office shall be paid by the manager out of the manager's

25    management fees."

Krabbenschmidt - Direct

Q   In other words, paid for, there would not be a separate
fee covering those duties; is that right?

A   Yes, so for instance, we started this testimony on this
specific subject talking about how it has been represented
that the person that actually provided the tenant file review
services was the person that was an employee of Trieste
Holdings at the corporate headquarters and reviewed the
tenant files that were prepared by the on site folks --
employees.  This clearly says that if there is such a person,
and that they work in the manager's corporate office, that
all of those costs will be paid for by the manager out of
these existing management fees.

Q   I wanted to touch on briefly also, you mentioned before
the break the bookkeeping fee, and that based on your
analysis of discovery that had been provided, your
determination was?

A   That it was a third-party payroll service is what was
represented, and therefore it is, in my opinion, that it was
a normal part of fees that are charged to the partnership for
those services.

Q   Was that evident from your review of the audited financial
statements you used to prepare your report?

A   No, it was not.  It simply called them bookkeeping fees.

Q   All right.  Let's carry on down the list here.  I believe
we stopped off at the extermination fee.  What is your

1  understanding of the extermination services fee that is

2  reflected in the report, also on page seven of your report?

3  A   So my understanding is that this related to bed bugs that

4  were in several of the units at the project.  Bed bugs do

5  require extermination.  They don't go away on their own.  I

6  have had experience dealing with bed bugs.  The specific

7  issue here is that, again through the discovery process, it

8  was indicated by Ms. Tamaro that it was for rental of heat

9  treating equipment that was used to eradicate the bed bugs.

10      The question that I was looking at was:  Was this a fair

11  amount to be charged for rental of that equipment.  I

12  determined that you could buy heat treating equipment for

13  approximately $3,500, which is about half the price of what

14  was charged.  If the services that were provided was a rental

15  of equipment, why would you rent equipment for this amount

16  for one-time use when you could buy the equipment for half

17  that price?

18  Q   The amount of -- in your opinion, though, the 7,200, the

19  amount of funds that, in your opinion, the partnership should

20  not have paid and should be returned would be half that,

21  approximately?

22  A   Yes, approximately half that.  So $3,600.

23  Q   If we could go back to Exhibit F.  There is an engineering

24  survey fee there on the last column.  Mr. Krabbenschmidt, do

25  you understand that there has been testimony in this trial to

Krabbenschmidt - Direct

1    the effect that this fee was paid for research and purchasing

2    of a trash compactor that, in fact, was not compatible with

3    the electrical system at the property?

4    A    Yes, that's my understanding.

5    Q    And that the affiliate who was paid for that is also a

6    licensed engineer in some capacity?

7    A    Yes.

8    Q    Do you know who the affiliate is in this case?

9    A    Ms. Tamaro's husband.

10   Q    In your opinion, were payment of those fees in the context

11   of the rewiring and purchase of a trash compactor

12   appropriate?

13   A    No, I do not.

14   Q    What do you base that opinion on?

15   A    So in one of my apartment complexes, I have also looked

16   into purchasing a trash compactor.  They are available.  They

17   are commercially available.  You can get them in different

18   configurations, meaning different electrical requirements for

19   the trash compactor.  In the equipment world, you can get

20   equipment either in what is called single-phase or

21   three-phase configurations.  I went on line and confirmed

22   single-phase is available.  That would have been compatible

23   with the apartment complex.  Had that happened, it is my

24   understanding that work had to be done to rewire either the

25   apartment complex or the trash compactor to be compatible

1   with the three-phase system.  It is my belief that that was

2   not required.  The only thing that was required when you

3   buy -- when you research and buy the proper piece of

4   equipment is to have the equipment delivered, and then to the

5   extent it requires connection to the electrical distribution

6   panel at the apartment complex, that you hire an electrician,

7   they run conduit to the trash compactor and it is hooked up.

8   Q   As to all the fees we just discussed, those being the fees

9   paid in compliance -- or, rather, paid in the context of the

10  actual property management agreement, which you had

11  determined in certain years should not have been paid, and

12  the other fees that were paid for services that should -- for

13  the most part should have been already paid for or

14  compensated under the property management agreement or were

15  otherwise improper or unnecessary, you have tallied those up

16  in Exhibits E and F; is that right?

17  A   Correct.

18  Q   Those amounts are accurate with the exceptions -- with the

19  exceptions you have already discussed?

20  A   Yes.

21  Q   In your opinion, did the payment or accrual of the fees in

22  those amounts damage the partnership?

23  A   Yes, those are amounts that were either paid or accrued as

24  payable to these affiliates, and since they were improper,

25  that they should be reversed and that amount of money should

Krabbenschmidt - Direct

1   be refunded to the partnership, or to the extent that a

2   payable had been created to the management company, Trieste

3   Holdings, that that payable should be reduced by that same

4   amount.

5   Q   In your opinion, does that ultimately have some impact on

6   the investment limited partner?

7   A   Yes, it ultimately has a direct impact on the limited

8   partner because for every dollar of damages that are

9   determined here in this court that were in excess of what

10  should have been paid to Trieste Holdings, for every dollar

11  that is determined, 99.99 percent of that would flow through

12  the waterfall to the limited partner and therefore be a

13  direct damage to them.

14  Q   We will get into the waterfall a little bit later as well.

15      I would like to move on to payments to the managing

16  general partner, which is on page 8 of your report.  If you

17  could pull up Trial Exhibit 28, please.  If you go to the

18  next page, please.  One more.  I am looking for paragraph 11.

19  One more page.  If we blow up paragraph 11.

20      Mr. Krabbenschmidt, would you let us know, what does

21  that paragraph there provide for?

22  A   This is specifically talking about the payment to the

23  managing general partner that would otherwise occur annually,

24  but what it specifically says is that it shall only be paid

25  to the extent that there is cash flow available.  Cash flow

Krabbenschmidt - Direct

here is a defined term.  You would look to the other parts of

the property management agreement to make sure you understood

how to calculate that and then determine if this was actually

payable.

Q   Can you tell us briefly, what is the function of a

not-for-profit managing general partner in the context of the

LIHTC partnership?

A   They can have different functions, depending upon what

role they are playing.  Particularly in low-income housing

tax credit projects, if the state law allows, like Washington

State does, you bring in a not-for-profit general partner,

having a designated not-for-profit general partner allows the

partnership to apply for an exemption from property taxation

or reduction of property taxes.  It is an exemption allowed

under Washington law and the role of the -- the role of the

managing general partner, the not-for-profit, can be

everything -- they can be actively involved.  But under this

agreement, I did not see any sort of active material

participation by this managing general partner.  Looked like

they are simply serving the role of allowing them to get this

property tax exemption.

Q   In the last sentence of the amendment to the partnership

agreement, it provides "The managing general partner fee,

which is defined above, will be disbursed," and going to the

next line, "from available cash flow in accordance with the

1   provisions of 6.2.A of the partnerhsip agreement."  Based on

2   your review of the partnership's financial statements, did

3   the partnership, in fact, pay this managing general partner

4   fee to Hearthstone?

5   A   It did.

6   Q   If you go to page 30 of Exhibit 282 -- A-282, I should

7   say -- did you form an opinion as to whether or not these

8   payments were appropriate?

9   A   Yes, we went back.  I recomputed the cash flow in

10  accordance with the limited partnership agreement.  I

11  determined there was no cash flow in any of the years except

12  for a minor amount in 2008, again a small amount in 2012, and

13  then finally in 2016.

14      The way the cash flow waterfall works is that to the

15  extent there is any cash flow, it must first be used to pay

16  for the limited partner fee.  This $798 in 2008 would have

17  been used for that purpose.  Same thing in 2012.  Then

18  finally, there was -- since there was a shortfall of cash

19  flow, there is this accumulation that is required.  Then

20  finally the same thing would be used to use up the 2016

21  amounts.

22  Q   Do you have an understanding here as to why the

23  administrative general partner claims that the partnership

24  needed to make these payments, notwithstanding the lack of

25  available cash flow?

Krabbenschmidt - Direct

A    It is my understanding from Ms. Tamaro's testimony that
Hearthstone would not have continued as the managing general
partner of the partnership, and that had they left the
partnership, the partnership would no longer have been able
to get the property tax exemption.

Q    In your opinion, assuming that the managing general
partner actually made that demand, that they be paid or they
would leave, was it appropriate for the partnership to pay
this annual fee?

A    The terms of the relationship with Hearthstone, as
governed by the limited partnership agreement, they were
brought in as a partner.  They have the contractual
obligation under the limited partnership agreement, so it
would have been inappropriate for them to leave.  In addition
to that, the point in time that they actually came in to the
partnership, which was 2007, was a point in time when there
was no cash flow.  They would have been able to determine at
that point in time whether there was an expectation of cash
flow by looking at the prior year's history and that current
year.

More importantly, not-for-profits are called
not-for-profits for a very specific reason, which is:  They
are not supposed to make a profit or profit from their
activities.  They are actually supposed to work and operate
at a loss.  That is under the Internal Revenue Code.

Krabbenschmidt - Direct

1    Therefore, there is many not-for-profits out there that

2    specialize in public housing or affordable housing that

3    provide those services at a loss.

4        In this particular case, it is perfectly conceivable that

5    this not-for-profit went into this with their eyes open,

6    knowing that they may not get paid for that service.

7    Q    Would your opinion be impacted at all if you would come to

8    find out that, in fact, they did provide some services of

9    some kind to the partnership in years where they were not

10   paid a fee?

11   A    No, that would not change my opinion.

12   Q    Why is that?

13   A    Well, I know that the partnership was benefitted from the

14   reduction of property taxes, but again, they were required to

15   provide that service, and to the extent there was not

16   sufficient cash flow to pay them, they should have been aware

17   of that.  It is my understanding they are a large

18   not-for-profit.  They are sophisticated.  They would have

19   known this.

20   Q    So you totaled up the amounts in the bottom right-hand

21   corner of this exhibit as $98,479; is that right?

22   A    Yes.

23   Q    In your opinion, what should happen to that amount of

24   money that was paid to the managing general partner?

25   A    That amount that was authorized and paid by the general

1  partner in this case, Trieste Holdings, should be reimbursed

2  back to the partnership -- sorry.

3  Q    The administrative general partner?

4  A    Administrative general partner -- thank you -- that

5  incorrectly authorized that payment should reimburse the

6  partnership for those amounts.

7  Q    Are you aware of any tax code or regulations that would

8  require that these payments only be made in the event of

9  adequate cash flow being available?  In other words, that

10 would provide that the amendment was drafted in that

11 particular way?

12 A    There is no Internal Revenue Code provisions that I am

13 aware of that somehow require the fee that is paid to

14 Hearthstone in this case to come from pure profits.

15      You can structure a partnership agreement such that they

16 are receiving a guaranteed payment, for instance, where it is

17 just regardless of the income, regardless of the cash flow,

18 they receive a guaranteed payment first.  You can structure

19 partnership agreements in that way to allow them to become

20 partners in this transaction.

21 Q    Let's discuss the deferred developer fee, which you have

22 on page ten of your report.  Would you please explain at the

23 outset what a deferred developer fee is in LIHTC's context?

24 A    When a low-income housing tax credit project is put

25 together, the three normal participants are the limited

1   partner that is investing their capital, the general partner

2   that will be running the project, and then a developer that

3   puts the whole thing together.

4       In exchange for the services that the developer provides,

5   they get what is called a developer services fee.  It is

6   quite common that the states either will require, or the cash

7   flow dictates, that there will not be sufficient cash to pay

8   all the developer fee, and whatever portion of that developer

9   fee is not paid at the formation of the partnership, then

10  must be paid out from cash flow.  That portion that is

11  deferred, that is not paid at the inception, is referred to

12  as the deferred developer fee.

13  Q   Can we pull up Trial Exhibit 3, at page 80.  Would you

14  blow up Note 1 down there at the bottom.

15       Mr. Krabbenschmidt, what does this language provide

16  for?

17  A   This is very standard language in the low-income housing

18  industry.  It specifically addresses that even though that

19  deferred developer fee can get paid from cash flow of the

20  partnership, that to the extent it is not repaid by the tenth

21  year, that then the general partner must contribute enough

22  capital to the partnership to then payoff the deferred

23  developer fee.  This is the creation of, you know, a lot of

24  very smart tax attorneys that have concluded that it is to

25  the benefit of these type of partnerships to have this

1   specific provision so that they can make sure that the tax
2   credits are preserved.  So anyway, at the end of the tenth
3   year, whatever has not been repaid at that point in time gets
4   contributed by the general partner.
5   Q   It refers to this -- the capital contribution being made
6   in the amount equal to such outstanding amount prior to the
7   end of such tenth year.  What do you understand to be the
8   placed-in-service date here, which would control when this
9   tenth year comes about?
10  A   That was 2002.
11  Q   I would like to pull up Exhibit 19.  Mr. Krabbenschmidt,
12  is this the document that you referred to in concluding that
13  the placed-in-service date was June in 2002?
14  A   Correct, so this is what is called a Form 8609.  This is
15  mandated by the Treasury Department.  Each and every building
16  that is at the property must have one of these.  They
17  dictate -- there is a line here, which is line 5, and if you
18  go down it says, "date building placed in service."  It says,
19  "June 19th, 2002."  This is the representation by Ms. Tamaro.
20  Ms. Tamaro must sign this document, turn it into the state
21  housing agency, and this is her representation as to the date
22  it was placed in service.
23  Q   Let me pause there briefly.
24       MR. BESSENGER:  Your Honor, I would ask to move
25  Exhibit 19 in evidence.

1          MR. GOODNIGHT:  No objection.

2          THE COURT:  Exhibit 19 is admitted.

3                    (Exhibit 19 admitted.)

4   BY MR. BESSENGER:

5   Q   When should the general partner have made a capital

6   contribution payoff of the outstanding deferred developer

7   fee?

8   A   It was ten years after that date.  That would be 2012.

9   Sorry.

10  Q   So let's go back to Exhibit G to your report, which is

11  282, page 30.  Did the general partner make a capital

12  contribution to pay off the deferred developer fee in 2012?

13  A   No.  It is my -- from reviewing the document, it appears

14  that occurred in 2013.

15  Q   Do you have an understanding as to why it occurred in

16  2013?

17  A   It is my understanding that Ms. Tamaro's position is that

18  the first placed-in-service date was 2003, not 2002.

19  Q   Did that capital contribution that was made in 2013

20  include interest on the deferred developer fee?

21  A   No, it did not.  From reviewing the financial statements,

22  it is clear that the interest remained as a liability on the

23  balance sheet of the partnership, and that should have also

24  been treated the same way as the deferred developer fee.

25  That is, whatever was owed on the deferred developer fee,

1   including the interest on that deferred developer fee, should

2   have all been treated as a capital contribution at that time

3   and taken off of the balance sheet as a liability or as a

4   debt payable.

5   Q   If you look at Exhibit G, it says "DDF interest."  Starts

6   in 2009.

7   A   Correct.

8   Q   It continues through 2013.  What do those numbers reflect?

9   A   Those represent the interest accrual on the deferred

10  developer fee.  The original deferred developer fee was -- my

11  memory is 1,240,000.  It accrues interest at an 8 percent

12  interest rate.  In 2009, they incorrectly paid $341,000 of

13  that.  So the net between those two, they started accruing an

14  8 percent interest rate on that amount from that point

15  forward.

16  Q   Was the unpaid interest ultimately consolidated into an

17  outstanding liability of the administrative general partner?

18  A   It was.  It was rolled up into a debt payable to the

19  general partner.

20  Q   If we look at Trial Exhibit 109, page 16.  Does this --

21  the development fee and development fee interest payable --

22  can you blow that up, please?  -- that is describing what you

23  were just speaking to; is that right?

24  A   That is correct.  The beginning of this paragraph, it

25  indicates that the development fee is 1,245,000.  It will --

1    any unpaid portion of the developer fee that remains after

2    all the capital contributions from the limited partner will

3    accrue at an 8 percent interest rate.  The last capital

4    contribution of the limited partner was in 2009.  So that is

5    why the interest accrual started in that year.  Then the

6    second part of this is that that interest accrual should stop

7    at the end of 2012, but continued being accrued in 2013.

8    That amount was also incorrectly done.  That was the amount

9    of $36,164.  That amount should not have been put into --

10   should not have been accrued at all and should be removed

11   from the financial statements completely.

12   Q   You mentioned this payment in 2009, the deferred developer

13   fee.  In your opinion, that was improper, you mentioned,

14   because, first of all, the tenth year had not yet come; is

15   that right?

16   A   I'm sorry, can you repeat that?

17   Q   Sure.  Yeah.  If you look at -- you had mentioned that the

18   deferred developer fee, there was a payment that was made on

19   it in 2009?

20   A   Correct.

21   Q   You mentioned that should not have been made, in your

22   opinion?

23   A   Correct.

24   Q   I would like you to discuss why, in your opinion, that

25   payment was improper?

1   A   Again, the deferred developer fee can only be paid

2   pursuant to the cash flow waterfall provisions of the

3   partnership agreement, to the extent there is cash flow.

4   Again, on my Exhibit G, in 2009, I computed that there was a

5   negative cash flow of 9,280, therefore there was no cash flow

6   available to pay the amount that was paid, and the amount

7   that was incorrectly paid was $341,685.  That should have

8   remained on the balance sheet, accrued interest during that

9   period of time until the tenth year when it was written off

10  through a capital contribution by the general partner.

11  Q   Do you recall where the payment for the funds in 2009 came

12  from?

13  A   Looking at the financial statements, it appears that those

14  funds came out of the capital contribution of the limited

15  partner.

16  Q   In your opinion, the $341,685 was paid improperly; is that

17  accurate?

18  A   Correct.

19  Q   What should have happened to that amount?

20  A   That amount should be repaid to the partnership with

21  interest from the date it was incorrectly taken from the

22  partnership.  If that amount was repaid, then what would

23  happen is there is a -- the deferred developer fee would --

24  any unpaid portion of the deferred developer fee would

25  eventually get paid pursuant to the waterfall.  That is the

1   correct way it should have been handled.

2   Q   What about with respect to the deferred developer fee

3   interest that got rolled up into the receivable that we

4   discussed?

5   A   Again, all of that should be taken out of that

6   subordinated -- what is called a subordinated loan on the

7   balance sheet.  It should not be on the balance sheet at all.

8   It will simply become part of a priority payment in the

9   waterfall liquidation.

10  Q   Let's turn to page 12 of your report.  You discuss the

11  excess wages and renovation costs and capitalization issue.

12  Based on your review of the partnership's audited financial

13  statements, did you form an opinion concerning the

14  partnership's operating expenses?

15  A   I did.

16  Q   Is that set out in Exhibit H of your report?

17  A   Yes.

18  Q   Did you perform an analysis to compare the operating costs

19  from prior years?

20  A   I did.

21  Q   What was the result of that analysis?

22  A   I just -- by way of background, when we were looking at

23  the financial statements, and based on my experience with

24  managing apartment complexes, the repair and maintenance

25  costs and the wages of the maintenance personnel are a very

1     regular thing.  They are able -- they are very -- they don't

2     deviate very much.  They may go up or down a little bit.  Not

3     by a substantial amount.  So we went back, and I looked at

4     the 2004 through the 2013 time frame and graphed it.  You can

5     see there is a very smooth graph except for a few blips that

6     indicate that if -- that there is an expectation -- it

7     actually was a fairly regular amount that was being spent,

8     but that if we graph that out and project it into the future,

9     we would expect it to follow this dotted line.

10         In fact, on the lower graph, what you can see is that the

11     actual amount spent greatly deviated from that expected

12     average that should have continued into the future.  It was

13     based on this that my feeling was that excessive amounts were

14     starting to be spent.  In 2014 through 2017, there was an

15     increasing amount being spent on the project.

16         I then went to Ms. Tamaro's deposition testimony where she

17     indicated that the partnership had engaged her employees in

18     the residing, reroofing, new asphalt, new windows and

19     railings in the complex.  It is -- and that most of those

20     amounts were being expensed in the income statement.

21         Therefore, in order to determine the amount that should

22     have been capitalized as part of the capital improvements for

23     the project, I took the portion of the expenditures in excess

24     of this projected regression line here, and I determined that

25     those were the amount that were excess expenses for capital

Krabbenschmidt - Direct

1   improvements that should not have been made.

2   Q   Where does that appear on the exhibit that we are looking

3   at here?  What is the total figure?

4   A   The total figure is $1,419,451.

5   Q   You mentioned the work that you understood had been done

6   at the project during those years that you looked at.  Is it

7   normal in the LIHTC industry to complete major capital

8   renovations on property before the limited partners exit?

9   A   No, not at all.  It is the normal -- the normal standard

10  in the low-income housing tax credit industry is to keep the

11  property in its existing condition.  Any repairs and

12  maintenance that need to be done to maintain the property in

13  that condition need to be done.  That would be things like,

14  if you had, you know, carpet that needed to be replaced.

15  Linoleum, appliances that break, that's part of the normal

16  repair and maintenance.  If you had a roof leak, you

17  determine if it is just a portion of the roof that needed to

18  be repaired.  You would repair that.  If there was some

19  siding, a portion of the siding that looked like it had

20  failed, you replace that portion and paint the building.

21  That is the normal standard in the low-income housing tax

22  credit industry.  What -- from my personal review of the

23  work, the work that was done went greatly beyond that

24  standard.

25  Q   What is the financial impact of performing all of that

Krabbenschmidt - Direct

91

1  work in that short period of time?  What impact does it have,

2  if any, in your opinion on the partnership?

3  A    First of all, the partnership is now out of pocket $1.4

4  million that it did not need to spend in order to maintain

5  the property in the condition that is normal in the

6  low-income housing tax credit industry.

7      The partnership expended this 1.4 million.  That cash was

8  now not available to pay back any other monies or operating

9  costs that needed to be paid at that time, and if there

10  happened to be some amounts that were owed to the

11  administrative general partner, those amounts could have been

12  funded currently. That is the impact.  The impact is:  This

13  money is no longer available to the partnership.

14      The secondary part is, the question is:  What benefit did

15  the partnership receive from spending these monies?  In

16  market rate apartment complexes, you spend money on an

17  apartment complex because you want to raise rents.  Raising

18  rents means the cash flow goes up and the value of the

19  property goes up.  That does not occur in a low-income

20  housing tax credit project because the rents are restricted

21  by law.  They cannot go up.  Therefore, any improvements you

22  make does not increase the valuation of the property.  It

23  goes -- that benefit, the benefit of this long-term value

24  created by putting in all new siding, windows, roofing,

25  rails, goes to the benefit of whoever the successor in

1  ownership is in this property.  To the extent the

2  administrative general partner buys the property, they are

3  now receiving an asset that does not require all this work to

4  be done in order to keep the property active for the next 40

5  years of its life.

6  Q    Does that have an impact on the limited partner?

7  A    It has a direct impact on the limited partner because this

8  is cash that otherwise might have been available for

9  distribution to the limited partner under the waterfall

10  provisions, or available to the limited partner either

11  through the operations or through the liquidation.

12      More importantly, it didn't just not have a positive

13  impact on the valuation because I went to one of the

14  appraisal reports, and it appears that there was instructions

15  given to the appraiser in the CBRE appraisal report that

16  specifically said because the project had only been halfway

17  completed, they were decreasing the value of the property by

18  the cost to repair -- to do the same improvements to the

19  second half of the property.  It was identified in that

20  report that that amount was $700,000.  They decreased the

21  value of the property by 75 percent of that amount or

22  $525,000.  That is an example of where it not only did not

23  help the partnership itself or the limited partner, but it

24  actually created a detriment to the partnership.

25  Q    Are you aware that Ms. -- are you aware of who Ms. Lindal

1   is?

2   A   Yes.

3   Q   You are aware that she was the auditor at one point in

4   time of the partnerships?

5   A   Yes.

6   Q   Are you aware she has testified in this matter that these

7   expenses were appropriately -- these were treated as

8   operating expenses appropriately and not capitalized because

9   they did not extend the useful life?

10  A   Yes, I had the opportunity to read her testimony.  If you

11  look at her testimony regarding this, she has two paragraphs

12  of statements she makes.  The first paragraph I agree with,

13  GAAP provides flexibility, generally accepted accounting

14  principles allows flexibility in how to treat things and

15  classify things.

16      The second paragraph is where I respectfully disagree with

17  her statement.  The reason is that she used an incorrect

18  assumption and set of facts in formulating her opinion.  So

19  the test that she provided was, you know, to the extent you

20  have to replace the siding or other items between years 14

21  and 16, that it does not necessarily extend the life if you

22  have to do that every -- similar amount of increments.  She

23  says, "Because it is only 14 to 16 years old, it should not

24  have been capitalized."

25      The reason this is an incorrect statement is because she

1   didn't go back to when the siding, the railings and the

2   windows were all originally installed, which was in 1976.  If

3   you take 1976 and you add 40 years, you get to 2016.  Those

4   assets had completed their 40-year expected life, and at some

5   point after that, you would then potentially go in and do

6   exactly what was done, reside, new railings, things like

7   that.

8        Her statement -- her assumption of facts that she used for

9   concluding was an incorrect assumption of facts, therefore,

10  it should not be an expense that should have been

11  capitalized.

12  Q   If we could talk about the construction contract payable.

13  Pull up Exhibit 95, page 16.  These are the notes, the

14  financial statements, and it refers to a related party

15  transaction concerning construction costs in the amount of

16  $120,197, there at the top under "construction contract."  It

17  says, "In 2014, the administrative general partner advanced

18  funds to pay the construction contract --

19            THE COURT:  You have to keep your voice up.

20            MR. BESSENGER:  I am looking down at the monitor. I

21  apologize.

22  BY MR. BESSENGER:

23  Q   It says, "In 2014, the administrative general partner

24  advanced funds to pay the construction costs payable."  Did

25  you form an opinion as to whether or not this construction

1   contract payable was appropriate?

2   A   I determined it was not appropriate.

3   Q   Can we pull up Trial Exhibit 4, page 6.  Let's first --

4   let's go to the first page so we can identify this.  What is

5   this document?

6   A   This is the development agreement between Parkway

7   Apartments, the partnership, and Paramount properties --

8   sorry.  Hold on.  I apologize.  Yes, sorry.  Between the

9   partnership, Parkway Apartments and 334th -- 334th Place

10  2001, LLC, which is defined as the developer in this case.

11  Q   You understand that entity is also the administrative

12  general partner?

13  A   That's my understanding.

14  Q   If we could go to Section 3 of this document, page 6.  It

15  reads -- starting here, going down, "Any balance of the

16  amount of each development advanced not reimbursed through

17  final closing, and any cost overruns shall not be

18  reimbursable, shall not be credited to the capital account of

19  any partner other otherwise change the interest of any person

20  or partnership, but shall be borne by the developer under the

21  terms of this agreement."

22      Did that -- is that also a basis for your opinion the

23  construction contract payable was not valid?

24  A   Correct.

25  Q   Is it also -- is your opinion also informed by industry

1   customer practice?

2   A   In the low-income housing tax credit industry, this is

3   very common language.  It is specifically meant to cover

4   situations where the developer really has control over the

5   development process, entering into the construction

6   contracts, and making sure the project is complete.  The

7   limited partner, the LIHTC investor, low-income housing tax

8   credit investor, really is trying to not take on the risk and

9   burden of this because -- because they do not want to do

10  that.  They contract it away.

11      This is the provision that is normal, not just in this

12  contract, but in the LIHTC industry that basically says that

13  the developer takes on that obligation and that risk of cost

14  overruns.

15      Just to be clear, I have had -- I mentioned earlier I had

16  a general partner that was removed.  One -- that one general

17  partner in this one case was removed for this very reason.

18  They had massive cost overruns that they couldn't fund and

19  the limited partner removed them.  So this is one of those

20  examples of how that would occur.

21  Q   In your opinion -- so this amount of $120,197, what

22  occurred to this amount in fact?

23  A   Sorry, what?

24  Q   How is this amount actually accounted for?  Did it

25  increase the subordinated loans, for example?

Krabbenschmidt - Direct

1    A    It did.   It was eventually rolled into the subordinated

2    loan payable to the general partner.

3    Q    In your opinion, based on industry customer practice in

4    the language in the contract you just looked at, what should

5    happen to that amount?

6    A    That amount should have been taken off the balance sheet

7    at the -- what was called the final closing of the financing.

8    At that point in time, they should have been removed from the

9    balance sheet.

10   Q    So what is the impact of keeping it as a component of the

11   subordinated loans to the administrative general partner,

12   what is the effect of that?

13   A    What happens is now at this point, at a point of time of

14   liquidation, the administrative general partner now is

15   seeking reimbursement of that amount.   That would be

16   inappropriate.   These provisions clearly indicate they should

17   not be reimbursed for that.   Therefore, the subordinated loan

18   should be reduced by that amount.

19           THE COURT:   What relevance is the following sentence,

20   "However, developer shall receive credit for any costs or

21   expenses under the amount set forth in the approved budget"?

22   There are budgets coming every year.   Is that relevant to

23   this inquiry?

24           THE WITNESS:   The approved budget is the annual

25   operating budget for the property.   That is different from

1  the construction obligations of the original development.

2          THE COURT:  Okay.  Thank you.

3  BY MR. BESSENGER:

4  Q   So in your opinion, the harm to the partnership here in

5  terms of the treatment of this amount does that decrease the

6  size of the subordinated loan to the administrative general

7  partner?

8          MR. GOODNIGHT:  Excuse me.  There is an awful lot of

9  leading going on here.

10          THE COURT:  I just want the information.

11          MR. BESSENGER:  I am trying to facilitate the

12  examination.

13          THE COURT:  You can reform the question so it is not

14  leading.

15          MR. GOODNIGHT:  Thank you.

16          THE COURT:  I want to get the information.

17  BY MR. BESSENGER:

18  Q   In your opinion, was the partnership harmed here by the

19  treatment of the funds?

20  A   It was harmed to the extent that it remains on the balance

21  sheet and now there is a claim for reimbursement of that

22  amount.  It needs to be removed so that during -- number one,

23  it is not on the balance sheet.  Number two is, at a point in

24  time when the partnership is liquidated and the general and

25  limited partner are getting their respective share of the

Krabbenschmidt - Direct

1    proceeds, it is correctly accounted for.

2    Q    You also addressed in your report a rental credit,

3    correct?

4    A    Correct.

5    Q    That is on page 15 of your report.

6    A    Yes.

7    Q    Did you form an opinion as to whether or not the rent

8    credit, which was categorized as an employee concession, was

9    paid properly or improperly?

10   A    Yes, I determined it was improperly paid.

11   Q    Why is that?

12   A    So it is normal in apartment complexes, large apartment

13   complexes specifically, to provide housing to an employee.

14   Even in the low-income housing tax credit industry, it is

15   done, and the Internal Revenue Service has specifically

16   indicated that to the extent units are provided, and in this

17   case it is my understanding that there is up to five units

18   that were set aside for employee housing, that that housing

19   could be provided and at a reduced cost.

20        The issue is, is that those guidelines by the Internal

21   Revenue Service specifically reference employees.  They don't

22   reference independent contractors.  It is in my experience, I

23   have never seen rent credits given in the LIHTC industry to

24   independent contractors.  More importantly, this was not an

25   on-site accommodation.  This was an off-site accommodation at

1  what has been represented as Ms. Tamaro's other property.

2  Therefore, this is a payment by the partnership to the

3  benefit of Ms. Tamaro for an employee -- sorry, for what has

4  been labeled an independent contractor, and my understanding

5  is that this person was a cleaning person, so not a critical

6  on-site person.

7      It is the combination of the fact that it is not an

8  employee, it is off site, and it is a non-critical nature

9  make me believe that this was not a proper payment to -- for

10 the benefit, but it was a payment for Ms. Tamaro's benefit.

11 Q   What was the total amount from the years that you looked

12 at?  Referring now to page 15.

13 A   Yes.  Sorry.  $45,329.

14 Q   What should happen to the rent credit in that amount?

15 A   That was an amount given for the benefit of Ms. Tamaro,

16 and therefore should be paid back to the partnership or

17 reduce the -- reduce the subordinated loan that Ms. Tamaro

18 has been accumulated or get repaid for the partnership.

19 Either would have the same effect.

20 Q   Did you perform an analysis and form an opinion with

21 respect to the rental rates being charged at the Parkway

22 property?

23 A   I did.

24 Q   What is your opinion in that respect?  This is set out in

25 page 16 of your report.

1    A    So in managing my properties, for instance, it is commonly

2    expected, both by me, the industry, appraisers, you should be

3    running a vacancy rate of about five percent.  In times of

4    restricted amount of available housing, that rate can drop

5    down to a lower rate.  You would expect that at any point in

6    time it drops down significantly below five percent, you

7    should be raising rents.

8         I looked at the appraisal reports, both the Novogradac

9    appraisal report and the CBRE appraisal report.  The

10   Novogradac appraisal report specifically identified that

11   there was five comparable properties, all charging the

12   maximum low-income housing tax credit rents.  The CBRE report

13   also references that this particular project, at the date of

14   the appraisal, was 100 percent occupied.

15        It is the combination of those things that make me

16   believe -- sorry, then I went to the rents that were

17   identified in the Novogradac appraisal report, and determined

18   that the rents -- the average rent being charged was

19   substantially below the low-income housing tax credit rent

20   limit.

21        I recomputed what should have been charged had this been

22   run in accordance with industry standards and with the

23   properties that were comparable to this property in this

24   area.  I determined that there was approximately $29,448 of

25   lost revenue every single month because of this.

1    In this particular case, the project has both -- what is

2  called 50 percent limit income units as well as 60 percent.

3  The appraisal report specifically indicated that all but one

4  unit had been leased at the 50 percent level.  I used the 50

5  percent lower max rent levels for the purposes of this

6  calculation.  It had -- I think I easily could have used the

7  60 percent on the big portion of the property and received

8  even -- or created -- calculated even a larger amount of lost

9  rent.

10    Despite that, I went with the conservative number.  I used

11  the more restricted amount, came up with a smaller amount.

12  When you annualize that, you say what was the total annual

13  lost revenue because of this activity, it appears that there

14  is $353,376 of lost rents in 2017 alone.

15    I went back and I looked at the vacancy rate, and it

16  appeared that the vacancy rate started to drop below five

17  percent in 2013 and continued all the way through this 2017.

18  The average vacancy rate during that period was 1.6 percent,

19  again, substantially below the five percent that would be

20  considered acceptable.

21    Last, I tried to -- I went back and I looked at the same

22  set of activities for '16.  I determined that the same

23  differences existed between '16 -- the '16 rents charged and

24  the '16 maximum rents that could be charged.  Based on that,

25  I determined that there is two years at a minimum -- at a

Krabbenschmidt - Direct

1   minimum, two years worth of lost rents that could have been

2   obtained.

3       If you take the 353,000 and you multiply it times two, you

4   get $706,000.  Unfortunately, when I filled out this report,

5   there was, I used a 750,000 number.  As I sit here today,

6   that number should be 706,000.

7   Q   Does that have an impact, in your opinion, on the value of

8   the property?

9   A   Yes, it has an impact.

10  Q   What is that?

11  A   The impact is that potentially any buyers of the property

12  would look at the lower rents and determine that maybe there

13  was some reason why the property was not able to achieve this

14  and might pay a lower price, or a corollary is the appraiser

15  coming in and looking at the property might use a lower

16  rental amount for determining the value.

17  Q   What, if anything, is the impact on the partnership of the

18  lost revenue that you analyzed here?

19  A   This is true damages to the partnership equal to the

20  $353,000 times two, $706,000.  So that is money that could

21  have gone into the bank account of the partnership and would

22  have been available.

23  Q   What could that have been used for, for example?

24  A   Again, paying down the subordinated loans or possibly

25  making the managing general partner fee payments.

1   Q    In compliance with the agreement?

2   A    In compliance with the agreement.

3   Q    I would like to now move on to the subject that we have

4   been discussing a bit, which is the subordinated loans to the

5   managing general partner on page 16.  If you could pull up

6   Trial Exhibit 109, page 22. There should be an entry -- let

7   me see here.

8        MR. BESSENGER:  Maybe if we could break for a minute.

9   This is an important document.  I would like to find the

10  right trial exhibit.

11       THE COURT:  Court will take the mid-afternoon break.

12  We will be at recess for 15 minutes.

13                          (Recessed.)

14       THE COURT:  Mr. Bessenger, you may proceed.

15       MR. BESSENGER:  Thank you, Your Honor.

16  Q    If you could pull up Trial Exhibit 109, page 19.  And

17  you'll see here there is a reference to the note under

18  "surplus cash note payable to the administrative general

19  partner," and reads, "On February 1, 2015 the partnership

20  entered into a long-term surplus cash note payable, totaling

21  $2,486,055, payable to the administrative general partner."

22       Did you form an opinion with respect to the validity of

23  this note payable to the general partner, in light of the

24  fees and expenses and other items that you opined on here

25  today?

1    A    Yes.

2    Q    What is that opinion?

3    A    My opinion is that to the extent some of the items I've

4    identified today, like for instance the construction contract

5    payable for $120,000, was rolled up into this item, and the

6    other items that I've identified in my testimony today, that

7    this amount of $2,486,055 should be reduced by every dollar

8    of item that I've identified in my testimony.

9    Q    And what does reducing the amount of that payable -- how

10   does that impact, or if it does have an impact, what is that

11   impact at the liquidation of the partnership, for example?

12   A    So the limited partnership agreement has what's called a

13   waterfall provision.  And that waterfall provision identifies

14   the priority for paying cash out to the general and limited

15   partner.  So in this particular case, this $2,486,000 would

16   receive one of the higher priorities.  So, therefore, it

17   would get repaid first before any additional funds after

18   that.

19   Q    Let me stop you there and let's actually pull up Section

20   6.2B, which is one of the waterfalls you're referring to.

21   It's Trial Exhibit 3 at page 36.

22        And at the bottom of what's labeled page 32 of the

23   agreement there, there's B, distributions of proceeds from a

24   sale or refinancing.  Then it goes on, on the next page with

25   various items.  Is this the waterfall or one of the

1  waterfalls that is in this limited partnership agreement?

2  A   Yes.  So A controls the cash distributions during

3  operations, and subparagraph B controls the cash

4  distributions upon liquidation of the partnership.

5  Q   And so can you walk us through what you've been describing

6  in terms of the impact, for example, of reducing the payable?

7  A   So --

8  Q   -- to the general partner?

9  A   Subparagraph B, then, if you work down to 2, little "i,"

10  it goes through what's identified as first through tenth

11  payments.  And the first is obviously paying back debts and

12  liabilities of the partnership.  And that's really referring

13  to third parties.  So there's a mortgage loan.  There's

14  security deposits.  There's things like that, that are all

15  payable to third parties.  And that would get repaid first.

16      Second, then, to the extent there was an asset management

17  fee that had not been paid to the limited partner, any of

18  those amounts that had not been paid up to that point in time

19  would get paid in full.

20      Third, credit recovery loans.  That's not going to be

21  applicable in this case, because all the credits were

22  provided.

23      Fourth, if there was an exit tax payable.  Exit tax refers

24  to if the limited partner had a negative capital account,

25  that they would be paid the taxes that are associated with

1    recognizing that negative capital account as income.

2        And then finally we get to fifth, which is the deferred

3    developer fee.  So this is where, when we looked at that

4    Exhibit A, footnote 1, it specifically said that to the

5    extent it was not repaid by the tenth year it would then go

6    into the waterfall.  And this is where that deferred

7    developer fee, along with the interest, would get paid to the

8    developer, or the general partner in this case.  Because they

9    paid that amount off.

10       Then we go to sixth, the subordinated loans of the

11   managing general partner.  That is what we were just

12   referring to on the financial statements.  So to the extent

13   the financial statements show there is that $2,468,000

14   payable to the general partner, that would now create the

15   next level of distribution.  And, therefore, it would

16   necessarily reduce all the distributions that are made

17   thereafter, particularly to the tenth, which is 99 percent to

18   the limited partner.

19   Q    And that's in the last step of the waterfall there?

20   A    That's right.  99.99 percent.

21   Q    And so what is the relationship or the impact of --

22   between the sixth and tenth, then, in other words?

23   A    So, for every dollar reduction in the subordinated loans

24   under paragraph six, it would increase the dollar distributed

25   to the limited partner by 99.99 percent of that dollar.

1  Q   And with respect to the other items that you've opined on

2  here today, does that have an impact on the capital account

3  of the limited partner at all?

4  A   It does have the impact on the capital accounts of both

5  the general and limited partners, because in this particular

6  case, as these excess expenses and fees were being incurred,

7  they were being allocated to the general partner, giving them

8  a tax benefit.  So all of these deductions were being

9  specially allocated to the general partner.  They got the tax

10 benefit of those deductions.

11     And, more importantly, the subordinated loan that was

12 sitting on the balance sheet meant that the limited partner

13 could no longer get any loss deductions because there is an

14 Internal Revenue Code provision, what's referred to as

15 704(b).  704(b) has very specific guidelines of how you

16 determine loss allocations.  And because this subordinated

17 loan from the general partner was, in my opinion, incorrect

18 and should not be there, they were making more allocation of

19 losses to the general partner than they should have.

20     So that's an example of how this -- these items can

21 adversely affect both the general and limited partner's tax

22 positions on this investment.

23 Q   Thank you.  And I'd like to address, briefly, another

24 related issue.  In the course of preparing your opinions, you

25 reviewed the audited financial statements for the

1    partnership?

2    A    I did.

3    Q    And are you aware, as we discussed earlier, that Ms. Laura

4    Lindal was the most recent auditor for the partnership?

5    A    Yes.

6    Q    You're aware she's withdrawn as the auditor?

7    A    Yes.

8    Q    And that she attributes her withdrawal to your deposition

9    testimony?

10   A    That's my understanding.

11   Q    Did you include, in your report, any allegation that the

12   auditor either committed malpractice or was otherwise

13   responsible for materially misstating the financial

14   statements of the partnership?

15   A    I did not.

16   Q    How is it that that came out of your deposition?

17   A    Multiple times during my deposition the attorney kept

18   prodding me to take a position that the financial statements

19   were wrong and had been inappropriately prepared.  And I

20   refused, on multiple occasions, to answer that, until I

21   finally got, what I felt like, I was penned into a position,

22   either I had to say there was a material misstatement or I

23   somehow blessed the financial statements, which I was not

24   going to do.

25        So at that point I had to say that there was a material

1    misstatement in the financial statements.

2        And just for purposes -- for the Court's understanding of

3    what a material misstatement is, it's defined under GAAP to

4    mean incorrect information included in the financial

5    statements that are of substantial amount that it would

6    influence the economic decisions being made by the reader of

7    the financial statements.

8        So in this particular case the reader of the financial

9    statements is the limited partner.  And these items that I've

10   identified are substantial amounts, they're material in

11   nature, and therefore under the definitions of generally

12   accepted accounting principles, I believe there was a

13   material misstatement with regard to those financial

14   statements.

15       But I want to emphasize that in no way do I want to impugn

16   the integrity of Ms. Lindal, because these financial

17   statements are the primary responsibility and work product of

18   the general partner.  It is their set of numbers.  It's their

19   books and records.  It is their numbers.  And they are the

20   ones that are required to prepare these financial statements.

21           MR. BESSENGER:  Nothing further at this time, Your

22   Honor, subject to redirect.

23           THE COURT:  All right.  Cross?

24       Mr. Goodnight?

25           MR. GOODNIGHT:  Thank you.

1                         CROSS EXAMINATION

2      BY MR. GOODNIGHT:

3      Q    Your report has a listing of materials that you relied on

4      in forming your opinions, which is Exhibit D?

5      A    Yes.

6      Q    Do you recall that?

7      A    Yes.

8      Q    Is that a complete listing of all the materials that you

9      relied on?

10     A    That is a listing of the materials I relied on.  It

11     includes references, for instance, to Catherine Tamaro's

12     deposition, which included exhibits that I reviewed.  And so

13     those are the primary things.

14         Also during my deposition I specifically indicated that to

15     the extent I had any footnotes in my report and/or references

16     in my report, that those would have been additional documents

17     that I reviewed.

18     Q    Okay.  And that was my understanding, with your references

19     to the deposition and all exhibits thereto.

20         With that clarification, are there any other documents

21     that you relied on in forming your opinions, that are in the

22     list here?

23     A    None that come to mind right at this time.

24     Q    Okay.  Now, this list of exhibits does not appear to me to

25     include the annual budgets that were provided to the limited

1   partner, which included expenses and major capital work.  Did

2   you see those annual budgets from year to year?

3   A   I did not.

4   Q   It also does not appear to me to include a variety of

5   reports that we know exist regarding the condition of the

6   property, and repairs on the property, and e-mail exchanges

7   between Mr. Newbold and Ms. Tamaro regarding repairs.  Have

8   you reviewed other exhibits regarding repairs and major

9   improvements and e-mails that are not listed here?

10  A   Not that come to mind right now.

11  Q   Okay.  Now, if you look with me at the very first sentence

12  of section -- scope of engagement on your report.

13          THE COURT:  A-282.

14          MR. GOODNIGHT:  Yes, Your Honor.

15  Q   You say, "I have been engaged to provide an expert opinion

16  on damages asserted by AMTAX Holdings 169 LLC, in its amended

17  counterclaim in the lawsuit."  Do you see that?

18  A   Yes.

19  Q   What are the damages asserted by AMTAX Holdings 169 in

20  this case, specifically?

21  A   It's my understanding that this is based on a derivative

22  claim, and that the damages are to the partnership.  And the

23  damages that I have determined that are -- have impacted the

24  partnership, the damages to the partnership are set out in my

25  report.  And I have reviewed those today.  So those are the

1    specific damages.

2    Q   I understand the categories and some of the numbers.  I'm

3    just asking you straight up, what are the damages to the

4    limited partner?  What's the number?

5    A   If you'd like me to read through my report and enumerate

6    them.

7    Q   No.  I can read your report.  I want to know if you know

8    what the number for the damages is.

9    A   If you'd like me to get out a calculator, I'd be glad to

10   add those up.

11          MR. BESSENGER:  I'm going to object, insofar as

12   counsel referred to damages of the limited partner.  The

13   witness was referring to damages to the partnership.

14          THE COURT:  Well, I think I understand that the

15   concept of damages is a little different in this case,

16   because it's under the definition of economic damage to the

17   partnership, which is justification in the defendants' minds,

18   for removal.  And then the effect that that has on the

19   waterfall and the pricing and all that.

20       Mr. Pettit?

21          MR. PETTIT:  That's correct, Your Honor.  AMTAX

22   limited partner's direct claim is for the removal.  They have

23   a derivative claim asserting damages that the partnership

24   sustained, and then the waterfall, obviously, if the option

25   is exercised and consummated, those derivative damages become

1   direct damages to the limited partnership.

2           THE COURT:  Mr. Goodnight.

3   Q   Do you have any separate opinion on the question of

4   removal, other than the damages opinions that we see in your

5   report?

6   A   I know that just one of the bases for removal is the

7   general partner not abiding by material provisions of the

8   partnership agreement.  And it's my opinion that the items

9   I've identified are material and would allow that provision

10  to be triggered.

11  Q   Okay.  Now, as I understand it, conceptually, the areas of

12  damages that you've identified fall into three categories,

13  and correct me if I'm wrong:  One is loss of rental income.

14  One is unnecessary repairs or improvements, like the roofs or

15  the parking lots.  And another is what you've categorized as

16  unauthorized fees.  Is that generally correct?  Do I

17  understand correctly?

18  A   To the extent, as long as we all agree, that all the items

19  I talked about fall into one of those three categories, then

20  I agree.

21  Q   Okay.  Is there another category that I didn't mention,

22  that's in your mind, that's a category of damages besides

23  those three?

24  A   No.  I know you're trying to simplify this and break it

25  down into categories.  And I haven't thought through what I

1    would -- how I would create categories, so I'm just saying

2    I'd like to agree with you as long as we're in agreement all

3    the items I identified are within those categories, then I'm

4    comfortable with that.

5    Q   Okay.  Now, one of the comments that you made in your

6    testimony, and I put it in quotes, is, "The LP is limited in

7    its ability to do anything in management of the property."

8    Do you recall saying that?

9    A   I think that was taken out of context.  I believe that I

10   said more than that, that they are limited to specific items

11   that are identified in the limited partnership agreement, by

12   which they get to approve, disapprove or otherwise

13   participate in.

14   Q   Fair enough.  I understand that.  But that's simply a

15   quote of what you said.  And you went on to say that the GP

16   has discretion in managing the affairs of the partnership.

17   Do you recall that?

18   A   Yes.

19   Q   Now, as I understand it, just a few moments ago you

20   indicated that the capital repairs for things like the roof

21   and the siding and the decks of $1,419,451 million should not

22   have been incurred.  Is that correct?

23   A   Correct.

24   Q   Okay.  And if those capital repairs, like a roof or a

25   deck, had not been incurred to replace the roofs that were

1    leaking or to replace the decks, which in some cases we see

2    evidence of in the records had rot, would there have been

3    other expenses associated with that portion of the property?

4    A   In other words, had they had to incur additional costs to

5    just maintain that portion if they didn't replace that entire

6    portion?

7    Q   Yes.

8    A   Yes.

9    Q   Okay.  And how does your damage calculation for a number

10   like that, $1,419,451, account for what would otherwise have

11   been done if the siding hadn't been replaced, if the roofs

12   hadn't been fixed?

13   A   It specifically -- again, when I went back and did my

14   trend-line calculation, that trend-line calculation is based

15   on ten years of history, and therefore what it allows -- when

16   I do that calculation throughout the life of a partnership,

17   there is always things that need to be repaired and

18   maintained.  That includes painting.  That includes repairing

19   railings on the apartment complexes.  If a window breaks, you

20   need to change that window.  If a roof leaks, you fix that

21   portion of the roof.  So that trend line that I created

22   assumes all those type of normal costs would be incurred.

23   And, therefore, it's only the amounts in excess of that that

24   are the excessive expenditures.

25   Q   So what you're saying, then, as I understand it, is all

1   $1,419,451 would be a direct damage to the partnership, which

2   would somehow, in turn, affect the limited partner; is that

3   correct?

4   A    Correct.  Those would be the amounts that were expended

5   unnecessarily by the partnership.  And they were over and

6   above simply maintaining the property.  And, therefore,

7   that's cash that would have been in the bank account of the

8   partnership.  So that's the measure of damage.

9   Q    Okay.  And I believe you said that none of that work

10  should have been done, even if the GP thought it was

11  important at the time, for whatever reasons, in your opinion

12  it should not have been done; is that correct?

13  A    Correct.

14  Q    Now, I think you also said that the CBRE report noted that

15  there was a discount on the value for work, for that kind of

16  work that wasn't yet complete; is that correct?

17  A    Correct.

18  Q    Okay.  So is it your opinion that doing this capital work

19  on the Parkway properties does not affect the value of the

20  property?

21  A    Correct.

22  Q    Then why is it reflected as a value issue on the CBRE

23  report?

24  A    As a reduction in value.

25  Q    Why is it reflected as a reduction of value for not doing

1   the work that you say doesn't increase the value?

2   A    So, whenever a valuation is done on a property, an

3   appraisal is done on a property.  There is the determination

4   of the value through the normal methodology, which is

5   capitalization of the net operating income.

6        Then what can happen is, to the extent there is immediate

7   needs of repair, you will see those items being deducted.

8   And immediate needs are things like leaks, or dry rot on

9   siding that need to be repaired.  So when those amounts are

10  determined as being an item that should be repaired -- and

11  usually that's done through what's called a property

12  condition report.

13       That's done by a licensed engineer.  So the licensed

14  engineer will perform that work.  They will produce the

15  report.  They will identify the immediate repair needs.  And

16  then that amount could be deducted from the appraised value.

17       But that's not what happened in this case.  So the CBRE

18  report specifically indicates that the appraiser was told

19  that there would be an additional $700,000 worth of work that

20  needed to be done to the property, and therefore, they then

21  took that amount and subtracted it from the value.

22       I believe that was the incorrect thing to do.  They should

23  have used the engineering report to make that determination

24  of what had to be replaced.

25  Q    Okay.  But your judgment today, as an expert for the

1  limited partner, is that whatever reasons led the GP to make

2  those improvements on the property, that judgment was wrong,

3  shouldn't have been done?

4  A   I believe that it was done in a way that it specifically

5  benefited the general partner, to the extent they were going

6  to eventually buy that property.  Because it did two things:

7  It reduced the amount of cash flow that was available for

8  distribution during that period, because all the cash was

9  being used for these improvements; and then the second was,

10  it did not increase the value of the property because there

11  was no upward adjuster calculation, or mention of an

12  increased value due to these improvements that have been

13  made; and then third, there's actually a deduction that was

14  caused due to the transfer of information about how much

15  additional work needed to be done, that in my opinion was not

16  required.

17  Q   Yeah.  I understood, I think, that part of your testimony.

18  My question is actually much, much simpler than that.

19  A   Sorry.

20  Q   As I understand your opinion as an expert for the limited

21  partner, you're telling us that none of that major capital

22  work, the roofs, the siding, the decks, the paving, none of

23  that should have been done at all, correct?

24  A   I'm saying that my testimony earlier was simply that the

25  standard of care in the low-income housing tax credit

1    industry is to maintain the property in good working

2    condition, not to improve the value of the property for a

3    long-term hold.

4    Q    Yeah.  We're going to get to that.  I'm still asking a

5    simpler question.  Is it your opinion that the GP somehow

6    made a mistake in judgment or erred in having all of those

7    improvements made?  I'm talking about the roofs, the siding,

8    the decks, the paving.

9    A    Yes.

10   Q    Now, you mentioned in making that opinion -- and your

11   graphics show what you called a regression analysis.  Do you

12   remember seeing that?

13   A    Yes.

14   Q    And you said that what the GP decided to do didn't comport

15   with your regression analysis for LITHC properties, right?

16   A    No, for this property.

17   Q    For this property?

18   A    Yes.

19   Q    Is there anything in the HUD standards for safe, sanitary,

20   good condition, that you're aware of, that judges

21   improvements based on a regression analysis?

22   A    No.

23   Q    Who came up with the regression analysis?  Was that you in

24   this case?

25   A    Yes.

KRABBENSCHMIDT - Cross

1  Q   But that's not the HUD standard, correct?

2  A   The issue that I had to deal with was to determine how

3  much of the excess costs were improperly incurred.  And the

4  correct way to do that is to look at the long-term trend,

5  create what would have been an inflationary sort of

6  adjustment upwards, and then look at all the costs over that.

7  Because the financial statements were improperly prepared and

8  not properly classified, I had to use other means in order to

9  determine that measure of damage.  And I believe that this

10  was a reasonable way to do that.

11  Q   I understood that.  And I think we've clarified, and

12  correct me if I'm wrong, that the analysis that you used, the

13  so-called regression analysis, is simply not a HUD standard,

14  correct?

15  A   You're implying that somehow HUD has determined the amount

16  that is supposed to be spent on properties.

17  Q   Oh, no.

18  A   They don't.

19  Q   No, not at all.

20  A   Sorry.  I interrupted you.

21  Q   I don't mean to imply that at all.  I'm just saying what

22  you've used as the baseline, the regression analysis, is

23  nowhere to be found in HUD's requirements for safe, sanitary

24  and good condition on HUD-insured properties, correct?

25  A   I agree, because they don't ever have to deal with the

1  measure of damages in cases.

2  Q   Now, in this case, you were retained as a litigation

3  expert to testify as to damages, not as a certified public

4  accountant to do an audit; is that correct?

5  A   Correct.

6  Q   Have you done audits of LITHC properties in the past?

7  A   Yes.

8  Q   You didn't conduct an audit here?

9  A   Correct.

10  Q   You're offering expert testimony as to damages, correct?

11  A   Yes.

12  Q   What do you think the note payable of $2,486,055 recorded

13  on the financial statements in the audits should have been?

14  A   As I've indicated, that amount should be,

15  dollar-for-dollar, reduced by all the items I've identified

16  today.

17  Q   Do you know what the dollar amount should be?  I mean, if

18  we're trying to figure out what that means and what dollar

19  amount you believe it should be, instead of what's in the

20  financial statements, what is the dollar amount, if you know?

21  If you don't know, that's fine.

22  A   Again, I could tell you exactly what it is by just

23  rereading all the damage items that I identified today, and

24  every one of those items should be reduced from that amount.

25  Q   So we'd have to go to your report and try to figure out

1  what the reduction should be based on your report and your

2  testimony; is that what you're telling me?

3  A   Yes.

4  Q   Okay.  What period of time is covered by your damages

5  calculation?  Is it 2002 to 2017, December?

6  A   Yes.  I went through all the financial statements for that

7  period of time.

8  Q   And did you make any effort to exclude timeframes that are

9  beyond a six-year statute of limitations, going back from

10 December '17, six years?

11 A   No, I did not.

12 Q   So you just included all numbers going all the way back to

13 2002 that you could find, based on your work as an expert,

14 that you thought were unauthorized or unnecessary repairs, et

15 cetera; is that correct?

16 A   Correct.

17 Q   Did you ask for instruction regarding the statute of

18 limitations?  Did you ask someone to say, "How far back

19 should I go?"

20 A   My belief was that the statute of limitations

21 determination is a legal question that needs to be resolved

22 by the Court, based on the facts that are presented here

23 today.  And that was not up to me to determine when that

24 statute of limitations starts to run.

25 Q   And you didn't ask for guidance on that?

1   A    Again, I wanted to point out all of the damages and let

2   the Court determine the statute of limitations issue.

3   Q    Okay.  So on that one, we would have to read through your

4   report, consider your testimony, and make an independent

5   determination of what you've done as to which dollar amounts

6   are in and out; is that right?

7   A    Well, it's my opinion that they all should be included,

8   because should the financial statements -- had the financial

9   statements not been materially misstated, the limited partner

10  would have had more information by which they could have

11  potentially intervened sooner; and, therefore, not had this

12  problem of dealing with the statute of limitation.

13  Q    Okay.

14       Let me pull up a chart that we prepared based on an

15  AMTAX exhibit.  And I want to just ask you one or two

16  questions about it.  And this is based on Exhibit 161.  I

17  believe this is Slide 59 from our opening.

18       So, in this slide, Mr. Krabbenschmidt, what we did is

19  we went back six years from the exercise date, and we based

20  this slide on AMTAX's own calculation of fees that it

21  believes were improperly paid.  And we simply drew a line

22  where the statute of limitations would fall on 7/2/12, based

23  on a six-year statute for contract or breach of fiduciary

24  duty claims.  And we found that the only potential claims

25  that would remain totaled $60,929, if you applied that

KRABBENSCHMIDT - Cross

1    timeframe.

2         Now, as I understand your testimony today, you made no

3    effort to do that kind of analysis as to the statute of

4    limitations; is that correct?

5    A   I included -- again, as my testimony just got through

6    saying, I included all the damages, regardless of when they

7    were incurred.

8    Q   Okay.

9    A   And just by the way, I don't understand your statute of

10   limitations saying $1,695 million has been barred, because

11   that would imply that substantially all of the items were

12   before 2012.  But as you can see from your own chart, that

13   very few dollar items were included before July 2, 2012.

14        So, this -- I'm just going to say that the way this is

15   formulated and presented does not appear to be correct to me.

16   Q   Would you turn to page 4 of your report, please?  I want

17   to ask you about the unauthorized property management fees.

18   And this is a conceptual question that I think will help, at

19   least me, understand how these damage calculations work.

20        You testified -- and this fee is listed as $200,754.

21   You also testified there was a reimbursement of part of that

22   amount, right?

23   A   I'm not sure what you're referring to.

24   Q   Page 4, middle of the page.  The amount you've listed for

25   the property management, unauthorized property management

KRABBENSCHMIDT - Cross

1    fee.

2    A    Right, correct.

3    Q    Do you know the amount of that reimbursement?

4    A    The excess property management fees were $200,754.  And my

5    understanding is $98,000 was reimbursed.

6    Q    Okay.  So let's just say for the sake of my question we're

7    left with a $100,000 fee there that you think is part of the

8    limited partner's damage claim.  Fair?

9    A    That's approximately correct.  $102,754.

10   Q    Okay.  How does that -- I'll call it $100,000 -- how does

11   that $100,000 work as an element of damages?  Does it come

12   out of the waterfall somewhere?  Is it a damage award?  How

13   does it work?

14   A    So what happened in this particular case was that there

15   was insufficient cash flow to pay all these -- whether it's

16   this fee or the other fees.  So the amounts that were not

17   paid, including these excessive amounts, continued to grow in

18   terms of loans that the general partner made to the

19   partnership to pay these improper fees.

20        Therefore, this loan that is payable to the general

21   partner that is now being requested to be repaid, is the

22   portion that has been improperly stated and now should be

23   reduced.

24   Q    Okay.  But where does that fit on the waterfall?  Or is

25   there some other way of listing that as a damage component?

KRABBENSCHMIDT - Cross

1  Call it $100,000.

2  A    Yeah.  So on the waterfall it was 6.2B2, little "i" and my

3  memory is number 7 is where that fits in.  But I don't have

4  the document in front of me, if I could look at that.

5  Q    That's okay.  I'm not trying to question you on the

6  waterfall or 6.2.  But it would come out somehow in the

7  waterfall calculation; is that your testimony?

8  A    My testimony is that the general partner is requesting

9  reimbursement or payment of that subordinated loan amount in

10  accordance with the waterfall at that level.  And to the

11  extent that subordinated loan is reduced by this measure of

12  damages that I've testified to today, that that amount would

13  go away.

14  Q    Okay.  And that would increase the limited partner's

15  liquidation value or distribution in the waterfall by

16  $100,000?

17  A    In this particular case, by, yes, by that $102,000.

18  Q    Okay.  So I'm thinking of that just in my simple way of

19  thinking about it as a damage item.  That's what you call an

20  unauthorized fee, okay?

21        Now let's turn to page 16 of your report, the rental

22  issue.

23        You have testified, I think, that there was a lack of

24  rental increases on the LITHC property that cost the

25  partnership -- the number is now not $750,000 but $706,000;

1   is that correct?

2   A   Correct.

3   Q   How does that number work where we're not talking about an

4   amount that was paid or an expense, we're now talking about

5   what would otherwise have been additional income to the

6   partnership in a period of years?

7   A   That's right.

8   Q   Where does that fit in the waterfall?  Or does it go

9   somewhere else?

10  A   Again, if that amount had come into the partnership by

11  correctly increasing rents to the tenants, that cash would

12  have been available to the partnership, and more importantly,

13  it would have reduced any outstanding subordinated loans --

14  sorry, it would have not had the subordinated loans increase

15  during that period of years.  Or that cash could have been

16  used to make cash flow waterfall distributions.

17  Q   Okay.  And because we're talking about what would have

18  been additional income to the partnership over a period of

19  several years, would that have to be calculated into each

20  year's financial condition?

21  A   Financial condition?  You mean each year's cash flow

22  waterfall calculation?

23  Q   Not waterfall calculation, but just financial statements

24  and cash flow.

25  A   If it had been received as rental income, it would have

1  been reflected on the income statement of the financial

2  statements.  And, therefore, it would have been on the

3  financial statements, had it been properly collected.

4  Q   So what years are we talking about for this rental --

5  additional rental income opinion of yours?  It's a limited

6  number of years?

7  A   2016 and 2017.

8  Q   Okay.  So we're talking about two years where your

9  testimony is the general partner should have been charging

10  the tenants more money for rent?

11  A   That's right.

12  Q   If she had done that in 2016, the partnership would have

13  had additional income from rent that would have been

14  available for other things, like to pay the bills?

15  A   That's right.

16  Q   Have you done any calculation of how that would have

17  affected that year's cash flow, payment of bills, and other

18  matters?

19  A   It's not necessary to do that, because the cash was not

20  received.  Therefore, the measure is no longer, had it been

21  received back then; it's now a question of if the partnership

22  receives it now, how is that amount treated?

23  Q   If the partnership receives it now, where would it go?

24  A   It would now go into the cash account of the partnership.

25  I do not believe it's a proper measure of cash flow waterfall

1   for purposes -- it's not a measure of cash flow for purposes

2   of the normal annual calculations.  But it would be cash that

3   would now be in the partnership bank accounts that would be

4   available for distribution to both the general partner and

5   limited partner in accordance with the waterfall provisions.

6   Q   Okay.  So I believe I understand you to be saying that if

7   the rent had been roughly $350,000 more income in 2016, you

8   would not look at what effect that had on the partnership at

9   that time?

10  A   If it actually had been received as rental income, then I

11  do believe it would have been appropriate to look at both the

12  calculation of cash flow, and any repayment of subordinated

13  -- of debt amounts that were owed by the partnership, that

14  year's operating expenses.  So I do believe had it been

15  received in that year, you would have done all that.

16  Q   You would have?

17  A   Yeah.

18  Q   But now you just record it as $700,000, somewhere else in

19  the waterfall, as a cash payment?

20  A   Well, these would be classified as damages received by the

21  partnership pursuant to this litigation.  And it would not be

22  treated the same way as rental income.

23  Q   Is there anything in Section 6 of the waterfall that has a

24  line item for damages to the partnership?

25  A   It's not part of the cash flow -- annual cash flow

1  calculation, but it is part of the waterfall.

2  Q   Where does it fit in the waterfall?

3  A   It becomes cash available for distribution under 6.2B.

4  And therefore it starts to work its way through the

5  waterfall.  And, again, after payment of the debts of the

6  partnership, third-party debts, the next item would be the

7  deferred developer fee.  And the next item after that, that

8  would be applicable in our case, is the subordinated loans.

9       But as I've testified, the subordinated loans in this case

10  would get reduced to zero, and therefore all of these

11  additional dollar amounts would now get distributed out to

12  the limited partner, 99.99 percent to the limited partner.

13  Q   Throughout your report and your testimony you use the

14  phrase, "unauthorized fees."  Correct?

15  A   Yes.

16  Q   By that, I understand you to mean that the GP was

17  authorizing the payment of fees for one thing or another,

18  tenant file review, maintenance, et cetera, that you believed

19  were not appropriate under the partnership agreement.  Is

20  that what you mean by unauthorized fees?

21  A   Yes.

22  Q   So you're making a judgment today, as a retained expert,

23  that decisions made by the GP at another point in time were

24  not authorized by the language of the partnership agreement?

25  A   Correct.

1    Q    Would it affect your opinion if a particular item,

2    decision for an expense, for instance, was actually discussed

3    with somebody from AMTAX and was the subject of an e-mail

4    back and forth where there were questions, and answers to

5    questions, about whether this was authorized or not?

6    A    Again, I have not looked at that specific item.  And to

7    the extent the facts determine that somebody from AMTAX have

8    approved them, then that would be for the Court to determine

9    that.

10   Q    Okay.  So if somebody from AMTAX in a back-and-forth

11   communication had said, we have questions about this

12   particular fee, the questions were answered in an e-mail and

13   they said, okay, understand, we approve this, and they move

14   forward, then you would take that out of your damage

15   calculation?

16          MR. BESSENGER:  I'm going to object.  Incomplete

17   hypothetical, Your Honor.

18          THE COURT:  Overruled.

19          MR. GOODNIGHT:  Thank you, Your Honor.

20   A    I'd have to look at that specific communication, and I'd

21   have to -- there would be a number of determinations.  You'd

22   have to determine whether the person that sent the e-mail was

23   authorized to obligate AMTAX.  You'd then have to look to

24   make sure that there was proper communication with the person

25   to properly communicate what was being done and the amount

1    being expended.  So I think there would be a number of

2    different things you'd have to look at before you could make

3    the determination that an e-mail somehow contravenes the

4    partnership agreements.

5    Q    Fair enough.  And I assume the answer to my question is,

6    no, that you have made no effort to make such a determination

7    because you simply haven't reviewed all of the reports and

8    back-and-forth e-mails on these items that you're opining on.

9    Correct?

10   A    Correct.

11   Q    Does the partnership agreement in Parkway, to your

12   knowledge, contain any guarantee by the general partner that

13   the tax credits will be maintained throughout the life of the

14   compliance period?  A guarantee.

15   A    Yes.  You know, I don't remember the specific language,

16   but that's very standard protocol for low-income housing tax

17   credit partnerships.  And so that would be normal to have in

18   there, that they actually do guarantee the delivery of those

19   tax credits.

20   Q    And is there a requirement in this partnership agreement

21   regarding the occupancy percentage that must be maintained

22   under the partnership?

23   A    No.

24   Q    Adam, can you pull up the partnership agreement, Section

25   7.4C?

1   A    I should rephrase my last statement.  Not that I know of.

2   Q    Okay.

3        Do you see the sentence, "The general partner shall not

4   take any action which would cause the termination or

5   discontinuance of the qualification of the project as a

6   qualified low-income housing project under Section 42G"?

7   A    Yes.

8   Q    All right.  Now, you list, in your report, a number of

9   cases where you have testified as an expert witness, correct?

10  A    Yes.

11  Q    And that's not a complete listing of cases, is it?

12  A    No.

13  Q    And you decided to exclude some of the cases where you've

14  testified?

15  A    No.  I thought I actually included all cases that were

16  within the five-year timeframe that I had had a deposition or

17  testified in court on.  And then I specifically excluded

18  arbitration cases, or cases that I worked on where I did not

19  testify.

20  Q    How many cases, roughly, have you testified as an expert

21  witness in LITHC matters?

22  A    I'm going to -- I'd have to speculate.  I don't know.  I

23  just honestly, as I sit here today -- I've probably worked on

24  60 cases in my career.  And as I sit here today, I would not

25  be able to tell you that exact number.

KRABBENSCHMIDT - Cross

1   Q    Okay.  And you've testified for AMTAX and Alden Torch in

2   other cases, correct?

3   A    Yeah, there's another case that was up here in federal

4   court in Seattle where I testified as to the interpretation

5   of a partnership agreement relating to rights of first

6   refusal.

7   Q    Adam, can you pull up Exhibit C, the list of deposition

8   testimony to Mr. Krabbenschmidt's report?

9        While we're pulling that up, let me ask you this:  Have

10  you testified in any other LITHC cases where a guarantee of

11  the GP that we just looked at, was found by the federal judge

12  to be an important fact?

13  A    The guarantee?  I just don't recall.

14  Q    You've testified as an expert witness while you've been at

15  Novogradac, correct?

16  A    Yes.

17  Q    In the cases in which you've testified in LITHC

18  properties, have you ever had a court determine that your

19  testimony and opinion was flawed?

20  A    I don't believe that I've ever read those words.

21  Q    Have you ever had a court determine that your testimony

22  improperly -- and your opinion improperly double counted the

23  value of tax credits in a LITHC matter?

24  A    Again, those are not words that I recall being in a court

25  opinion.

1    Q    All right.

2    A    There is mention of -- in a court case, of double

3    counting, but that's not the words that were used.

4    Q    Have you ever had a court determine that your opinion

5    ignored salient facts?

6    A    Ignored salient facts?  Again, there was a court case

7    which was -- the federal bankruptcy court in Phoenix,

8    Arizona, where there was a question of valuation of

9    low-income housing tax credits in the bankruptcy case to

10   determine how much value was still left in the bankruptcy

11   estate.  And there was two experts, myself and another woman

12   from another accounting firm, and we had differences of

13   opinion on how to do that valuation.

14        And the court in that particular case identified that he

15   did not think that my valuation properly incorporated the

16   risks that were potentially associated.  So we had -- I think

17   we had -- the expert and I had a difference of opinion about

18   what those risks were and how to interpret those risks.

19        So I believe in that case there was language that

20   resembles what you're describing today.

21   Q    Have you ever had a court, a federal court, determine and

22   write an opinion that your opinions were so deficient that

23   they simply would not be accepted by the court?

24   A    I don't recall those words.

25   Q    Okay.

KRABBENSCHMIDT - Cross

1        Let me ask you about your opinion on the repair

2   supervision fee, page 4 of your report.  It's on the bottom

3   of the page.

4   A   Yes.

5   Q   You list $460,558 there.  Do you see that?

6   A   Yes.

7   Q   Is it your opinion that no value to the partnership was

8   received for the work that was done?

9   A   I'm sorry, which work?  The supervision work or the repair

10  work that was done?

11  Q   No.  The supervision fee.  This is about a supervision

12  fee, as I understand it; is that correct?

13  A   Correct.  But you said "work."  I was just asking you to

14  clarify the word "work."

15  Q   Fair enough.  I'm referring to what you've listed here as

16  a repair supervision fee over several years of $460,558.  Is

17  it your opinion that entire amount is damages to the

18  partnership?

19  A   Yes.

20  Q   Is it your opinion that of all the work that was done in

21  that repair supervision fee, it had no value to the

22  partnership?

23  A   That's not my testimony.

24  Q   What's the differential or the delta between the $460,558

25  and the actual value that was provided by that?

1    MR. BESSENGER:  Your Honor, I'm going to object as

2    misstating the witness's testimony.

3    THE COURT:  I'm going to overrule the objection.

4    It's cross examination.

5    I understand that the argument was that the repair

6    supervision fee was subsumed by the management fee, and

7    that's -- so it may be confusing as to what includes the

8    value.  But that's my mind's eye of this debate.

9    Q   Let's get that straight, Mr. Krabbenschmidt.  Is the

10   Judge's understanding what you're testifying to?

11   A   Yes.

12   Q   So none of this is for major capital work?

13   A   Again, that's not what my testimony was.  My testimony was

14   that these were amounts that were paid to the general partner

15   for supervision work that was otherwise required by the

16   property management agreement, and the fee that had already

17   been identified and payable under that property management

18   services agreement.

19   Q   Okay.  Okay.  Do you think it's a fair statement that in a

20   limited partnership, in a LITHC transaction, a primary

21   concern of the LP is to receive the tax credits and losses to

22   offset its taxable income during the compliance period?

23   A   Yes.

24   Q   And do you recall the amendment, the second amendment to

25   the limited partnership agreement -- and I can show it to you

1   if it's helpful -- that indicates that all of the tax credits

2   and losses were delivered to AMTAX in this partnership?

3   A   I don't believe your statement was correctly worded, that

4   there is an amendment to the partnership agreement that

5   includes an exhibit that has the amount of the tax credits

6   and losses that are scheduled to be delivered.  You used the

7   word "actually delivered."  So there's -- my difference with

8   you is just simply the word you used there.

9   Q   I don't think this is a matter in dispute.  I want to make

10  sure it's clear with you.  Do we agree that all tax credits

11  and all losses that were scheduled were actually delivered to

12  AMTAX during the compliance period?

13  A   I agree with regard to the credits that we believe -- I

14  believe that all the credits were actually allocated out to

15  the limited partner.

16      The second part of that question was whether the losses

17  were all delivered in accordance with the agreement.  And my

18  answer to that is, I do not believe that is a correct

19  statement.

20  Q   Okay.

21  A   Because the exhibit identified an estimated amount of

22  losses that were going to be allocated to the limited partner

23  over the life of the investment.  But the actual partnership

24  agreement and the provisions of the partnership agreement

25  that determine how losses are to be allocated is the actual

1  final controlling document for determining how that is to be

2  done.

3  Q   Is it your testimony that there were some losses that were

4  not delivered to AMTAX?

5  A   My earlier testimony was because of the subordinated loan,

6  that the addition of that to the negative -- to the capital

7  account of the general partner, meant that the tax return

8  preparer would have looked at those subordinated loans and

9  determined that more losses should have been allocated to the

10  general partner.  Had those subordinated loans not been

11  there, more losses would have been allocated to the limited

12  partner.

13  Q   Okay.  Putting aside the subordinated-loan issue, do you

14  know of any other basis to say that the losses were not all

15  delivered?

16  A   Losses were delivered.  But what happened was the losses

17  were only delivered to bring the capital account of the

18  limited partner down to zero.  And it's my belief that it

19  should have gone more negative than that.

20  Q   How much more negative?

21  A   By the amount of losses that were reallocated to the

22  general partner during that timeframe.  I don't have that

23  exact calculation in front of me.

24  Q   Okay.  And there was no schedule in the partnership

25  agreement or the amendment for cash flow to the limited

1   partner.  Do we agree on that?

2   A   There is a provision in the partnership agreement, and

3   we've referred to it many times today, that refers to the

4   waterfall.  That is the controlling portion of the limited

5   partnership agreement that determines when and if cash flow

6   becomes available, how it will be distributed.  But there is

7   no preset schedule that said a certain dollar amount had to

8   be distributed, other than some of the fees we've talked

9   about.

10  Q   Okay.  Now, it's not uncommon in a partnership agreement

11  like this one that the general partner will have a right to

12  call the investor's interest upon the expiration of the

13  compliance period, correct?

14  A   I wish you could be more precise than the word "call."  So

15  maybe -- could you clarify that?

16  Q   Sure.  I think that's the word that's used in your book at

17  Novogradac.  But I'll say there's a buyout option at the end

18  of the compliance period, right?

19  A   Typically -- many times the limited partnership agreement

20  will have provisions in it that allow the general partner to

21  buy out the limited partner or the property -- sorry, let me

22  rephrase that -- either the property fee interest or the

23  limited partner's partnership interest, and it will depend on

24  the wording of that partnership agreement.

25  Q   Okay.  And here the general partner, we know, has a right

1  to buy out the limited partner's interest in the property of

2  the partnership, correct?

3  A   And, again, I don't have the partnership agreement in

4  front of me.  And if you want me to refer to that, I'd be

5  glad to do that by looking at it.  But I don't want to

6  speculate as I'm sitting in front of you.

7  Q   It's not meant to be a tricky or technical question.  Do

8  you not agree that the general partner has a right, at the

9  end of the compliance period, to buy out the limited

10  partner's interest?

11  A   Again, I haven't looked at that provision for a while.  So

12  if you want to show me that provision, I'll be glad to look

13  at it and confirm your statement.

14  Q   Now, when loans have been made to a partnership by the GP

15  during the compliance period, do we agree that the

16  partnership is required to repay the loans from the sale of

17  its interest at the time of the buyout?

18  A   There is a provision in the waterfall that, to the extent

19  there are properly -- that there are loans made by the

20  general partner for proper items of operation expenses of the

21  partnership, that there is a provision for those to get

22  repaid at liquidation.

23  Q   Okay.  And do you know when the GP first advanced loans to

24  the partnership?

25  A   My understanding is that it started early in the

1    partnership, meaning back in 2003, 2004.  But I'm not sure of

2    exactly when that started.

3    Q    Do you have a schedule of advances by the GPs to the

4    partnership?

5    A    Not with me today.

6    Q    Do you know why the GP was advancing loans to the

7    partnership throughout the partnership period -- compliance

8    period?

9    A    Well, I mean, some of them, the advances were for the

10   items we discussed today that were deemed improper.  And I'm

11   not -- there could have been advances to the partnership for

12   proper operations.  And I'm not contesting that.  I'm just

13   saying that to the extent there was advances for improper

14   payments or to the extent there was not cash flow sufficient

15   inside the partnership -- for instance, in 2009 when the

16   limited partner made their capital contribution, the general

17   partner improperly took $340,000 out of the cash account of

18   the partnership.  And so in that case they not only took it

19   out, but then they had to start advancing the monies back in,

20   in order to pay for the operations.  Had they not done that,

21   that cash would have been there.  So that's an example of

22   where they made that advance unnecessarily.

23   Q    Okay.

24        Now, I want to ask you about some of the repairs and

25   your criticisms of repairs that were made to the property

1   over the 15-year compliance period.

2        You've testified that you have some personal experience

3   with LITHC properties.  And I think you said you were a

4   general partner of a partnership to a LITHC property; is that

5   correct?

6   A   No.  My testimony was that I was the general partner for

7   the investment limited partner.

8   Q   You've not been a general partner for the operating

9   general partnership, correct?

10  A   Correct.

11  Q   You said that you went by the property here and looked at

12  it and talked to a tenant and touched something.  Did you do

13  that before or after you wrote your report and before or

14  after your deposition was taken?

15  A   It was after my report, after the deposition.

16  Q   Okay.  And it's your fundamental opinion, as I understand

17  your testimony, that when it comes to repairs and maintenance

18  of a low-income housing property, the GP should maintain the

19  property in its current condition -- this is the beginning of

20  the 15 years -- in that condition, throughout the 15-year

21  period, and do nothing more than maintain the property in

22  that condition.  Is that correct?

23  A   Correct.

24  Q   And --

25  A   Assuming the starting point was good operable condition,

1  which is how the LITHC partnerships start.  They rehabilitate

2  the property.  They do a substantial amount of work.  They

3  put it in good operating condition.  And then it's required

4  by the GP and the property management company to maintain it

5  in that condition.

6  Q   All right.  And part of that opinion, as I understand

7  it -- correct me if I'm wrong -- is that the property will be

8  maintained in that original condition and no additional

9  material construction will be performed through 15 years; is

10  that correct?

11  A   Yes, that's right.

12  Q   And one of the reasons for that, in your opinion, is to

13  maximize the profits to the limited partner investor; is that

14  correct?

15  A   That's one of the benefits, yes.

16  Q   Now, it's also your opinion that in terms of the condition

17  the property should be maintained in, it should merely be

18  maintained in a habitable condition; is that correct?

19  A   I think that's the minimum standard under state law.  So,

20  you know, anything below that would not be acceptable.

21  Q   Do you remember testifying in your deposition that in

22  low-income housing the standard should be to simply maintain

23  the property in a habitable condition.  Do you recall that?

24  A   To the extent you interpret the word "simply" as being no

25  more, then that was an incorrect assumption or interpretation

1    by me.  It is the minimum, the minimum level that has to be

2    state-law habitability.

3    Q    All right.  Let's look at your deposition.  And it's page

4    189 -- 188 and 189.

5    A    Is it in front of me somewhere?

6    Q    It will pop up in a moment, if things work as I expect

7    they will.

8          So I'm looking at page 188 of your deposition, the very

9    bottom of that page.

10          Question:  "Okay."  Do you see that?

11   A    Yes.

12   Q    "Is it your view that the general partners -- that in the

13   LITHC industry, it is the -- it is the standard to simply

14   maintain the property in habitable condition for the first

15   15 years and do no more than that?"

16          And your answer, Mr. Krabbenschmidt, was, "Yes."

17   Correct?

18   A    Yes.  That's exactly what my answer was.

19   Q    So when you're making the judgments today about the

20   improvements that the general partner made to fix the roofs

21   with new roofs, to replace the decks with new decks, to

22   replace the siding and so forth, your view that she did too

23   much is based on this standard that the property -- the

24   low-income housing property should have merely been

25   maintained in a habitable condition; is that correct?

1   A    As I sit here today -- this was late in the day in my

2   deposition.  I was getting very tired.  So as I sit here

3   today, it's my belief that it should be maintained, at a

4   minimum, in habitable condition.  But a more nuanced answer

5   would be, maintain the property in the condition that it was

6   in at the time the partnership was formed and the

7   rehabilitation work was done.

8        So, obviously that is different from simply habitable, and

9   no more.  And as I sit here today, I believe that I could

10  have been better at answering that question.

11  Q    Fair enough.  I'm going to pull up a chart of repairs that

12  we used in the opening and show it to you.  These are some of

13  the repairs that were done to the property during the

14  compliance period.

15       Now, it's my understanding that your testimony would be

16  that none of this work should have been done, none of these

17  repairs should have been made; is that correct?

18  A    Well, no, that's not -- that wasn't my testimony.  For

19  instance, the easy one is bedbug extermination.  That's not a

20  repair that shouldn't have been done.  We agree, you need to

21  get rid of your bedbugs.

22  Q    Let's put that aside.

23       Do you agree that the other repairs listed here should

24  not have been done?

25  A    There is some portion of this that could have been done.

1    But, for instance, I'm going to say that the siding, I do not

2    believe, was needed to be done the way it is.  Because I went

3    out to the buildings that had not been re-sided yet, I tested

4    the wood, I looked at it.  It's identical to the T-111 siding

5    that I have on my two projects in Sacramento.  I know what

6    dry rot looks like.  There was no evidence of dry rot within

7    that.

8        The same thing with sliding doors and windows.  It looked

9    like they had replaced all the doors and windows with

10   dual-glazed glass, which is what I did in Sacramento, except

11   it was unnecessary.  The existing windows would have

12   continued functioning throughout the remaining 40-year life.

13   And when she bought the property she could have made the

14   decision to upgrade those.

15       The deck replacements, I looked at the pictures of the

16   original decks and railings.  They were wood.  They had been

17   replaced with metal railings.  Again, that was not necessary.

18   Those original wooden railings could be maintained in a

19   condition of safety throughout the life of this.  And

20   periodically some portions of those do need to get either

21   fixed or replaced, but not 100 percent.  There's never a

22   100-percent failure rate on anything.

23       And then siding.  Again, the siding that was put on there

24   is a new, manmade composite material.  It's called Hardy

25   plank.  And there appears to be aluminum siding on top.  All

1 that was overlaid on top of the existing siding that was

2 there.

3     And one of the foundational issues, when you're putting on

4 that new siding, is that the underlayment has to be in good

5 condition and capable of accepting the exterior siding.

6     So, to the extent there was any dry rot, they would have

7 had to fix that original dry rot before they put on the new

8 siding.  That's the standard by which those things have to be

9 installed.

10     And so in this case they would have had to repair any dry

11 rot that might have occurred.  That is what they should have

12 done.  And, therefore, this siding that is here in the amount

13 of $1,087,000, was something that was being used to extend

14 the life of the property for another 40 years.  It was a

15 major capital improvement that didn't need to be done during

16 the life of this partnership, to the detriment of the limited

17 partner.

18 Q    Okay.  Thank you.

19     Would it change your view on the deck replacement if

20 you knew that there were existing code violations with the

21 railings?

22 A    Again, those are things that need to be maintained in

23 habitable, usable condition.  And if there is code

24 violations, again, I think it was the property management

25 company's responsibility to maintain the property in a way

1  that there was no code violations.

2     And then the portion of the property that had not been

3  re-sided, it looked like it had not been painted in many,

4  many years.  Anyway, I'm -- sorry, I digressed.

5  Q   Fair enough.

6     You, I think, would agree that you haven't talked to

7  anybody who knew the condition of the property before the

8  repairs were made, correct?

9  A   That is true, except for the one tenant that I talked to

10  that did give me an indication of when the work had stopped

11  -- started and stopped.  And it abruptly stopped halfway

12  through last year, which coincided with when this lawsuit

13  started.

14  Q   So you felt like you were able to make the judgment that

15  the general partner committed a breach of fiduciary duty that

16  caused damage to the partnership by making these repairs,

17  without knowing the condition of the property before the

18  repairs were made, without visiting the property at the time

19  you made this judgment, and without even knowing the back and

20  forth between the general partner and the limited partner on

21  each one of these items?

22  A   In my deposition I specifically referred to what's -- a

23  report that was prepared by an engineering firm that

24  identified the condition of the property at the time of its

25  refinance.  And I believe that was in 2014.

1        At that point in time the engineering survey that was

2    done, reviewed the property and determined that there was --

3    again, I'm going off of memory -- $23,000 worth of what's

4    called immediate repair and needs.  And it was a number of

5    miscellaneous items.

6        Had there been conditions at the property that were unsafe

7    or conditions at the property that were showing that

8    something was falling apart, those would have been identified

9    on that report, and then they are items that should be

10   immediately corrected.

11       The $23,000 worth of items on that report, it's my

12   understanding they were corrected, but that all the other

13   items on that report, which included eventual siding issues,

14   paint issues, roofing issues, were scheduled out over a

15   succeeding 20-year period of time.  And that my memory,

16   again, is none of those items that I just identified, were

17   within the timeframe of the limited partnership as

18   contemplated by this agreement, which is that 15-year

19   timeframe.

20       And in that particular case, there was only three

21   additional years after that point in time that could elapse

22   before Ms. Tamaro could have made the decision to start doing

23   these major repairs and replacements.

24   Q    Okay.  Are you finished?

25   A    Yeah.  Sorry.

1  Q    So help me understand something, what I'll call a

2  double-counting issue.  When these repairs are made, Parkway

3  has new roofs, new decks, new siding, pavement is repaired,

4  all of that.  Right?

5  A    Yes.

6  Q    You wouldn't say any of those repairs caused damage to the

7  partnership, would you?

8  A    I did testify that that's exactly what happened, yes,

9  there was damages to the partnership.

10 Q    When those repairs are made, the property is going to be

11 valued at the time of the waterfall, the fair market value,

12 as a property with a new roof, with new siding, with new

13 decks, correct?

14 A    Exactly.  Yes.  I agree with you that it will be valued at

15 that point in time with those items.

16      But as I testified to earlier, that they determined the

17 value based upon the cash flow of the partnership.  And none

18 of these repairs or replacements -- sorry, major capital

19 improvements, would increase the cash flow of the

20 partnership.  The cash flow of the partnership, by necessity,

21 in low-income housing tax credit properties, is restricted to

22 the maximum rents that are allowed.

23      So the way this partnership was valued in the appraisal

24 reports, both the CBRE and the Novogradac appraisal took the

25 net operating income and capitalized it with a cap rate.

1       But in no way was that increased by these major capital

2   improvements.

3   Q   Okay.  And I do understand the portion of your testimony

4   that doing this kind of work, in your view, would reduce the

5   cash flow, and potentially the waterfall that is available to

6   the limited partner.  So it has an impact on the limited

7   partner's cash flow.  That's one of the reasons you don't

8   think this kind of work should be done; is that fair?

9   A   That's one of the reasons, yes.

10  Q   Okay.

11      Let me show you what I think is the opinion from the

12  federal court that you mentioned a few minutes ago.

13          MR. GOODNIGHT:  May I approach, Your Honor?

14          THE COURT:  You may.

15  Q   This is a case reported in Westlaw, 2012 Westlaw 6479735

16  called *Sunnyslope*.  And I assume you were the expert for

17  First Southern; is that correct?

18  A   Yes.

19  Q   And you were working for Novogradac at the time?

20  A   Yes.

21  Q   If you turn to the second page, bottom of the second page,

22  there's a paragraph that begins with, "But First Southern's

23  expert's report."  Do you see that?

24  A   Yes.

25  Q   "First Southern's expert report was equally, if not more

1    deficient.  It contained absolutely no attempt at a market

2    survey to determine the value or investor interest in LITHCs,

3    like the debtor's."  Do you see that?

4    A    Yes.

5    Q    Now, if you look at the column on the opposite side of the

6    page, which begins with, "Another flaw."  Do you see that?

7    A    Yes.

8    Q    It reads, "Another flaw in First Southern's expert

9    analysis is that he essentially double counted the value of

10   tax benefits flowing from the owning the property other than

11   LITHCs."  Do you see that?

12   A    Yes.

13   Q    It goes on to say in the beginning of the next

14   paragraph -- and there's more that I won't cover here -- it

15   says, "These deficiencies in First Southern's expert's

16   analysis render it almost useless."  Do you see that?

17   A    Yes.

18   Q    And this was your expert analysis in this case; is that

19   correct?

20   A    Correct.

21   Q    Let me ask you -- and we have a few minutes left, I

22   think -- about rental rates.  It's your opinion that the GP

23   should have raised the rental rates more aggressively on the

24   low-income tenants.  And that's at the end of your expert

25   report.  Correct?

KRABBENSCHMIDT - Cross

1  A    Correct.

2  Q    When I looked at the documents that were attached and

3  referenced in Exhibit D, I did not see the Novogradac report

4  on the rental rates for the Parkway properties.  Did you

5  consider your company's own rental report analysis before you

6  rendered the opinion that the rental rates were too low?

7  A    Which rental report analysis?  I'm sorry.

8  Q    Let me pull it up as Trial Exhibit 52.  Let me turn to

9  page 13 of the report.

10       Do you see the sentence I've highlighted that rental

11  rates -- current rate rents are reasonable?

12  A    Yes.

13  Q    And I haven't read the whole sentence.

14  A    Right.

15  Q    Did you consider that Novogradac report and analysis of

16  rental rates before you rendered your opinion in this case?

17  A    This particular report was issued in 2012.  And my

18  testimony regards specifically 2016 and 2017.  And I'm

19  relying on the subsequent Novogradac appraisal report and the

20  CBRE report that both address this issue.

21       So, this refers to a period of time that I am not

22  contesting.

23  Q    I fully understand that.  That wasn't my question.  My

24  question was, had you reviewed your company's report on the

25  rental rates of this property before you issued your opinion?

KRABBENSCHMIDT - Cross

1   A    No.  I did not think it was necessary to review a 2012

2   report regarding a period of time I was not looking at.

3   Q    Now, this report on the rental rates appears to be based

4   on a fairly detailed analysis of comparable properties, and

5   the industry and so forth.  Is your opinion based on a

6   similar Novogradac analysis of rental rates for the 2016/2017

7   timeframe?

8   A    Yes.  So the Novogradac appraisal specifically lists five

9   comparable properties, and specifically states that each of

10  those comparable properties are being rented at very low

11  vacancy rates, at the maximum low-income housing tax credits

12  rents.  So on that basis, plus other information that was

13  included in the CBRE report, I've made my opinion.

14  Q    Okay.  Did you -- Novogradac does rental rate analyses in

15  a formal way, not just an appraisal, but in a formal

16  rental-rate analysis, just like the one we're looking at.

17  Did you commission that kind of work before you rendered your

18  opinion?

19  A    No.

20  Q    And your opinion is based primarily on occupancy rates,

21  correct?

22  A    No.  No.  It's based on the -- occupancy is the leading

23  indicator to show that there might be something wrong.  But

24  the calculation is done based on actual rents being charged

25  versus the amounts allowable at the low end of the range, and

1  then looking at how that compares to other comparable

2  properties.

3  Q   Mr. Krabbenschmidt, were you aware of this Novogradac

4  report and chose not to read it and rely on it, or did you

5  not know that your company issued a report on rental rates

6  for the property at issue?

7  A   I don't know that I was aware of this report.

8  Q   Okay.  Now, Ms. Tamaro has testified in this case as to

9  all of the factors that she considered in raising rents or

10  not, over the years.  Are you aware of the factors that the

11  GP considered in making rental determinations?

12  A   In reading her deposition testimony, she indicated that

13  she feared that it would be too difficult to keep the

14  property leased if she raised the rents.  And I'm just

15  paraphrasing from my memory of what her testimony was.

16  Q   Okay.  Are you aware of what she testified to in this

17  trial, in terms of her considerations over the years in

18  raising rents?

19  A   I haven't read her testimony for -- over the last two

20  days.  So I'm not sure if she addressed that issue or not.

21  Q   Are you aware of back and forth communications that she

22  had at the time with the LP about the rental rates and

23  whether they should be raised and her concerns about raising

24  them?  Have you seen those?

25  A   No.

1  Q   Would it affect your opinion if the LP had actually

2  written documents saying, we understand -- understood?

3  A   Could you rephrase that question?  Because that seems like

4  an incomplete question to me.

5  Q   Would it affect your opinion that the rates were too low

6  if she actually had had numerous communications with

7  representatives of the limited partner, explained the

8  reasoning, and the limited partner's representative said,

9  "Understood"?

10 A   I don't think it would impact my decision at all, because

11 I believe that the limited partner relies on the general

12 partner to be -- make good-faith determinations.

13      But at the time that Novogradac completed its appraisal,

14 there's clear information that indicates that rents could

15 have been raised to the maximum LITHC-allowable rents.  And

16 in this case they were not.

17      So if you look at the comparable properties that are

18 low-income housing tax credit properties, they are full with

19 very low vacancy rates, way below 5 percent, and they're

20 charging the maximum allowable rents.  That indicates that

21 the market will support the higher rents.

22      And it may cause turnover.  But, again, for instance, on

23 the CBRE report that was commissioned as of the beginning of

24 2018, it indicated that the complex was 100 percent full.

25 And in my experience of running apartment complexes, large

 1   apartment complexes, there's almost never a point in time,

 2   ever, where a large apartment complex is 100 percent full.

 3   There's always a constant ebb and flow of tenants.

 4       So that was additional support of why I felt that this is

 5   a proper -- that my calculation was proper and supportable.

 6   Q   Just one more question, then I'll stop and check with the

 7   Court --

 8           MR. GOODNIGHT:  If that's all right, Your Honor.

 9           THE COURT:  You've got one question.

10           MR. GOODNIGHT:  Thank you.

11   Q   You testified early on in your direct testimony today that

12   the general partner had discretion in managing the

13   properties.  How is it that you're not substituting your

14   judgment now as a litigation expert for the judgment that the

15   general partner exercised at the point in time when these

16   rents were set?

17   A   As an expert, I think I am exercising my judgment as to

18   whether things were done correctly or not.

19           MR. GOODNIGHT:  Thank you, Your Honor.

20           THE COURT:  We're going to recess until Monday at

21   9:30.  Mr. Pettit?

22           MR. PETTIT:  I apologize for this, I'm honestly not

23   sure about Mr. Krabbenschmidt's availability on Monday.  He's

24   based in San Francisco.  I don't how much more Mr. Goodnight

25   has.  I don't know what the Court's schedule looks like.

1    THE COURT:  You guys talk about it, whether you need

2    to have him come back and all that.  You can do that.  But

3    you are all spending a lot of money in this courtroom with

4    the lawyers and everything.  I've gotten what I need on this

5    subject.  And it's your decision whether to invest the

6    candle-time for another go.

7    MR. PETTIT:  So I'm clear, Your Honor, that's a

8    unilateral decision Mr. Goodnight --

9    THE COURT:  No, not at all.  I want you to work it

10   out together.  It's a bench trial.  We can recess it until

11   August if you want and finish it if you want.  But we're

12   quitting tonight.  I've got things set tomorrow.  And you can

13   keep your stuff here, but clear off the desks, because we'll

14   have a full cadre of lawyers and defendants and the like.

15   MR. GOODNIGHT:  Do you want us to confer and get back

16   to the Court on the schedule?  We have one rebuttal witness

17   who is an expert, and I have probably another hour.  But I

18   think we could wrap up in one day.  Whether Monday can work,

19   I don't know.

20   MR. PETTIT:  I'll have to consult.  But we'll try to

21   work it out, Your Honor.

22   THE COURT:  All right.  We are at recess.

23                          (Recess.)

24

25

1                    C E R T I F I C A T E

2

3

4        I certify that the foregoing is a correct transcript from

5    the record of proceedings in the above-entitled matter.

6

7

8

9    /s/ Debbie Zurn

10   /s/ Angela Nicolavo

11   DEBBIE ZURN
     ANGELA NICOLAVO
12   COURT REPORTERS

13

14

15

16

17

18

19

20

21

22

23

24

25