

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

_____

HIDDEN HILLS MANAGEMENT,           )
LLC, and 334th PLACE 2001,         )
LLC,                               )
                                   )
Plaintiffs,                        )
                                   )
v.                                 )   3:17-cv-06048-RBL
                                   )
AMTAX HOLDINGS 114, LLC, and       )   TACOMA, WASHINGTON
AMTAX HOLDINGS 169, LLC,           )
                                   )   June 10, 2019
Defendants.                        )
                                   )   9:30 a.m.
_____    )
                                   )   Bench Trial
AMTAX HOLDINGS 114, LLC,           )
AMTAX HOLDINGS 169, and            )
PARKWAY APARTMENTS, LP,            )
                                   )
                                   )
Counter-Plaintiffs,                )
                                   )
v.                                 )
                                   )
HIDDEN HILLS MANAGEMENT,           )
LLC, and 334th PLACE 2001,         )
LLC,                               )
                                   )
Counter-Defendants.                )

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE
_____

Proceedings stenographically reported and transcript
produced with computer-aided technology

```
 1                        APPEARANCES

 2

 3    FOR THE PLAINTIFF &           DAVID R. GOODNIGHT
      COUNTER-DEFENDANTS:           MARGARITA V. LATSINOVA
 4                                  J. SCOTT PRITCHARD
                                    Stoel Rives
 5                                  600 University Street
                                    Suite 3600
 6                                  Seattle, Washington

 7

 8

 9    FOR THE DEFENDANT &           CRAIG H. BESSENGER
      COUNTER-PLAINTIFFS:           ERIC S. PETTIT
10                                  GRAYCE S. ZELPHIN
                                    Boies Schiller & Flexner
11                                  725 South Figueroa Street
                                    31st Floor
12                                  Los Angeles, California.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        EXAMINATION INDEX

2
     EXAMINATION OF:                                        PAGE
3
       JOHN                CROSS EXAMINATION (Cont.)          5
4      KRABBENSCHMIDT      BY MR. GOODNIGHT
                           REDIRECT EXAMINATION             34
5                          BY MR. BESSENGER

6      CATHERINE TAMARO    DIRECT EXAMINATION              39
                           BY MR. GOODNIGHT
7                          CROSS EXAMINATION               44
                           BY MR. PETTIT
8
       LORRAINE BARRICK,   DIRECT EXAMINATION              46
9                          BY MS. LATSINOVA
                           CROSS-EXAMINATION               70
10                         BY MR. PETTIT
                           REDIRECT EXAMINATION            95
11                         BY MS. LATSINOVA                96

12

13

14                        EXHIBIT INDEX

15
     EXHIBITS ADMITTED                                     PAGE
16
       Exhibits 165, 166, 172, A-295, A-302, A-303,          4
17     A-307, A-308, A-310

18

19

20

21

22

23

24

25

 1          THE COURT:  Good morning.  All right.  Mr. Goodnight.

 2          MR. GOODNIGHT:  Thank you for the order on Friday.

 3  That was helpful.  Ms. Barrick will be here this afternoon.

 4  And I think we won't have any trouble finishing the evidence

 5  this morning, except for her testimony.

 6          THE COURT:  That's great.

 7          MR. GOODNIGHT:  I do have three exhibits I want to

 8  move into evidence, 165 --

 9          THE COURT:  Judge Bryan says never move, offer.

10          MR. GOODNIGHT:  Offer.  Offer.  I stand corrected.

11  So I offer 165, 166 and 172.

12          THE COURT:  Okay.  Any objection?

13          MR. PETTIT:  No, Your Honor.  And I have a few of my

14  own I'd like to offer.  A-295, A-302, A-303, A-307, A-308,

15  and A-310.  And I'd also like to very briefly take the

16  opportunity -- unfortunately, Mr. Blake couldn't be here

17  today because of other work commitments.  Ms. Alison Wadle,

18  who was here all last week as well, is sitting in as our

19  party representative.  She's the general counsel for Alden

20  Torch.

21          THE COURT:  All right.  Those are admitted.

22          MR. GOODNIGHT:  Thank you Your Honor.

23          (Exhibits 165, 166, 172, A-295, A-302, A-303,

24               A-307, A-308, A-310 were admitted.)

25

 1                    JOHN KRABBENSCHMIDT

 2    Having previously been sworn, testified further as follows:

 3                   CROSS EXAMINATION (Cont.)

 4   BY MR. GOODNIGHT:

 5   Q   Mr. Krabbenschmidt, I want to hand you a paper copy of

 6   your report, which is Defendants' A-282.

 7            MR. GOODNIGHT:  If I may approach, Your Honor.

 8            THE COURT:  You may.

 9   Q   Adam, can you pull up, please, Exhibit 52?  And I'd like

10   to ask you to turn, if you would, to page 4.  I'd like to

11   direct your attention, Mr. Krabbenschmidt, to the bottom of

12   the page.  And this is the Novogradac report of 2012.  You

13   see the quoted paragraph there that refers to employees who

14   reside on the property, and names them?

15   A   Yes, I do.

16   Q   And do you see that it indicates that there is a rent

17   credit listed there?

18   A   Yes, I do.

19   Q   Okay.  Had you seen this particular paragraph before you

20   finalized your report?

21   A   Yes.

22   Q   Do you recall testifying on Thursday that you had not seen

23   this Novogradac report before you finalized your expert

24   report?

25   A   Oh, I'm sorry, was this the 2012 report?

1  Q   Yes, it is.

2  A   No, no, sorry.  I correct my testimony.  I do not remember

3  seeing this particular paragraph.

4  Q   Okay.

5  A   I thought it was part of the appraisal report that was

6  done later.

7  Q   So you were aware, through the appraisal report, that

8  there was a rent credit for employees living there?

9  A   Again, I'm going to have to refresh my memory if it's in

10  that report.  I just thought we were looking at this, and

11  then you had asked if I had seen this before.  And since I

12  had seen that report, I would have seen this.

13  Q   Okay.  Turn with me, if you would, to your report, page

14  16.  And I don't know if we can pull that page up on the

15  screen for you, but I wanted you to have a paper copy.  Are

16  you there?

17  A   Yes.

18  Q   Okay.  Now, you say in your report, toward the middle of

19  the page, "Based on these facts and my experience in the

20  LITHC industry, the lack of rental increases very likely cost

21  the partnership more than $750,000 in total revenue."  Do you

22  see that?

23  A   Yes, I do.

24  Q   And as I understand your opinion from the first paragraph

25  on that page, that is for a loss of rental income between the

1  years 2013 and '17.  Is that correct?

2  A   My actual computation is only for the year 2017.  And my

3  prior testimony last week was that I went back and I applied

4  this to '17 and '16.  Does that answer your question?

5  Q   Well, did I misunderstand?  I thought you had indicated

6  here and in your testimony that you originally had calculated

7  lost rental income from 2013 through '17 of $750,000.  And

8  then you said, I'm now only calculating it for '16 and '17 in

9  the amount of $706,000.  Is that correct?

10 A   Well, if I said that, I want to correct it.  So, if you

11 look at the report, it indicates that I looked at the years

12 2013 through '17.

13 Q   Right.

14 A   And during that period there is rents, vacancies that were

15 abnormally low.

16     Then in my original report, prior to this draft, I

17 actually computed it for -- over that five-year period, and

18 came up with a million five of rental income that had been

19 lost.

20     I then, when I looked at all the evidence, I determined

21 that it was -- I could easily compute it for '16 and '17, but

22 that prior to that, I think it would become too speculative

23 for me to go back and compute that.  So I limited my damages

24 to '16 and '17 as being the amount I computed here, times

25 two.

1      Before we go on to the next question, I want to correct

2  some prior testimony I had on Thursday.

3      Going through my notes over the weekend, I determined that

4  I had left out a critical item in the computation, and it's

5  called utility allowances.

6  Q    Yes.

7  A    And the utility allowances are where you take the maximum

8  rent allowed and you subtract it for the allowance you give

9  to the tenant.  So in this particular case, the utility

10  allowance is $57 for a one bedroom, one bath, and $73 for a

11  two bedroom, one bath.  When you reduce the amount I computed

12  by the allowed utility allowance, I would reduce that

13  $353,000 by $156,000, resulting in a net damages for '17 of

14  $197,000.

15      So, when you extend that number out for the two years,

16  '16 and '17, it results in damages of $394,000.

17      So I just wanted to make sure I got that into the record,

18  that I had originally thought I had included that, but when I

19  was reviewing my notes, I realized I had not.

20  Q    Okay.  I was going to ask you if you had calculated the

21  utility allowance.  And now we know that you did not.  Let me

22  go back to the reduction from $750,000 in your report to what

23  you testified to on Thursday, that the amount was then

24  $706,000.

25          What was the basis for that reduction from $750,000 to

1    $706,000?

2    A   Again, it was that -- I testified that my $353,000,

3    multiplied times two, is $706,000.  And I just never updated

4    that $750,000.

5    Q   So it was just a multiplication error?

6    A   No, it was just a drafting error that I never updated that

7    $750,000 for the correct amount.

8    Q   So we've gone from $750,000 to $706,000, to now $394,000

9    for 2016 and 2017; is that correct?

10   A   Correct.

11   Q   What is the exact rent number, per month, that you believe

12   should have been charged in 2016, the dollar amount?

13   A   It should have been $16,984.

14   Q   I'm sorry, I meant for -- let's take a one-bedroom

15   apartment in 2016.  What do you think should have been

16   charged per month?

17   A   Oh, I'm sorry, I thought you wanted it for all units.  So

18   you want it just for the one bedrooms?

19   Q   Yes, the monthly one-bedroom charge, 2016?

20   A   It is $900 minus a utility allowance of $57.  So it was

21   $843.

22   Q   So, are you getting that -- looking at page 16 -- by

23   taking the maximum LITHC amount in 2017 of 900 minus 52?

24   A   Minus 53 -- 56, sorry, minus 56.

25   Q   Oh, 57.

1   A   Sorry, 57.

2   Q   I thought your report said that 900 was the amount in

3   2017, not 2016.

4   A   Sorry.  I'm going to have to pay more attention to your

5   question.  So you are specifically asking for '16?

6   Q   I asked 2016 monthly amount, one bedroom.  What's your

7   opinion of what it should have been?

8   A   I went back and I looked at the prior years' rent, and I

9   looked at the differential between both the vacancy rate and

10  the difference between the average rents charged and the

11  maximum allowable, and I determined that it was the same

12  difference between '16 and '17.  So I was able to use the

13  2017 amount as a good estimate of what it should have been

14  for '16.

15  Q   Okay.  So it's the same in '16 and '17?

16  A   Again, I estimated '16, based on a reasonable calculation,

17  by using the '17 amounts.

18  Q   Okay.  And how about for a two bedroom in 2017, what's

19  your monthly amount that you believe it should have been,

20  2017, two bedroom?

21  A   It would have been the $1,080 minus the utility allowance

22  that I've -- which was $73.  Then if you go back to 2016, it

23  would have been lower.  And, again, it was, by using this --

24  this, as a proxy and estimate for 2016.

25  Q   So the numbers I looked at, at the middle of page 16 of

1   your report, are incorrect?

2   A    No.  They are correct, except for the utility allowance

3   that I just discussed.

4   Q    Okay.  My understanding, from reading your report and the

5   attachments, and everything you said, as carefully I know

6   how, is that your opinion, and I want you to correct me if

7   I'm wrong, if you know, is that from January of '16 to May of

8   '17, the general partners should have raised the rents for a

9   two bedroom -- let's just take that example -- from $880,

10  which it was to $1,223; is that correct, if you know?

11  A    Can you read the question one more time back to me?

12  Because I was trying to make sure I understood where you were

13  reading from in the report.

14  Q    I'm not reading from the report.  The report does not

15  indicate any of these numbers, other than what's in the

16  middle of the page, which has now been corrected.  I'm

17  putting together, the best I can, what I think all of the

18  data that you've said shows.  And my understanding, and I

19  want you to tell me if you accept this or if you don't, is

20  that your testimony for a two bedroom, is that from January

21  '16 through May of '17, instead of being $880, it should have

22  gone up to $1,223?

23  A    No, I don't think I said that.

24  Q    Let me see if I can get this clear.  Looking at the middle

25  of page 16, you have a column, "LITHC's max 2017."  Is your

1    opinion based on the premise that the general partner should

2    have been charging the maximum LITHC amounts during 2016 and

3    '17?

4    A   Yes.

5    Q   Okay.  And I assume the reason that you offer that opinion

6    is because you believe that the general partner had a duty to

7    maximize the profits of the limited partner investor during

8    the compliance period; is that correct?

9    A   I believe that the general partner had a duty to manage

10   the property in a manner that does maximize the value of the

11   property, the cash flow of the property, in accordance with

12   industry standards, to the benefit of all the partners,

13   including themselves.

14   Q   Okay.  And do you know of anything in the partnership

15   agreement that provides that the general partner has a duty

16   to charge the maximum allowable rents under LITHC?  Not the

17   range, but the absolute maximum.

18   A   No, they have -- the language is not -- I don't know of

19   anything that says they have to charge the maximum allowable

20   rents.  They need to operate the property prudently in

21   accordance with industry standards --

22   Q   Okay.

23   A   -- is my understanding of the language.

24   Q   Did you consider the actual language of the partnership

25   agreement as it relates to this very question of rents?  Do

1    you know if there's a provision that relates precisely to

2    this question?

3    A   There is limitations on the rents.  So there is not a

4    minimum rent that I know of that's identified, but there's

5    limitations on the maximum rents.

6    Q   Let me ask you to look with us on the screen of the

7    partnership agreement, Section 7.4B, if you would.  And we'll

8    pull it up and highlight it.  It's on page 43 of the Parkway

9    LPA.

10   A   You said paragraph B?

11   Q   Yes.  We're going to highlight it for you there.  You see

12   the reference to the requirements of Section 42 of the code?

13   A   Yes.

14   Q   You see the reference to managing general partner shall

15   use reasonable efforts consistent with sound management

16   practice?  Do you see that?

17   A   Yes, I do.

18   Q   Do you see anything in this standard that says that the

19   LPA requires the maximum LITHC rates for monthly rents?

20   A   No.  You would never include that in a partnership

21   agreement, because it's often -- some times where the rents

22   that you can actually achieve in the market are lower than

23   the maximum rent.  So you would never write that in or

24   incorporate that into a partnership agreement for a LITHC

25   project.

1  Q   Do you see the reference to -- you see the part that's

2  highlighted in yellow following that clause, "The project to

3  maximize income produced by the project, including, if

4  necessary, seeking any necessary approvals of and

5  implementing appropriate adjustments in the rent schedule of

6  the property."  Do you see that?

7  A   Yes, I do.

8  Q   All right.  Are you interpreting that to say that that

9  requires that the rents be set at the maximum LITHC level?

10  A   No.  But it clearly says they need to make reasonable

11  efforts to maximize the income.

12  Q   Okay.  Where does the standard come from that your opinion

13  is based on that the maximum LITHC rents must be charged each

14  month?

15  A   No, the standard is you need to manage properties, whether

16  it's this property management company for this LITHC project,

17  or a market rate, it does not matter.  The standard in the

18  industry is that you raise rents to the maximum level that

19  the market will allow.  And so to the extent that in this

20  case the market is LITHC tenants, and the maximum would be

21  the LITHC limited amounts, you then look at the range below

22  that to see if you are capable of raising those rents.

23      If you look at the CBRE appraisal report dated -- my

24  memory was it was dated May of -- no, January of 2017, it

25  specifically states in there that five of the one bedroom,

1    one baths were achieving the maximum LITHC rents.  And then

2    it goes on to say that four of the two bedroom, one baths

3    were achieving the maximum market rents, LITHC rents.

4        Based on that, I determined that the rents -- the market

5    and the rents that could be charged could be at those LITHC

6    levels.  And based on the fact that also in the same report

7    it clearly says that because they are charging under the

8    maximum rent, there's a lot of increased rental income

9    potential, that based on those things, and the other -- the

10   comparable units in the Novogradac report, I determined that

11   the maximum rents were not being achieved and they could have

12   been achieved.

13   Q   Okay.  Thank you.

14       I'm going to switch gears and look at Exhibit 23, and

15   ask Adam to pull up page 3 on that page.

16       Let me orient you to this.  Do you know who Paramount

17   is and what Paramount's role was?

18   A   I'm sorry, just a second.  I was just trying to make sure

19   this wasn't Paramount, which is a syndicator, this appears to

20   be a different group.

21   Q   This is Paramount Financial Group, Inc., and the report is

22   2006.  Have you seen this report before?

23   A   No, I have not.

24   Q   You didn't consider this report before you finalized your

25   opinions?

1   A    No.  This report is shortly after the original

2   rehabilitation of the project, within four years after that

3   point in time.

4        And that I considered the condition report that was

5   commissioned by the general partner as part of the refinance

6   that's dated May 15, 2014 to be more relevant and better

7   evidence of the condition of the property.

8   Q    How could you determine that that other report was more

9   relevant if you hadn't seen this one?

10  A    Just the date of this report would make it no longer

11  appropriate to determine what the condition of the property

12  was in 2014, '15 and '16, because either additional

13  deterioration of the property could have occurred or

14  improvements to the property could have occurred that would

15  have modified this.

16  Q    Let me ask you to look at the bottom of page 3 under

17  general notes.  And we'll highlight just one of those notes,

18  the very bottom one.  It reads, "All windows are original and

19  have aluminum frames.  During the winter months, they

20  experience condensation.  In retrospect, the general partner

21  advised that they should have included this item within the

22  rehab project scope."

23       Do you see that?

24  A    Yes, I do.

25  Q    Now, this was all the way back in 2006.  And these are the

1  same windows that you have testified did not need to be

2  replaced; is that correct?

3  A   Again, I'm relying on the physical conditions report from

4  2014 where it specifically has a line item for replacement of

5  the windows.  It identified that the windows were to be

6  replaced in year '17, after the date of that report.  That

7  would put that date somewhere out around 2032.  And it also

8  identified that the windows still had a remaining useful life

9  of 16 years.

10      So, if you look at that report, this statement appears to

11  be the general partner's view of the condition.  But I'm

12  basing mine on what independent engineers determined in 2014.

13  Q   Let me ask you to turn to Exhibit 50, which we'll pull up.

14      This is a report evaluation of 2012.  Did you review

15  and consider this report before you finalized your report?

16  A   No.  Again, I thought the 2014 report was the most current

17  report that I knew of.

18  Q   Let me ask you to turn to page 43, top of page 43, there's

19  a quote, which I'll read, and you can see on the screen, "Of

20  concern, however, is the subject's an articulated facade

21  system consisting of wood frame balconies, which will warrant

22  a high level of preventive maintenance to ensure

23  watertightness."  Do you see that?

24  A   I see that, but it doesn't make any sense to me, because

25  the balconies are exterior exposed wood framing that is not

1   sealed for water protection, because it does not -- it is not

2   above a dwelling unit.

3       So when it talks about the balconies needing

4   watertightness, the only spot it could be referring to is the

5   part where it connects to the building, but the rest of the

6   framing would not be somehow waterproofed.

7   Q   Mr. Krabbenschmidt, had you seen that sentence before

8   today?

9   A   No.

10  Q   Look down a few sentences, you'll see, "Asphalt paving

11  throughout the complex is in generally poor condition."  Do

12  you see that?

13  A   Yes.

14  Q   Below that, you'll see a bullet, five bullets down, "A

15  number of sidewalks are cracked and require repair."  Do you

16  see that?

17  A   Yes.

18  Q   And if you turn to the page ending in Bates 062, and we'll

19  pull it up on the screen, at the very bottom of that page

20  there's a paragraph that talks about the siding.  "Overall,

21  we observed the siding to be in fair condition.  Depending on

22  the face-grade, T1-11 siding generally lasts about 25 years

23  (if it is well painted or stained at least every five years)

24  before delamination commences.  The subject's siding is about

25  36 years old."  Do you see that?

1   A    Yes.

2   Q    A minute ago you referenced the useful life of the

3   property the condition of the property.  Were you aware of

4   this sentence before you finalized your report?

5   A    This -- you know, again, when it says, "T1-11 siding is

6   expected to last 25 years," I'm going back to the physical

7   condition report that specifically addresses the siding.  And

8   it identified in that, that there is another 15 years of

9   useful life left in the siding and that it was generally in

10  good condition, but it needed to be painted.  That was the

11  identified condition.

12  Q    Do you know who prepared this report and who it was

13  prepared for?

14  A    This one that you're quoting from here?

15  Q    Yes.

16  A    No, I do not.

17  Q    Let me ask you to turn to Exhibit 60.

18  A    By the way, the prior question where you addressed the

19  concrete was cracked and needed repair, the physical needs

20  report which was commissioned in 2014, specifically

21  identified that item, and indicated that there was some

22  portion of the concrete that needed immediate repair, but

23  because of the cracks, but it was a very minor amount.  And

24  then the rest of the concrete work that it identified was to

25  be done in later years.  So those items that are identified

1    in that report were specifically addressed in the 2014

2    physical needs report.

3    Q   Okay.  Thank you.

4        Let me ask you to turn to 60.  And this is an e-mail

5    from Gary Newbold to Catherine Tamaro dated in 2013.  And she

6    is responding to various inquiries that he makes.  And

7    they're numbered 1 through 5.  Do you see that?

8    A   Yes, I do.  Thank you.

9    Q   And the first one has to do with Trieste Holdings, LLC, a

10   Washington State general contractor, employs four carpenters,

11   et cetera.  Do you see that?

12   A   Yes.

13   Q   The second one has to do with repairs.  The repairs are

14   being accounted for under replacement/major expenses, which

15   reflects the cost of the roof.  Do you see that?

16   A   Yes.

17   Q   The third one has to do with occupancy rates and rents for

18   the properties.  Do you see that?

19   A   Yes.

20   Q   And she says that, "We have discussed the rents, and right

21   now feel it's better to leave well enough alone."  Do you see

22   that?

23   A   Again, this was for 2013.  And then my testimony regarding

24   lost rents was in 2016 and '17.

25   Q   And the next item, No. 4, she references a section of the

1    partnership agreement.  Do you see that 8.16(c)?

2    A    Yes.

3    Q    Had you seen this e-mail before today?

4    A    No.  Again, I don't consider this e-mail relevant for -- a

5    2013 e-mail, relevant for the items that I testified to.

6    Q    Do you know who Mr. Newbold was?

7    A    No, I do not.

8    Q    You made no effort to speak with him, I gather?

9    A    I did not.

10   Q    You made no effort to ask him any questions about his

11   communications over the years on repairs and rents with

12   Ms. Tamaro, correct?

13   A    I did not.

14   Q    Let me ask you to turn to Exhibit 91, if you would.

15        This is an e-mail between Mr. Newbold and others,

16   including Mr. Blake in 2014, in August.  I gather you've not

17   seen this before today as well; is that correct?

18   A    Correct.

19   Q    If you look at the first paragraph, Mr. Newbold writes,

20   "The GP is currently replacing all remaining aluminum-framed

21   windows and sliding glass doors.  The total is 210 windows

22   and 150 sliders.  Estimated cost of purchasing all the

23   windows and doors is $183,000 including tax," et cetera.  Do

24   you see that?

25   A    Yes, I do.

1  Q   And if you look at the bottom paragraph of that top

2  e-mail, Mr. Newbold reports, "This was part of the budget and

3  HUD agreed that the GP could draw on the replacement reserve

4  for the windows and doors.  Parkway is paying for labor out

5  of operating income, although the GP anticipates they have to

6  lend money to the partnership to cover some of the bills."

7  Do you see that?

8  A   Yes.

9  Q   Before you finalized your opinions on unnecessary,

10 unauthorized repairs and improvements to the property, you

11 had never seen this e-mail from Mr. Newbold, correct?

12 A   Again, I don't know if I characterized the excessive

13 replacements as unauthorized.  I thought I used that term in

14 reference to the fees that were charged, and that my

15 testimony regarding the replacements were that those amounts

16 were greatly in excess of what should have been the

17 trend-line replacement costs.  And I calculated that amount.

18 And I'm not sure, you know, that Gary Newbold has the

19 authority to change the overall provisions of the partnership

20 agreement or if Gary Newbold had identified or had been given

21 enough information to understand whether this was required or

22 not.  I've not determined that.  And that's not part of my

23 testimony.

24 Q   Do you know -- switching gears -- whether the partnership

25 agreement itself contains a provision that makes the partners

1   liable for violating HUD loan provisions?

2   A   I don't remember, specifically.  The partnership

3   agreements are very broad, so it might have some sort of

4   reference to that.

5   Q   Do you know what the HUD loan covenants actually consist

6   of?  Have you looked at those, for Parkway?

7   A   I don't recall, as I'm sitting here today.

8   Q   Okay.  Let me pull up, first, the partnership agreement,

9   Section 13.11D, which is at page 70, and ask you to look at

10  that.

11          THE COURT:  For the record, that's Exhibit 3?

12          MR. GOODNIGHT:  Correct, Your Honor.

13          THE COURT:  The partnership agreement.

14  Q   I want to highlight the beginning of D.  "Liability of

15  partners under regulatory agreement."  Do you see that

16  section?

17  A   Yes.

18  Q   "Each of the partners and any assignee of a partner shall

19  be liable to HUD under the regulatory agreement in its

20  individual capacity with respect to the following matters."

21          Then if you look below that, we'll see the items there.

22  "For funds or property of the project coming into its

23  possession" -- item number one -- "which by the provisions of

24  the regulatory agreement the person or entity is not entitled

25  to retain.  Item number two, "For its own acts and deeds, or

1  the acts and deeds of others, which the person or entity has

2  authorized in violation of the provisions of the regulatory

3  agreement," et cetera.  Do you see that?

4  A    Yes.

5  Q    Had you read that provision before today?

6  A    This looks like a standard what's called a "bad boys"

7  carve-out provision that we'd normally have in any loan

8  agreement.

9  Q    Mr. Krabbenschmidt, my question wasn't whether it was

10  standard or non-standard.  My question was very simple.  Had

11  you read that before today?

12  A    You know, it's a very long document.  I might have read

13  it, I just don't recall those specific words.  But, again,

14  this is very standard language in loan agreements and has

15  been incorporated by similar language into the partnership

16  agreement.

17  Q    Let me pull up the actual HUD regulatory agreement,

18  Exhibit 9.  And we'll go to the Bates page ending in 28859.

19  You'll see a paragraph 11 -- which we'll pull up, and we'll

20  highlight the first part of that -- this is a covenant that

21  the partners are bound by, "To keep said property in good

22  condition and repair, not to remove or demolish any buildings

23  thereon, to complete or restore promptly and in good

24  workmanlike manner any building which may be constructed,

25  damaged, or destroyed thereon," et cetera.  Do you see that?

1    A    I do.

2    Q    The standard under this HUD agreement is good condition

3    and repair, correct?

4    A    Yes.

5    Q    It's not mere habitability, correct?

6    A    Correct.  And if you look at the 2014 physical conditions

7    report, it was specifically prepared in accordance with HUD

8    standards.

9         So all of the information that was done by MB Consulting

10   for the purposes of that report specifically considered what

11   the HUD standards were and what the cost of maintaining those

12   standards were.  So that's why I'm relying on that specific

13   report.

14   Q    Mr. Krabbenschmidt, earlier in this trial I understood you

15   to say that no improvements to the property should be made

16   during the 15-year compliance period, and that it should

17   simply be maintained according to habitability standards.

18        Do you see anything in the regulatory agreement that

19   says that?

20   A    I think that misstates my prior testimony.  I specifically

21   said that habitability was the minimum standard that must be

22   met, and that the language that is here, which is keeping the

23   property in good condition and repair, in its condition, is

24   in line with what my opinion is.

25   Q    And part of what you told me earlier is that for the first

1  15 years of that compliance period, in your opinion the

2  general partner had a duty to try to maximize the profits or

3  the cash flow of the limited partner, AMTAX, correct?

4  A   Yes.

5  Q   Is this a 15-year partnership agreement or does it have a

6  longer term?

7  A   Actually, it's a longer term.  But it has multiple

8  provisions that indicate that after year 14, that the limited

9  partner has the ability to request a sale of the property.

10 And in accordance with industry standard, the usual timeframe

11 for LITHC projects is around year 15, that the limited

12 partner and general partner will either sell the property or

13 sever their relationship somehow, regarding their joint

14 investment in the property.

15 Q   I assume that you're aware that this is actually a 50-year

16 partnership?

17 A   Yes, like I said, that's --

18 Q   Are you aware of that?

19 A   That's standard language in partnership agreements.

20 Q   So you would agree with me, based on the HUD regulatory

21 agreement, that the general partner's duty is actually to

22 maintain the property in good condition and repair for

23 50 years?

24 A   In accordance with industry standards, HUD guidelines and

25 condition reports prepared by experts, yes.

1    Q    Can you look at page 5 of your report, please?

2    A    (Witness complies.)

3    Q    You had an opinion on bookkeeping fees, that the

4    partnership had been damaged by $27,133 in bookkeeping fees.

5    And at the time you issued that opinion and signed it, you

6    were unaware that the partnership had actually paid a third

7    party for those fees, correct?

8    A    Correct.

9    Q    So you've withdrawn that opinion, correct?

10   A    Yes.

11   Q    And page 11 of your report, if you can turn there, you

12   take issue with the general partner's understanding that

13   Parkway was first placed in service in 2003.  Do you recall

14   saying that?

15   A    Yes.

16   Q    It's right in the middle of page 11 of your report; isn't

17   it?

18   A    Correct.

19   Q    You said, "I have reviewed the IRS Form 8609s prepared by

20   the partnership, signed by Ms. Tamaro, included as part of

21   the partnership's tax filing requirement in order to obtain

22   tax credits."  This form states that the first

23   placed-in-service date was June 2002?

24   A    That's correct.

25   Q    Okay.  Did you check the state website for the

1   placed-in-service date?

2   A   I don't believe that that is a better source of

3   information than the form 8609, which is a form that's filed

4   with the federal government and signed by and attested to by

5   the general partner.

6   Q   My question is not whether you believe it's better or

7   worse, just whether you even checked the website.

8   A   No.

9   Q   Let me pull it up on the screen.  And I'll turn to the

10  entry for Parkway Apartments.  It's on page 16 near the

11  middle of the page.  You'll see the OID column 00-104A,

12  Parkway Apartments.  Federal Way.  County, King.  Do you see

13  that?

14  A   Yes.

15  Q   You see the column, "First building placed in service

16  date."  Do you see that column?

17  A   Yes.

18  Q   What's the date listed on the website?

19  A   It appears to say June 30, 2003.

20  Q   Let me ask you to turn -- or we'll pull up for you

21  Exhibit 90.

22          This is a funding request of August 28, 2014, submitted

23  to Morgan Stanley.  Did you consider this document and

24  funding request and its contents before you authored your

25  opinion?

1    A    Sorry, just give me a minute to look at it.

2    Q    I'll represent to you that I don't believe it's included

3    in your documents.

4    A    No, I don't believe I've seen this document before.

5    Q    But you were shown this document, I assume, before today;

6    weren't you?

7    A    Again, I have no memory of this document.

8    Q    You are aware that the property was refinanced and the

9    refinance date is February 2015.  Are you aware of that?

10   A    Yes.  For some reason I thought it was in '14.  But if

11   you're representing to me that -- I mean, it's referencing a

12   date here of 12/20/2014.  So are you saying that's not the

13   date that it was refinanced?

14   Q    This is a funding request.  The refinance closed in

15   February of 2015, I'll represent to you.

16        But let me ask you to turn to page 2, if you would.

17   Under the section, "Nature of consent analysis and

18   recommendation," there's a paragraph that begins with,

19   "Historically, this property..."  Do you see that paragraph?

20   A    No.  If you could -- oh, thank you.

21   Q    Do you see the reference in this document to a light rehab

22   in 2002 totaling $1,473,411?

23   A    Yes.

24   Q    And do you see the last sentence, two sentences, beginning

25   with, "However, the single pane windows were not part of the

1    scope.  And the AM noted instances of condensation leading to

2    mold around the window seals during the most recent site

3    inspection."  Do you see that?

4    A    Yes.

5    Q    Do you see the sentence saying, "Additionally, the

6    property appears to be suffering from water intrusion and

7    rot, due to damp environment in some areas"?

8    A    Yes.  And this is contrary to this engineering report that

9    I continue to refer to, which is MB Consulting.  It

10   specifically identifies in that report there is no water

11   intrusion into the buildings.  It identifies no rot.  And in

12   my personal inspection of the building, it shows that the new

13   windows also have mold on the base of the windows.  And that

14   mold, even with the new vinyl dual-glazed windows, there's

15   mold on there.  That indicates there's a maintenance issue

16   not a window issue.

17   Q    Mr. Krabbenschmidt, did you just say that what's reported

18   in this document is contrary to the other document that you

19   are relying on?

20   A    It does appear to be contrary, yes.

21   Q    So your testimony is that your opinions are based on that

22   other document and that you didn't take this document into

23   consideration?

24   A    Again, the other document is an engineering report

25   prepared by engineers that are qualified to provide a

 1   condition opinion.  I don't know who -- whether the person

 2   that prepared this report has those -- that set of

 3   qualifications.

 4   Q   If you look with me at page 7 of 10, there's a paragraph

 5   that begins with, "The first quarter of 2014."  Do you see

 6   that?

 7   A   Yes.

 8   Q   "The first quarter of 2014 was positive, but the property

 9   has a history of underperforming with both 2012 and 2013

10   showing deficit operations of $135,000.  The GP has been

11   supporting the deficit by deferring payroll from the

12   affiliated management company."  Do you see that?

13   A   Yes.

14   Q   There's a reference right in this funding request to

15   Trieste Holdings above; do you see that?

16   A   There's a funding request, sorry.

17   Q   Do you see the reference to, "Trieste Holdings, LLC is an

18   affiliate of the administrative general partner"?

19   A   Yes, I see that.

20   Q   Okay.

21   A   I didn't understand the prior statement of funding

22   request, so --

23   Q   Turn to the page 9 of 10, debt abstract and other

24   payables.

25           There's a lot of information on this page about

1   outstanding capital contributions.  Do you see those two

2   boxes?

3   A   No, can you --

4   Q   It's No. 7.  We'll highlight.  Do you see that?

5   A   Yes.

6   Q   Do you know what Installment 1, original amount

7   $2.370 million represents?  Due date 2002.  Date paid 2002.

8   A   I think you misstated the amount, you said 273, it's

9   $2,370,000.  So, now, with that corrected, what's your

10  question, I'm sorry?

11  Q   Do you know what that even represents?

12  A   That appears to be the initial capital installment by the

13  limited partner to the partnership.

14  Q   Do you see the replacement reserve balance of $262,062.25?

15  A   It's not on the highlighted section you're pointing me to.

16  Q   We'll pull it up on the next box.  I apologize.

17  A   Yes, it appears to be in the section down below $262,000.

18  Q   And do you see when this funding request was presented to

19  the investor, they were notified of the advances of the GP at

20  this time in the amount of $1,097,480?  Do you see that?

21  A   Yes.

22  Q   You weren't aware of any of these entries in this funding

23  request before you signed your report, were you?

24  A   Again, the GP advances are normal in a LITHC project,

25  where the capital contributions by the limited partner are --

 1  don't come in until a later point in time when all the

 2  conditions have been met for funding.

 3      But in this particular case, you know, it's dated as of

 4  2014, and it's indicating that the items that I've testified

 5  to, which are the excessive fees, the excessive management

 6  fees, the excessive maintenance review fees, are all those

 7  things that are contributing to the GP advances here that

 8  appear that are outstanding at that point in time.

 9  Q   Mr. Krabbenschmidt, you do -- your firm, Novogradac, does

10  quite a bit of work for Alden Torch on an ongoing basis,

11  correct?

12  A   I believe that there's other partners in the firm that do

13  work for Alden Torch.

14  Q   In fact, your firm is paid in the range of three quarters

15  of a million dollars a year doing work for Alden Torch,

16  correct?

17  A   I don't know the exact amount, but it could be in that

18  range, yes.

19  Q   Do you remember testifying in your deposition that it was

20  in the range of $500,000 to $750,000 a year?

21  A   Yes, I do.  Right.

22          MR. GOODNIGHT:  Nothing further, Your Honor.  Thank

23  you.

24          THE COURT:  Redirect?

25          MR. BESSENGER:  Could I have a moment, Your Honor?

1          THE COURT:  Sure.

2                    REDIRECT EXAMINATION

3    BY MR. BESSENGER:

4    Q   Good morning, Mr. Krabbenschmidt.

5    A   Good morning.

6    Q   I'll just grab one thing.

7          Mr. Krabbenschmidt, in your prior day of testimony,

8    plaintiffs' counsel addressed the Sunnyslope case, which we

9    also discussed at your deposition to some degree.  And I just

10   wanted to touch on that briefly.

11         Do you recall if the Court in that case found that you

12   were qualified as an expert to provide your testimony?

13   A   Yes, it did.

14   Q   I'm reading from page 1 of that order.  It says, "The

15   Court finds and concludes that both experts were highly

16   qualified to provide their expert opinions on the value of

17   the LITHCs.  Indeed, both parties agreed that these are among

18   the most highly skilled and respected experts in the field."

19         And do you recall if the court in that opinion was

20   critical of both your opinion as well as the other expert's

21   opinion?

22   A   Yes.  The other expert was Beth Mullen of CohnResnick.

23   And the court specifically addressed that both reports were

24   deficient in the approach.  And I'm going to say that part of

25   the reason I believe both of our reports were deficient was

1  this was a highly unusual case.  It involved a tax-credit

2  project that had only five or six years left to run on its

3  tax credits, and the assignment was to determine what the

4  market value of those credits were.  And because there is not

5  a ready market, and because this is an unusual transaction

6  that doesn't happen all the time, it's understandable that

7  both the experts for both sides might have been found to not

8  include all the factors that were necessary to determine the

9  value.

10      In my specific report, the Court determined that I had not

11  adequately considered the risks of litigation, how it might

12  affect the value of those tax credits.  And as I sit here

13  today, I'm not going to disagree with the court's findings.

14  I think they're findings that both of us, but particularly

15  with regard to me on the risks of litigation affecting the

16  value, I respect the Court's opinion on that.

17  Q   And did the Court have any other criticisms of your

18  opinion?

19  A   So the second part of the opinion, that I'm going to also

20  say was my fault, which was the Court specifically said that

21  I double counted the depreciation along with the credits.

22  And I believe that that was a failure on my part to fully

23  explain what my opinion was.

24      It's not that the tax-credit investor gets depreciation,

25  which was already included in the value of the real property

1   in that case, it was that the tax credit investor gets to

2   write off its investment.  So if they purchase the credits

3   for $2 million, they get to write that investment off over

4   the period that they own the credits.  And that creates a tax

5   benefit.

6       It's just that simple.  So, 2 million, because it's in

7   your capital account, your 2 million has to go to zero at the

8   end of your investment period.  And if the corporation is the

9   investor, they have a 35 percent federal tax rate.  You'd

10  multiply 2 million times 35 percent.  That would be a

11  $700,000 tax benefit.

12      So in this particular case, the Court found that the

13  credits were worth $1.3 million, without any further tax

14  benefits.  And it was my opinion that it should have been

15  valued even higher, in that example, by another $700,000.

16      That would have taken the value of those credits up to

17  $2 million.  And then I think that would have been the

18  correct result.  But, again, I attribute that to my failure

19  to properly explain that to the Court.

20          MR. BESSENGER:  Thank you, Your Honor.

21          THE COURT:  All right.  Any redirect or recross?

22          MR. GOODNIGHT:  No, Your Honor.

23          THE COURT:  You're excused, sir.  Thank you very

24  much.  All right.  What are we doing now?

25          MR. PETTIT:  So, Your Honor, we have three witnesses

1  who we jointly agreed with opposing counsel that would not be

2  called live.  We've designated deposition testimony from them

3  and counter-designated testimony.  Those three witnesses are

4  Brett Carp, who is the principal at EPI; Todd Henderson, who

5  is the appraiser at CBRE; and Cory Hutsell, who is the

6  appraiser at Colliers who performed the third appraisal.

7      Those three -- those have been cut, and the depos are

8  ready to play live.  If you say "go," we can press play right

9  now.  They total is one hour, 52 minutes.  So given that we

10  have -- we may have that time, or some approximation of that

11  time, we could play those in open court.

12  If Your Honor would prefer to just have those admitted

13  into the record and then you can consider them in chambers at

14  your convenience, we'd be amenable to that as well.

15      THE COURT:  We'll do the latter.  We don't need to go

16  to that expense of time in court.

17      MR. PETTIT:  Sure.  I understand.

18      THE COURT:  We're just waiting for the witness, then,

19  the live witness?

20      MR. GOODNIGHT:  We have one additional matter.  Are

21  you closing your case at this point?

22      THE COURT:  With those three witnesses?

23      MR. PETTIT:  With the inclusion of those three

24  witnesses, then, yes, we are closing our case.

25      MR. GOODNIGHT:  We have very brief rebuttal testimony

 1    on two points, from Ms. Tamaro.

 2          MR. PETTIT:  This was something that we discussed

 3    over the weekend.  Mr. Goodnight suggested to us yesterday

 4    that he intended to call Ms. Tamaro to the stand for rebuttal

 5    testimony.  We had previously discussed that the parties

 6    would only have their witnesses sit once, for efficiency

 7    purposes, that this was a bench trial, and we'd have --

 8    everyone would have full opportunity to question them then.

 9       I have concern -- I asked Mr. Goodnight to identify what

10    topics, and he didn't have an opportunity to.  I asked him

11    about that so I could consider that request.  And he didn't

12    identify those for me.  I said, since you can't identify them

13    for me, I'm not in a position to agree.

14       I think that the Court has heard quite a bit of testimony

15    from all of the parties involved.  And I would -- I have some

16    concern about the procedural fairness of this, because when

17    this was first raised to me, Mr. Blake had already made

18    arrangements not to be here today.  And so I don't know what

19    she's going to say.  I haven't been told what she's going to

20    testify about.  But I do have some concerns about procedural

21    fairness, when there was a previous agreement we'd call

22    everyone once.  And now we're going away from that.

23          THE COURT:  This is an exception to the rule that you

24    agreed to together.  Very brief, you can put Ms. Tamaro on.

25    We'll see what becomes of that.  And we'll go from there.

1             MR. GOODNIGHT:  Thank you, Your Honor.

2             THE COURT:  Ms. Tamaro, you're still under oath.

3             THE WITNESS:  Yes.

4                         CATHERINE TAMARO

5     Having previously been sworn, testified further as follows:

6                         DIRECT EXAMINATION

7     BY MR. GOODNIGHT:

8     Q   Ms. Tamaro, I just have two lines of questions.  And this

9     will be brief, I think.

10            To set the context for the first line of questions, I

11    want to pull up some testimony from trial on June 6th at, I

12    think, page 26.  And we'll look at it together, and then I

13    have some questions.

14            So, can you highlight the question beginning at line

15    22, "So one of AMTAX's claims in this case," and then the

16    answer that follows?

17            So, Mr. Blake was asked, "So one of AMTAX's claims in

18    this case is that the general partner did too many repairs on

19    Parkway, right?"  And he says, "Yes.  After the refinance.  I

20    think the behavior pre and post refinance was dramatically

21    different."  Do you see that?

22    A   Yes.

23    Q   Then he goes on to say, "We have these small little fees

24    that are being incurred every year.  We questioned those.  I

25    would say they are immaterial, but relative to what happened

1    after the refinance where the GP is advancing hundreds of

2    thousands, if not millions of dollars to complete repairs.

3    That should need to be -- shouldn't have been necessary until

4    2025 or 2035, based on the physical needs report."  Do you

5    see that?

6    A    Yes.

7    Q    Then there's another below that.  Then I have some

8    questions for you.

9         The next question "So the work should have been done

10   after the limited partner exited the partnership?"  And the

11   answer is, "Based on -- I mean, work is going to be done

12   throughout the life of this property.  The GP accelerated

13   millions of dollars of work that was supposed to be done or

14   anticipated to be done between 2025 and 2035.  Did that, in

15   the two to three years leading up to the end of compliance,

16   and funded those with massive advances.  Those advances go on

17   the balance sheet.  When the GP exercises its option, the

18   limited partner's proceeds are reduced dollar for dollar for

19   that amount.  It is a very similar scheme to what was done on

20   Hidden Hills.  It is just GP advances in place of suppressing

21   the value through -- yeah, inflated and unnecessary

22   environmental remediation costs."

23        Do you see that?

24   A    Yes.

25   Q    Okay.  Now, when did the refinance of the property close?

 1  A    It was February 24th of 2015.

 2  Q    And did you go back and look at the advances to the

 3  Parkway Partnership from 2014 through 2018, based on the

 4  financial statements?

 5  A    Have I done that?

 6  Q    Yes.

 7  A    Yes.

 8  Q    Let me hand you a chart that we prepared, based on the

 9  financial statements in this case.  And you'll see that it

10  references exhibit numbers.

11       Did you pull, at my request, the information from the

12  financial statements that is listed on this chart, GP

13  advances to Parkway, deposits into replacement reserves and

14  HUD-approved disbursements?

15  A    Yes.

16  Q    Do you believe these to be accurate from the financial

17  statements?

18  A    Yes.

19       MR. GOODNIGHT:  Your Honor, I would move admission of

20  what I think is 178?

21       THE CLERK:  Yes.

22       MR. PETTIT:  Your Honor, I object.  This was a

23  document that was obviously prepared over the weekend.  This

24  was not provided to us.  There was no discussion.

25       THE COURT:  Mr. Pettit, we can defer this to closing

1   argument.  It's not going to make -- it's not going to have

2   any impact on my decision.  I've got my sense of what this

3   case is and is not.  So I want to allay any fears for both of

4   you that this case -- you're very sophisticated people.  The

5   agreements are well written.  The Business Judgment Rule

6   overrides many provisions on a day-to-day basis, on a

7   periodic basis.  You can make your record, but I think this

8   dog will not hunt on the fees.

9          MR. GOODNIGHT:  All right.  I appreciate that.  Thank

10  you, Your Honor.

11         THE COURT:  Okay.

12  Q   Let's be very brief, Ms. Tamaro.  Just on the GP advances,

13  can you explain what the numbers in that column across

14  represent, 2015, '16, '17 and '18?

15  A   Those were advances into the partnership that the general

16  partner made.  We took everything in the refinance, we took

17  everything that was owed to me, and wrapped it into that one

18  note payable to general partner, that's -- HUD did the

19  accounting that way.

20  Q   Okay.

21  A   There were some subsequent advances, and the largest one

22  was in 2017, where, as I said, we purchased the rest of the

23  siding that we would need, because the manufacturer was going

24  to discontinue the color.  And we didn't want a property with

25  a whole variety of different color buildings.

1    Q    Okay.  So to put it in context, just briefly, in 2014,

2    before the refinance, the advances totaled $284,955.  And the

3    total number of, dollar number of advances in the following

4    four years was $400,403?

5    A    Yes.

6    Q    What does deposits into replacement reserves represent?

7    A    That's a combination of money that Parkway puts aside

8    every month, with its mortgage.  Then in 2015, there was also

9    loan proceeds that were put into that reserve.

10   Q    All right.

11   A    In 2015.  Did I say 2015?  Yes, as part of the refinance,

12   we made an additional deposit.

13   Q    In light of the Court's guidance, I'm going to skip

14   virtually all of the rest of this examination, other than one

15   question about rents.

16   A    Okay.

17   Q    And that is, you heard Mr. Krabbenschmidt testify that

18   rents should have been at the maximum LITHC levels in '16 and

19   '17.  Why didn't you set them at the maximum LITHC levels?

20   A    As I said, I have to take account of who is living there.

21   I have to take account of what's going on in the

22   neighborhood.  And we have a regulatory agreement.  I'm

23   trying to maintain the property tax exemption, because it is

24   valuable for the property.  And as I said, it's a look around

25   the neighborhood, and what's going on, and what our tenant

1    base is looking like.  And I take all of those factors into

2    account.

3    Q    Okay.  Thank you very much.

4         MR. GOODNIGHT:  Nothing further, Your Honor.

5         THE COURT:  Any recross -- or cross?

6         MR. PETTIT:  Your Honor, just one question.

7                      CROSS EXAMINATION

8    BY MR. PETTIT:

9    Q    Ms. Tamaro, on the chart that you were just looking at,

10   the operating GP advances on here, that doesn't include

11   amounts that were accrued or deferred; is that right?

12   A    Can you be more specific?

13   Q    Does the operating advance amount here include amounts

14   that were accrued or deferred, or are those called out

15   separately in the financial statement?

16   A    It does not include things like deferred payroll.  Those

17   would be separate.  These were advances, as categorized by

18   the auditor.

19   Q    And accrual of affiliate fees are also separate; is that

20   right?

21   A    By and large, yes, they are.

22        MR. PETTIT:  Thank you, Your Honor.

23        THE COURT:  Thank you.  Ms. Tamaro, you're excused.

24   All right.

25        Now, are we just waiting for the last witness, then at

1    1:30?

2             MR. GOODNIGHT:  Yes.

3             THE COURT:  All right.  Court will be at recess.

4                        (Recess.)

 1                                 AFTERNOON SESSION

 2                                 JUNE 10, 2019

 3          THE COURT:  Good afternoon.  Ms. Latsinova.

 4          MS. LATSINOVA:  Yes, Your Honor, we call

 5   Lorraine Barrick.

 6          THE COURT:  Ms. Barrick, if you would come forward to

 7   the lectern, stand next to Ms. Latsinova and raise your right

 8   hand and be sworn.

 9                         LORRAINE BARRICK,

10          having been sworn under oath, testified as follows:

11          THE COURT:  Please be seated at the witness stand

12   immediately to my left.  Keep the volume of your voice up so

13   people in the courtroom can hear you and speak slowly enough

14   so the court reporter can keep up with you.

15          MS. LATSINOVA:  We are going to be using a Power

16   Point.  We have copies for everybody.  May I approach?

17          THE COURT:  You may.

18                         DIRECT EXAMINATION

19   BY MS. LATSINOVA:

20   Q   We don't have much time this afternoon so we'll be going

21   fast.

22          Can you tell us about your education?

23   A   I graduated with honors from Colorado State University

24   with a bachelor in accounting and minor in computer science

25   in 1985.

 1   Q   Can you please tell us about your employment history?

 2   A   My employment history?

 3   Q   Yes.

 4   A   Sure.  Right out of college I joined Arthur Andersen in

 5   the audit department.  I did audits for three years in the

 6   Denver office.  Then I switched to something called

 7   litigation consulting at that time, which was economic

 8   analysis, damage analysis, forensic accounting and business

 9   valuation.

10       I worked at Arthur Andersen for 15 years.  I transferred

11   to Hong Kong in 1992.  I became a partner in the business

12   valuation and litigation service practices.  I headed our

13   greater China practice.  In 1999, I transferred to Seattle to

14   the economic and financial consulting division as a partner

15   in that division.  I was there for about half a year.

16       I left Arthur Andersen and went to work for a technology

17   company for a year and a half before resigning and starting

18   my own consulting practice in 2001 doing exactly the same

19   thing I had been doing all those years at Arthur Andersen,

20   namely, forensic accounting, economic damage analysis and the

21   rest.

22   Q   Do you have professional certifications?

23   A   I do.

24   Q   What are they?

25   A   I am a certified public accountant with the state of

1    Washington.  I am certified in financial forensics and also

2    an accredited business valuer through the American Institute

3    of Certified Public Accountants.  I am a certified fraud

4    examiner and an accredited senior appraiser in business

5    valuation with the American Society of Appraisers.

6    Q    Have you served as an expert witness before?

7    A    Yes, I have.

8    Q    In what fields?

9    A    Forensic accounting, financial fraud, economic analysis,

10   damage analysis and business valuation.

11   Q    What are the documents that you reviewed?

12   A    The documents I reviewed in this case includes the

13   pleadings, a list of pleadings.  I am not going to read those

14   off unless you want me to.  I reviewed the property

15   management agreement.  I reviewed the amended and restated

16   limited partnership agreement, along with the amendments to

17   that agreement.  I reviewed the developer agreement.  I

18   reviewed Parkway's audited financial statements for each

19   year.  I looked at reports.  I asked for extract out of the

20   accounting system of Parkway and looked at various aspects of

21   the financial accounting records that way.  I also had

22   invoices pulled that Parkway paid to various people for

23   expenses I had questions about.

24        I looked at some of the monthly reporting packets so I

25   understood what the limited partner investor was shown each

1  month and all the information they were receiving and what

2  that showed.  I read the report of Mr. Krabbenschmidt.  I

3  looked at correspondence between the parties regarding

4  certain expenses that have been at issue in this dispute.

5      I looked at the project capital needs assessment report

6  that was prepared by MD Consulting.  I looked at some of the

7  HUD refinancing documents that showed various requirements

8  and disclosed various debts.

9      I looked at deposition transcripts from Mr. Blake and

10  Ms. Tamaro.  I attended Mr. Krabbenschmidt's deposition.  I

11  have had discussions with Ms. Tamaro, also with

12  Mr. Arterberry and with Laura Lindal, the former CPA for

13  Parkway Apartments.  I have done other financial, economic

14  and industry research.

15  Q   Were you in court when Mr. Krabbenschmidt testified last

16  week?

17  A   I was.

18  Q   You heard Mr. Krabbenschmidt testify about certain

19  categories of damages?

20  A   Yes.

21  Q   What was the scope of your assignment?

22  A   The scope of my assignment was to look at -- well, to read

23  the report of Mr. Krabbenschmidt, to understand the claims he

24  was making about alleged harm to the partnership and to the

25  limited partner, and to do my own underlying analysis and

 1   investigation into those issues to determine whether or not I

 2   agreed with Mr. Krabbenschmidt on those issues.

 3   Q   So let's dive in and go category by category identified by

 4   Mr. Krabbenschmidt.  Let start with excess property

 5   management fees.  Let's go to the next slide.  You

 6   understand, do you not, that Mr. Krabbenschmidt testified

 7   that the property manager, Trieste Holdings, charged excess

 8   management fees to the partnership?

 9   A   I understand.

10   Q   And are you aware of Mr. Blake's testimony last week that

11   nothing prior to the refinance was material?

12   A   Yes, I am aware.

13   Q   Do you know when the refinance closed?

14   A   It was in February of 2015.

15   Q   This slide that we see in front of us, that is

16   Mr. Krabbenschmidt's calculation of allegedly excess property

17   management fees; is that right?

18   A   It is, with my corrections.

19   Q   How far does it go?

20   A   Starts in 2002 and goes through 2017.

21   Q   To your knowledge, did Mr. Krabbenschmidt make any efforts

22   to limit his calculation of allegedly excessive property

23   management fees to Mr. Blake's testimony that only

24   post-refinance fees are material?

25   A   He did not.

1  Q   Now, and -- if you limit the excess property management

2  fees, or so alleged excessive fees, to post-refinance years,

3  what would the number be?

4  A   Well, even including 2015, we only have three years.  In

5  one year the calculation suggests that there is $9,582

6  overpaid.  The next year there was nothing overpaid.  The

7  next year it was underpaid by $159, so the net of those is

8  approximately $9,400 in possible overpayment.

9  Q   These alleged overpayment, was it actually paid by the

10 partnership?

11 A   No.  In fact, it wasn't paid by the partnership.

12 Q   And how come?

13 A   Because these -- there wasn't enough.  There wasn't enough

14 cash flow to pay these management fees.  These fees were

15 added to the subordinated debt to the AGP.

16 Q   What is the next category; do you recall?

17 A   His next category was what I think he called unauthorized

18 fees.

19 Q   Let's go to the next slide.  I represent to you that

20 Mr. Krabbenschmidt has deleted one of the categories, that is

21 the bookkeeping fee.  There is a line across the second

22 category.

23 A   I heard him talk about that.

24 Q   Now, you say here on the right column in their response

25 that you cite LPA Section 7.10.B.  Do you see that?

1    A    I do.

2    Q    Why do you cite that section?  Because it is difficult to

3    toggle between the Power Point and a document, I will

4    actually put it on the camera and then you can explain why

5    you think it is important.

6    A    Okay.

7    Q    I apologize for my scribbles.

8    A    That's all right.

9    Q    I think you can still use your screen to highlight what is

10   important to you.

11   A    This is the section that is relevant to the general

12   partner making these expenses.  If you look here it says that

13   all of the partnership's expenses shall be billed to and paid

14   by the partnership.

15   Q    Okay.

16   A    And reimbursements, importantly, to the general partner or

17   any of its affiliates by the partnership shall be allowed

18   subject to the following conditions, and then we have some

19   conditions.  The first one is that the goods or services must

20   be necessary for the prudent formation, development and

21   organization and operation of the partnership.  So they must

22   be needed.

23   Q    What is condition No. 2?

24   A    Condition No. 2 is that the reimbursement for those goods

25   or services, who are not affiliated with the general partner,

 1   shall not exceed the cost to a general partner of obtaining

 2   those goods and services.

 3   Q    No markups?

 4   A    Right, no markups.  Right.

 5   Q    What is condition 3?

 6   A    The reimbursement for goods and services obtained directly

 7   from a general partner or its affiliate -- these are the ones

 8   that the general partner provides -- shall not exceed the

 9   amount the partnership would be required to pay independent

10   parties for comparable goods and services in the same

11   geographic location.

12   Q    Okay.  Now, in your opinion, did Mr. Krabbenschmidt show

13   that any of the fees that appear on the slide on page -- can

14   we go back to the slide, please?  That's hard to read.

15        Did Mr. Krabbenschmidt show that any of the fees on

16   this slide, including repair supervision fees, tenant file

17   review fee, legal services fee, extermination fee, or

18   engineering service fee, were not incurred in the prudent

19   operation of the partnership?

20   A    No, he didn't.

21   Q    Did you do your own analysis?

22   A    Yes, yes, I did.

23   Q    Tell us about what you did, please, starting with the

24   repair supervision?

25   A    With regard to the repair supervision fees, first I went

1    to the detailed financial statements and looked at those

2    repair supervision statements in -- the repair supervision

3    fees in the financial statements.  They are broken out

4    separately. You can clearly see them.  What you can see about

5    them is they are related to specific repairs and improvements

6    that were undertaken.  There are many repairs and maintenance

7    expenses for which no repair supervision fee is charged,

8    millions of dollars of maintenance and repair for which no

9    repair supervision is charged.

10       If you look on the financial statements, you will see --

11   below net operations and net operating income, you will see

12   these other major repairs.  That's the portion of the repairs

13   that have the repair supervision fee.

14       That was the first thing I did. I talked to Ms. Tamaro.

15   She explained to me these are fees that are incurred from the

16   property manager over and above what they normally do, and

17   they are, in essence, the fees a general contractor would

18   receive.  It is my understanding that standard repairs and

19   maintenance, of course, are covered -- supervision of those

20   things are covered by the property management fee.

21       When you are acting as a general contractor to provide

22   oversight to major repairs, that is always charged either as

23   an extra free or often, more commonly, it is actually

24   outsourced to a general contractor and you are going to pay

25   the general contractor to perform that service for you.

1   Q   Would the same rationale apply to tenant file review,

2   legal, extermination and engineering fees?

3   A   Yes, they are different services, of course, but yes.

4   Q   So are there any documents that confirm your opinion in

5   this regard?

6   A   I looked at a lot of documents that confirmed my opinion.

7   With regard to the repair supervision, we talked about those.

8   We talked about the detailed financial statements.  You can

9   see in the audit, in the notes to the audits, every year

10  where it specifically disclosed that these fees are charged.

11      I talked to, for example, Ms. Lindal, the CPA.  I talked

12  to her about when these fees are charged and when they

13  aren't.  She told me she sees this all the time.  She said

14  exactly what I just said, that some property managers

15  outsource this, many do.  Some build this special capability

16  in house.  When they do, they always charge for it.

17      Then I also looked at the limit -- a document that the

18  limited partner prepared for the HUD financing to actually

19  showed to Morgan Stanley that also talks about the repair

20  supervision fee.

21  Q   I think I know what you are talking about.  It is Exhibit

22  90, page 9, I believe.

23  A   Yes, this is it.  Could you make it smaller for me so I

24  can see the edges?

25  Q   Just so we are oriented, it is Exhibit 90.  That is the

1   funding request from the predecessor of Alden Torch.

2   A   Hunt.

3   Q   The funding request from Hunt to Morgan Stanley, their

4   investor?

5   A   Yes.

6   Q   Please explain why this is relevant to the slide we were

7   discussing.

8   A   This is the predecessor to Alden Torch explaining to

9   Morgan Stanley what the obligations of the partnership will

10  be.  If you were to look just above this, this is their debt

11  disclosures.  I would focus for this moment on the box at the

12  bottom of this section on debt disclosures.

13      What you see here is the fact -- what I will point to

14  first is the fact that they are telling Morgan Stanley that

15  they are going to have $1,240,809 in construction costs that

16  they are going to be incurring.

17      What is interesting is they are also telling them -- so

18  this is Hunt telling Morgan Stanley -- that these fees are

19  going to go to a GP affiliate.

20      If you look at the financial statements for Parkway, you

21  can see among these major repair expenses, as they were

22  incurred, that is where the repair supervision is, and

23  therefore those -- that 1.240 million includes the repair

24  supervision fee.

25  Q   So do you understand Mr. Krabbenschmidt to be challenging

 1  that affiliate fee in his report --

 2  A    I do.

 3  Q    -- in his testimony?

 4  A    Yes.

 5  Q    Let's go to the next category.  Do you understand

 6  Mr. Krabbenschmidt objects to the payment of the managing

 7  general partner fee?

 8  A    I do.

 9  Q    Do you recall that?

10  A    I do.

11  Q    Let's go to the next.

12  A    Can I clear this?  Oh, yes.

13  Q    Now we have a nice clear slide.  Can you please explain to

14  us what is the managing general partner and what is the fee

15  for, and what is Mr. Krabbenschmidt's objection to it?

16  A    Managing general partner is Hearthstone Housing.  It is a

17  non-profit associated with low-income housing.  It joined at

18  some point the partnership as managing general partner.  It

19  provides certain services.  Very importantly, it provides

20  property tax credits so the partnership does not have to pay

21  all of its property taxes.

22       In exchange for those services and their participation,

23  which gets us the property taxes saved, it required the

24  payment of a fee.  The first year it was $10,000.  After that

25  it was $7,500, increased by three percent per year as

1    compensation for what they were bringing to the partnership.

2    That is the fee we are talking about.

3    Q    So, is there any -- the fee was paid by -- was advanced by

4    the general partner because there was no cash flow; is that

5    right?

6    A    That's right.

7    Q    So is there any net detriment to the partnership from this

8    advance?

9    A    There is a huge net gain here.  I just gave you this very

10   simple chart to give you an idea of a comparison between the

11   property taxes that the partnership saved and the amount of

12   fees that were paid to the managing general partner.  You can

13   see this brought a huge benefit to the partnership, this

14   association.

15   Q    Okay.  Now, moving to the next category, deferred

16   developer fee.  I think you have two slides on that.  This

17   will take some explaining.  What is a deferred developer fee?

18   A    The deferred developer fee is the part of the original

19   developer fee from the outset of the project that was not

20   paid at the closing -- at the initial closing.  That deferred

21   developer fee initially is to be funded from the cash flow of

22   the partnership during the first ten years.

23   Q    If there is no cash flow, what happens?

24   A    If there is no cash flow or not enough cash flow to pay it

25   all off, anything that is outstanding at that point is

1   converted to capital that is contributed by the general

2   partner.

3   Q   Do I understand correctly that the unpaid deferred

4   developer fee is converted to capital?

5   A   Right.

6   Q   What is Mr. Krabbenschmidt's issue or issues with that

7   fee?

8   A   He has had three issues with the whole concept of this

9   deferred developer fee.  The first issue is very simply this:

10  There was additional money in the partnership in 2009.  It

11  came from primarily -- or some of it came from contributions

12  from the limited partner that were required to be paid under

13  the agreement.  Some of that was used to pay off the deferred

14  developer fee.  It is my understanding Mr. Krabbenschmidt, as

15  he explained, believes that money should not have been used

16  in 2009 for that particular purpose.

17  Q   What would have happened if it was the way he says?  If

18  it -- if part of it was not prepaid in 2009, wouldn't the

19  whole thing have converted to capital contribution?

20  A   That's right.  Essentially you wouldn't have made that

21  payment.  The whole amount would have been outstanding.  By

22  the way, the whole amount would have continued to accrue

23  interest at eight percent until the ten-year period was up in

24  two years -- two to three years.  There would have been more

25  interest at that time on the deferred developer fee, but

1    then, yes, it would have been -- it would have converted to

2    capital, and it would be paid out to the general partner in a

3    hypothetical dissolution of the partnership.

4    Q   I think you explained the next slide.  Let's go there,

5    Adam.

6         I think you just explained, but please summarize and

7    point to your slide if you need to.  What is the economic

8    difference in dollars between paying part of the DDF in 2009,

9    which is what happened, compared to what Mr. Krabbenschmidt

10   thinks should have happened?

11   A   We are talking about the first issue at the moment.  There

12   are two parts of this.  What would happen to the partnership

13   if instead of paying the DDF earlier, it converts to capital

14   and is paid later, is there a benefit or detriment?  No,

15   there is no impact on the partnership really regarding when

16   you make that payment.  There is no question it is going to

17   be made.

18        The impact comes when you look at the little breakout box

19   here, and what I am showing you is that you have four extra

20   years of interest on the amount that was paid off.

21        If she had left it in there, she would have accrued four

22   years of interest at eight percent, which is $109,000.

23   Instead of just owing the additional $341,685 at the end, the

24   partnership would have also owed an extra $109,000 in

25   interest. That is a detriment to the partnership.

1  Q   Explain the second issue, the accrued interest.

2  A   Sure.  Mr. Krabbenschmidt says the accrued interest on the

3  fees, and I am not talking about the $109,000, I am talking

4  about on the $900,000 that did eventually convert, that was

5  not paid down in 2009.  On the remainder of the deferred

6  development fee, of course, it accrued interest at eight

7  percent.

8      Mr. Krabbenschmidt has identified, and I don't disagree

9  with him, the fact that after ten years, when the deferred

10  developer fee -- the remaining deferred developer fee was

11  converted to capital, they did not convert the debt for the

12  interest on the deferred developer fee for -- to capital.

13  They left it as a liability.  He's identified that issue, but

14  that issue also has no economic impact on the partnership.

15  Q   Is that because it goes into the waterfall in the same

16  priority?

17  A   Yes, essentially, because what you get in the waterfall is

18  first you pay off the debts to the GP, of which this would be

19  one.  Then you pay off their capital contribution to convert

20  the developer fee, which is the very next thing.  Whether it

21  is one bucket or the other, it gets paid out virtually at the

22  same time.

23  Q   Now Issue 3, I know it is on your slide.  We won't talk

24  about it because that is the issue related to the

25  placed-in-service date; is that right?

1   A   Yes, it is the issue of placed in service.

2   Q   We have looked at Exhibit 170 already this morning.  We

3   know what the State website says about the placed in service.

4           Moving on to the next category, Adam.  Okay.

5           Are you aware Mr. Krabbenschmidt believes that $1.4

6   million of repairs and improvements were unnecessary?

7   A   Yes.

8   Q   So you are aware of what kind of repairs he is talking

9   about?

10  A   Absolutely.  He is talking about siding, roofing, paving

11  and windows.

12  Q   Is there any question in your mind whether these repairs

13  were actually needed?

14  A   No question in my mind.

15  Q   Why is that?

16  A   I reviewed a number of inspection reports that identify

17  these as issues that will need to be repaired.

18  Q   And weren't these repairs specifically discussed in

19  connection with the refinance?

20  A   Yes.

21  Q   Now, did you hear Mr. Krabbenschmidt testify that repairs

22  were in fact so unnecessary that the CBRE appraisal report

23  actually deducted the amount of these repairs from the

24  valuation?

25  A   I did hear him say that.

1   Q   Did that surprise you?

2   A   Yes, it did.  Yes.

3   Q   Does the CBRE report actually deduct for the repairs that

4   were done?

5   A   No, it doesn't.

6   Q   Let's take a look.  Here we have Exhibit 129.  There are a

7   couple pages I want to show you.  So can you please explain

8   to us what CBRE did?

9   A   Yes.  So one of the key conditions to understanding how

10  they valued it is their explanation that they have used what

11  we call as appraisers a hypothetical condition.  Their

12  hypothetical condition is this:  While not reported in our

13  value conclusions, we are valuing the subject under the

14  hypothetical condition that all siding repairs are complete

15  as of the date of value.  That is an assumption that they are

16  making.

17  Q   Okay.  Did they deduct for anything?

18  A   Yes, they did.

19  Q   Let's see.  Can you please show us what they deducted?

20  A   If you give us a snippet at the top so we can see what

21  this is.  You will see this is their summary, their direct

22  capitalization summary, essentially the summary of their

23  valuation.  If we could scroll down to the bottom, a little

24  bit farther down now.  There we go.  Okay.

25      So what I am focused on here when I say they did deduct

1   something, I could explain to you the capitalization method

2   of valuation.  I think it can suffice to say that their

3   conclusion on the valuation is $17,500,000.  Now we see they

4   have a deduction.  What they are deducting is --

5   Q   Are they deducting for work done or for work that remains

6   to be done?

7   A   They are deducting the work that remains to be done.  The

8   credit is given for the work that is done.  What they are

9   deducting for is the work that isn't done.

10  Q   Okay.  In your opinion, all things being equal, in your

11  experience does a property in better repair sell for more

12  than the one that is in worse condition?

13  A   Of course.

14  Q   Now the next issue -- and we will be moving very quickly

15  to cover everything we have -- is the -- do you understand

16  that Mr. Krabbenschmidt takes issue with an accounting

17  treatment of certain repairs in terms of capitalizing them

18  versus expensing them?

19  A   Yes, I do.

20  Q   Can you please explain to the Court what this issue is to

21  a CPA?

22  A   For a CPA, it is an accountant issue.  When someone spends

23  money on a repair or improvement, the accountant has to

24  decide whether this is going to be an expense this year, the

25  whole cost of it, and deduct it from income, or whether this

1    actually creates an additional asset for the company, in

2    which case you will put that cost on the balance sheet as an

3    asset and then depreciated over time.  In other words,

4    expense it in future periods when its useful life is used up.

5    You have this choice to make from an accounting standpoint.

6    Q    Are you aware of Laura Lindal's treatment of these repairs

7    as capitalized versus expensed?

8    A    Yes, and I have interviewed her about that.

9    Q    What is her view?

10   A    Well, the short story is she views they are in compliance

11   with GAAP.

12   Q    Do you agree with that?

13   A    As far as I know.

14   Q    Is the plaintiff challenging the audited financial

15   statements in this case?

16   A    My understanding from the testimony is that they are not.

17   Q    Now, next slide, please, Adam.

18        This is the construction contract payable.  That's the

19   one we already talked about, right, when we looked at the

20   Morgan Stanley memo; is that right?

21   A    We saw it on there.  We haven't talked about it.  It was

22   on the same page.

23   Q    So is there any basis to assume this is not a valid

24   liability of the partnership?

25   A    Mr. Krabbenschmidt didn't identify any that I am aware of.

1    I haven't seen any.

2    Q    Moving to charitable contributions, Adam.  That is Slide

3    14.  Are you aware Mr. Krabbenschmidt disagrees with the

4    payment of $17,000 to the Tacoma Area Coalition for

5    Individuals with Disabilities?

6    A    I am.

7    Q    So what was this contribution for?

8    A    This contribution was in connection with receiving tax

9    exempt bond financing.  TACID, the Tacoma Area Coalition for

10   Individuals with Disabilities, their involvement and the

11   services they are providing enabled that tax exempt bond

12   financing which obviously created a net benefit for the

13   partnership.  This was a payment to them for the services

14   they rendered.

15   Q    Is it in the business of the general partner to make a

16   contribution like that?

17   A    It is certainly to the benefit of the partnership, so I

18   would say it is a reasonable choice.

19   Q    Now, we will run through this quickly.  Next one, Adam.

20        So are you aware Mr. Krabbenschmidt opines rent credits

21   to on-call personnel should not have been given?

22   A    I am.

23   Q    Did this credit cause -- I think we all heard enough

24   about -- heard a lot about this item.  Can you please explain

25   whether this credit caused any detriment or loss to the

1  partnership?

2  A   No, it didn't because staff that are on call are entitled

3  to either a reduced rate one-bedroom apartment in the

4  facility or they can receive a rent credit.  They can take

5  that rent credit and go live somewhere nearby.  In this

6  particular case, in some periods that's what they did.  In

7  those periods, the apartments that would have otherwise been

8  given to them were rented at the normal rate.  The

9  partnership is not out any money when you compare what it

10  would have had if it had just given them the apartment versus

11  when it give them the credit.  It is my understanding they

12  were still able to do their job.  No loss.

13  Q   Let's briefly touch on rents.

14      There was a lot of discussion about rents this morning

15  when you were in a different court.  I will just represent to

16  you that Mr. Krabbenschmidt corrected his calculations in

17  that he conceded that he did not take into account the

18  utility allowance.

19  A   In calculating the max rent?

20  Q   Yes.  The 900 and 1,080 should be reduced by the

21  corresponding utility allowances.

22  A   Right.

23  Q   In your opinion, does this correct his calculation of the

24  rental rates?

25  A   No, it doesn't.  I just want to be careful what we are

1  looking at.  What we are looking at in the top square is what

2  I had put down there this weekend.  That is not his corrected

3  calculation.  This is the calculation before that correction.

4  Q    Okay.  Before you go further, I should also tell you that

5  Mr. Krabbenschmidt now has a different number.

6  A    Right.

7  Q    He started at 750.  Actually, he started at a million,

8  went to 750, then to 706.  I think he is at -- in the

9  $300,000 range today.  I don't know the exact number.

10 A    For two years?

11 Q    For two years, yes.  My question to you is:  If you

12 subtract for utilities, would his calculation be correct?

13 A    Still wouldn't be correct, no.

14 Q    Why not?

15 A    Because you can't just raise the rates by quite a large

16 percentage and expect no one to move out or stop paying.

17 That just doesn't happen.

18      As Mr. Krabbenschmidt said himself, you are targeting a

19 five percent vacancy rate.  Presumably if you raised the

20 rents as much as Mr. Krabbenschmidt wanted to, you would have

21 got at least that five percent vacancy.  He hasn't taken that

22 into account.

23 Q    Are you aware of anything in the LPA that requires the

24 general partner to rent the units in Parkway at maximum LIHTC

25 rates?

1  A   No.

2  Q   Now, we will skip and go to the last set of questions.  I

3  have three concluding questions for you that don't require

4  you looking at any Power Points.

5       After considering all the items that we talked about

6  today and that are in your report, is there a net detriment

7  to the partnership --

8  A   I don't believe so.

9  Q   In payment of the fees?

10 A   I don't believe so. The issues that have been raised are

11 largely for the benefit of the partnership.

12 Q   Now, second question.  Now, can you accept audited

13 financial statements and at the same time refuse, for

14 example, to accept a debt that is shown on the same financial

15 statement as a valid debt?

16 A   No, you cannot.  Those are two completely inconsistent

17 things.  No, you can't.

18 Q   Lastly, Mr. Krabbenschmidt claims that in the LIHTC

19 industry there is a standard not to make any significant

20 repairs during the compliance period in order to maximize the

21 limited partner's return when the option is exercised, or

22 when the exit year 15 is up, approximately.  Do you see in

23 your research in working on this case, anything in the tax

24 code, in the HUD regulations, HUD rules, HUD guidance, LIHTC

25 literature, anything that would support this claim?

```
 1   A   No, nothing.

 2             MS. LATSINOVA:  Thank you.

 3             THE COURT:  Cross.

 4             MR. PETTIT:  Thank you, Your Honor.

 5                         CROSS-EXAMINATION

 6   BY MR. PETTIT:

 7   Q   Good afternoon, Ms. Barrick.

 8   A   Good afternoon.

 9   Q   My name is Eric Pettit.  I am an attorney for the

10   defendants in this action.

11   A   Hello.

12   Q   I want to ask you a few questions about your expert report

13   and your testimony today.  Do you recall providing an expert

14   report in connection with this engagement?

15   A   I do.

16   Q   Do you recall providing a schedule that accompanied that

17   report?

18   A   There were many schedules, yes.

19   Q   I would like to direct your attention to Exhibit 150,

20   which I will represent to you is a combined set of all of the

21   schedules that were accompanied to your report -- that

22   accompanied your report.  I would like to direct your

23   attention specifically to page 3 of Exhibit 150.  It is going

24   to come up on a screen for you.

25   A   Do I not need it?
```

1    Q    If you need to look at any full document, let me know.

2    Hopefully everything will come up on the screen and make it

3    nice and easy for you.

4    A    Thank you very much.

5    Q    This is, I believe, a description that you prepared

6    regarding your qualifications and experience; is that right?

7    A    That's right.

8    Q    At the beginning of this document, there is a section

9    called background.

10   A    There is, yes, uh-huh.

11   Q    And in -- if you look at the second sentence of the first

12   paragraph, it says your focus is financial analysis in

13   dispute settings in business and intangible asset valuation

14   for tax and litigation matters; is that right?

15   A    Yes.

16   Q    Would you say that is a general characterization of the

17   areas in which you are an expert?

18   A    Yes, that is a very broad categorization, covers a lot,

19   but yes.

20   Q    Is it fair to say that essentially you are a professional

21   expert witness?

22   A    I don't think so, but most of my work is for disputes.

23   Q    Is it true that in the last -- over the last 20 years you

24   have provided expert testimony on more than 80 occasions?

25   A    Probably.

1  Q    If we go to page 5 and 6 and if we go to page 7, and 8,

2  and 9, those are a list of all of the matters which you

3  provided expert testimony in the last 20 years, give or take;

4  is that right?

5  A    Yes, through the date of the report hopefully, yes.

6  Q    And you have testified, I think you confirmed here, that

7  most or all of the work that is performed by

8  Lorraine Barrick, LLC involves providing expert opinions or

9  consulting to parties involved in disputes; is that right?

10 A    That is right, mostly independent expert opinions.

11 Q    And I think you testified in your deposition that you

12 work -- you have worked with Stoel Rives about a half dozen

13 times prior to this engagement; is that right?

14 A    That is right, yes.

15 Q    But prior to this engagement, you have not had any

16 experience with the LIHTC industry in particular; is that

17 right?

18 A    No, that is right -- yes, that is right.  I have done a

19 lot of work in real estate.  I don't recall any of the

20 projects I worked on having any particular LIHTC emphasis.

21 Q    It is fair to say you are not an expert in the LIHTC

22 industry; is that right?

23 A    Yes, that's fair.

24 Q    I know that you heard Mr. Krabbenschmidt testify in court

25 on Thursday and also have reviewed his deposition transcript;

1  is that right?

2  A   That's right -- well, actually, I attended his deposition.

3  Q   You attended his deposition.  You would agree, based on

4  his testimony, that he has significantly more experience and

5  expertise than you with respect to the LIHTC industry; is

6  that right?

7  A   I am prepared to give him that, yes.

8  Q   Also with respect to property management; isn't that

9  right?

10  A   That is possible.  I have certainly done a lot of analysis

11  that related to property management agreements and property

12  management decisions.  He may have more.  That is possible.

13  Q   Have you ever managed any commercial properties?

14  A   I have never personally managed commercial properties --

15  well, no, yes, essentially I have managed my own investments,

16  but they are not commercial properties.

17  Q   You are not an attorney; is that right?

18  A   No, I am not.

19  Q   You are not offering a legal opinion as to what any of the

20  contracts or agreements that are at issue in this case mean;

21  is that right?

22  A   I am not offering any legal opinions at all.

23  Q   I would like to turn your attention to Exhibit 149, which

24  is your expert report, and specifically direct your attention

25  to page 9 of that report.  Page 9 includes a summary of your

1  conclusions; is that right?

2  A   Yes.

3  Q   And I would like to direct your attention to the first

4  bullet point there on page 9 where you say,

5  "Mr. Krabbenschmidt has not quantified the damages calculated

6  by AMTAX -- claimed by AMTAX 169 in this matter.  At best, he

7  has provided a list of issues that he believes may not have

8  been handled correctly by the AGP."  Do you see that?

9  A   I do see that.

10  Q   Do you understand, Ms. Barrick, that AMTAX 169 is seeking

11  damages in this action derivatively on behalf of the

12  partnership?

13  A   Yes, I understand that as well.

14  Q   So AMTAX 169 is not claiming any direct monetary damages

15  in this action; isn't that right?

16  A   You know, I heard -- well, I have no idea.

17  Mr. Krabbenschmidt discussed the fact that the emphasis of

18  his testimony would be on detriment to the partnership.

19  Although if you read the contents of his report, he certainly

20  spent a lot of time talking about how things damaged the

21  limited partner as well.  In my original report, I responded

22  to those critiques.

23  Q   Fair enough.  Let's unpack them.

24  A   I was going to say, but he appeared not to emphasize that

25  in his testimony so I didn't bring those up either.

1   Q   Let's unpack that.  So focusing on derivative damages for

2   a moment.  To the extent an excess fee was charged to the

3   partnership that shouldn't have, that fee would total the

4   damages to the partnership; isn't that right?

5   A   I just want to make sure, when you say "derivative

6   claim" -- I'm sorry, I'm not a lawyer, as you said -- it is a

7   claim for damages to the partnership, is what you are talking

8   about?

9   Q   That is right.

10  A   Can you repeat the question?

11  Q   If we are talking about damages to the partnership, the

12  partnership is charged a fee of a dollar that it shouldn't

13  have been charged.

14  A   Yes.

15  Q   The damages as a result of that excess fee charge is one

16  dollar to the partnership?

17  A   Yes.

18  Q   And let's take a look at Exhibit 168.  I will represent to

19  you, Ms. Barrick, that Exhibit 168 is Ms. Tamaro's

20  calculation of the proceeds to the various partners under the

21  Parkway Apartments' sales proceed waterfall in Section 6.2.B

22  of the partnership agreement.  Are you familiar with that

23  provision?

24  A   Yes.

25  Q   Are you generally familiar with the concept of sales

1  proceed waterfalls within partnership agreements?

2  A  Absolutely.  I have seen them many times.

3  Q  I want to direct your attention to line 27, which is about

4  two-thirds of the way down the page where it says, "AGP

5  subordinated loans"; do you see that?

6  A  I do.

7  Q  That shows a negative amount, and that's because that is

8  amounts that would have to be paid to the administrative

9  general partner through the waterfall; is that right?

10 A  You are right.

11 Q  And if you go down to lines 30 through 37, those are a

12 sort of preliminary split of profits after all of the loans

13 are paid off; is that right?

14 A  That is correct.  That is the split of the remainder.

15 Q  There is actually lines 39 through 43, there is what I

16 refer to as a residual split.  Have you heard that term

17 before, a residual split?

18 A  I have heard it.  This is essentially the total amount to

19 the LP, but yes.

20 Q  Isn't it true if you look at line 42, it references

21 Section 6.2.B(ii)?

22 A  That is right.

23 Q  It talks about the 99 percent of the balance of such

24 proceeds to the investor limited partner; is that right?

25 A  Right.

1  Q   So when you have subordinated debt up on line, I think it

2  was 27, and that goes up by a dollar, and you assume that

3  there is enough funds to get to the bottom of this waterfall,

4  99 cents of that comes out of the investor limited partner's

5  pocket; isn't that right?

6  A   If there is enough money to get to the bottom of the

7  waterfall.  If there is not enough money, none of it might

8  come out of their pocket.

9  Q   Let's assume for my purposes there is enough money to get

10  to the bottom of the waterfall.  With that assumption in

11  mind, one extra dollar in subordinated loans is 99 cents less

12  in the investor limited partner's pocket; is that right?

13  A   Yes.

14  Q   That kind of addresses the issue in terms of the damages

15  to the limited partner in connection with damages to the

16  partnership, does it not?

17  A   Well, certainly if, if, there is enough money upon sale,

18  that would be true.

19  Q   That is the assumption I am asking you to work under.

20  A   Right.  I am just trying to think it through.  Not

21  everything that Mr. Krabbenschmidt complained of functions in

22  the same way.  For any of the things he complained of, the

23  due result and the extra dollar of debt, I would agree with

24  you.

25  Q   Let's return to page 9 of your report, which again is

1   Exhibit 149.  I would like to direct your attention to the

2   third bullet point there.  You write, "Mr. Krabbenschmidt has

3   ignored any impact of the statute of limitations and the

4   right of the AGP as granted in the LPA to make management

5   decisions regarding the operation of the property."  Do you

6   see that?

7   A   I do.

8   Q   Did you perform any analysis to determine the impact of

9   the statute of limitations on the partnership's damages

10  claims?

11  A   Well, in most of these cases, I don't believe there were

12  any damages to the partnership, so I didn't have to consider

13  that.

14  Q   Well, let me -- listen to my question and answer my

15  question, if you can.  Did you consider the impact of the

16  statute of limitations on any of the damages claims that

17  Mr. Krabbenschmidt included in his report?

18  A   What I have done is considered the impact, if the -- well,

19  what I did was actually go back to 2015.  If the statute of

20  limitations goes back slightly farther than that, I did not.

21  Well, okay.  You could say I did not.  I did look at the

22  amounts of the damages that had happened since the refinance.

23  Q   Let me ask you this:  Are you offering any opinion as to

24  how the statute of limitations applies to the damages claims

25  in this action?

1    A    I am not.

2    Q    Are you suggesting that the failure to address the legal

3    issue of the statute of limitations is a shortcoming of

4    Mr. Krabbenschmidt's report?

5    A    I am.

6    Q    So you think he should have undertaken that legal

7    analysis?

8    A    No, that's not how it works with an independent expert.  I

9    have done many, many damage calculations where a statute of

10   limitations comes into play.  I think any competent damage

11   expert is aware of what this is.  They are aware this is a

12   legal interpretation.  When I am calculating a damage

13   calculation, I will talk to my attorneys.  I will say, I need

14   your legal advice on this because I am aware that there may

15   be some period of time I can't claim damages for.  Usually

16   they will tell me on the front end so I can take that into

17   account.

18   Q    You didn't do that here?

19   A    I didn't do that here because I don't agree with the

20   damages -- that there is damage going back that far.

21   Q    Let's direct your attention to page 12 of your report,

22   which is Exhibit 149.  I want to specifically direct your

23   attention to your discussion of the alleged excess property

24   management fees.  Do you recall including that in your

25   report?

1   A   Yes.

2   Q   Do you recall testifying about that on direct examination

3   here?

4   A   Yes.

5   Q   If you go to the bottom of page 12 and the top of page 13,

6   I think you include -- you conclude that it was inappropriate

7   to not take into account underpayments as well as

8   overpayments; is that right?

9   A   That's right.

10  Q   And that is because you understand that the fee that was

11  owed to the property manager is equal to four percent; is

12  that right?

13  A   The property manager is entitled to four percent, yes.

14  Q   Equal to four percent?

15  A   Four percent.

16  Q   So let's go back to page 12 of your report at the top.

17  You actually -- if you go to the top paragraph there, you

18  actually quote Article 11.A of the limited partnership

19  agreement. This is the four percent limitation; is that

20  right?

21  A   That is correct.

22  Q   It says, "The management agent shall be entitled to

23  receive a reasonable and competitive management fee not to

24  exceed the lesser of four percent of net rental income or the

25  maximum amount permitted by each agency or lender."  Do you

1  see that?

2  A   I do.

3  Q   "Not to exceed" is different than "equal to," is it not?

4  A   The words are different, yes.  I don't think the meaning

5  has any substantial difference, but ultimately it is a legal

6  question.

7  Q   Well, "not to exceed" means no greater than; isn't that

8  right?

9  A   Right.  Absolutely.

10  Q   If you wanted it to be exactly four percent you would just

11  delete "not to exceed," correct?  You would just say, "The

12  lesser of four percent of net rental income or maximum amount

13  permitted by each agency or lender," would you not?

14  A   You are asking me what the parties meant.  I interpret

15  this as four percent.  I would say as well that in the vast

16  majority of that underpayment or at least half of that

17  underpayment for those years was in the year of transition

18  between the two property managers.  It is my understanding

19  that it isn't -- what I am speaking about specifically is

20  2005.  It is my understanding that it isn't that the property

21  manager in 2005 decided they didn't want to charge their

22  whole fee.  It was that during the transition some fees

23  were -- I have to say, they were mistakenly not accrued or

24  they were accrued but not properly recorded.  I don't even

25  believe that necessarily that was the full bill -- that the

1  property manager actually billed the full bill for that year.

2  I think something fell through the cracks.

3  Q   Ms. Barrick, your testimony that you believe that

4  Mr. Krabbenschmidt erred in not netting out the fees that

5  were below four percent in the earlier year is premised on

6  your belief that the limited partnership agreement provides a

7  fee of exactly four percent; isn't that right?

8  A   The way I thought of it when I came to this conclusion is

9  if we are going to go back and recalculate every year's fees

10  to get four percent, we should do it for every year and not

11  just cherry pick the years in which it was over, because in

12  some years it was a little over, some years it was a little

13  under, but to include all years if that's what we are going

14  to do.

15  Q   That is notwithstanding the fact the contract says "not to

16  exceed;" is that right?

17  A   That's right.

18  Q   You also testified that -- or I believe you criticized

19  Mr. Krabbenschmidt for failing to reduce the amount of the

20  excess property management fee by an amount that you

21  understood was reimbursed to the partnership in 2013; is that

22  right?

23  A   '13.  2013, wasn't it?

24  Q   I think that's what I said.

25  A   I'm sorry.  I am having trouble hearing today.  Yes,

1  that's correct.

2  Q   Isn't it true Mr. Krabbenschmidt also included a footnote

3  in his report where he specifically identified this repayment

4  and specifically said that the amount of the excess property

5  management fee would have to be reduced by that

6  reimbursement; isn't that right?

7  A   Yeah, and I find that presentation a little misleading.

8  If he knew that they had repaid $96,000 of it, why bury that

9  in a footnote and then put in the total a claim for $200,000.

10  He knew it was only 102.

11  Q   Ms. Barrick, do you find it misleading that he would

12  suggest that he didn't account for this when there is a

13  footnote directly in his report where that specifically

14  accounts for this?

15  A   That's what I am saying.

16  Q   I am asking if you would find it misleading that you

17  testified today that he failed to account for this when he

18  included a footnote there?

19  A   No.

20  Q   Now, you still, notwithstanding these differences of

21  opinion with respect to Mr. Krabbenschmidt's calculation of

22  the excess property management fee, still found that the

23  general partner overcharged the partnership by approximately

24  $59,000 of excess property management fees?

25  A   Yes, if you count out the years, yes.

1    Q    In your report, on page 13, you say that the appropriate

2    way to correct this -- and I am looking at the last sentence

3    of page 13, "The appropriate way to correct for this error is

4    to reduce the subordinated debt owed to the AGP on the

5    balance sheet."  Do you see that?

6    A    I do.

7    Q    To the extent there are fees that were -- shouldn't have

8    been charged, the appropriate way to correct for that is to

9    reduce the subordinated debt; is that right?

10   A    I believe so.

11   Q    Now let's talk about the repair supervision fee quickly.

12   You understand, Ms. Barrick, that the repair supervision fee

13   was paid to Trieste Holdings; is that right?

14   A    That's my understanding, yeah.

15   Q    Trieste Holdings is the property manager for the property,

16   correct?

17   A    Yes.

18   Q    Trieste is owned by Ms. Tamaro?

19   A    Yes.

20   Q    Mr. Krabbenschmidt opined that Trieste should not have

21   charged this repair supervision because the responsibilities

22   are within the scope of the Treiste responsibilities under

23   the property management agreement; is that right?

24   A    He said that, yes.

25   Q    In your opinion, let's look at Exhibit 149, page 15. You

1  say, "In my opinion," middle of the page, "these repair

2  supervision fees are not of the type that would be included

3  in a property management fee, but rather are in the nature of

4  the fees that would be charged by a third-party general

5  contractor for major repairs to the property."  Do you see

6  that?

7  A   I do.

8  Q   That's an accurate summary of your opinion?

9  A   Yes.

10  Q   Let's go over what you reviewed, and I will direct your

11  attention to page 14 of your report. Isn't it true,

12  Ms. Barrick, that you don't identify the property management

13  agreement as one of the documents you identified or you

14  reviewed in connection with reaching this opinion; isn't that

15  right?

16  A   I don't remember whether I said that or I didn't.  I

17  certainly am well familiar with the provisions of the

18  property management agreement that relate to this.

19  Q   Did you review the property management agreement with an

20  eye to whether it permitted these repair supervision fees to

21  be charged?

22  A   Yes.

23  Q   I ask because you didn't identify it in your report.  You

24  didn't identify it on the stand today as one of the documents

25  that you reviewed.  It's your testimony you did review that?

 1  A   I believe I did.  In fact, I think that Ms. Latsinova

 2  put -- flashed it up on the screen when we were talking about

 3  repair supervision fees and had me read that portion of the

 4  property management agreement just now.

 5  Q   Let's take a look at the property management agreement,

 6  which is Exhibit 40.  I specifically want to direct your

 7  attention to page 7.  Sorry, I think this is the wrong

 8  Exhibit.  Is Exhibit 40 up?  4-0?

 9        Let's look at paragraph 4.2 of the property management

10  agreement.  This is an agreement that Treiste entered into

11  with the owner of the project; is that right?

12  A   Yes.

13  Q   That is the partnership?

14  A   Right.

15  Q   And Treiste earned the 4 percent fee by fulfilling its

16  responsibilities under this property management agreement; do

17  you see that?

18  A   I do.

19  Q   This provision says, "Manager shall have the right to

20  engage independent contractors" -- but performance --

21  sorry -- "for performance of such of its duties hereunder as

22  manager deems necessary, but manager," again, this is

23  Treiste, right?  Manager is Trieste -- "shall have the

24  responsibility for supervision of the performance of such

25  duties."  Do you see that?

1  A   Of course.

2  Q   Ms. Latsinova did not show you that provision of the

3  property management agreement on your direct examination, did

4  she?

5  A   Nope.

6  Q   This provision makes clear that if there is any

7  supervision of an independent contractor, that is part of the

8  manager's responsibilities, isn't it?

9  A   Right.  For example, if the manager hired a general

10  contractor, they would supervise that general contractor,

11  yes.

12  Q   Here, the manager was Treiste?

13  A   Yes.

14  Q   The manager hired a general contractor, correct?

15  A   Which was itself.

16  Q   Which was itself.  So it had an obligation under the

17  property management agreement to supervise itself; is that

18  right?

19  A   To do the part that the property manager would do, but not

20  to do the part the GC would do, yes.

21  Q   The part that the property manager would do is dictated by

22  what is in the agreement, correct?

23  A   Yes.

24  Q   What the agreement says is that the manager shall have the

25  responsibility for supervision of the performance of

1    independent contractor duties; isn't that what it says?

2    A    Performance of such duties, yes, independent contractor

3    duties.  I'll give you that, yep, for sure.

4    Q    Do you know whether Ms. Tamaro entered into any contract

5    with Treiste in connection with independent contracting

6    services?

7    A    Is there a contract for that work?

8    Q    That's what I am asking.

9    A    I am not aware of one.

10   Q    Now, you also base your opinion on the property -- the

11   repair supervision fee on conferences that you had with

12   Laura Lindal; is that right?

13   A    That's right.

14   Q    You testified about those conferences that you had with

15   her today on the stand; is that right?

16   A    That is right.

17   Q    Did you do anything to independently verify what

18   Ms. Lindal was telling you?

19   A    Well, I am aware through my work with real estate, with

20   real estate partnerships, with their managers and with the

21   companies they hire to do major repairs and replacements that

22   this is generally true.  I am aware of that based on my

23   background in real estate.

24   Q    Ms. Barrick, did you do anything to independently verify

25   what Ms. Lindal was telling you?

1    A    Oh, and I talked with Ms. Tamaro.  Yes, I discussed with

2    her the types of services that were actually included in this

3    repair supervision.  I also wanted to make sure that Treiste

4    was in fact a contractor that could perform these services.

5    I went to the state of Washington website, and I looked up

6    the licenses for Treiste.  Indeed, it has a valid

7    contractor's license.

8         I have talked about the document we looked at, prepared by

9    Hunt, that showed that an affiliate of the GP would be doing

10   this work, that the amount that the document quoted included

11   the repair supervision fee paid to Treiste.  All of those

12   things.

13   Q    Ms. Barrick, you have no personal experience as an expert

14   or otherwise for what is or is not permitted under a property

15   management agreement for a LIHTC property; isn't that right?

16   A    Not for LIHTC, but for other properties, yes.

17   Q    You are giving an opinion that a property management fee

18   was appropriate under the property management agreement here?

19   A    The property management fee was --

20   Q    Repair supervision fee was appropriate under the property

21   management agreement here?

22   A    Yes.

23   Q    And that is based on conversations you had with

24   Ms. Lindal.  Do you understand that Ms. Lindal withdrew from

25   her engagement as the auditor for this partnership based on

1  what she perceived to be a lack of her independence?

2  A  I do note that she withdrew.

3  Q  Does that impact your reliance on her perspective?

4  A  Not at all.  It actually increased my respect for her

5  integrity, yes.

6  Q  You have an increased respect for her integrity because

7  you think that she correctly determined that she was --

8  lacked independent -- independence in connection with her

9  auditor engagement here?

10  A  Well, yeah.

11         MS. LATSINOVA:  Objection.  This misstates prior

12  testimony.

13         THE COURT:  Overruled.

14         THE WITNESS: I would just say that as an auditor in

15  general, we like to keep our clients.  We take the decision

16  to withdraw from an engagement very seriously.  We don't take

17  it lightly.  All those being equal, we would like to stay.

18  So the decision to leave is not an easy one.  I respect her

19  for it.

20  BY MR. PETTIT:

21  Q  There would have to be some pretty serious circumstances

22  present in order to convince someone that they'd want to go

23  past that -- those barriers and actually disengage; isn't

24  that right?

25  A  I don't understand the question.

1   Q   You testified that typically you want to stay with your

2   engagement.  I think what you were saying is it would have to

3   be a pretty serious situation to convince you that you needed

4   to disengage; isn't that right?

5   A   I would have to view that as something important, yeah.

6   Q   Again, now, on the tenant file review fee, again, you

7   don't have any personal experience with evaluating whether a

8   property manager has an obligation to review tenant files; is

9   that right?

10  A   Personal experience?  Well, I have never managed a

11  property.  I can say that.

12  Q   The tenant file review fee you understand is something

13  that you do in connection with a LIHTC property; is that

14  right?

15  A   Yes.

16  Q   That is an area you don't have any expertise in, correct?

17  A   That is right.

18  Q   Let's take a look at page 18 of your report on Exhibit

19  149.  This talks about -- let's go to the bottom of the page

20  there it talks about the legal services fee.  Do you see

21  that?

22  A   I do, yes.

23  Q   Do you understand that, at least the portion of the legal

24  services fee charged by Mr. Arterberry, related to claims

25  that were brought against Trieste Holdings, the property

1    manager?

2    A   I can't say that is universally true.  There are a number

3    of claims that were -- that Mr. Arterberry performed services

4    on that totalled that $52,776.  I know that one of them, the

5    named defendant was Treiste.

6    Q   Would you agree with me that for that one engagement, it

7    was inappropriate for Treiste and the -- the administrative

8    general partner to bill the partnership for those fees?

9    A   No, I don't.

10   Q   Let's go to page 19.  On page 19, if you look at the first

11   full paragraph towards the top you say, "It is my

12   understanding that the work environment in the 2015 dispute

13   was the work environment at Parkway."  Then you say, "The AGP

14   is to be indemnified by the partnership for," and then you

15   quote the partnership agreement.  Do you see that?

16   A   I do.

17   Q   Do you understand, Ms. Barrick, that what is at issue here

18   is not whether the administrative general partner is

19   indemnified by the partnership, but whether the property

20   manager is indemnified by the partnership?

21   A   I think there is an indemnity for the property manager.

22   Maybe I have quoted the wrong thing.  I believe there is an

23   indemnity, but I need to look it up.

24   Q   You think you quoted the wrong provision here?

25   A   It is possible.

1   Q   Do you understand the difference between the

2   administrative general partner and the managing agent of the

3   property?

4   A   I definitely do.

5   Q   Do you know those are two distinct entities?

6   A   Of course.

7   Q   You think this may have been an error on your part?

8   A   Can I finish reading it?

9   Q   Sure.  I am a little time constrained.  Please, if you

10  need to read the rest of that paragraph, go right ahead.

11  A   Yes, it may be that I have quoted the wrong indemnity.

12  Q   Let's look at page 29 of your report.  If you look at the

13  second full paragraph there you say, "In addition,

14  Mr. Krabbenschmidt takes issue with the decision to make the

15  repairs at all."  Ms. Barrick, are you contesting

16  Mr. Krabbenschmidt's opinion regarding timing of the repairs?

17  A   Yes.

18  Q   Isn't it true, Ms. Barrick, that you don't have any

19  experience that would make you qualified to opine on what is

20  the normal course of repairs with respect to a LIHTC

21  property?

22  A   Let me rephrase that.  I have seen substantial evidence

23  that suggests that these repairs needed to be made.  I am not

24  a property engineer.  I don't know whether the repairs needed

25  to be made or not.  There was certainly plenty of objective,

1  third-party evidence that these problems existed and needed

2  to be repaired.

3  Q   Ms. Barrick, let's take a look at Exhibit 90, which is one

4  of the exhibits Ms. Latsinova showed you.  Specifically, the

5  Hunt funding request here.  I would like to direct your

6  attention to page 9, and the particular portion of page 9

7  that Ms. Latsinova asked you about.

8       If you go to the box in the middle there, Chris, the

9  capital contributions.  Okay.  Sorry.  Clear out of this.  Go

10 up to the third -- yeah, right up there.

11      If you go to the bottom box where it says "construction

12 costs, GP affiliate $1.24 million."  Do you see that?

13 A   I do.

14 Q   I believe you testified on direct examination that the

15 repair supervision fee relates to that amount; is that right?

16 A   It is included, or most of it is included in that amount.

17 Q   Ms. Barrick, isn't it true this line item has to do with

18 construction cost incurred in 2002 when this partnership was

19 first formed?

20 A   I don't believe so.

21 Q   If that were the case, then you would have to revise your

22 opinion; isn't that right?

23 A   Yes.

24 Q   Then let's -- I don't know if this is possible.  On page

25 10 of the Power Point that you were shown, you were shown

 1  something that looked at capitalization or expense of

 2  construction costs.  Do you recall that?

 3  A   Yes.

 4  Q   You would agree with me, Ms. Barrick, that expensing these

 5  costs as opposed to capitalizing them brings down the net

 6  operating income of the partnership; isn't that right?

 7  A   Depends on what year you are talking about.  It does in

 8  the first year.  Every year after that it is higher because

 9  you have taken them all in the first year.

10  Q   To the --

11  A   It is only a time issue.

12  Q   To the extent that appraisals are based NOI, that would

13  reduce the appraised value of the property, right?

14  A   I'm sorry, what?

15  Q   To the extent that commercial properties are appraised, in

16  part based on NOI, and NOI is reduced, that would reduce the

17  appraised value --

18  A   Not at all.  That's not true.  That's now how these

19  appraisals work.  If you look at the detailed trial

20  balance --

21  Q   Ms. Barrick, I actually have no time left.  You have

22  answered my questions.

23          MR. PETTIT: I have no further questions, Your Honor.

24

25

1                      REDIRECT EXAMINATION

2    BY MS. LATSINOVA:

3    Q    One question.  Counsel showed you a waterfall for Parkway?

4    A    Right.

5    Q    Do you recall that?

6    A    Uh-huh.

7    Q    Does the waterfall represent damage to the partnership?

8    A    No.

9    Q    Please explain.

10   A    Well, the waterfall simply shows us, and the one we were

11   looking at is the waterfall on hypothetical dissolution of

12   the partnership, it simply shows us at the bottom how the

13   proceeds will be divided among the partners.  It doesn't --

14   there is no damage in that to the partnership.  The

15   partnership receives its fair value, and then is divvied up.

16   That is only about divvying it up.

17            MS. LATSINOVA:  Thank you.  Nothing further.

18            THE COURT:  Very well.  You are excused, Ms. Barrick.

19   Thank you very much.

20        Mr. Pettit has to catch a plane?

21            MR. PETTIT:  No, we are trying to get our closing

22   arguments finished today so we can finish the trial today.

23   Mr. Goodnight and I sort of informally agreed to split the

24   time equally in the afternoon between Ms. Barrick's

25   examination and closing arguments.  I was trying to keep some

1    time for myself to give closing argument.

2         THE COURT:  We will take our recess, and we will go

3    to closing arguments.

4       I need to have the depositions of Hutsell, Henderson,

5    Carp.  Thank you.

6       I will hold my water.  I have some distinct impressions

7    about this case and the outcome of this case.  I think you

8    should focus on those fees that are, in my judgment, perhaps

9    debatable: the repair supervision fee and the excess property

10   management fee.  The cost for environmental reports has been

11   conceded.  The rest, I mean, if you want to talk about legal

12   fees, you can.  Don't waste a lot of time on that.

13      My comments will come in the argument.  You guys will have

14   every opportunity to say what you want to say, and so we will

15   be at recess for 15 minutes.

16                                        (Recessed.)

17        THE COURT:  All right.  Mr. Goodnight.

18        MR. GOODNIGHT:  I want to turn right to your question

19   and do my best to walk through the impacts that I think we

20   have, if the Court found an adjustment for the property

21   management or repair supervision fees.  And I'm going to look

22   here at Exhibit 168, which is the Parkway waterfall.  I think

23   Your Honor is correct, on Hidden Hills we've conceded the EPI

24   payment.  We've already made arrangements to pay the expenses

25   back.  So there's no adjustment there.

1        THE COURT:  Right.

2        MR. GOODNIGHT:  So first of all, the amount of the

3    property management fee claimed by AMTAX, as I understand it,

4    is $104,000, going all the way back to 2002, so not taking

5    into account the statute of limitations.  And this is for

6    on-site management, day-to-day management of employees by

7    Trieste.  That's the amount of that, $104,000.  The amount

8    for the repair supervision fee, which is for the major

9    construction work by a general contractor and Trieste, was

10   $460,558.  And that goes back to 2010.

11       So those numbers that I'm providing to the Court do not

12   take into account estoppel principles or statute of

13   limitations.  Those are the raw numbers claimed.  That total

14   would be $564,558, without any application of time-barred

15   principles.

16       Our view -- and this is on page 9 of Ms. Barrick's

17   PowerPoint -- if the Court made that kind of adjustment in

18   the waterfall, there would need to be a deduction from that

19   total amount of $564,558 in the amount of $109,414.  And

20   that's interest that's calculated on this page.

21       So that leaves a total of $455,144.  And we think that

22   that would go -- let me make sure I get this correct -- we

23   think that that would go here.

24       So, what would happen, in our view, if Your Honor found

25   that AMTAX was entitled to those fees, is that there would be

1   a deduction from that $1,571,375 in the amount of $455,144,

2   if the Court agreed with the undercharged interest due of

3   $109,414.  If the Court didn't agree with that, there would

4   be a deduction from that of $564,558.  And I think that would

5   fall right to the bottom line and increase the amount paid to

6   the limited partner by that dollar amount.

7       I hope that I got that right.  So I hope that answers Your

8   Honor's questions on those two items.

9           THE COURT:  I have been thinking about this case

10  quite a bit.  I do not believe, on this record, that I can or

11  should remove Ms. Tamaro.  I don't want to characterize the

12  parties.  They are aggressive in their own right.  They are

13  sophisticated business people.  It's like watching a sumo

14  wrestling match, who gets to push the other off the mat.  And

15  I just want to tweak the waterfall where it is appropriate.

16      I said in the summary judgment motion that perhaps the

17  simplest solution is do the appraisal process over.  I think

18  it should be done on today's date and get it done and be done

19  with it.  That's what I think.

20          MR. GOODNIGHT:  Okay.

21          THE COURT:  Go ahead with Mr. Goodnight's argument

22  now.

23          MR. GOODNIGHT:  On the Hidden Hills' property where

24  we accepted the AMTAX appraisal and calculated the waterfall

25  based on the date of the option exercise, Your Honor's

 1  thinking is to do a third final and binding appraisal?

 2        THE COURT:  Third.  Or do them all over.  Obviously,

 3  you've got a whole cast of characters here that are costing a

 4  lot of money.

 5        MR. GOODNIGHT:  Yep.

 6        THE COURT:  And whether you do a third or you do all

 7  three of them, start over.  But that's the cost of

 8  manipulation of the appraisal process.

 9        MR. GOODNIGHT:  Understood.  Our thinking, in

10  accepting the AMTAX appraisal for Hidden Hills, was that if

11  -- let's assume that there had not been a third appraisal and

12  the first two appraisers had met and the parties had called

13  each other and said:  Hey, let's see if we can work this out,

14  let's get together and talk about it.

15        THE COURT:  You can structure your own deal.

16        MR. GOODNIGHT:  If they had done that and the GP had

17  said:  Look, we'll accept the AMTAX appraisal, that would

18  have been the end of it.

19     So from my way of thinking, we are stepping back in time

20  to that date.  But we were trying to really to do what might

21  have been done at the time, to accept the appraisal.  And

22  then we've cited some cases that we think stand for the

23  proposition that the right date for the exercise in the

24  waterfall is the date of the option.  That's when she had a

25  right to exercise.

1      So, you know, it was a fine line, Your Honor, as you, I

2   think, appreciated that we wanted you to understand

3   Ms. Tamaro's thinking about the environmental issue, but at

4   the same time wanted to be very clear that as soon as Your

5   Honor ruled, within a matter of days we said:  We accept

6   that, without qualification, we accept your appraisal.

7   Here's the waterfall.  So now we're basically down to the

8   waterfall calculation.

9      Our biggest concern in this case, without question, is

10  that Ms. Tamaro, as Your Honor has indicated, not be removed

11  and that the option be allowed to work.  She either can or

12  she can't pay whatever you decide the waterfall price is.

13  But our preference would be for you to take the waterfall in

14  Hidden Hills, which is now, you know, the adjusted waterfall

15  after we got AMTAX's waterfall and then came back and said we

16  agree with several fees -- it's in the exhibits as 165 -- and

17  make any adjustment to that that you want so we don't have to

18  go through the process of a final and binding third

19  appraisal.  But as I said in opening, and I stand by this, if

20  Your Honor feels we need to do that, then that's what we'll

21  do.

22          THE COURT:  It's not up to me.

23          MR. GOODNIGHT:  Yeah.

24          THE COURT:  You know, you folks are sophisticated

25  people.  You're great lawyers.  You know, I've told you what

 1  I think about the case and how it ought to be resolved.

 2          MR. GOODNIGHT:  Yep.

 3          THE COURT:  It shouldn't require me to pick a date or

 4  pick a first and second appraiser and go to the third

 5  appraiser.  Ms. Tamaro committed a foot fault.

 6          MR. GOODNIGHT:  Yes.

 7          THE COURT:  Okay.

 8          MR. GOODNIGHT:  Understood.

 9          THE COURT:  The limited partners are justifiably

10  annoyed by that process.  They, I think, used more force than

11  was necessary to meet that foot fault.  And, you know, these

12  are not uncommon solutions.

13      I was in a real estate deal with a guy who was a good

14  friend of mine, who went to Seattle because he antagonized

15  all of his limited partners because of self dealing.  He's

16  still my friend.  And we tried to avoid the court system to

17  solve the problem.

18          MR. GOODNIGHT:  Yep.

19          THE COURT:  And we did.

20      But the fine contours of this case are that Ms. Tamaro --

21  I cannot see myself on this record justifying her removal.

22          MR. GOODNIGHT:  I can understand and appreciate that.

23          THE COURT:  Tweaking some fees that were not

24  copacetic.  Make those.  The bigger issue is when is the

25  appraisal date?

 1         MR. GOODNIGHT:  Yes.

 2         THE COURT:  And as a compensation to the limited

 3   partners, you know, is bring it forward, do it now and

 4   resolve it.  So those are my big -- now we can drill down as

 5   far as you want to go.

 6         MR. GOODNIGHT:  No.  That's very helpful to me in

 7   understanding the Court's thinking.

 8      On the Hidden Hills matter, it seems to me that because

 9   we've exchanged the waterfalls, our request would be to get

10   the Court's guidance on two things, which would allow us to

11   move forward.  Number one is the date, the option date.  And

12   if we have an opportunity to do supplemental findings and

13   conclusions, we can provide more case law.

14         THE COURT:  I want to hear from Mr. Pettit on those.

15   I want him to answer the questions, too.  Which one of you

16   are going to -- has the talking stick?

17         MR. GOODNIGHT:  So one is the date issue.  The other

18   is our acceptance of the AMTAX appraisal.  They say they

19   don't accept the acceptance.  If that's the Court's judgment,

20   then we get a third final and binding appraiser to do an

21   appraisal.  That's fine, too.  I will make sure we cooperate

22   very openly and fully with AMTAX to make that happen.

23         THE COURT:  Why don't we do this in the round.  You

24   get up and down, up and down, up and down.  We get these

25   issues resolved in my head and your head, then we'll see

1  where we go.

2       MR. GOODNIGHT:  Okay.  Let me address the Parkway

3  issue, which I think is quite different.

4       THE COURT:  Right.

5       MR. GOODNIGHT:  In Parkway, you have these fee

6  issues.

7       THE COURT:  Right.

8       MR. GOODNIGHT:  And the way I thought about those,

9  Your Honor, is that we talk about estoppel, we talk about the

10  statute of limitations, but really under the partnership

11  agreement, under the HUD rules, the first line of difficulty

12  for the limited partner is the Business Judgment Rule, which

13  is baked right into the LPA.

14       THE COURT:  There was clear communication between

15  both sides.

16       MR. GOODNIGHT:  Yep.  Very clear.  Very constant.

17  And we have -- I want to say a little more about that.  And I

18  have some slides that I think will -- I'm not going to spend

19  time going through them -- but will be helpful to the Court

20  in just kind of capturing the evidence.

21       In Parkway, what the LP did was to say, really, we're not

22  going to participate in the appraisal process.  We have a

23  claim.  We're not going to give you an appraisal.  And that

24  was really a breach of Section 7.

25       Now, that section doesn't provide a date by which the

1    appraisal is due.  But when they knew the option had been

2    exercised, there's no question it was timely, there's no

3    question it was their right, they had a duty to participate.

4    And in February, March, April and May, they refused.  They

5    instead took the position, we want you removed unless you

6    give up all these fees, which is really improper.  It's a

7    clear violation of the partnership agreement and the duty of

8    good faith.  And that's not an equitable argument, that's

9    just a contractual duty that they had.

10       If a limited partner of this magnitude, Alden Torch, could

11   defeat an option after 15 years by simply saying, we're not

12   going to participate unless you give up these fees --

13   remember the three choice letter, pay us more than our

14   appraisal, agree to be removed, or sell the property.  None

15   of which are rights of the LP.

16       If a buyout option can be defeated by that kind of -- it's

17   meaningless.  So in that case, I think it's quite different,

18   really, than Hidden Hills.  And we would ask the Court there

19   to say, you breached, AMTAX, your duty to participate in the

20   buyout process.  And so on the Parkway property, the GP's

21   appraisal will be accepted.  And that's the waterfall.  And

22   that's right in our slides here.

23       You'll note, I think, and we have a slide on this which is

24   on page 11, Adam, that all of the issues that were raised by

25   AMTAX and Mr. Krabbenschmidt were disclosed for many years in

1    these various -- and you've noted that, Your Honor,

2    correctly.  And this slide simply captures the record

3    citations to all of these issues.  And Mr. Newbold's e-mails

4    that he understood and that sort of thing.

5        I told you in opening that every one of these fees was

6    something that was discussed.  And that's what the evidence

7    shows.

8        We also told you that all the fee claims were the subject

9    of audited financials.  And the evidence also shows that.  So

10   we have a slide on that.  And that goes all the way back to

11   2002.  And one of the odd things about this case, Your Honor,

12   was the corporate representative of AMTAX saying, we accept

13   the audited financials, we're not challenging them, we're not

14   questioning them.  Then to have Mr. Krabbenschmidt come in

15   and sort of question them.

16       But the evidence is clear that the LP never complained

17   about untimely audited financials or the legitimacy of the

18   audited financials, for 17 years.  And that's another slide

19   that we have, the next slide, the 2018 audited financial

20   statements.

21       Now, this one makes the point, with exhibit citations,

22   just that in Parkway where the 2018 audited financial wasn't

23   finalized by Ms. Lindal, this is all the information that

24   AMTAX had, listed by exhibits.  They had a lot of

25   information.

1          THE COURT:  Right.

2          MR. GOODNIGHT:  They had the draft.  They had the

3     REAC filing.  They had all of this information.

4          And Mr. Blake testified, I think very clearly, we've cited

5     that here, that none of that was being questioned.

6          And we think that one issue for the Court to just decide

7     is that his testimony, as a corporate representative in this

8     trial, has got to be binding on the limited.  The limited

9     can't bring in an expert to sort of question these, after the

10    fact, who has not even done an audit.

11         So the funds owed to Ms. Tamaro on those financial

12    statements are clear.  They're valid partnership obligations.

13    They were part of the refinance.  They were always disclosed

14    year in and year out.  And they should not be ignored.

15         Now, on the morning of the second day, Mr. Blake came in

16    and, in our view, we were sort of shocked, in a way, and said

17    all of those prior fees before the refinance were immaterial.

18    And what really mattered was loading up the balance sheet

19    with all of these loans from the general partner.  And that's

20    why we wanted Your Honor to see that that's just not what

21    happened.  I mean, the numbers are the numbers.  They're

22    right from the audited financials.

23         And that exhibit that we went through with Ms. Tamaro

24    cites to those particular audited financial statements to

25    show where those numbers come from.  But this new theory that

 1    she was somehow suddenly, in 2016, '17, '18, loading up the

 2    loans, is just simply not true.

 3        In fact, in 2014 the balance was $284,955.  And it went

 4    down in 2015 and '16, not up.  The amount of the loan went

 5    down.  And the total over four years was $400,000.  So this

 6    slide simply lists those amounts.

 7        I'm not going to spend any significant time, Your Honor,

 8    on Mr. Krabbenschmidt's damages testimony.  You heard it.

 9    You heard the admissions that some of the fees were being

10    withdrawn.  The rent fee changed from one number to various

11    other numbers.

12        But the bottom line is that you don't even get to those

13    issues if you Honor the business judgment of the general

14    partner, which is clearly, clearly expressed in the

15    partnership agreement, as you said.

16        THE COURT:  How do you deal with the Business

17    Judgment Rule on one hand with regard to the excess property

18    management fee, for example?

19        MR. GOODNIGHT:  Yeah.

20        THE COURT:  Which is 4 percent.  What is your legal

21    argument that the Business Judgment Rule can trump the

22    original agreement, without some clear consensus on results?

23        MR. GOODNIGHT:  A couple of things.  One is that we

24    don't see anything in the agreement itself that prohibits

25    what was happening with either the property management fee or

1    the repair supervision fee.  There's nothing in the

2    partnership agreement or the management agreement that says

3    that was improper.

4         The other thing is that those fees were disclosed in all

5    kinds of documents.  Trieste Holdings.  All those fees were

6    disclosed.  They were discussed.

7         So the question -- that's why I had such a problem with

8    Mr. Krabbenschmidt, who didn't even look at that material,

9    coming in and saying that these fees were unauthorized.

10   When, in fact, we see -- and that's the prior listing that I

11   made -- all of these back and forths, including not just

12   e-mails with Mr. Newbold, but things like actual reports done

13   by the LP.  And, Your Honor, I can see, grasps all that

14   evidence.

15        So I don't think there was anything improper and there's

16   no evidence to support the notion that those fees are somehow

17   not allowed under the partnership agreement.  Ms. Tamaro, the

18   GP, was always upfront about what she was doing.  And it's

19   perfectly legitimate, in our view.  When I started out with

20   the calculation, I just wanted the Court to understand that

21   if you determined that there should be an adjustment, that's

22   how it would work, in our view.

23             THE COURT:  I wanted to flinch when you were saying

24   that, because I had looked at the agreements, and they were

25   not as definitive as Mr. Pettit and Mr. Blake advocated.

 1        MR. GOODNIGHT:  Yes.

 2        THE COURT:  And I wanted some understanding from the

 3   parties in closing argument about what the agreement is,

 4   says, requires, versus -- or what is a reasonable

 5   interpretation, given the inherent ambiguities with the

 6   agreement.

 7        MR. GOODNIGHT:  Understood.  And I can see why that

 8   would raise questions.  The conceptual dividing line on some

 9   of these issues, I think, is the difference between repairs

10   and maintenance.

11        THE COURT:  Right.

12        MR. GOODNIGHT:  And major contracts.  When you have a

13   general contractor who needs a permit, to pull a permit into

14   a project like replacing those decks, that's not repair and

15   maintenance.  That's a major construction project.

16        THE COURT:  There's no demarcation in the agreement

17   between maintenance and repair.  I mean, there isn't, in

18   those agreements, that I saw.

19        MR. GOODNIGHT:  I think in the property management

20   agreement, maintenance would clearly be covered.  But these

21   major, major projects would be subject to additional fees.

22   And that's what was always done.  That's what was always

23   disclosed.

24      This is not a case on any issue, which is one of the

25   things that struck me about this from the beginning, I've had

1    a number of partnership removal cases, where the partner was

2    not paying the TTB fees for the winery, or the partner was

3    off to Tahiti or Las Vegas on extravagant vacations doing

4    something that had nothing to do with the partnership.  We

5    don't have anything like that.  This is all work related to

6    the partnership.  But that line of demarcation between

7    maintenance and repair versus major projects, I think, is the

8    critical one.

9         Another really important issue from our perspective, Your

10   Honor, and I sense that you saw this clearly in the

11   partnership agreement, this is not a 15-year partnership

12   agreement.  The notion -- I mean, the notion that there was a

13   fiduciary obligation to maximize the rents in 2016 and '17 to

14   the very maximum of the LITHC standards, while not doing any

15   maintenance, I just couldn't believe it.

16        THE COURT:  No.  That is a position that I can't

17   accept.

18        MR. GOODNIGHT:  Yeah.

19        THE COURT:  Most of these limited partnerships are --

20   they have an exit on the freeway to get off --

21        MR. GOODNIGHT:  Yeah.

22        THE COURT:  -- when or at the earning of the tax

23   credits.  But there's never a date certain that's

24   commensurate with the harvesting of those tax credits.

25   There's a much longer life.  As an investor, I may not want

1   to be here at the end.

2        MR. GOODNIGHT:  Right.  Exactly right.  And

3   Ms. Tamaro, as the general partner, we don't know whether

4   she'll have the cash to pay whatever Your Honor determines is

5   the option price.  That's all she wants is a chance to do

6   that.

7        If she does, she'll have a new limited partner, perhaps.

8   Or if the interest is sold on the market under K, if she

9   can't pay, she'll have a new limited partner.  That won't

10  change the partnership.  It will go on.  And her duty is

11  50 years, under HUD, to the partnership in Parkway.

12       Let me just mention one slide we have on rents.  And you

13  can see on the two-bedroom units, rents were raised every

14  single year.  On the one-bedroom units, they were raised

15  every year, but one.  And I think the testimony on that is

16  clear.

17       THE COURT:  I think both of you can save your breath

18  on the repair expenses and the rents.

19       MR. GOODNIGHT:  Thank you.

20       We have a slide on the removal standard, from the

21  partnership agreement, 4.5.A.  and Your Honor is familiar

22  with that standard.  And to me, at the heart of this case,

23  and I said this in the opening -- and I'll sort of end with

24  this, then tell you more precisely what we would like the

25  Court to consider doing -- the heart of this case is that the

1   GP has a right to exercise a buyout option.  No question

2   about that.  No question it was timely exercised.

3       There was a foot fault on the environmental issue.  I

4   don't know what else we can do to say we accept

5   responsibility, completely, unequivocally, we put it in

6   writing, just like that.  We'll pay the EPI fees.

7       But she deserves a right to exercise that option.  Whether

8   she can do it remains to be seen.  It depends on how you

9   decide the issues on the fees.  But that's what she deserves.

10      And so in Parkway, if you look at the waterfall we

11  provided, we're asking you to make the determination, number

12  one, that the LP breached its duty to provide an appraisal

13  under Section 7.  There was no question there was a duty to

14  do that.

15      There's no question that they failed, and continue today

16  to have failed to provide an appraisal, which thwarts and

17  defeats the general partner's option right.  And so the

18  Parkway waterfall appraisal number, which is the only

19  appraisal as of the date of the option, should be accepted.

20  And that waterfall should be accepted, unless Your Honor

21  wants to make the adjustments that we started with today.

22      Then in Hidden Hills, I think we've already discussed that

23  we need guidance on two issues.  One is whether the

24  acceptance of the waterfall is acceptable to the Court.  And

25  the other is the option date.  And as I said, if you

1    determine, Your Honor, because of the taint of the appraisal

2    process we need a third appraisal, we will cooperate in

3    getting that done.

4        I hope that's helpful, Judge.

5            THE COURT:  Yes.  Thank you.  Thank you,

6    Mr. Goodnight.

7        Mr. Pettit.

8            MR. PETTIT:  So obviously, Your Honor, I'm having to

9    call a little bit of an audible here.  This is not the

10   closing argument that I was anticipating giving.

11           THE COURT:  I oftentimes jump the pass route and get

12   the lawyers speaking, and learn a little bit more about the

13   case and the inside football.

14       How important is it for you all to declare victory?

15           MR. PETTIT:  Well, Your Honor --

16           THE COURT:  I mean, attorney fees are always in the

17   offing.

18           MR. PETTIT:  Well, Your Honor, from the outset, we've

19   never wanted to be here.

20           THE COURT:  We wanted -- from my chambers -- we

21   wanted you here, because you were good lawyers.  And I was a

22   civil lawyer for 25 years.  And my experience as a federal

23   judge is that the bottom falls out on the civil practice.  We

24   get some really bad cases with bad representation.  So, we

25   knew you folks were good lawyers, and we were going to get to

1  put you through your paces, and you were going to put us

2  through our paces, and it was going to be a good experience.

3      But, there's -- at some point, there's a day of reckoning,

4  and you can -- you still have your future in your own hands.

5          MR. PETTIT:  Certainly, Your Honor, and I appreciate

6  those nice words.

7      I think sort of cutting to it, and what I was beginning to

8  say is we never wanted to be here.  What we've always wanted,

9  what we've wanted since the inception of this dispute, is to

10 have the value of our interest fairly valued.  That's all we

11 want.  We're not looking to stay in the partnership.  We're

12 not -- up until what we believe was a serious breach of trust

13 by Ms. Tamaro, we were not looking to kick her out of the

14 partnership.  She exercised her option on Hidden Hills.  She

15 manipulated the process.  We had no choice but to call her

16 out on that, and we did.  And Your Honor found in your

17 summary judgment order that she had manipulated the process

18 in order to bring our price down.

19     So we're back where we wanted to be.  We're back where we

20 always have been, which is we want to figure out a way to

21 fairly value our interest in Hidden Hills -- and in Parkway,

22 frankly, but I'm talking about Hidden Hills for the moment --

23 so that our exit is not, our exit price is not reduced by

24 actions taken by the general partner.

25     Now, what does that mean?  Well, I think -- and I have a

 1  really persuasive pitch about why she should be removed from

 2  the partnership.  But I don't flatter myself to think that

 3  I'd be able to convince you to change your mind on that.

 4      So, putting that aside, what our perspective is, is that

 5  she manipulated this process.  She caused the delay in the

 6  process.  The only fair outcome here, in which she continues

 7  to exercise her option, is one in which we do a new

 8  appraisal.  And if we go -- I think if we go straight to the

 9  third appraisal, I don't think that will be a problem.  But

10  that if there is a third appraisal, that it's done as of

11  today.

12          THE COURT:  Right.

13          MR. PETTIT:  And that it's then run through the

14  waterfall as of today.  We don't go back and look at what the

15  finances of the partnership were in 2017 when she was

16  engaging in this manipulation.  We run the waterfall through

17  as of today.

18      And my understanding, based on the communications that

19  went back and forth in May where they offered the 4.9, then

20  we called that into question, then they raised it up to 5.7,

21  is there's really only two issues in dispute with respect to

22  that waterfall.  One is, what's the price at the top?  And

23  what they've purported is they want to use this two-year old

24  appraisal.  And what I think is fair, and I think what the

25  Court has indicated is fair, is that we get a new appraisal

1    based on today's value.  And that's where we start at the

2    top.

3        The second issue is then when you go through that

4    waterfall, again, what time period do you use?  Do you use

5    the financial condition of the partnership today, which is

6    how this partnership agreement is always contemplated?  If

7    you have a liquidation event, you run the proceeds through

8    the waterfall as of the liquidation event.

9        And so what we would ask is that we have a new appraisal,

10   and then we run that appraisal through the waterfall as of

11   today.  And then that should give a value.  And, you know,

12   frankly, from our perspective, we're still concerned about

13   efforts to manipulate the process.  But if safeguards can be

14   put in place to ensure that Ms. Tamaro would not interfere

15   with that, our preference would be marketing the property,

16   let that determine fair market value, if she wants a ROFR.

17            THE COURT:  No.  She wants her right inviolate.  And

18   I'm going to give that to her.  I was distressed by what I

19   saw from the appraisal process.  I was one of lead counsel in

20   the ASARCO litigation for six months here in court.  And the

21   science persuaded me that ASARCO damaged the fish mightily,

22   and not so much humans.  And we have spent a lot of money

23   cleaning up playgrounds and all that.  And you've seen the

24   news about the property values in Tacoma, even, that are

25   going through the roof.

1    And no one is going to ever compel anyone to scrape off

2    two feet of topsoil.  I've lived in the plume ever since I've

3    moved here in 1976.  So, you know, it's a false fact.  But it

4    does not lead me to the conclusion that it is all -- all of

5    this, including the fees, are so material to justify her

6    removal.

7        And, frankly, I think your side kind of overplayed your

8    hand.  I mean, you know, the issues were too small to be made

9    -- except for the big categories, you know -- but the

10   compactor, you see them as insider trading or self dealing,

11   but to me it looks like people who are resourceful to solve a

12   problem, and not with a manipulative intent at that point.

13   So, you know, agree to disagree.

14        MR. PETTIT:  Fair enough, Your Honor.  And I would

15   like the opportunity to go through some of those fees with

16   Parkway.

17        THE COURT:  Absolutely.

18        MR. PETTIT:  And I think I've made our position

19   clear, under the constraints that have been imposed on us,

20   what we really want on Hidden Hills is an exit that values

21   our interest as of today's date.  And I don't think there are

22   any further disputes how the waterfall should be interpreted.

23   So if that were ordered, I think that that --

24        THE COURT:  We can resolve that.

25        So now what do you want to do on Parkway?

1        MR. PETTIT:  So on Parkway if you'll permit me, Your

2   Honor, there were some specific fees to which you did express

3   concern.

4        THE COURT:  Right.

5        MR. PETTIT:  And I would like to address those, if I

6   may.

7        THE COURT:  Sure.

8        MR. PETTIT:  And the first I'd like to address is the

9   repair supervision fee.  And, Your Honor -- so, as you know,

10  you've got, Ms. Tamaro's company is the general partner, she

11  has another company Trieste.  The general partner has the

12  ability, because it has the control, to hire Trieste to be

13  the property manager.

14      Trieste, as the property manager, enters into a property

15  management agreement.  And that provides for fees.  And I

16  think that the fees in the property management agreement,

17  there's an inconsistency between what fees are in the

18  property management agreement, which has it at 10 percent,

19  and the maximum fees under the limited partnership agreement,

20  which is 4 percent.  I'll get to that in a minute.

21      Right now, I want to talk about the repair supervision

22  fees.  So Trieste is the property manager.  Generally

23  speaking, they have the obligation to run, operate, supervise

24  the property.  And I agree with you that there is some

25  language in the partnership agreement that makes the property

1    manager responsible for repairs.  And there's some argument

2    that certain repairs should be included within the 4 percent

3    fee.

4         And there are some repairs that are, you know, of a

5    capital improvement nature, or are so substantial that maybe

6    you would argue, and we think that the term is broad about

7    what they should be covering.  But arguably, maybe there's

8    some repair fees that fall outside of the repair obligations

9    of the property management agreement.

10         But that's not the end of the inquiry.  You then have to

11    look -- and I'd like to bring up Exhibit 40, which is the

12    2010, so the current version of the property management

13    agreement.  And I'd specifically like to direct your

14    attention to page 7 of Exhibit 40.  And it's Section 4.2.

15         And Section 4.2 specifically addresses this situation

16    where the property manager has to hire an independent

17    contractor to perform services.  And it specifically

18    contemplates that, "The manager shall have the right to

19    engage independent contractors for performance of its duties

20    hereunder as manager deems necessary.  Manager shall have the

21    responsibility for supervision of the performance of such

22    duties."

23         So let's break that apart.  First it says, "The manager

24    has the right to engage independent contractors for

25    performance of such of its duties hereunder."  So we're

1  starting with the idea that these are all duties that belong

2  to the property manager.  But it can then -- what this is

3  saying is you can go out, property manager, and hire an

4  independent contractor to cover some of those duties.  And

5  although we think that those charges are improper because

6  they racked up fees and debt, and I know that you don't want

7  us to go there, we think those were all improper and they

8  shouldn't have even been incurred.

9       But that's not what this is talking about.  This repair

10  supervision fee is assuming that those -- that independent

11  contractor performs those services, what Trieste is trying to

12  do is then charge another 15 percent on top of that, and they

13  call that the repair supervision fee, in order to supervise

14  all of the repairs that are being taken care of.

15       And this provision specifically precludes that.  It starts

16  with the presumption that the property manager has all the

17  responsibilities.  It says, you can hire an independent

18  contractor to take care of those responsibilities.  But it

19  says, but manager shall have the responsibility for

20  supervision of the performance of such duties.

21       And so I would submit, Your Honor, that that is pretty

22  clear language in the property management agreement that

23  subsumes those supervising responsibilities, within the four

24  corners of the obligations and within the four corners of the

25  4 percent management fee.

```
 1          THE COURT:  How does that square with administrative
 2   charges, and all of that, for Trieste or the independent
 3   contractor?
 4          MR. PETTIT:  I'm sorry, Your Honor?
 5          THE COURT:  There are always independent contractor
 6   fees, contractors always have fees.  And how do they square
 7   with this?  This is a supervision fee that's charged by the
 8   manager, right, in the waterfall?
 9          MR. PETTIT:  That's right, Your Honor.
10          THE COURT:  How about the fees that the contractor
11   charges, the --
12          MR. PETTIT:  So, Your Honor, I think that the
13   property manager has two choices.  The property manager can
14   hire out a third-party independent contractor.  And if
15   there's a contract that is favorable to the partnership, they
16   can enter into that.  And even if that includes a surcharge
17   above the labor and materials, I understand that's not
18   uncommon.
19       But what's happening here is not that the property manager
20   is going out and hiring an independent contractor.  The
21   property manager is hiring itself.  And the property manager
22   has an obligation, under this agreement, to provide these
23   supervisory services.
24       And so if the property manager is hiring itself, it
25   doesn't get to take off its property manager hat and put on
```

1   its independent contractor hat and say, since I'm not wearing

2   my property management hat, I don't have to supervise these

3   repairs.  I think if they want to be an independent

4   contractor, they have to wear both hats at the same time.

5           THE COURT:  But they've got overhead in the contract.

6   You're not disqualifying those fees because it is an

7   affiliate of the general partner.

8           MR. PETTIT:  What I'm saying is improper is for them

9   to mark up their fees, to make a profit that's independent of

10  their 4 percent profit.

11      So if they have fees because they have to pay for labor,

12  or because they have to pay for materials, or they have, for

13  whatever reason as part of their project, there are costs

14  associated with that, that's not part of the repair

15  supervision fee.  The repair supervision fee is an

16  across-the-board 15 percent markup for all of their costs,

17  and is being marked up specifically -- and we didn't call it

18  a repair supervision fee, Your Honor.  They call it a repair

19  supervision fee, because that's exactly what it is.

20      And the property management agreement specifically says

21  that those supervisory functions are the responsibility of

22  the property manager, and that the property manager is not

23  entitled to receive any fees beyond the 4 percent.  The

24  4 percent is intended as a ceiling that the property manager

25  can charge.

1      And so to put on its independent contractor hat and say

2  that because I'm wearing my independent contractor hat, I can

3  do an end run around this limit on my fees for supervising, I

4  think is contrary to the terms of the agreement.

5           THE COURT:  Okay.

6           MR. PETTIT:  And I'd just point out, Your Honor,

7  there was no contract here.  Ms. Tamaro testified that -- I

8  mean, independent contractors, you always have a contract.  I

9  mean, contract is right in the name.  But she didn't enter

10  into any contract with Trieste.  And when I asked her why not

11  she said, "I just didn't."

12      And I think, Your Honor, and I don't want to bleed into

13  the breach of trust, but I think this is just an example

14  where she's treating the partnership as if it's her own thing

15  and she gets to do whatever she wants, rather than having to

16  follow.

17           THE COURT:  Well, yes, but she sends a lot of

18  information to your representative.  And your representatives

19  are trained professionals in their own right.  And over a

20  multiyear performance, you know, it gets easy to coin a term

21  of art as just "performance."  What the expectations are.

22  And now we're reinventing the relationship.  And it's

23  problematic.

24      I was paying attention on those e-mails with Mr. Newbold,

25  and all of those responses.  And, you know, it seemed clear

1  to me that he was -- he felt like he was informed.  She

2  thought he was informed.  Everything was copacetic.  And then

3  because of the appraisal process, got into the, you know,

4  looking for the belly -- naval lint.

5      MR. PETTIT:  Well, Your Honor, I understand.  And I

6  don't want to be difficult.

7      THE COURT:  No.

8      MR. PETTIT:  I will point out, Your Honor, while

9  you've referred to it as these notices being over a multiyear

10 period, all of these communications happened either in 2013

11 or 2014.

12     THE COURT:  Yeah.

13     MR. PETTIT:  And all of these communications -- it's

14 important to understand the context in which they occurred.

15 So the communications that were happening in 2013, those had

16 to do with negotiations over an investor exit.  And so to the

17 extent that the investor had concerns about mismanagement or

18 improper fees -- and you heard Mr. Blake testify about

19 this -- that could all be rolled up into a capital

20 transaction, and you wouldn't have to worry about whether the

21 general partner is taking advantage of you going forward,

22 because what's being contemplated in those discussions is an

23 exit.

24     And then in 2014, where you also heard these -- and,

25 again, there's no e-mail where we say:  We approve of this,

1   we agree with you.  There's some e-mails that say -- there's

2   one that says, "Understood."  There's one that says, "We're

3   on the same page with respect to the audit."  And all of

4   these e-mails, again, were in the 2013/2014 time period, and

5   were either in connection with this attempt to negotiate a

6   buyout, which would take us out of the partnership and then

7   we would have no more concern about what she was doing,

8   whether she was charging fees properly; or, they happened in

9   the context of the general partner's request for a refinance.

10          THE COURT:  Yeah.

11          MR. PETTIT:  And I think the evidence shows this and

12  the funding requests that we made to our investor, Morgan

13  Stanley, informs this, is that our view was, we know that

14  this property, Parkway, has had trouble in the past.  We know

15  that they're having difficulties with meeting their operating

16  expenses and to run as a going concern.  We understand that

17  the partnership has this debt.  And this debt is eating up a

18  significant -- the debt service is eating up a significant

19  amount of money that could otherwise be used to make repairs,

20  to pay down subordinated loans, to pay down the DDF.

21      And so what we -- and I say "we" -- what my client decided

22  was, well, we're going to approve this refinance.  And

23  between the refinance, which Ms. Tamaro testified freed up

24  about $20,000 a month in money that was previously going to

25  debt service, plus the increase in the HUD requirement for

1   the replacement reserve -- if you'll recall, Your Honor, that

2   2014 HUD report required that the general partner increase

3   their reserve from $300 to $500.

4       The thinking was, from the limited partner's perspective,

5   that the combination of those two sources of additional funds

6   would allow the property to make any repairs needed, to pay

7   down some of its debt, and get this thing on the right track.

8   And that's what we approved.  That's what we understood was

9   going to happen.  The refinance happened in 2015.

10      And, Your Honor, you won't see any e-mails from 2015.  You

11  won't see any e-mails from 2016.  You won't see any e-mails

12  from 2017, where all of these significant expenses were rung

13  up.  There weren't subsequent e-mails where Ms. Tamaro was

14  saying, I'm going to replace all of the siding.  She

15  mentioned it in 2013, 2014.  But when she went out to buy the

16  $250,000 worth of siding, there were no communications then.

17      And so my point is, and I apologize for making it a long

18  point, but my point is you have to understand the context in

19  which those communications were made.  And you have to also

20  understand the fact that those communications were in a very

21  narrow band of time, for a specific purpose.  And that from

22  2015 onward, which is where the bulk of what we're

23  complaining about occurred, there was nothing like that from

24  the limited partners.

25      Did we take our eye off the ball?  Perhaps we did.  Maybe

1    we should have been more on top of things and watching her

2    with eagle eyes and making sure that she did everything

3    right.  But, frankly, Your Honor, we're the limited partners.

4    We're not supposed to have to do that.  The general partner

5    has a fiduciary duty to look out for the interests of the

6    partnership and the limited partners.  And we relied on

7    Ms. Tamaro as the general partner to be looking out for our

8    interests.

9         And so when we discovered -- and, again, it started out

10   with Hidden Hills -- but when we discovered that she was

11   taking active steps that we believe, and continue to believe,

12   were directly intended to reduce our buyout price, in a way

13   that wasn't authorized by the partnership agreements, then

14   obviously that created problems for us.

15        And so I understand the chronology of this, it looks like

16   -- and I'll be the first to admit that when we realized what

17   was happening in Hidden Hills, and all of the manipulation

18   that was going on, then there was a heightened awareness on

19   our part that we needed to take a deeper dive and look at

20   exactly what was happening in Parkway.  And when we did, when

21   we opened up the books, we found all of these problems.

22        And I understand Ms. Tamaro is saying that she fronted

23   these things in 2013 and 2014.  That doesn't change the fact

24   that these things are not permitted under the partnership

25   agreement.  And it doesn't change the fact that the

1   partnership was harmed as a result.

2      And so in addition, on Parkway, we would ask that the

3   Court -- and Ms. Barrick testified that this is the proper

4   way to do this -- to the extent that there are improper fees,

5   which we think that there are, the proper solution there, you

6   know, we believe that the proper solution is to remove the

7   general partner.

8      And I think the Court gets this, but I just want to

9   emphasize, so it's clear for the record, in case you have any

10  confusion about this, removal doesn't take away the general

11  partner's ability to enjoy their economic rights.  They

12  continue to receive the economics on this.  What we believed

13  was the fair outcome on both of these partnerships was that

14  she would be removed, for the sole purpose of allowing us to

15  market and sell the property, which would be, in our mind,

16  the most transparent way to determine the fair market value

17  of our interests.

18     To the extent that Ms. Tamaro wanted to hold onto the

19  property, she would be permitted to bid in that process and

20  buy the property in that process.  I understand that Your

21  Honor doesn't want to go there.  That's our -- that was our

22  preferred outcome.

23     I think that, with that off of the table, the second

24  preferred outcome would be for the Court to recognize that

25  many of these fees, including the repair supervision fee and

1   the tenant file review fee and the excess property management

2   fee and the legal services fee that was paid to

3   Mr. Arterberry for services to Trieste, that we, I think

4   convincingly, established were not indemnifiable expenses,

5   that all of these fees should be reduced -- should come off

6   of the subordinated debt.

7        And the result of that -- and, again, I don't want to beat

8   a dead horse -- but everyone here agrees that as that number

9   comes down, every dollar that number comes down, 99 percent

10  of that goes to the limited partner.

11       And so I would, if you don't mind, Your Honor, like to

12  just very quickly go through the excess property management

13  fee and some of the other fees.

14       Let me start with the tenant file review fee, because this

15  is another fee where our position is that that's specifically

16  contemplated by the property management agreement.  And if we

17  go back to Exhibit 40 and take a look at page 3, at Section

18  3.4A and B.

19       I'm sorry, Chris, if you can highlight everything after

20  3.4.  That whole -- all the way down to the bottom of the

21  page there.

22       Starting at 3.4, all the way to the bottom, I want to

23  direct your attention to a couple of things, Your Honor.

24  First, in A, the requirement of the manager is to rent the

25  units in the project only to individuals or families who, at

1    a minimum, qualify under the restrictive agreements with, and

2    the guidelines established by the State of Washington for

3    low-income families.

4        Now, Ms. Tamaro testified that the reason why she

5    outsourced some of these responsibilities and charged a

6    tenant file review fee on top of the 4 percent property

7    management fee, was that there were certain types of reviews

8    having to do with compliance with the Washington State

9    Housing Finance Commission, that were not contemplated by the

10   partnership agreement.

11       And whether that's true or not, they are contemplated by

12   the property management agreement, because it specifically

13   says, "Guidelines established by the State of Washington."

14   That's the Washington State Housing Finance Commission.  And

15   to the extent that there are guidelines that they've imposed

16   that need to be removed by the property manager, it's not

17   appropriate to charge a separate fee for that.

18       Now, Ms. Barrick testified, and you'll see in her report

19   that she concluded that it was appropriate for them to charge

20   a separate fee for this.  And before we get there, while

21   we're still on this document, go down to the paragraph that

22   starts with, "Manager further acknowledges."  And, again, the

23   second sentence there, "Manager will familiarize itself with

24   the low-income housing tax credit requirements as they relate

25   to manager's leasing and management duties hereunder, and

1  shall use its best efforts to comply with such requirements.

2  And to the extent manager is unable to do so, manager will

3  promptly notify owner of such fact and the reasons

4  therefore."

5      So, the property management agreement is clear that this

6  is not an additional charge that should be charged.  Now

7  Ms. Barrick said, well, I talked to Laura Lindal and she said

8  it's okay to charge this separately.  She didn't look at this

9  specific language.  And she hasn't been able to identify why

10  that language doesn't prevent this type of fee from being

11  charged.  And, Your Honor, we respectfully submit that this

12  is another example of double charging by the general partner.

13      The excessive property management fee.  Now, Ms. Barrick

14  seems to think that the Article 11 of -- 11(a) of the limited

15  partnership agreement says that the property management fee

16  is 4 percent flat.  That's not what it says.  It says not to

17  exceed 4 percent.  It's the lesser of 4 percent and some

18  other number that's not applicable here.  Not to exceed.  If

19  it was supposed to be 4 percent exactly, not to exceed

20  wouldn't be in there.  You would say 4 percent.  Not to

21  exceed not only would be surplusage, but it would be

22  misleading, because it would suggest that it could be less

23  than 4 percent.  So the clear reading of that provision is

24  it's not to exceed 4 percent.

25      And what Ms. Barrick did was she looked at years before

1    Ms. Tamaro was running the property, by the way, because she

2    testified that that didn't happen until 2005, with

3    Mr. Renicker leaving, her partner -- but when those property

4    management fees were undercharged -- undercharged -- by the

5    previous property managing agent, Ms. Barrick would like to

6    net those undercharges against the overcharges.

7         And what I would submit, Your Honor, is that's not what is

8    permitted under the agreement.  It's a maximum of 4 percent.

9    It could be less than 4 percent.  It was less than 4 percent

10   and you don't get to net it out.

11        And the other thing I wanted to point out with respect to

12   the 4 percent, exceeding the 4 percent maximum, was that this

13   overpayment was only corrected after the limited partner

14   brought it to Ms. Tamaro's attention.  She knew that the

15   partnership agreement said 4 percent max.  She was

16   responsible for creating the property management agreement.

17   She put 10 percent in there.  She said on the stand she

18   didn't look at the partnership agreement, she didn't realize

19   what she was doing.  She overcharged the partnership by over

20   $100,000.  And it was the limited partner who had to figure

21   that out.  For all we know, if we hadn't been watching things

22   closely, she could be charging that 10 percent every year

23   from 2010 onward, and depriving the partnership of money that

24   it's legally entitled to.  And that's not the job of the

25   limited partner.  It's not our responsibility for her to

1    comply with the terms of the partnership agreement.

2        And then apparently there was some reimbursement after

3    AMTAX made them aware of this overpayment.  And Ms. Barrick

4    and Mr. Krabbenschmidt both account for and recognize that

5    reimbursement.  And they both agree -- Ms. Barrick agrees

6    that that reimbursement was insufficient to make up for the

7    excess property management fee.  And that's even netting out

8    the earlier years, which we've already established is

9    improper.

10       And what is Ms. Barrick's solution for rectifying that?

11   It's the same solution that we've been suggesting, which is

12   that you reduce that amount from the line item reflecting the

13   general partner's subordinated debt, which will have a result

14   of putting 99.9 cents into the limited partner's pocket for

15   every dollar that that number is reduced.

16       The evidence also established that Ms. Tamaro authorized

17   other improper fees to its affiliates and others, which

18   resulted in hundreds of thousands of additional dollars of

19   fees to the partnership.  And, again, it just illustrates the

20   disregard that she had for her contractual and fiduciary

21   duties.  This construction note payable, that's been on the

22   books since 2002, they seem to suggest that the fact that

23   it's been on the books since 2002 means that somehow they've

24   grandfathered in the right to get this amount paid.  But

25   Mr. Krabbenschmidt looked at the developer agreement and

1   walked you through the provisions there.  And the language

2   there is very clear, that when the construction payable is

3   not paid by the final closing date, it must be borne by the

4   developer, Ms. Tamaro.

5       And the general partners have not offered any evidence

6   rebutting that interpretation.  So that's $120,000.  And that

7   money was called out as a separate line item in the financial

8   statements until 2015, when Ms. Tamaro took a number of

9   different line items that all sourced to her, she rolled them

10  up in what she called a "consolidated debt note," and then

11  she put that on as a single line item in the partnership

12  agreement.  And this $120,000 was included in that line item.

13  And the developer agreement is clear, that that would be

14  improper for the partnership to pay to the general partner at

15  this stage of the life of the partnership.

16      The legal services fee.  You know, I understand that the

17  property management agreement allows the managing agent to

18  hire affiliates.  I understand that Mr. Arterberry is a

19  licensed attorney.  And I understand that the rule is you

20  can't pay more than what you would get for comparable

21  services, if you were to hire a third party.

22      But, one, there was no competitive bidding.  She didn't

23  call any other attorneys and say, what are your rates for

24  something like this?  She just went straight to her husband.

25  And I understand Your Honor may not think that's a

1   significant infraction on her part.  But if you look at the

2   actual substance of what he did, that, too, is something that

3   is unfair to charge the partnership for.

4       First of all, he appeared in small claims court.  I mean,

5   I don't know how it is in the State of Washington, in

6   California you can't even -- if you're an attorney, you're

7   not allowed to represent somebody in small claims court,

8   unless you are the party who's representing yourself.  And so

9   I guess by virtue of the fact that he was an affiliate of the

10  property manager, I think that's what Ms. Tamaro said, why he

11  could represent them in small claims court.

12      But that's not something you hire a lawyer for.  That's

13  something you go in and do yourself.  And that's something

14  that should be included within the 4 percent management fee

15  for the property manager.

16      More significantly, he also charged the partnership for

17  over $10,000 worth of fees that he incurred in defending

18  Trieste Holdings, the management company, against claims for

19  workplace discrimination.  And I'd like to go back to the

20  property management agreement.  And I'd like to direct the

21  Court's attention to sections -- I want to look at 5.7 and

22  then 5.6.  They're both Exhibit 40, at page 8.

23      Starting with 5.7, and this is what I showed Ms. Tamaro.

24  On her direct examination, she just said, well, this is --

25  this requires that we indemnify the manager for this type of

1    a claim.  But if you read the language here, it clearly says

2    that the indemnification obligation is only for claims and

3    suits that are attributable to bodily injury, sickness,

4    disease or death, or to injury or destruction of tangible

5    property.

6        And Ms. Tamaro acknowledged on the stand that this Dienes

7    matter, for which Mr. Arterberry charged the partnership, I

8    believe it's over $12,000, does not fall into any of those

9    categories.

10       And, in fact, if we go to 5.6, which is the provision

11   immediately before 5.7, there's a section that's called

12   indemnification of owner.

13       Now, owner is the partnership.  And this provision

14   specifically says that the manager, Trieste, indemnifies the

15   owner, the partnership, for these types of claims.  All

16   claims, investigations and suits, with respect to any alleged

17   or actual violation of state or federal labor or other laws

18   pertaining to employees.  And this discrimination, employee

19   discrimination case falls squarely within this

20   indemnification obligation.

21       So it was the property manager, Trieste's obligation to

22   indemnify the partnership for these claims, not the other way

23   around.  And so that's another fee that was made by an

24   affiliate of Ms. Tamaro, and was improperly attributed to the

25   partnership.

1      Very briefly on the rent credits, Mr. Krabbenschmidt

2  confirmed that rent credits are appropriate when they're

3  given to employees to live on the property, and those

4  employees are necessary to respond to emergencies on nights

5  and weekends.  But Ms. Tamaro confirmed, at her deposition,

6  that numerous rent credits were used to pay for rent at

7  different properties, also owned by Ms. Tamaro, and that at

8  least one rental credit was provided to an individual who was

9  neither an employee nor necessary emergency personnel.

10      And, Your Honor, I recognize it may seem picky to focus on

11  these details, but these are simply further evidence of

12  Ms. Tamaro's belief that she is in complete control of these

13  partnerships, and can run them however she sees fit,

14  irrespective of her contractual obligations and

15  industry-accepted norms.

16      The Hearthstone fee.  And I know that this wasn't made to

17  one of her affiliates, and I don't want to belabor the point

18  here, but she was asked on the stand by Ms. Latsinova, she

19  was asked, "Counsel asked you about whether there was a

20  specific provision in the LPA that allows you, for example,

21  to advance funds to pay Hearthstone's fees when the cash flow

22  is insufficient to pay it.  Do you recall that?"  Answer:

23  "Yes."  Question:  "What provision in the LPA did you rely on

24  when you made these advances?"  Answer:  "Hearthstone's fee

25  kind of slips between the cracks of the LPA.  We categorized

1    it as a subordinated loan."

2         And the reason why it slips between the cracks, as

3    Ms. Tamaro put it -- in reality, it doesn't slip between the

4    cracks, there's very clear provisions how that fee is

5    supposed to be paid.  It is supposed to be paid with cash

6    flow, when it's available.  And if the cash flow is not

7    available, then it's not supposed to be paid.

8         If Ms. Tamaro was concerned that the nonprofit would walk

9    if it wasn't going to get this fee, nothing prohibited her

10   from calling up the limited partner and say:  Gee whiz, if

11   the nonprofit doesn't get paid, then they're going to walk

12   and we're going to lose this property tax exemption, can we

13   amend the partnership agreement so that I can pay them out of

14   advances?  But she didn't do that.  She went ahead and did it

15   on her own, without telling the limited partner.

16        And there is nothing in the amendment to the partnership

17   agreement, admitting Hearthstone, that allows it to

18   unilaterally walk away from its obligations under this

19   agreement.

20        So to the extent that Ms. Barrick is comparing the fees

21   advanced to Hearthstone, against the property tax exemption

22   that it created for the partnership, that's not a fair

23   comparison, because those obligations went to Hearthstone.

24   And Hearthstone specifically bargained for its rights under

25   that agreement.  And what it wanted was fees, if there was

1    available cash flow, not operating advances from Ms. Tamaro.

2       And I won't spend any time on the rental rates.  I

3    understand that.

4       Now, on Parkway, going back to the end result of what we

5    want to do here, so I've raised fees that I think are

6    inappropriate.  I've explained to you how I think that should

7    be dealt with, which is to reduce the subordinated loan.

8       Then the question becomes, what about the appraisal

9    process?  And as things stand right now, there has been an

10   appraisal by the general partner.  And what the general

11   partner has asked you to do, if I understood Mr. Goodnight

12   correctly, is to say that we breached the partnership

13   agreement by not participating in the process, and punish us

14   by not allowing us to appoint our appraiser and to go through

15   the appraisal process contemplated by Section 7.4J.

16      And, Your Honor, I respectfully submit that would not be

17   warranted here, it's not permitted under the partnership

18   agreement, and that what should happen is that we should

19   follow the appraisal process that's contemplated in Section

20   7.4J.

21      They've submitted an appraisal.  We took the position that

22   they had been removed, and that we didn't need to participate

23   in the appraisal process.  I understand that Your Honor is

24   denying that.  But Your Honor also found that there were

25   triable issues on that.  And that we came to court and made

1    our showings here that they have been removed.

2        And given our position that they've been removed, we

3    weren't going to participate in an appraisal process.  We now

4    understand, at least Your Honor is indicating that you're

5    taking removal off the table.  So that should then allow us

6    to go back and say, okay, we'll participate in the appraisal

7    process now.  And we're not saying like they did, oh, well

8    we're going to retroactively accept some other appraisal that

9    happened some other time and force you to accept that.  All

10   we're saying is, let's follow the contract.  The contract

11   says they appoint an appraiser, we appoint an appraiser.

12   They try to come up with an agreed-upon value.  If they do,

13   that's the final price.  If they don't, then they appoint a

14   third appraiser.  Not Ms. Tamaro appoint it, not we appoint

15   it, the two appraisers appoint a third appraiser.  Then that

16   appraiser determines the fair market value of the property.

17       That then gets run through the waterfall as of the day of

18   liquidation, and as adjusted by the reductions in the

19   subordinated loans as a result of Your Honor's findings.

20       So that's kind of the big picture under the circumstances,

21   given we can't get our first best option, what we'd be

22   looking to do in Parkway.

23            THE COURT:  Okay.

24            MR. PETTIT:  And, Your Honor, I don't want to take up

25   all the remaining time, but I just will say, for the record,

 1  that what we are seeking here is simple and straightforward.

 2  We believe that the general partner has exhibited, by its

 3  conduct, including -- to be honest, Your Honor -- the failure

 4  to be able to deliver the audits for 2018.  And we haven't

 5  talked about that much at all.  That's a requirement in the

 6  partnership agreement.  It has to be done.

 7         THE COURT:  That's a bridge too far.

 8         MR. PETTIT:  Well, understood, Your Honor.  I just

 9  wanted to make the point for the record that there's clear,

10  unambiguous contractual language that requires that to be

11  provided by a date certain.

12         THE COURT:  This world and this lawsuit would be a

13  lot better without the experts.

14         MR. PETTIT:  Fair enough, Your Honor.

15         THE COURT:  And we have Ms. Lindal.  She would be on

16  the job doing it.

17         MR. PETTIT:  Well, Your Honor, again, I don't want to

18  belabor these points.  I had a whole presentation that I

19  thought was very compelling about the breaches of fiduciary

20  duty.  And I will say for the record that I understand that

21  the Business Judgment Rule is a very real thing.  I

22  understand that it gives a general partner, like Ms. Tamaro,

23  a large amount of discretion.  I understand that it is

24  inappropriate for AMTAX to be second guessing business

25  decisions that were made by the general partner.  However,

1   Your Honor, business judgment presumes good faith.  Business

2   judgment presumes that the general partner has pure motives

3   and is acting in a way to further the interests of the

4   partnership and its limited partners.

5       And I would respectfully suggest that the evidence here

6   shows that Ms. Tamaro was motivated by a different goal.

7           THE COURT:  I choose in this case to not find a

8   breach of the duty of good faith on either side.  I think the

9   allegation that Ms. Tamaro has lost rental income by her

10  pricing, is the absence of good faith from your side.  I've

11  already mentioned, in the decision I made on summary

12  judgment, that I found some bad faith on Ms. Tamaro's side.

13      So, I want to solve a problem.  I don't want -- I don't

14  want to defame anyone in this process.  You're all alphas.

15  And with a tack hammer, you could have gotten as much as what

16  you've gotten with a sledge hammer.

17          MR. PETTIT:  Well, Your Honor, I appreciate that.

18  And that's fair enough.  And I will accept that.

19          THE COURT:  No, no, no.

20          MR. PETTIT:  Constructive observation.

21          THE COURT:  It's meant with affection.

22          MR. PETTIT:  Thank you, Your Honor.  And I guess I'll

23  conclude at this point saying, I think what we have proposed,

24  what I have laid out for you is a very clear,

25  straightforward, simple way and fair way of resolving this

1    dispute, ensuring that we get the fair market value of our

2    interests, assuring that Ms. Tamaro gets to hold onto the

3    property.

4          THE COURT:  I'm focused on the subordinated loan.

5    And I think everything else, I'm prepared to resolve.

6          MR. PETTIT:  Thank you, Your Honor.

7          THE COURT:  Thanks.

8       Mr. Goodnight.

9          MR. GOODNIGHT:  Thank you, Judge.  Just two points.

10   First I want to say thank you to the Court and the staff.

11   This has been one of the most helpful and pleasant court

12   staffs that I have ever seen.

13         THE COURT:  Good.

14         MR. GOODNIGHT:  And it's been very pleasant and easy

15   to be here.  And it makes our work so much easier.  So thank

16   you all for that.

17         THE COURT:  Thank you.

18         MR. GOODNIGHT:  Just two things.  One is Exhibit 68,

19   which is the Parkway waterfall, we're 100 percent comfortable

20   with Your Honor resolving any fee issues, any disputes over

21   that waterfall.  I have nothing more to say about that,

22   unless you have questions.

23         THE COURT:  Nope.

24         MR. GOODNIGHT:  We do think there are two ways to do

25   this that makes sense to me.  One is to accept the appraisal

1  that's been done by the GP.  Or we're also okay if Your Honor

2  thinks a new appraisal needs to be done, provided that it's

3  at the date that the option was exercised, for Parkway.

4  Because I really am very concerned about this notion that a

5  limited partner can simply kind of dig in its heels and cross

6  its arms, and we have Mr. Krabbenschmidt making a damage

7  claim, so we're not going to participate, then take advantage

8  of the appreciation in this market, which is a lot of what

9  this case is about, frankly.  I think everyone knows that.

10 And now say let's re-tick the appraisal after we -- you know,

11 we are now a year and a half down the road.  So that's the

12 first point.

13     The second point, and then I'll be done.  Your Honor, I

14 think, noted the critical issue on this management fee, legal

15 services, repair supervision fee.  And that is the course of

16 dealing.  And the course of dealing in this case, very

17 importantly, includes the audits.  And I just want to note

18 that if Your Honor looks at what was the second slide in my

19 slide dec.

20         THE COURT:  Yeah.

21         MR. GOODNIGHT:  All of those fees from the project

22 management fee, B, legal services, C, et cetera, we've

23 included the references to the exhibits.  And I think what

24 the record will show, I think this is true, I don't think

25 there was ever -- you know, one of the things that's a little

 1    distressing to me is that what I think Ms. Tamaro and her

 2    husband genuinely believed is being industrious and solving

 3    problems and getting the job done, is viewed as a breach of

 4    trust or something else.  I just don't think it's true.

 5        But I think the record will show that there is not a

 6    single one of these fees, not one, where there wasn't a

 7    significant amount which we've listed of back and forth,

 8    including after the refinance.  And Ms. Tamaro was never

 9    hiding the ball on any of this.

10            THE COURT:  Right.

11            MR. GOODNIGHT:  And so to the extent that there's

12    ambiguity, that course of dealing seems to be very, very

13    important, and particularly as reflected in the audits.

14        So I have nothing further.  But thank you very much.

15            THE COURT:  Thank you.  Thank you all.  I will --

16    I've got a significant medical malpractice case starting

17    tomorrow.  So it will be probably the second week that I'll

18    get the findings of fact and conclusions of law out to you.

19            MR. GOODNIGHT:  Would Your Honor appreciate having

20    supplemental draft findings and conclusions?

21            THE COURT:  Absolutely.  Because I'm going to be

22    focusing on the other case for this week, you can revise and

23    extend your remarks in a submittal of findings and

24    conclusions if you wish.

25            MR. PETTIT:  Sure.  Your Honor, we'd be happy to

 1  submit supplemental findings.  When would you like to have

 2  that submitted?

 3          THE COURT:  By next Wednesday.  Not this Wednesday.

 4          MR. PETTIT:  A week from Wednesday?

 5          MR. GOODNIGHT:  Could we have a little bit more time,

 6  Your Honor?  I've got an enormous amount of personal and

 7  professional commitments.  Maybe 30 days?

 8          THE COURT:  All right.  That's fine.  But time is of

 9  the essence, on these appraisals and all of that.

10          MR. GOODNIGHT:  Yes.

11          THE COURT:  I mean, I can hum a few bars for you so

12  you know what you can do.

13      On the appraisal, on Hidden Hills, the third appraisal,

14  you can commit it, today's date.

15          MR. GOODNIGHT:  Okay.

16          THE COURT:  The Parkway, start the appraisal process

17  from the exercise of the option.

18          MR. GOODNIGHT:  Thank you, Your Honor.

19          THE COURT:  And that's just fundamental fairness for

20  who made the foot fault.

21          MR. GOODNIGHT:  Understood.

22          THE COURT:  And then now I just have to deal with the

23  subordinated loan and the waterfall.

24          MR. GOODNIGHT:  I think that's right.  Thank you very

25  much.

1    THE COURT:  All right.  Court will be at recess.

2                      (Recess.)

3

4                C E R T I F I C A T E

5

6

7    I certify that the foregoing is a correct transcript from

8    the record of proceedings in the above-entitled matter.

9

10

11   /s/ Debbie Zurn
     /s/ Angela Nicolavo
12

13   DEBBIE ZURN
     COURT REPORTER
14
     ANGELA NICOLAVO
15   COURT REPORTER

16

17

18

19

20

21

22

23

24

25